

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
WESTERN DIVISION
312 North Spring Street, Room G-8
Los Angeles, CA 90012
Tel: (213) 894-35

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4750

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

**SHERRI R. CARTER**
District Court Executive and
Clerk of Court



**FILED**

JUN - 3 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

**To:**   Clerk, United States District Court
Southern _____ District of California
880 Front Street, Suite 4290
San Diego, CA 92101

**Re:**   Transfer of our Civil Case No. CV 08-2310 JVS (SS)

Case Title: Javier Espinoza Rodriguez v. John C. Marshal, Warden

Dear Sir/Madam:

'08 CV 1007 H CAB

**An order having been made transferring the above-numbered case to your district, we are transmitting herewith our file:**

- ☐ Original case file documents are enclosed in paper format.
- ☑ Electronic Documents are accessible through Pacer.
- ☑ Other: Certified copy of the Transfer Order

Very truly yours,

Clerk, U.S. District Court

Date: 6/1/08

By  Ed Sambrano
Deputy Clerk

*cc:   All counsel of record*

---

**TO BE COMPLETED BY RECEIVING DISTRICT**

**Please acknowledge receipt via e-mail to appropriate address listed below and provide the case number assigned in your district:**

- ☑ CivilIntakecourtdocs-LA@cacd.uscourts.gov    (Los Angeles Office)
- ☐ CivilIntakecourtdocs-RS@cacd.uscourts.gov    (Riverside Office)
- ☐ CivilIntakecourtdocs-SA@cacd.uscourts.gov    (Santa Ana Office)

Case Number: _____

Clerk, U.S. District Court

Date: _____    By _____
Deputy Clerk

CV-22 (05/08)          **TRANSMITTAL LETTER - CIVIL CASE TRANSFER OUT**

1

2    I hereby attest and certify on 6/2/08
     that the foregoing document is a full, true
3    and correct copy of the original on file in
     my office, and in my legal custody.
4
     CLERK, U.S. DISTRICT COURT
5    CENTRAL DISTRICT OF CALIFORNIA

6              DEPUTY CLERK



(1098)



Priority ✓
Send ✓
Enter ✓
Closed
JS-5/JS-6 ✓
JS-2/JS-3
Scan Only

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11   JAVIER ESPINOZA RODRIGUEZ,        )    NO. CV 08-02310 JVS (SS)
                                       )
12              Petitioner,            )
                                       )    **ORDER TRANSFERRING ACTION TO**
13        v.                           )
                                       )    **SOUTHERN DISTRICT OF CALIFORNIA**
14   JOHN C. MARSHALL, Warden,         )
                                       )
15                                     )
                Respondent.            )
16   _____)

17

18        On April 8, 2008, Petitioner, a California state prisoner

19   proceeding <u>pro</u> <u>se</u>, filed a Petition for Writ of Habeas Corpus

20   ("Petition") pursuant to 28 U.S.C. § 2254. Upon review of the Petition,

21   the Court finds that, in the interest of justice, this case should be

22   transferred to the United States District Court for the Southern

23   District of California.

24

25        A petition for writ of habeas corpus brought by a state prisoner

26   may be filed in the United States District Court for either the judicial

27   district in which the petitioner is presently confined or the judicial

28   district in which he was convicted and sentenced. <u>See</u> 28 U.S.C.

2241(d); <u>Braden v. 30th Judicial Circuit Court of Ky.</u>, 410 U.S. 484, 497, 93 S. Ct. 1123, 35 L. Ed. 2d 443 (1973).  The current Petition attacks a conviction sustained and sentence imposed in the San Diego County Superior Court, which is within the jurisdictional boundaries of the United States District Court for the Southern District of California.  <u>See</u> 28 U.S.C. § 84(d).  Petitioner is presently confined on the San Diego County conviction at the California Men's Colony in San Luis Obispo County, California.  San Luis Obispo County is within the jurisdictional boundaries of the United States District Court for the Central District of California.  <u>See</u> 28 U.S.C. § 84(c).  Thus, jurisdiction over the Petition exists concurrently in the Southern District of California and the Central District of California.

However, the Court has determined that the Southern District of California is the more appropriate forum for adjudication of the Petition.  <u>Braden</u>, 410 U.S. at 493-500 (applying traditional venue considerations to determination of where the action should be located); <u>see also</u> <u>Fest v. Bartee</u>, 804 F.2d 559, 560 (9th Cir. 1986) (same).  Petitioner attacks his conviction and sentence rather than the execution of his sentence.  Accordingly, all relevant evidence, records and witnesses are more readily available within the Southern District of California.  Moreover, the expense and risk of transporting Petitioner to the Southern District of California, in the event that his presence is necessary for a hearing, would likely be outweighed by the costs and difficulties of transporting the records and witnesses to the Central District of California.  This is especially true because habeas petitions are often resolved without requiring the petitioner's presence in court.  <u>Braden</u>, 410 U.S. at 498.  Thus, the Court concludes that this

1   action should be brought in the Southern District of California rather
2   than the Central District of California.

3

4       Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and
5   witnesses, in the interest of justice, a district court may transfer any
6   civil action to any other district or division where it might have been
7   brought." <u>See also</u> <u>Braden</u> 410 U.S. at 497, 499 n.15 (stating that
8   courts can transfer habeas cases to the district of conviction, which is
9   ordinarily the more convenient forum). Accordingly, in the interest of
10  justice, IT IS ORDERED that the Clerk of the Court transfer this matter
11  to the United States District Court for the Southern District of
12  California.

13

14      IT IS FURTHER ORDERED that the Clerk serve a copy of this Order on
15  Petitioner.

16

17

18      IT IS SO ORDERED.

19

20  DATED: _____ 5.30.08 .

21

22                                      JAMES V. SELNA
                                        UNITED STATES DISTRICT JUDGE

23  PRESENTED BY:

24

25  SUZANNE H. SEGAL
    UNITED STATES MAGISTRATE JUDGE
26

27

28

                                        3

194, CLOSED, TRANSFERRED

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:08-cv-02310-JVS-SS

Javier Espinoza Rodriguez v. John C Marshall
Assigned to: Judge James V. Selna
Referred to: Magistrate Judge Suzanne H. Segal
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 04/08/2008
Date Terminated: 05/30/2008
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

## Petitioner

**Javier Espinoza Rodriguez**

represented by **Javier Espinoza Rodriguez**
CDC V-15361
California Mens Colony East
PO Box 8101
San Luis Obispo, CA 93409-8101

PRO SE

I hereby attest and certify on 6/2/08
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

DEPUTY CLERK

(1098)

V.

## Respondent

**John C Marshall**
*Warden-CMC*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/08/2008 | 1 | PETITION for Writ of Habeas Corpus by a Person In State Custody (28:2254) Case assigned to Judge James V. Selna and referred to Magistrate Judge Suzanne H. Segal.(Filing fee $ 5 DUE.), filed by Petitioner Javier Espinoza Rodriguez. (Attachments: # 1 Part 1 to Petition# 2 Part 2 to Petition# 3 Part 3 to Petition# 4 Part 4 to Petition# 5 Part 5 to Petition# 6 Part 6 to Petition# 7 Part 7 to Petition# 8 Part 8 to Petition# 9 Part 9 to Petition.) (et) (Entered: 04/16/2008) |

| 04/08/2008 | 2 | NOTICE OF REFERENCE TO A U.S. MAGISTRATE JUDGE. Pursuant to the provisions of the Local Rules, the within action has been assigned to the calendar of Judge James V. Selna and referred to Magistrate Judge Suzanne H. Segal to consider preliminary matters and conduct all further matters as appropriate. The Court must be notified within 15 days of any change of address. (et) (Entered: 04/16/2008) |
| 05/30/2008 | 3 | ORDER by Judge James V. Selna transferring case to Southern District of California. Certified copy of the transfer order and docket sheet sent. (MD JS-6. Case Terminated.) (Attachments: # 1 Letter Transmittal Letter) (esa) (Entered: 06/02/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/02/2008 10:58:57 | | |
| **PACER Login:** us3877 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 2:08-cv-02310-JVS-SS End date: 6/2/2008 |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

[PETITIONER, IN PRO SE]

JAVIER ESPINOZA RODRIGUEZ [CELL # 6147]
NAME
CALIFORNIA MENS COLONY-EAST V-15361
PRISON IDENTIFICATION/BOOKING NO.
P.O. 8101
ADDRESS OR PLACE OF CONFINEMENT
SAN LUIS OBISPO, CA 93409-8101

Note:   It is your responsibility to notify the Clerk of Court in writing of any
        change of address. If represented by an attorney, provide his name,
        address, telephone and facsimile numbers, and e-mail address.

```
                          FILED
              CLERK, U.S. DISTRICT COURT

                     APR - 8 2008
                        1.56pm
              CENTRAL DISTRICT OF CALIFORNIA
              BY            KGM         DEPUTY
```

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JAVIER ESPINOZA RODRIGUEZ,

FULL NAME (Include name under which you were convicted)

                                              Petitioner,

                    v.

JOHN C. MARSHALL [WARDEN-CMC],

NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

                                              Respondent.

CASE NUMBER:

CV 08 - 02310 JVS SS

To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY
### 28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION _____
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)
CV _____
CV _____

### INSTRUCTIONS - PLEASE READ CAREFULLY

1.   To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.   In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3.   Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.   Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you may be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.   You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

5.   You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

6.   When you have completed the form, send the original and two copies to the following address:
     Clerk of the United States District Court for the Central District of California
     United States Courthouse
     ATTN: Intake/Docket Section
     312 North Spring Street
     Los Angeles, California 90012

```
         LODGED
  CLERK, U.S. DISTRICT COURT

        APR - 3 2008

  CENTRAL DISTRICT OF CALIFORNIA
  BY                      DEPUTY
```

CV-69 (04/05)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C § 2254)

Page 1 of 10

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue

   a. Place of detention: California Men's Colony-East [as addressed-front page].

   b. Place of conviction and sentence: San Diego County Superior Court.

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).

   a. Nature of offenses involved (*include all counts*): Attempting to Dissuade a Witness/Reporting a Crime; Car Burglary; Gang-Enhancements; Gun-Enhancements; Carrying Weapon Concealed within Vehicle; Carrying Loaded Firearms; Firearm Used in Crime, and ect.

   b. Penal or other code section or sections: P.C. §§ 136(b)(1); 459 [2nd Degree Vehicle]; 12025(a)(1); 12031(a)(1); ; 186.22 et. seq.; and 12022.5; plus 667(b)-(i).

   c. Case number: SCS176087.

   d. Date of conviction: 8-15-03.

   e. Date of sentence: 10-14-03.

   f. Length of sentence on each count: Count 1: 1-year, 4-months; Count 2: 2x2 [doubled per strike]=4; Count 3: 2x2 [doubled per strike]=4; Count 4: 2x2 [doubled per Strike]=4; Enhancements under Count 2, and Count 2, 4, &

   g. Plea (*check one*): 5-years=Total 14-years, and 4-months at 85%.

      ☒ Not guilty

      ☐ Guilty

      ☐ Nolo contendere

   h. Kind of trial (*check one*):

      ☒ Jury

      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?    ☒ Yes  ☐ No

   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):

   a. Case number: DO43198.

   b. Grounds raised (*list each*):

      (1) 10-Grounds+added 3-New Grounds, and additional claims under [IAC]: Please see extensive Headings within.

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C § 2254)

    (2) _____

    (3) _____

    (4) _____

    (5) _____

    (6) _____

c.  Date of decision: <u>5-5-05.</u>

d.  Result <u>Affirmed.</u>

_____


4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?  ☒ Yes  ☐ No.

If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a.  Case number: <u>S133875. Copy at Exhibits A, & H.</u>

b.  Grounds raised *(list each)*:

    (1) <u>Please see Exhibits A & H.</u>

    (2) <u>Also, please see Exhibit H [behind Post-Card Denial Supreme Ct. [Ca]]: See</u>

    (3) <u>Addendum [#2]: GENERALITIES OF THE APPLICABILITIES OF CUNNINGHAM, OF</u>

    (4) <u>WHICH VIOLATE THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES</u>

    (5) <u>CONSTITUTION.</u>

    (6) _____

c.  Date of decision: <u>7-20-05.</u>

d.  Result <u>Dismissed Without Prejudice, to re-file according to People v Black:</u>

_____


5.  If you did not appeal:

a.  State your reasons <u>N/A.</u>

_____

_____

_____

_____

b.  Did you seek permission to file a late appeal?  ☐ Yes  ☒ No


6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☒ Yes  ☐ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*: All such petitions are parts of this Federal Petition.

_____

a.  (1) Name of court: San Diego County Superior Court.

   (2) Case number: HSC 10837.

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* 7-11-06.

   (4) Grounds raised *(list each):*

   (a) Please see extensive Headings, Grounds, Claims, & Issues within.

   (b) _____

   (c) _____

   (d) _____

   (e) _____

   (f) _____

   (5) Date of decision: 8-10-06.

   (6) Result  Denied, please see Decision within Exhibit F.

   _____

   (7) Was an evidentiary hearing held?    ☐ Yes   ☒ No


b.  (1) Name of court: Fourth Appellate District, Division One.

   (2) Case number:  D049739.

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* 10-29-06.

   (4) Grounds raised *(list each):*

   (a) Please see infra & supra.

   (b) _____

   (c) _____

   (d) _____

   (e) _____

   (f) _____

   (5) Date of decision: On or about March 8, 2007.

   (6) Result  Denied with written Decision-please see Exhibit G.

   _____

   (7) Was an evidentiary hearing held?    ☐ Yes   ☒ No


c.  (1) Name of court: The Honorable Supreme Court of the State of California.

   (2) Case number: S153884.

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* On or about June 19, 2007.

   (4) Grounds raised *(list each):*

   (a) Please infra & supra.

   (b) Subsequently to, the Supreme Court's Denial; further arguments regarding: **THE APPLICABILITIES OF NUMEROUS STANDARDS OF REVIEWS, REGARDLESS OF WHICH STATNDARD APPLIES: PARTS A-D-attached to pp. 1-33.**

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: 12-12-07.

(6) Result Denied. Please see **Exhibit H.**

_____

(7) Was an evidentiary hearing held?    ☐ Yes    ☒ No

7.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the <u>facts</u> supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**    *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

a.  Ground one: Please see the attached pleading papers with extensive headings, ect.

(1) Supporting FACTS: Same.

_____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☒ Yes    ☐ No

b.  Ground two: Same as above. Due to numerous claims of [IAC] being added after direct appeal, petitioner filed his Habeas Corpus into the Superior Court,

(1) Supporting FACTS: Same as above.
aAppellate Court, and The Supreme Court.

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☒ Yes   ☐ No

c.  Ground three: _See above._ _____

_____

(1) Supporting FACTS: _See above._ _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?   ☒ Yes   ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes   ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☒ Yes   ☐ No

d.  Ground four: _See above._ _____

_____

(1) Supporting FACTS: _See above._ _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?   ☒ Yes   ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes   ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☒ Yes   ☐ No

e.  Ground five: _See above._ _____

_____

(1) Supporting FACTS: _See above._ _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?   ☒ Yes   ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes   ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☒ Yes   ☐ No

8.  If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: N/A.

    _____

    _____


9.  Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

    ☐ Yes   ☒ No

    If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

    a.  (1) Name of court: N/A.

        (2) Case number: _____

        (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

        (4) Grounds raised *(list each)*:

            (a) _____

            (b) _____

            (c) _____

            (d) _____

            (e) _____

            (f) _____

        (5) Date of decision: _____

        (6) Result _____

        (7) Was an evidentiary hearing held?   ☐ Yes   ☐ No

    b.  (1) Name of court: N/A.

        (2) Case number: _____

        (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

        (4) Grounds raised *(list each)*:

            (a) _____

            (b) _____

            (c) _____

            (d) _____

            (e) _____

            (f) _____

        (5) Date of decision: _____

        (6) Result _____

(7) Was an evidentiary hearing held?    ☐ Yes ☐ No

10. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect

to this judgment of conviction?    ☐ Yes ☒ No

If so, give the following information *(and attach a copy of the petition if available)*:

    (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

11. Are you presently represented by counsel?    ☐ Yes ☒ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____

*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on ___3-27-08___

        *Date*                *Signature of Petitioner*

Name  JAVIER ESPINOZA RODRIGUEZ                                                     MC-275

Address  CALIFORNIA MENS COLONY-EAST 6255

_____ P.O. BOX 8101 _____

_____ SAN LUIS OBISPO, CA 93409-8101 _____

CDC or ID Number  V-15361

## IN THE SUPREME COURT

## OF THE STATE OF CALIFORNIA
### (Court)

PETITION FOR WRIT OF HABEAS CORPUS

| | |
|---|---|
| JAVIER ESPINOZA RODRIGUEZ | No. _____ |
| Petitioner | *(To be supplied by the Clerk of the Court)* |
| vs. | |
| JOHN C. MARSHALL [WARDEN] | |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

Name JAVIER ESPINOZA RODR___Z

Address CALIFORNIA MENS COLONY-EAST

P.O. BOX 8101

SAN LUIS OBISPO, CA 93409-8101

PETITIONER, IN PRO PER

CDC or ID Number V-15361

F I L E D

Stephen M. Kelly, Clerk

**NOV - 6 2006**

Court of Appeal Fourth District

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

(Court)

PETITION FOR WRIT OF HABEAS CORPUS

JAVIER ESPINOZA RODRIGUEZ,
Petitioner

vs.

JOHN MARSHALL [WARDEN-CMC],
Respondent

No. **D049739**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS - READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January1, 1999]
Optional Form
CHC-115-010 (06/02) 0578

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.
Cal. Rules of Court, rules 56.5,201(h)

MC-275

COPY

Name _____

Address California Mens Colony-East

P.O. Box 8101

San Luis Obispo, Ca 93409-8101

CDC or ID Number  V-15361 _____

IN THE STATE OF CALIFORNIA

IN AND FOR THE SUPERIOR COURT OF SAN DIEGO COUNTY
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

| | |
|---|---|
| Javier Espinoza Rodriguez | No. _____ |
| Petitioner | *(To be supplied by the Clerk of the Court)* |
| vs. | |
| John C. Marshall | |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

[X] A conviction

[X] A sentence

[ ] Jail or prison conditions

[ ] Parole

[ ] Credits

[ ] Prison discipline

[X] Other (specify): __Enhancements under Penal Code § 186.22 et. seq.; and § 2933.1=85% Loss__ credit.

Your name: __Javier Espinoza Rodriguez__

1. Where are you incarcerated? __California Mens Colony-East__

3. Why are you in custody?  [X] Criminal Conviction  [ ] Civil Commitment

Answer subdivisions a. through i. to the best of your ability.

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
   __Attempting to Dissuade a Witness/Reporting a Crime; Car Burglary; and Gang-Enhancements,__
   __Gun-Enhancement under the[STEP-ACT]; ect.; please see within for additional offenses.__

b. Penal or other code sections: __P.C., §§ 136.1(b)(1); 459; 1205(a)(1); 12031(a)(1); 186.22et. seq.;__
   __and 12022.5; ect.; please see within for additional offenses.__

c. Name and location of sentencing or committing court: __THE SUPERIOR COURT OF SAN DIEGO COUNTY, IN AND FOR THE STATE OF CALIFORNIA.__

d. Case number: __SCS176087.__

e. Date convicted or committed: __8/15/03.__

f. Date sentenced: __10/14/03.__

g. Length of sentence: __14-years, and 4-months at 85%.__

h. When do you expect to be released? __2015-approximately.__

i. Were you represented by counsel in the trial court?  [X] Yes.  [ ] No. If yes, state the attorney's name and address:
   __Benjamin San chez: #85 Third Ave, Chula Vista, Ca 91910__

4. What was the LAST plea you entered? (check one)

   [X] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?
                    /PPrior
   [X] Jury  [X] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Please see attached Grounds (1)-(13), pages 1-33.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

Please see attached Grounds (1)-(13), pages 1-33.

b. Supporting cases, rules, or other authority (optional):

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

"Same as above".

**PETITION FOR WRIT OF HABEAS CORPUS**

MC-275 [Rev. July 1, 2005]

Page three of six

Case 2:08-cv-02310-JVS-SS    Document 1    Filed 04/08/2008    Page 14 of 50

7. **Ground 2 or Ground** _(if any):_

Please see attached Grounds (1)-(13), pages 1-33.

a. Supporting facts:

"Same as above".

b. Supporting cases, rules, or other authority:

"Same as above".

8. Did you appeal from the conviction, sentence, or commitment? [X] Yes. [ ] No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
Court of Appeals, Fourth District, Division One, 750 "B" Street, Suiet 300

San Diego, Ca 92101                                    c. Date of decision: April 5, 2005

b. Result  Affirmed

d. Case number or citation of opinion, if known:  No. D043198

e. Issues raised: (1)  (1)-(10) Issues: Please see Petitoner's Petion for Review-Exhibit A.
                                                                                        "
   (2) _____"_____"
   (3) _____"_____

f. Were you represented by counsel on appeal? [X] Yes. [ ] No. If yes, state the attorney's name and address, if known:

Robert L. Swain: 964 Fifth Ave., Suiet 214, San Diego, Ca 92101

9. Did you seek review in the California Supreme Court? [X] Yes [ ] No. If yes, give the following information:

a. Result  Dismised Without Prejudice, to re-file.   b. Date of decision: July 20, 2005-Exh. A-end

c. Case number or citation of opinion, if known:   S133875

d. Issues raised: (1)  "Same as the above.".
   (2) _____"_____"_____
   (3) _____"_____"_____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Ineffective Assistance of Counsel-Please see Issues (1)-(13)-this Petition.

_____

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? [ ] Yes. [ ] No.
   *Attach documents that show you have exhausted your administrative remedies.*

**PETITION FOR WRIT OF HABEAS CORPUS**

MC-275 (Rev. July 1, 2005)

Case 3:10-cv-0510-JVS-SS   Document 1   Filed 04/08/2010   Page 16 of 50

12. Other than direct appeal, have you filed other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

    b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

    c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
    N/A: Investigation into additional meritable claims & issues; and to Federalize old & new claims and issues.

16. Are you presently represented by counsel?  ☒ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    N/A.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 7-11-06                              (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]        PETITION FOR WRIT OF HABEAS CORPUS        Page six of six

12. Other than direct appeal, have you filed other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: Superior Court, County of San Diego

   (2) Nature of proceeding (for example, "habeas corpus petition"): Habeas Corpus-Petition for Writ.

   (3) Issues raised: (a) Please see Petition-attached MEMORANDUM OF POINTS AND AUTHORITIES and CLAIMS AND ISSUES.

   (b) _____

   (4) Result (Attach order or explain why unavailable): Court's Denial and Petitioner's Rebuttal-attached as EXHIBIT F.

   (5) Date of Decision: August 10, 2006.

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

   (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of Decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a seperate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
   N/A.

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
   N/A.

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   N/A.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 10-29-06       (SIGNATURE OF PETITIONER)       Page six of six

MC-275 [Rev. January1, 1999]     **PETITION FOR WRIT OF HABEAS CORPUS**

12. Other than direct appeal, have you filed other petitions, applications or motions with respect to this conviction, commitment, or issue in any court?    [X] Yes. If yes, continue with number 13.    [ ] No. If no, skip to number 15.

13. a.  (1) Name of court: _____

        (2) Nature of proceeding (for example, "habeas corpus petition"): _____

        (3) Issues raised: (a) _____

            (b) _____

        (4) Result (Attach order or explain why unavailable): _____

        (5) Date of decision: _____

    b.  (1) Name of court: IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA, FOURTH APPELLATE, DIVISON ONE

        (2) Nature of proceeding: Petition for Writ of Habeas [Corpus].

        (3) Issues raised: (a) Please see Petition and it's attached MEMORANDUM OF POINTS AND AUTHORITIES and CLAIMS AND ISSUES.

            (b) _____

        (4) Result (Attach order or explain why unavailable): Court's Denial and Petitioner's Rebuttal—within the separately bound exhibits.

        (5) Date of decision: March 8, 2007.

    c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
    N/A.

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
    N/A.

16. Are you presently represented by counsel?    [ ] Yes.    [X] No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?    [ ] Yes.    [X] No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    N/A.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 6-10-07                                    ▶ _____
                                                      (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]        PETITION FOR WRIT OF HABEAS CORPUS                    Page six of six

~~ISSUES FOR STATE EXHAUSTION AND~~
ADDENDUM OF NEW ISSUES
AND CLAIMS

INTRODUCTION:

The expansion of all issues are based mainly on the boot-strapping of issues to claims of ineffective assistance of trial counsel, in the first instance. Plus, as all arguments will show, additional claims of Due Process and Equal Protection will also be added for the purpose of federalization of all issues within Petitioner's (PETITION FOR REVIEW[postly filed, but denied without prejudice by our Honorable California Supreme Court pending the outcome of People v. Black(2005) 35 Cal.4th 1238 regarding the effect of Blackly v. Washington(2004) 542 U.S.296, 124 S.Ct. 2531, and United States v. Booker(2005) 543 U.S. __ , 125 S.Ct. 738; on California Law].) (Please see EN BANC hearing denial-attached hereto back of Petition, as Exhibit A.)

THE EXPANSION PLUS FEDERALISM
OF ALL ISSUES TO CLAIMS FOR STATE EXHAUSTION

ISSUES AND CLAIMS PRESENTED:

I.  REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO REPLACE A JUROR WHO WAS UNABLE TO UNEQUIVOCALLY STATE THAT SHE WOULD DECIDE THE CASE BY REFERENCE EXCLUSIVELY TO THE LAW AND THE EVIDENCE/DENIAL OF DUE PROCESS, EQUAL PROTECTION OF THE LAW AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

II. THE PETITION FOR REVIEW SHOULD BE GRANTED BECAUSE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH MR. RODRIGUEZ ATTEMPTED TO DISSUADE A WITNESS/DENIAL OF DUE PROCESS, EQUAL PROTECTION OF THE LAW, AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

III. REVIEW SHOULD BE GRANTED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED FOR BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH ANY CRIMINAL STREET GANG/DENIAL OF DUE PROCESS, EQUAL PROTECTION OF THE LAW, AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

   A. The Evidence Is Insufficient to Establish That "Sidro" Is a Criminal Street Gang

   B. The State Presented Insufficient Evidence that Any Of The Offenses Were Committed For The Benefit Of, At The Direction Of, And In Association With A Criminal Street Gang With The Specific Intent To Promote, Further And Assist In Criminal Conduct By Gang Members

Case 3:08-cv-01007-JVS-SS    Document 1    Filed 04/08/2008    Page 20 of 50

IV.  REVIEW SHOULD BE GRANTED BECAUSE THERE WAS INSUFF
     EVIDENCE TO EST. SE BEYOND A REASONABLE DOUBT
     THAT MR. RODRIGUEZ WAS AN ACTIVE PARTICIPANT OF A
     CRIMINAL STREET GANG/DENIAL OF DUE PROCESS, EQUAL PROTECTION
     AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH
     AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

V.   REVIEW SHOULD BE GRANTED BECAUSE MARTINEZ'S TESTIMONY
     REGARDING THE ALLEGED STATEMENTS MADE BY OFFICERS
     ABOUT FIELD INTERVIEWS IS VIOLATIVE OF MR. RODRIGUEZ'S SIXTH
     AMENDMENT RIGHT TO CONFRONTATION/DUE PROCESS, AND EQUAL
     PROTECTION OF THE LAW UNDER THE FIFTH,
     SIXTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

VI.  REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT
     ERRED BY ALLOWING IMPROPER PRIOR ACT EVIDENCE THAT
     PREJUDICED THE DEFENDANT's RIGHT TO A FAIR TRIAL/
     DENIAL OF DUE PROCESS, EQUAL PROTECTION AND INEFFECTIVE
     ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND
     FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

VII. REVIEW SHOULD BE GRANTED BECAUSE THE COURT ERRED
     IN FAILING TO GIVE A LESSER INCLUDED OFFENSE
     INSTRUCTIONS FOR COUNTS THREE AND FOUR/DENIAL OF
     DUE PROCESS, EQUAL PROTECTION UNDER THE LAW AND
     INEFFECTIVE ASSISTANCE OF COUNSEL
     UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS
     TO THE UNITED STATES CONSTITUTION

VIII. REVIEW SHOULD BE GRANTED BECAUSE THE IMPOSITION OF
     CONSECUTIVE SENTENCES BASED ON JUDICIAL FACT FINDING
     IS VIOLATIVE OF THE SIXTH AMENDMENT

IX.  REVIEW SHOULD BE GRANTED BECAUSE THE COURT ABUSED
     ITS DISCRETION IN FAILING TO DISMISS THE STRIKE
     PRIOR/DENIAL OF DUE PROCESS, EQUAL PROTECTION OF THE
     LAW AND INEFFECTIVE ASSISTANCE OF COUNSEL, FIFTH,
     SIXTH AND FOURTEENTH AMENDMENTS OF THE
     UNITED STATES CONSTITUTION

X.   REVIEW SHOULD BE GRANTED BECAUSE THE ERRONEOUS
     JURY INSTRUCTION ON THE GANG ENHANCEMENT MANDATES
     REVERSAL BECAUSE IT MISLED THE JURY AS THE BURDEN
     OF PROOF AND THE ELEMENTS OF THE ENHANCE-
     MENT/DENIAL OF DUE PROCESS, EQUAL PROTECTION
     AND INEFFECTIVE ASSISTANCE OF COUNSEL
     UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS
     OF THE UNITED STATES CONSTITUTION

////

////

////

////

////

ADDENDUM OF NEW ISSUES
AND CLAIMS

XI.    EXCESSIVE FINES/RESTITUTION ORDERS BY THE TRIAL COURT
       ASSESSED AGAINST PETITIONER IN EXCESS OF THE COURT'S
       JURISDICTION AND LIKENING THE ORDER TO AN UNAUTHORIZED
       SENTENCE

XII.   REVERSAL SHOULD BE GRANTED BECAUSE PETITIONER'S
       CONVICTION UNDER PENAL CODE, SECTION 186.22 ET. SEQ.
       [CALIFORNIA'S GANG ENHANCEMENT LAWS] IS UNCONSTITUTIONAL
       AND IN EXCESS OF THE COURT'S JURISDICTION, OF WHICH,
       PROVIDED A DENIAL OF DUE PROCESS AND EQUAL PROTECTION
       UNDER THE LAW, ALL UNDER THE FIFTH AND FOURTEENTH
       AMENDMENT TO THE UNITED STATES CONSTITUTION

XIII.  REVERSAL SHOULD BE GRANTED BECAUSE THE COMBINATION
       OF NUMEROUS EVIDENTIARY ERRORS CAUSED THE TOTALITY
       OF CIRCUMSTANCES, OF WHICH, CONSTITUTED A DEPRIVATION
       OF SUBSTANTIVE DUE PROCESS DURING THE TRIAL COURT
       PROCEEDINGS

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF

I.    REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT
ABUSED ITS DISCRETION WHEN IT FAILED TO REPLACE A
JUROR WHO WAS UNABLE TO UNEQUIVOCALLY STATE THAT
SHE WOULD DECIDE THE CASE BY REFERENCE EXCLUSIVELY
TO THE LAW AND THE EVIDENCE/DENIAL OF DUE PROCESS,
EQUAL PROTECTION OF THE LAW AND INEFFECTIVE ASSISTANCE
OF COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION

Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUE I.,
pages 8-11, Exhibit A]. In addition, Petitioner claims denial of Due Process,
Equal Protection under the law and Ineffective assistance of counsel: Under
the Fifth, Sixth and Fourteenth Amendments to the United States Constitution,
respectively-as referenced above and articulated below. The Introduction,
Statement of Issues Presented for Review, Necessity for Review, Statement of
the Case, Statement of Facts, and Argument, the procedural background
assessments are contained within[Petitioner's PETITION FOR REVIEW, pages 1-8].

As stated in (Issue I.[i.e., references to Issues within Petitioner's
PETITION FOR REVIEW]), the trial court abused it's discretion by not removing
Juror #7, when that Juror unequivocally stated she was fearful for her and her
familie's lives, because of retaliation from the Defendant's. Ergo, Juror #10
also stated concerns about his and his familie's lives. [R.T.A. 157-174.]
However, the trial court ruled to excuse Juror #10. [R.T.A. 173; line 14.]
Apparently, the trial court determined that Juror #10 would always have the
thought of retaliation in the back of his mind; therefore, the Judge excused
him, a sound and reasonable determination. However, even with Defense
Counsel's and the District Attorney's stipulation to excuse Juror #7, the
Judge refused to excuse her; even though she had verbalized the identical
concerns for her and her familie's safety. [R.T.A. 159; 1-4.] Just because she
did not express herself as well as Juror #10 about the fear of retaliation
remaining in the back of his thoughts, that concern for Juror #7, she could
not automatically delete that concern out of her thoughts or mind. It would
remain there throughout the proceedings, thereby, an extraneous influence that

effected her verdict . . . she should put these Defendant' away in
along, long time, that way they cannot get to me or my family. That, of
course, is what we all would be thinking; that or the opposite, of which we
can reasonable deduce did not happen because, she would have voted to find
Defendants not guilty, and that did not happen.

The United States Supreme Court has ruled on this Extraneous Influences
upon jurors. In **Remmer v. United States**, 347 U.S. 227(1954): Extraneous
influences not only include juror contact with other people, but also juror
contact with evidence, and other extrinsic materials. In the event that a
juror is exposed to extraneous influences, the trial court "should determine
the circumstances, the impact thereof upon the juror, and whether or not it
was prejudicial, in a hearing with all interested parties permitted to
participate." (Citing **Remmer**, supra, 347 U.S. at 230.)

Although, it is true that the trial court conducted a hearing with all
interested parties, it abuse it's discretion by not considering the prejudice
already attached to the tainted proceedings: "Juror No. 7 : SURE, I GUESS IT
COULD BE. LIKE I SAID, I GUESS MY FEAR WOULD BE, EASILY PUT, WOULD BE FEAR OF
RETALIATION ONE WAY OR ANOTHER." (R.T.A. 159; 1-4.) Both parties believed that
therefore, Juror #7 had serious prejudicial extraneous influences of gang
retaliation against her and her family. This obviously tainted her judgment to
and caused her to find Defendants guilty for the sake of protecting her family
and herself; after-all, the trail judge wouldn't even protect her and her
family by excusing her, post to her admitting her fear of retaliation, of
which, was apparently, very difficult for her to do on the record. [R.T.A.
157-161.]

Therefore, all the above and the herein, in corporated references above,
are violations of Petitioner's Due Process, Equal Protection, and ineffective
assistance of trial counsel for not objecting to the abuse of discretion by
the Judge and counsel failed/refused to file a formal motion including cites
to authority on point. For obviously, since Juror #10 was allowed to be

Case 2:08-cv-02910-JVS-SS    Document 1    Filed 04/08/2008    Page 24 of 50

excluded by [ ] fair and impartial trial would   call that Juror #7

be allowed to be excluded also. The Deputy District Attorney[Sophia

Roach]stipulated to the exclusion of Juror #7; therefore, she could see for

herself the prejudicial affect/effect that could and did taint the fairness of

the trial proceedings. No reason to rebut Co-defendant's motion to excuse

Juror #7, because prejudice was presumed-already attached.

Under the Fifth, Sixth and Fourteenth Amendments to the United States

Constitution.

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

II.  THE PETITION FOR REVIEW SHOULD BE GRANTED BECAUSE
     THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH
     MR. RODRIGUEZ ATTEMPTED TO DISSUADE A WITNESS/DENIAL
     OF DUE PROCESS, EQUAL PROTECTION OF THE LAW
     AND INEFFECTIVE ASSISTANCE OF COUNSEL
     UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS
     TO THE UNITED STATES CONSTITUTION

         Incorporated by reference[PETITIONER'S PETITION FOR REVIEW, ISSUE II.,

pages 11-14, Exhibit A]. In addition, Petitioner claims denial of Due

Process, Equal Protection under the law and Ineffective Assistance of Counsel

under the Fifth, Sixth and Fourteenth Amendments to the United States

Constitution-as referenced above and articulated below.

         The only testimony regarding this Issue of Dissuading a Witness, is

Martin Herrera's[contained within (R.T. 159-197)]of which, does not prove the

elements beyond a reasonable doubt. Yes, there was a shot fired by Petitioner,

however, this shot was just to show-off, not to dissuade any witness or

witnesses. Accordingly, even to Mr. Herrera's testimony[see (R.T. 180-186)]the

suspects were told way before the shot was ever fired that they were calling

the Police. The Petitioner never heard that statement or pointed the gun at

anyone or anything, he only fired up into the sky. According to all the

witnesses testimony, none of them ever saw a gun, were never threatened by the

gun or even a statement (i.e., don't call the Police or we will...). There was

no evidence whatsoever, to show that Petitioner threatened them; only by the

sequence of events does the jury assume that since the shot happened

subsequently to, someone saying they were going to call the Police, that he

was guilty of Dissuading a Witness.

         A petitioner may challenge a state court verdict on the grounds that

there was insufficient evidence to support the conviction. In reviewing such

an argument, a state court or federal court must decide whether there was

sufficient evidence for a rational trier of fact to find the petitioner's

guilt beyond a reasonable doubt of the elements of the criminal offense as

defined by the state criminal codes. Jackson v. Virginia(1979) U.S. 307,

318-19[90 S.Ct. 2781; 61 L.Ed.2d 560]. Please compare[PETITIONER'S PETITION

FOR REVIEW, ISSUE II, pages 11-14], regarding (P.C., § 136.1, subdivision

7.

Case 2:08-cv-02370-JVS-SS    Document 1    Filed 04/08/2008    Page 26 of 50

[b][IIa]-and-be-clear therein. This is a clear viol.. on of Due Process and Equal Protection under the law.

Additionally, Petitioner's trial counsel failed/refuse to object to any of the testimony regarding this issue. Failed/refused to offer any expert testimony to offset the witnesses testimony, to even ask the witnesses point-blank[Did you ever feel you were being dissuading from calling the Police?]. Never requested a direct verdict in this regard or file a motion. His pre-trial investigation and preparation was totally ineffective. Did not even attempt to adequately test the Prosecution's Case-as stated infra and supra-as within the meaning of-(Cronic v. United States[1984] 466 U.S. 684, 655[L.Ed.2d 657, 104 S.Ct. 2039]).


[The Issues of III.-V., and their headings are quoted above in ISSUES AND CLAIMS PRESENTED.]


Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUES III.-V.,pages 14-28, Exhibit A-and those applicable HEADINGS]. In addition, Petitioner claims denial of Due Process, Equal Protection under the law and Ineffective Assistance of Counsel: Under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, respectively-as referenced above and articulated below.

Thus, in addition to the arguments in[ISSUES III.-V.]Petitioner claims an overall prejudicial effect ineffected the jury's mind as a whole and caused an unfair trial, ergo an impartial verdict. As stated herein, and incorporated with those[ISSUES III.-V.], without this overall tainting, the verdict of the jury would have favored Petitioner. Gang-affiliation evidence admitted to show bais or identity is cumulative and prejudicial:

It is well established that even where a defendant is known or proven to be a gang member, evidence of that gang membership too often leads to the impermissible inference that the defendant is guilty by virtue of his membership in a gang (People v. Cardenas[1982] 31 Cal.3d 897, 904-905, 184

Cal.Rptr. 165, 647 P.2d 569["there was a real danger that [the] jury would improperly infer that appellant had a criminal disposition because...appellant was a member of the Flores gang."]; **People v. Perez** (1981) 114 Cal.App.3d 470, 479, 170 Cal.Rptr. 619["The word gang...connotes opprobrious implications...[and]takes on a sinister meaning...to the prejudice of the defendant."]). The Court of Appeal in **People v. Maestas**(1993) 20 Cal.App.4th 1482, 1495, 25 Cal.Rptr.2d 644, in reversing a conviction due to the improper introduction of gang membership.

As the court concluded in **People v. Maestas** (1993),supra, 20 Cal.App.4th 1482, 1497-1498, 25 Cal.Rptr.2d 644: "[E]ven when offered to buttress identification, the prejudicial effect may be too great. (**People v. Perez** (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619].) As the Perez[italics omitted]court noted: 'It is fair to say that when word gang[quotation marks omitted]is used in Los Angeles County, one does not have visions of the characters from the 'Our Little Gang' series. The word gang...connotes opprobrious implications...[T]he word 'gang' takes on a sinister meaning when it is associated with activities".

Our Supreme Court has observed that "...evidence of common gang membership...is arguably of limited probative value while creating a significat danger of unnecessary prejudice."

Accordingly, to the case at bar, Petitioner's trial was infected with this unnecessary prejudice due to the Trial Court's rulings, the prosecutors misquotes and the failure/refusal of trial counsel to object to such.

The Trial Court-even with objections from the Petitioner's Co-Defendant's Counsel[Mr. Leahy]-made the erroneous ruling upon the Deputy District Attorney's[Sophia Roach]off point authorities regarding the above prejudicial effect and using Defendants' priors as predicate acts to prove the gang enhancements against the Petitioner. [R.T. 5-36.]

This is clearly abuse of discretion by the Trial Court and Prosecutorial Misconduct by the (D.D.A.), for she blatantly introduced proffered authority

on point that was incor...ect and very misleading.

Petitioner's Counsel[Mr. Sanchez]failed/refused to object to the above, in anyway or matter regarding the introduction of this very prejudicial material against the interest of his client. [R.T.A. 2-3; 10; 14: 6-7; 14: 8-15; and 22: 1-8.] He could not come up with any case cites on point-even with days to do the research-and therefore, could not offer a sustainable objection to the Prosecution's Case. Compare above case-cites and years derived, trial counsel could have discovered with very little effort.

Also, according to the ruling of the Trial Court and all other parties, that ruling was only made against Petitioner's Co-Defendant, not Petitioner. [R.T. 17: 1-17.]

Allowing Petitioner's Prior as a predicate and for impeachment purposes was of proportional Constitutional Error. If a prior conviction is an element of the charged offense, as it was here, Article I, § 28(f) of the California Constitution (Proposition 8) requires that "When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court. "The jury must be advised of the fact of the prior conviction, but not of its nature if the defendant stipulates to his status as a prior offender. The California Supreme Court has held that Art. I, § 28(f), permits disclosure of stipulated ex-felon status to a jury trying a charge as a violation of Pen C § 12021 because that status is an element of the offense. However, Art. I, § 28(f) "does not require the nature of prior convictions to go to the jury in such case, since that information is utterly irrelevant to the charge. Disclosure of the nature of the priors remains error in post-Proposition 8 trials" (__People v. Valentine__ [1986] 42 Cal.3d 170, 181-182, 228 Cal.Rptr. 25, 720 P.2d 913).

Thus, if the defendant offers to stipulate to the prior conviction allegation which is an element of the offense, the jury will be informed that the defendant is an "ex-felon" or has been convicted of one of the offenses listed as an element in the charged offense, but will not be informed of the

10.

nature of the prior conviction[People v. Robbins (1992) 1 Cal.App.4th 1699, 1701-1702, 13 Cal.Rptr.2d 451]. (See California Jury Instruction Criminal [6th ed.] No. 12:44 for example.)

The Petitioner's Counsel stipulated to that, but still during the Trial Court's Proceedings the prior's nature was shown; this, evidently was used as a predicate for the new offense, the gang enhancement and as a prior strike, for the purpose of the Three-strike Law[to double Petitioner's sentence and to only allow 20% reduction credits upon his sentence]. [R.T. 1-36.]

And for impeachment purposes[R.T. 4: 3-16], of which, Petitioner's Counsel submitted to the use. [R.T. 4: 12.] Thus, not only did these uses violate the California Constitution, but the United States Constitution of denial of Due Process, Equal Protection under the law and the right to effective assistance of counsel[see corresponding Amendments above—each HEADINGS]. The Trial Court Proceedings, the Statues, and related Constitutionally protected parts were violated and therefore, violations of Proportional U.S. Constitutional errors of, unnecessary prejudice. A federal petition for writ of habeas corpus will be granted only where a state's violations of its own evidentiary rules results in denial of federal fairness. Estelle v. McGuire (1991) 502 U.S. 62, 70[112 S.Ct. 475, 481; 116 L.Ed.2d 385]. There can be a denial of fundamental fairness if there was a single grossly prejudicial evidentiary ruling or if there were numerous evidentiary errors that the totality of circumstances constituted a deprivation of substantive due process. Just as due process can be violated when states fail to follow their own administrative regulations, due process is violated when a state fails to follow its own established criminal procedure and violates its own statutes or constitution. Hicks v. Oklahoma (1980) 447 u.s. 343[100 S.Ct. 2227; 65 L.Ed.2d 175].

Due to the above and below, the failure of the Trial Court to follow those procedural rules, have impacted the criminal proceedings of Petitioner. Bill v. United States (1962) 368 U.S. 424[82 S.Ct. 468; 7 L.Ed.2d 417].

11.

Combined, also with, the Prosecution's only witness; gang beweise

alleged statements made, the elements of the gang enhancements, and the very

insufficient evidence proffered to prove[that any of the offenses were

committed for the benefit of, at the direction of, and in association with a

criminal street gang with the specific intent to promote, further and assist

in criminal conduct by gang members]: And that, the Petitioner was an active

participant of a criminal street gang, all beyond a reasonable doubt.

Due to the presentation of, and the testimony of Mr. Martinez[the

Prosecution's Expert on Gangs]might have dazzled the jury; thereby, actually

fooling the jury, the Petitioner's Co-Defendant's Counsel knew better. [R.T.

341-370-Mr. Martinez' testimony.] This testimony was, in of it self, did not

prove the elements within any of the gang allegations. this testimony violated

Petitioner's Due Process and Equal protection by being so vague and overboard.

He definitely could not testify to Petitioner's state of mind, to him being an

active participant of a criminal street gang or that any of the offenses were

committed for the benefit of, ect. ect. [R.T. 366-369.] (People v. Killebrew

(2003) 103 Cal.App.4th 644, 657-657, and cites above.) This caused the jury to

find Petitioner guilty beyond unreasonable doubt, by using tainted and

unreliable testimony based on disputed material facts.

And that testimony had an impacted effect upon the jury's deliberations,

in addition to the above; Petitioner's Confrontation Clause was violated due

to the hearsay testimony, that of, Mr. Martinez, and the court and defense

counsel allowing-the use of his and others-field interviews, tainted by

hearsay. (Crawford v. Washington [2004] 124 S.Ct. 1354, 1364.)

Generally, a prisoner must be able to show "actual prejudice," in other

words, the court must be able to find that the error had substantial and

injurious effect or influence in determining the jury's verdict. Bains v.

Cambra (9th Cir. 2000) 204 F.3d 964; see also Kotteakos v. United States

(1946) 328 U.S. 750[66 S.Ct. 1239]; Brecht v. Abrahamson (1993) 507 U.S.

619[113 S.Ct. 1710; 123 L.Ed.2d 353]. The burden of proof is on the state to

12.

Case 2:08-cv-02310-JVS-SS    Document 1    Filed 04/08/2008    Page 31 of 50

show that an error did not substantially influence the jury. Any doubt should be resolved in favor of the petitioner. **O'Neal v. McAninch** (1995) 513 U.S. 432[115 S.Ct. 992; 130 L.Ed.2d 947]. However, in some circumstances-for example, where a jury instruction might have allowed the jury to convict on evidence amounting to less that proof beyond a reasonable doubt-the conviction will automatically be reversed without any need to show prejudice. **Sullivan v. Louisiana** (1993) 508 U.S. 275[113 S.Ct. 2078; 128 L.Ed.2d 182]; **Arizona v. Fulminate** (1991) 499 U.S. 279, 331[111 S.Ct. 1246; 113 L.Ed.2d 302](giving examples of structural defects); **Ramirez v. Hatcher** (9th Cir. 1998) 136 F.3d 1209.

Petitioner's Trial Counsel failed/refused to produce any expert testimony or any witnesses to contradict the Prosecution's Expert Gang testimony. The right to counsel includes the right to the use of experts such as psychiatrist or psychologists or any other expert that will assist counsel in preparing a defense. Confidence in our criminal justice system rests in its adversarial components. **Glasser v. U.S.** (1942) 315 U.S. 60, 71[62 S.Ct. 457]; 86 L.Ed. 680. One of these adversarial componets is counsels preparation for trial. To hire competent expert witnesses to counter the prosecution's case in chief. In Petitioner's case to counter Mr. Martinez's testimony regarding the elements to allegations of gang enhancements. A reasonable competent person, knowing that Mr. Martinez was scheduled to testify for the prosecution, would have prepared for such, ahead of trial; thereby, having hired experts to testify in defenses behalf. (Please see **Cronic**, cited above.)

////
////
////
////
////
////
////

13.

VI.   REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT
ERRED BY ALLOWING IMPROPER PRIOR ACT EVIDENCE THAT
PREJUDICED THE DEFENDANT'S RIGHT TO A FAIR TRIAL/
DENIAL OF DUE PROCESS, EQUAL PROTECTION AND INEF-
FECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUE VI.,pages

28-29, Exhibit A]. In addition, Petitioner claims denial of Due Process, Equal

Protection under the law and Ineffective Assistance of Counsel. Under the Fifth,

Sixth and Fourteenth Amendments to the United States Constitution,

respectively-as referenced above and articulated below. The Introduction,

Statement of Issues Presented for Review, Necessity for Review, Statement of the

Case, Statement of the Facts, and Argument, the procedural background assessments

are contained within[Petitioner's PETITION FOR REVIEW, pages 1-8].

    As stated in (Issue VI., referenced to Issues within Petitioner's PETITION

FOR REVIEW]), the trial court erred in allowing the state to present evidence of

a prior conviction by Mr. Rodriguez. [R.T. 358.] See the rest of argument in the

above incorporated-pages 28-29. However, this was ruled earlier on by the court

that this prior would only be used to impeach Petitioner if he chose to testify.

[R.T. 4.] Also, see above arguments in[ISSUES III.-V.], because, those arguments

are interwoven with the issue here. [R.T. 5: 15-28; 6-16.] And Mr. Rodriguez's

prior was not to be brought in under (Evidence Code, § 1101[b]) either. [R.T.

16:21-28; and 17:1-6.]

    Thus, denial of Due Process and Equal Protection under the law. The

California Court's of Appeals decision was therefore, contrary to and an

unreasonable application of Supreme Court standard of review regarding these two

constitutional violations. See Court of Appeal's Opinion-herein after referred to

as [Opn pp. 28-32-attached as Exhibit B]. The Court stated: "Finally, we do not

reach Rodriguez's conclusory argument that admission of his prior conviction

violated his due process right to a fair trial. First, he does not specify how,

or in what manner, his due process right is implicated." [Opn p. 30.] However, he

has articulated numerous reason that specify why these right were violated as incorporated above, and this is dispositve of this issue due to the substantial influence upon the jury's decision.(Jackson v. Virginia, supra[1979]) 443 U.S. 307, 318-19[90 S.Ct. 2781; 61 L.Ed.2d 560]; insufficient evidence.)

Generally, a federal prisoner must be able to show "actual prejudice," in other words, the court must be able to find that the error had substantial and injurious effect or influence in determining the jury's verdict. Bains v. Cambra(9th Cir. 2000) 204 F.3d 964; see also Kotteakos v. United States(1946) 328 U.S. 750[66 S.Ct. 1239]; Brecht v. Abrahamson(1993) 507 U.S. 619[113 S.Ct. 1710; 123 L.Ed.2d 353]. The burden of proof is on the state to show that an error did not substantially influenced the jury's decision, and doubt should be resolved in favor of the petitioner. O'Neal v. McAninch(1995) 513 U.S. 432[115 S.Ct. 992; 130 L.Ed.2d 947]. However. in some circumstances-for example, where amounting to less than proof beyond a reasonable doubt-the conviction will automatically be reversed without any need to show prejudice. Sullivan v. louisiana(1993) 508 U.S. 275[113 S.Ct. 2078; 128 L.Ed.2d 182]; Arizona v. Fulminante(1991) 499 U.S. 279, 331[111 S.Ct. 1246; 113 L.Ed.2d 302](giving examples of structural defects); Ramirez v. Hatcher(9th Cir. 1998) 135 F.3d 1209.

Petitioner's trial counsel failed/refused to object to, or research these issues involved; to even know if he could object, on what grounds[foundations] and when. [R.T. 14:7; 14:15; and 22:7-8.] Here is one example of his incompetence and providing ineffective assistance of counsel: Petitioner's counsel failed/refused to object to the erroneous admission of evidence based on the scope of Martinez's[the Prosecution's-Gang Expert], testimony[informed speculation, of which amounted to his opinion], that the Petitioner's crimes were committed to benefit, promote or assist the street-gang he used to belong to. However, Petitioner himself testified that he no longer associated with them, that he married, had children and went to work faithfully. [Opn pp. 19-22.] Court Appeals' Opinion of waiver of objection and forfeiture.

This example also corresponds to[improper prior conviction

evidence]introduced by the Prosecution, allowed by the Trial and objected

to by Defense Counsel: "[e]vidence of a prior conviction[part omitted]establishing

that 'Sidro' was a criminal street gang and that Mr. Rodriguez was an active

participant of the 'Sidro' gang." [Opn p. 29; and Petitioner's PETITION FOR REVIEW,

ISSUE VI., at pp. 28-29.] (<u>Cronic v. United States</u>, supra[1984] 466 U.S. 684,

655[L.Ed.2d 657, 104 S.Ct. 2039]).

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

VII.   REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT ERRED IN FAILING TO GIVE A LESSOR INCLUDED OFFENSE INSTRUCTIONS FOR COUNTS THREE AND FOUR/DENIAL OF DUE PROCESS, EQUAL PROTECTION UNDER THE LAW AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Incorporated by referenced[Petitioner's PETITION FOR REVIEW, ISSUE VII., pages 29-33, Exhibit A]. In addition, Petitioner claims denial of jury trial for the purpose of above, [fact finding of aggravating factors], violative of the Sixth Amendment to the United States Constitution-as referenced above and articulated below. The Introduction, Statement of Issues Presented for Review, Necessity for Review, Statement of the Case, Statement of the Facts, and Argument, the procedural background assessments are contained within[Petitioner's PETITION FOR REVIEW, pages 1-8].

Those incorporated arguments are the bases for the Denial of Due Process, Equal Protection and ineffective Assistance of Counsel. Additionally, all arguments contained in the above issues and the below issues are the predicates and reasons for the within constitutional violations proffered hereby.

Plus, these proffered arguments by incorporation and reference are compounded by Petitioner's trial counsel refusals/failures to object to, state appropriate grounds for those objections and to even accomplish the appropriate pretrial preparation, such as, investigation of material witnesses, possible needed expert witness testimony and to research the applicable law in regards to all the Prosecution's Case in Chief. Please see supra and infra statutes, case cites, ect.; in direct regards to constitutional violations herein alleged.

It is contended by Petitioner that the jury's decision was close; that

1   on two occasions the jury requested clarification from the court. The first

2   request, a question: "on CT.3-IS THE CHARGE OF CONCEALED WEAPON BY ITSELF? OR

3   IS THE CHARGE CONTINGENT UPON BEING A GANG MEMBER? HENCE, IF NOT A GANG MEMBER

4   THEN SHOULD WE THEN FIND HAVING A CONCEALED WEAPON AS A CRIME?" [CT 226-dated

5   8/14/03.] The second: "WE NEED COPIES OF THE TRANSCRIPTS FOR MARTINEZ &

6   RODRIGUEZ TESTIMONIES." [CT 227-same date.] Neither responses by the court,

7   prosecutor, nor defense counsels were informative to the jury, and not

8   expanded/clarified on really, at all, to the jury's expectations. The very

9   next day[without the last days requested material facts]the jury has reached a

10  verdict[8/15/2003-at 11:02AM]. Accordingly, one could easily presume that the

11  jury found the defendants guilty of all gang-enhancements due to lack of the

12  requested information; that they were in a hurry to go home. How could they

13  possibly find on the lessor included offenses when, as here, no jury

14  instruction for such was given. [This paragraph is repeated in ISSUE

15  XIII.-combination/cumulitive errors.]

16          Of course, this rejection of the lessor included offenses was a

17  viable-second defense: Counsel stated: "It is for all or nothing theory."

18  However, the lessor included offense(s) instruction did not conflict with

19  Petitioner's theory of; he admitted everything already, but the active/promote

20  or assist gang-enhancements. Therefore, the lessor included offenses(s) would

21  have been the very offense(s) he was already taken responsibility for; the car

22  burglary, discharging a firearm during the commissions, the strike prior, ect.

23  Defense counsel by turning down the lessor included instructions forfeited the

24  only reasonable defense that was so obviously the right defense after talking

25  to his client. Let-alone the evidence against the defendants; numerous

26  witnesses, and the victims property within the defendants car. [See record as

27

28  a hole.]

                                    18.

VIII.  REVIEW SHOULD BE GRANTED BECAUSE THE IMPOSITION OF
       CONSECUTIVE SENTENCES BASED ON JUDICIAL FACT FINDING
       IS VIOLATIVE OF THE SIXTH AMENDMENT

          Incorporated by referenced[Petitioner's PETITION FOR REVIEW, ISSUE VIII.,

pages 33-38, Exhibit A]. In addition, Petitioner claims denial of jury trial for

the purpose of above, [fact finding of aggravating factors], violative of the Sixth

Amendment to the United States Constitution-as referenced above and articulated

below. The Introduction, Statement of Issues Presented for Review, Necessity for

Review, Statement of the Case, Statement of the Facts, and Argument, the procedural

background assessments are contained within[Petitioner's PETITION FOR REVIEW, pages

1-8].

10          Those incorporated arguments are the bases for the Denial of Due Process,
11 Equal Protection and ineffective Assistance of Counsel. Additionally, all arguments
12 contained in the above issues and the below issues are the predicates and reasons
13 for the within constitutional violations proffered hereby.
14          Plus, these proffered arguments by incorporation and reference are compounded
15 by Petitioner's trial counsel refusals/failures to object to, state appropriate
   grounds for those objections and to even accomplish the appropriate pretrial
16 preparation, such as, investigation of material witnesses, possible needed expert
17 witness testimony and to research the applicable law in regards to all the
18 Prosecution's Case in Chief. Please see supra and infra statutes, case cites, ect.;
19 in direct regards to constitutional violations herein alleged.

20 IX.    REVIEW SHOULD BE GRANTED BECAUSE THE COURT ABUSED
          ITS DISCRETION IN FAILING TO DISMISS THE STRIKE
21        PRIOR/DENIAL OF DUE PROCESS, EQUAL PROTECTION OF
          THE LAW AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER
22        THE FIFTH, SIXTH AMENDMENTS
          OF THE UNITED STATES CONSTITUTION

24
25          Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUE VII., pages

26 29-33, Exhibit A]. In addition, Petitioner claims denial of Due Process, Equal

27 Protection under the law and ineffective Assistance of Counsel. Under the Fifth,

28 Sixth and Fourteenth Amendments to the United States Constitution, respectively-as

referenced above and articulated below. The Introduction, Statement of Issues

Presented for Review, Necessity for Review, Statement of the Case, Statement of the Facts, and Argument, the procedural background assessments are contained within[Petitioner's **PETITION FOR REVIEW**, pages 1-8].

Those incorporated arguments are the bases for the Denial of Due Process, Equal Protection and ineffective Assistance of Counsel. Additionally, all arguments contained in the above issues and the below issues are the predicates and reasons for the within constitutional violations proffered hereby.

Plus, these proffered arguments by incorporation and reference are compounded by Petitioner's trial counsel refusals/failures to object to, state appropriate grounds for those objections and to even accomplish the appropriate pretrial preparation, such as, investigation of material witnesses, possible needed expert witness testimony and to research the applicable law in regards to all the Prosecution's Case in Chief. Please see supra and infra statutes, case cites, ect.; in direct regards to constitutional violations herein alleged.

X. REVIEW SHOULD BE GRANTED BECAUSE THE ERRONEOUS JURY INSTRUCTION ON THE GANG ENHANCEMENT MANDATES REVERSAL BECAUSE IT MISLED THE JURY AS TO THE BURDEN OF PROOF AND THE ELEMENTS OF THE ENHANCE-MENT/ DENIAL OF DUE PROCESS, EQUAL PROTECTION AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

Incorporated by reference[Petitioner's **PETITION FOR REVIEW**, ISSUE X., pages 42-46, Exhibit A]. In addition, Petitioner claims denial of Due Process, Equal Protection under the law and ineffective Assistance of Counsel. Under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, respectively-as referenced above and articulated below. The Introduction, Statement of Issues Presented for Review, Necessity for Review, Statement of the Case, Statement of the Facts, and Argument, the procedural background assessments are contained within[Petitioner's **PETITION FOR REVIEW**, pages 1-8].

Those incorporated arguments are the bases for the Denial of Due Process, Equal Protection and ineffective Assistance of Counsel. Additionally, all arguments contained in the above issues and the below issues are the predicates and reasons

20.

1   for the within constitutional violations proffered hereby.

2          Plus, these proffered arguments by incorporation and reference are

3   compounded by Petitioner's trial counsel refusals/failures to object to, state

4   appropriate grounds for those objections and to even accomplish the

5   appropriate pretrial preparation, such as, investigation of material

6   witnesses, possible needed expert witness testimony and to research the

7   applicable law in regards to all the Prosecution's Case in Chief. Please see

8   supra and infra statutes, case cites, ect.: in direct regards to

9   constitutional violations herein alleged.

10                        ADDENDUM OF NEW ISSUES
11                             AND CLAIMS

12  XI.   EXCESSIVE FINES/RESTITUTION ORDERS BY THE TRIAL COURT
          ASSESSED AGAINST PETITIONER IN EXCESS OF THE COURT'S
13        JURISDICTION AND LIKENING THE ORDER TO AN UNAUTHORIZED
14        SENTENCE

15         Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUES I-X.,

16  pages 8-46, Exhibit A]. In addition, Petitioner claims denial of Due Process,

17  Equal Protection under the law and ineffective Assistance of Counsel. Under

18  the Fifth, Sixth and Fourteenth Amendments to the United States Constitution,

19  respectively-as referenced above and articulated below. The Introduction,

20  Statement of Issues Presented for Review, Necessity for Review, Statement of

21  the Case, Statement of the Facts, and Argument, the procedural background

22  assessments are contained within[Petitioner's PETITION FOR REVIEW, pages 1-8].

23         Those incorporated arguments are the bases for the Denial of Due

24  Process, Equal Protection and ineffective Assistance of Counsel. Additionally,

25  all arguments contained in the above issues and the below issues are the

26  predicates and reasons for the within constitutional violations proffered

27  hereby.

28         Plus, these proffered arguments by incorporation and reference are

                                      21.

compounded by Petitioner's trial counsel refusals/failures to object to the appropriate grounds for those objections and to even accomplish the appropriate pretrial preparation, such as, investigation of material witnesses, possible needed expert witness testimony and to research the applicable law in regards to all the Prosecution's Case in Chief. Please see supra and infra statutes, case cites, ect.; in direct regards to constitutional violations herein alleged.

At sentencing, the court "ordered[Petitioner]to pay ten thousand dollars restitution fine, a parole revocation fine," plus restitution to the Victim[Donna Tucker] of $250.00. [RT 1112-1114.] The Order for Restitution and Abstract of Judgment reflected only the restitution fine of $250.00 to the Victim[Donna Tucker]. [CT 202-203-Abstract of Judgment.] The Minute Order[CT 235]reflected the following:

The Defendant is to pay a restitution fine pursuant to section 1202.4(b) Penal Code in the amount of $10,000.00.

Defendant is to pay parole restitution fine pursuant to Penal Code section 1202.45, in the amount of $10,000.00 said fine is stayed and the stay is to become permanent upon successful completion of parole.

Defendant to pay restitution to Victim[Donna Tucker]pursuant to Penal Code section 1202.4(f) in the amount of $250.00. [CT 235.]

First, a discrepancy between the judgment as orally pronounced and entered in the minutes or in the abstract of judgment is presumably the result of clerical error and must be resolved in favor of the oral pronouncement. (**People v. Mesa**[1975] 14 Cal.3d 466, 471; **People v. Caudillo**[1980] 101 Cal.App.3d 122, 126-127.) Here, since the oral pronouncement did impose penalty assessments[RT 1112-1114], and the Court's Minute Order[CT 235]also reflected the same assessments; but the Order for Restitution and Abstract of Judgment[CT 202-204]failed to reflect the same, that has to be clerical error.

Thus, Petitioner hereby, challenges the assessed restitution fines under[P.C., §§ 1202.4(b) & 1202.45]as excessive and in excess of the Trial

22.

Court's Jurisdiction. (People v. Castro [Cal.App. 5th Dist.]-(1985) 30

Cal.Rptr.2d 188; and People v. Wilson, 26 Cal.Rptr.2d 537.) Plus, many other

cases were granted review by the California Supreme Court regarding the

"ability to pay" provision, notwithstanding the statute, fined under. All

these courts found that it was excess of the trial court's jurisdiction to

asses fines so high compared to the defendant's ability to pay: Based on the

following criterion: Factors such as the defendant's age, physical and mental

condition, length of prison sentence, education, work history, family support

liabilities and accumulated assets are all relevant to the defendant's ability

to pay a restitution fine.

  Ideally, the probation report should provide a short analysis of these

factors when making a recommendation to the court on the amount of restitution

fine to be imposed. (Citing-Castro, supra.)

  Therefore, when you compare the Petitioner's Probation Report &

Supplemental Probation Report[CT 170-183; & CT 184-201-respectively], to that

of his ability to pay, it is clear that here also, the trial court acted in

excess of it's jurisdiction in assessing two $10,000.00 fines.

  The Petitioner has a family with two young children[family support

liabilities]; his prison wage doesn't amount to a sufficient yearly amount[see

Exhibit E]; he has no accumulated assets; he-approximately-is doing 85% of

fourteen-(14)-years and four-(4)-months, of which, equals:

twelve-(12)-years-point-one-(1): 12.1-years. That's how long he has to pay the

first $10,000.00 fine at his rate of pay. The rest of the factors are

contained in both the probation reports, but are not major factors against or

for the Petitioner. Therefore, as stated in[Castro]and its prodigy, the

Petitioner's fines of both $10,000.00, and his ability to pay that amount, is

not supported by the record and should be reduced accordingly to this

Honorable Court's ruling. [CT 170-201 & RT 1101-1114+all other factors in the

record as a whole.]

////

XII.    REVERSAL SHOULD BE GRANTED BECAUSE PETITIONER'S
        CONVICTION UNDER PENAL CODE, SECTION 186.22 ET. SEQ.
        [CALIFORNIA'S GANG ENHANCEMENT LAWS]ARE UNCONSTITUTIONAL
        AND IN EXCESS OF THE COURT'S JURISDICTION, OF WHICH,
        PROVIDED A DENIAL OF DUE PROCESS AND EQUAL PROTECTION
        UNDER THE LAW, ALL UNDER THE FIFTH, SIXTH AND FOURTEENTH
        AMENDMENTS TO THE UNITED STATES CONSTITUTION

Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUES I-X.,

pages 8-46, Exhibit A]. In addition, Petitioner claims denial of Due Process,

Equal Protection under the law and ineffective Assistance of Counsel. Under the

Fifth, Sixth and Fourteenth Amendments to the United States Constitution,

respectively-as referenced above and articulated below. The Introduction,

Statement of Issues Presented for Review, Necessity for Review, Statement of

the Case, Statement of the Facts, and Argument, the procedural background

assessments are contained within[Petitioner's PETITION FOR REVIEW, pages 1-8].

Those incorporated arguments are the bases for the Denial of Due Process,

Equal Protection and ineffective Assistance of Counsel. Additionally, all

arguments contained in the above issues and the below issues are the predicates

and reasons for the within constitutional violations proffered hereby.

Plus, these proffered arguments by incorporation and reference are

compounded by Petitioner's trial counsel refusals/failures to object to, state

appropriate grounds for those objections and to even accomplish the appropriate

pretrial preparation, such as, investigation of material witnesses, possible

needed expert witness testimony and to research the applicable law in regards

to all the Prosecution's Case in Chief. Please see supra and infra statutes,

case cites, ect.; in direct regards to constitutional violations herein

alleged.

Due to the above and the below, Petitioner hereby, contends that the

California's[STEP-ACT]is unconstitutional on its face. By allowing expert

1   testimony on the proffered hearsay evidence, of which, used against the

2   defendant's and the Petitioner herein, as material facts that, he said, she

3   said, proves the elements within this act deprives the defendants and the

4   Petitioner herein, of a fair trial, for this allows the jury to find them

5   guilty of less than, beyond a reasonable doubt.

6        Additionally, as applied to the Petitioner, this statute is

7   unconstitutional. In People v. Zermeno, 21 Cal.4th 927, 89 Cal.Rptr.2d 863; 986

8   P.2d 196[Nov. 1999]: In Zermeno the California Supreme Court reversed his case

9   because of the aiding & abetting offense-to prove one of the predicate

10  offenses—was a single offense, not two(2)-offenses, of which, was used to

11  establish the "gang Activity," element within the[STEP-ACT].

12       In Petitioner's case the same use occurred: The Prosecutor stated:

13  "Correct, because we will be pursuing an aiding and abetting theory on Mr.

14  Rodriguez on Count 1, Just not by virtue of natural and probable consequences."

15  [RT 506:9-15; & 507:6-8.] His contention is easily discerned; due to the use of

16  the theory of aiding and abetting, even on just Count 1, the jury was easily

17  mislead on finding Petitioner guilty on all counts. Even with the correct

18  instructions to the jury-as was not the case here-the jury would transfer the

19  elements therein, to all counts. Then with all reasonable inferences drawn, a

20  reasonable trier of fact could not possibly find the Petitioner guilty beyond a

21  reasonable doubt. For the Trial Court to allow such a error to take place, the

22  Prosecutor for misleading, and for Petitioner's Counsel for not objecting is

23  understandable, for the complexity of the issues, the statutes, and case-law

24  involved, anyone would be baffled. [See Prosecutor's Trial Memorandum-CT 16.]

25  [See also, Witkin & Epstien California Criminal Law 2d ed. 1988 § 1251B.]

26       Those violations being under the Fifth, Sixth and Fourteenth Amendments

27  to the United States Constitution. (Garcia v. Carey, supra[Jan. 21st, 2005] 395

28

1  F.3d 1099; citing <u>Jackson v. Virginia</u>, supra, 443 U.S. 307, 324 [1979].)

2  XIII.  REVERSAL SHOULD BE GRANTED BECAUSE THE COMBINATION
       OF NUMEROUS EVIDENTIARY ERRORS CAUSED THE TOTALITY
3      OF CIRCUMSTANCES, OF WHICH, CONSTITUTED A DEPRIVATION
       OF SUBSTANTIVE DUE PROCESS DURING THE TRIAL COURT
4      PROCEEDINGS

5         Incorporated by reference[Petitioner's PETITION FOR REVIEW, ISSUES I-X.,

6  pages 8-46, Exhibit A]. In addition, Petitioner claims denial of Due Process,

7  Equal Protection under the law and ineffective Assistance of Counsel. Under the

8  Fifth, Sixth and Fourteenth Amendments to the United States Constitution,

9  respectively—as referenced above and articulated below. The Introduction,

10 Statement of Issues Presented for Review, Necessity for Review, Statement of

11 the Case, Statement of the Facts, and Argument, the procedural background

12 assessments are contained within[Petitioner's PETITION FOR REVIEW, pages 1-8].

13        Those incorporated arguments are the bases for the Denial of Due Process,

14 Equal Protection and ineffective Assistance of Counsel. Additionally, all

15 arguments contained in the above issues and the below issues are the predicates

16 and reasons for the within constitutional violations proffered hereby.

17        Plus, these proffered arguments by incorporation and reference are

18 compounded by Petitioner's trial counsel refusals/failures to object to, state

19 appropriate grounds for those objections and to even accomplish the appropriate

20 pretrial preparation, such as, investigation of material witnesses, possible

21 needed expert witness testimony and to research the applicable law in regards

22 to all the Prosecution's Case in Chief. Please see supra and infra statutes,

23 case cites, ect.; in direct regards to constitutional violations herein

24 alleged.

25        Additionally, in regards to Petitioner's trial counsel's performance

26 during the whole trial proceedings, all the issues above and below, have shown

27 a clear pattern of incompetency. The combination or cumulative acts and

28

26.

1   omissions show an unequivocal lack of preparation and investigation into the

2   facts of the Petitioner's defense. Mr. Sanchez was very sick physically[taking

3   numerous mind altering medications; i.v. in his arm during the court

4   proceedings, and nodding-off during important times of same]; was having legal

5   problems himself, civil action against himself; and thus, under enormous mental

6   and physical stress during the trial court proceedings; and not even present

7   during other important parts of the pretrial and court trial. [RT 101; 101-102;

8   and 2-respectively.] (In Re Rocha, DAR,[Dec. 30, 2005], at page

9   14919[Case#B180415-Cal.2d];deficient performance of trial counsel rendered in

10  conducting his pretrial investigation necessarily was prejudicial to defendant

11  and thus requires a new trial.)

12      However, here in Petitioner's case his trial counsel was also deficient

13  in challenging the Prosecution's Case in Chief. As within the meaning

14  of-(Cronic v. United States[1984] 466 U.S. 684, 655[L.Ed.2d 657, 104 S.Ct.

15  2039]). He failed in all areas, areas he could have put on a defense for his

16  client; instead of assuming the facts of the Prosecution's Case were true, and

17  just accepting the Prosecutor's file, full of the right facts. The record as a

18  whole shows clearly that he failed/refused to object to very incriminating

19  evidence, that was dubious as to its admissibility. Prejudicial out-weighing

20  the probative value. He failed/refused to conduct invaluable research into the

21  charged offenses or case-law that's very important court interpretation of

22  those charged offense. Directly in regards to the[STEP-ACT]he did not even

23  attempt to conduct minimal applicable research before showing up in court. When

24  you consider the importance of the sentencing enhancements attached to

25  Petitioner's Case[STEP-ACT]; this was the greater part of his sentence, plus,

26  of course, the doubling effect of his prior serious felony, alleged against

27  him. During the sentencing phase, Petitioner's Trial Counsel was very concerned

28  about his client being found guilty for all those gang-enhancements. [RT

27.

1  1101-1103.] If he was so troubled about the gang applicability, why did he not

2  do his homework...Petitioner was not an active gang member during his offenses.

3  He testified to that fact. [RT 1104-1105; and Probation Report 195-196.] As an

4  example of challenges to the[STEP-ACT]enhancements-see-(Garcia v. Carey[2005]

5  395 F.3d. 1099; considering the date of this Case-cite[2005]it was not

6  opinioned until subsequently to, Petitioner's conviction; however, the

7  cases-cited within was used to affirm the granting of relief, and were already

8  published during Petitioner's trial). Therefore, Petitioner's Counsel should of

9  found them with minimal effort. Plus, most were in the Prosecutor's Trial

10  Memorandum[Exhibit D, pages 1-27]or could be discovered with minimal research

11  techniques. His counsel could have proffered objections to or an answer to that

12  memorandum; could have filed motions in limine, a motion to demurr, or/and a

13  motion to strike in regards to the[STEP-ACT].

14       The other combination or cumulitive error[s]are stated above and below;

15  however, it should also be considered under this heading also.

16       The following is a combined argument based on a mixture of issues already

17  considered above and below. For, the cumulative effect of the duel-use of

18  elements is overwhelming when attempting to conceive: Due to the use of

19  elements[considered facts]over and over again, it would be reasonable to

20  conclude that, it is, un-constitutional on its face, that statute, that caused

21  such an effect-an increased prison sentence. The Statute in question here

22  is[the STEP-ACT: P.C., § 186.22 et. seq.], of which, is open to challenges to

23  it's face. Especially, looking at Petitioner's Case, his prior offense[P.C., §

24  459]was used to impeach him; it was used as a predicate offense in[STEP-ACT],

25  as a prior within the meaning of[P.C., § 667(a)-five year enhancement]and again

26  under[California's Three-Strike Law, P.C., §§ 667(b)-(i) & 1170.12][prior at CT

27  7: Amended Complaint; RT 4; 5-7; 8:1-6; 8-10; 11-17; & allowed in by the

28  court-22:11-25; 1004:1-5]. Once convicted of all counts and gang/gun

1   enhancements the court during sentencing used the prior strike allegation to

2   double most of Petitioner's Sentence and to limit his credit earning ability to

3   (the court stated: "credit under[P.C., § 2933.1+85%[Vol.#8-RT 1112:17];

4   however, this is in direct conflict with doubling his sentence; due to, The

5   Strike Law incorporates 80%, once the sentence is doubled-that's hand-in glove;

6   you can't have one without the other. [See P.C., § 667(e)(1).]

7          To re-cap the duel-use above, now Petitioner's prior conviction was used,

8   not twice-as priors are used-but four times, plus, doubling/credit earning

9   reduction.

10         Gloria A. Vazquez[Petitoner's girl friend-now his wife]also testifies to

11  the fact that, he has not been an active gang member for along time; instead he

12  has been going to work everyday and providing for his family. [RT 416-428.] And

13  again Petitioner testifies to that fact. [RT 428-433.]

14         Counsel totally failed when it came to affirmative defenses that should

15  have been used to negate the elements involved. Intoxication during the crime.

16  [RT 434.] Jury Instruction on Intoxication was requested by Petitioner's

17  Co-defendant's Trail Counsel[Mr. Leahy][RT 440:4-8]. Although, limited

18  instruction were given, Petitioner's Counsel should have backed-up those given

19  instructions with defense expert testimony of the true effects of Roches[known

20  as the rape-drug-Rohypnol-a sedative-hypnotic drug][Probation Report-CT

21  179-¶7-near bottom]. Petitioner testified to the fact that he was intoxicated

22  that night. [RT 433:24-28; 434:1-27; & 532:26-28.] And no expert testimony

23  offered by Petitioner's Counsel, no foundation of authenticity regarding the

24  fact of that specific drug was used. Counsel failed/refused to even argue the

25  facts testified to, by his own client. [RT 549:22-28; 550:1-28.] However, as

26  stated already, Petitioner's Co-defendant's Counsel[MR. Leahy]requested the

27  instruction for intoxication. [RT 440:4-8.]

28

                                        29.

1  Thus, other corroborating witnesses along with the two mentioned, would
2  have had a different light shined upon the jury's face; of which, would have
3  changed the outcome of the jury's decision to convict on the presently active
4  gang member enhancements. This would reduce the Petitioner's overall sentence
5  immensely. It is clear from the record that Petitioner was not a active member
6  or even promoting/assisting any gang crimes. The record shows the opposite;
7  that he had distance himself from the grips of the street gang he was a member
8  before. That he had started a family and moved away from that gang's territory.
9  He was a good provider for his family. He made the mistake of going to party
10 with an old friend, using drugs and alcohol to the point of inhibition. He was
11 showing off with a dangerous weapon, he never attempted to persuade anyone to
12 do anything; he was totally intoxicated and made very bad mistakes and bad
13 errors of judgment, of which, he knows he has to pay for. However, the sentence
14 he received is enhanced badly also.
15     Petitioner's counsel failed/refused to gain the plea-bargin he said he
16 would, early in the pretrial proceedings: seven[7]-years or no more than
17 ten[10]-years.
18     Counsel failed/refused advise Petitioner correctly on testifying in his
19 own behalf: but, advised him strongly to testify: did not inform Petitioner of
20 possible consequences (i.e., what it would mean to be impeached by his prior
21 serious felony conviction: of having to admit that prior; that it would be
22 detrimental in regards to the gang-enhancements alleged against him; that it
23 would qualify as a strike under the strike-law, that it could be used to double
24 his sentences; be enhanced under an additional five[5]-years to any new serious
25 felony conviction); and that, exposure of such, would cause the jury to find
26 him guilty based on that, prejudicial admission. Additionally, considering
27 Petitioner's prior gang-involvement, his impeachment in this area, had the most
28

30.

1   detrimental effect—overall, the significant increased sentence based upon same.

2   (**Cronic**, supra.)

3          It is contended by Petitioner that the jury's decision was close; that on

4   two occasions the jury requested clarification from the court. The first

5   request, a question: "on CT.3-IS THE CHARGE OF CONCEALED WEAPON BY ITSELF? OR

6   IS THE CHARGE CONTINGENT UPON BEING A GANG MEMBER? HENCE, IF NOT A GANG MEMBER

7   THEN SHOULD WE THEN FIND HAVING A CONCEALED WEAPON AS A CRIME?" [CT 226—dated

8   8/14/03.] The second: "WE NEED COPIES OF THE TRANSCRIPTS FOR MARTINEZ &

9   RODRIGUEZ TESTIMONIES." [CT 227—same date.] Neither responses by the court,

10  prosecutor, nor defense counsels were informative to the jury, and not

11  expanded/clarified on really, at all, to the jury's expectations. The very next

12  day[without the last days requested material facts]the jury has reached a

13  verdict[8/15/2003-at 11:02AM]. Accordingly, one could easily presume that the

14  jury found the defendants guilty of all gang-enhancements due to lack of the

15  requested information; that they were in a hurry to go home. How could they

16  possibly find on the lessor included offenses when, as here, no jury

17  instruction for such was given. It can also be presumed that, the jury found

18  true on the gang-enhancements due to the Prosecution's Star-Expert Witness[Mr.

19  Martinez]; for without any defense expert testimony to the contrary or really

20  any evidence proffered by the defense, the jury had nothing to work-on, but the

21  Prosecution's Case in Chief. (**Cronic**, supra.)

22         Therefore, the cumulative effect of the errors were very prejudicial and

23  requires reversal.

24         The premise behind the cumulative error doctrine is that while a number

25  of errors may be harmless taken individually, their cumulative effect requires

26  reversal. (People v. Bunyard[1988] 45 Cal.3d 1189, 1236.)

27         When errors of federal magnitude combine with non-constitutional errors,

28

31.

1  all errors should be reviewed under Chapman standard. In People v. Williams

2  (1971) 22 Cal.App.3d 34, 58-59, the court summarized the multiple committed

3  trial level and concluded: "Some of the errors reviewed are of constitutional

4  dimension. Although they are not the type calling for automatic reversal, we

5  are not satisfied beyond a reasonable doubt that the totality of error we have

6  analyzed did not contribute to the guilty verdict, was not harmless error.

7  [Citations.] (Chapman v. California, 386 U.S. 18 [1967].)

8

9                                CONCLUSION

10

11

12       Due to the singular errors expressed within, reversal can be provided on

13  each and everyone. However, if this Honorable Court decides differently,

14  Petitioner request the Court to find the cumulative effect violated his rights

15  as stated above.

16       The Petitioner hereby, request from this Honorable Court to consider the

17  very long increased sentence, of which, he has been exposed to, and the long

18  term-effect upon his family[notwithstanding his admitted to, responsibility

19  early in the Trial Court Proceedings]. He admits that he was very foolish and

20  caused immeasurable damage to others and has remorse for all.

21

22                               PRAYER FOR RELIEF

23

24       Petitioner therefore, request that this Honorable Court:

25       1. Take judicial notice of all records relevant to Petitioner's Cases[RT

26  & CT's, ect.]entitled People v. Javier Rodriguez (May 14th, 2003) Superior

27  Court Case#SCS176087; Court of Appeal, Fourth Appellate District Case# DO43198;

28  and the California Supreme Court Case# S133875;

2. Declare the rights of the parties;

3. Issue an Order to Show Cause, returnable before this Honorable Court, as to why Petitioner's Conviction and Sentence should not be set aside or the gang-enhancements should not be stricken;

4. Upon final review, order that Petitioner's Conviction and Sentence be set aside, order a new trial to be granted; and provide any and all other relief as may be deemed appropriate in the interest of justice.

Dated: 7-11-06                                    Respectfully submitted,

                                                  Javier Espinoza Rodriguez
                                                  Petitioner, in pro per

////

////

////

////

////

////

Dated: 7-11-06                                    .

                                                  Scott Howell Duke
                                                  Researched, composed and typed
                                                  by

////

////

////

////

////

////

////

33.

A.

THE APPLICABILITIES OF NUMEROUS STANDARDS OF REVIEWS,

AND REGARDLESS OF WHICH STANDARD APPLIES,

PETITIONER HAS ESTABLISHED HE IS WORTHY OF RELIEF

In general, the petitioner has established he is worthy of relief-on each and all claims/issues-regardless of which, standard of review applies to which claim(s)/issue(s). In the alternative, his cumulative arguments have great merit, and he has obviously established that, many of his constitutional rights were violated during his trial. That his right to a fair trial was invaded in numerous areas as stated above and below; that his right to effective assistance of counsel was-stomped upon-in more than numerous areas as established above and below, that all his calims/issues have been boot-strapped to his claims/issues contended under the ineffective assistance of counsel standard of review. [Strickland, or/and Cronic standard.]

Therefore, considering the generalities of this part within, please consider these general arguments of which, standard of review might apply, consider all Petitioner's Claims/Issues, and arguments to be applicable thereon, even if not mention specifically-as of yet.

Whether the standard of review that is applicable is contained within the cited authorities, the clearly established federal law [meaning U.S. Supreme Court Opinions]; or the applicability of Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"], adds a second level of deference to this standard, so that a federal habeas petitioner may obtain relief only by demonstrating that, the state court's adjudication on the merits of the claim involved an unreasonable application of [U.S. Sup. Ct. Cites] or contrary to standard applies. That would fall upon this Honorable Court's opinion and

discretions.

Either or both, it is Petitioner's Contention that he has established that relief should be granted under either or both standard(s). He would hope that this Honorable Court agrees, and therefore, grants the requested relief.

## B.

## STANDARD OF REVIEW

The Antiterrorism and effective Death penalty Act of 1996 [hereinafter "AEDPA"] became effective on April 24, 1996. When a state court adjudicates a claim on the merits, the AEDPA bars federal habeas corpus relief on the claim unless the state-court adjudication was either (1) "contrary to, or involved an unreasonable application of, clearly establish federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Price v Vincent [2003] 538 U.S. 634, 638-39, 123 S.Ct. 1848, 155 L. Ed. 2d 877. This is a "'highly deferential standard for evaluating state-court rulings' which demands that state-court decisions be given the benefit of the doubt." Woodford v Viscioti [2002] [per curiam] [quoting Lindh v Murphy [1997] 521 U.S. 320, 333 n.7, 117 S.Ct. 2059, 138 L. Ed. 2d 481.

A state court decision is "contrary to" federal law if it either "applies a rule that contradicts the governing law" as set forth in Supreme Court opinions, or reaches a different decision from a Supreme court opinion when confronted with materially indistinguishable facts. Williams v Taylor [200] 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L. Ed. 2d 389; accord Bell v Cone [2002] 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L. Ed. 2d 914 [Bell I]; Clark v Murphy

1   [9th Cir. 2003] 331 F.3d 1062, 1067. A state court makes an "unreasonable
2   application" of federal law if the state court identifies the correct governing
3   legal principle from the Supreme Court's decisions but unreasonably applies
4   that principle to the facts of the petitioner's case. Williams v Taylor, supra,
5   529 U.S. at 413; Bell I, 535 U.S. at 694; accord Lockyer v Andrade [2003] 538
6   U.S. 63, 71, 123 S.Ct. 1166, 155 L. Ed. 2d 144. ["AEDPA does not require a
7   federal habeas court to adopt any one methodology in deciding the only question
8   that matters under § 2254(d)(1)—whether a state court decision is contrary to,
9   or involved an unreasonable application of, clearly established federal law".]
10          A state court's failure to cite any federal law in its opinion does not
11  run afoul of the AEDPA. In fact, "so long as neither the reasoning nor the
12  result of the state-court decisions contradicts them." Early v Packer, supra,
13  537 U.S. at 8; Bell v Cone [2005] 543 U.S. 447, 455, 125 S.Ct. 847, 160 L. Ed.
14  2d 881 [per curiam] [Bell II] [federal courts are not free to presume that a
15  state court did not comply with constitutional dictates on the bases of nothing
16  more than a lack of citation; federal courts must presume that the state court
17  applied the same constitutionally sufficient review it used in earlier cases
18  absent some contrary indication].
19
20                                        C.
21           THE GANG ENHANCEMENT(S)/CONVICTION(S) USED AGAINST PETITIONER,
22          AND THE GRANTING OF RELIEF BASED UPON ANY SAID STANDARD OF REVIEW
23
24          In Petitioner's Case, Grounds I-XIII were rejected on the merits by the
25  California Supreme Court on habeas corpus, as that Court's Denial of relief
26  without comment [A.K.A.-Post-Card Denial] or citation of authority constituted
27  a denial on the merits. See Hunter v Aispuro [9th Cir. 1992] 982 F.2d 344,
28

                                        3.

347-48. Federal habeas review of these claims is not de novo despite the fact that the California Supreme Court denied the claims without comment, and instead the record must be independently reviewed in order to determine whether the denial was objectively unreasonable. See __Himes v Thompson__ [9th Cir. 2003] 336 F.3d 848, 852-53. It appears that all Grounds I-XIII were rejected in an unreasonable opinion on appeal by the California Court of Appeal.

As shown above, and below, the **AEDPA**, and even its "highly deferential standard of review," provides relief in this case.

Additionally, attached to, all of the Petitioner's Grounds, is his claims/issues of Ineffective Assistance of Counsel, [ditto-for those claims/issues regarding appellate counsel], of which have been boot-strapped to his claims/issues. [Please see pp. 1-3, of the attached pleadings, of his petition.] [See Part D-below for further expansion of [IAC].]

Petitioner's Claim(s)/Issue(s) regarding Gang Enhancement(s)/Conviction(s) are contained within [CLAIMS AND ISSUES, ISSUES II, III [PARTS A, B], IV, V, XII, & XIII] of his Petition.

1.

SPECIFIC INTENT ELEMENT

As __Garcia v Carey__ [9th Cir. 2005] 395 F.3d 1099 has established, under either standard of review, the petitioner herein, meets either standard-separately or taken together. Especially since, the record shows that, the petitioner was no longer an active gang-member, and had no specific intent on aiding & abetting an inactive or active gang-member, period. The record establishes just the reverse-that he was no-longer an active gang-member, had moved out of the gang-land territory, had been working to take care of his

4.

[then] girlfriend, [now] his wife, and his children. He and his girlfriend testified to those facts. [RT 416-428; RT 428-433-respectively: Corresponding to Petitioner's Petition at the attached page 29.] [Also Probation Report at CT 173: ¶3-5.]

Unlike **Garcia**, petitioner was not an active gang-member or aiding & abetting any other gang-members-no "specific intent," element intended.

Under **Garcia**..."[T]he district court determined that habeas relief was proper because 'the prosecution failed to present any direct or circumstantial evidence that [Garcia] robbed Bojorquez with the specific intent to promote, further, or assist in other criminal conduct by the [E.M.F.] street gang.'" [Ibid., at p. 1101.]

As established by testimony from both the petitioner and his girlfriend he no-longer was an active gang-member, nor did he possess the specific intent to promote, further, or assist in other criminal conduct by any said or un-said gangs. The only so-called circumstantial evidence that he was still active came from the Prosecution's Expert Witness [MR. Martinez], a person of whom, did not know the defendant/petitioner personally, who could not-even, if allowed to-testify to that, non-fact, there was never any specific intent to promote, further, or assist in any or other conduct for any or other gang or member. [RT 341-370.] The witness used field-notes to establish petitioner as a active gang-member or knew he was assisting an active gang-member; these field-notes are not "certified" in any way or matter, they are not considered "testimony" or "verified substantial material facts," of which, can establish or prove beyond a reasonable doubt the elements of the alleged charges. Field-notes can not be cross-examined, they do not show or establish material facts, such as the specific intent prong within the [S.T.E.P. Act]. [RT 341-370.]

Thus, as within **Garcia**: ..."[S]ee **Chein v Shumsky** [9th Cir. 2004] [en

5.

banc]. Like our en banc court in Chein, we do not decide the affect of **AEDPA** on Jackson because we reach the same result whether we review directly under Jackson or whether we review more deferentially the state court's application of jackson under **AEDPA's** standard...." [Ibid., at p. 1101 [italics omitted].]

Therefore, there was no showing of any elements of the necessary "specific intent," that resulted into, a clear violation of Petitioner's fundamental right to a "fair trial."

Other California cases also present examples of the kind of evidence permitting inferences of specific intent to further other criminal gang activity. See e.g., **People v Augborne** [2002] 104 Cal. App.4th 362, 372-73 [expert testimony to the belief that crimes were committed for promotion and assistance of criminal conduct by gang members]; **In re Ramon** [1997] 57 Cal. App.4th 201, 207-08 [finding gang enhancement supported by expert evidence and unequivocal act where the attack against a police officer who had another gang member in custody was committed in order to assist the gang member's escape]; **California v Ortiz** [1997] 57 Cal. App.4th 480, 484-85 [finding sufficient evidence was that a robbery and murder were committed with the specific intent of framing a rival gang for the crimes]. Here, Detective Hernandez testified that Garcia was a member of the E.M.F. gang, that the robbery was committed in gang territory, and that the E.M.F. gang was "turforiented." Detective Hernandez did not offer any testimony, however, on what was meant by being "turforiented," what implications arose from a gang being "turforiented," or how the gang's "turforiented" nature could support the conclusion that this robbery was committed with the specific intent to promote, further, or assist other gang related criminal activity. Without this evidentiary link, it is unreasonable to conclude that a rational jury could find Garcia committed this robbery with the specific intent to facilitate other gang crimes. There was

6.

simply a total failure of proof of the requisite specific intent. The district court correctly granted habeas relief on the gang enhancement, and on the firearm enhancement that depended on it. [Ibid., at p. 1001-1102 [italics omitted].]

Like the petitioner herein, he did not possess the requisite "specific intent," to promote, further, or assist other gang related criminal activity.

Since the inception of **Garcia**, and the effect upon **Augborne**, **In re Ramon**, & **Ortiz**, the California Courts of Appeal have had published their new opinions, of which have their interpretation of **Garcia**, and their reasons, failures/refusals to follow the 9th Circuit Court's ruling thereon, that was based on **Jackson** U.S. Supreme Court firmly established federal law. These cases are **People v Romero** [2006] 43 Cal.Rptr.3d 862, 140 Cal. App.4th 15; & **People v Hill** [2006] 47 Cal.Rptr. 3d 875, 142 Cal. App.4th 770: of which, they attempt to find fault within the wording of the (9th Circuit Court of Appeals by using: "Garcia, however, misinterprets California law. 'In (italics-Garcia), the Ninth Circuit found insufficient evidence of specific intent to promote, further, or assist in (italics-other) criminal conduct by the defendant's gang. We disagree with (italics-Garcia's) interpretation of the California statute, and decline to follow it. (See People v. Burnett (2003) 110 Cal.App.4th 868, 882, [2 Cal.Rptr.3d 120][] [federal authority is not binding in matters involving state law]; see also Oxborrow v. Eikenberry (9th Cir. 1989) 877 F.2d 1395, 1399 [state court interpretation of state statue binding of federal court unless interpretation is a subterfuge or untenable.]) By its plain language, the statue requires a showing of specific intent to promote, further, or assist in 'any criminal conduct by gang members,' rather than (italics-other) criminal conduct. (§ 186.22 subd. (b)(1), italics added.)' (People v. Romero (2006) 140 Cal.App.4th 15, 19, 43 Cal.Rptr.3d 862, italics in original.) We agree with

1  Romero." [Quoting **People v Hill**, supra, [2006] 47 Cal.Rptr.3d 875, 879 at ¶3,

2  142 Cal.App.4th 770, 774 at ¶3. [italics in original as (italics-)].]

3      This word playing by the California Courts of Appeals show that their very

4  opinions, and their standard of reviews are contrary to, and a misapplication

5  of established federal law-in this case **Jackson v Virgina**, supra, and as

6  applied properly to **Garcia**, supra.

7      In **Garcia**: and as within the Petitioner's Case herein, [based upon the

8  same facts-and additionally, since the record proves he was no longer an active

9  gang-member]; of which, applies the right standard of review incased in

10  **Jackson**, and articulated within **Garcia** by the 9th Circuit Court of Appeals.

11  Thus, their interpretation doesn't garble the words, and the interpretation

12  thereon, [P.C. § 186.22(B)-S.T.E.P. Act], by attempting to tangle the plain

13  meaning of "to promote , further, or assist in (any-italics) criminal conduct

14  by gang members." [Quoting  **People v Hill**, supra, ibid., at 879 ¶4; & 774

15  ¶4-respectively.] And compared to; **Garcia**, supra, at p. 1102, fn.5: "It is

16  important to keep these two requirements of the gang enhancement separate. For

17  example, (italics-People v. olguin), 31 Cal. App.4th (1994), cited by the

18  California court of appeal in affirming Garcia's sentence, dealt with a

19  challenge  to  the  sufficiency  of  the  evidence  to  meet  the  first

20  requirement--that the crime of conviction be 'for the benefit of, at the

21  direction of, or in association with' a criminal street gang--not the second

22  requirement of specific intent to further other criminal activity of the gang.

23  (Italics-See id.) at 1382."

24      Ergo, as within **Garcia**, we are dealing with the first requirement in

25  Petitioner's Case, not the second requirement. Basically, in this case at bar,

26  petitioner is contending that neither requirements apply in his case; neither

27  requirements were really proven during his trial, just the opposite was shown,

28

1  due to only one so-called expert witness testified that within his field-notes

2  the petitioner was still an active gang-member, however, not only did petitioner

3  testify that he was no longer an active gang-member, but his girlfriend-of whom

4  corroborated his testimony, was totally credible in court-there was additional

5  evidence corroborating this fact, the Probation Report. [Exhibit G, at CT 190

6  ¶3, 194-196 ¶1 & ¶s7-9.] Although, the CAL/GANGS Information Center considered

7  him still active, there was more evidence to the opposite according to the

8  record during and attendant upon it.

9      Accordingly, to the "specific intent" requirement(s), there was

10  insufficient evidence [proof offered] to establish or support any of the

11  elements, and meet either requirements of the [S.T.E.P. Act], in regards to

12  petitioner.

13

14

15                                D.

16              THE CALIFORNIA SUPREME COURT'S AND THE APPELLATE COURT'S

17              REJECTION OF PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL

18                     CLAIM WAS OBJECTIVELY UNREASONABLE

19

20      Petitioner's Claims/issues regarding Ineffective Assistance of Counsel are

21  contained within [ALL CLAIMS AND ISSUES, ISSUES I-XIII] of his Petition; for due

22  to the facts that, those claims/issues of [IAC] are bootstrapped to all his

23  claims/issues.

24  ////

25  ////

26

27

28

                                9.

1.

APPLICABLE LAW

STANDARD OF REVIEW

UNDER

Strickland

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's conduct fell below an objective standard of reasonableness, and that the defendant was prejudiced by counsel's acts or omissions. Strickland v Washington [1984]; accord [Bell I], supra, 535 U.S. at 695; Williams v Taylor, supra, 529 U.S. at 390. Strickland imposes a "highly demanding" standard upon the defendant to prove "gross incompetence." Kimmelman v Morrison [1986] 477, U.S. 365, 382, 106 S.Ct. 2574, 91 L. Ed. 2d 305. According to the Supreme Court, judicial review of a Strickland claim is "highly deferential," and "doubly deferential when it is conducted through the lens of federal habeas." Yarborough v Gentry [2003] 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 [per curiam]; see Delgado v lewis [9th Cir. 2000] 223 F.3d 976, 981 [Strickland standard is "very forgiving"].

2.

APPLICABLE LAW

STANDARD OF REVIEW

UNDER

Cronic

Alike Strickland, supra, Petitioner's Case was lacking due to that

10.

1    counsel being physically absent at many times during crucial court

2    proceedings. [See generally, **PETITIONER'S PET.** at the attached pp. 1-33.] And

3    at those times when he was absent co-counsel hardly offered constitutional

4    effective assistance due to attempting to be attentive to his own client-the

5    co-defendent. **Strickland**, supra, at 466 U.S. at 692; see **U.S. v Taylor**,

6    supra, 933 F.2d 307, 311-13 [court's refusal to retract defendant's waiver of

7    right to counsel and to appointed counsel for sentencing denied defendant

8    assistance of counsel when, given key limitation on standby counsel that such

9    counsel not responsible for accused's defense as full-fledged counsel,

10   standby counsel not "counsel" for Six Amendment purposes], cert. denied,

11   (italics omitted), 502 U.S. 883 [1991]]. Similarly, if counsel "entirely

12   fails to subject the prosecution's case to meaningful adversarial testing,"

13   the adversarial process itself becomes presumptively unreliable. **Cronic**

14   (italics omitted, bold & underlining added).

15       Alike **Cronic**, supra, Petitioner's Counsel (Mr. Sanchez) failed/refused

16   "entirely fails to subject the prosecution's case to meaningful adversarial

17   testing." [See generally, **PETITIONER'S PET.** at the attached pp. 1-33.]

18       And the combination and cumulative acts and omissions show an

19   unequivocal lack of preparation and investigation into the facts of the

20   Petitioner's Defense. Mr. Sanchez was very sick physically [taking numerous

21   mind-altering medications; i.v. in his arm during court proceedings , and

22   nodding-off during important times of same]; was having legal problems

23   himself, civil action against himself; and thus, under enormous mental and

24   physical stress during the trial court proceedings; and not even present

25   during other important parts of the pretrial and court trial. [RT 101;

26   101-102; and 2-respectively.] [**In re Rocha**, DAR [Dec. 30, 2005] at page 14919

27   [Case# B180415-Cal.2d] deficient performance of trial counsel rendered in

1  conducting his pretrial investigation necessarily was prejudicial to

2  defendant and thus, requires a new trial.)

3      Additionally, herein Petitioner's Case his trial counsel was also

4  deficient in challenging the Prosecution's Case in Chief. As within, the

5  meaning of **Cronic**, supra, he failed in all areas he could have put on a

6  defense for his client; instead the of assuming the facts of the

7  Prosecution's Case were true, and just accepting the Prosecution's File, full

8  of the right facts taken as true. The record as a whole clearly shows

9  [demonstrates] that he failed/refused to object to very incriminating

10  evidence, that was dubious as to its admissibility. Prejudiced out-weighing

11  the probative value. He failed/refused to conduct ivaluable research into the

12  charged offenses or case-law that's very important court interpretation of

13  the language within those charged offenses. Directly in regards to the

14  [SEPT-ACT] he did not even attempt to conduct minimal applicable research

15  before showing up into court. When you consider the importance of the

16  sentencing enhancements attached to Petitioner's Case [STEPT-ACT]; this was

17  the greatest part of his sentence, plus, of course, the doubling effect of

18  his prior serious felony, alleged against him. During the sentencing phase,

19  Petitioner's Trial Counsel (Mr. Sanchez) was very concerned about his client

20  being found guilty for all those gang-enhancements. [RT 1101-1103.] If he was

21  so troubled about the gang applicability, why did he not do his

22  homework...Petitioner was not an active gang member during his offenses. He

23  testified to that fact. [RT 1104-1105; and Probation Report 195-196.] As an

24  example of challenges to the [STEP-ACT] enhancements-see-[**Garcia v. Carey**,

25  Supra, 395 F.3d 1099; considering the date of this cite [2005] it was not

26  opinion until subsequently to, Petitioner's Conviction; however, the

27  cases-cited within was used to affirm the granting of relief, and were

28

already published during Petitioner's Trial]. Therefore, Petitioner's Counsel should have found them with minimal effort. Plus, most were in the Prosecutor's [TRIAL MEMORANDUM [EXHIBIT D, pp. 1-27] or could have been discovered with minimal research techniques. His counsel could have proffered objection to or an answer to that, [MEMORANDUM]; could have filed motions in limine, a motion to demurr, or/and a motion to strike in regards to the [STEP-ACT]. [See continuation of specific, [IAC] of arguments within, [PET. at ¶2, of attached p. 28, 29-30.]

## CONCLUSION

Considering all the differential "STANDARD OF REVIEWS," herein possible, we must leave this difficult decision to this Honorable Court, of which STANDARD is the correct one?

Additionally, petitioner humbly request this Honorable Court to consider in conjunction with the above, all the rest of the arguments within his Petition.

"Thank you for your time and attention!!!"

////
////

13.

\*
\*\*

THE HONORABLE CALIFORNIA SUPREME COURT

ORIGINAL PETITION FOR WRIT
OF HABEAS CORPUS
[SEPARATELY BOUND EXHIBITS]

PETITIONER JAVIER ESPINOZA RODRIGUEZ
CALIFORNIA MENS COLONY-EAST 6147
STATE PRISON
P.O. BOX 8101
SAN LUIS OBISPO, CA 93409-8101

RESPONDENT JOHN C. MARSHAL [WARDEN-CMC]

FOURTH APPELLATE DISTRICT, DIVISION ONE,
NO. D049739
\*\*
\*

## TABLE OF CONTENTS

EXHIBIT A: EN BANC DENIAL & PETITION FOR
REVIEW,
**AT PP. i-vii, & 1-47.**


EXHIBIT B: APPELLATE COURT'S DECISION,
**AT PP. 1-44.**


EXHIBIT C: STATE BAR OF CALIFORNIA INFORMATION,
**AT PP. 1-3.**


EXHIBIT D: TRIAL MEMORANDUM,
**AT PP. 1-27.**


EXHIBIT E: INMATE TRUST ACCOUNT STATEMENT,
**AT P. 1 OF 1.**


EXHIBIT F: SUPERIOR COURT DENIAL,
**AT PP. 1-4**
; AND REBUTTAL TO COURT'S DENIAL,
**AT PP. 1-2.**


EXHIBIT G: APPELLATE COURT'S DENIAL,
**AT PP. 1-2 ON BACK PAGE**
& REBUTTAL,
**AT PP. 1-6.**


CLERK'S TRANSCRIPTS ON APPEAL
**[ALL IN NUMBERED SEQUENCE: BUT NOT ALL
TRANSCRIPTS INCLUDED].**


REPORTER'S TRANSCRIPTS.


REPORTER'S TRANSCRIPTS AUGMENTATED.


ADDEMDUM [#2]


EXHIBIT H: CALIFORNIA SUPREME COURT DENIAL [POST-CARD, NO-CITE],
**AT P. 1 OF 1.**
AND ADDENDUM [#2]: GENERALITIES OF THE APPLICABILITES OF CUNNINGHAM,
OF WHICH VIOLATE THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION

EXHIBIT A

Court of Appeal, Fourth Appellate District, Division One - No. D043198
S133875

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

JAVIER ESPINOZA RODRIGUEZ, Defendant and Appellant.

Petition for review denied without prejudice to any relief to which defendant might be entitled upon finality of *People v. Black* (2005) 35 Cal.4th 1238 regarding the effect of *Blakely v. Washington* (2004) 542 U.S. __, 124 S.Ct. 2531, and *United States v. Booker* (2005) 543 U.S. __, 125 S.Ct. 738, on California law.

SUPREME COURT
FILED

George, C.J., and Baxter, J., were absent and did not participate.

JUL 2 0 2005

Frederick K. Ohlrich Clerk

_____
DEPUTY

WERDEGAR
_____
Acting Chief Justice

SUPREME COURT NO. _____

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

**THE PEOPLE OF THE STATE OF CALIFORNIA,** ) Court of Appeal
)  No. D043198
)
Plaintiff and Respondent, ) Superior Court
)  No. SCS176087
)
v. )
)
**JAVIER ESPINOZA RODRIGUEZ,** )
)
Defendant and Appellant. )
_____ )

APPEAL FROM THE SUPERIOR COURT OF SAN DIEGO COUNTY

Honorable Esteban Hernandez, Judge

_____

PETITION FOR REVIEW AFTER THE
UNPUBLISHED DECISION OF THE COURT
OF APPEAL, FOURTH APPELLATE
DISTRICT, DIVISION ONE, AFFIRMING THE
JUDGMENT OF CONVICTION.

_____

**ROBERT L. SWAIN**
Attorney at Law
California State Bar No. 144163
The Granger Building
964 Fifth Avenue, Suite 214
San Diego, California 92101
Telephone No: (619) 544-1494
Facsimile No: (619) 544-1473

By appointment of the Court of Appeal
under the Appellate Defenders, Inc.
independent-case system

SUPREME COURT NO. _____

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,** | ) Court of Appeal |
| | ) No. D03198 |
| | ) |
| Plaintiff and Respondent, | ) Superior Court |
| | ) No. SCS176087 |
| v. | ) |
| | ) |
| **JAVIER ESPINOZA RODRIGUEZ,** | ) |
| | ) |
| Defendant and Appellant. | ) |
| | ) |

APPEAL FROM THE SUPERIOR COURT OF SAN DIEGO COUNTY

Honorable Esteban Hernandez, Judge

_____

PETITION FOR REVIEW AFTER THE
UNPUBLISHED DECISION OF THE COURT
OF APPEAL, FOURTH APPELLATE
DISTRICT, DIVISION ONE, AFFIRMING THE
JUDGMENT OF CONVICTION.

_____

TO THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE,

AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE

SUPREME COURT OF THE STATE OF CALIFORNIA.

Defendant and Appellant, Javier Espinoza Rodriguez, petitions for

review following the unpublished decision of the Court of Appeal, Fourth

Appellate District, Division One (per Justice O'Rourke) filed on April 5, 2005.

A copy of the decision is attached to this petition as Exhibit "A."

# TABLE OF CONTENTS

PAGE

Table of Authorities .................................................................. iv - vii

Introduction ................................................................................. 1

Statement of Issues Presented for Review ............................... 2, 3

Necessity for Review .................................................................. 3

Statement of the Case ................................................................. 5

Statement of Facts. ...................................................................... 7

Argument ..................................................................................... 8

    I.    REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT
        ABUSED ITS DISCRETION WHEN IT FAILED TO REPLACE A
        JUROR WHO WAS UNABLE TO UNEQUIVOCALLY STATE THAT
        SHE WOULD DECIDE THE CASE BY REFERENCE EXCLUSIVELY
        TO THE LAW AND THE EVIDENCE. ................................................. 8

    II.    THE PETITION FOR REVIEW SHOULD BE GRANTED BECAUSE
        THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH MR.
        RODRIGUEZ ATTEMPTED TO DISSUADE A WITNESS ............ 11

    III.    REVIEW SHOULD BE GRANTED BECAUSE THERE WAS
        INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A
        REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED
        FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN
        ASSOCIATION WITH ANY CRIMINAL STREET GANG ............ 14

        A.    The Evidence Is Insufficient to Establish That "Sidro" Is a
            Criminal Street Gang ........................................................ 16

<u>TABLE OF CONTENTS CONTINUED</u>

PAGE

B.  The State Presented Insufficient Evidence That Any Of The Offenses Were Committed For The Benefit Of, At The Direction Of, And In Association With A Criminal Street Gang With The Specific Intent To Promote, Further And Assist In Criminal Conduct By Gang Members . . . . . . . . 20

No    IV.  REVIEW SHOULD BE GRANTED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT MR. RODRIGUEZ WAS AN ACTIVE PARTICIPANT OF A CRIMINAL STREET GANG . . . . . . . . . . . . . . 22

Yes    V.  REVIEW SHOULD BE GRANTED BECAUSE MARTINEZ' TESTIMONY REGARDING THE ALLEGED STATEMENTS MADE BY OFFICERS ABOUT FIELD INTERVIEWS IS VIOLATIVE OF MR. RODRIGUEZ' SIXTH AMENDMENT RIGHT TO CONFRONTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

No    VI.  REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT ERRED BY ALLOWING IMPROPER PRIOR ACT EVIDENCE THAT PREJUDICED THE DEFENDANT'S RIGHT TO A FAIR TRIAL . . . . 28

No    VII.  REVIEWS SHOULD BE GRANTED BECAUSE THE COURT ERRED IN FAILING TO GIVE A LESSER INCLUDED OFFENSE INSTRUCTIONS FOR COUNTS THREE AND FOUR . . . . . . . . . . . . 29

Yes    VIII.  REVIEW SHOULD BE GRANTED BECAUSE THE IMPOSITION OF CONSECUTIVE SENTENCES BASED ON JUDICIAL FACT FINDING IS VIOLATIVE OF THE SIXTH AMENDMENT . . . . . . . . . . . . . . . . . 33

No    IX.  REVIEW SHOULD BE GRANTED BECAUSE THE COURT ABUSED ITS DISCRETION IN FAILING TO DISMISS THE STRIKE PRIOR . . 38

Yes    X.  REVIEW SHOULD BE GRANTED BECAUSE THE ERRONEOUS JURY INSTRUCTION ON THE GANG ENHANCEMENT MANDATES REVERSAL BECAUSE IT MISLED THE JURY AS TO THE BURDEN OF PROOF AND THE ELEMENTS OF THE ENHANCEMENT . . . . . 42

## TABLE OF CONTENTS CONTINUED

                                                                              **PAGE**

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Proof of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

PAGES

## CASES

*Apprendi v. New Jersey,*
  (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] . . . . . . . . . . . . . . . . . . . . 35

*Blakely v. Washington,*
  (2004) 524 U.S. [124 S.Ct. 2351; 159 L.Ed.2d 403] . . . . . . . . . . . . . 33, 35, 36, 37

*Chapman v. California,*
  (1967) 386 U.S. 18 [87 S.Ct. 824; 17 L.Ed.2d 705] . . . . . . . . . . . . . . . . . . 27, 38

*Crawford v. Washington,*
  (2004), 124 S.Ct. 1354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Gibson v. Ortiz,*
  (9th Cir. 2004) 387 F.3d 812 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Hitchings,*
  (1993), 6 Cal.4th 97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Winship,*
  (1970) 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368 ] . . . . . . . . . . . . . . . . . 45

*Jackson v. Virginia,*
  (1979) 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lilly v. Virginia,*
  (1999) 527 U.S. 116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Anderson,*
  (1987) 43 Cal.3d 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Carmony,*
  (2004) 14 Cal.Rptr.3d 880 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Castaneda,*
  (2000) 23 Cal.4th 743 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES CONTINUED

PAGES

## CASES

*People v. Cole,*
   (2004) 33 Cal.4th 1158 ................................................................ 45

*People v. Compton,*
   (1971) 6 Cal.3d 55 ................................................................ 8

*People v. Fitch,*
   (1997) 55 Cal.App. 4th 172 ................................................................ 46

*People v. Ford,*
   (1983) 145 Cal.App.3d 985 ................................................................ 12, 13

*People v. Gardeley,*
   (1996) 14 Cal.4th 605 ................................................................ 18

*People v. Hecker,*
   (1990) 219 Cal.App.3d 1238 ................................................................ 11

*People v. Holt,*
   (1997) 15 Cal.4th 619 ................................................................ 13

*People v. Killebrew,*
   (2003) 103 Cal.App.4th 644 ................................................................ 20, 21

*People v. Lewis,*
   (2001) 25 Cal.4th 610 ................................................................ 32

*People v. Lucas,*
   (1995) 12 Cal.4th 415 ................................................................ 10

*People v. Marshall,*
   (1990) 50 Cal.3d 907 ................................................................ 10

*People v. Marshall,*
   (1996) 13 Cal.4th 799 ................................................................ 10

# TABLE OF AUTHORITIES CONTINUED

**CASES**                                                                    **PAGES**

*People v. McDaniel,*
(1994) 22 Cal.App.4th 278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Perez,*
(2004) 118 Cal.App.4th 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Sengpadychith,*
(2001) 26 Cal.4th 316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*People v. Springfield,*
(1993)13, Cal.App.4th 1674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Superior Court (Romero),*
(1996) 13 Cal.4th 497 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Williams,*
(1998) 17 Cal.4th 148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Salazar v. Superior Court,*
(2000) 83 Cal.App.4th 840 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Sullivan v. Louisiana,*
(1993) 508 U.S. 275 [113 S.Ct. 2078, 124 L.Ed.2d 182] . . . . . . . . . . . . . . . . . . . 43

## STATUTES

California Rules of Court, rule 4.425 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

CALJIC No. 2.80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43, 44

CALJIC No. 6.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43, 44

CALJIC No. 8.73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Evidence Code section 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES CONTINUED

**CASES**                                                                    **PAGES**

Penal Code section 12025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29, 30

Penal Code section 12031 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

Penal Code section 136.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Penal Code section 186.20, et seq.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Penal Code section 186.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Penal Code section 459, 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO REMOVE A JUROR WHO INDICATED THAT SHE WAS UNSURE WHETHER SHE HAD THE ABILITY TO DECIDE THE CASE BY REFERENCE EXCLUSIVELY TO THE LAW AND THE EVIDENCE.

2.  WHETHER THERE WAS SUFFICIENT EVIDENCE TO FIND BEYOND A REASONABLE DOUBT THAT MR. RODRIGUEZ ATTEMPTED TO DISSUADE A WITNESS.

3.  WHETHER THERE WAS SUFFICIENT EVIDENCE TO FIND BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH A CRIMINAL STREET GANG.

4.  WHETHER THERE WAS SUFFICIENT EVIDENCE TO FIND BEYOND A REASONABLE DOUBT THAT MR. RODRIGUEZ WAS AN ACTIVE PARTICIPANT OF A CRIMINAL STREET GANG.

5.  WHETHER THE ADMISSION OF HEARSAY EVIDENCE BY THE GANG EXPERT VIOLATED MR. RODRIGUEZ' SIXTH AMENDMENT RIGHT TO CONFRONTATION.

6.  WHETHER THE TRIAL COURT PREJUDICIALLY ERRED BY ALLOWING EVIDENCE OF MR. RODRIGUEZ' PRIOR CONVICTION.

7.  WHETHER THE TRIAL COURT ERRED BY FAILING TO INSTRUCT ON THE LESSER-INCLUDED OFFENSES FOR COUNTS THREE AND FOUR.

8.  WHETHER THE IMPOSITION OF CONSECUTIVE SENTENCES BASED ON JUDICIAL FACT FINDING IS VIOLATIVE OF THE SIXTH AMENDMENT.

9.  WHETHER THE TRIAL COURT ERRED IN FAILING TO DISMISS

2

THE STRIKE PRIOR.

10.    WHETHER IT WAS ERROR TO INSTRUCT THE JURY PURSUANT TO CALJIC NO. 6.50 BECAUSE IT ALLOWED THE JURY TO GIVE UNDUE WEIGHT TO THE GANG EXPERT.

## NECESSITY FOR REVIEW

The lower court denied the appeal holding that, 1) the court did not abuse its discretion by not replacing a distraught juror; 2) substantial evidence supports the jury verdict that the appellant had the specific intent to dissuade a witness because he fired a weapon; 3) the gang enhancement was proven because both the primary activity of the gang was shown and the gang expert's testimony was proper; 4) sufficient evidence was presented to establish that the appellant was currently an active participant in a criminal street gang; 5) appellant's Sixth Amendment right to confrontation was not violated by Investigator Martinez' testimony about the statements made by other officers; 6) the trial court properly admitted appellant's prior burglary conviction to establish the predicate offenses of the gang; 7) any error in failing to give lesser included offense instructions for counts three and four was harmless; 8) the imposition of consecutive sentences did not contravene the Sixth Amendment; 9) the trial court did not abuse its discretion in refusing to strike appellant's strike prior; and 10) CALJIC No. 6.50 did not cause the jury to improperly consider the expert's testimony.

3

Mr. Rodriguez believes that the Court should grant review because, 1) the lower court fails to justify the trial court's failure to replace Juror No. 7; 2) the lower court does not adequately consider the lack of connection between the appellant's conduct and the specific intent necessary to show dissuading a witness; 3) the lower court does not show that the primary activity of the gang was established, nor that the expert testimony was proper; 4) the lower court fails to consider the evidence that Mr. Rodriguez distanced himself from "Sidro", and currently had very limited contact with the gang; 5) the lower court misapprehends the Sixth Amendment violation by focusing on the appellant's statements instead of the out of court declarants, which were the field officers; 6) the lower court's reliance on the limiting instruction to justify the prior bad act evidence is misplaced because the instruction placed undue weight on the prejudicial evidence; 7) the lower court sidesteps the trial court's error in failing to give a lesser included offense instruction for counts three and four, by incorrectly finding the error was harmless; 8) the lower court incorrectly finds there was no Sixth Amendment error in imposing sentence because the sentence did not exceed the total maximum or rely on facts not proven; 9) the lower court did not recognize that the trial court did not properly balance all factors in determining whether or not to strike Mr. Rodriguez strike prior; and 10) the lower court fails to recognize the mandatory language of

4

CALJIC NO. 6.50, and the conflict with CALJIC NO. 2.80.

## STATEMENT OF THE CASE

In a five-count amended information filed August 4, 2003, Javier Espinoza Rodriguez, and co-defendant Jose Luis Leon, were charged in count one with burglary of a motor vehicle in violation of Penal Code section 459[1], in count two with attempting to dissuade a witness from reporting a crime in violation of section 136.1, subdivision (b)(1); in count three with having a concealed firearm in a vehicle while being an active participant of a criminal street gang, in violation of section 12025, subdivision (a)(1); in count four with carrying a loaded firearm while being an active participant of a criminal street gang, in violation of section 12031, subdivision (a)(1); and in count five, co-defendant Leon was charged with resisting an officer, in violation of section 148, subdivision (a)(1). [C.T. 9-13.][2] It was alleged in counts one and two that during the commission of those offenses, Mr. Rodriguez was armed with a firearm, within the meaning of section 12022.5, subdivision (a)(1). It further was alleged on all counts that both defendants committed the above offense for

---

[1]    All further references are to the California Penal Code unless otherwise noted.

[2]    "C.T." refers to the Clerk's Transcript filed in this appeal, "R.T." refers to the Reporter's Transcript, and "R.T.A." refers to the Augmented Reporter's Transcript.

5

the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members in violation of section 186.22, subdivision (b)(1).

Jury trial began in the matter on August 4, 2003, before the Honorable Esteban Hernandez. [C.T. 216.] Trial continued on August 5, August 7, August 12, August 13, and August 14, 2003. [C.T. 216 - 231.] On August 15, 2003, the jury entered guilty verdicts on all counts, but, on count one, found that Mr. Rodriguez had not personally used a firearm within the meaning of section 12022.5, subdivision (a)(1). [C.T. 139.]

On August 18, 2003, the Court proceeded with the bifurcated trial on Mr. Rodriguez' prior strike allegation. [C.T. 233.] The Court found true the strike prior as alleged per section 667, subdivisions (b)-(i). [Ibid.]

On October 14, 2003, Mr. Rodriguez appeared for sentencing. [C.T. 235.] The court denied probation and sentenced Mr. Rodriguez as follows: On the principal term, count two, the middle term doubled because of the strike prior for a total term of four years, five years consecutive for the allegation pursuant to section 186.22, and four years consecutive pursuant to section 12022.5(a)(1); on count one, one-third of the middle term doubled because of the strike prior allegation for a total term of 16 months consecutive to count two, and the gang allegation was stayed pursuant to section 654; all other

6

counts were stayed pursuant to Section 654, resulting in a total term of 14 years, 4 months. [C.T. 235.] The notice of appeal was timely filed on October 31, 2003. [C.T. 205.]

On April 5, 2005, the court of appeal affirmed the conviction and sentence. This petition follows.

## STATEMENT OF FACTS

The statement of facts is set forth in the decision, and is incorporated herein by reference. In summary, the case arose on May 11, 2003, when police officers responded to a report that two men had broken into a car, and that one of the men had fired a gun in the air. Upon arriving near the scene, an officer saw a car leaving the area that matched the description of the suspects' vehicle and which contained the two defendants. The officer followed the vehicle for a short distance. Once the officer activated his emergency lights, the vehicle immediately pulled over. Jose Leon, the passenger, attempted to flee the scene, but was apprehended within a short distance.

Mr. Rodriguez, who was the driver of the car, went to trial on the defense of voluntary intoxication, and disputed that he was an active participant of a criminal street gang, or that the offense was committed to benefit a gang. Further facts in the record will be cited in the argument.

7

## ARGUMENT

### I.

### REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO REPLACE A JUROR WHO WAS UNABLE TO UNEQUIVOCALLY STATE THAT SHE WOULD DECIDE THE CASE BY REFERENCE EXCLUSIVELY TO THE LAW AND THE EVIDENCE.

The trial court erred in failing to remove a juror who was unable to unequivocally state that she would properly perform her duties. Section 1089 provides that "[i]f at any time, whether before or after the final submission of the case to the jury, a juror ... is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, ...." In *People v. Compton* (1971) 6 Cal.3d 55, 60, the Supreme Court explained that "the trial court has at most a limited discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." Here, the court received a note from Juror 7, which read: "I have some concerns regarding the defendants. They look familiar. At first sight, I thought I might have seen them on television (news). The more I look at them, I think it might be somewhere else, and this concerns me. Could it be possible for me to be excused?" [R.T.A. 157.] After receiving the note, the juror further stated, "My instincts say something just

8

doesn't fell right."......"Your words, of course, make perfect sense, and of course I can do that. Like I said, internally, I'm just not–I don't know. I just don't feel comfortable."...... "Like I said, I don't know them or anything like that. But, you know, I guess my fear would be, easily put, would be fear of retaliation one way or another."......"I don't know what the outcome is going to be. I just  have that feeling. And like I said, I thought since I wasn't comfortable with it, like I said, I should speak up." [R.T.A. 157-161.]

The defense made a motion to excuse the juror based on this information. [R.T.A. 162.] The prosecutor stipulated to the Court. [Ibid.] The Court denied the motion despite the fact that the Court recognized that Juror 7 used the word "retaliation". The Court determined: "[I] think the fact that came after listening to the witness, Herrera's testimony, wherein he expresses some fear of retaliation, may have put that thought in her mind, because certainly she did not come forward earlier about recognizing anybody or anything of that nature." [Ibid.] In denying the defense motion, the court determined that Juror 7 would be able to listen to the evidence and follow the court's instructions. However, the court essentially acknowledged that the juror had lied, or at least created a ruse, to be removed from the jury due to fear of retaliation.

The trial court's decision whether or not to discharge a juror under

9

section 1089 is reviewed for abuse of discretion and will be upheld if

supported by substantial evidence; to warrant discharge the juror's bias or other

disability must appear in the record as a demonstrable reality. (*People v.*

*Marshall* (1996) 13 Cal.4th 799, 843, 55; *People v. Lucas* (1995) 12 Cal.4th

415, 489.) A juror's misconduct creates a rebuttable presumption of prejudice,

and reversal is required if there is a substantial likelihood one or more jurors

were improperly influenced by bias. (*In re Hitchings* (1993) 6 Cal.4th 97, 118-

119; *People v. Marshall* (1990) 50 Cal.3d 907, 950-951.)

The lower court holds that the court did not abuse its discretion by not

removing a juror because the record reflects no demonstrable reality that the

juror was unable to perform her duties. [Opn. p. 10]. The lower court does not

recognize, however, that there was a significant likelihood that the juror would

decide the case based on extraneous matters, and the court erred in failing to

dismiss the juror.

The record reflects that the prosecutor recognized the issue presented

by a juror who appeared likely to decide the case based on extraneous matters

by stipulating to the court upon the defense motion. [RT 162].

The lower court recognizes that the juror's inability to properly perform

his or duties must appear in the record as demonstrable reality. [Opn. p. 9].

However, the lower court narrowly relies upon the juror's one statement that

10

she could decide the case based on the evidence, but ignores the numerous instances where the juror admits that she was afraid of the defendants. (See e.g., RTA 159 [noting fear of retaliation], RTA 159 [acknowledging that fear about involvement in trial stems from the gang-related nature of the case]; RTA 158 ["My instincts say something just doesn't feel right."].)

In sum, the court was presented with a juror who admitted that there was a significant likelihood that extraneous matters would enter into her decisionmaking process. As the court determined in *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1244-45, "An admission by a juror that there is a significant likelihood extraneous matters will enter into the decisionmaking process is ... sufficient to warrant removal of the juror and substitution of an alternate." Therefore, the court abused its discretion in failing to remove Juror No. 7, and the petition should be granted.

## II.

## THE PETITION FOR REVIEW SHOULD BE GRANTED BECAUSE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH MR. RODRIGUEZ ATTEMPTED TO DISSUADE A WITNESS.

The state presented insufficient evidence that Mr. Rodriguez had the specific intent to dissuade the witnesses from making any report to a peace officer within the meaning of section 136.1, subdivision (b)(1). Instead, the evidence showed that the intoxicated Mr. Rodriguez fired a handgun in the air

11

after the witnesses stated that they had already called the police. Moreover, the evidence showed that Mr. Rodriguez was approximately 173 feet away from the witnesses when they said that they had called 911 and there was no specific evidence that he could hear the witness. As well, there was never any link shown between the gun shot and the witnesses' past report. Therefore, because the evidence is insufficient to establish that Mr. Rodriguez specifically intended to dissuade a witness from making any report, the conviction for Count one must be dismissed.

The United States Supreme Court has held that "the due process standard ... protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 314-315.)

There was insufficient evidence to establish that Mr. Rodriguez possessed the specific intent to dissuade any witness from testifying. "Section 136.1 proscribes preventing a witness or victim from testifying or doing other enumerated acts." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) Unless the defendant's acts or statements are intended to affect or influence a potential witness' or victim's testimony or acts, no crime has been committed under this section. (*People v. Ford* (1983) 145 Cal.App.3d

12

985, 989.) Because the definition refers to a defendant's intent to achieve some further or additional consequence, Section 136.1 is a specific intent crime. (Id., at p. 990.)

Here, the only evidence presented at trial was that Mr. Rodriguez fired a handgun in the air at some point after the witnesses had called the police from 173 feet away. There was no evidence produced at trial that Mr. Rodriguez could have heard the witness or was otherwise aware that the police had been called. Moreover, Mr. Rodriguez was heavily intoxicated at the time.

The lower court holds that substantial evidence supports the conviction because the evidence showed that the appellant fired a shot in response to the witness' statement that he was going to call the police. [Opn. p. 13]. This is incorrect because based on the timing of the action, Mr. Rodriguez' distance from the witnesses, and Mr. Rodriguez' mental state, the evidence is insufficient to establish that Mr. Rodriguez specifically intended to dissuade any witness from testifying.

While the lower court notes that the evidence is viewed in the light most favorable to the verdict, the reviewing court must still find substantial evidence to support the conviction based on the entire record [Opn. p. 12]. (See *People v. Holt* (1997) 15 Cal.4th 619, 667 ["In making this assessment

13

the court looks to the whole record, not just the evidence favorable to the respondent to determine if the evidence supporting the verdict is substantial in light of other facts."].) The entire record here fails to show substantial evidence sufficient to support the conviction.

The lower court holds that given the sequence of events the jury could conclude that the purpose of shooting the gun was to threaten the witness with harm. [Opn. p. 14]. Although it is correct that the 911 tape shows that Martin Herrera yelled before the gun was discharged, it does not confirm that Mr. Rodriguez heard what Mr. Herrera said. Mr. Rodriguez was heavily intoxicated and approximately 173 feet away from Mr. Herrera at the time he yelled. Furthermore, it does not establish that Mr. Rodriguez had the specific intent to dissuade a witness from making a report. The petition should therefore be granted.

## III.

### REVIEW SHOULD BE GRANTED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH ANY CRIMINAL STREET GANG.

The evidence was insufficient to prove that "Sidro" is a criminal street gang or that the offenses were committed for the benefit of, at the direction of, or in association with any criminal street gang. Counts one

14

through four alleged that Mr. Rodriguez committed the charged offenses within the meaning of Section 186.22, subdivision (b)(1), which enhances the sentence of "any person convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members...." Thus, in order for the enhancement to apply, the prosecution must show the existence of a criminal street gang, and must also show that the offense was committed with the specific intent to benefit the gang. In order to meet its burden on the elements of this enhancement, the state relied solely on a so-called "gang expert". Martinez' testimony was insufficient to establish either that "Sidro" is a criminal street gang, or that the above offenses were committed to benefit a criminal street gang.

The lower court holds that the gang enhancement was proven because the primary activity of the gang was shown, and that the testimony of the gang expert was proper. [Opn. pp. 15-18]. This holding is incorrect for two reasons. First, the evidence was insufficient to establish that "Sidro" is a criminal street gang because neither the primary activity nor that gang members repeatedly committed criminal activity was established. Second, the expert testimony was improper and overbroad and could not establish the offenses were committed for the benefit of the gang with the

15

specific intent to promote criminal conduct by gang members.

**A.    The Evidence Is Insufficient to Establish That "Sidro" Is a Criminal Street Gang.**

The evidence was insufficient to establish that a "primary activity" of the "Sidro" gang was the commission of one or more of the crimes enumerated in section 186.22. The existence of a criminal street gang is an element of section 186.22. (*See Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846.) .

The lower court holds that substantial evidence supports the finding that "Sidro" is a criminal street gang. [Opn. p. 17]. Under section 186.22, the state has the burden of proving that a group is a criminal street gang. In order to establish that a group is a criminal street gang, the prosecution must prove, *inter alia*, that the group have as one of its primary activities the commission of an enumerated offense. [RB 25]. The lower court notes: "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations. [Citations.]" [*Ibid*; citations omitted.] Sufficient proof that one of the gang's primary activities is the commission of an enumerated offense can be established by showing that the gang's members consistently and repeatedly have committed the enumerated crimes. [Opn. pp.15-16, citing *People v.*

16

*Sengpadychith* (2001) 26 Cal.4th 316].

In this case, the evidence was insufficient to establish either that the "primary activity" of "Sidro" was the commission of an enumerated offense or that members of "Sidro" consistently and repeatedly committed enumerated offenses. The lower court cites the expert testimony, in addition to the evidence providing the commission of the charged crimes, to establish that "Sidro" is a criminal street gang. [Opn. p. 17].

In particular the lower court finds the following testimony to be sufficient to infer the facts at issue:

> Prosecutor: Are you aware of what the <u>primary criminal activities</u> is [sic] of Sidro Gang members.
>
> Martinez: Yes.
>
> Prosecutor: And can you please give us what you would consider their <u>primary crime</u>?
>
> Martinez: Well, I look at–I look at ranges, okay? Everything from vandalism up to murder. So they've–They've met at least on one occasion they met some type within those boundaries. We're talking about assaults, we're talking about extortions, we're talking about burglaries, narcotics involvement, and other types.

[Opn. pp. 16-18, RT 353-354; emphasis added]. The lower court fails to recognize that under the statute, the prosecution, in order to meet its burden that a group constitutes a criminal street gang, must prove that the

17

group "has as one of its primary activities the commission of one or more

of the criminal acts enumerated in the statute". (*People v. Gardeley* (1996)

14 Cal.4th 605, 617.) Therefore, the "primary criminal activities" and the

"primary crime[s]" of Sidro have no bearing on whether or not "Sidro"

constitutes a criminal street gang. The statute focuses exclusively on the

"primary activities" of the group, not the primary crimes or primary

criminal activities.

In *People v. Sengpadychith, supra,* 26 Cal.4th 316, the California

Supreme Court explained:

> The phrase "primary activities," as used in the gang statute,
> implies that the commission of one or more of the statutorily
> enumerated crimes is one of the group's "chief" or "principal"
> occupations. [Citation.] That definition would necessarily
> exclude the occasional commission of those crimes by the
> group's members... "Though members of the Los Angeles
> Police Department may commit an enumerated offense while
> on duty, the commission of crime is not a *primary activity* of
> the department."

Thus, like the LAPD, the primary crime of "Sidro" may range from

vandalism to murder, and that robbery may be common [R.T. 353], but that

does not establish that "Sidro" is a criminal street gang.

Contrary to the lower court's holding, the phrase "primary activity"

has significant meaning. In order to establish that a group is a criminal

street gang under the statute, the state must prove, in part, that a "primary

18

activity" of the group is the commission of enumerated acts. Here, the evidence did not establish that the "primary activity" of "Sidro" is the commission of enumerated offenses. Therefore, the evidence was insufficient to establish that "Sidro" is a gang within the meaning of the statute.

Moreover, the evidence was insufficient to establish that "Sidro" is a criminal street gang because there is insufficient evidence that members of "Sidro" consistently and repeatedly committed enumerated criminal offenses. The lower court distinguishes *People v. Perez* (2004) 118 Cal.App.4th 151, from the case at bar by holding that in *Perez*, there was no expert testimony directly linking the enumerated offenses to the defendant's gang. However, the *Perez* Court concluded that even if the expert's testimony was applicable and correct, such evidence was "insufficient to establish that 'the group's members *consistently* and *repeatedly* have committed criminal activity listed in the gang statute. (*Ibid.*)

There is insufficient evidence to establish that "Sidro" members consistently and repeatedly committed offenses enumerated in the gang statue. Therefore, because there is the absence of proof of this element of the criminal street gang allegation, the petition should be granted.

19

**B.**   <u>The State Presented Insufficient Evidence That Any Of The Offenses Were Committed For The Benefit Of, At The Direction Of, And In Association With A Criminal Street Gang With The Specific Intent To Promote, Further And Assist In Criminal Conduct By Gang Members.</u>

The convictions in counts one through four must also be reversed because the state presented insufficient evidence that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members. The only evidence presented by the state on this issue was the testimony of Martinez. This evidence was insufficient to establish this element for two reasons; first, Martinez' testimony exceeded the scope of permissible expert testimony; and second, Martinez' claims regarding what activities benefit a gang was so broad it became meaningless to prove the allegations in this case.

The lower court holds that the evidence was sufficient to establish that the offenses were committed for the benefit of a criminal street gang with the specific intent to promote criminal conduct by gang members because Martinez' testimony was permissible expert testimony, and that Martinez' claims regarding what activities benefit a gang was sufficient to prove the allegations in this case. [Opn. pp. 20-21]. The lower court fails to consider that in *People v. Killebrew* (2003) 103 Cal.App.4th 644, 657-

658, the court cited numerous cases on expert testimony in gang cases, and determined, that "[n]one of the[] cases permitted testimony that a specific individual had specific knowledge or possessed a specific intent." In *Killebrew*, an expert witness, through the use of hypothetical questions, "testified to the subjective knowledge and intent of each occupant in each vehicle. Such testimony is much different from the expectations of gang members in general when confronted with specific action." (*Id.*, at p. 658; emphasis original.)

In this case, Martinez testified that the theft was committed for the benefit of documented gang members for the benefit of the gang, and that the firing of the weapon was also done for the benefit of the gang. This testimony is not proper because it was not based on the expectations of gang members, but on the subjective knowledge and intent of Mr. Rodriguez.

The lower court also rejects Appellant's argument that Martinez' testimony was overboard. However, Martinez' testimony was overboard because he testified that nearly every offense committed by two gang members is committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members, simply because

21

the two individuals happen to belong to the same gang. [RT 391].

Furthermore, and more importantly, Martinez testified that the offenses in this case were committed for the benefit of a criminal street gang with the specific intent to promote criminal conduct by gang members. [R.T. 366-369]. Therefore, Martinez' testimony was overboard and violative of Mr. Rodriguez' right to due process, and thus the petition should be granted for this reason also.

## IV.

## REVIEW SHOULD BE GRANTED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT MR. RODRIGUEZ WAS AN ACTIVE PARTICIPANT OF A CRIMINAL STREET GANG.

The evidence introduced at trial was insufficient as a matter of law to sustain the convictions in counts three and four for violations of section 12025, subdivision (a)(1), and section 12031, subdivision (a)(1), because both offenses include the element that the defendant be an active gang member. In order to meet its burden on this element, the state must prove: first, that the defendant was an active participant, and second that "Sidro" was a criminal street gang. Here, because there was insufficient evidence that Mr. Rodriguez was an active participant of a criminal street gang, the convictions must be reversed.

Mr. Rodriguez was not an active participant of the "Sidro" gang

22

because the California Supreme Court has determined, based on its

statutory interpretation of section 186.22, subdivision (a), that "actively

participates in any criminal street gang" means "involvement with a

criminal street gang that is more than nominal or passive." (*People v.*

*Castaneda* (2000) 23 Cal.4th 743, 747.)  Based on this definition, the

*Castaneda* Court found that the defendant was actively participating in a

criminal street gang because:

> In the 14 months before the crimes in this case, Santa Ana
> police officers on seven occasions saw defendant in the
> company of known Goldenwest gang members, and on four
> of these gave him written notice that Goldenwest was a
> criminal street gang under the ["California Street Terrorism
> Enforcement and Prevention Act"; Penal Code section
> 186.20, *et seq.*].  On those occasions, defendant bragged to
> the officers that he "kicked back" with the Goldenwest gang,
> a phrase that gang expert Officer Thomas Seafin explained
> was gang parlance for being associated with or being a
> member of the gang.

(Id., at pp. 752-753.)

The facts in this case are significantly and materially different.

According to Martinez, Mr. Rodriguez only had six contacts in almost three

years prior to this offense.  Moreover, only one of these contacts had been

made in the previous two years, and there were no contacts in 2003.  More

importantly, a field interview sheet from 2001 reflected that Mr. Rodriguez

acknowledged that he **used** to be affiliated with "Sidro". [R.T. 400.]

23

Furthermore, the state did not produce any evidence that on any of these occasions police officers warned Mr. Rodriguez about the consequences of being an active participant of a criminal street gang. Such a limited amount of contacts establishes that any involvement Mr. Rodriguez had with "Sidro" was at most only nominal or passive.

In response to Mr. Rodriguez' argument that the evidence introduced at trial was insufficient as a matter of law to sustain the convictions in counts three and four for violations of section 12025, subdivision (a)(1), and section 12031, subdivision (a)(1), the lower court holds that substantial evidence supports the finding that Mr. Rodriguez was an active participant of the "Sidro" gang. [Opn. pp. 25-26]. The lower court holds that Mr. Rodriguez' past association with "Sidro" clearly evidences his current participation. The lower court notes that since 1990, Mr. Rodriguez had over 30 contacts in the CAL/GANGS database, and that Mr. Rodriguez had tattoos associated with "Sidro".

However, the lower court fails to adequately consider the appellant's argument that Mr. Rodriguez only had six contacts in almost three years prior to this offense, or that only one of these contacts had been made in the previous two years, or that there were no contacts in 2003. Nor does the lower court give sufficient weight to the appellant's argument that a field

24

interview sheet from 2001 reflected that Mr. Rodriguez acknowledged that

he used to be affiliated with "Sidro". [R.T. 400.]. After all, Mr.

Rodriguez' unrebutted testimony was that he is no longer a member of

"Sidro".

Finally, the lower court fails to consider that the mere presence of

tattoos which are associated with a gang is not sufficient to establish that he

or she is an active participant of a criminal street gang. It is the permanent

nature of tattoos which makes them so unreliable when they are used for the

purpose of establishing that a person is <u>currently</u> an <u>active member</u> of a

criminal street gang. Therefore, neither the fact that Mr. Rodriguez used to

be a gang member, nor the fact that he permanently marked his body,

establish that Mr. Rodriguez was an active participant of "Sidro".

The evidence was insufficient as a matter of law to establish either

that "Sidro" is a criminal street gang, or that Mr. Rodriguez was an active

participant of "Sidro." The court should therefore grant review.

## V.

## REVIEW SHOULD BE GRANTED BECAUSE MARTINEZ' TESTIMONY REGARDING THE ALLEGED STATEMENTS MADE BY OFFICERS ABOUT FIELD INTERVIEWS IS VIOLATIVE OF MR. RODRIGUEZ' SIXTH AMENDMENT RIGHT TO CONFRONTATION.

Mr. Rodriguez was denied his fundamental Sixth Amendment right

25

to confrontation because Martinez testified about statements made by

officers about alleged statements from Mr. Rodriguez to police officers.

In the recent United States Supreme Court decision of *Crawford v.*

*Washington* (2004) 124 S.Ct. 1354, 1364, the Court found that it

> once again reject[s] the view that the Confrontation Clause
> applies of its own force only to in-court testimony, and that its
> application to out-of-court statements introduced at trial
> depends upon "the law of Evidence for the time being."
> [Citations.] Leaving the regulation of out-of-court statements
> to the law of evidence would render the Confrontation Clause
> powerless to prevent even the most flagrant inquisitorial
> practices.

The *Crawford* Court then determined that "even if the Sixth Amendment is

not solely concerned with testimonial hearsay, that is its primary object, and

interrogations by law enforcement officers falls squarely within that class."

(Id., at p. 1355; see footnote 4 [noting that the court is using the term

"interrogation" in its colloquial, rather than any technical legal sense].)

Here, the hearsay in question are the statements in the field reports about

statements allegedly made by Mr. Rodriguez during interrogations by police

officers.

In response to appellant's argument that the introduction of hearsay

evidence by Martinez violated Mr. Rodriguez' Sixth Amendment Right to

confrontation the lower court holds that the Sixth Amendment is

inapplicable when it is the defendant's own statement at issue. [Opn. p. 27].

26

However, the declarants at issue are the field officers who made the notes referred by Martinez at trial, not the appellant.

According to the lower court's holding, Mr. Rodriguez' statements, which were contained in the field interview reports, were admissible as a statement by the defendant. [Opn. p. 27]. However, the declarant at issue in this case is not Mr. Rodriguez, but the **officers** who authored the field interview reports. Had those officers testified at trial as to the statements allegedly made by Mr. Rodriguez, then a Sixth Amendment violation would not have occurred. Therefore, because the relevant declarant did not testify, the introduction of the statements was violative of Mr. Rodriguez' Sixth Amendment right to confrontation.

Because the violation of the right to confrontation involves the denial of a constitutional right, the determination of whether reversal is required is evaluated under the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824; 17 L.Ed.2d 705]. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128; *Lilly v. Virginia* (1999) 527 U.S. 116, 139-140.) Here, the only evidence offered to establish that Mr. Rodriguez was an active participant of a criminal street gang was the testimony of Martinez, the majority of which was based on multiple hearsay. Therefore, Mr. Rodriguez' convictions

27

must be reversed.

## VI.

## REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL COURT ERRED BY ALLOWING IMPROPER PRIOR ACT EVIDENCE THAT PREJUDICED THE DEFENDANT'S RIGHT TO A FAIR TRIAL.

The trial court erred in allowing the state to present evidence of a prior conviction by Mr. Rodriguez. Martinez testified that he was aware that "on April 22nd of 1999, that a documented gang member, defendant Javier Rodriguez, was convicted of residential burglary". [R.T. 358.] The trial court ruled that the state could introduce the evidence in order to establish the predicate offenses, which is a component of one of the elements in Section 186.22, as well as both counts three and four. However, the introduction of the evidence of the prior conviction as a documented gang member constituted inadmissable character evidence, and the prejudicial value outweighed any probative value. Therefore, the trial court erred by admitting the evidence of Mr. Rodriguez' prior conviction.

In response to Mr. Rodriguez' argument that the trial court erred in allowing the state to present evidence of a prior conviction, the lower court holds that the evidence was properly admitted for the limited purpose of establishing that "Sidro" was a criminal street gang and that Mr. Rodriguez was an active participant of the "Sidro" gang. [Opn p. 29]. However, the

28

introduction of the prior conviction constituted inadmissable character

evidence, and violated Mr. Rodriguez' right to a fair trial.

The lower court fails to recognize that the use of a four-year old

conviction to establish that Mr. Rodriguez is currently "an active

participant" is highly prejudicial. While a limiting instruction was given by

the court, the limiting instruction specifically directed the jury to consider

the appellant's **past** conviction in determining whether or not he was an

**active** participant in "Sidro". Thus, the court erred in weighing the

counterbalancing factors under evidence code § 352, because the prejudicial

effect outweighed the probative value. Moreover, admission of the prior

conviction implicates Mr. Rodriguez' federal constitutional right to due

process. The petition should therefore be granted.

## VII.

### REVIEWS SHOULD BE GRANTED BECAUSE THE COURT ERRED IN FAILING TO GIVE A LESSER INCLUDED OFFENSE INSTRUCTION FOR COUNTS THREE AND FOUR.

The trial court erred by failing to give a jury instruction on the lesser

included offenses for counts three and four. Section 12025, subdivision

(a)(1), has the following elements: (1) a person must carry a concealed

pistol, revolver, or other firearm, (2) which is capable of being concealed

upon the person, (3) within any vehicle, which is under his or her control.
Whereas, Section 12031, subdivision (a)(1), has the following elements: (1)
a person carries, (2) a loaded firearm, (3) on his or her person or in a
vehicle. Moreover, in this case, in order to elevate both offenses to
felonies, the prosecution had the burden of proving that Mr. Rodriguez was
an active participant of a criminal street gang. (See Section 12025, subd.
(b)(3); Section 12031, subd. (a)(2)(C).) Here, the trial court erred in failing
to give, sua sponte, a lesser included offense instruction on counts three and
four because there was disputed evidence regarding whether Mr. Rodriguez
was an active participant of a criminal street gang.

    The trial court erred in failing to instruct the jury on the lesser-
included offenses for counts three and four. Section 12025 and 12031 are
similar in that they both enhance the punishment for persons who are active
participants of criminal street gangs. (See section 12025, subd. (b)(3); see
also section 12031, subd. (a)(2)(C).) Here, as discussed above, the only
evidence presented by the state that Mr. Rodriguez was an "active
participant" of a "criminal street gang" was the testimony of Martinez that
Mr. Rodriguez had gang tattoos. Moreover, Mr. Rodriguez testified that he
was not an active participant of the "Sidro" gang. Therefore, the trial court
committed error by failing to give the instructions even though the evidence

that the offense was less than charged was substantial enough to merit consideration by the jury.

Furthermore, the jurors submitted a question to the court, which stated: "On Count 3, is the charge of concealed weapon by itself? Or is the charge contingent upon being a gang member? Hence, if not a gang member then should we then find having a concealed weapon as a crime?" [R.T. 802.]

There can really be no dispute that the trial court erred by failing to give a jury instruction on the lesser included offenses for counts three and four. Here, the state in its brief acknowledged that the trial court erred in failing to give lesser included offense instructions on counts three and four.

The lower court makes a fundamental error by finding that because the jury convicted the appellant on the greater offenses, it could not be harmful. Of course, if this were the proper test, no defendant could ever prevail when the jury was erroneously denied instructions on the lesser offenses. There would be no issue to appeal if the jury had not convicted on the greater offenses. In other words, every case where an appellate court is reviewing the failure to give instructions on a lesser included offense, there necessarily has been a conviction on the greater offense.

This is directly contrary to the principle that an "error in failing to

31

instruct a jury on a lesser includes offense is harmless when the jury 'necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions.'" (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) Here, the jury did not necessarily decide the factual questions adversely to the appellant on other counts.

In *Lewis*, the trial court instructed the jury on first degree felony murder and the crimes of robbery and burglary. The court also instructed the jury on theft as a lesser included offense of robbery and burglary, an instruction emphasizing that if defendant formed the intent to steal only after he had entered the victim's apartment and assaulted them, he was guilty of the lesser crime of theft. The jury found Lewis guilty of robbery and burglary, and it found true the special circumstance allegations that defendant killed the victim in the commission of robbery and burglary. Thus, the *Lewis* court concluded that in order to render these verdicts, the jury had to find that defendant had already formed the intent to steal when he entered the victim's apartment and assaulted them, thus necessarily rejecting defendant's version of the events.

Here, the only counts requiring the jury to find that Mr. Rodriguez was an **active participant** of a **criminal street gang** were counts three and four. The enhancement under section 186.22 does not require the jury to

32

make a finding that the defendant is an **active participant**. Thus, a defendant could be properly convicted of committing an offense for the benefit of a criminal street gang and be acquitted of carry a firearm while being an **active participant** of a criminal street gang. Therefore, in this case, unlike *Lewis*, other jury findings did not establish the facts adversely to the appellant

The convictions for counts three and four should be reversed because there is a reasonable probability that had the court given the lesser-included offense instruction, the jury would not have convicted Mr. Rodriguez for the more serious offenses of possessing and discharging a firearm while being an active participant of a criminal street gang. (*See generally People v. Springfield* (1993) 13 Cal.App.4th 1674, 1681 [finding, where the evidence established that the trial court erred in not giving a lesser-included offense instruction, that the proper remedy was to reverse the conviction and remand the case.].) The petition should therefore be granted.

### VIII.

### REVIEW SHOULD BE GRANTED BECAUSE THE IMPOSITION OF CONSECUTIVE SENTENCES BASED ON JUDICIAL FACT FINDING IS VIOLATIVE OF THE SIXTH AMENDMENT.

On June 24, 2004, the Supreme Court of the United States decided *Blakely v. Washington* (2004) 524 U.S. __, [124 S.Ct 2351; 159 L.Ed 2d

33

403. The Court's decision in *Blakely* effectively renders unconstitutional portions of California's determinate sentencing scheme. The sentence imposed in this case is unconstitutional because the sentence imposed by the court was greater than the sentence the court could have imposed based on the jury verdict.

In sentencing Mr. Rodriguez, the court followed the recommendation of probation. [RT 1111.] The probation report found, in part:

> In regards to concurrent vs. consecutive sentencing, consecutive sentencing appears appropriate in Counts 1 and 2 per Rule 4.425(a)(1), that the crime and objectives were predominately independent of each other. Additionally that Count 3 and 4 be stayed per PC654 in that it represents the same course of conduct as in the PC12022.5(a)(1) allegation. Furthermore, that the PC186.22(b)(1) allegations in Counts 1,3, and 4 also be stayed per PC 654 in that they present the same course of conduct as the allegation in Count 2.

[CT 197.] Therefore, in sentencing Mr. Rodriguez, the sentencing court made a finding that the "crimes and objectives were predominately independent of each other", which removed the fact finding role from the province of the jury.

The rules governing imposition of consecutive terms violate the *Apprendi* mandate. Section 669 provides that in the absence of special findings by the trial judge, sentences for two or more felonies shall run concurrently. The rule implementing that statute is California Rules of

34

Court, rule 4.425.

Based on these rules, in order to sentence consecutively rather than concurrently, the trial judge has to find one or more of the factors listed in rule 4.425. None of these factors are presented to or found true beyond a reasonable doubt by a unanimous jury. Consecutive sentencing is an enhanced sentencing power reserved solely to the trial judge based on factors beyond those authorized by the jury verdict alone. As such, the consecutive sentencing scheme in California fails the *Apprendi* test as explained in *Blakely* and thus violates the Sixth Amendment right to a jury trial.

In response to Mr. Rodriguez' argument that the sentence imposed in this case is unconstitutional because the sentence imposed by the court was greater than the sentence the court could have imposed based on the jury verdict, the lower court holds that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], and *Blakely v. Washington, supra,* 124 S.Ct. 2531, do not apply to consecutive sentences. [Opn. p. 36]. However, Mr. Rodriguez' rights to due process and a fair trial, as recognized by the Supreme Court in *Blakely* and *Apprendi*, apply, in cases such as this, when a defendant's sentence is not supported by the jury verdict alone.

35

The lower court holds that *Apprendi* was solely concerned with what

term could be imposed, on a single challenged count. [Opn p. 16] However,

the *Blakely* court specifically found:

> In other words, the relevant "statutory maximum" is not the
> maximum sentence a judge may impose after finding
> additional facts [to support a sentence enhancement], but the
> maximum he may impose without any additional findings.
> When a judge inflicts punishment that the jury's verdict alone
> does not allow, the jury has not found all the facts "which the
> law makes essential to the punishment," [citation omitted],
> and the judge exceeds his proper authority.

(*Id.*, at p. 2544.) Neither the *Apprendi* nor *Blakely* courts are limited to a

singled challenged count, but instead are concerned with the

constitutionality of a sentence. Here, the imposition of consecutive terms is

violative of *Blakely* because the sentence is greater that the maximum

sentence authorized by the jury verdict alone.

Under the Sixth Amendment, all facts used to increase a defendant's

sentence beyond the statutory maximum must be charged and proven to a

jury. In *Blakely*, the Court explain that the relevant "statutory maximum" is

the "maximum sentence a judge may impose solely on the basis of the facts

reflected in the jury verdict or admitted by the defendant." *Blakely v.

Washington, supra,* 124 S.Ct. at 2536 (emphasis original).] That is, the jury

must find all factual predicates for the punishment to be imposed.

Under a constitutional application of the sentencing scheme, the

36

appellant should not have been sentenced to a consecutive term on counts one and two. The determining question is whether the jury's verdict alone supported the sentence imposed, in the absence of any additional fact. (*Blakely v. Washington, supra*, at p. 2536.) Here, the imposition of the consecutive terms was a discretionary sentencing act not supported by facts found by the jury beyond a reasonable doubt. In sentencing Mr. Rodriguez, the court followed the recommendation of probation. [RT 1111.] The probation report set forth the findings that "the crime and objectives were predominately independent of each other." [CT 197.] Therefore, in sentencing Mr. Rodriguez, the sentencing court made a finding that the "crimes and objectives were predominately independent of each other", which removed the fact finding role from the province of the jury.

The rules governing imposition of consecutive terms violate the *Apprendi* mandate. Section 669 provides that in the absence of special findings by the trial judge, sentences for two or more felonies shall run concurrently. The rule implementing that statute is California Rules of Court, rule 4.425. Therefore, because the determination of whether or not impose consecutive sentences was based upon judicial fact finding, the imposition of consecutive sentences is violative of the Sixth Amendment.

Under *Blakely*, the denial of the Sixth Amendment right to a jury

37

trial appears to be a structural error and thus reversible *per se*. However, even if the *Chapman* reversible error analysis is applied, it could not be said beyond a reasonable doubt that the result would be the same. (*Chapman v. California, supra,* 386 U.S. at p. 24.) The facts of this case were in conflict and it could have been found by the jury that the two offenses did not really arise from separate occasions. Therefore, even if a harmless error analysis is required, in this case it cannot be said beyond a reasonable doubt that the jury would have reached the same conclusion as the judge. The petition should therefore be granted.

<div align="center">

## IX.

## REVIEW SHOULD BE GRANTED BECAUSE THE COURT ABUSED ITS DISCRETION IN FAILING TO DISMISS THE STRIKE PRIOR.

</div>

The court failed to properly balance the relevant factors in determining whether Mr. Rodriguez' "strike" prior should have been dismissed. Under section 1385, subdivision (a), a "judge...may, either of his or her own motion or upon the application of the prosecuting attorney, and in the furtherance of justice, order an action to be dismissed." In *Romero*, the California Supreme Court "held that a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own

<div align="center">

38

</div>

motion, 'in furtherance of justice' pursuant to...section 1385(a)." (*People v. Williams* (1998) 17 Cal.4th 148, 158). The *Romero* Court further held that "[a] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is" reviewable for abuse of discretion. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 531.) In the recent case of *People v. Carmony* (2004) 14 Cal. Rptr. 3d 880, 886, the California Supreme Court concluded that a court's failure to dismiss or strike a prior conviction allegation is subject to review under abuse of discretion standard.

In deciding whether to dismiss a prior strike under the Three Strikes law, the court must consider the nature and circumstances of the present offense, the prior offenses, and the particulars of the defendant's background, character, and prospects in order to determine whether the defendant may be deemed outside the scheme's spirit, in whole or in part. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) In looking within the scheme of the Three Strikes law, *Williams* cited *Romero's* "balance between the defendant's constitutional rights–which [the court] suggested included the Eighth Amendment to the United State Constitution and article I, section 17 of the California Constitution–and society's legitimate interests...." (*Id.*, at p. 160, citing *People v. Superior Court (Romero)*,

39

*supra*, 13 Cal.4th at pp. 530-31.)

The sentencing judge failed to take into account the nature and circumstances of the offense in terms of whether it was within the spirit of the Three Strikes law regarding serious or violent felonies. Mr. Rodriguez' present offenses are for car burglary, witness intimidation, and possession of a firearm. His prior strike offense was for burglary. However, in the years since being released from prison, Mr. Rodriguez left his gang, moved away from his old neighborhood to get away from members of his former gang, began attending drug counseling, got married, had two children, and became a union concrete worker. The sentencing court failed to adequately apply any of the factors required under *Romero*. The court simply concluded that the strike prior would apply. [R.T. 1111.] Therefore, the court abused its discretion in failing to properly weigh the above factors and dismiss a strike prior.

In response to Appellant's argument that the trial court abused its discretion in failing to dismiss a strike prior, the lower court holds that Mr. Rodriguez failed to demonstrate that the sentencing decision was "irrational or arbitrary." [Opn. p. 39]. This is incorrect because by failing to take into account all relevant factors, the court's failure to dismiss the strike priors was arbitrary, and thus an abuse of discretion.

40

The sentencing judge failed to take into account Mr. Rodriguez' background, character and prospects in determining whether or not he fell outside the Three Strikes spirit. Contrary to the state's contention below, this case is about drug addiction, not gang affiliation. After being released from jail, Mr. Rodriguez moved away from his old neighborhood, attended NA meetings, stopped associating with gang members, and became a union construction worker. On the night of the incident, however, Mr. Rodriguez was under the influence of alcohol and drugs. This is not a case of a "boy" not being able to leave the neighborhood, but a case about a person's addiction to narcotics.

Since being released from jail, Mr. Rodriguez had proven that he was getting his life together. Had the court properly taken into account the fact that Mr. Rodriguez was a father of two children and a union construction worker, it would have determined that Mr. Rodriguez falls outside of the sprit of the Three Strikes law. Therefore, the court abused its discretion in failing to dismiss Mr. Rodriguez' strike prior and the petition should be granted.

41

## X.

### REVIEW SHOULD BE GRANTED BECAUSE THE ERRONEOUS JURY INSTRUCTION ON THE GANG ENHANCEMENT MANDATES REVERSAL BECAUSE IT MISLED THE JURY AS TO THE BURDEN OF PROOF AND THE ELEMENTS OF THE ENHANCEMENT.

The trial court committed reversible error by giving conflicting instructions on the gang enhancement allegations charged under Penal Code section 186.22, which lessened the prosecution's burden of proof. In light of the expert's testimony that any crime committed by a gang member would implicate the enhancement, it was error not to instruct that every offense committed by a gang member does not necessitate a true finding. The court's failure to clarify the confusion constituted error for two reasons. First, the language in CALJIC No. 6.50 regarding the consideration of expert testimony undercuts the language in CALJIC 2.80, and combined with the expert's testimony, equated to a directed verdict. Second, the language in CALJIC No. 6.50 that the jury should consider the expert's testimony eviscerated the earlier provision in the instruction, which excludes the occasional commission of an offense.

The charged gang enhancement requires that an offense be committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in

42

criminal conduct by gang members. (§ 186.22, subd. (b)(1).) However,

because the language in CALJIC No. 6.50 specifically instructed the jury to

consider expert testimony, and highlighted Agent Martinez' extremely

expansive testimony about gang offenses, the jury could find that any crime

committed by a gang member is sufficient to sustain the allegation under

section 186.22. Such a finding constitutes a directed verdict, which is a

violation of Mr. Rodriguez' Sixth Amendment right to a fair trial and

Fourteenth Amendment right to Due Process. (See *Sullivan v. Louisiana*

(1993) 508 U.S. 275, 277 [113 S.Ct. 2078, 124 L.Ed.2d 182] ["Thus, although

a judge may direct a verdict for the defendant if the evidence is legally

insufficient to establish guilt, he [or she] may not direct a verdict for the

State, no matter how overwhelming the evidence] [Citations omitted]."

The confusion arose here when the court instructed the jury pursuant

to CALJIC No. 6.50, which, in relevant part, reads that jurors "should

consider expert testimony" when determining if the elements of the gang

enhancement have been satisfied. (Emphasis added.) This instruction

conflicts with CALJIC No. 2.80, where the jurors are properly instructed

that they are not bound by any expert opinion. Because the gang

enhancement instruction left the jurors with the impression that they should

base their finding of the gang enhancement based on the testimony of

43

Martinez, it allowed the jury to conclude that the true finding should be
sustained because all crimes committed by gang members constitute a
violation of section 186.22. This was not only an incorrect statement of
law, but was equivalent to a directed verdict, since the jury was left with
little choice but to conclude that based on Martinez testimony, the offense
was a gang crime within the meaning of section 186.22.

The lower court fails to adequately consider the appellant's argument
that a faulty specific instruction cannot be cured by a proper general
instruction. Here, the state is correct that CALJIC No. 2.80 properly
instructs jurors on the weight that should be given to expert testimony.
However, CALJIC No. 2.80 is a general instruction regarding the weight of
expert testimony, whereas CALJIC No. 6.80 specifically instructs jurors to
consider the expert's testimony in determining whether or not the elements
of the gang offenses have been met. Therefore, the jury was given a
specific instruction directing them to consider the expert's testimony,
Counts three and four, and the allegations attached to all counts, should be
reversed. (See Gibson v. Ortiz (9th Cir. 2004) 387 F.3d 812 ["Language
that merely contradicts and does not explain a constitutionally infirm
instruction will not suffice to absolve the infirmity. A reviewing court has
no way of knowing which of the two irreconcilable instructions the jurors

44

applied in reaching their verdict."].)

Moreover, the lower court gives no weight to the mandatory language of CALJIC No. 6.50. The fundamental flaw in the this holding is its reliance on the word "consider" while ignoring the word "should". According to the lower court, CALJIC 6.50 only suggest that the[ jury] consider the testimony of the expert, along with the other evidence criminal conduct, in making that specific determination. [Opn. p. 43].

The word **should**, however, has considerable meaning.  Currently, CALJIC No. 8.73 instructs:

> If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you **should consider** the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation

(Emphasis added). However, the former version of CALJIC No. 8.73 found that evidence of premeditation **may** be considered in determining degree of murder. (*See People v. Cole* (2004) 33 Cal.4th 1158, 1211.) The change from **may** to **should** was made in order to require jurors to consider provocation.  Therefore, as CALJIC No. 8.73 reflects, the word **should** has significant meaning.

The instructions in this case, combined with Martinez' testimony

45

regarding gang crimes, resulted in an unfair trial. Apart from being the functional equivalent of a directed verdict, directing the jury to give special consideration to crucial prosecution evidence implicates due process. Under the Due Process Clause, criminally accused have the right to have the jury find beyond a reasonable doubt every element of the crime. (*In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068, 25 L.Ed.2d 368 ].) Here, when the prosecution case rises or falls on a witness' testimony, it is fundamentally unfair for the court to give an instruction bolstering that witness' testimony. (See generally *People v. Fitch* (1997) 55 Cal.App.4th 172 [noting that diluting the prosecution's burden of proof implicates the Due Process Clause].)

Here, the thrust of the state's evidence regarding the gang offenses was presented by Martinez. The Court specifically instructed the jurors to consider Martinez' testimony in determining whether the state had met its burden. The faulty instruction directing the jury to specially consider the state's central evidence establishes, at a minimum, that there is a *reasonable chance* that the jury would have given the expert testimony extra consideration. Therefore, the petition should be granted.

46

## CONCLUSION

For the foregoing reasons, Mr. Rodriguez respectfully requests that

the court grant the petition for review so that it can consider the important

issues raised herein.

Respectfully Submitted,

Dated: May 11, 2005
**ROBERT L. SWAIN**
Attorney at Law
964 Fifth Avenue, Suite 214
San Diego, California 92101
Telephone: (619) 544-1494
Facsimile: (619) 544-1473

47

EXHIBIT B

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

Filed
Stephan M. Kelly, Clerk

APR 0 5 2005

Court of Appeal Fourth District

THE PEOPLE,

    Plaintiff and Respondent,

    v.

JAVIER ESPINOZA RODRIGUEZ,

    Defendant and Appellant.

D043198

(Super. Ct. No. SCS176087)

APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge. Affirmed.

A jury convicted Javier Espinoza Rodriguez of burglary (Pen. Code, § 459; count 1),[1] attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1); count 2), having a concealed firearm in a vehicle while being an active participant of a criminal street gang (§ 12025, subd. (a)(1); count 3), and carrying a loaded firearm while being an

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

active participant of a criminal street gang (§ 12031, subd. (a)(1); count 4). It further found Rodriguez had personally used the firearm during the commission of count 2 (§ 12022.5, subdivision (a)(1)). In a bifurcated proceeding, the court found Rodriguez had a prior serious or violent felony conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). It sentenced Rodriguez to a total term of 14 years 4 months in state prison.

Rodriguez contends: (1) the court abused its discretion by failing to remove a juror on grounds of bias; (2) the evidence is insufficient to establish he attempted to dissuade a witness; (3) the evidence is insufficient to establish he committed the offenses for the benefit or at the direction of, or in association with any criminal street gang; (4) there is insufficient evidence to prove he was an active participant of a criminal street gang for purposes of counts 3 and 4; (5) his Sixth Amendment confrontation rights were violated by the admission of certain gang expert testimony; (6) the court prejudicially erred by admitting evidence of his prior residential burglary conviction; (7) the court erred by failing to give, sua sponte, lesser included offense instructions on counts 3 and 4; (8) the court violated his Sixth Amendment right to a jury trial by imposing consecutive sentences based on judicial factfinding; and (9) the court abused its discretion when it declined to dismiss his prior strike conviction. In a supplemental brief, Rodriguez further contends the court prejudicially erred by giving conflicting jury instructions on the section 186.22 gang enhancement. We affirm the judgment.

2

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

At about 2:00 a.m. on May 11, 2003, Laura Limon, her husband Martin Hererra, their son, and Martin's brother, Angel Herrera, were returning home to Angel's Chula Vista apartment after visiting family in Mexico.[2]  When they drove into the parking lot of the apartment complex, Limon and the Herreras noticed a small, dark-colored Ford Explorer with its driver's door open and light on.  Limon exited their car and saw a bald, Hispanic individual in a white shirt crouch down to hide in front of Angel Herrera's truck.  Hearing noises, Martin and Angel also noticed the man ducking near the truck's grill.  Martin identified the man at trial as Rodriguez's codefendant Jose Luis Leon.

Angel walked over to his truck and confronted Leon, asking what he was doing.  Leon mumbled something but paying no attention, Angel turned around and said to his brother, "You know what? Just go inside, call the cops.  Let them do the work."  At her husband's instruction, Limon took her son inside the apartment and called police.  Martin Hererra followed his wife to the apartment, but turned and saw Leon break the window of a nearby Volkswagen Jetta.  Angel had gone to an upstairs apartment to notify the Jetta's owner that someone was breaking into her car and was returning downstairs when Martin yelled out, "I'm going to call the police.  You guys better leave."  Both Angel and Martin then heard a gunshot and saw a second man, identified by Martin at trial as Rodriguez,

---

2       At times we refer to the Herreras by their first names.  We intend no disrespect by use of this shorthand device.

3

with his hand raised up in the air. Martin and his wife went inside the apartment and closed the door.

Officer Joseph Picone of the Chula Vista Police Department responded to a radio call about the vehicle burglary; eventually he and other officers detained Leon and Rodriguez, who were found driving away in Rodriguez's green Ford Explorer. Officers retrieved a loaded .22-caliber handgun from Leon's waistband and .22-caliber ammunition from his pockets. They found a spent casing and additional rounds of ammunition in Rodriguez's vehicle. They also found other items, including a gas card and employee badge, later confirmed to have been taken from the Jetta. Officer Picone measured the distance from Angel Hererra's apartment to the parking lot area to be approximately 173 feet.

At trial, the prosecution presented Peter Martinez, an investigator from the San Diego District Attorneys Office, to testify about the gang-related nature of the charged offenses. Martinez explained the background of the San Ysidro-area "Sidro" gang and its culture. He testified that he was aware the primary criminal activities of the Sidro gang included assaults, extortion, burglary, involvement with narcotics, grand theft involving automobiles and robberies. Based on his review of certified records, he also related several criminal convictions that had been suffered by other Sidro gang members in September 2001 and September 2002. Martinez further testified, based on a certified record, that Rodriguez was convicted of residential burglary on April 22, 1999. According to Martinez, Rodriguez was a documented member and active participant in the Sidro gang based on over 30 field interviews that had been conducted by law

4

enforcement officers. Those interviews showed Rodriguez had admitted being a Sidro

gang member to officers on 23 occasions, had at times claimed a gang moniker, had been

routinely contacted in areas known for Sidro gang activity and had been contacted in the

company of other gang members on five occasions. Martinez also pointed out Rodriguez

was wearing gang colors at the time of the offenses, and had three gang-related tattoos:

three dots on his left hand, the word "Sidro" on the back of his neck, and the numbers

"1925" on both his right arm and stomach area signifying the Sidro gang sign letters "S"

and "Y" for San Ysidro. Martinez opined that the defendants, who were documented

gang members, committed the charged crimes for the benefit of the gang. In rebuttal,

Martinez observed that the apartment complex where the offenses occurred was within

the territory of the "Otay" gang, a Sidro rival.

*Defense Evidence*

Rodriguez testified in his own behalf at trial. He admitted joining the Sidro gang

when he was 11 or 12 years old, but stated that after his last prison sentence was over in

1999 he had tired of the gang lifestyle and left San Ysidro. At the time of the offenses,

he was attending drug classes twice a week. Rodriguez testified that on the evening in

question he met up with Leon to drink, and also took a "date rape" drug that caused

memory loss. He and Leon drove around and stopped in the parking lot so Rodriguez

could urinate. He could not recall why he grabbed his gun from the back of his vehicle

and fired it, other than he was "trying to show off." According to Rodriguez, Leon was

not and had never been a member of Sidro "as far as he kn[e]w," but Leon's older brother,

with whom Rodriguez used to hang out, was a member.

5

DISCUSSION

I. *The Court Did Not Abuse Its Discretion by Refusing to Discharge Juror No. 7*

Rodriguez contends the court abused its discretion when it refused to replace a juror despite grounds to disqualify her for bias. He maintains the juror was "unable to unequivocally state that she would properly perform her duties." The contention is without merit.

A. *Background*

Before the afternoon session on the first day of testimony in Rodriguez's case, Juror No. 7 sent a note to the court expressing concern that she might have seen the defendants from somewhere other than the television news, and asking if she could possibly be excused. After reading the note to counsel, the court let Juror No. 7 explain, and then proceeded to question her:

"[Juror No. 7]: I was just going to say, at first when – upon first sight, like I said, I thought there was some kind of familiarity, and I thought maybe it could have been from the news. I don't know. I'm thinking it might not be. I don't know if it could be. I don't know them, first of all. But there's just, you know, they look familiar. I don't know where from. I couldn't tell you. I couldn't tell you if it was, you know, from the restaurant down the street. I couldn't tell you where. But it makes me uncomfortable knowing this. I can't give you any specifics. All I can say is I'm just not comfortable with it. I don't know why, you know."

"The Court: Well, let me ask you this, the fact they look familiar and you're not sure where, that does not cause you to prejudice the case, does it?

6

"[Juror No. 7]: *No.* No, I'm just – I'm just not comfortable with that, you know. My instincts say something just doesn't feel right.

"The Court: Okay. Now, the fact that you may or may not have seen them in the past, does that affect your ability to look at the evidence and make a determination based simply on evidence that comes in?

"[Juror No. 7]: Just looking, *no, of course.* I mean, I know what you're –

"The Court: And then would you be able to apply the law that I give you, facts, and find them based strictly on the evidence?

"[Juror No. 7]: Your words, of course, make perfect sense, and *of course I can do that.* Like I said, internally, I'm just not – I don't know. I just don't feel comfortable.

"The Court: Okay. But since you're not sure from that context, sensing that there's something more, is there a fear, or is there some other concern?

"[Juror No. 7]: Sure, I guess it could be. Like I said, I don't know them or anything like that. But, you know, I guess my fear would be, easily put, would be fear of retaliation one way or another." (Italics added.)

The court held an unreported sidebar conference after which counsel for codefendant Leon questioned the juror:

"[Leon's counsel]: You used the word 'retaliation' a moment ago. Do you remember that? Do you remember using the word 'retaliation?'

"[Juror No. 7]: Yes.

7

"[Leon's counsel]:  That suggests to me that because there's some gang overtones in this case, that you feel perhaps some fear about your involvement in the trial; is that correct?

"[Juror No. 7]:  Yes.

"[Leon's counsel]:  I guess the real question that we need to know is, do you think that you can set that fear aside as you consider the evidence in this case?

"[Juror No. 7]:  I mean, *academically, of course, yes, I can.*  But like I said, it just – something just wasn't sitting well we [*sic*] me.  And I thought, you know, I should say something.

"[Leon's counsel]:  To the best of my knowledge, these men have never been on television.  So I don't think you would have seen them because of that.  Certainly this case did not get any publicity.  [¶]  Do you think that your feelings would influence how you decided the issues in this case?  Do you think it would make you more prone to find these young men guilty, or more prone to find them not guilty?

"[Juror No. 7]:  *No, I can follow those instructions.  I can do that,* you know, putting like – *I can separate my emotions from that.*  But like I said, something just wasn't sitting we [*sic*] me.  And I thought since it was my concern that I should speak up before, you know, I went any further.  That's all.

"[Leon's counsel]:  We certainly appreciate that.  But I think you can understand our concern, is that we need to know that you can listen fairly and objectively to the evidence, and when you go back into the jury room, you can leave aside those feelings,

8

presume that these gentlemen are not guilty, and just look at the evidence, and see if the evidence convinces you of their guilt. Do you think you can do that?

"[Juror No. 7]: *Yes, I can.* You know, I was sitting here, and I'm thinking, 'Okay. Of course,' like I said, ' I don't know these gentlemen.' I'm thinking, 'yeah, they could be innocent, I don't know. They could be guilty, I don't know.' I don't know what the outcome is going to be. I just have that feeling. And like I said, I thought since I wasn't feeling comfortable with it, like I said, I should speak up.

"[Leon's counsel]: I appreciate that. Thank you very much."

Section 1089 provides in part: "If at any time . . . a juror . . . upon . . . good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate. . . ." A juror may properly be discharged if the nature of the case makes it difficult for that juror to keep an open mind so that he or she is actually unable to perform her duty. (*People v. Compton* (1971) 6 Cal.3d 55, 59, disapproved on another point in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.) However, if the juror can set aside a general abstract bias and is capable of acting impartially, the juror need not be excused even though he or she may have to make a special effort to be objective. (*People v. Compton, supra,* 6 Cal.3d at pp. 59-60; *People v. Davis* (1972) 27 Cal.App.3d 115, 120.) The juror's inability to perform his or her duty " 'must appear in the record as a "demonstrable reality" and bias may not be presumed.' " (*People v. Beeler* (1995) 9 Cal.4th 953, 975.) The decision whether to retain or discharge a juror rests within the sound discretion of the trial court and will be upheld if supported by

9

substantial evidence. (*People v. Boyette, supra*, 29 Cal.4th at p. 462; *People v. Beeler*, at p. 975.)

Contrary to Rodriguez's characterization of the evidence, our review of the dialogue between the court, counsel and the juror shows that Juror No. 7 expressed no equivocation about her ability to set aside her discomfort and possible fear of retaliation. She repeatedly unambiguously stated she *could* set aside her feelings and emotions from her task as a juror, while also explaining why she felt the need to raise her concern with the court. The circumstances are not comparable to *People v. Hecker* (1990) 219 Cal.App.3d 1238, cited by Rodriguez, in which the juror was unable to assure the court she could be a fair juror after she recognized the defendant as a visitor to her church. (*Id.* at pp. 1243-1244.) In *Hecker*, following a series of questions, the juror responded, "I don't know" to defense counsel's question, "Can you say you can't be a fair juror now?" (*Id.* at p. 1244.) There, unlike here, the record indicated " 'as a demonstrable reality' " that the juror was unable to perform her duty within the meaning of section 1089. (*Id.* at p. 1245.) Given Juror No. 7's assurances to the court that she could perform her duties and set aside her concerns, the court did not abuse its discretion in declining to discharge her.

Finally we reject Rodriguez's contention, raised for the first time in his reply brief, that the prosecutor's submission of the issue following Juror No. 7's questioning on the matter was a "tacit agreement" with defense counsels' request to excuse that juror. Rodriguez relies on *People v. Overby* (2004) 124 Cal.App.4th 1237 in support of this contention. *Overby*, however, involved a defense counsel's response, "Submit," given

10

after the court already expressed its tentative decision to reseat a juror. (*Id.* at pp. 1242-1243.) The court held that statement "suggests [counsel's] acquiescence in the remedy *the court proposed.*" (*Id.* at p. 1244.) Here, just before the court issued its decision on the question of Juror No. 7's ability to perform her duty, the prosecution stated, "I'll stipulate to the court." The court then denied defense counsel's motion. The circumstances here are factually distinguishable from *Overby.* Even were we to apply the reasoning of that case, we would conclude that it only establishes the prosecutor's implicit consent to the court's decision to retain Juror No. 7, which the People have not challenged. *Overby* furnishes no basis for reversal.

II. *Substantial Evidence Supports the Conviction of Dissuading a Witness*

Rodriguez contends the evidence is insufficient to support his conviction for dissuading witnesses from making a report to a peace officer under section 136.1, subdivision (b)(1). He argues the evidence does not support the specific intent element of that offense; it shows he fired his handgun only after the Hererras had already called the police, and given his intoxicated state and the 173-foot distance between them, there is no evidence he could hear Martin or even knew he had called police. Rodriguez maintains the prosecution showed no link between his gunshot and Limon's call to police. Again, we reject the contention.

"When an appellant challenges the sufficiency of the evidence to support a conviction, the appellate court reviews the entire record to see ' "whether it contains substantial evidence – i.e., evidence that is credible and of solid value – from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." '

11

[Citation.] We view the facts in the light most favorable to the judgment, drawing all reasonable inferences in its support. [Citations.] We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. [Citations.] The test on appeal is not whether we believe the evidence established the defendant's guilt beyond a reasonable doubt, but whether ' " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " ' " (*People v. Cochran* (2002) 103 Cal.App.4th 8, 12-13.) A criminal defendant's specific intent may be proven by circumstantial evidence. (See, e.g. *People v. Lewis* (2001) 25 Cal.4th 610, 642-644.)

Subdivision (b)(1) of section 136.1 makes it a crime to "attempt[] to prevent or dissuade another person who has been the victim of any crime or who is witness to a crime from . . . [m]aking any report of that victimization to any peace officer or state or local law enforcement officer . . . ." The statute does not require that the defendant act knowingly or maliciously, nor does it require that any particular words or actions be used by the perpetrator. Indeed, in the context of subdivision (c)(1) of that statute (making it a felony where "the [preventing or dissuading] act is accompanied by force or by an express or implied threat of force"), the court in *People v. Mendoza* (1997) 59 Cal.App.4th 1333 explained: " 'There is, of course, no talismanic requirement that a defendant must say "Don't testify" or words tantamount thereto, in order to commit the charged offenses. As long as his words or actions support the inference that he . . . attempted by threat of force to induce a person to withhold testimony [citation], a defendant is properly' convicted of a violation of section 136.1, subdivision (c)(1)." (*Id.*

12

at p. 1344, superceded by statute on other grounds as noted in *People v. Franz* (2001) 88 Cal.App.4th 1426, 1441.)

Here, the question is whether Rodriguez's actions support an inference that he attempted to prevent the Hererras from reporting his actions to police within the meaning of section 136.1, subdivision (b)(1). We conclude they do. In making his arguments, Rodriguez ignores our obligation to draw all reasonable inferences in support of the judgment. First, he selectively characterizes the evidence when he argues it shows he fired his gun after the Hererras had already called the police. While that may be true, it fails to acknowledge that both Angel and Martin indicated they heard a gunshot *after* Martin shouted out to the defendants that he was going to call police. Further, it is evident from the transcript of Limon's 911 call played to the jury that the gunshot occurred after either Martin or Angel yelled, "The cops are coming." The jury could reasonably infer that in the early morning hours (just after 2:00 a.m., according to the 911 transcript), Rodriguez would hear Martin's shout even if they were over 170 feet away, and indeed Rodriguez himself testified he could hear someone yell they were calling police from where he was standing. The important point is that a reasonable jury could conclude from the evidence Rodriguez *became aware* of an actual phone call to report the burglary to police *before* he fired his weapon. The jury was free to disbelieve Rodriguez's claim that he only heard someone yell they were going to call police *after* he fired his gun.

Given the sequence of events and the fact the gunshot occurred shortly after Martin's shout, jurors reasonably could infer that Rodriguez's purpose in shooting his

gun, even at a distance away, was to threaten the witnesses with harm if they either proceeded to contact the authorities or did not immediately cut off communications with police. The distance between the parking lot and Angel's apartment does not militate against such a finding, since Rodriguez and Leon had access to Rodriguez's vehicle and could have easily traveled the short distance to Angel's first floor apartment to act on the threat. The evidence thus supports the jury's verdict convicting Rodriguez of dissuading or preventing Limon or the Herreras from reporting his activities to police within the meaning of section 136.1, subdivision (b)(1).

### III. Gang Enhancement

Rodriguez contends there is insufficient evidence to support the court's imposition of enhanced sentences for committing his crimes "for the benefit of, at the direction of, or in association with, [a] criminal street gang" under section 186.22, subdivision (b). Specifically, he challenges the sufficiency of expert Martinez's testimony with respect to two essential prongs of the gang enhancement: first, that one of the primary activities of the Sidro criminal street gang was an offense enumerated in section 186.22, subdivision (e);[3] and second, that the offenses were committed to benefit the gang.

"[T]o subject a defendant to the penal consequences of [section 186.22, subdivision (b)], the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association

---

[3]    The acts enumerated in subdivision (e) of section 186.22 include robbery, grand theft as defined in subdivision (a) or (c) of section 487, and burglary as defined in section 459. (§ 186.22, subd. (e).)

with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' [Citation.] In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period." (*People v. Gardeley* (1996) 14 Cal.4th 605, 616-617 (*Gardeley*), emphasis omitted, citing § 186.22, subds. (b)(1), (e) and (f).)

A. *Primary Activities*

    *People v. Sengpadychith* (2001) 26 Cal.4th 316 (*Sengpadychith*) discussed the "primary activity" requirement of section 186.22: "The phrase 'primary activities,' as used in [section 186.22], implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . 'Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a primary activity of the department. Section 186.22 . . . requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s]. . . . Similarly, environmental activists or any other group engaged in civil disobedience could not be considered a criminal street gang under the statutory definition unless one of the

primary activities of the group was the commission of one of the [25] enumerated crimes found within the statute.'

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in *Gardeley*, *supra*, 14 Cal.4th 605. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies." (*Sengpadychith, supra*, 26 Cal.4th at pp. 323-324; see also *People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.) Both past and present offenses are relevant and admissible to show a gang's primary activity. (*Sengpadychith*, at p. 323.)

In the present case, Martinez testified on this point as follows:

"[Prosecutor]: Are you aware of what the primary criminal activities is [*sic*] of Sidro gang members?

"[Martinez]: Yes.

"[Prosecutor]: And can you please give us what you would consider their primary crime?

16

"[Martinez]: Well, I look at — I look at ranges, okay? Everything from vandalism up to murder. So they've met at least on one occasion they met some type within those boundaries. We're talking about assaults, we're talking about extortions, we're talking about burglaries, narcotics involvement, and other types.

"[Prosecutor]: How about other thefts like grand theft auto?

"[Martinez]: Yes.

"[Prosecutor]: And what about robberies?

"[Martinez]: Yes.

"[Prosecutor]: In your research, do you find that there is one crime that appears to stick out more recently with many of the Sidro gang members than others?

. . .

"[Martinez]: What I have noticed in the data that I've gathered is that Sidro is involved in a lot of robberies." Martinez went on to testify that three Sidro gang members had each suffered robbery convictions in September 2001, September 2002 and December 1999, and Rodriguez himself had been convicted of residential burglary in April of 1999.

Rodriguez maintains this testimony, while it may demonstrate the Sidro gang's primary *crimes*, does not establish that that organization's primary *activities* are the commission of specified offenses. As *Sengpadychith* explained, an expert's testimony that a particular gang's crimes fall within section 186.22's enumerated offenses does not necessarily establish that the gang's primary *activities* consist of the commission of such crimes. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.) However, here, Martinez testified

17

that the Sidro gang, which was in existence since before 1994 with over two hundred members, was involved in numerous crimes including burglary and grand theft, as well as "a lot" of robberies. He supported his conclusion by identifying Rodriguez's residential burglary and three such robberies occurring from mid 1999 to the fall of 2002. While Martinez did not provide detailed evidence of the Sidro gang's activities other than those mentioned, the trier of fact could nonetheless reasonably infer from his testimony that the gang's commission of enumerated offenses was not merely "occasional" (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323), but rather was frequent and repeated.

Rodriguez's reliance on *People v. Perez* (2004) 118 Cal.App.4th 151 and *In re Nathaniel C.* (1991) 228 Cal.App.3d 990 does not persuade us otherwise. In *Perez*, the expert sought to establish that the shooting of an Asian teenager was done in retaliation for actions taken by other Asian gang members, and was thus committed for the benefit of the defendant's Latino gang. He testified that the Latino gang had a longstanding rivalry with Asians and African-Americans, and he was aware of the attempted murder of an Asian boy six years earlier by that gang. He also noted there had been shootings of Asian gang members and an Asian teenager days before the present crime, which were possibly committed by the defendant's gang. (*Perez, supra*, 118 Cal.App.4th at pp. 156-157.) The *Perez* court held that even if the defendant's gang "was responsible for the shootings of Asians on February 16 and 18, as well as the shooting of [the attempted murder victim], such evidence of the retaliatory shootings of a few individuals over of period of less than a week, together with a beating six years earlier, was insufficient to establish that 'the group's members consistently and repeatedly have committed criminal

18

activity listed in the gang statute.' " (*Id.* at p. 160.) Martinez's testimony, unlike the

expert in *Perez*, showed unequivocally that the Sidro gang was responsible for the crimes

cited in support of the "primary activities" element of the gang enhancement. (Cf. *People*

*v. Vy*, *supra*, 122 Cal.App.4th at p. 1226, fn. 12.) Further, as we have concluded,

Martinez established more than just retaliatory crimes committed in short period of time;

his testimony supports the jury's conclusion that the Sidro gang engaged in repeated and

frequent statutorily enumerated crimes. As for *In re Nathaniel C.*, the expert's testimony

there did not relate to the criminal street gang at issue or its activities, and for that reason

(and others) it was held insufficient to prove that gang's primary activities was

commission of one or more of the enumerated offenses. (*In re Nathaniel C.*, *supra*, 228

Cal.App.3d at p. 1005.)

B. *Crimes Committed to Benefit the Gang*

Rodriguez raises two challenges to the evidence supporting the jury's conclusion

that the offenses were committed for the benefit of the Sidro gang. First, he argues

Martinez's testimony embraced the ultimate issue of Rodriguez's intent and thus exceeded

the scope of permissible expert testimony. Second, he maintains Martinez's testimony

was so broad as to "eviscerate any standard of conduct for the proscribed activity" and

"destroyed any ability to ascertain [his] guilt," thereby violating his right to due process.

As for Rodriguez's attack on the scope of Martinez's testimony, the People counter

that Rodriguez did not object to Martinez's opinions on the ground they addressed an

ultimate issue in the case, and thereby waived the contentions. We agree Rodriguez

forfeited any claim of error as to the propriety of Martinez's opinions by failing to object

on those grounds at trial. (Evid. Code, § 353, subd. (a) [judgment will not be reversed by reason of erroneous admission of evidence unless counsel makes a timely objection and states the specific ground for the objection, or moves to strike the objectionable testimony]; *People v. Valdez* (1997) 58 Cal.App.4th 494, 504-505.)

In any event, we cannot say the court abused its discretion in admitting the evidence. As Rodriguez concedes, expert opinion testimony that embraces the ultimate issue to be decided by the trier of fact is admissible. (Evid. Code, § 805; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972; *People v. Valdez, supra,* 58 Cal.App.4th at p. 507.) In cases involving gang enhancement allegations, courts have repeatedly acknowledged that an expert may properly testify that certain crimes were committed for the benefit of the gang. (See *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, citing *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224, 1227-1228 [finding sufficient evidence of gang enhancement in part on expert testimony that a "current shooting was committed to benefit or promote [a gang], judging from the fired rounds"]; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 204, 208 [upholding gang enhancement based in part on expert's testimony that the offenses in question "were committed by [the gang] 'to benefit the gang by assisting each other' "].)

Here, Martinez explained *how* certain crimes benefit a gang: He testified that various theft crimes can benefit the gang because stolen items can be sold and checks or credit cards can be used to purchase items for the gang. He testified that the use of a firearm shows the gang has strength and also intimidates by preventing others from "mess[ing]" with it. He explained that witness intimidation benefits a gang because it can

20

prevent individuals from testifying in court against the gang. He then testified to his opinion that the present vehicle theft, in which documented gang members took small items including a credit card and identification, was for the benefit of the gang. He reached the same opinion as to the firing of a weapon, and possession of firearms. We disagree that these opinions referred to Rodriguez's subjective knowledge or intent. It is entirely unlike the opinions of the expert in *Killebrew*, who testified that "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Killebrew, supra*, 103 Cal.App.4th at p. 652.) The appellate court held this to be an improper opinion concerning the ultimate issue because it was merely the expert's belief that a specific individual (the three occupants of the vehicle) had specific knowledge or possessed as specific intent. (*Id.* at p. 658.) In this case, Martinez's opinions related to a subject – whether the present crimes were committed to benefit or promote the Sidro gang – that was sufficiently beyond common experience so as to assist the jury. (Evid. Code, § 801.) His testimony provides substantial evidence to support the jury's true finding on the gang enhancement allegations.

We likewise disagree that Martinez's testimony on this point was so broad as to violate Rodriguez's due process rights and compel the reversal of his convictions on counts 3 and 4. Rodriguez first maintains Martinez essentially testified that "every act done by a gang member is for the benefit of a street gang." In his reply brief, he narrows this assertion, claiming that Martinez testified that "nearly every offense committed by two gang members is committed for the benefit of . . . a criminal street gang . . . simply

21

because the two individuals happen to belong to the same gang." Rodriguez points to Martinez's explanation of his testimony that a theft of beer from a convenience store committed by two gang members would be a gang crime. Martinez stated: "[Y]ou're talking about two people that are with the same gang instead of separate gangs, okay? They've conspired to do a crime, okay? And if that crime leads to the benefit to [*sic*] the gang, no matter how slight, you're talking about it being a gang crime."

Rodriguez cites no authority supporting his general assertion that such testimony "eviscerate[d] any standard of conduct for the proscribed activity" and "destroyed any ability to ascertain [Rodriguez's] guilt." For this reason alone, we may reject his contention. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627 ["[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration"].) Moreover, Rodriguez has ignored additional testimony from Martinez in which he clarified that he assumed in his explanation about the beer theft that the beer was taken back to the gang for consumption. In fact, as the People point out, Martinez acknowledged it was fair to say that not all crimes committed by gang members are gang crimes, and that he would consider all the facts and circumstances (including wearing of gang attire, use of gang signs and shouting of gang names) as well as evidence of the perpetrators' intent at the time of the crime in order to determine whether it was gang related. Reviewing Martinez's testimony in its entire context, we cannot say it was overbroad or deprived Rodriguez of any due process rights.

22

IV. *Sufficiency of Evidence — Active Participation in a Street Gang (Counts 3 and 4)*

Rodriguez contends the evidence is insufficient to support his convictions in counts 3 and 4 of having a concealed firearm in a vehicle and carrying a loaded firearm. To elevate these crimes to felony offenses, they require proof that they were committed while Rodriguez was an active participant in a street gang. (§§ 12025, subds. (a)(1), (b)(3),[4] 12031, subds. (a)(1), (2)(C).[5]) Relying on his earlier contentions, Rodriguez first argues there is no evidence Sidro is a criminal street gang within the meaning of section 186.22, subdivision (f) because there is insufficient evidence of the primary activities element. He next argues his law enforcement contacts were too limited and the mere existence of his gang-related tattoos not enough to show current active participation in the gang.

Our rejection of Rodriguez's arguments as to the primary activities prong of section 182.66 disposes of Rodriguez's first argument. As stated in part III (A), *ante,*

---

[4]     Section 12025, subdivisions (a)(1) and (b)(3) provide in part: "(a) A person is guilty of carrying a concealed firearm when he or she does any of the following: [¶] (1) Carries concealed within any vehicle which is under his or her control or direction any pistol, revolver, or other firearm capable of being concealed upon the person. [¶] . . . [¶] (b) Carrying a concealed firearm in violation of this section is punishable, as follows: [¶] . . . [¶] (3) Where the person is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22 . . . , as a felony."

[5]     Section 12031, subdivisions (a)(1) and (2)(C) provide in part: "(a)(1) A person is guilty of carrying a loaded firearm when he or she carries a loaded firearm on his or her person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory. [¶] (2) Carrying a loaded firearm in violation of this section is punishable, as follows: [¶] . . . [¶] (C) Where the person is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22 . . . , as a felony.

23

Martinez's testimony constituted sufficient evidence that the primary activity of the Sidro gang were offenses falling within section 186.22, subdivision (e).

Nor are we persuaded by Rodriguez's argument that the evidence presented was insufficient to show he was an active participant in a criminal street gang at the time of the offenses. Section 186.22, subdivision (a)[6] establishes a substantive offense for "active gang participation where the defendant promotes or assists felonious conduct by the gang." (*People v. Herrera* (1999) 70 Cal.App.4th 1456. 1467, fn. omitted; see *People v. Jose P.* (2003) 106 Cal.App.4th 458, 466.) The People must prove active participation by demonstrating more than just nominal or passive involvement with a criminal street gang, and it also must show the defendant engages in such participation "with 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and that the defendant 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' " (*People v. Castenada* (2000) 23 Cal.4th 743, 747, 749; see also *People v. Robles* (2000) 23 Cal.4th 1106, 1115; *People v. Jose P.*

---

[6]      Section 186.22, subdivision (a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." Subdivision (A)(2)(C) of section 12031 elevates the crime to a felony where the person is an active participant in a criminal street gang, an identical provision to section 12025, subdivision (b)(3). Where identical language appears in both statutes it should be given the same meaning. (See *People v. Caudillo* (1978) 21 Cal.3d 562, 585, overruled on other grounds in *People v. Escobar* (1992) 3 Cal.4th 740, 749-751 and *People v. Martinez* (1999) 20 Cal.4th 225, 237, fn. 6.)

at p. 466.) A person need not be a gang member to be guilty of violating section 186.22, subdivision (a). (*People v. Jose P.*, at p. 466.)

In making his evidentiary challenge, Rodriguez points to evidence showing he only had six contacts in the three years before the offenses in question, none of which occurred in 2003. He refers to evidence of a field interview from 2001 in which he indicated he was not "claiming" with Sidro any longer, and also to his trial testimony that he was no longer associating with Sidro. Rodriguez finally argues the existence of his gang-related tattoos does not tend to establish his active participation; that the fact at one time he decided to obtain tattoos associated with Sidro is no indication of *present* active participation since the tattoos are permanent and would be apparent even if he had at some point earlier ended his association with Sidro.

Rodriguez takes too narrow a view of the evidence. He neglects evidence that in committing the instant offenses he acted in association with codefendant Leon, who Martinez testified was another documented Sidro gang member with 12 documented gang-related contacts occurring up to April 2003, the month before the present offenses. Rodriguez does not dispute Leon's documented status. Thus, as required by section 186.22, subdivision (a), Rodriguez used the firearm while furthering or assisting a separate felony offense committed by a gang member. (*People v. Castenada, supra*, 23 Cal.4th at p. 750; *People v. Robles, supra*, 23 Cal.4th at p. 1115.) Moreover, the People's burden was not to show Rodriguez was an active *member* of the Sidro gang, but only to establish that his *involvement* with the gang was more than nominal or passive. (*Castenada, supra*, 23 Cal.4th at p. 752.) Nevertheless, the evidence showed Rodriguez

25

was wearing gang colors at the time of the offense, and his use of the firearm, according to Martinez, benefited the gang in various ways. This evidence, combined with the evidence of Rodriguez's approximately 30 gang-related contacts from 1990 to 2002, his 23 admissions to law enforcement officers over the years that he was a member of Sidro, and his gang-related tattoos, is, in our view, sufficient to establish that Rodriguez's involvement with Sidro at the time of the offenses was more than just nominal or passive.

### V. *Confrontation Clause*

Rodriguez contends he was denied his Sixth Amendment right to confront witnesses against him under *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] (*Crawford*) when Martinez was permitted to testify about statements other officers made concerning Rodriguez's admissions during field investigations. The People counter that Rodriguez waived the issue by failing to object to introduction of Martinez's testimony at trial, and in any event, *Crawford* does not apply where Rodriguez was the declarant and testified at trial.

We reject the People's waiver argument. *Crawford* had not been decided at the time of trial, and in view of settled law permitting experts to base their opinions on hearsay, there was no reason for his counsel to object to Martinez's testimony. (*People v. Turner* (1990) 50 Cal.3d 668, 703 ["Though evidentiary challenges are usually waived unless timely raised in the trial court, this is not so when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change"]; see also *People v. Chavez* (1980) 26 Cal.3d 334, 350, fn. 5.)

26

Turning to Rodriguez's confrontation clause challenge, we conclude it is without merit. In *Crawford*, the U.S. Supreme Court "repudiated the high court's prior ruling in *Ohio v. Roberts* (1980) 448 U.S. 56, under which an unavailable witness's statements were admissible against a criminal defendant if the statement bore 'adequate "indicia of reliability." ' [Citation.] To meet that latter test, evidence had to fall within a 'firmly rooted hearsay exception' or bear 'particularized guarantees of trustworthiness.' [Citation.] In overruling *Roberts*, *Crawford* held that out-of-court statements by a witness that are testimonial are barred under the Sixth Amendment's confrontation clause unless the witness is shown to be unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the trial court. 'Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rule of evidence, much less to amorphous notions of "reliability." . . . To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 763-764.)

We agree with the People that *Crawford* plainly does not prevent admission of Rodriguez's own statements to officers during field investigations. The *Crawford* court made it clear that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford, supra,* 541 U.S. at p. 38 [124 S.Ct. at p. 1369, fn. 9].)

But Rodriguez argues it is the admission of the *officer's* recorded statements that violates *Crawford*. Citing *People v. Ferguson* (1982) 129 Cal.App.3d 1014, he maintains the field interview sheets are inadmissible hearsay and were offered to prove the truth of the matter asserted. The contention is unavailing. First, in *Ferguson*, the police record was held inadmissible because it was introduced as evidence of the *defendant's* statement, for the truth of his statement about repossessing a vehicle. (*Ferguson*, 129 Cal.App.3d at p. 1024.) As we have just explained, to the extent Martinez relied upon the field interview reports to introduce Rodriguez's statements into evidence, no *Crawford* issue arises. Nor is there a *Crawford* violation to the extent Martinez relied upon the officers' recorded statements, if any, within the reports. *Crawford* did not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions; and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. In short, the field investigation reports were mentioned only as a basis for Martinez's opinion that Rodriguez was a documented member of the Sidro gang and that his crimes were gang-related. There was no Sixth Amendment violation based on Martinez's reliance on the field investigation reports.

## VI. *Prior Bad Act Evidence*

Rodriguez contends the trial court erred by permitting the People to present evidence of his April 22, 1999 residential burglary conviction because it amounted to

inadmissible character evidence, and the evidence was highly prejudicial, rendering it

inadmissible under Evidence Code section 352. Rodriguez further asserts the admission

of this evidence violated his due process right to a fair trial.

We review Rodriguez's evidentiary challenge for abuse of discretion; to prevail he

must demonstrate the court "exercised its discretion in an arbitrary, capricious, or

patently absurd manner that resulted in a manifest miscarriage of justice." (*People v.*

*Rodriguez* (1999) 20 Cal.4th 1, 9-10; see also *People v. Alvarez* (1996) 14 Cal.4th 155,

201.)

No such abuse occurred here. Evidence of Rodriguez's prior conviction was

presented solely for the limited purpose of proving the section 186.22 criminal street

gang enhancement, as well as to show Rodriguez was an active participant in the gang for

purposes of counts 3 and 4. The trial court twice specifically instructed the jury about the

limited purpose of that evidence, first before Martinez related Rodriguez's prior

residential burglary conviction, and again before counsel's closing arguments.[7] Absent

evidence to the contrary, the jury is presumed to have understood and followed these

instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662; *People v. Marshall* (1996) 13

Cal.4th 799, 864.)

---

[7]   Just before Martinez's testimony on this point, the court advised the jury as
follows: "All right. Ladies and gentlemen, there is certain evidence that is admitted for a
limited purpose, and this is one of those. The purpose for which this is admitted is solely
the allegation of Penal Code section 186.22, subdivision (b)(1), attached to each of the
counts, as well as for counts 3 and 4. So this evidence is admitted solely for that
enhancement purpose attached to each count and also limited for consideration on counts
3 and 4, and not to be considered for any other purpose."

Second, we cannot say the prejudicial nature of that evidence was so high as to outweigh its probative value on that issue. We disagree with Rodriguez's argument the evidence was highly prejudicial because the past offense did not tend to show his *current* active participation in Sidro. Courts have taken into account past involvement in crimes as part of the evidence supporting a jury's finding of active participation in a street gang. (See *In re Jose P.*, *supra*, 106 Cal.App.4th at pp. 464, 468 [expert recounted the minor's past arrests for robbery and resisting arrest, and also the minor's arrest in connection with a stolen vehicle in which he acted with his brother, an associate of one subset of the Norteo gang; court relied on this evidence to conclude there was substantial evidence to support the finding the minor was an active participant in the Norteo criminal street gang].) But even assuming the evidence should have been excluded, we would nevertheless conclude the error was harmless. That is, in view of the other evidence supporting the gang enhancement and the active participation prong for counts 3 and 4 (Rodriguez's wearing of gang colors at the time of the crimes; his presence in rival gang territory; his use of a firearm in the commission of the offenses; his association with Leon; his past association with Sidro gang members, use of a moniker and claims of membership to police; and his gang-related tattoos), there is no reasonable probability that any error in allowing Martinez to point out Rodriguez's 1999 burglary conviction affected the jury's verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Finally, we do not reach Rodriguez's conclusory argument that admission of his prior conviction violated his due process right to a fair trial. First, he does not specify how, or in what manner, his due process right is implicated. Moreover, he did not

preserve such an objection at the time evidence of his prior conviction was admitted. " 'It is, of course, "the general rule" ' . . . ' "that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' " (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) This forfeiture rule applies to a defendant's failure to object on grounds of federal constitutional provisions. (See *People v. Davis* (1995) 10 Cal.4th 463, 501, fn. 1; *People v. Gordon* (1990) 50 Cal.3d 1223, 1264-1265, overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835.)

VII. *Failure to Give Lesser Included Offense Instructions — Counts 3 and 4*

Rodriguez contends the court erred in not instructing the jury sua sponte on the misdemeanor offenses of section 12025, subdivision (a)(1) and section 12031, subdivision (a)(1) for counts 3 and 4. He maintains the error was prejudicial based on the weak evidence of his active participation in the Sidro gang, as well as the following question posed by the jury during its deliberations: "On Count 3 — is the charge of concealed weapon by itself? Or is the charge contingent upon being a gang member? Hence, if not a gang member then should we then find having a concealed weapon as a crime?"

"A court must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so." (*People v. Horning* (2004) 34 Cal.4th 871, 904-905; citing *People v. Barton* (1995) 12 Cal.4th 186, 196-198.) The People concede the court erred in failing to give instructions on the lesser-included offenses in counts 3 and 4. They maintain, however, the error was invited by

31

Rodriguez's counsel, and was also harmless in view of the jury's findings, as well as the substantial evidence of Rodriguez's active participation in the Sidro gang.

We need not decide whether Rodriguez's counsel invited the error because we conclude any error was harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) Further, under *People v. Watson, supra*, 46 Cal.2d at p. 836, there must be "a reasonable probability, not a mere theoretical possibility, that the instructional error affected the outcome of the trial." (*People v. Blakeley* (2000) 23 Cal.4th 82, 94, 96, italics omitted.)

By convicting Rodriguez of the offenses in counts 3 and 4, the jury necessarily decided he was an active participant in the Sidro criminal street gang as required by section 186.22, subdivision (a), thus rejecting Rodriguez's defense theory that he had ended his affiliation with the gang. Its finding precluded the possibility of convicting Rodriguez of the lesser included offenses. The jury's question to the court does not indicate it was leaning against a finding of Rodriguez's active participation in the Sidro gang, and indeed, as we have held, there was substantial evidence supporting the jury's finding in that regard. Rodriguez cannot demonstrate prejudice stemming from the court's decision to omit an instruction on the lesser-included offenses of having a concealed firearm in a vehicle and carrying a loaded firearm. (*Lewis, supra*, 25 Cal.4th at p. 646.)

32

VIII. *Imposition of Consecutive Sentences on Counts 1 and 2*

Rodriguez contends imposition of consecutive sentences on counts 1 and 2 is

contrary to *Blakely v. Washington* (2004) 524 U.S. ___ [124 S.Ct. 2531] (*Blakely*)

because the court's sentencing decision was based on the nonjury finding that his crimes

were predominantly independent of each other.  In *Blakely*, the court applied the rule

stated in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) to an "exceptional"

sentence imposed under a Washington state sentencing scheme.  Under *Apprendi*,

"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved

beyond a reasonable doubt." (*Id.* at p. 490.)  The *Blakely* court explained that the "

'statutory maximum' . . . is the maximum sentence a judge may impose *solely on the basis*

*of the facts reflected in the jury verdict or admitted by the defendant.*" (*Blakely*, 524 U.S.

at p. ___ [124 S.Ct. at p. 2537].)  "In other words, the relevant 'statutory maximum' is not

the maximum sentence a judge may impose after finding additional facts, but the

maximum he may impose without any additional findings." (*Ibid.*)

A. *Forfeiture*

We first address and reject the People's argument that Rodriguez forfeited this

claim of error by failing to object on this ground at the time of sentencing.  They

acknowledge the split among appellate courts on this issue, and we note the issue is now

before the California Supreme Court. (*People v. Black*, review granted July 28, 2004,

S126182.)

" ' "The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had. . . ." ' [Citation.]  " 'No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. omitted.)[8]  In *People v. Scott* (1994) 9 Cal.4th 331, 351, 353 (*Scott*), the California Supreme Court held a defendant's failure in the trial court to challenge imposition of an enhanced sentence based on erroneous or flawed information waived the issue on appeal.  The *Scott* court reasoned that its waiver rule was necessary to facilitate the prompt detection and correction of errors in the trial court, thereby reducing the number of appellate claims and preserving judicial resources. (*Id.* at p. 351; see also *People v. Walker* (1991) 54 Cal.3d 1013, 1023.)

Here, had Rodriguez objected to the court's imposition of consecutive sentences based on its finding, he would not have achieved the purpose of prompt detection or correction in the trial court. This is because before *Blakely*, California courts had held that there was no right to a jury trial in connection with a court's imposition of consecutive sentences. (See e.g. *People v. Groves* (2003) 107 Cal.App.4th 1227, 1230-

---

[8]     "[T]he terms 'waiver' and 'forfeiture' long have been used interchangeably. As the United States Supreme Court has explained, however, '[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." ' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9.)

1231.) We conclude application of *Blakely* to Rodriguez's consecutive sentences was sufficiently unforeseeable so as to excuse Rodriguez's lack of objection, or render any objection on that ground futile. (*People v. Welch* (1993) 5 Cal.4th 228, 237-238 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence"].)

We are not persuaded by the People's various arguments, including their reliance on *People v. Marchand* (2002) 98 Cal.App.4th 1056 for the proposition that a defendant waives his right to object on *Apprendi* grounds by failing to object specifically on that ground in the trial court. In *Marchand*, the defendant argued he had been denied his right to due process when the court instead of a jury made the necessary predicate finding for the purpose of having him register as a sex offender under section 290, subdivision (a)(2)(E). On appeal, the court held the defendant waived these claims by not asserting them in the trial court, but it elected to address them anyway because they presented important questions of constitutional law. (*Marchand*, at p. 1061.) The appellate court did not consider whether the defendant waived his jury trial right by failing to assert it in the trial court since the defendant had expressly waived his right to a jury trial, and did not assert the trial court had violated that right. (*Marchand*, at p. 1059.) Thus, we do not find *Marchand* persuasive in deciding whether Rodriguez's *Blakely* claim can be waived by a failure to object on that basis at sentencing.

35

B. *Blakely is Inapplicable to Imposition of The Consecutive Sentences Imposed in Counts 1 and 2*

Proceeding to the merits of Rodriguez's claim, we disagree that *Blakely* invalidates the consecutive sentences imposed in this case. Imposition of consecutive sentences was not at issue in *Blakely*, and we see no indication *Blakely* was intended to apply in that circumstance. *Blakely* (and also *Apprendi*) was concerned with the finding of a fact " 'that increases the penalty for a crime beyond the prescribed statutory maximum.' " (*Blakely, supra*, 524 U.S. at p. ___ [124 S.Ct. at p. 2536], *Apprendi, supra*, 530 U.S. at p. 490.) In *Apprendi*, the relevant issue was the sentence for a *particular crime*, not the aggregate effect of the defendant's multiple sentences. (*Apprendi, supra*, at p. 474.) Furthermore, *Apprendi* sought to preserve a jury trial right for all facts necessary to constitute a statutory offense, and ensuring they are proven beyond a reasonable doubt. (*Id.* at pp. 483-484.) The consecutive sentencing decision does not involve the facts necessary to constitute a statutory offense. Here, the jury convicted Rodriguez of counts 1 and 2 by a finding beyond a reasonable doubt, and he received no more than the statutory maximum for each conviction.[9] Imposing those lawful sentences consecutively does not exceed the statutory maximum penalty for any one of his offenses.

---

[9]     On count 1, the court sentenced Rodriguez to one-third the midterm (8 months), and doubled that sentence to 16 months for his prior strike conviction, and on count 2, to one-third the midterm (2 years) doubled to 4 years due to the section 186.22, subdivision (b)(1) allegation. The court stayed the section 186.22 enhancement on count 1 under section 654.

In addition, there is no presumption of concurrent sentencing in California in the sense that a concurrent term could be construed to be a type of statutory maximum for *Blakely* purposes. When a defendant is convicted of multiple crimes, the trial court has discretion to impose sentence on the subordinate counts consecutively or concurrently. (*In re Hoddinott* (1996) 12 Cal.4th 992, 1000.) Rodriguez points to section 669, which reads in part: "Upon the failure of the court to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently." But this language merely mandates concurrent terms if the court has failed to indicate whether a sentence is to be consecutive or concurrent. It does not create a presumption favoring concurrent terms. (See *People v. Reeder* (1984) 152 Cal.App.3d 900, 923 ["The trial court is required to determine whether a sentence shall be consecutive or concurrent but is not required to presume in favor of concurrent sentencing"].) Nor are the provisions of California Rules of Court, rule 4.425 mandatory; while they are criteria affecting the decision to impose consecutive rather than concurrent sentences, they are "guidelines, not rigid rules courts are bound to apply in every case. . . ." (*People v. Calderon* (1993) 20 Cal.App.4th 82, 87.) Thus, a consecutive term does not represent a departure from any standard or presumptive sentencing range. Rodriguez was not denied his due process right to jury trial under *Blakely* by the court's selection of consecutive terms for counts 1 and 2.

IX. *Refusal to Dismiss Rodriguez's Prior Strike Conviction*

Rodriguez contends the court erred in refusing to strike his April 1999 residential burglary conviction; that the court did not properly balance the relevant factors as

37

required by *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 531 in making its

decision. Specifically, Rodriguez argues the court did not take into account the fact that

he left the Sidro gang, moved from his old neighborhood, attended drug counseling, got

married and had children and worked as a union contract worker. We disagree.

Section 1385, subdivision (a) permits a trial court to strike an allegation of a prior

felony conviction in cases brought under the Three Strikes law. (*Romero, supra,* 13

Cal.4th at pp. 529-530.) The trial court may strike such prior convictions " 'in the

furtherance of justice' " so that a defendant is not subject to the statutorily increased

penalty. (*Id.* at p. 529.) In so doing, the court must consider both the constitutional rights

of the defendant, and the interests of society represented by the People. (*Id.* at pp. 530-

531.) That is, the trial court "must consider whether, in light of the nature and

circumstances of his present felonies and prior serious . . . or violent felony convictions,

and the particulars of his background, character, and prospects, the defendant may be

deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence should

be treated as though he had not previously been convicted of one or more serious . . . or

violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

"[A] court's failure to dismiss or strike a prior conviction allegation is subject to

review under the deferential abuse of discretion standard." (*People v. Carmony* (2004)

33 Cal.4th 367, 374.) In reviewing a trial court's decision under this standard, a

reviewing court is guided "by two fundamental precepts. First, ' "[t]he burden is on the

party attacking the sentence to clearly show that the sentencing decision was irrational or

arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to

38

have acted to achieve the legitimate sentencing objectives, and its discretionary

determination to impose a particular sentence will not be set aside on review." '

[Citations.] Second, a ' "decision will not be reversed merely because reasonable people

might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting

its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these

precepts establish that a trial court does not abuse its discretion unless its decision is so

irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.)

Under *Carmony*, this court must consider the trial court's refusal in light of the legal

principles and policies regarding the particular law in which the discretionary exercise of

authority was sought. (*Carmony*, at p. 377.)

   Rodriguez does not adequately explain why the court's ruling was arbitrary or

capricious; he does not point to improper factors considered by the court, nor does he

persuasively show the court failed to consider relevant factors. He merely reiterates the

evidence, facts and circumstances before the court favorable to him and concludes they

require a finding he should be deemed outside the Three Strikes scheme's spirit. Such

argument does not adequately demonstrate the court's ruling "falls outside the bounds of

reason." (*People v. Williams, supra*, 17 Cal.4th at p. 162.)

   Nor was the court's ruling an abuse of discretion. It is of no consequence that the

court did not explain its reasoning; section 1385, subdivision (a) does not require the trial

court to state reasons for declining to strike a strike. (*People v. Zichwic* (2001) 94

Cal.App.4th 944.) During the sentencing hearing, both Rodriguez and his counsel

highlighted the factors that Rodriguez asserts should have compelled striking his

39

conviction, including Rodriguez's claim that he was no longer a gang member, the fact he moved out of his old neighborhood and supported a wife and two children, and the fact he had a drug problem. The court indicated it had read and considered the probation report, the supplemental probation report, Rodriguez's statement in mitigation and attachments of character letters, and it heard the arguments of counsel. It considered the prosecutor's arguments that Rodriguez continued to associate with gang members, had a history of committing similar crimes, and used a gun in committing the present crimes, one of which, the People point out, was a serious and violent felony. (§§ 667.5, subd.(c)(20); 1192.7, subd.(c)(8).) If we accepted Rodriguez's claims, we would be holding that the court's refusal to strike his 1999 conviction was irrational, capricious, or patently absurd (*People v. Delgado* (1992) 10 Cal.App.4th 1837, 1845) and without even a fairly debatable justification. (*People v. Clark* (1992) 3 Cal.4th 41, 111.) On this record, we cannot reach that conclusion.

Under the circumstances, the court's refusal to strike Rodriguez's prior felony was not so irrational or arbitrary as to be unreasonable, nor did it " 'fall[] outside the bounds of reason.' " (*People v. Carmony, supra,* 33 Cal.4th at p. 377; *Williams, supra,* 17 Cal.4th at p. 162.)

### X. *Instructional Error*

Rodriguez contends the court prejudicially erred by failing to instruct the jury, in response to Martinez's testimony, "that every offense committed by a gang member does not compel a finding that the charged crime was committed for the benefit of the gang." He argues the court compounded its error by giving conflicting jury instructions on the

40

gang enhancement allegations, namely, CALJIC Nos. 6.50 and 2.80.[10] According to

Rodriguez, the latter instructions, combined with Martinez's testimony, equated to

directing a guilty verdict and deprived him of his right to due process.

The People assert Rodriguez waived these arguments because he did not object to

the giving of CALJIC No. 6.50 or request modification of the instruction. We agree that

Rodriguez forfeited any claim that the court should have provided an additional clarifying

instruction or "pinpoint" instruction. "[A] party may not complain on appeal that an

instruction correct in law and responsive to the evidence was too general or incomplete

unless the party has requested appropriate clarifying or amplifying language." (*People v.*

---

[10]    As read to the jury, CALJIC No. 6.50 provides in part: "Pattern of criminal street
gang means [*sic*] the commission of, or attempted commission of, or solicitation of
sustained juvenile petition for, or conviction of two or more of the crimes listed above,
provided at least one of those crimes occurred after September 26, 1988, and the last of
those crimes occurred within three years after a prior offense, and the crimes are
committed on separate occasions, or by two or more persons. I[n] determining this issue,
you should consider any expert opinion evidence offered as well as evidence of the past
or present conduct by gang members involving the commission of one or more of the
identified crimes, including the crimes charged in this proceeding. [¶] The People have
the burden of proving the truth of this [section 186.22] allegation. If you have a
reasonable doubt that this allegation is true, you must find it to be not true."

CALJIC No. 2.80 was read to the jury in part as follows: "In determining what weight to
[g]ive to any opinion expressed by an expert witness, you should consider the
qualifications and believability of the witness, the facts or materials upon which each
opinion is based, and the reasons for each opinion. [¶] An opinion is only as good as the
facts and reasons on which it is based. If you find that any fact has not been proved, or
has been disproved, you must consider that in determining the value of the opinion.
Likewise, you must consider the strengths and weaknesses of the reasons on which it is
based. [¶] You are not bound by an opinion. Give each opinion the weight you find it
deserves. You may disregard any opinion if you find it to be unreasonable."

*Guiuan* (1998) 18 Cal.4th 558, 570; see also *People v. Sully* (1991) 53 Cal.3d 1195, 1218.)

As for Rodriguez's second contention – that the language of CALJIC No. 6.50 undercuts the instruction in CALJIC No. 2.80 resulting in a denial of his right to due process in view of Martinez's testimony – we will not find waiver in a matter that assertedly concerns Rodriguez's substantial rights. (§ 1259.) Nevertheless, we are not persuaded the court's instructions confused or mislead the jury, or resulted in a directed verdict.

There are two premises to Rodriguez's contention with which we disagree. The first is Rodriguez's characterization of Martinez's testimony as "extremely expansive" on the issue of the types of crimes sufficient to sustain the allegation under section 186.22 that crimes were committed for the benefit of a street gang. We rejected such an interpretation based on the totality of Martinez's testimony in part III (B), *ante*.

The second is Rodriguez's assertion that the two instructions somehow contradict each other. Rodriguez focuses on the portion of CALJIC No. 6.50 that tells the jury it "should consider any expert opinion evidence . . . . " That aspect of the instruction actually addresses the "pattern of gang activity" element of the section 186.22 enhancement, and instructs the jury that it "should consider any expert opinion evidence offered as well as evidence of the past or present conduct by gang members involving the commission of one or more of the identified crimes, including the crimes charged in this proceeding." Rodriguez argues the instruction "left the jurors with the impression that they should base their finding of the gang enhancement" (underlining in original) on

Martinez's testimony, somehow giving his testimony undue weight and eliminating other relevant factors.

There is no conflict in these instructions. The challenged portion of CALJIC No. 6.50 does not advise the jury that it must accept or be bound by an expert's testimony; indeed it does not even pertain to the jury's assessment of that aspect of Martinez's testimony that Rodriguez claims is overbroad, that is, whether Rodriguez's offenses were committed for the benefit of the Sidro gang. The instruction simply directs the jury to *consider* certain evidence in making its determination, which is something different from directing the jury to *adopt* it. Further, consistent with CALJIC No. 6.50, CALJIC No. 2.80 more broadly instructs the jury on *how* to consider the expert's opinion, and it specifically instructs the jury that it must consider whether the facts and reasons on which it is based have been proven, and the strengths or weaknesses of those facts and reasons. (See footnote 10, p. 42 *ante*.) We conclude the court did not err by instructing the jury with CALJIC Nos. 6.50 and 2.80. Rodriguez's claim of instructional error therefore fails on its flawed premises.

## DISPOSITION

The judgment is affirmed.

_____
O'ROURKE, J.

WE CONCUR:

_____
McCONNELL, P. J.

_____
NARES, J.

44

EXHIBIT C

State Bar of CA :: Benjamin Sanchez



# THE STATE BAR OF CALIFORNIA

State Bar Home

Search Calbar Site 🔘

Tuesday, February 28, 2006

Home > Attorney Search > Attorney Profile

ATTORNEY SEARCH

Member Services

About the Bar

Public Services

Attorney Resources

## Benjamin Sanchez - #72505

**Current Status: Active**

This member is active and may practice law in California.

See below for more details.

## Profile Information

| | | | |
|---|---|---|---|
| Bar Number | 72505 | | |
| Address | 4364 Bonita Rd PMB 483 Bonita, CA 91902-1421 | Phone Number | (619) 685-1535 |
| | | Fax Number | (619) 498-3814 |
| | | e-mail | Not Available |
| District | District 9 | Undergraduate School | No Information Available; USA |
| County | San Diego | Law School | Western State Univ; CA USA |

## Status History

| Effective Date | Status Change |
|---|---|
| Present | Active |
| 11/25/2005 | Active |
| 8/27/2005 | Not Eligible To Practice Law |

State Bar of CA :: Benjamin Sanchez

| | | |
|---|---|---|
| 12/22/1976 | Admitted to The State Bar of California | |

Explanation of member status

## Actions Affecting Eligibility to Practice Law

| Effective Date | Description | Case Number | Resulting Status |
|---|---|---|---|

## Disciplinary and Related Actions

| 8/27/2005 | Discipline w/actual suspension | 02-O-10355 | Not Eligible To Practice Law |

## Administrative Actions

*This member has no public record of administrative actions.*

Explanation of common actions

Copies of official attorney discipline records are available upon request.

## California Bar Journal Discipline Summaries

*Summaries from the California Bar Journal are based on discipline orders but are not the official records. Not all discipline actions have associated CBJ summaries. Copies of official attorney discipline records are available upon request.*

### August 27, 2005

BENJAMIN SANCHEZ [#72505], 68, of Bonita was suspended for one year, stayed, placed on three years of probation with a 90-day actual suspension and was ordered to make restitution, take the MPRE within one year and comply with rule 955. The order took effect Aug. 27, 2005.

Sanchez stipulated to four counts of misconduct in two cases.

A solo practitioner in San Diego, he opened a satellite office in Los Angeles in 2000 and hired an office manager whom he authorized to use a general checking account. He did not authorize the woman to use his client trust account. He visited the office once a week.

State Bar of CA :: Benjamin Sanchez    :

A client hired him at the Los Angeles office to handle a personal injury case. He never met with or talked to the client, instead communicating with the office manager. Proceeds from a partial settlement were received in Los Angeles and provided to the client.

An additional settlement check for $606.50 was received in Los Angeles for reimbursement for storage and towing expenses incurred by the client. Unbeknownst to Sanchez, the office manager took the funds.

A third settlement check, for $9,000, went to the Los Angeles office and was deposited in Sanchez' client trust account. Although a check was issued to the client, she never received it. The balance in the trust account fell below the required amount. Sanchez said when he tried to confront the office manager, she vacated the office and disappeared.

He stipulated that he failed to notify a client of receipt of funds or maintain client funds in trust, and by not supervising his employee, he failed to perform legal services competently.

In the second matter, Sanchez employed an individual in 1998 to administer personal injury cases for him in Los Angeles. A client hired him to handle a personal injury case but Sanchez did not file a complaint before the statute of limitations expired. When the client spoke to someone in Sanchez' San Diego office, she was told the case was going well. Sanchez claims he was unaware of his failure at the time.

The client filed a malpractice suit against Sanchez and won a $28,349 judgment that he has not paid.

He stipulated that he failed to perform legal services competently.

In mitigation, he has no prior record of discipline and he cooperated with the bar's investigation.

Start New Search>

Contact Us    Site Map    Privacy Policy    Notices    © 2006 The State Bar of California

Page 3 of 3

EXHIBIT D

1  BONNIE M. DUMANIS
   District Attorney
2  SOPHIA G. ROACH
   Deputy District Attorney, SBN 194080
3  500 Third Avenue
   Chula Vista, CA 91910
4  (619) 691-4938

5

6  Attorneys for Plaintiff

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF SAN DIEGO

10 THE PEOPLE OF THE STATE OF CALIFORNIA,     | No. CS176087
                                    Plaintiff, | DA BAL576
11
                                              | **TRIAL MEMORANDUM**
12              v.
                                              | Date: 08-04-03
13 JOSE LUIS LEON, JAVIER ESPINOZA            | Time: 8:30AM
   RODRIGUEZ,                                 | Dept: 16
14                                 Defendant.
15

16      Comes now the plaintiff, the People of the State of California, by and through their

17 attorneys, BONNIE M. DUMANIS, District Attorney, SOPHIA G. ROACH, Deputy District

18 Attorney, and respectfully submits the following Trial Memorandum.

19              **DATE TIME AND LOCATION OF INCIDENT**

20 5/11/03 at 2:09PM at 240 Qunitard Street in Chula Vista

21                        **WITNESS LIST**

22 Donna Tucker                     Martin Herrera

23 Angel Herrera                    Laura Limon

24 Officer James Petray CVPD        Agent Randy Smith CVPD

25 Officer Rodney Demetrio CVPD     Officer Jeff Hughes CVPD

26 Officer Joseph Picone CVPD       Investigator Peter Martinez SDDA

27 ///

28 ///

29 ///

                                1

## STATEMENT OF FACTS

1
2       On May 11, 2003, Martin Herrera, his brother Angel and his wife/girlfriend Laura were
3   coming home from Tijuana at approximately 2:00AM. They parked in the parking lot for an
4   apartment complex at 240 Quintard in Chula Vista, when they noticed two men breaking into a
5   neighbor's (Donna Tucker) car. They walked towards the apartments and told the suspects that
6   they were going to call police. At that time one of the suspects later identified as Javier
7   Rodriguez shot a gun into the air. Laura Limon was already on the phone with police when the
8   shot was fired. The two men fled the area in a dark colored Ford Explorer.

9       A nearby patrol officer responded to the call and saw a dark colored SUV leaving the
10  apartment complex parking lot with its lights off. The patrol officer followed the vehicle at a
11  distance and called for back up. Once back up arrived, a felony hot stop was initiated and the
12  SUV pulled to the side of the road. The front passenger got out of the vehicle and attempted to
13  flee on foot. After a short foot pursuit he was apprehended and identified as Jose Leon. Leon
14  had a loaded .22 caliber handgun concealed in his waistband. The driver was identified as
15  Rodriguez. When he was taken into custody he had a lug nut wrench in his pocket. A search of
16  the vehicle revealed an open 12 pack of Corona, numerous .22 caliber rounds, and several items
17  belonging to Donna Tucker including her work ID, credit cards and other miscellaneous
18  property.

19      The two suspects were identified by the witnesses in a curbside line up. Tucker identified
20  the property taken from her vehicle. Tucker's vehicle had a broken window and a .22 caliber
21  shell casing was found in the parking lot near the location where the shots were fired.

22      Both defendants are documented Sidro gang members who have been contacted by police
23  on numerous occasions in Sidro hang outs and with other Sidro gang members. Both of them
24  have previously committed serious felonies with other gang members.

25                          ## MOTIONS
26                               ### I
27  ### IF THE DEFENDANTS TESTIFY, THEY MAY BE IMPEACHED
28  ### WITH PRIOR FELONY CONVICTIONS AND TRUE FINDINGS
29      "When a defendant testifies on his own behalf, his character as a witness my be

1   impeached in the same manner as any other witness." *Id.* at 618, citing *People v. Pike* (58

2   Cal.2d 70, 93. This means that the defendant can be impeached with evidence of prior acts of

3   moral turpitude. In *People v. Wheeler*, (1992) 4 Cal. 4th 284, 292, the California Supreme Court

4   discussed new amendments to the California Constitution which broadened the scope of

5   admissible evidence. The court found that Evidence Code Sections 787 and 788 no longer

6   preclude the introduction of relevant conduct. In fact, they held that "[s]ection 28(d) makes

7   immoral conduct admissible for impeachment whether or not it produced any conviction, felony

8   or misdemeanor". *Id.* at 297 fn. 7, citing *People v. Castro* (1985) 38 Cal. 3d 301, 314-317.

9        If the defendant Leon testifies, the People will seek to introduce evidence underlying his

10  prior true finding for PC211 from 1999. If defendant Rodriguez testifies, the People will

11  impeach him with his prior PC 459 conviction from 1999.

12                                    **II**

13  **CHARACTER EVIDENCE IS SUBJECT TO IMPEACHMENT AND REBUTTAL**

14       When the defendant . . . has injected the issue of his good moral character into the case

15  by direct testimony, the prosecution may rebut by introducing evidence of the defendant's bad

16  moral character." *People v. Wagner* (1975) 13 Cal. 3d 612, 618. The Evidence Code clearly

17  reflects this rule in section 1102, which states:

18       In a criminal action, evidence of the defendant's character or trait of his character in the

19  form of an opinion or evidence of his reputation is not made inadmissible . . . if such evidence

20  is:

21       (a) Offered by the defendant to prove his conduct in conformity with such character or

22  trait of character.

23       (b) **Offered by the Prosecution to rebut evidence adduced by the defendant under**

24  **subdivision (a). (Emphasis added.)**

25  In the case at hand the defense may be introducing evidence of the defendant's character through

26  special witnesses. If the defendant chooses to introduce such evidence, the People may not be

27  prohibited from introducing character evidence in rebuttal. Additionally, when a defense

28  witness, other than the accused, testifies as to the defendant's character, the People may ask the

29  witness if he has heard of specific acts or conduct of the defendant that might contradict his or

1    her testimony. Supra, *People v. Wagner* at 619. So long as the prosecutor is acting in good faith

2    and with the belief that the acts did take place, he or she may ask questions which test the

3    witness' knowledge of the defendant's reputation. *Id.* Questions asked in a "have you heard?"

4    form are acceptable. *Id.*

5         Therefore, the People should be allowed to introduce evidence of the defendant's poor

6    character, in the form of opinion or reputation, should the defendant elicit evidence of his good

7    character. Further, any witnesses who testify as to the defendant's character are subject to cross-

8    examination regarding their knowledge of prior conduct of the defendant.

9                                            **III**

10        **DEFENDANT'S PRIOR ACTS ARE ADMISSIBLE UNDER SECTION 1101(B)**

11        Defendant Leon sustained a juvenile true finding for PC 211in 1999. The facts of that

12   case reveal a gang-related intent and motive. In the 1999 case the defendant and 3 other Sidro

13   gang members approached a boy on the trolley and demanded his property. When he was

14   reluctant they beat him and took it by force.

15        Evidence Code section 1101(b) permits the introduction of a defendant's prior conduct

16   when it is relevant to prove any fact in dispute other than defendant's disposition to commit an

17   act. This section lists several facts that prior acts may be introduced to prove. Among these are

18   motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or

19   accident. (Evidence Code section 1101(b).) This list is not exhaustive, and evidence may be

20   admitted to prove any fact other than the defendant's disposition to commit the act. *Id.; People*

21   *v. Carter* (1993) 19 Cal.App.4th 1236, 1246.

22        The admissibility of evidence of uncharged offenses "'depends upon three principal

23   factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the

24   uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or

25   policy requiring the exclusion of relevant evidence.'" *People v. Carter supra at* 1246.

26        The People assert that the defendant's prior offense meets all of the criteria required by

27   section 1101(b). The material fact to be proved by admission of this evidence is that the

28   defendant had the specific intent to aid and abet gang related activity and gang members in the

29   commission of criminal activity. This is an element required under the Penal Code section

                                            4

1   186.22 allegation. The defendant's prior juvenile finding tends to prove this because it is similar

2   in intent and motive. In the prior case the defendant assisted other Sidro gangsters in the

3   commission of a crime. In this case he assisted another Sidro gang member. There is no rule,

4   which excludes such evidence so long as proper techniques are employed to elicit such

5   information.

6         Evidence of a defendant's commission of charged and uncharged criminal acts is

7   admissible to establish motive and/or intent to commit a charged act. *People v. Thompson*

8   (1980) 27 Cal.3d 303, 315, fns. 13, 14. The ultimate fact of intent can be inferred from the

9   intermediate fact of motive. *People v. De Moss* (1935) 4 Cal.2d 469; *People v. Ewoldt* (1994) 7

10   Cal.4th 380. The inference is that in light of the motive in the first event, the motive, and thus

11   the state of mind, of the defendant is the same in the second event. *People v. Robbins* (1988) 45

12   Cal.3d 867, 879-880. Motive is always subject to proof, is material, and wide latitude is

13   permitted in admitting evidence of its existence. (*People v. Pertsoni* (1985) 172 Cal.App.3d

14   369, 375; *People v. Daniels* (1971) 16 Cal.App.3d 36, 46.)

15         In many cases the introduction of other crimes evidence is relevant to prove intent

16   because of the assumption that people act with a similar intent in similar circumstances. The

17   California Supreme Court explained in People v. Robbins (1988) 45 Cal.3d 867, at page 879:

18           "We have long recognized `that if a person acts similarly in similar
    situations, he probably harbors the same intent in each instance' [citations
19   omitted], and that such prior conduct may be relevant circumstantial evidence of
    the actor's most recent intent. The inference to be drawn is not that the actor is
20   disposed to commit such acts; instead, the inference to be drawn is that, in light of
    the first event, the actor, at the time of the second event, must have had the intent
21   attributed to him by the prosecution." (Emphasis in original.)
22   
23   

24         The cases have made it quite clear that the similarity of the crimes is applied as a

25   threshold test where the uncharged crime is offered to prove identity rather than intent.

26   Logically, an inference of identity can be made from evidence of other crimes only where they

27   share a large number of distinctive common marks with the charged crime. (*People v. Matson*

28   (1974) 13 Cal.3d 35, 40; *People v. Nible* (1988) 200 Cal.App.3d 838, 848.)

29         "However, when the other crime evidence is admitted solely for its

1
2
3
4
5

relevance to the defendant's intent, a distinctive similarity between the two crimes is often unnecessary for the other crime to be relevant. Rather, if the other crime sheds great light on the defendant's intent at the time he committed that offense it may lead to a logical inference of his intent at the time he committed the charged offense if the circumstances of the two crimes are substantially similar even though not distinctive."

6
7
8
9
10

(Emphasis in original; *People v. Nible, supra*, at pp. 848-849; similarly see *People v. Carter* (1993) 19 Cal.App.4th 1236, 1246.) Stated another way, the California Supreme Court held, in People v. Robbins, supra, at page 880, "[i]t has been observed that when evidence of an uncharged offense is introduced to prove intent, the prosecution need not show the same quantum of `similarity' as when uncharged conduct is used to prove identity."

11
12
13
14
15

To be sure, there are some differences between the defendants acts, however, what remains the same is his intent to assist other gang members in the commission of violent crimes. Whether it to beat up a victim  or to fire shots at witnesses who attempt to notify law enforcement, the defendant's conduct was linked to gang loyalty, assistance of fellow gang members, and ultimately the upholding of public respect of his gang.

16
17
18
19

The law merely requires the defendant's prior conduct be substantially similar to his current offenses for admissibility under 1101(b) as evidence of intent and motive. In this case, the defendant's past motive for use of violence is remarkably similar to that in the present case. Likewise his intent is the same, to assist other gangsters.

20
21
22
23
24
25
26
27
28
29

The admission of prior gang related conduct has been previously admitted in California cases as evidence of motive and intent under Evidence Code section 1101(b).  *People v. Dominguez*, 121 Cal. App. 3d 481, 498-499, upheld the use of gang membership to prove motive.   In *People v. Beyea* (1974) 38 Cal.App.3d 176, the defendant argued that admission of gang membership evidence would have an inflammatory effect on the jury, however, the court determined that membership would be admissible to prove their identity and motive. The appellate court upheld stating, "As proof of the defendants' membership in the Hell's Angels was relevant to proof of motive and was material and necessary, we cannot say that the trial court erred in concluding that the evidence's probative value outweighed its prejudicial effect." *Id.*, at

1  p. 195.

2      The Supreme Court has reiterated that evidence of uncharged offenses may be admissible

3  to show "a larger continuing plan, scheme, or conspiracy, of which the present crime on trial is a

4  part" . . ." (*People v. Thomas* (1978) 20 Cal.3d 457, 464-465 [143 Cal.Rptr. 215, 573 P.2d 433];

5  see also *People v. Sam* (1969) 71 Cal.2d 194, 204-205 [77 Cal.Rptr. 804, 454 P.2d 700]).

6  *People v. Garnica*, 121 Cal. App. 3d 727, 734.

7      Based on the clear admissibility of such acts under Evidence Code section 1101(b) and

8  the overwhelming probative value of such prior acts, the People request admission of the

9  defendant's prior gang related attack.  As further discussed below any possible prejudice to the

10  defendant would be negated by the cross-admissibility of such evidence as predicate offenses

11  establishing his documentation as a gang member.  The People seek permission to introduce the

12  evidence not only for purposes of showing the defendant is a gang member, but also for the

13  purpose of showing his similar intent and motive for assaulting others on prior occasions.

14                                    IV ·

15  **GANG EVIDENCE IS ADMISSIBLE PURSUANT TO PENAL CODE SECTION 186.22**

16  **I. Introduction**

17      Penal Code Section 186.22, otherwise known as the Street Terrorism Enforcement and

18  Prevention (STEP) Act, includes two separate provisions. The first is contained in 186.22(a),

19  and is an offense for knowing participation and willful furtherance of felonious conduct by

20  members of a criminal street gang, as defined in 186.22(f). The offense in 186.22(a) is

21  chargeable as either a felony or misdemeanor. The second provision is a special allegation

22  contained in 186.22(b)(1). This allegation is applicable to felony charges committed for the

23  benefit of any criminal street gang with the specific intent to further criminal conduct by gang

24  members.

25      The legislature has stated, in no uncertain terms, the intent behind the STEP Act and

26  codified its findings in Penal Code Section 186.20.

27      The Legislature, however, further finds that the State of California is in a state of
       crisis which has been caused by violent street gangs whose members threaten,
28     terrorize, and commit a multitude of crimes against the peaceful citizens of their
       neighborhoods. These activities, both individually and collectively, present a clear
29

                                        7

and present danger to public order and safety and are not constitutionally protected. . . . It is the intent of the Legislature in enacting this chapter to seek the eradication of criminal activity by street gangs by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs.
Penal Code Section 186.20.

## A. Validity

It should be noted at the onset that Penal Code Section 186.22 has survived constitutional scrutiny since 1991. *In Re Alberto R.*, (1991) 235 Cal. App. 3d 1309 is an exhaustive opinion finding that the statute is not void for vagueness, is not an overbroad encroachment into rights of free assembly, is not an equal protection violation, and provides adequate notice for sentence enhancements. Likewise, *People v. Gamez*, (1991) 235 Cal. App. 3d 957 holds Penal Code Section 186.22 is not violative of due process despite the fact that the section does not require the defendant have knowledge of predicate offenses of other members of the gang. In addition, *Gamez* finds the statute is neither vague nor overbroad. *People v. Green*, (1991) 227 Cal. App. 3d 692 is the original examination of the statute's constitutionality, and finds neither vagueness, overbreadth nor due process violations.

## B. Expert Testimony

Expert testimony is appropriate for establishing most of the requirements of Penal Code Section 186.22. The clearest delineation of the foundation needed for such testimony is in *People v. Gardeley*, (1996) 14 Cal. 4th 605. *Gardeley* establishes the threshold foundation for qualifying experts on gang activity under Evidence Codes 720 and 801. In *In re Elodio O.*, (1997) 56 Cal. App. 4th 1175 at 1179-80, these were summarized as follows:

1.    Conversations with the defendant or the defendant's gang.

2.    Conversations with other gang members.

3.    Personal investigations of crimes committed by gang members.

4.    Information from colleagues and various law enforcement

      agencies.

      *People v. Olguin*, (1994) 31 Cal. App. 4th 1355 holds a proper foundation for gang

1    experts is satisfied by "personal observations of and discussions with gang members as well as
2    information from other officers and the department's files." *Id.*, at 1370; *citing People v. Gamez,*
3    (1991) 235 Cal. App. 3d 957, 966.

4        The gang expert in forming his or her opinions may rely upon hearsay and other
5    inadmissible evidence. *People v. Gardeley, supra,* 14 Cal. 4th at 619. *See In re Fields,* (1990) 51
6    Cal. 3d 1063, 1070, and *People v. Shattuck,* (1895) 109 Cal. 673, 678. A threshold requirement
7    of reliability must be shown through establishing that the expert's opinion is based on material
8    "of a type reasonably relied upon by experts in the particular field in forming their opinions."
9    Cal. Evid. Code Section 801(b); *People v. Montel,* (1993) 5 Cal. 4th 877, 918-19.

10       Proper subjects of expert testimony include the "culture and habits of criminal street
11   gangs" (*People v. Olguin,* (1994) 31 Cal. App. 4th 1355, 1370), and "gang sociology and
12   psychology" (*People v. Gamez,* (1991) 235 Cal. App. 3d 957, 965-66). In addition, most of the
13   substantive requirements of Penal Code Section 186.22 can be met through expert testimony.
14   Specifically, almost the entirety of the requirements in subdivision (f) fall within the scope of
15   expert testimony (*People v. Gardeley,* (1996) 14 Cal. 4th 605, 620), as well as the requirement
16   contained in the 186.22(b)(1) special allegation involving a benefit to the gang (*People v.*
17   *Olguin,* (1994) 31 Cal. App. 4th 1355, 1382-84). Gang experts were used in *People v. Roberts,*
18   (1997) 55 Cal. App. 4th 1073 to testify that gang members are likely to lie for a non-gang
19   member who lived in the same neighborhood. Although this opinion was depublished (but not
20   reversed) on Oct. 3, 1997 in 97 D.A.R. 12519, it gives an indication of the possible scope of
21   gang expert testimony.

22       The California Court of Appeals, Sixth Appellate District, published an exhaustive
23   opinion on the scope and use of gang expert testimony, beginning with the general rule that
24   where a gang allegation is charged, gang expert testimony is admissible. *People v. Valdez,*
25   (1997) 58 Cal. App. 4th 494 relies on *Gardeley* and its progeny to refine and expand the
26   permissive scope of expert testimony. The expert's testimony at trial included relating "at length
27   and in detail, sometimes verbatim, an extensive amount of otherwise inadmissible hearsay from
28   written reports, information learned from others on the street, letters and statements by
29   participants." *Valdez, supra,* 58 Cal. App. 4th at 504. Topics testified to include:

9

1.    1.    The origin and history of Hispanic gangs in California and The United States.

2.    2.    Local gang history.

3.    3.    Characterization of relationships and interaction between

4.          local gangs.

5.    4.    Gang sociology and psychology.

6.    5.    Gang structure and membership classifications.

7.    6.    Police Department formal criteria for classifying an individual as a gang member.

8.    7.    Expert opinion on whether the defendant is associated with a

9.          gang, including testifying directly to the opinion of

10.         whether the defendant is a member of a gang.

11.    8.    Expert opinion on whether the defendant's actions benefited

12.         a gang.

13.    *Valdez, supra*, 58 Cal. App. 4th at 502-04.

14.         Although the issue of whether a benefit has been conferred to a gang is a matter of fact

15. for the trier of fact to determine, *Valdez* holds that it is properly the subject of expert testimony

16. if the trial court believes the expert's opinion (going directly to the ultimate issue) will assist the

17. trier of fact. *Id.* at 507. In addition, Evidence Code Section 805 states: [t]estimony in the form of

18. an opinion that is otherwise admissible is not objectionable because it embraces the ultimate

19. issue to be decided by the trier of fact." *Valdez* goes further and allows the expert to testify

20. directly to the ultimate issues of benefit to the gang and membership in that gang, stating "there

21. is no hard and fast rule that the expert cannot be asked a question that coincides with the

22. ultimate issue in the case." *Id.* (citing *People v. Wilson*, (1944) 25 Cal. 2d 341, 349; *People v.*

23. *Brown*, (1981) 116 Cal. App. 3d 820, 827.) *Valdez* then cites several examples where the courts

24. have permitted experts to testify to an ultimate issue in a criminal trial. *See People v. Wilson*,

25. (1944) 25 Cal. 2d 341; *People v. Gardeley*, (1996) 14 Cal. 4th 605; and *People v. Doss*, (1992) 4

26. Cal. App. 4th 1585.

27.         *Valdez* affirms the use of hearsay as a foundation of the expert's testimony. In addition,

28. *Valdez* held that the expert may recite otherwise inadmissible hearsay in open court, and the

29. extent of such testimony is limited only by the discretion of the trial court, and reviewable only

1  on an abuse of discretion standard. *Id. Valdez* also remarks that a defense counsel's objection to

2  the credibility and reliability of the use of otherwise inadmissible police reports in open court as

3  a basis for the expert's opinion are not issues for the court, but are "matters for cross-

4  examination." *Id.* at 507, note 11. Finally, *Valdez* holds that the appropriate remedy for the use

5  of otherwise inadmissible hearsay as a foundation for gang expert testimony is to "admonish the

6  jurors not to consider it for the truth of the matters stated." *Id.* at 511.

7  **II. Penal Code Section 186.22(f): Gang Defined**

8    A Criminal Street Gang is defined in 186.22(f) as "an ongoing organization, association

9  or group of three or more persons, whether formal or informal, having as one of its primary

10  activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to

11  (23), inclusive, of [Penal Code Section 186.22] subdivision (e), having a common name or

12  common identifying sign or symbol, and whose members individually or collectively engage in

13  or have engaged in a pattern of criminal gang activity."

14    Thus, a Criminal Street Gang is identified by showing the following elements:

15  1.    Ongoing organization of three or more persons with a common

16      name or identifying sign or symbol.

17  2.    Primary activity is the commission of one of the offenses in

18      Penal Code Section 186.22(e).

19  3.    Members who individually or collectively engage or have

20      engaged in "a pattern of criminal gang activity."

21    The third element, the "pattern of criminal gang activity," is defined in 186.22(e), along

22  with the enumerated offenses.

23    **A. The Organization**

24    Three or more members may be shown through a variety of sources. In *In re Nathaniel*

25  *C.*, (1991) 228 Cal. App. 3d 990, 1001 this element was met through witness testimony that

26  there were three or more participants in the underlying crime. *Nathaniel C.* also relied upon

27  testimony referring to a membership roll written on a wall and that the members "were capable

28  of concerted action" such as the attempted retaliation which was the underlying incident. In

29  *People v. Gardeley*, (1996) 14 Cal. 4th 605 the California Supreme Court held that this element

1  may be established through expert testimony, so long as the expert is properly qualified.

2       The common name or identifying sign or symbol is likewise easily met. Once again, *In re*

3  *Nathaniel C.*, (1991) 228 Cal. App. 3d 990 requires only that, while the gang at issue was

4  known by at least two names, there exists one name common to the gang's members. No

5  common color or clothing is required (although a common color of clothing or a common style

6  of dress may satisfy this element) and graffiti may be used to establish a common sign. Once

7  again, expert testimony is appropriate under *People v. Gardeley*, (1996) 14 Cal. 4th 605.

8  *Nathaniel C.* refers to "both alternatives" in subsection (f) at page 1001. Accordingly, it is not

9  necessary to show both a common name and a common symbol; simply showing one is enough

10 to satisfy the statute.

11      **B. Enumerated Offenses and Primary Activity**

12      The enumerated offenses in Penal Code Section 186.22(e) include most serious felonies

13 and practically anything involving any drug, except mere possession. Also of note are the

14 inclusion of Penal Code Section 136.1, Intimidation of Witnesses and Victims, and just about

15 any offense involving a firearm except mere possession and reckless discharge (possession by a

16 minor, however, is included).

17      These enumerated offenses are used for two purposes. The first is that the Criminal Street

18 Gang must have as its primary purpose the commission of one or more of these offenses. The

19 second is to establish predicate offenses for the "pattern of Criminal Gang Activity," which will

20 be discussed in the next section.

21      The issue of establishing the element of "primary activity" arose in *People v. Galvan*

22 (1998) 68 Cal. App. 4th 1135. In *Galvan*, the Court of Appeal held that "either prior conduct or

23 acts committed at the time of the charged offenses can be used to establish the 'primary

24 activities' element of the gang enhancement statute." *Id.* at 1140. The court in *Galvan* expressly

25 found that in light of the plain language of the statute, and the California Supreme Court's

26 analysis in *People v. Loeun*, (1997) 17 Cal. 4th 1, an expert may base his opinion of the gang's

27 primary activities entirely upon conduct in the charged offenses. This is a departure from the

28 holding in *In re Elodio O.*, (1997) 56 Cal. App. 4th 1175 and to that extent, *Elodio O.* is

29 disapproved. The remainder of the original *Elodio O.* holding, specifically the discussion of the

1  method of proof of the gang's primary activity, is left untouched by the holding in *Galvan*.

2  Under *Elodio O.*, a properly qualified expert may testify directly to the issue of the primary

3  activity of the gang. The *Elodio O.* court nails this concept down by concluding the following:

> 4  [A]ctual convictions or proof beyond a reasonable doubt for these past activities
> 5  was unnecessary. It was sufficient instead to provide credible testimony that the
> gang is known for committing one or more of the offenses listed [in Penal Code
> 6  Section 186.22(e)].
> 7  *In re Elodio O.*, *supra*, 56 Cal. App. 4th at 9975.

8  Thus, a properly qualified expert may establish the primary activity of a gang through

9  opinion testimony going directly to "what is the primary activity of this gang?" or testimony that

10  the gang is known for committing certain offenses.

11  **C. Pattern of Criminal Gang Activity**

12  The "pattern of criminal gang activity" is defined as the "commission of, attempted

13  commission of, or solicitation of, sustained juvenile petition for, or conviction of two or more of

14  the following offenses, provided at least one of these offenses occurred after the effective date of

15  this chapter and the last of these offenses occurred within three years after a prior offense, and

16  the offenses were committed on separate occasions, or by two or more persons." Penal Code

17  Section 186.22(e). This language has been defined and refined by a series of decisions, ending

18  with the recent *People v. Zermeno*, (November 4, 1999) 21 Cal. 4th 927 opinion.

19  The number of incidents required by statute has been defined from the inception of the

20  statute as being either two incidents committed by a single perpetrator or a single incident with

21  multiple participants. *In re Nathaniel C.*, (1991) 228 Cal. App. 3d 990, 1003. In addition, the

22  currently charged offense may be used for the purpose of establishing the pattern of predicate

23  offenses. *People v. Olguin*, (1994) 31 Cal. App. 4th 1355, 1385; *In re Jose T.*, (1991) 230 Cal.

24  App. 3d 1455, 1463; *In re Lincoln J.*, (1990) 223 Cal. App. 3d 322, 328. The prosecution need

25  not prove that the predicate offenses in the pattern of criminal gang activity be "gang related."

26  *People v. Gardeley*, (1996) 14 Cal. 4th 605, 622 (disapproving to that extent *People v. Gamez*,

27  (1991) 235 Cal. App. 3d 957). One must note, however, that if the charged offense is also being

28  used as a predicate offense, the prosecution is not relieved of proving the charged offense is

29  gang related. *People v. Gardeley*, *supra*, 14 Cal. 4th at 625, note 12. Nor must the prosecution

1  necessarily provide convictions for these offenses or prove them beyond a "competent evidence"

2  standard. *Nathaniel C., supra*, 228 Cal. App. 3d at 1004; In re Jose T., (1991) 282 Cal. App. 3d

3  1455. The predicate offenses must have occurred within three years of each other, one of them

4  (not both) must have occurred after the effective date of the statute: September 23, 1988.

5  *Nathaniel C., supra*, 228 Cal. App. 3d at 1002. No predicate offense may be proven by instances

6  occurring after the charged crime. *People v. Godinez*, (1993) 17 Cal. App. 4th 1363. In addition,

7  the statute does not require two different offenses be committed; two separate commissions of

8  the same offense are sufficient. *Id.*

9       The courts have yet to establish a bright-line between sufficient and insufficient evidence,

10  but a great deal can be learned from the *Nathaniel C.* court's analysis of the two incidents

11  presented before it at trial. The first incident was an assault in a park attributed to the

12  defendant's gang, which had more than one suspect. *Nathaniel C., supra*, 228 Cal. App. 3d at

13  998. The testifying expert's knowledge of the incident was "obtained from police reports" and

14  the officer was not aware of any convictions. *Id.* The court found that this testimony provided

15  "ample proof." *Id.*, at 1003. Alternately, the court found that an incident from which the expert's

16  only information consisted of conversations with other unspecified police officers, was

17  insufficient. *Id.* It appears that hearsay evidence gained from department records and reports is

18  sufficient, while hearsay from non-specific verbal statements is insufficient. In either case, a

19  review of the relevant case law finds the courts rejecting "nonspecific hearsay and arrest

20  information which does not specify exactly who, when, where, and under what circumstances

21  gang crimes were committed." *In re Jose T.*, (1991) 230 Cal. App. 3d 1455, 1462. In contrast,

22  *People v. Gamez*, (1991) 235 Cal. App. 3d 957, 978, note 8, distinguished the proof in its trial

23  from this standard by stating "certified copies of the convictions, combined with the recitation of

24  the facts surrounding those crimes, supplied proof of the 'who, when, where and under what

25  circumstances.'"

26       Other cases have satisfied the predicate offenses standard in other ways. In *Gardeley*, one

27  offense was satisfied through the abstract of a judgment against another unrelated gang member

28  and the currently charged offense. *People v. Gardeley, supra*, 14 Cal. 4th at 624. In *People v.*

29  *Ramon T.*, (1997) 57 Cal. App. 4th 201 the prosecution expert testified that "he had personally

14

1   investigated several cases involving [enumerated] offenses and that he had talked to both

2   Nortenos and rival gang members about the activities of the Nortenos. Moreover, he offered

3   specific testimony about offenses enumerated in section 186.22 which were committed by

4   [defendants] in support of the gang's activities." *Id.*, at 207.

5          In *In re Elodio O., supra*, 56 Cal. App. 1175, the defendant was charged with robbery and

6   assault with a deadly weapon. The court in *Elodio O.* found for the first time that the prosecution

7   had established a predicate pattern of criminal gang activity entirely through the charged

8   offense. *Elodio O., supra*, 56 Cal. App. 4th at 1178-79. The court reasoned that since the

9   charged offense may be considered as a predicate offense, and the statute may be satisfied by a

10  single incident with multiple participants, the underlying offense (assault by a group on an

11  individual) was sufficient in itself.

12         More significantly, the California Supreme Court in *People v. Loeun*, (1997) 17 Cal. 4th

13  1, has given its express blessing to this concept. *Loeun* found the prosecution could establish the

14  predicate offenses through evidence of the defendant's activity in the charged crime, and a

15  fellow gang member's contemporaneous commission of an enumerated offense directed against

16  the same victim. The *Loeun* court, considering the language of Penal Code Section 186.22(e)

17  states:

18

19         This language allows the prosecution the choice of proving the requisite "pattern
           of criminal gang activity" by evidence of "two or more" predicate offenses
20         committed "on separate occasions" *or* by evidence of such offenses committed "by
           two or more persons" on the same occasion. Therefore, when the prosecution
21         chooses to establish the requisite "pattern" by evidence of "two or more" predicate
           offenses committed on a single occasion by "two or more persons," it can, as here,
22         rely on evidence of the defendant's commission of the charged offense and the
           contemporaneous commission of a second predicate offense by a fellow gang
23         member.
24
           *Loeun, supra*, 17 Cal. 4th at 10. (emphasis in original)
25

26  This decision eliminates the last bastion of resistance to the above concept: the Fifth Appellate

27  District. The only remaining citable case opposing the idea that a pattern may be established

28  entirely by the charged incident resides in the Fifth Appellate District in *In re Leland D.*, (1990)

29  223 Cal. App. 3d 251, and is superseded, to that extent, by the more recent Fifth District ruling

1   in *Elodio O.* and is now overruled to that extent by *Loeun.*

2   Recently, the California Supreme Court defined the scope of the *Loeun* decision in

3   *People v. Zermeno*, (November 4, 1999) 21 Cal. 4th 927. *Zermeno* overturns the Second

4   Appellate District holding that the entire pattern of criminal gang activity may be shown through

5   proof of an offense contained in paragraph (e) of Penal Code Section 186.22 and proof that

6   another person aided and abetted in the commission of that offense. In *Zermeno*, the People

7   established the predicate pattern of two offenses through proof of the commission of the current

8   offense by defendant (Penal Code Section 245) and the defendant's fellow gang member aiding

9   and abetting that offense. Specifically, the uncharged gang member positioned himself between

10  the victim (who at this time was being assaulted by the defendant) and the victim's friends,

11  telling them "Just let them fight one-on-one. Just let them fight." *Zermeno, Id.* "In doing so,

12  [the gang expert] testified, [the uncharged gang member] was 'protect[ing] the back' of

13  defendant, a fellow gang member. By assisting defendant, the actual perpetrator of the assault,

14  'with the intent that the actual perpetrator's purpose be facilitated thereby.'" *Id.* The Supreme

15  Court found that the uncharged gang member could be held accountable for defendant's

16  wrongful act as an aider and abettor. *Id.* (*citing People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 *and*

17  *People v. Sanchez* (1995) 12 Cal.4th 1, 33.) Most significantly, the Supreme Court also found

18  that the defendant's fellow gang member's criminal liability is "vicarious." *Id.*

19  Citing to Penal Code Section 31 and Section 971, the Court notes that the statutes

20  defining aider and abettor liability refer to a singular offense. Penal Code Section 31 refers to "a

21  crime" and Penal Code Section 971 refers to "the offense." The Court holds that "both statutes

22  describe aider and abettor liability as involving a single offense, the one committed by the

23  perpetrator." *Id.*. Applying this to the facts in *Zermeno*, the Court finds "when [defendant] hit

24  [victim] with the beer bottle and [the uncharged gang member] prevented [victim's] friends

25  from coming to his aid, this was just one offense. Accordingly, this conduct did not satisfy the

26  statutory requirement of "two or more" predicate offenses to establish the "pattern of criminal

27  gang activity" under the STEP Act." *Id.*

28  The *Zermeno* Court distinguishes its holding from the holding in *Loeun* as follows:

29

1    This case is distinguishable from *Loeun, supra*, 17 Cal.4th 1, in which the
2    defendant committed an assault with a deadly weapon (a baseball bat)
     contemporaneously with a fellow gang member's separate assault with a deadly
3    weapon (a tire iron) on the same victim. We concluded in *Loeun* that these actions
     met the statutory requirement of "two or more offenses" necessary to establish a
4    "pattern of criminal gang activity." (Section 186.22, subd. (e).) Unlike the
5    situation here, *Loeun* involved two separate assaults by two different assailants,
     each one subject to criminal liability as a direct perpetrator, not merely as an aider
6    and abettor.
7    *Zermeno, supra.*

8

9         It appears that the Supreme Court holding changes the focus of the analysis of the

10   sufficiency of the predicate offense from the Appellate Court's analysis, which focused solely

11   on whether a prospective gang member may potentially be charged with an offense. The

12   Supreme Court's analysis focuses on whether members of the gang *actually committed* two or

13   more offenses, rather than whether members of the gang *could be charged* with two or more

14   offenses.  Therefore, for a single incident to satisfy the entire pattern of predicate gang activity

15   under *Zermeno* and *Loeun*, there must be two separate offenses committed. A prospective co-

16   defendant, who may be liable as a principle for the underlying offense, cannot establish a

17   predicate offense unless that co-participant independently commits an offense enumerated in

18   Penal Code Section 186.22(e).

19        As a final note, the pattern of criminal gang activity falls within the "continuous course of

20   conduct" exception to juror unanimity, and jurors need not unanimously agree on which two

21   predicate offenses establish the pattern of criminal gang activity. *People v. Funes*, (1994) 23

22   Cal. App. 4th 1506.

23   **III. 186.22(b)(1): Special Allegation**

24        Penal Code Section 186.22(b)(1) allows for a special allegation when the defendant's

25   conduct is both felonious and gang related. The statute specifically states that this allegation is

26   only applicable to felonies. Because subsection (b) allegations are much more common than

27   subsection (a) charges, the law has refined the special allegation requirements to a much greater

28   extent. The statute requires that the underlying felony have been committed under both of the

29   following conditions:

17

1.      The felony was committed for the benefit of, at the
direction of, or in association with any criminal street
gang.

2.      The felony was committed with the specific intent to
promote, further, or assist in any criminal conduct by gang
members.

       As an initial matter, for the purposes of section 186.22(b)(1), there is no requirement that
the defendant be an "active" member of the gang as in subdivision (a). The court in *People v.
Ramon T.*, (1997) 57 Cal. App. 4th 201, 207 expressly states: "We decline to read a requirement
into subdivision (b) of section 186.22 that violation of the act requires either 'active' or 'current,
active' participation in a gang." In addition, there is no requirement that gang members enter into
any sort of agreement. *People v. Gamez*, (1991) 235 Cal. App. 3d 957. The term "criminal street
gang" in subsection (b)(1) is defined in 186.22(e) and discussed above. Defendant is not entitled
to bifurcation of the charges and enhancement. *People v. Martin*, (1994) 23 Cal. App. 4th 76.
No court examining this issue has found that a defendant has a right to a bifurcation.

       **A. Commission of an Offense for the Benefit of, at the Direction of,**
      **or in Association with Any Criminal Street Gang.**

       California's most exhaustive analysis of whether a crime was committed for the benefit of
a gang lies in *People v. Olguin*, (1994) 31 Cal. App. 4th 1355. The underlying incident is a
contracted shooting which was precipitated by the crossing out of gang graffiti. *Olguin* states
that "it is difficult to imagine a clearer need for expert explication." *Id.*, at 1384. The court relied
on expert testimony to find that the underlying crime of murder for hire benefited the
defendant's gang by promoting "respect" for that gang. The expert "explained that 'respect' is
often synonymous with fear among gangs, and [the expert's] expertise enabled him to recognize
the benefit [defendant's gang] would realize from the fact another gang called upon one of its
members when it needed serious muscle." *Id.* The court found that if the crime promoted
"respect" for itself or its members, a sufficient benefit has accrued to the gang and the
underlying crime is sufficient for 186.22(b)(1) enhancement. (Factual emphasis was also placed
on a lack of "a prior relationship between the killers and their victim, and no reason for

1   animosity other than gang-related insults." *Id.*, at 1382-83.) In addition, the *Olguin* court found

2   expressly that expert testimony on the issue of a benefit accruing to a gang was appropriate. *Id.*

3   at 1185.

4         *People v. Ramon T.*, (1997) 57 Cal. App. 4th at 202-08 found a crime to be committed in

5   association with a criminal street gang based solely on testimony that several gang members

6   acted in concert, and did not require proof that any of the members be active participants in the

7   gang. *People v. Gamez*, (1991) 235 Cal. App. 3d 957, 978 found a sufficient act in a retaliatory

8   shooting against a rival gang member who was in the defendant's "territory." Several gang

9   members mistakenly identifying and assaulting a passer-by as a rival gang member was

10  sufficient in *People v. Elodio O.*, (1997) 56 Cal. App. 1175.

11        *People v. Gardeley*, (1996) 14 Cal. 4th 605, 620 relies upon expert testimony that an

12  assault by gang members on a non-gang member in the gang's territory was a "'classic' example

13  of gang-related activity, explaining that criminal street gangs rely on such violent assaults to

14  frighten the residents of an area where the gang members sell drugs, thereby securing the gang's

15  drug-dealing stronghold." The *Gardeley* court found that a collateral result of this assault was

16  that local residents would be frightened by the activity, and this collateral, unintended and

17  incidental consequence of the commission of the underlying crime was sufficient to establish a

18  benefit to the gang. *Id.* In addition, under the reasoning in *Elodio O.* and *Gamez* the fact that

19  there was more than one gang member involved in the assault would similarly satisfy the "in

20  association with" alternative. *In re Jose T.*, (1991) 230 Cal. App. 3rd 1455 found that the

21  underlying crime (attempted murder) was gang related since it was directed toward a rival gang

22  member. In *People v. Ortiz*, (1997) 57 Cal. App. 4th 480 the Court of Appeals relied upon

23  expert testimony that a robbery committed by gang members who left graffiti associated with a

24  rival gang, was "pay back." *Id.*, at 484, note 3. The expert testified that the defendants were

25  attempting to frame a rival gang, and the court found that "it cannot be seriously disputed" that

26  the crime was committed for the benefit of the gang and that it was committed with the specific

27  intent to promote, further, or assist criminal gang behavior. *Id.* at 484.

28        In sum, it appears that the threshold for showing this prong of 186.22(b)(1) is fairly low.

29  It has been satisfied on minimal evidence such as the presence of more than one member of the

19

1    gang, where violence was directed at a rival gang member and where an unintended collateral

2    effect of the crime could be fear. It is important to note that no court has required proof of *actual*

3    fear or even an actual observation of the crime by a third party who may or may not then

4    become afraid. Every court to reach this issue has consistently relied upon expert testimony.

5    **B. The Specific Intent to Promote, Further, or Assist in**

6    **any Criminal Conduct by Gang Members.**

7    The most recent application of this element appears in *People v. Ramon T.*, (1997) 57

8    Cal. App. 4th 201, 208. Testimony showed the defendants had assaulted a police officer in an

9    attempt to free their friend/gang-member from the officer's grasp. *Id.*, at 208. The defense

10   argued that the specific intent to promote, further, or assist in any criminal conduct by gang

11   members was not shown. The court strongly disagreed, saying "a series of assaults and batteries

12   committed to free a gang member (appellant) from the grasp of an officer effecting a lawful

13   arrest strikes us as having unequivocally been committed with the intent of promoting,

14   furthering *and* assisting in the criminal conduct of all three juveniles." *Id.* (emphasis in original)

15   Specific intent has readily been shown through expert testimony and the circumstances

16   surrounding the underlying incident. "Evidence of gang activity and affiliation is admissible

17   where it is relevant to issues of motive and intent." *People v. Funes*, (1994) 23 Cal. App. 4th

18   1506, 1518. Gang expert testimony, specifically involving gang psychology and the significance

19   of certain actions (such as throwing gang signs, shouting slogans, crossing out graffiti, and

20   wearing certain colors in certain neighborhoods, etc . . .) as well as expected reactions from

21   other gang members, is an important part of this element. Intent may be shown through past

22   dealings between the gangs at issue and through general principles that tend to guide gang

23   behavior. *See People v. Olguin*, (1994) 31 Cal. App. 4th 1355, 1369-80.  Additionally, pursuant

24   to *People v. Croy*, (1985) 41 Cal. 3d 1, 12 note 5, and the *Olguin* decision, specific intent that

25   the charged crime be committed does not need to be shown. *Olguin* extrapolated the *Croy*

26   holding into a gang context and held: "no specific intent is required for liability as an aider and

27   abettor other than the intent to aid, encourage, facilitate or promote a criminal act. If that intent

28   is shown, it matters not that the crime actually committed was not intended by the aider and

29   abettor, so long as it was a reasonably foreseeable consequence of the underlying criminal

1   conduct." *People v. Olguin, supra*, 31 Cal. App. 4th at 1380. Therefore, where a gang member

2   willfully engages in an act intended to aid a criminal act by another gang member, no specific

3   intent to commit or aid in the commission of the resulting crime need be shown, so long as the

4   resultant crime was a reasonably foreseeable consequence of the original conduct.

5       In *People v. Ortiz*, (1997) 57 Cal. App. 4th 480, the court relied almost entirely on expert

6   testimony to find that the requirements of Penal Code Section 186.22(b)(1) were satisfied. *Id.*, at

7   484, note 3. As discussed above, the court found that upon the expert's testimony this element

8   had been established to a point where the issue "cannot seriously be disputed." *Id.*

9       The issue of specific intent is subject to both expert testimony and aiding and abetting

10  theories. So long as the underlying act is willfully done (i.e. not unconscious or involuntary) and

11  satisfies the other element of subsection (b)(1) as being gang related, specific intent under this

12  element will generally be found.

13  **IV. 186.22 Testimony and Evidence**

14      Under the current state of the law surrounding Penal Code Section 186.22, the following

15  elements must be shown:

16  1. Criminal Street Gang

17      a. 3 or more members

18          i. May be proven through expert testimony.

19          ii. Police records, contact information and photographs, etc . . . are all relevant

20              to prove association.

21      b. Common name or common identifying sign or symbol

22          i. May be proven through expert testimony.

23          ii. "A single common name" and possibly a common color are sufficient.

24      c. Primary activity enumerated in 186.22(e)

25          i. May be proven through expert testimony, so long as the expert expressly

26              states what the crime is and that that crime is a "primary activity."

27          ii. The expert's foundation for this opinion may rest entirely on the charged

28              offenses.

29  2. Pattern of Criminal Gang Activity

1        a.  Commission of two or more of the enumerated offenses in 186.22(e)

2             i.  May be proven through expert testimony (provided any hearsay relied upon

3                by the expert be of sufficient specificity), percipient witness testimony and

4                certified records.

5            ii.  The charged offense is usable as a predicate crime, and the charged

6                incident, if containing the commission of more than one enumerated

7                offense, is sufficient in itself to establish a pattern.

8        b.  One offense occurring after 9/23/88.

9        c.  Offenses occurring within three years of each other.

10    3.  186.22(a) Charge

11        a.  Active membership

12             i.  May be proven through expert testimony.

13            ii.  Requires a showing the defendant's involvement is "more than nominal,

14                passive, inactive or merely technical" and/or that all or a substantial part of

15                the defendant's time is devoted to gang related activity.

16        b.  Knowledge of criminal gang activity in defendant's gang

17             i.  May be proven through expert testimony.

18            ii.  Circumstantial evidence including rumor and "braggadocio" are relevant

19                and possibly sufficient in themselves.

20        c.  Willful promotion, assistance or furtherance of felonious criminal conduct

21             i.  May be proven through expert testimony.

22            ii.  "Willful promotion" is identical under the law to aiding and abetting.

23           iii.  "Felonious criminal conduct" is conduct amounting to the commission of a

24                felony.

25    4.  186.22(b)(1) Special Allegation

26        a.  Felony conviction of underlying crime

27         b.  Commission for benefit of, at the direction of or in association with a criminal

28            street gang.

29             i.  May be proven through expert testimony.

      ii. Collateral effects of the crime including "respect" for the gang, revenge, and fear have all been found to constitute a benefit to a gang.

      iii. The "in association with" alternative may be shown solely through the presence of more than one gang member.

  c. Specific intent to promote, further, or assist in criminal conduct.

      i. May be proven through expert testimony.

      ii. Evidence of gang affiliation and involvement are, in themselves, evidence relevant to intent and motive.

      iii. Subject to aider and abettor theory involving reasonably foreseeable consequences of intended acts.

5. Expert Witness Foundation

  a. Conversations with defendant's gang and/or defendant.

  b. Conversations with rival gang members.

  c. Personal investigation of gang crimes.

  d. Information from other officers, departments, and records, reports and other documents.

  e. Under *Valdez*, and Evidence Code Section 805, it is appropriate for the expert to testify directly to the ultimate issue.

<center>V</center>

<center>911 TAPE IS ADMISSIBLE AS A SPONTANEOUS STATEMENT</center>

The hearsay exception for declarations against interest has been recognized in case law since *Showalter v. Western Pacific RR* (1940) 16 Cal. 2d 460, and is now codified in the Rules of Evidence as section 1240. Case law has determined that there are two requirements which must be satisfied prior to admission of a hearsay statement under section 1240. The statement must purport to narrate, describe or explain an act condition or event perceived by the declarant and be made spontaneously while the declarant is under the stress of excitement caused by such perception. Confronting and cross examining the declarant is not necessary since:

> "[t]he theory of the spontaneous statement exception to the hearsay rule is that since the statement is made spontaneously, while under the stress of excitement

<center>23</center>

1   and with no opportunity to contrive or reflect, it is particularly likely to be truthful.
2   As explained by Wigmore, **this type of out-of-court statement, because of its**
    **"superior" trustworthiness, is "better than is likely to be obtained from the**
3   **same person upon the stand . . . ."** (6 Wigmore, Evidence (Chadbourn ed. 1976)
4   § 1748, p. 199, italics added.) Unlike other hearsay exceptions in which the
    unavailability of a witness makes it "necessary" to resort to hearsay as a weaker
5   substitute for live testimony (5 Wigmore, Evidence (Chadbourn ed. 1974) § 1420,
6   p. 251), the spontaneous statement exception involves a "necessity" of a different
    sort: "[That] we cannot expect, again, or at this time, to get evidence of the same
7   value from the same or other sources" (id. at § 1421, p. 253, italics in original) and
8   "[the] extrajudicial assertion being better than is likely to be obtained from the
    same person upon the stand, a necessity or expediency arises for resorting to it." (6
9   Wigmore, Evidence, op. cit. supra, § 1748, p. 199.) This is why unavailability of
10  the declarant as a witness need never be shown under this exception. (Ibid.; 6 Cal.
    Law Revision Com. Rep. (1964) appen. pp. 465-466. See also *People v. Brust*
11  (1957) 47 Cal.2d 776, 785 [306 P.2d 480].)"
12
13  *People v. Hughey* (1987) 194 Cal.App.3d 1383, 1392. Emphasis added.
14      So reliable are these out of court declarations that they can be admitted without showing
15  that the declarant is competent to stand testify.  In fact this exception has been used in dozens of
16  child molest and violent crime cases where the declarant was unable to testify due to
17  competence issues.  (See . Evid. Code, § 701; *People v. Orduno*, 80 Cal.App.3d 738 [three-
18  year-old victim-declarant found not competent as preliminary hearing witness; her excited
19  utterance admitted at trial; *In re Damon H.*, 165 Cal.App.3d 471 [excited utterance by two- year-
20  nine-month-old victim admitted]  Additionally they can support a conviction on their own and
21  do not require corroboration.  *People v. Sully* (1991) 53 Cal.3d 1195, 1229-1230.  In fact the
22  declarant does not even have to be identified.  *People v. Provencio* (1989) 210 Cal.App.3d 290.
23  *Provencio* is especially important because in that case the statement of an unidentified child
24  saying "there goes Angel" was admitted to show the identity of a burglar.  Clearly the rational
25  used in *Provencio* to admit and use such a statement to show identity indicates that spontaneous
26  statements are not subject to exclusion just because the content contains the identity of the
27  perpetrators.
28      The main inquiry to be made prior to admission of hearsay is whether or not it is reliable.
29  (*People v. Frierson*, supra.)  In fact it has been held that, "the **heart** of the **exception** is the **basic**

1   **trustworthiness** of the declaration." (*People v. Gordon*, supra at 1252, emphasis in original.)

2   This emphasis was also noted by the United States Supreme Court in *Ohio v. Roberts* (1980)

3   448 US 56, 65, 65 L.Ed.2d 597, 607:

4           The focus of the Court's concern has been to insure that there 'are indicia of
5           reliability which have been widely viewed as determinative of whether a statement
            may be placed before a jury though there is no confrontation of the declarant,'
6           (citations omitted) and to 'afford the trier of fact a satisfactory basis for evaluating
            the truth of the prior statement.' (Citations omitted.)
7

8           "The decision whether trustworthiness is present requires the court to apply to the

9   peculiar facts of the individual case a broad and deep acquaintance with the ways of human

10  beings actually conduct themselves in the circumstances material under the exception." (*People*

11  *v. Frierson*, supra at p. 745 citing *People v. Gordon*, supra at 1251; See also: *Chambers v.*

12  *Mississippi*, supra at 311-312; and *People v. Cudjo*, supra at 607.

13          In the case at hand, the statements which the People seek to admit satisfy the

14  requirements of the code and case law.   Laura Limon saw a vehicle being burglarized and

15  called 911 immediately.   While she was on the phone a shot was fired by the suspects.  She

16  described the acts of the suspects while the vent was occurring. Her brother in law who had

17  witnessed the incident only seconds earlier also described what he saw without the benefit of

18  reflection.

19          The information given to the 911 operator was clearly reliable and made while Limon

20  and Herrera were under the stress of the incident. Dispatch records confirm that officers arrived

21  within minutes of the call being placed and had both suspects in custody in a few minutes.  A

22  casing was found in the parking lot which matched a gun carried by one of the suspects at the

23  time of his arrest. Based on all these factors the tape must be deemed admissible and introduced

24  into evidence.

25                                      **VI**

26                      **911 TAPE IS SELF AUTHENTICATING**

27          Tape recordings of 911 calls are writings. (See Evid. Code 140 and 250.)  The

28  authenticity of any tape recordings can be established simply by testimony by one of the

29

1   participants in the conversation. (Evid. Code. 1413; *People v. Bowie* (1977) 72 Cal.App.3d 143,

2   151; *People v. Dupree* (1957) 156 Cal.App.2d 60, 67; *People v. Finch* (1963) 216 Cal.App.2d

3   444, 453.)

4        This means of authentication, however, is by no means exclusive. (See Evid. Code. 1410

5   et seq.)

6        There is no requirement that the operator of the tape recorder be called as a witness.

7   (Evid. Code. 1413; *People v. Richardson* (1968) 258 Cal.App.2d 23, 30 [operator of camera not

8   necessary for admission of photographs]; 2 Jefferson Cal. Evidence Benchbook (2d ed. 1982)

9   30.3, pp. 1071-1072.)

10        A tape recording may also be authenticated by a person who is not an expert in

11   voice identification but is simply familiar with the voice of one of the participants on the tape.

12   (Evid. Code. 1416; *United States v. Axselle* (10th Cir. 1979) 604 F.2d 1330, 1338; *United States*

13   *v. Watson* (10th Cir. 1979) 594 F.2d 1330, 1334.)

14        The authenticity of a tape recording may be established by the content of the tape itself.

15   (Evid. Code. 1421; *People v. Fonville* (1973) 35 Cal.App.3d 693, 708-709 [matters unlikely to

16   be known by anyone other than purported speaker]; *People v. Estrada* (1979) 93 Cal.App.3d 76,

17   100.)

18        Additionally, because of a 911 tape is a writing prepared by a public employee at the

19   behest of a public entity, there is a presumption that the audio signature which is customarily

20   found at the beginning of the tape, or the end of the tape, or both, is genuine. (See Evid. Code

21   1453, 195, and 200.) Also, the dispatcher customarily begins each 911 phone conversation with

22   the audio signature, offering similar authentication. (Ibid.)

23        Accordingly, the authenticity of the 911 tape in the present case is established by several

24   different methods, any of which serves as proper authentication under law.

25   ///

26   ///

27   ///

28   ///

29   ///

1

## CONCLUSION

2    Based on the foregoing Points and Authorities, the People respectfully request the

3    foregoing In Limine Motions be granted.

4    Dated: 08-04-03

Respectfully Submitted,

5    
BONNIE DUMANIS
District Attorney

6    

7    

8    SOPHIA ROACH
Deputy District Attorney

9    

10    

11    

12    

13    

14    

15    

16    

17    

18    

19    

20    

21    

22    

23    

24    

25    

26    

27    

28    

29

EXHIBIT E

CALIFORNIA DEPARTMENT OF CORRECTIONS
INMATE TRUST ACCOUNT DISPLAY

ACCOUNT INFORMATION

ACCOUNT NUMBER: V15351
ACCOUNT NAME: RODRIGUEZ, JAVIER
ACCOUNT TYPE: I
CURRENT BALANCE: 51.55
HELD BALANCE: 0.00
CURR. BALANCE: 0.00
PRIVILEGE GROUP:

| DATE | FROM | AMOUNT | DESCRIPTION | CHECK NUM | CURRENT BALANCE |
|------|------|--------|-------------|-----------|-----------------|
| 05/23/06 | V350 | 15.60 | DONATION-VICTIM | 3963/0000 | 15.56 |
| 05/31/06 | FC01 | 15.56 | DRAW-FAC 1 | | 0.00 |
| 06/01/06 | V350 | 40.46 | INMATE-PAYROLL | 440/2006 | 40.46 |
| 06/25/06 | 4456 | 5.00 | CURR CHARGE | | 35.86 |
| 06/08/06 | FC01 | 35.86 | DRAW-FAC 1 | | 0.00 |
| 07/03/06 | V350 | 51.55 | INMATE-PAYROLL | 206/4828 | 51.55 |

PAGE 1 OF 3 PAGES

LAST   ACCOUNT   PREVIOUS   NEXT   DISPLAY   SELECT   PRINT   MAIN
PAGES  DISPLAY   PAGE       PAGE   PREV      NEW FAC  SCRN    MENU

EXHIBIT F

F  I  L  E  D
Clerk of the Superior Court

AUG 1 0 2006

By: LESLIE MCALLISTER

1

2

3

4

5

6

7

8              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF SAN DIEGO

10

11  In the Matter of the Application of        )   Case No.:  HSC 10837; SCS 176087;
                                               )   Appellate Case No. D043198
12                                             )
                                               )   ORDER DENYING PETITION FOR WRIT
13        JAVIER RODRIGUEZ,                     )   OF HABEAS CORPUS
                                               )
14                  Petitioner.                )
                                               )
15                                             )
                                               )
16  _____)

17         AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE

18  COURT FILE IN THE ABOVE-REFERENCED MATTER, THE COURT FINDS AS

19  FOLLOWS:

20  Mr. JAVIER RODRIGUEZ ("Petitioner") is currently incarcerated with the California

21  Department of Corrections & Rehabilitation ("CDCR") at the California Men's Colony West,

22  located in San Luis Obispo, California.  In Case No. SCS 176087, a jury convicted Petitioner of

23  burglary (Penal Code § 459), attempting to dissuade a witness from reporting a crime (Count 1;

24  Penal Code § 136.1(b)(1)), concealing a firearm in a vehicle while being an active participant of

25  a criminal street gang (Count 2; Penal Code § 12025(a)(1)), and carrying a loaded firearm while

-1-

1    being an active participant of a criminal street gang (Count 3; Penal Code § 12031(a)(1)).

2    Petitioner was also convicted of personally using a firearm during the dissuading of a witness

3    (Count 4; Penal Code § 12022.5(a)(1)).  In a bifurcated proceeding, the court found that

4    Petitioner had a prior serious or violent felony conviction, or "strike," within the meaning of

5    Penal Code §§ 667(b)-(i) and 1170.12).  Petitioner was sentenced to a total term of 14 years, 4

6    months in state prison.

7        Petitioner appealed his conviction to the Court of Appeal, 4th Dist., Div 1.; Case No

8    D043198.  Petitioner's conviction was affirmed in an unpublished decision filed on April 6,

9    2005.

10        On July 20, 2006, Petitioner filed a petition for writ of habeas corpus ("Petition") with

11    this court.  The Petition repeats arguments that were considered and rejected on appeal.  Those

12    arguments include: (1) the court abused its discretion by failing to remove a juror, (2) the

13    evidence was insufficient to establish Petitioner attempted to dissuade a witness, (3) the evidence

14    was insufficient to establish Petitioner committed the offenses for the benefit or at the direction

15    of, or in associate with a criminal street gang for Counts 3 and 4, (4) there was insufficient

16    evidence that Petitioner was an active participant of a criminal street gang for Counts 3 and 4, (5)

17    Petitioner's Sixth Amendment rights to confrontation were violated through the admission of

18    certain gang expert testimony, (6) Petitioner's suffered prejudicial error through the admission of

19    Petitioner's prior residential burglary convictions, (7) the court erred by failing to give, sua

20    sponte, lesser included instructions on Counts 3 and 4, (8) the court violated Petitioner's Sixth

21    Amendment right to a jury trial by imposing consecutive sentence based upon judicial fact

22    finding, (9) the court abused its discretion by failing to dismiss the prior strike, and (10) the court

23    erred by giving conflicting jury instructions on the Penal Code § 186.22 gang enhancement.

24    //

25

-2-

1    In general, habeas corpus cannot serve as a second appeal, and matters that were raised

2  and rejected on appeal are not cognizable on state habeas corpus in the absence of special

3  circumstances.  The "*Waltreus* rule" generally prohibits raising an issue in a postappeal habeas

4  corpus petition if that issue has been raised and rejected on direct appeal.  (*In re Waltreus* (1965)

5  62 Cal. 2d 218; see also *In re Huffman* (1986) 42 Cal.3d 552, 554-55 and *In re Terry* (1971) 4

6  Cal.3d 911, 927.)

7    Case law has established four exceptions to the "*Waltreus* rule," which allow a petitioner

8  to raise the following issues in a postappeal petition:  (1) A fundamental constitutional error, (2)

9  Lack of fundamental jurisdiction; (3) A pure question of law that demonstrates that the trial court

10  acted in excess or jurisdiction; or (4) A change in law affecting the petitioner.  (*In re Harris*

11  (1993) 5 Cal. 4th 813, 829-841.)  A claimed constitutional error must be clear and fundamental,

12  and strike at the heart of the trial process.  The California Supreme Court noted limited this

13  exception to "rare situations." (*Id.* at 834.)

14    In the present case, the court finds that the ten aforementioned claims set forth in the

15  Petition were considered and rejected on appeal.  The court furthermore finds that none of these

16  claims constitute the rare exception to the "*Waltreus* rule," which bars this court from

17  considering issues raised and rejected on appeal.  The claims raised in the Petition, either

18  individually or collectively, fail to present fundamental constitutional errors that strike at the

19  heart of the trial process.  For the reasons stated, the ten claims denied on appeal, and repeated in

20  this Petition, are summarily denied.

21    The Petition also asserts that the court imposed an excessive restitution fine.  The "*Dixon*

22  rule" generally prohibits habeas corpus relief on issues that could have been raised on appeal.

23  (*In re Dixon* (1953) 41 Cal. 2d 756.)  As a general rule, habeas corpus cannot serve as a

24  substitute for an appeal, and matters that "could have been, but were not, raised on a timely

25  appeal from a judgment of conviction" are not cognizable on habeas corpus in the absence of

-3-

Rodriguez - Order Denying Petition for Writ of Habeas Corpus

1  special circumstances warranting departure from that rule. (*In re Clark* (1993) 5 Cal.4th 750,

2  765 [quoting *In re Dixon* (1953) 41 Cal.2d 756, 759]; *In re Walker* (1974) 10 Cal.3d 764, 773.)

3  Petitioner fails to explain why his complaint concerning restitution and fines was not brought on

4  appeal. Accordingly, this claim is also summarily denied.

5        Petitioner's complaint regarding an excessive restitution fine fares no better on its merits.

6  In the present case, the court imposed a restitution fine of $10,000. This amount is the maximum

7  amount authorized pursuant to Penal Code § 1202.4(b). The court did not abuse its discretion by

8  imposing the maximum restitution fine in this case.

9        The court finds that the Petition fails to state a prima facie case for relief. For the reasons

10  stated, the Petition is denied.

11        Service of this ORDER is ordered on Petitioner.

12  IT IS SO ORDERED:

13  Dated: 8/9/06

14  RAYMOND EDWARDS
    JUDGE OF THE SUPERIOR COURT

15

16

17

18

19

20

21

22

23  The foregoing instrument consisting
  of ___4___ page(s) is a full, true
24  and correct copy of the original on
  file in this office

25  Clerk of the San Diego Superior Court
  Dated: 8-10-06
  By _____ Deputy

-4-

Rodriguez - Order Denying Petition for Writ of Habeas Corpus

## VERIFICATION

STATE OF CALIFORNIA,     ) On this day, LISTED COURT PLEADINGS WERE GIVEN
                         ) TO PRISON OFFICIAL FOR FILING/MAILING
COUNTY OF SAN LUIS OBISPO
              (C.C.P. §446 & 2015.5;  28 U.S.C. §1746)

    I, Javier Espinoza Rodriguez     , declare under penalty of perjury that: I am the

 Petitioner          in the above-entitled action; I have read  the foregoing documents
and know the contents thereof; and the same is true of my own knowledge except as to
matters stated therein upon information and belief, and as to those matters, I believe
they are true.
    Executed this 2 9 day of   Oct.      , 20 06   , at CMC-east  State Prison,
P.O. Box 8101 , San LuisObispo,CA  93409-8101

                                              _____
                                                      Petitioner

         ******************************************************

                       PROOF OF SERVICE BY MAIL
              (C.C.P. §1013(a) & 2015.5;  28 U.S.C. §1746)

    I, Scott Duke              , am a resident of CMC-East  . State Prison, in the
County of San Luis   ., State of California; I am over the age of eighteen (18) years, and
am not a party to the above-entitled action.  My state prison address is:

 P.O. Box 8101        , San Luis  , CA   93409-8101
   Obispo
    On  Oct. 29    ,2006     , I served the following documents:

    Petition for Writ of Habeas Corpus: No Exhibits

_____ ,
on the party(s) herein by placing true copy(s) thereof, enclosed in sealed enevelope(s),
with postage thereon fully paid, in the United States Mail, in a deposit box so provided
at CMC-East   State Prison, P.O. Box 8101  San Luis Obispo,CA  93409 , addressed as follows:

    Attorney General
    P.O. BOX 85266
    110 WEST "A" STREET, SUITE 1100
    SAN DIEGO, CA 92101

    There is delivery service by United States Mail at the so addressed, and/or there
is regular communication by mail between the place of mailing and the place so addressed.
I declare under penalty of perjury that the foregoing is true and correct.

DATED: Oct. 29   , 2006_____                  _____
                                                      Witness

REBUTTAL TO COURT'S DENIAL

Within the[COURT'S DENIAL-attached as Exhibit F, supra], the Court recognizes two-basic creations of case-law rules; otherwise known as, precedence; the "Waltreus Rule," and the "Dixon Rule." These two creations of the "Evolution of Law," are where the Honorable Superior Court of San Diego County bases it's reasons for the[Denial].

The Petitioner submits that, even withstanding those creatures of the "Evolution of Law," he has stated numerous clear and fundamental constitutional errors. (Please see Petitioner's[APPLICATION FOR PETITION FOR WRIT OF HABEAS CORPUS]-[PET., mandated will refer to the mandated form, pp. 1-6 & PET., Id. pp. 1-33, will refer to the attached part to same], as a whole. He has also demonstrated-through articulation-excess of the court's jurisdiction[excessive fines and restitution orders-PET., ISSUE XI, id at pp. 21-23], of which, can be likened to an authorized sentence, that can be challenged any time, notwithstanding an appeal or no appeal. (See People v. Castro[Cal.App. 5th Dist. 1994]30 Cal.Rptr.2d 188; People v. Wilson, 26 Cal.Rptr.2d 537; and In re Clark[1995]5 Cal.4th 750.)

To support the above, Petitioner has alleged Ineffective Assistance of Counsel during his direct appeal[PET., mandated form at p. 5-question #10]. (See People v. Pope[1979]23 Cal.3d 412; Wiggins v. Smith[2003]123 S.Ct. 2527; and Smith v. Robbins[2000]528 U.S. 259.) Furthermore, please see[PET., Id. at p. 1-INTRODUCTION-]: For all Issues allege[IAC]of counsel generally, of which implicate appellate counsel also. The very reasons for his filing the petition is to boot-strap all the Issues and Claims within his[PETITION FOR REVIEW]to that, of[IAC]applied to all counsel and to federalize those Issues and Claims before re-allying to our Honorable Supreme Court for exhaustion purposes, as stated therein; in reserve in case this Honorable Court denies Petitioner's

1.

1   Application of this Original Petition for Writ of Habeas Corpus. However, his

2   trial counsel did not research the issue of excessive fines and restitution

3   orders before or after the Probation Report Recommendation or the Court's actual

4   pronouncement of said orders. He did not challenge that issue during the court

5   proceedings nor post-trial. Therefore, it can be conclusive on the issue of

6   Ineffective Assistance of Counsel, for he failed/refused to investigate,

7   research and then to challenge the amount-whatsoever. Thus, trial counsel did

8   not use reasonable competent counsel, of which any other counsel should have

9   afforded those protections of his client's interest. (Please see[Pet., Id. at

10  pp. 21-23].) Where the above[IAC]is previously submitted by Petitioner.

11       As insofar as, the rest of the Issues are concerned, the Petitioner has

12  articulated his pleading around the applicable procedural bars by demonstrating

13  that, a "Miscarriage of Justice," has taken place, both in regards to procedural

14  innocence and actual innocence[not guilty of the gang enhancements]. (Hewitt v.

15  Helms[1983]59 U.S. 460; and Ford v. Wainwright[1983]447 U.S. 399.)

16

17

18

19

20  Dated: 12/12/06 .

21

22  _____          _____
    Researcher, composer, and           Petitioner, in pro per
23  typer: Scott Duke                    Javier Rodriguez

24

25

26

27

28

                              2.

EXHIBIT G

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephan M. Kelly, Clerk

MAR 0 8 2007

Court of Appeal Fourth District

| | |
|---|---|
| In re JAVIER ESPINOZA RODRIGUEZ | D049739 |
| on | |
| Habeas Corpus. | (San Diego County Super. Ct. No. SCS 176087) |

THE COURT:

The petition for a writ of habeas corpus has been read and considered by Justices Benke, Huffman and Aaron. We take judicial notice of the direct appeal D043198.

A jury convicted Javier Espinoza Rodriguez of burglary, attempting to dissuade a witness from reporting a crime, having a concealed firearm in a vehicle while being an active participant of a criminal street gang and carrying a loaded firearm while being an active participant of a criminal street gang. The jury also found Rodriguez had personally used the firearm. The court found Rodriguez had one strike conviction and sentenced him to a total term of 14 years, 4 months in prison.

On appeal Rodriguez contended:

1. the court abused its discretion by failing to remove a juror on grounds of bias
2. the evidence was insufficient to establish he attempted to dissuade a witness
3. the evidence was insufficient to establish he committed the offenses for the benefit or at the direction of, or in association with any criminal street gang
4. there was insufficient evidence to prove he was an active participant of a criminal street gang regarding the weapons counts
5. his Sixth Amendment confrontation rights were violated by the admission of certain gang expert testimony
6. the court prejudicially erred admitting evidence of his prior residential burglary conviction
7. the court prejudicially erred by failing to give, sua sponte, lesser included offense instructions on the weapons counts

REBUTTAL TO THE APPELLATE COURT'S

[FOURTH APPELLATE DISTRICT, DIVISION ONE]

DENIAL


Within the [COURT'S DENIAL-separately bound Exhibit G], the court refused to adjudicate the ten original claims-even though he has boot-strapped his new claims of ineffective assistance of counsel-in which, to exhaust his claims of the violation of his Six Amendment; by not only his trial counsel but, also his appellate/supreme court counsel. [Please see Petitioner's [APPLICATION FOR PETITION FOR WRIT OF HABEAS CORPUS]-[Pet., mandated form, pp. 1-6 & Pet., pp. 1-33, will refer to the attached part of same].]

The main reason used within the [COURT'S DENIAL] are case created laws of California's Procedural Bars of: issues that were already included within Petitioner's Direct Appeal and issues that were not included. However, the petitioner has articulated those reasons of his acts and omissions by pleading around them, for trial counsel and appellate counsel failed/refused to include those issues, and failed/refused to present all constitutional violations, in which, to federalize those claims/issues for purpose of state exhaustion. Thus, those reasons for denial will be dissipated more and more as petitioner re-climbs the latter of the quest, "request for relief," during his legal adventures towards and up into the federal courts. Plus, since-as the petitioner has shown-those reasons for denial were and are contrary to and an unreasonable application of established federal law. [**Strickland v. Washington** [1984] 466 U.S. 668, 679, [80 L.Ed.2d 674, 638, 104 S.Ct. 2052]; and **Cronic v. United States** [1984] 466 U.S. 684 [80 L.Ed.2d 657, 104 S.Ct. 2039].]

Those reasons above and his intentions are articulated already in numerous places throughout Petitioner's Petition. [Please see **EXPANSION PLUS FEDERALISM**

1.

OF OLD ISSUES FOR STATE EXHAUSTION AND ADDENDUM OF NEW ISSUE AND CLAIMS-at p. 1 of 33-attached to the mandated form; and also see **REBUTTAL TO COURT'S DENIAL**-Superior courts.] And to add the [**ADDENDUM OF NEW ISSUES AND CLAIMS**, ibid., pp. 21-33-discovered, investigated, researched, and composed, subsequently to, his **PETITION FOR REVIEW**].

The Honorable Court of Appeals, Fourth Appellate District, Division One, does not even mention Petitioner's [IAC]-claims. [**COURT'S DENIAL**, pp. 1-2.] Although, one might determine that, the [IAC] was adjudicated when the court denied [ISSUE XIII], for the cumulative errors had issues of [IAC] therein. [Ibid., p. 1-last ¶-last sentence.] [Osumi v. Giverbino [C.D. Cal. 2006] 445 F. Supp.2d 1152-passed on issues/claims of violations of constitutional dimension even without comment is considered exhausted.]

To back-track to [ISSUE VIII]-The Imposition of Consecutive Sentences based on Judicial Fact Finding is Violative of the Six Amendment-the state court never mentions the effect of [Cunningham v. California [2007] 549 U.S. ], has upon this issue. So, therefore, we can conclude that, this was and is, contrary to, and an unreasonable application of the facts of Petitioner's Case compared to those of Cunningham. [Cunningham v, California, supra, 549 U.S. ; compared to People v. Black [2005] 35 Cal. 4th 1238, 1247, 113 P.3d 534, 538.]

This issue was actually-denied without prejudice by the Honorable California Supreme Court pending any relief to which defendant might be entitled upon the finality of People v. Black, supra, [2005] 35 Cal. 4th 1238, 1247, 113 P.3d 534, 538 regarding the effect of Blakely v. Washington [2004] 542 U.S. ___, 124 S.Ct. 2531, and United States v. Booker [2005] 543 U.S. ___, 125 S.Ct. 738, on California law-that, was within his Petition for Review. [Please see Pet., Exhibit A-Order En Banc.]

2.

Therefore, considering the above and incorporated by reference all Petitioner's Court Records [e.g., R.T.'s, C.T.'s, Affidavits, ect.], petitioner now comes after considerable exhaustion, request this Honorable Court to consider now, the effect[s] of **Cunningham** upon said issue[s], so denied without prejudice. Thus, petitioner further request that, these effect[s] or affect[s] of **Cunningham** should be applicable to any issue[s]/claim[s] so presented within his petition regardless of lack for said cite and it's authority granted through the Honorable United States Supreme Court's Discretion and it's bite-marks in case. Especially in regards to the California's Three-Strike Laws use of facts separate or in conjunction with numerous uses of Petitioner's Strike-Prior. [Please see Pet., pp. 28: 17-28, & 29: 1-10.]

The main focus should also be Petitioner's Convictions regarding Gang-Enhancements under the [**S.T.E.P. Act**] and it's applicability to his elongated prison sentence[s]/exsposure[s]. [**Pet.**, at ISSUES III, IV, V, X, [**XII-especially**], and XIII.]

As stated in those numerous [**ISSUES**] by petitioner, there was insufficient evidence to sustain those Gang-Enhancements. The premise of his arguments stem from a federal case on these exact issues that he has proffered. That case's authority and interpretation are not recognized by the California Appellate Courts.[1] [See **People v. Hill** [Agu. 2006] 142 Cal.App. 4th 770;-Cal.Rptr.3d -disagreeing with **Garcia**; and **People v. Romero** [June 2006] 140 Cal.App. 4th 15; Cal.Rptr.3d ___ -disagreeing with **Garcia**.]

However, it is contended herein that, Petitioner's Case reflects **Garcia** in perfection and is establishes substantial merit regarding violations of his constitutional rights as numerously stated within his [**Petition**]. And although, the Honorable California Appellate Courts failed/refused to grant relief to defendants and/or petitioners, the United States Federal Courts do recognize

---

[1] **Garcia v. Carey** [2005-9th Cir.] 395 F.3d 1099.

1  the constitutional implications and therefore, grant relief based therein and

2  thereon. Considering Petitioner's submission on this subject to the Honorable

3  California Supreme Court, this is a question of first impression for

4  adjudication. Please grant review of this newly presented constitutional

5  question of first impression, and adjudicate accordingly.

6      For the Petitioner knows within his heart that he was not involved in gang

7  activities anymore or for the benefit of any gangs-whatsoever. [Please see

8  **Pet.**, ISSUE XII, pp. 24-26, & ISSUE XIII, at p. 29: 11-14-girlfriends

9  testimony, now she is his wife and defendant's testimony generally.]

10     Petitioner's arguments regarding the application of **Garcia** Case Facts

11 compared to his are contained within his [**Petition-generally**]: However, such

12 convincing language is proffered here to convince this Honorable "Trier of

13 Facts," as follows:

14     "We review de novo the district court's order granting Garcia's petition

15 for writ of habeas corpus. **Clark v. Murphy** [9th Cir. 2003] 331 F.3d 1062, 1067.

16 A defendant alleging that the evidence was insufficient to support his

17 convictions can obtain relief only if, 'upon the record adduced at the trial[,]

18 no rational trier of fact could have found proof of guilt beyond a reasonable

19 doubt.' **Jackson v. Virginia** [1979] 443 U.S. 307, 324 [emphasis added]. It

20 appears to be an open question in this circuit whether the Antiterrorism and

21 Effective death Penalty Act of 1996 ['AEDPA'], 28 U.S.C. § 2254[d], adds a

22 second level of deference to this standard, so that a federal habeas petitioner

23 may obtain relief only by demonstrating that the state court's adjudication on

24 he merits of the claim involved an unreasonable application of **Jackson's** 'no

25 rational trier of fact' standard. See **Chein v. Shumsky**, 373 F.3d 978,983 [9th

26 Cir. 2004][en banc]. Like our en banc court in **Chein**, we do not decide the

27 effect of AEDPA on **Jackson** because we reach the same result whether we review

28

4.

1  directly under **Jackson** or whether we review more deferentially the state

2  court's application of **Jackson** under AEDPA's standard. See id." [**Emphasis**

3  **added in bold** and quotation marks added.]

4      Thus, Petitioner's Case and the facts therein, were adjudicated by the

5  state court's-so far-have been an unreasonable application and contrary to

6  established federal law.

7      The theory of specific intent, aiding & abetting, and the use of a

8  so-called gang-expert witness were mirrored [**Garcia**], compared and applied to

9  Petitioner's Case of Facts, plus the evidence that supports those facts. The

10  constitutional implications are identical also, and thus, deserve relief

11  based thereon. [Please see record as a whole, and additionally the arguments

12  based and compared thereon.]

13      In addition petitioner points and directs this Honorable Court's

14  attention to <u>Osumi v. Givrbino</u> [C.D. Ca. 2006] 445 F. Supp.2d 1152-1160:

15      For even though habeas corpus was denied, there are numerous

16  issues/claims that are contended and pertinent in everyone's cases. [I.e.,

17  IAC, allegations of counsel's disciplinary actions, cumulative error, and

18  faulty jury instruction given-interalia.] However, one must see the apparent

19  difference of the merits of Petitioner's Case Facts compared to **Osumi**.

20

21      Back-tracking even farther to [**ISSUE I-PETITION FOR REVIEW**, at pp. 8-11,

22  Exhibit A; and **Pet.**, pp. 4-6], Juror #7, should have been excused for she was

23  unequivocally stated: "she was fearful for her and her family, due to the

24  allegations of gang affiliation of the defendant's." [R.T.A. 159:

25  1-4-referring to Reporter's Transcripts Augumented on Appeal.] This is

26  important to include at this point, for it intertwines with the

27  unconstitutionality of Petitioner's Gang-Enhancements that, are alike

28  barnacles stuck upon a ship's-bottom and need to be scrapped off. This

5.

extraneous influence upon a juror has been ruled on-along time-ago by the Honorable United State Supreme Court in **Remmer v. United States** [1954] 347 U.S. 227:

"Extraneous influences not only include juror contact with other people, but also juror contact with evidence, and other extrinsic materials. In the event that a juror is exposed to extraneous influences, the trial court 'should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.'" [Citing **Remmer**, supra, 347 U.S. at 230.] So, this [**ISSUE I**] was adjudicated by the state courts in an unreasonable and contrary to application to **Remmer**, a firmly established federal law; for the prejudicial and the biased feelings of that [Juror #7] tainted the standard of "beyond a reasonable doubt," that had to be proven by the prosecution, for she assumed defendant must be guilty [even before trial], for he is a gang-member and "I must find him guilty, to put him away, so that, he can not hurt me or my family."

The petitioner submits that, additional records regarding his case that, establish even more substantial material evidence of facts are contained therein, and will be lodged with this Honorable Court, if necessary.

Petitioner humbly request relief; based upon his Application for Writ of Habeas Corpus, the full record in this matter, the affidavits, and the within information of this [**REBUTTAL**]; be granted. Thank you.

Submitted by,

Dated: JUNE 6 , 2007.

Javier Espinoza Rodriguez
Petitioner, in pro per

6.

EXHIBIT H

CALIFORNIA SUPREME COURT'S DENIAL: AND
ADDENDUM [#2]: GENERALITIES OF THE APPLICABILITIES OF CUNNINGHAM, OF WHICH
VIOLATE   THE   SIXTH   AND   FOURTEENTH   AMENDMENTS   TO   THE   UNITED   STATES
CONSTITUTION

S153884

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JAVIER ESPINOZA RODRIGUEZ on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

DEC 1 2 2007

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

GENERALITIES OF THE APPLICABILITIES OF CUNNINGHAM, OF WHICH

VIOLATE THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Under the United States Supreme Court opinion in **Cunningham v California** [No 05-6551, Jan. 22, 2007] [549 U.S. ___] [2007 U.S. 1324], abrogating **People v black** [2005] 35 Cal. 4th 1238, the sentence violated the Sixth Amendment jury trial guarantee and the Fourteenth Amendment requirement of proof beyond a reasonable doubt for aggravating factors used to support an upper term sentence. As **Cunningham** held, the decision was a direct application of the bright-line rule of **Blakely v Washington** [2004] 542 U.S. 296, and **Apprendi v New Jersey** [2000] 530 U.S. 466, to California upper terms.

Based on settled California Supreme Court and federal constitutional authority, this court should reduce the upper term sentence to midterm with no remand. In the alternative, the judgment should be vacated and the cause remanded.

**Cunningham**, is a straightforward application of **Blakely v Washington** [2004] 542 U.S. 296, and the bright-line rule of **Apprendi v New Jersey**, supra, [2000] 530 U.S. 466. Except for a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. [**Cunningham**, supra, 549 U.S. ___, at [2007 LEXIS 1324, pp. 35-36].] [Quoting **Apprendi**, at p. 490.]

The bright-line rule was explained in **Apprendi** with specific reference to the Sixth and Fourteenth Amendments. "Under the due process clause of the Fourteenth Amendment, and the notice and jury trial guarantees of the Sixth Amendment and the fact [other than a prior conviction] that increases the maximum penalty for a crime must be charged in an indictment [or information], and submitted to a jury, and then proven beyond a reasonable doubt. " [Id., at p. 476 [quoting **Jones v United States** [1999] 526 U.S. 227, 243, fn. 6].] As

1.

**Blakely** recapitulated: This rule reflects two longstanding tenets of common-law criminal jurisprudence: that the truth of every accusation against a defendant should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, and that an accusation which lacks any particular fact which the law makes essential to the punishment is no accusation within the requirements of the common-law, and it is of no accusation in reason. [**Blakeley**, supra, 542 U.S. at pp.301-302 [citations omitted].] "[E]very fact which is legally essential to the punishment must be charged in the indictment and proved to a jury." [Id., at p. 302, fn.5 [citation omitted].] In **Cunningham**, the Supreme Court held that the California Sentencing Rules require that the mid-term shall be imposed unless circumstances in aggravation or mitigation are found, so an upper-term cannot be imposed without extra facts beyond those found necessarily by the jury's verdict. As a result, **Cunningham** held, the **Blakeley** prescribed statutory maximum is the midterm-the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant-so facts used to support a sentence above the midterm are subject to the Sixth and Fourteenth Amendments under **Apprendi** and **Blakely**. [**Cunningham**, 549 U.S., at pp. ___ - ___ [2007 U.S LEXIS 1324, at pp. 26-27, 35-36, 40, fn. 14, & 44].] **Cunningham** held, that should be the end of the matter. [Id., at p. [2007 U.S. LEXIS 1324, at p. 36] [quoting **Blakeley**, supra, 542 U.S. p. 313].] But it then went on to analyze the California Supreme Court's assumptions in **Black**, and found that each violated **Apprendi's** bright-line rule. [**Cunningham**, supra, at p. ___ [2007 LEXIS 1324, at pp. 39-40].] And that, **Black** misunderstood prior U.S. Supreme Court precedent in its erroneous belief that there was no bright-line rule on the issue. [**Cunningham**, at p.___ [2007 LEXIS 1324, at p. 40].] Accordingly, **Cunningham** held that the Sixth and Fourteenth Amendment requirements of a jury and proof beyond a reasonable doubt for upper term

1 aggravating   factors   [other   than   prior   conviction]   apply   directly   to

2 California's Sentencing Laws, in exactly the same manner that they apply to the

3 Washington Sentencing Scheme which the U.S. Supreme Court invalidated in

4 **Blakely**, and to the mandatory Federal Guidelines invalidated in **United States v**

5 **Booker** [2005] 543 U.S. 220. [**Cunningham**, supra, 549 U.S. ____ [2007 U.S. LEXIS

6 1324, at pp. 11, 24, 35-37, & 39-44].]

7     Additionally, it is Petitioner's Contention that, **Cunningham** is a landmark

8 precedence that has yet to be defined to its two extremes—either generally or

9 specifically—for the wide, far-reaching ratifications have yet to ripple onto

10 its opposite shores of law. Petitioner believes that, more of California's

11 Sentencing Laws will fall when faced with the inter-meaning of **Cunningham**,

12 let-alone the other fifty-one states: Those laws are, but not limited to, The

13 Three-Strikes Law, The Second-Strike Law, and The Eighty-Five Percent [85%]

14 Law-reducing credit earning for-violent felony-offense(s) to fifteen percent

15 [15%].

16

17     First of all, within The Three-Strikes Law that, has within it a

18 [mandatory] sentencing Scheme identical to the Determinate Sentencing Law

19 [DSL-**Penal Code § 1170 et seq**.] [hereinafter all references to codes, statutes,

20 rules of court, ect. will be spelled-out, then they will be abbreviated within

21 Brackets, in **bold**]: See [**P.C.** §§ 667(b)-(i), & 1170.12 et seq.], but

22 specifically [667(e)(2)(A), (i), (ii), & (iii)]; of which gives three-levels of

23 punishment for a third-striker [mandatory that after computation of all three

24 choices, the longest term to apply], and this is decided by a judge, not a jury.

25     Secondly, a second-striker's sentence due to his or her prior strike, their

26 new term or terms can be elongated, enhanced, or/and aggravated by that prior

27 over and over again. First the new term [principle-term] [low, middle or high

28 term] will be doubled, any other subordinate-terms are to be added at one-third

3.

1  of the middle-term [P.C. § 1170 et seq.], is doubled+each new felony conviction

2  will be applied the same, of which are all run consecutively [mandated] to any

3  and all other terms-on top of-the principle-term. Then of course, any applicable

4  enhancements, some of which, are provided by the same corresponding elements

5  [the very nature of the prior]-that prior strike; due to [e.g.] prison prior(s)

6  based thereon, are then run consecutively to the applicable count(s), a one-year

7  prison prior under [P.C. § 667.5(b)]; and a nickel prior under [P.C. § 667(a)]

8  could apply due to the same strike prior. And lets not forget that, all those

9  years combined consecutively-because of the use of one strike prior being used

10  over and over again-only twenty percent [20%] credit reduction will be earned,

11  and be applied on that, elongated, enhanced, or/and aggravated sentence. [See

12  P.C. §§ 667(b)-(i), & 1170.12 et seq.] As within the words of **Cunningham**:

13

14  "[N]otably, the Penal Code permits elevation of a sentence above the upper

15  term based on specifically statutory enhancements relating to the defendant's

16  criminal history or circumstances of the crime. See, e.g., Penal Code § 667 et

17  seq. [West Supp. 2006]; 12022 et seq. See also Black [italics omitted], 35 Cal.

18  4th, at 1257, 113 P. 3d, at 545. Unlike aggravating circumstances, statutory

19  enhancements must be charge in the indictment, and the underlying facts must be

20  proved to the jury beyond a reasonable doubt. Penal Code § 1170.1(e); Black, 35

21  Cal. 4th, at 1257, 113 P. 3d, at 545. A fact underlying an enhancement cannot be

22  used to impose an upper term sentence and, on top of that, an enhanced term.

23  Penal Code § 1170(b)."

24  Thus, the above is not just a worst-case scenario, it is part of thousands

25  of inmate's sentences today. Of course, it took about thirty-years [30]-years

26  for **Cunningham** to make a dent upon the Determinate Sentencing Law [DLS-P.C. §

27  1170 et seq.]. [See expansion below-on these contention(s) that, are applicable

28  to said petitioner-specifically.]

4.

1        Thirdly, some of the above sentencing [mandated] schemes are taken, farther

2   or separately, can only earn fifteen percent [15%] reduction credit earning

3   ability. For the conviction of a-violent felonies-causes that count or even all

4   counts to be regulated to allow only the earning of fifteen percent [15%] credit

5   ability [P.C. §§ 667.5(c)(1)-(22), & 2933.1.]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLERK TRANSCRIPTS

0226

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN DIEGO

DATE: AUGUST 14, 2003        DEPT:  FOURTEEN        REPORTER A:  I. PERKINS
                                                                                          CSR #:  12727
PRESENT HON. ESTEBAN HERNANDEZ,                          REPORTER B:
                                            JUDGE


CLERK:        J. L. RODRIGUEZ

BAILIFF:      F. HINKLE                              REPORTERS' ADDRESS:
                                                                  P.O. Box 128
                                                                  San Diego, CA 92112-4104

| | | |
|---|---|---|
| SCS  176087<br>DA  BAL57601/02 | THE PEOPLE OF THE STATE<br>OF CALIFORNIA,<br>Plaintiff,<br>vs. | BY:  DDA – SOPHIA ROACH |
| | LEON,  JOSE LUIS<br>&<br>RODRIGUEZ, JAVIER E. | BY:  JERRY LEAHY<br><br>BY:  BENJAMIN SANCHEZ |
| | Defendants. | |


09:09 AM    This is the time previously set for jury deliberations in the above-entitled
                   cause, having been continued from August 13, 2003.  All sworn jurors are
                   present and commence deliberations.

11:28 AM    Sworn bailiff delivers jury note #1 to the Court.  Clerk notifies attorneys to
                   report to court at 01:15 p.m.

01:33 PM    Court is in session with DDA Sophia Roach is present on behalf of the
                   People.  Jerry Leahy is present on behalf of defendant Leon.  Neither
                   defendant is present.  Jerry Leahy is appearing on behalf of Benjamin
                   Sanchez and defendant Rodriguez.  Jury note #1 reads as follows:

                   "ON CT. 3 – IS THE CHARGE OF CONCEALED WEAPON BY
                   ITSELF?  OR IS THE CHARGE CONTINGENT UPON BEING A
                   GANG MEMBER?  HENCE, IF NOT A GANG MEMBER THEN
                   SHOULD WE THEN FIND HAVING A CONCEALED WEAPON AS A
                   CRIME?"

                   Dated – 08/14/03           signed – juror #11

                   Court and counsel formulate the following response to jury note #1:

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 78 of 111
Case 2:08-cv-02310-JVS-SS    Document 1-5    Filed 04/08/2008    Page 28 of 50

0227

SCS 176087   PEOPLE VS. LEON/RODRIGUEZ   PAGE 2 OF 2        08/14/03

"THE COURT DIRECTS YOUR ATTENTION TO THE
INSTRUCTION CONTAINED IN CALJIC #16.460."

Signed – Judge Esteban Hernandez        Dated – 08/14/03

01:46 PM    Court's response to jury note #1 is delivered to the jury by the sworn
            bailiff.

02:45 PM    Sworn bailiff delivers jury note #2 to the Court.  Jury note #2 reads as
            follows:

            "WE NEED COPIES OF THE TRANSCRIPTS FOR MARTINEZ &
            RODRIGUEZ TESTIMONIES."

            Court and counsel are notified of jury note #2 and concur with the court's
            proposed response.

            Court responds to jury note #2 as follows:

            "YOU CAN HEAR A READBACK BY THE REPORTER, BUT WE
            CANNOT PROVIDE TRANSCRIPTS."

03:05 PM    Sworn bailiff delivers Court's response to jury note #2.

04:05 PM    Sworn bailiff delivers Court's addendum response/inquiry to jury note #2.
            Court's addendum to jury note #2 reads as follows:

            "PLEASE INDICATE IF YOU WANT A READBACK BY THE
            REPORTER."

            Signed: Judge Esteban Hernandez    Dated: 08/14/03

04:07 PM    Sworn bailiff delivers jury note #2 with added writing from jury as
            follows:  "NOT TODAY!!"  No signature or date added to note.

04:35 PM    Sworn excuses the jury for the evening.  Jury is to resume deliberations at
            9:00 a.m. on 08/15/03.  Both defendants remain in the custody of the
            Sheriff with bail set at $100,000 each.
                                    -jlr-

SBS

SCS176087  DA  BAL57602          **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
☐ CENTRAL  ☐ NORTH  ☐ EAST  ☒ SOUTH

DATE 10-14-03    AT 09:00 M.    03118814    **PROB HEAR-SENTENCING**

0235

PRESENT: HON ESTEBAN HERNANDEZ          JUDGE PRESIDING DEPARTMENT ___014___

CLERK J.L. Rodriguez    REPORTER M. Hirschorn          CSR# 4740

REPORTER'S ADDRESS: P.O. BOX 120128, SAN DIEGO, CA 92112-0128

S. Roach

THE PEOPLE OF THE STATE OF CALIFORNIA                    DEPUTY DISTRICT ATTORNEY

VS.

RODRIGUEZ    JAVIER    E          R - B. SANCHEZ
DEFENDANT                    ATTORNEY FOR DEFENDANT (PD / APD / PCC / RETAINED)

VIOLATION OF #PC459  #PC136.1(B)(1  #PC12025(A)(1  #PC12031(A)(1

ENH(S) _____    INTERP. _____    OATH ON FILE / SWN.

PRIOR(S) _____    LANGUAGE _____

☒ DEFENDANT ☒ PRESENT ☐ NOT PRESENT ☐ NOT PRODUCED    D.P.O. - K. Woodward

☐ DEFENDANT ADVISED OF RIGHTS AND ADMITS / DENIES A VIOLATION OF PROBATION          ☐ WAIVES HEARING.

PROBATION IS : REMAINS : FORMALLY / SUMMARILY  ☐ REVKD  ☐ REINST  ☐ MODIFIED  ☐ CONT  ☐ ST&C  ☐ TERMD.  ☐ EXT. TO: _____

☒ WAIVES ARRAIGNMENT.  ☐ ARRAIGNED FOR JUDGMENT.  ☐ IMPOSITION / EXECUTION OF SENTENCE IS SUSPENDED.

☒ PROBATION IS : ☒ DENIED  ☐ GRANTED _____ YEARS (FORMAL/SUMMARY) TO EXPIRE _____

☐ COMMITMENT TO SHERIFF FOR _____ DAYS. STAYED TO _____ / PNDG. SUCC. COMPL. OF PROB.  ☐ PAROLE NOT TO BE GRANTED.

☐ PERFORM _____ HRS / DAYS PSP / VOL. WORK AT NONPROFIT ORG.  SUBMIT PROOF TO PROBATION / COURT BY _____

☐ 4TH AMENDMENT WAIVER          ☐ FORMAL PROB. CONVERTS TO SUMM. PROB.

☐ FURTHER CONDITIONS ARE SET FORTH IN PROBATION ORDER.  ☐ WORK FURLOUGH, REPORT: _____

☐ DEFENDANT IS COMMITTED TO THE CALIFORNIA YOUTH AUTHORITY  ☐ PER WI 1737

☒ DEFENDANT IS COMMITTED TO THE DEPARTMENT OF CORRECTIONS  ☐ PER PC 1170(d).

☒ FOR ☐ LOWER / MIDDLE / UPPER / INDETERMINATE TERM OF ___4___ YEARS / MONTHS / TO LIFE

ON COUNT ___2___ CODE & NO. PC136.1(b)(1 ☒ PRINCIPAL COUNT.  ☐ STIPULATED SENTENCE.

☒ DEFENDANT SENTENCED PER PC 667(b)-(i)/1170.12.  ☒ NOTICE OF FIREARMS PROHIBITION GIVEN PER PC 12021.

CREDIT FOR TIME SERVED
156 DAYS LOCAL
_____ DAYS STATE INST.
23 DAYS PC 4019 (2933.1)
179 TOTAL DAYS CREDIT

☒ NO VISITATION PER PC 1202.05.  VICTIM IS UNDER 18 YRS. OF AGE.  DA TO COMPLY WITH NOTICES.

☒ DEFT. ADVISED REGARDING PAROLE / APPEAL RIGHTS.  ☐ REGISTRATION PER PC ☐ HS 11590 / PC 457.1 / PC 186.30.  ☐ TESTING PER PC 1202.1 HIV / PC 296 DNA.

☒ DEFENDANT TO PAY: FINE OF $ 10,000 PLUS PENALTY ASSESSMENT PER.  ☐ $20 COURT SECURITY FEE.  ☐ PROBATION COSTS.  ☐ BOOKING FEES.

REST. FINE(S) ☒ $ 10,000 PER PC 1202.4(b).  ☒ FORTHWITH PER PC 2085.5.  ☒ $ 10,000 PER PC 1202.45 SUSP. UNLESS PAROLE REVKD.

☒ RESTITUTION TO VICTIM(S) PER P.O.'S REPORT / REST. FUND PER PC 1202.4(f) OF $ 250 / IN AN AMT. TO BE DETERMINED.  ☒ JOINT & SEVERAL.

☐ COURT-APPOINTED ATTORNEY FEES ORDERED IN THE AMOUNT OF $ _____    Victim: Donna Tucker

☐ INCOME DEDUCTION ORDER OF $ _____ PER PAY PERIOD PER PC 1202.42 STAYED UNLESS DEFT. FAILS TO PAY VICTIM REST.  NOTICE OF RIGHTS PROVIDED.

☐ AT THE COMBINED RATE OF $ _____ PER MONTH TO START 60 DAYS AFTER RELEASE / ON _____

☐ DEFENDANT IS REFERRED TO ☐ REVENUE & RECOVERY ☒ COURT COLLECTIONS TO SET UP AN ACCOUNT.

☐ DEFENDANT IS TO REPORT TO PROBATION / REV. & REC./ COURT COLLECTIONS FORTHWITH / WITHIN 72 HOURS OF RELEASE FROM CUSTODY.

☒ DEFENDANT REMANDED TO CUSTODY OF SHERIFF ☒ WITHOUT BAIL.  ☐ WITH BAIL SET AT $ _____

☐ DEFENDANT TO REMAIN AT LIBERTY  ☐ ON BOND POSTED $ _____  ☐ ON PROBATION.  ☐ ON DEJ.  ☐ ON OWN / SUPERVISED RECOGNIZANCE.

☐ DEFENDANT ORDERED RELEASED FROM CUSTODY  ☐ ON PROBATION.  ☐ ON OWN / SUPERVISED RECOGNIZANCE.  ☐ ON DEJ.  ☐ THIS CASE ONLY.

☐ DEFENDANT WAIVES STATUTORY TIME FOR PRONOUNCEMENT OF JUDGMENT.

☐ DEFENDANT REFERRED FOR DIAGNOSTIC EVALUATION.  ☐ PER PC 1203.03.  ☐ PER WI 707.2.

OCT 30 2003    CONTINUED TO / SET FOR _____ AT _____ M. IN DEPT. _____ ON MOTION

OF COURT / DDA / DEFENDANT / PROBATION OFFICER.  REASON: _____

☐ BENCH WARRANT TO ISSUE. BAIL SET AT $ _____  ☐ SERVICE FORTHWITH.  ☐ ORDERED WITHHELD TO _____

☐ BENCH WARRANT ISSUED / ORDERED _____ IS RECALLED / RESCINDED.

☐ BAIL IS ☐ EXONERATED.  ☐ FORFEITED.  AMOUNT $ _____ . BOND NO. _____

BOND COMPANY _____    AGENT _____

☐ PROCEEDINGS SUSPENDED ☐ PER PC 1368, MENTAL COMPETENCY. (SEE BELOW FOR DATES OF EXAMINATION AND HEARING.)
☐ PER WI 3051, ADDICTION OR DANGER OF ADDICTION.  SERVICE OF PETITION: _____

☐ PROBATION TO PREPARE SUPP. REPT.  ☐ SUBMIT POST-SENT REPT TO CDC PER PC1203c.  ☐ REPT. TO REG. OF VOTERS.  ☐ DMV ABSTRACT. B.A.C.
☐ CONCURRENT WITH / CONSECUTIVE TO: As to: enhancement - PC186.22(b)(1)-
15 years consec., PC 12022.5(a) - 4 years consec., - PC459 2nd
degree - 1/3 mid term -16 months consec., enh. PC 186.22 mid term 4
years - stayed per PC654  - PC12025(a)(1) - mid term - 4 years-
stayed per PC654, enh. PC 186.22(b)(1) - mid term 3 years - stayed per
PC654  - PC12031(a)(1) - mid term 4 years-stayed
per PC654, enh. PC 186.22(b)(1) - mid term
2 years - stayed per PC654.   [mid term  4 months]

ESTEBAN HERNANDEZ    JUDGE OF THE SUPERIOR COURT

SCSC CR-2B(Rev. 9-03)    CRIMINAL MINUTES: PRONOUNCEMENT OF JUDGEMENT

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN DIEGO

### CLERK'S CERTIFICATE

I, the Clerk of the Superior Court,

DO CERTIFY:

☐     That the following Superior Court case file contains all the original documents filed in my office in the action on appeal in compliance with California Rules of Court, Rule 5.2.

☐     That the foregoing transcript was provided in part by the appellant/respondent, and these pages are numbered:

☐     Pursuant to California Rules of Court, Rule 11(a), the record on appeal is certified to be a full and true transcript of the record on appeal.

☐     That Notice of Completion has been mailed to counsel for respective parties and copy(ies) of the record made available in compliance with California Rules of Court, Rule 11(b).

☐     That the record on appeal was furnished wholly, or in part, in compliance with California Rules of Court, Rule 5(b)(d), and conforming with Rule 9; it is therefore transmitted to the reviewing court.

☒     Pursuant to California Rules of Court, Rules 35(c), 39 and 39.1, the foregoing record is hereby certified to be a full, true and correct transcript on appeal.

Witness my hand and the Seal of said Court.



CLERK OF THE SUPERIOR COURT

Dated: November 19, 2003

by _____ , Deputy

MARIA TALABAN

SDSC APL-42(Rev. 11-02)

Case 2:08-cv-02~~ABSTRACT OF JUDGMENT PRISON COMMITMENT~~ ~~DETERMINATE~~ of 50

*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

CR-290

| ☐ SUPERIOR | COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | | | |
|---|---|---|---|---|
| ☐ MUNICIPAL | BRANCH OR JUDICIAL DISTRICT  **SOUTH COUNTY** | | | |

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: **JAVIER ESPINOZA RODRIGUEZ**        DOB: **10-10-76**

AKA:

CII#: **11432421**

BOOKING #: **03118814A**        ☐ NOT PRESENT

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT        ☐ AMENDED ABSTRACT

SCS176087  -A
                       -B
                       -C
                       -D

| DATE OF HEARING | DEPT. NO. | JUDGE |
|---|---|---|
| **10-14-03** | **14** | **E. HERNANDEZ** |

| CLERK | REPORTER | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|
| **J.L. RODRIGUEZ** | **M. HIRSCHORN** | **A-000788070** |

| COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | |
|---|---|---|
| **S. ROACH** | **B. SANCHEZ** | ☐ APPTD. |

1.  Defendant was convicted of the commission of the following felonies:
    ☐ Additional counts are listed on attachment
    ___ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY JURY | COURT | PLEA | TERM (L,M,U) | CONCURRENT | CONSECUTIVE 1/3 VIOLENT | CONSECUTIVE 1/3 NON-VIOLENT | CONSECUTIVE FULL TERM | INCOMPLETE SENTENCE | 664 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 136.1(B)(1) | ATTEMPTING TO DISSUADE A | 2003 | 08-15-03 | X | | | M | | | | | | | 4 | 0 |
| | | | WITNESS/REPORTING A CRIME | | · · | | | | | | | | | | | | |
| 1 | PC | 459** | BURGLARY | 2003 | 08-15-03 | X | | ✓ | | | | | X | | | 1 | 4 |
| 3 | PC | 12025(A)(1) | HVG CNCEALED FIREARM/VEH | 2003 | 08-15-03 | X | | | M | | | | | | X | 4 | 0 |
| 4 | PC | 12031(A)(1) | CARRYING LOADED FIREARM | 2003 | 08-15-03 | X | | | M | | | | | | X | 4 | 0 |
| | | | | | · · | | | | | | | | | | | | |

2.  ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC186.22(B)(1) | 5 | | | | | | | 5 | 0 |
| 2 | PC12022.5 | 4 | | | | | | | 4 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

3.  ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

4.  ☒ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).

5.  INCOMPLETED SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER |
|---|---|
| | |
| | |
| | |

6.  | TOTAL TIME ON ATTACHED PAGES: | | |

7.  ☐ Additional indeterminate term (see CR-292).

8.  | TOTAL TIME: | 14 | 4 |

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

*(Continued on reverse)*

Form Adopted by the
Judicial Council of California
CR-290 (Rev. January 1, 1999)

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE**
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

Penal Code
§§ 1213, 1213.5

STATE OF CALIFORNIA vs.
JAVIER ESPINOZA RODRIGUEZ

| SCS176087 | -A | -B | -C | -D |
|---|---|---|---|---|

9. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):
   a. RESTITUTION FINE of: $10,000 per PC 1202.4(b) forthwith per PC 2085.5.
   b. RESTITUTION FINE of: $10,000 per PC 1202.45 suspended unless parole is revoked.
   c. RESTITUTION of: $250.00 per PC 1202.4(f) to   ☒ victim(s)*   ☐ Restitution Fund
      (*List victim name(s) if known and amount breakdown in item 11, below.)
      (1) ☐ Amount to be determined.
      (2) ☐ Interest rate of: __% (not to exceed 10% per PC 1202.4(f)(3)(F)).
   d. ☐ LAB FEE of: $____ for counts: _____ per H&SC 11372.5(a).
   e. ☐ DRUG PROGRAM FEE of $150 per H&SC 11372.7(a).
   f. ☐ FINE of $___ per PC 1202.5.

10. TESTING
    a. ☐ AIDS pursuant to    ☐ PC 1202.1    ☐ other (specify):
    b. ☐ DNA pursuant to     ☐ PC 290.2     ☐ other (specify):

11. Other orders (specify):
COUNT ONE:PC186.22 MIDDLE TERM 3 YEARS STAYED PER PC654
COUNT THREE:PC186.22(B)(1) MIDDLE TERM 3 YEARS STAYED PER PC654
COUNT FOUR: PC186.22(B)(1) MIDDLE TERM 3 YEARS STAYED PER PC654

VICTIM: DONNA TUCKER

12. Execution of sentence imposed
    a. ☒ at initial sentencing hearing.
    b. ☐ at resentencing per decision on appeal.
    c. ☐ after revocation of probation.
    d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
    e. ☐ other (specify):

13. CREDIT FOR TIME SERVED

| CASE NUMBER | | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | |
|---|---|---|---|---|---|
| SCS176087 | -A | 179 | 156 | 23 | ☐ 4019 ☒ 2933.1 |
| | -B | | | | ☐ 4019 ☐ 2933.1 |
| | -C | | | | ☐ 4019 ☐ 2933.1 |
| | -D | | | | ☐ 4019 ☐ 2933.1 |

DATE SENTENCE PRONOUNCED: - -   SERVED TIME IN STATE INSTITUTION: ☐ DMH   ☐ CDC   ☐ CRC

14. The defendant is remanded to the custody of the sheriff  ☒ forthwith  ☐ after 48 hours excluding Saturdays, Sundays, and holidays.

To be delivered to  ☐ the reception center designated by the director of the California Department of Corrections.
☐ other (specify): ____

CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE
T. GARCIA

DATE
12-08-03

CR-290 (Rev. January 1, 1999)   ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE   Page two

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO, SOUTH COUNTY DIVISION

DEPARTMENT 14            BEFORE HON. ESTEBAN HERNANDEZ, JUDGE

---

PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
            PLAINTIFF,             )
                                   )
        VS.                        )
                                   )
JOSE LUIS LEON,                    )      CASE NO. SCS176087
     &                             )
JAVIER RODRIGUEZ,                  )
                                   )
        DEFENDANTS.                )
                                   )

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

AUGUST 5, 2003
AUGUST 7, 2003

APPEARANCES:

FOR THE PLAINTIFF:        SOPHIA ROACH
                          DEPUTY DISTRICT ATTORNEY


FOR DEFENDANT LEON:       JERRY LEAHY
                          ATTORNEY AT LAW


FOR DEFENDANT RODRIGUEZ:  BENJAMIN SANCHEZ
                          ATTORNEY AT LAW


REPORTED BY: IRENE PERKINS, CSR NO. 12727
SAN DIEGO SUPERIOR COURT

1                    CERTIFICATE OF REPORTER

2

3    STATE OF CALIFORNIA )
                         ) ss:
4    COUNTY OF SAN DIEGO )

5

6          THE PEOPLE OF THE STATE OF CALIFORNIA

7                          VS.

8                    JAVIER RODRIGUEZ

9               CASE NO. SCS176087

10                  AUGUST 5, 2003
                    AUGUST 7, 2003
11
                    PAGES 1 -- 174
12

13

14        I, IRENE PERKINS, CSR NO. 12727, A CERTIFIED SHORTHAND

15   REPORTER IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN

16   AND FOR THE COUNTY OF SAN DIEGO, HEREBY CERTIFY THAT I MADE A

17   SHORTHAND RECORD OF THE PROCEEDINGS HAD IN THE WITHIN CASE

18   AND THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE, AND

19   CORRECT TRANSCRIPTION OF THE PROCEEDINGS IN THIS CASE.

20        DATED THIS 7TH DAY OF JUNE, 2004.

21

22

23

24

25                                  IRENE PERKINS, CSR 12727

26

27

28

# COURT OF APPEAL -- STATE OF CALIFORNIA
## FOURTH APPELLATE DISTRICT



(California Rules of Court, Rules 9, 35, 39)

PEOPLE OF THE STATE OF CALIFORNIA,

    Plaintiff & Respondent

               vs.

    JAVIER RODRIGUEZ

    Defendant & Appellant

## FROM SAN DIEGO COUNTY

HON.  ESTEBAN HERNANDEZ

## JUDGE

NO.  D043198

## CLERK'S TRANSCRIPT
### VOLUME 1 of 1      PGS  0 - 201

BILL LOCKYER, ATTY.  GENERAL
STATE OF CALIFORNIA
110 WEST "A" STREET
SAN DIEGO, CA 92101
BY:      , DEPUTY

Attorney for Plaintiff &
RESPONDENT

Attorney for Defendant &
 APPELLANT

TO DCA:
TO ATTORNEY GENERAL:
TO ATTORNEY:

SDSC APL-48CRM(Rev. 1-03)

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 86 of 111
Case 2:08-cv-02310-JVS-SS    Document 1-5    Filed 04/08/2008    Page 36 of 50

0003

## CHARGES (cont'd)

**)UNT  3 - HAVING CONCEALED FIREARM IN VEHICLE, OFFENDER ACTIVE PARTICIPANT OF CRIMINAL STREET GANG**

On or about May 11, 2003, JOSE LUIS LEON and JAVIER ESPINOZA RODRIGUEZ did unlawfully carry concealed within a vehicle which was under his/her control and direction a pistol, revolver and other firearm capable of being concealed upon the person, in violation of PENAL CODE SECTION 12025(a)(1).

And it is further alleged that the defendant is an active participant in a criminal street gang, within the meaning of PENAL CODE SECTION 12025(b)(3).

**)UNT  4 - CARRYING A LOADED FIREARM ON ONE'S PERSON, ACTIVE PARTICIPANT OF CRIMINAL STREET GANG**

On or about May 11, 2003, JOSE LUIS LEON and JAVIER ESPINOZA RODRIGUEZ did unlawfully carry a loaded firearm on his/her person and in a vehicle while in a public place and on a public street in an incorporated city and in a public place and on a public street in a prohibited area of unincorporated territory, in violation of PENAL CODE SECTION 12031(a)(1).

And it is further alleged that the defendant is an active participant in a criminal street gang, within the meaning of PENAL CODE SECTION 12031(a)(2)(C).

**)UNT  5 - RESISTING AN OFFICER**

On or about May 11, 2003, JOSE LUIS LEON did willfully and unlawfully resist, delay and obstruct a public officer, peace officer and emergency medical technician in the discharge of and the attempt to discharge a duty of his/her office and employment, in violation of PENAL CODE SECTION 148(a)(1).

## PRIORS

**!VIER ESPINOZA RODRIGUEZ:**

**'RIKE PRIOR(S)**

And it is further alleged pursuant to Penal Code sections 667(b) through (i), 1170.12, and 668 that the defendant, JAVIER ESPINOZA RODRIGUEZ, has suffered the following prior conviction(s) and juvenile adjudication(s), which are now serious or violent felonies under California law whether committed in California or elsewhere.

| harge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| 459 | 04/22/1999 | SCD142327 | Superior Court | San Diego | CA |

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 87 of 111
Case 2:08-cv-02310-JVS-SS    Document 1-5    Filed 04/08/2008    Page 37 of 50

0007

## CHARGES (cont'd)

### COUNT  3  - HAVING CONCEALED FIREARM IN VEHICLE, OFFENDER ACTIVE PARTICIPANT OF CRIMINAL STREET GANG

On or about May 11, 2003, JOSE LUIS LEON and JAVIER ESPINOZA RODRIGUEZ did unlawfully carry concealed within a vehicle which was under his/her control and direction a pistol, revolver and other firearm capable of being concealed upon the person, in violation of PENAL CODE SECTION 12025(a)(1).

And it is further alleged that the defendant is an active participant in a criminal street gang, within the meaning of PENAL CODE SECTION 12025(b)(3).

### COUNT  4  - CARRYING A LOADED FIREARM ON ONE'S PERSON,  ACTIVE PARTICIPANT OF CRIMINAL STREET GANG

On or about May 11, 2003, JOSE LUIS LEON and JAVIER ESPINOZA RODRIGUEZ did unlawfully carry a loaded firearm on his/her person and in a vehicle while in a public place and on a public street in an incorporated city and in a public place and on a public street in a prohibited area of unincorporated territory, in violation of PENAL CODE SECTION 12031(a)(1).

And it  is further alleged that the defendant is an active participant in a criminal street gang, within the meaning of PENAL CODE SECTION 12031(a)(2)(C).

### COUNT  5  - RESISTING AN OFFICER

On or about May 11, 2003, JOSE LUIS LEON did willfully and unlawfully resist, delay and obstruct a public officer, peace officer and emergency medical technician in the discharge of and the attempt to discharge a duty of his/her office and employment, in violation of PENAL CODE SECTION 148(a)(1).

## PRIORS

*JAVIER ESPINOZA RODRIGUEZ:*

### STRIKE PRIOR(S)

And it is further alleged pursuant to Penal Code sections 667(b) through (i), 1170.12, and 668 that the defendant, JAVIER ESPINOZA RODRIGUEZ, has suffered the following prior conviction(s) and juvenile adjudication(s), which are now serious or violent felonies under California law whether committed in California or elsewhere.

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| 459 | 04/22/1999 | SCD142327 | Superior Court | San Diego | CA |

SAN DIEGO COUNTY PROBATION DEPART

ADULT SERVICES

PROBATION OFFICER'S REPORT

| PEOPLE OF THE STATE OF CALIFORNIA | COURT NO.<br>SCS-176087 | DEPT. & JUDGE<br>SBSC          DEPT. 14<br>HERNANDEZ, E. |
|---|---|---|
| v. | DA FILE NO.<br>BAL57602 | ATTORNEY<br>SANCHEZ, B<br>RET |
| RODRIGUEZ, JAVIER E | HEARING DATE/TIME<br>09/15/2003<br>09:00AM | PROB CASE NO.<br>A-000788070 |
| RODRIGUEZ, JAVIER ESPINOZA<br>ESPINOSA, JAVIER RODRIGUEZ | PROBATION OFFICER<br>WOODWARD, K | PO TEL. NO.<br>(619)441-3483 |

| ADDRESS<br>4211 ALTADENA AVE<br>SAN DIEGO, CA 92115-5178 | TEL. NO.<br>(619)280-3925 | BIRTHPLACE/CITIZENSHIP<br>SAN DIEGO<br>CA<br>US |
|---|---|---|

| BIRTH DATE<br>10/10/1976 | AGE<br>26 | RACE<br>HIS/LAT/MEX | SEX<br>MALE | HT<br>5'06" | WT<br>170 | EYES<br>BROWN | HAIR<br>BLACK |
|---|---|---|---|---|---|---|---|

| DRIVER'S LIC.NO<br>CAB4475839 | INS. NO. | OTHER ID DATA<br>TT RIGHT ARM "SIDRO", 3 DOTS LEFT HAND<br>ON CHEST CLOWN AND EVELIA |
|---|---|---|

| DATE OFFENSE COMMITTED<br>05/11/2003 | DATE CONVICTED<br>08/15/2003 | HOW<br>GUILTY BY JURY | CUSTODY STATUS<br>CUSTODY |
|---|---|---|---|

| INVESTIGATING ARRESTING AGENCY<br>CHULA VISTA POLICE DEPARTMENT | DATE INFO FILED<br>06/09/2003 | SDSO SYSTEM NO.<br>94188 014154 |
|---|---|---|

| NO.<br>432421 | FBI NO.<br>485416DB0 | ARREST REPORT NO.<br>0308732 | SDSO BOOKING NO.<br>03118814A |
|---|---|---|---|

CONVICTED OF:

| COUNT 01 | PC459:SECOND DEGREE | BURGLARY |
| ALLEGATION | PC186.22(b)(1) | CRIME COMMITTED TO BENEFIT CRIMINAL CONDUCT OF STREET GANG |
| COUNT 02 | PC136.1(b)(1) | PREVENT/DISSUADE WITNESS/VICTIM FROM REPORTING A CRIME |
| ALLEGATION | PC186.22(b)(1) | |
| ALLEGATION | PC12022.5(a)(1) | PERSONAL USE OF A FIREARM |
| COUNT 03 | PC12025(b)(3) | HAVING CONCEALED FIREARM IN VEHICLE |
| ALLEGATION | PC186.22(b)(1) | |
| COUNT 04 | PC12031(a)(1) | CARRY LOADED FIREARM IN PUBLIC PLACE |
| ALLEGATION | PC186.22(b)(1) | |
| PRIOR | PC667(b)-(i)/668 | 1ST STRIKE PRIOR |

PLEA AGREEMENT:

Guilty by Jury.

RECOMMENDATION:  State Prison

RIGUEZ, JAVIER E
176087

**DEFENDANT(S):**

on, Jose Luis: Found Guilty by Jury of same charges and is scheduled for Probation Hearing and Sentencing on 09/15/03 at SBSC-14 at 9:00 am.

**LATED COURT DATA:**

one.

**OFFENSE:**

SOURCES OF INFORMATION for this section

Chula Vista Police reports.

In that the defendant was found guilty by a jury, additional information may have been provided to the Court, but not the undersigned officer. The following synopsis of the offense was obtained from provided police reports.

On 05/11/2003, at approximately 2:00 am, Chula Vista Police were dispatched to a vehicle burglary in process. The witness reported that two male suspects were breaking into a Volkswagen Jetta in an apartment complex parking lot. It was also reported that when the suspects were told that the police were going to be called, a handgun was fired into the air.(As to Count 2) The two suspects then got into a dark colored SUV and left the scene.

As the first officer arrived on the scene, a green Ford Explorer was leaving the parking lot with its headlights turned off. The officer followed the vehicle until additional vehicles arrived, and then a traffic stop was initiated. The Ford Explorer pulled over, and as the officer exited his vehicle, co-defendant Jose Leon, exited from the vehicle's passenger side and began running away from the vehicle. Initially, he did not follow officers commands to stop. A short distance later he stopped and was taken into custody.

While being arrested, Leon admitted to having a gun. A loaded .22 caliber Luger handgun was found in his waistband.(As to Counts 3 and 4) Also, 13 rounds of .22 caliber ammunition was discovered in his pockets.

Leon stated that he had just purchased the gun and did not have a permit. A records check on the gun's serial number was conducted with negative findings.

It was also noted that there was an odor of an alcoholic beverage coming from Leon.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 90 of 111
Case 2:03-cv-02310-JVS-SS    Document 1-5    Filed 04/08/2008    Page 40 of 50  09/15/200?

ORIGINAL
2176087                                                                        0172

driver of the vehicle, the defendant, Javier Rodriguez was removed from the vehicle at gunpoint. He was non-compliant with the directives of the officers, and was physically taken to the ground. In that Leon had been in possession of a gun, and Rodriguez was non-compliant and intoxicated, he was shot with a taser gun. Rodriguez was finally able to be detained and handcuffed. After his arrest, he continued to be physically and verbally non-compliant. A field sobriety test was conducted with negative results.

The vandalized vehicle, a white Jetta, had both its driver and passenger side windows broken. The automatic gear shift was also broken. The glove compartment was open and there was a brick lying on the front passenger floorboard. Near the vehicle, a crowbar and a .22 caliber casing was found on the ground. The victim, Donna Tucker, reported that her car manual, her work identification card and her gas card were missing. She thought that there may have been additional items taken from the vehicle.

The victim was driven to the defendants vehicle, and she was able to identify her car manual, an ID card, a gas card, a mini-headset telephone, and a small clock. The gas card was released to Tucker, while the other items were taken as evidence. (As to Count 1)

Both defendants were positively identified by witnesses. Leon was identified as the individual who broke into the vehicle, and Rodriguez was identified as the individual who shot the handgun.

After being Mirandized, both defendants refused to give a statement and were transported and booked into County Jail.

**VICTIMS:**

RESTITUTION: $250.00, to be paid jointly and severely with co-defendant Jose Leon.

VICTIM NOTIFIED OF P&S HEARING: Yes          INTENDS TO APPEAR: No

SOURCES OF INFORMATION for this section

See below.

A victim letter was mailed to DONNA TUCKER informing her of her rights per California law and requesting any information regarding any losses suffered as result of the instant matter.

Ms. Tucker reported that her vehicle was covered by insurance and the only restitution that she is seeking is $250 for her deductible. She did not wish to make any additional statements.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 91 of 111
Case 2:08-cv-02510-JVS-SS    Document 1-54    Filed 04/08/2008    Page 41 of 50    09/15/200

0173

176087

DEFENDANT'S STATEMENT:

SOURCES OF INFORMATION for this section

Interview with the defendant on 09/04/03 at the South Bay Detention Facility.

___

The defendant did not provide a written statement. He stated that on the night of the instant matter, he and Leon had gotten together. He explained that had known Leon's older brother, who is currently in State Prison. They began drinking and each took approximately 5 "rochas." He did not have any recollection of how they ended up at the vehicle, and added that he had no plan or intent to burglarize the vehicle. However, stated that his actions were "old behavior." When questioned about the gun, he stated that he had it in the vehicle for a long time, hidden in the spare tire. He explained that he fired the gun into the air "to show off," not to hurt anybody. Regarding his arrest, he stated that he was under the influence and was "slowed down" from the rochas. He explained that it was hard for him to follow the officers instructions and passed out numerous times during his arrest. He does not recall a sobriety test being conducted on him.

Over the past couple of years, the defendant reported that he has been "trying to do things right." He moved away from his neighborhood and has been supporting his wife and children. He described himself as a productive member of society.

He did admit to a drug and alcohol problem. He stated that while in custody, he has admitted to this addiction and realizes that he needs help. He has been attending Narcotics Anonymous, Alcoholics Anonymous, and Substance Abuse Classes while in custody.

Additionally, he has attended classes to receive his high school diploma, an HIV class, and parenting class. He has also requested information regarding the Delancey Street Treatment program in Los Angeles, which is a 2 year program for substance abuse and job training. In the future, he hopes to become a certified counselor, working with youth involved with gangs and drug abuse.

The defendant takes full responsibility for his actions, and although he is aware that a prison commit is likely, he hopes that the Judge will consider giving him another opportunity on Probation. If granted Probation, he will abide by its conditions.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 92 of 111
Case 2:08-cv-02310-JVS-SS    Document 1-5    Filed 04/08/2008    Page 42 of 50
GUEZ, XAVIER E
76087

09/15/2003

0174

CRIMINAL HISTORY:

SOURCES OF INFORMATION for this section

FBI and Local Computer Clearances.

| DATE | AGENCY | CHARGE | DISPOSITION |
|---|---|---|---|
| 09/1996 | CVPD | VC23152(b) Driving Under the Influence | S104534: 05/14/96; misd, pg, 3 yrs crt prob. 07/19/96; revk, wi. 12/30/96; revk, reins. 03/13/97; revk, wi. 04/04/97; revk, reins 06/03/97; revk. 07/01/97; remanded into custody 120 dys. 04/18/01; PC1203.4 petition granted. |
| 5/20/1997 | SDPD | Cnt 1 VC10851(a) Taking Vehicle w/out Owners Consent, Cnt 2 PC496 Buying Stolen Property, Cnt 3 PC466 Posses Burglary Tools. | SF-115773: 07/01/97; fel, pg cnt 1 3 yrs f prob. 01/05/98; revk. 01/26/99 revk, reins. 03/03/99; revk. 06/08/99; revk, reins. 04/16/01; PC1203.4 Petition granted. |

The defendant was arrested driving a stolen vehicle. At the time of his arrest, he was in possession of a screwdriver, a multi-tool, and several keys. He denied knowledge that the vehicle was stolen, reporting that he had borrowed it from a friend.

| | | | |
|---|---|---|---|
| 12/18/1998 | CVPD | VC14601.2 Driving on Suspended License after DUI Conviction. | S134726: 02/09/99; fta for arraign. bwi. 06/04/99; png. 07/06/99; pg, 3 yrs crt prob. |

| /1999 | SDPD | Cnt 1 PC459 Burglary Cnt 2 PC136.1 Preventing or Dissuading From Attending or Giving Testimony Cnt 3 Terrorist Threats | SCD-142327: 02/03/99; fel, png. 04/22/99; cop. 06/08/99; pg cnt 1 3 yrs f prob, $250 fine, $324 restit, 365 dys jl. |

defendant, after being asked to leave the victim's residence, was served by the victim in her garage taking a tire and a rim. She subsequently discovered that a total of four tires, four rims, a cell phone, and pager were missing. The defendant was identified by the victim and arrested by the police. The victim also reported receiving threatening telephone calls from the defendant and his friends. Upon his arrest, the defendant denied taking the items or making threatening calls to the victim. None of the property was ever recovered.

| 01/2000 | SDPD | VC14601.5 Driving While Privileges Suspended for Specific BAL | S146248: 02/03/00; png, misd. 02/24/00; cop, 3 yrs crt prob, fine. |

GUEZ, JAVIER E                                                                            09/15/2003
176087

0176

| /2003 | CVPD | COUNT 01<br>PC459:SECOND<br>DEGREE<br>BURGLARY<br>ALLEGATION<br>PC186.22(b)(1)<br>CRIME COMMITTED<br>TO BENEFIT<br>CRIMINAL<br>CONDUCT OF<br>STREET GANG<br>COUNT 02<br>PC136.1(b)(1)<br>PREVENT/DISSUADE<br>WITNESS/VICTIM<br>FROM<br>REPORTING A<br>CRIME<br>ALLEGATION<br>PC186.22(b)(1)<br>ALLEGATION<br>PC12022.5(a)(1)<br>COUNT 03<br>PC12025(b)(3)<br>HAVING CONCEALED<br>FIREARM IN<br>VEHICLE<br>ALLEGATION<br>PC186.22(b)(1)<br>COUNT 04<br>PC12031(a)(1)<br>CARRY LOADED<br>FIREARM IN<br>PUBLIC PLACE<br>ALLEGATION<br>PC136.22(b)(1)<br>PRIOR<br>PC667(b)-(i)/668<br>1ST STRIKE PRIOR | SCS-176087: GUILTY BY<br>JURY ALL FOUR COUNTS,<br>AND ALLEGATIONS PER<br>PC186.22(b)(1). INSTANT<br>MATTER. |

## PROBATION AND PAROLE:

SOURCES OF INFORMATION for this section

Local Computer Clearances and Probation records.

The defendant received his first misdemeanor and grant of Court probation in 1996 in case S104534 for Driving Under the Influence. This grant of Probation was revoked numerous times and was finally revoked with the defendant being remanded into custody for 120 days.

GUEZ, JAVIER E
6087

0177

so received his first felony conviction in case SF-115773. During
grant he was again non-compliant and his probation revoked on numerous
ions for failure to report, failure to test and possession of gang
hernalia. He also failed to remain law-abiding and received a second
emeanor conviction in case S134726 for Driving on a Suspended license
a new felony case SCD-142327 for Burglary.

serving 365 days in custody in case SCD-142327, although he initially
problems, as time went on, he appeared to adjust to Probation with no
cations. However, he did receive another misdemeanor conviction for
ving on a Suspended License. His grant was allowed to expire, with him
ng in compliance, on 06/07/2002.

though in the past, the defendant appeared to have had difficulties
usting to Probation, during his most recent grant of Probation his grant
red successfully.

## RSONAL DATA

he following information was offered by the defendant. Unless noted
herwise it has not been verified.

### irth Place and Areas of Residence:

he defendant was born in San Diego and has resided here his entire life.

### urrent Living Situation:

t the time of his arrest, he was living with his wife and their two
children.

### amily Relationships:

His parents are married and live in San Ysidro. He has 5 brothers and 3
sisters. Although he stated he is close to his mother and siblings, he
eeds to make "amends" with his father. According to him, his father was
emotionally and physically abusive while he was growing up.

### arital Status and Dependents:

He married his girlfriend of four years, Gloria, while he was in custody.
He states that she is very supportive of him. They have two sons, ages 3
and 6 months.

### amily Criminal History:

He stated that three of his brothers have been involved in gang activity.

### Acquaintances:

He spends his time with his wife and children.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 96 of 111
Case 2:08-cv-02310-JVS-SS    Document 1-5    Filed 04/08/2008    Page 46 of 50

09/15/200:

RIGUEZ, XAVIER E
176087

0178

**Social Activities:**

Enjoys sports.

**Education:**

defendant attended Southwest High School, however dropped out after the grade. He then attended continuation high school, but eventually received his GED through the Job Corp. While in custody, he has been taking classes in order to receive his high school diploma.

**Military Service:**

None.

**Employment History:**

At the time of his arrest, he was employed as a concrete finisher for a local union where he has been employed for approximately 1 1/2 years. In the past, he has been employed as a forklift operator, and doing warehouse work. When he was younger he worked for fast food restaurants.

Upon his release from custody, he will be able to return to his job.

**Financial Information:**

He stated that he had been "doing good." However, since his arrest, his credit card bills have gone unpaid and wife is receiving AFDC.

**Psychological and Medical Problems:**

Denies.

**Substance Abuse and Treatment History:**

At the age of 11, he first tried beer. By junior high his drinking had increased and he considered himself a "heavy" drinker. He admits to regular use of alcohol and believes that he has a drinking problem. At 11, he also began smoking marijuana everyday. He continued using on and off, however, has not used since he was last in custody. He also began experimenting with cocaine and methamphetamine at that age. He stated that he only used cocaine a couple of times, however, admits to currently using methamphetamine "on the weekends," last using the night of the instant matter. He has also use "rochas" on several occasions, including the night of his arrest. As a juvenile, he experimented with mushrooms, PCP and acid.

While he has been in custody, he has attended substance abuse classes, Narcotics Anonymous, and Alcoholics Anonymous. He stated that he has become aware that he has a problem with alcohol and drugs, and is ready to address the issue.

RIGUEZ, JAVIER E
176087

09/15/2003

0179

## Affiliation:

...has been involved in the "Sidro" gang since he was 11, however stated he has not affiliated with them recently. He stated he wants to leave life behind. He also stated that he would like to have his gang ...oos removed.

...CalGangs, the defendant is a documented gang member, who self-reported affiliation to SDPD in 1991. His moniker is "Casco" and also is know "Javi."

## Migration Status:

## Future Plans:

...five years, he hopes to be spending time with his family, having money, ...ing money for a house, and hopes to be volunteering his time with youth involved in gangs and drugs.

## COLLATERAL INFORMATION:

SOURCES OF INFORMATION for this section

See below.

In efforts to gather any additional information that may have come to light during the trial, DDA S. Roach and Defense Attorney B. Sanchez were contacted and messages were left.

Attorney Sanchez stated that this was a very tough case. He believes that the defendant is no longer a gang member, and has made substantial positive changes in his life, moving from his neighborhood, working and supporting his family. However, the defendant has a drug problem, which eventually led to the instant offense. Mr. Sanchez also added that he believes that since the instant matter the defendant has "seen the light."

In that it may not be clear what "rochas" are, the undersigned located information which identified "rochas" as a street name for Rohypnol, a sedative-hypnotic drug.

## SENTENCING DATA: AS TO ALL COUNTS

### Possible Circumstances in Mitigation:

Rule 4.423(a)(4):    Although not amounting to a defense, at the time of the instant matter, the defendant reported that he had been drinking and had taken 5 "rochas."

Rule 4.423(b)(6):    The defendant's performance on his last grant of Formal probation was satisfactory and was allowed to expire successfully.

RODRIGUEZ, JAVIER E
BCS-176087

0180

Possible Circumstances in Aggravation:

Rule 4.421(b)(2):     The defendant's prior convictions are numerous in that
he has three prior misdemeanors and 2 prior felonies,
one included a similar act in that the defendant stole
items from the victim and then he and his friends would
call and threaten her.

Rule 4.408(a):     At the time of his arrest, the defendant was non-
compliant and a taser gun needed to be used to
detain him.

Possible Circumstances in Mitigation and Aggravation: As to the
PC186.22(b)(1) allegation in Counts 1, 3, and 4.

None noted.

Possible Circumstances in Mitigation and Aggravation: As to the
PC12022.5(a)(1) allegation in Count 2.

None noted.

Prison Term Analysis:

The sentencing options available for Count 1 PC459, Count 2 PC136.1(b)(1),
Count 3 PC12025(b)(3), and Count 4 PC12031(a)(1)) are 16 months, 2 or 3
years.  In that the aggravating and mitigating factors appear balanced, the
recommendation would be for the middle term in each case.

The allegation per PC186.22(b)(1) carries an additional 1, 2, or 3 years
consecutive term for each felony which has been committed, at the Court's
discretion.  In that no mitigants or aggravants were noted, the
recommendation would be for the middle term of 2 years.  However, in that
Count 2 PC136.1(b)(1) is considered a violent felony, the allegation as to
that count is 10 years consecutive per PC186.22(b)(1)(C).

The allegation per PC12022.5(a)(1) carries an additional and consecutive
term of 3, 4, or 10 years.  In that no aggravating or mitigating factors
were noted, the presumptive middle term of 4 years is recommended.

In regards to concurrent vs. consecutive sentencing, consecutive sentencing
appears appropriate in Counts 1 and 2 per Rule 4.425(a)(1), that the crime
and objectives were predominately independent of each other.  Additionally
that Count 3 and 4 be stayed per PC654 in that it represents the same
course of conduct as in the PC12022.5(a)(1) allegation.  Furthermore, that
the PC186.22(b)(1) allegations in Counts 1,3, and 4 also be stayed per
PC654 in that they represent the same course of conduct as the allegation
in Count 2.

Additionally, the Strike prior per PC667(b)-(i) indicates that the given
term be doubled per PC667(e)(1).

Count 2 has been selected as the primary term in that it carries the most
custody time.

RODRIGUEZ, JAVIER E
CS-176087

0181

EVALUATION:

Probation Eligibility:

Rule 4.413(b):   The defendant is absolutely ineligible for Probation
pursuant to PC667(b)-(i).  Additionally, per PC1203.06(a)(1)(M), this
allegation makes the defendant absolutely ineligible for Probation.Due to
the ineligibility, circumstances supporting or denying a grant of
probation will not be addressed.

Discussion:

Appearing before the Court today is 26-year-old Javier Rodriguez, having
been found guilty by a jury of PC459 Burglary:Second Degree, PC136.1(b)(1)
Prevent/Dissuade Witness/Victim from Reporting a Crime, PC12025(a)(3)
Having Concealed Weapon in Vehicle, PC12031(a)(1) Carry Loaded Firearm in
Public Place,  PC186.22(b)(1) Crime for the Benefit of a Street Gang
allegation in each count, and a PC12022.5(a)(1) allegation in Count 2.  In
this case, the defendant and co-defendant Leon were observed burglarizing a
vehicle.  When witnesses informed them that they were going to call the
police, the defendant fired a handgun into the air.  They drove away from
the scene, however, were pulled over by police.  The defendant was non-
cooperative during the arrest and a taser gun needed to be used.  In that
he exhibited signs of being under the influence, a sobriety test was
conducted with negative results.  The co-defendant was found to have a
loaded .22 caliber handgun in his waistband. Additionally, property
belonging to the victim was located in their vehicle. After declining to
give a statement, he was transported and booked into County Jail.

The victim, Donna Tucker is requesting $250 in restitution for her
insurance deductible.  She did not wish to make any additional statements.
It is being requested that restitution be jointly and severely paid by the
defendants in the amount of $125 each.

In regards to the instant matter, the defendant stated he had no intentions
of burglarizing the vehicle, or harming anyone with the gun.  Although the
defendant reported that he was under the influence of alcohol and "rochas,"
at the time of the instant matter, he takes full responsibility for his
actions.  He described these actions as "old behavior."  Furthermore,
although the defendant is documented in Cal Gangs, he contends that he has
changed his life" by moving from his neighborhood and not affiliating with
his friends anymore.  Additionally, he stated that he now realizes that he
has substance abuse issues and hopes to address them.

In light of the proven "strike" prior and pursuant to PC1203.06(a)(1)(M),
he is absolutely ineligible for Probation..

Considering all the facts provided in this case, the undersigned
respectfully submits the following recommendation for the Court's approval.

RODRIGUEZ, JAVIER E
CS-176087

0182

## CUSTODY DATA:

| Date Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| 05/11/2003 | 09/15/2003 (In custody) | CJ | 128 |
| | | PC2933.1 credits | 19 |
| | | TOTAL CTS | 147 |

## RECOMMENDATION:

That probation be denied and the defendant be committed to the Department of Corrections for the term of 19 years 4 months with credit for time served of 128 actual days and 19 days 2933.1 PC credits, a total of 147 days credit; that the defendant pay a restitution fine pursuant to 1202.4(b) PC in the amount of $10,000 to be paid forthwith or as provided in 2085.5 PC, that restitution in the amount of $250.00 be paid jointly and severely with the co-defendant Jose Leon to victim Deborah Tucker ; further, that the defendant pay an additional restitution fine pursuant to 1202.45 PC in the amount of $10,000 to be suspended and remain so unless defendant's parole is revoked.

09/15/2003

CDC-176087

0183

### Term Recommendation Breakdown by Count is as Follows:

| Crime | Suggested Base Term | Recommended Term | Recommended Stay |
|---|---|---|---|
| Count 2 PC136.1(b)(1) Per PC667(b)-(i)) | mid - 4 years | 4 years | 0 |
| Allegation PC186.22(b)(1) | 10 years (consecutive) | 10 years | 0 |
| Allegation PC12022.5(a)(1) | mid- 4 years (consecutive) | 4 years | 0 |
| Count 1 PC459:Second Degree Per PC667(b)-(i)) | 1/3 mid - 16 months (consecutive) | 16 months | 0 |
| Allegation 186.22(b)(1) | mid - 2 years | 0 | 2 years stayed per 654 |
| Count 3 PC12025(b)(3) Per PC667(b)-(i)) | mid - 4 years | 0 | 4 years stayed per 654 |
| Allegation PC186.22(b)(1) | mid - 2 years | 0 | 2 years stayed per 654 |
| Count 4 PC12031(a)(1) Per PC667(b)-(i) | mid - 4 years | 0 | 4 years stayed per 654 |
| Allegation PC186.22(b)(1) | mid - 2 years | 0 | 2 years stayed per 654 |

Total term    19 years and 4 months

SAN DIEGO COUNTY PROBATION DEPARTMENT
PROBATION OFFICER'S SUPPLEMENTAL REPORT

OCT 14 2003

CLERK OF THE SUPERIOR COURT

BY C. MONTI

0184

[X] Appearance                          [] Ex Parte

PEOPLE OF THE STATE OF CALIFORNIA

vs.

RODRIGUEZ, JAVIER ESPINOZA

| COURT NO.           | DEPT & JUDGE            |
|---------------------|-------------------------|
| SCS-176087          | SBSC 14 HERNANDEZ, E.   |
| DA FILE NO.         | ATTORNEY - RET          |
| BAL57602            | SANCHEZ                 |
| DATE/TIME           | PROBATION OFFICER       |
| 10/14/2003  09:00AM | WOODWARD, K             |
| PROB. NO.           | PROB. OFFICER PHONE     |
| A-000788070         | (619)441-3483           |

ESPINOSA, JAVIER RODRIGUEZ

REASON FOR REPORT:

The defendant was last before this Court on 09/15/2003, at which time there were questions regarding the Prison Term breakdown. The information has been revised, and the defendant is before the Court today for sentencing.

Prison Term Analysis:

The sentencing options available for Count 1 PC459, Count 2 PC136.1(b)(1), Count 3 PC12025(b)(3), and Count 4 PC12031(a)(1)) are 16 months, 2 or 3 years. In that the aggravating and mitigating factors appear balanced, the recommendation would be for the middle term in each case.

The allegation per PC186.22(b)(1) carries an additional 2, 3, or 4 years consecutive term for each felony which has been committed, at the Court's discretion. In that no mitigants or aggravants were noted, the recommendation would be for the middle term of 3 years. However, in that Count 2 PC136.1(b)(1) is considered a serious felony, the allegation as to that count is 5 years consecutive per PC186.22(b)(1)(B).

The allegation per PC12022.5(a)(1) carries an additional and consecutive term of 3, 4, or 5 years. In that no aggravating or mitigating factors were noted, the presumptive middle term of 4 years is recommended.

In regards to concurrent vs. consecutive sentencing, consecutive sentencing appears appropriate in Counts 1 and 2 per Rule 4.425(a)(1), that the crimes and objectives were predominately independent of each other. Additionally, that Count 3 and 4 be stayed per PC654 in that it represents the same course of conduct as in the PC12022.5(a)(1) allegation. Furthermore, that the PC186.22(b)(1) allegations in Counts 1,3, and 4 also be stayed per PC654 in that they represent the same course of conduct as the allegation in Count 2.

Additionally, the Strike prior per PC667(b)-(i) indicates that the given term be doubled per PC667(e)(1).

Count 2 has been selected as the primary term in that it carries the most custody time.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 104 of 111
Case 2:08-cv-02310-INS-SS    Document 1-6    Filed 04/08/2008    Page 4 of 09/15/2003

0185

**Term Recommendation Breakdown by Count is as Follows:**

| Suggested Base Term | Recommended Term | Recommended Stay |
|---|---|---|
| mid - 4 years | 4 years | 0 |
| 5 years (consecutive) | 5 years | 0 |
| mid- 4 years (consecutive) | 4 years | 0 |
| 1/3 mid - 16 months (consecutive) | 16 months | 0 |
| mid - 3 years | 0 | 3 years stayed per 654 |
| mid - 4 years | 0 | 4 years stayed 654 |
| mid - 3 years | 0 | 3 years stayed per 654 |
| mid - 4 years | 0 | 4 years stayed per 654 |
| mid - 3 years | 0 | 3 years stayed per 654 |

**Total term    14 years and 4 months**

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 105 of 111
Case 2:08-cv-02570-JVS-SS    Document 1-6    Filed 04/08/2008    Page 5 of 50
JAVIER ESPIN
6087
06/15/2003
0186

DY DATA:

| Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| /2003 | 10/14/2003 | CJ | 157 |
| | | PC2933.1 credits | 23 |
| | | TOTAL CTS | 180 |

ENDATION:

probation be denied and the defendant be committed to the Department of Corrections
the term of 14 years 4 months with credit for time served of 157 actual days and 23
2933.1 PC credits, a total of 180 days credit; that the defendant pay a restitution
pursuant to 1202.4(b) PC in the amount of $10,000 to be paid forthwith or as provided
1085.5 PC, that restitution in the amount of $250.00 be paid jointly and severely with
co-defendant Jose Leon to victim Deborah Tucker ; further, that the defendant pay an
itional restitution fine pursuant to 1202.45 PC in the amount of $10,000 to be
pended and remain so unless defendant's parole is revoked.

                    Respectfully submitted,

                    DAVID E. CRANFORD
                    (Acting) Chief Probation Officer

                    By: Kelly Woodward
                    Kelly Woodward
                    DEPUTY PROBATION OFFICER

roved _____
    Elaine Villalpando, SUPERVISOR

ave read and considered the foregoing report.

                    JUDGE OF THE SUPERIOR COURT

/07/03 klw)
B.2185p (Rev. 07/24/03)

ADULT SERVICES                          SEP 16 2003      0187

PROBATION OFFICER'S REPORT

| PEOPLE OF THE STATE OF CALIFORNIA | COURT NO.<br>SCS-176087 | DEPT. & JUDGE<br>SBSC        DEPT. 14<br>HERNANDEZ, E. |
|---|---|---|
| v.<br><br>RODRIGUEZ, JAVIER E | DA FILE NO.<br>BAL57602 | ATTORNEY<br>SANCHEZ, B<br>RET |
| RODRIGUEZ, JAVIER ESPINOZA | HEARING DATE/TIME<br>09/15/2003<br>09:00AM | PROB CASE NO.<br>A-000788070 |
| ESPINOSA, JAVIER RODRIGUEZ | PROBATION OFFICER<br>WOODWARD, K | PO TEL. NO.<br>(619)441-3483 |

| ADDRESS<br>ALTADENA AVE<br>SAN DIEGO, CA 92115-5178 | TEL. NO.<br>(619)280-3925 | BIRTHPLACE/CITIZENSHIP<br>SAN DIEGO<br>CA<br>US |
|---|---|---|

| BIRTH DATE | AGE | RACE | SEX | HT | WT | EYES | HAIR |
|---|---|---|---|---|---|---|---|
| /10/1976 | 26 | HIS/LAT/MEX | MALE | 5'06" | 170 | BROWN | BLACK |

| DRIVER'S LIC.NO | INS. NO. | OTHER ID DATA |
|---|---|---|
| D04475839 | | TT RIGHT ARM "SIDRO", 3 DOTS LEFT HAND<br>ON CHEST CLOWN AND EVELIA |

| DATE OFFENSE COMMITTED<br>05/11/2003 | DATE CONVICTED<br>08/15/2003 | HOW<br>GUILTY BY JURY | CUSTODY STATUS<br>CUSTODY |
|---|---|---|---|

| INVESTIGATING ARRESTING AGENCY<br>CHULA VISTA POLICE DEPARTMENT | DATE INFO FILED<br>06/09/2003 | SDSO SYSTEM NO.<br>94188 014154 |
|---|---|---|

| CII NO.<br>11432421 | FBI NO.<br>485416DB0 | ARREST REPORT NO.<br>0308732 | SDSO BOOKING NO.<br>03118814A |
|---|---|---|---|

**CONVICTED OF:**

COUNT 01        PC459:SECOND DEGREE    BURGLARY
ALLEGATION       PC186.22(b)(1)        CRIME COMMITTED TO BENEFIT CRIMINAL
                                        CONDUCT OF STREET GANG
COUNT 02        PC136.1(b)(1)        PREVENT/DISSUADE WITNESS/VICTIM FROM
                                        REPORTING A CRIME
ALLEGATION       PC186.22(b)(1)
ALLEGATION       PC12022.5(a)(1)        PERSONAL USE OF A FIREARM

COUNT 03        PC12025(b)(3)        HAVING CONCEALED FIREARM IN VEHICLE
ALLEGATION       PC186.22(b)(1)

COUNT 04        PC12031(a)(1)        CARRY LOADED FIREARM IN PUBLIC PLACE
ALLEGATION       PC186.22(b)(1)

PRIOR            PC667(b)-(i)/668        1ST STRIKE PRIOR


**RE PLEA AGREEMENT:**

Guilty by Jury.


**RECOMMENDATION:**  State Prison

09/15/2003

GUEZ, JAVIER E
6087

0188

FENDANT(S):

Jose Luis:  Found Guilty by Jury of same charges and is scheduled for
bation Hearing and Sentencing on 09/15/03 at SBSC-14 at 9:00 am.

TED COURT DATA:

OFFENSE:

RCES OF INFORMATION for this section

a Vista Police reports.

that the defendant was found guilty by a jury, additional information
have been provided to the Court, but not the undersigned officer.  The
lowing synopsis of the offense was obtained from provided police
ports.

05/11/2003, at approximately 2:00 am, Chula Vista Police were dispatched
a vehicle burglary in process.  The witness reported that two male
spects were breaking into a Volkswagen Jetta in an apartment complex
rking lot.  It was also reported that when the suspects were told that
police were going to be called, a handgun was fired into the air.(As to
unt 2)  The two suspects then got into a dark colored SUV and left the
ene.

the first officer arrived on the scene, a green Ford Explorer was
aving the parking lot with its headlights turned off.  The officer
llowed the vehicle until additional vehicles arrived, and then a traffic
top was initiated.  The Ford Explorer pulled over, and as the officer
ited his vehicle, co-defendant Jose Leon, exited from the vehicle's
assenger side and began running away from the vehicle.  Initially, he did
ot follow officers commands to stop.  A short distance later he stopped
nd was taken into custody.

hile being arrested, Leon admitted to having a gun.  A loaded .22 caliber
uger handgun was found in his waistband.(As to Counts 3 and 4)  Also, 13
ounds of .22 caliber ammunition was discovered in his pockets.

eon stated that he had just purchased the gun and did not have a permit.
records check on the gun's serial number was conducted with negative
findings.

It was also noted that there was an odor of an alcoholic beverage coming
from Leon.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 108 of 111
Case 3:08-cv-01007-H-CAB    Document 1-6    Filed 04/08/2008    Page 8 of 50  09/15/200?
08-176087

0189

the driver of the vehicle, the defendant, Javier Rodriguez was removed from the vehicle at gunpoint. He was non-compliant with the directives of the officers, and was physically taken to the ground. In that Leon had been in possession of a gun, and Rodriguez was non-compliant and intoxicated, he was shot with a taser gun. Rodriguez was finally able to be detained and handcuffed. After his arrest, he continued to be physically and verbally non-compliant. A field sobriety test was conducted with negative results.

The vandalized vehicle, a white Jetta, had both its driver and passenger side windows broken. The automatic gear shift was also broken. The glove compartment was open and there was a brick lying on the front passenger floorboard. Near the vehicle, a crowbar and a .22 caliber casing was found on the ground. The victim, Donna Tucker, reported that her car manual, her work identification card and her gas card were missing. She thought that there may have been additional items taken from the vehicle.

The victim was driven to the defendants vehicle, and she was able to identify her car manual, an ID card, a gas card, a mini-headset telephone, and a small clock. The gas card was released to Tucker, while the other items were taken as evidence. (As to Count 1)

Both defendants were positively identified by witnesses. Leon was identified as the individual who broke into the vehicle, and Rodriguez was identified as the individual who shot the handgun.

After being Mirandized, both defendants refused to give a statement and were transported and booked into County Jail.

VICTIMS:

RESTITUTION: $250.00, to be paid jointly and severely with co-defendant Jose Leon.

VICTIM NOTIFIED OF P&S HEARING: Yes        INTENDS TO APPEAR: No

SOURCES OF INFORMATION for this section

See below.

Victim letter was mailed to DONNA TUCKER informing her of her rights per California law and requesting any information regarding any losses suffered as result of the instant matter.

Ms Tucker reported that her vehicle was covered by insurance and the only restitution that she is seeking is $250 for her deductible. She did not wish to make any additional statements.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 109 of 111
RODRIGUEZ, JAVIER F.
Case 2:08-cv-02310-JVS-SS    Document 146    Filed 04/08/2008    Page 9 of 50
05-176087
09/15/2003
0190

**DEFENDANT'S STATEMENT:**

SOURCES OF INFORMATION for this section

Interview with the defendant on 09/04/03 at the South Bay Detention Facility.

The defendant did not provide a written statement. He stated that on the night of the instant matter, he and Leon had gotten together. He explained that had known Leon's older brother, who is currently in State Prison. They began drinking and each took approximately 5 "rochas." He did not have any recollection of how they ended up at the vehicle, and added that he had no plan or intent to burglarize the vehicle. However, stated that his actions were "old behavior." When questioned about the gun, he stated that he had it in the vehicle for a long time,' hidden in the spare tire. He explained that he fired the gun into the air "to show off," not to hurt anybody. Regarding his arrest, he stated that he was under the influence and was "slowed down" from the rochas. He explained that it was hard for him to follow the officers instructions and passed out numerous times during his arrest. He does not recall a sobriety test being conducted on him.

Over the past couple of years, the defendant reported that he has been trying to do things right." He moved away from his neighborhood and has been supporting his wife and children. He described himself as a productive member of society.

He did admit to a drug and alcohol problem. He stated that while in custody, he has admitted to this addiction and realizes that he needs help. He has been attending Narcotics Anonymous, Alcoholics Anonymous, and Substance Abuse Classes while in custody.

Additionally, he has attended classes to receive his high school diploma, an HIV class, and parenting class. He has also requested information regarding the Delancey Street Treatment program in Los Angeles, which is a year program for substance abuse and job training. In the future, he hopes to become a certified counselor, working with youth involved with drugs and drug abuse.

The defendant takes full responsibility for his actions, and although he is aware that a prison commit is likely, he hopes that the Judge will consider giving him another opportunity on Probation. If granted Probation, he will abide by its conditions.

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 110 of 111
RODRIGUEZ, JAVIER JR.
Case 2:06-cv-02310-JVS-SS    Document 5-6    Filed 04/08/2008    Page 10 of 50
09/15/2003
13-176087
0191

CRIMINAL HISTORY:

SOURCES OF INFORMATION for this section

III/FBI and Local Computer Clearances.

| DATE | AGENCY | CHARGE | DISPOSITION |
|---|---|---|---|
| 09/09/1996 | CVPD | VC23152(b) Driving Under the Influence | S104534: 05/14/96; misd, pg, 3 yrs crt prob. 07/19/96; revk, wi. 12/30/96; revk, reins. 03/13/97; revk, wi. 04/04/97; revk, reins 06/03/97; revk. 07/01/97; remanded into custody 120 dys. 04/18/01; PC1203.4 petition granted. |
| 05/20/1997 | SDPD | Cnt 1 VC10851(a) Taking Vehicle w/out Owners Consent, Cnt 2 PC496 Buying Stolen Property, Cnt 3 PC466 Posses Burglary Tools. | SF-115773:  07/01/97; fel, pg cnt 1 3 yrs f prob. 01/05/98; revk. 01/26/99 revk, reins. 03/03/99; revk. 06/08/99; revk, reins. 04/16/01; PC1203.4 Petition granted. |

defendant was arrested driving a stolen vehicle.  At the time of his arrest, he was in possession of a screwdriver, a multi-tool, and several keys.  He denied knowledge that the vehicle was stolen, reporting that he had borrowed it from a friend.

| DATE | AGENCY | CHARGE | DISPOSITION |
|---|---|---|---|
| 09/18/1998 | CVPD | VC14601.2 Driving on Suspended License after DUI Conviction. | S134726: 02/09/99; fta for arraign. bwi. 06/04/99; png. 07/06/99; pg, 3 yrs crt prob. |

Case 3:08-cv-01007-H-CAB    Document 1-3    Filed 06/03/2008    Page 111 of 111
RODRIGUEZ, JAVIER E.    09/15/2003
Case 2:08-cv-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 11 of 50    0192
5-176087

| /11/1999 | SDPD | Cnt 1 PC459 Burglary Cnt 2 PC136.1 Preventing or Dissuading From Attending or Giving Testimony Cnt 3 Terrorist Threats . | **SCD-142327:** 02/03/99; fel, png. 04/22/99; cop. 06/08/99; pg cnt 1 3 yrs f prob, $250 fine, $324 restit, 365 dys jl. |

The defendant, after being asked to leave the victim's residence, was observed by the victim in her garage taking a tire and a rim.  She subsequently discovered that a total of four tires, four rims, a cell phone, and pager were missing.  The defendant was identified by the victim and arrested by the police.  The victim also reported receiving threatening telephone calls from the defendant and his friends.  Upon his arrest, the defendant denied taking the items or making threatening calls to the victim.  None of the property was ever recovered.

| /01/2000 | SDPD | VC14601.5 Driving While Privileges Suspended for Specific BAL | **S146248:** 02/03/00; png, misd. 02/24/00; cop, 3 yrs crt prob, fine. |

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 1 of 132
Case 2:08-cv-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 12 of 50
SCS-176087                                7

09/15/2003

0193

5/11/2003      CVPD

COUNT 01
PC459:SECOND
DEGREE
BURGLARY
ALLEGATION
PC186.22(b)(1)
CRIME COMMITTED
TO BENEFIT
CRIMINAL
CONDUCT OF
STREET GANG
COUNT 02
PC136.1(b)(1)
PREVENT/DISSUADE
WITNESS/VICTIM
FROM
REPORTING A
CRIME
ALLEGATION
PC186.22(b)(1)
ALLEGATION
PC12022.5(a)(1)
COUNT 03
PC12025(b)(3)
HAVING CONCEALED
FIREARM IN
VEHICLE
ALLEGATION
PC186.22(b)(1)
COUNT 04
PC12031(a)(1)
CARRY LOADED
FIREARM IN
PUBLIC PLACE
ALLEGATION
PC136.22(b)(1)
PRIOR
PC667(b)-(i)/668
1ST STRIKE PRIOR

SCS-176087: GUILTY BY
JURY ALL FOUR COUNTS,
AND ALLEGATIONS PER
PC186.22(b)(1). INSTANT
MATTER.

**PROBATION AND PAROLE:**

SOURCES OF INFORMATION for this section

Local Computer Clearances and Probation records.

The defendant received his first misdemeanor and grant of Court probation in 1996 in case S104534 for Driving Under the Influence. This grant of probation was revoked numerous times and was finally revoked with the defendant being remanded into custody for 120 days.

Case 3:08-cv-01007-H-CAB    Document 1-4    ·    Filed 06/03/2008    Page 2 of 132
RDRIGUEZ, JAVIER 10-JVS-SS    Document 186    Filed 04/08/2008    Page 13 of 50 09/15/2003
Case 2:08-cv-023 10
-176087

0194

also received his first felony conviction in case SF-115773. During his grant he was again non-compliant and his probation revoked on numerous occasions for failure to report, failure to test and possession of gang paraphernalia. He also failed to remain law-abiding and received a second misdemeanor conviction in case S134726 for Driving on a Suspended license and a new felony case SCD-142327 for Burglary.

After serving 365 days in custody in case SCD-142327, although he initially had problems, as time went on, he appeared to adjust to Probation with no revocations. However, he did receive another misdemeanor conviction for Driving on a Suspended License. His grant was allowed to expire, with him being in compliance, on 06/07/2002.

Although in the past, the defendant appeared to have had difficulties adjusting to Probation, during his most recent grant of Probation his grant expired successfully.

## PERSONAL DATA

The following information was offered by the defendant. Unless noted otherwise it has not been verified.

### Birth Place and Areas of Residence:

The defendant was born in San Diego and has resided here his entire life.

### Current Living Situation:

At the time of his arrest, he was living with his wife and their two children.

### Family Relationships:

His parents are married and live in San Ysidro. He has 5 brothers and 3 sisters. Although he stated he is close to his mother and siblings, he needs to make "amends" with his father. According to him, his father was emotionally and physically abusive while he was growing up.

### Marital Status and Dependents:

He married his girlfriend of four years, Gloria, while he was in custody. He states that she is very supportive of him. They have two sons, ages 3 and 6 months.

### Family Criminal History:

He stated that three of his brothers have been involved in gang activity.

### Acquaintances:

He spends his time with his wife and children.

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 3 of 132
Case 2:03-cv-02310-JVS-SS    Document 196    Filed 04/08/2008    Page 14 of 50 09/15/2003
176087

0195

**Social Activities:**

enjoys sports.

**Education:**

defendant attended Southwest High School, however dropped out after the
grade. He then attended continuation high school, but eventually
received his GED through the Job Corp. While in custody, he has been
taking classes in order to receive his high school diploma.

**Military Service:**

none.

**Employment History:**

the time of his arrest, he was employed as a concrete finisher for a
local union where he has been employed for approximately 1 1/2 years. In
the past, he has been employed as a forklift operator, and doing warehouse
work. When he was younger he worked for fast food restaurants.

Upon his release from custody, he will be able to return to his job.

**Financial Information:**

stated that he had been "doing good." However, since his arrest, his
credit card bills have gone unpaid and wife is receiving AFDC.

**Psychological and Medical Problems:**

denies.

**Substance Abuse and Treatment History:**

the age of 11, he first tried beer. By junior high his drinking had
increased and he considered himself a "heavy" drinker. He admits to
regular use of alcohol and believes that he has a drinking problem. At 11,
also began smoking marijuana everyday. He continued using on and off,
however, has not used since he was last in custody. He also began
experimenting with cocaine and methamphetamine at that age. He stated that
only used cocaine a couple of times, however, admits to currently using
methamphetamine "on the weekends," last using the night of the instant
offer. He has also use "rochas" on several occasions, including the night
this arrest. As a juvenile, he experimented with mushrooms, PCP and
acid.

While he has been in custody, he has attended substance abuse classes,
Narcotics Anonymous, and Alcoholics Anonymous. He stated that he has
become aware that he has a problem with alcohol and drugs, and is ready to
address the issue.

0196

**Affiliation:**

has been involved in the "Sidro" gang since he was 11, however stated that he has not affiliated with them recently. He stated he wants to leave that life behind. He also stated that he would like to have his gang tattoos removed.

Per CalGangs, the defendant is a documented gang member, who self-reported his affiliation to SDPD in 1991. His moniker is "Casco" and also is know "Javi."

**Immigration Status:**

N/A

**Future Plans:**

In five years, he hopes to be spending time with his family, having money, saving money for a house, and hopes to be volunteering his time with youth involved in gangs and drugs.

**COLLATERAL INFORMATION:**

SOURCES OF INFORMATION for this section

see below.

In efforts to gather any additional information that may have come to light during the trial, DDA S. Roach and Defense Attorney B. Sanchez were contacted and messages were left.

Attorney Sanchez stated that this was a very tough case. He believes that the defendant is no longer a gang member, and has made substantial positive changes in his life, moving from his neighborhood, working and supporting his family. However, the defendant has a drug problem, which eventually led to the instant offense. Mr. Sanchez also added that he believes that since the instant matter the defendant has "seen the light."

So that it may not be clear what "rochas" are, the undersigned located information which identified "rochas" as a street name for Rohypnol, a sedative-hypnotic drug.

**SENTENCING DATA: AS TO ALL COUNTS**

**Possible Circumstances in Mitigation:**

Rule 4.423(a)(4):    Although not amounting to a defense, at the time of the instant matter, the defendant reported that he had been drinking and had taken 5 "rochas."

Rule 4.423(b)(6):    The defendant's performance on his last grant of Formal probation was satisfactory and was allowed to expire successfully.

RIGUEZ, JAVIER E    09/15/2003
L176087

0197

**ible Circumstances in Aggravation:**

e 4.421(b)(2):    The defendant's prior convictions are numerous in that
he has three prior misdemeanors and 2 prior felonies,
one included a similar act in that the defendant stole
items from the victim and then he and his friends would
call and threaten her.

e 4.408(a):    At the time of his arrest, the defendant was non-
compliant and a taser gun needed to be used to
detain him.

**ssible Circumstances in Mitigation and Aggravation:** As to the
C186.22(b)(1) allegation in Counts 1, 3, and 4.

ne noted.

**ssible Circumstances in Mitigation and Aggravation:** As to the
C12022.5(a)(1) allegation in Count 2.

ne noted.

**rison Term Analysis:**

e sentencing options available for Count 1 PC459, Count 2 PC136.1(b)(1),
unt 3 PC12025(b)(3), and Count 4 PC12031(a)(1)) are 16 months, 2 or 3
ars. In that the aggravating and mitigating factors appear balanced, the
ecommendation would be for the middle term in each case.

e allegation per PC186.22(b)(1) carries an additional 1, 2, or 3 years
onsecutive term for each felony which has been committed, at the Court's
scretion. In that no mitigants or aggravants were noted, the
ecommendation would be for the middle term of 2 years. However, in that
unt 2 PC136.1(b)(1) is considered a violent felony, the allegation as to
at count is 10 years consecutive per PC186.22(b)(1)(C).

e allegation per PC12022.5(a)(1) carries an additional and consecutive
rm of 3, 4, or 10 years. In that no aggravating or mitigating factors
re noted, the presumptive middle term of 4 years is recommended.

n regards to concurrent vs. consecutive sentencing, consecutive sentencing
ppears appropriate in Counts 1 and 2 per Rule 4.425(a)(1), that the crimes
nd objectives were predominately independent of each other. Additionally,
at Count 3 and 4 be stayed per PC654 in that it represents the same
ourse of conduct as in the PC12022.5(a)(1) allegation. Furthermore, that
e PC186.22(b)(1) allegations in Counts 1,3, and 4 also be stayed per
C654 in that they represent the same course of conduct as the allegation
n Count 2.

dditionally, the Strike prior per PC667(b)-(i) indicates that the given
erm be doubled per PC667(e)(1).

ount 2 has been selected as the primary term in that it carries the most
ustody time.

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 6 of 132
RIGUEZ, JAVIER E Case 2:08-cv-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 17 of 50 09/15/2003
176087

0198

**VALUATION:**

**Probation Eligibility:**

Rule 4.413(b):  The defendant is absolutely ineligible for Probation pursuant to PC667(b)-(i).  Additionally, per PC1203.06(a)(1)(M), this allegation makes the defendant absolutely ineligible for Probation. Due to this ineligibility,  circumstances supporting or denying a grant of probation will not be addressed.

**Discussion:**

Appearing before the Court today is 26-year-old Javier Rodriguez, having been found guilty by a jury of PC459 Burglary:Second Degree, PC136.1(b)(1) Prevent/Dissuade Witness/Victim from Reporting a Crime, PC12025(a)(3) Having Concealed Weapon in Vehicle, PC12031(a)(1) Carry Loaded Firearm in Public Place,   PC186.22(b)(1) Crime for the Benefit of a Street Gang Allegation in each count, and a PC12022.5(a)(1) allegation in Count 2.   In this case, the defendant and co-defendant Leon were observed burglarizing a vehicle.  When witnesses informed them that they were going to call the police, the defendant fired a handgun into the air.  They drove away from the scene, however, were pulled over by police.  The defendant was non-cooperative during the arrest and a taser gun needed to be used.  In that he exhibited signs of being under the influence, a sobriety test was conducted with negative results.  The co-defendant was found to have a loaded .22 caliber handgun in his waistband. Additionally, property belonging to the victim was located in their vehicle. After declining to give a statement, he was transported and booked into County Jail.

The victim, Donna Tucker is requesting $250 in restitution for her insurance deductible.  She did not wish to make any additional statements. It is being requested that restitution be jointly and severely paid by the defendants in the amount of $125 each.

In regards to the instant matter, the defendant stated he had no intentions of burglarizing the vehicle, or harming anyone with the gun.  Although the defendant reported that he was under the influence of alcohol and "rochas," at the time of the instant matter, he takes full responsibility for his actions.  He described these actions as "old behavior."  Furthermore, although the defendant is documented in Cal Gangs, he contends that he has "changed his life" by moving from his neighborhood and not affiliating with his friends anymore.  Additionally, he stated that he now realizes that he has substance abuse issues and hopes to address them.

In light of the proven "strike" prior and pursuant to PC1203.06(a)(1)(M), he is absolutely ineligible for Probation..

Considering all the facts provided in this case, the undersigned respectfully submits the following recommendation for the Court's approval.

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 7 of 132
Case 2:05-cr-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 180 of 315/2003

0199

IGUE
176087

**CUSTODY DATA:**

| Date Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| 5/11/2003 | 09/15/2003 (In custody) | CJ | 128 |
| | | PC2933.1 credits | 19 |
| | | TOTAL CTS | 147 |

**RECOMMENDATION:**

That probation be denied and the defendant be committed to the Department of Corrections for the term of 19 years 4 months with credit for time served of 128 actual days and 19 days 2933.1 PC credits, a total of 147 days credit; that the defendant pay a restitution fine pursuant to 1202.4(b) PC in the amount of $10,000 to be paid forthwith or as provided in 2085.5 PC, that restitution in the amount of $250.00 be paid jointly and severely with the co-defendant Jose Leon to victim Deborah Tucker ; further, that the defendant pay an additional restitution fine pursuant to 1202.45 PC in the amount of $10,000 to be suspended and remain so unless defendant's parole is revoked.

Case 3:08-cv-01007-H-CAB  Document 1-4  Filed 06/03/2008  Page 8 of 132
Case 2:08-cv-02310-JVS-SS  Document 41-6  Filed 04/08/2008  Page 19 of 30
08/15/2003
0200

RGUEZ, JAVIER R
176087

## Term Recommendation Breakdown by Count is as Follows:

| me | Suggested Base Term | Recommended Term | Recommended Stay |
|---|---|---|---|
| nt 2<br>36.1(b)(1)<br>PC667(b)-(i)) | mid - 4 years | 4 years | 0 |
| llegation<br>186.22(b)(1) | 10 years<br>(consecutive) | 10 years | 0 |
| llegation<br>12022.5(a)(1) | mid- 4 years<br>(consecutive) | 4 years | 0 |
| nt 1<br>459:Second Degree<br>r PC667(b)-(i)) | 1/3 mid - 16 months<br>(consecutive) | 16 months | 0 |
| llegation<br>86.22(b)(1) | mid - 2 years | 0 | 2 years<br>stayed<br>per 654 |
| ount 3<br>C12025(b)(3)<br>er PC667(b)-(i)) | mid - 4 years | 0 | 4 years<br>stayed per<br>654 |
| llegation<br>C186.22(b)(1) | mid - 2 years | 0 | 2 years<br>stayed<br>per 654 |
| ount 4<br>C12031(a)(1)<br>er PC667(b)-(i) | mid - 4 years | 0 | 4 years<br>stayed<br>per 654 |
| llegation<br>C186.22(b)(1) | mid - 2 years | 0 | 2 years<br>stayed<br>per 654 |

**Total term    19 years and 4 months**

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 9 of 132
3:08-cv-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 20 of 50
09/15/2003

0201

Respectfully submitted,

DAVID E. CRANFORD
(Acting) Chief Probation Officer

By: *Kelly Woodward*

Kelly Woodward
DEPUTY PROBATION OFFICER

proved _____
     Elaine Villalpando, SUPERVISOR

have read and considered the foregoing report.

_____
JUDGE OF THE SUPERIOR COURT

9/01/03 klw)
PROB.2185 (Rev. 07/24/03)√√

0202

ATTORNEY OR PERSON WITHOUT ATTORNEY (N.  state bar number, and
)

Recording by County Recorder requested by and return to:
Name:
Address:
Unit No.:
City/State:
Zip Code:

TELEPHONE NO:          FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
☐ ATTORNEY FOR     ☐ JUDGMENT          ☐ ASSIGNEE OF
                        CREDITOR                RECORD

Insert name of court, branch court, if any, and post office, and street address:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
☐ County Courthouse, 220 W. Broadway, San Diego, CA 92101-3409
☐ East County Division, 250 E. Main St., El Cajon, CA 92020-3941
☐ Juvenile Division, 2851 Meadowlark Dr., San Diego, CA 92123
☐ North County Division, 325 S. Melrose Dr., Vista, CA 92063-6695
☐ South County Division, 500 3rd Ave., Chula Vista, CA 91910-5649

FOR RECORDER'S USE ONLY

CASE NUMBER: CS176087

CASE NAME: *Javier Rodriguez and Jose Leon*

FOR COURT USE ONLY

**ORDER FOR RESTITUTION AND ABSTRACT OF JUDGMENT**
(Penal Code, §§ 1202.4(f), 1214; Welfare and Institutions Code, § 730.6(h) & (i))

**ORDER FOR RESTITUTION**

1. a. ☒ On (date): 10/14/05
      defendant (name): *Jose Leon + Javier Rodriguez*
      was convicted of a crime that entitles the victim to restitution.
   b. ☐ On (date):
      child (name):
      was found to be a person described in Welfare and Institutions Code section
      602, which entitles the victim to restitution. ☐ Wardship is terminated.
   c. ☐ Parents or guardians jointly and severally liable (name each):

   d. ☐ Co-offenders found jointly and severally liable (name each):

2. Evidence was presented that the victim named above suffered losses as a result of defendant's/child's conduct.
   Defendant/child was informed of his or her right to a judicial determination of the amount of restitution and:
   a. ☐ a hearing was conducted.  b. ☐ stipulated to the amount of restitution to be ordered.  c. ☐ waived a hearing.

3. THE COURT ORDERS defendant/child to pay restitution to
   a. ☒ the victim (name): Donna Tucker                                   in the amount of: $ 250.00
   b. ☐ the State Victim Compensation Board, to reimburse payments to the victim(s) from the Restitution Fund,
      in the amount of: $
   c. ☐ plus interest at 10% per year from the date of ☐ loss
   d. ☐ plus attorney fees and collection costs in the sum of $_____          or ☐ sentencing
   e. ☐ plus a 10% administrative fee of the restitution owed (Pen. Code § 1202.4(l); Welf. & Inst. Code § 730.6(q))

4. The amount of restitution includes
   a. ☒ value of property stolen or damaged
   b. ☐ medical expenses
   c. ☐ lost wages or profits
      (1) ☐ incurred by victim due to injury
      (2) ☐ of victim's parent(s) or guardian(s) (if victim is a child) incurred while caring for the injured child
      (3) ☐ incurred by victim due to time spent as a witness or in assisting police or prosecution
      (4) ☐ of victim's parent(s) or guardian(s) (if victim is a child) due to time spent as a witness or in assisting or
         prosecution
   d. ☐ noneconomic losses (felony violations of Penal Code section 288 only)
   e. ☐ other (specify):

Date: _____                    _____
                                                      JUDICIAL OFFICER

**VICTIM TO RECEIVE CERTIFIED COPY FOR FILING WITH COUNTY RECORDER**

Form Approved for Optional Use
Judicial Council of California
CR-110/JV-790 (Rev. July 1, 2002)
[Rev. SDCDA/VRE July 1, 2002]

**ORDER FOR RESTITUTION
AND ABSTRACT OF JUDGMENT**

Penal Code, §§ 1202.4(f), 1214;
Welfare and Institutions Code, §730.6(h), (i)

Page One

0203

CASE NAME: *Javier Rodriguez + Jose Leon*    CASE NUMBER: *CS176087*

## NOTICE TO VICTIMS

PENAL CODE SECTION 1214 PROVIDES THAT ONCE A DOLLAR AMOUNT OF RESTITUTION HAS BEEN ORDERED, THIS ORDER IS THEN ENFORCEABLE AS IF IT WERE A CIVIL JUDGMENT. ALTHOUGH THE CLERK OF THE COURT IS NOT ALLOWED TO GIVE LEGAL ADVICE, YOU ARE ENTITLED TO ALL RESOURCES AVAILABLE UNDER THE LAW TO OBTAIN OTHER INFORMATION TO ASSIST IN ENFORCING THE ORDER.

THE ORDER DOES NOT EXPIRE UNDER PENAL CODE SECTION 1214(d).

THE VICTIM SHALL FILE A SATISFACTION OF JUDGMENT WITH THE COURT WHENEVER AN ORDER TO PAY RESTITUTION IS SATISFIED, PURSUANT TO PENAL CODE SECTION 1214(d).

## APPLICATION FOR ABSTRACT OF JUDGMENT

The ☐ judgment creditor    ☐ assignee of record    ☐ other *(specify)*:
applies for an abstract of judgment and represents the following:
a.    Judgment debtor's
                                Name and last known address                ⌐ *Javier Rodriguez*
                ⌐
                Name: *Jose Leon*
                Address:
                Unit No.:
                City/State:
                Zip Code:                                            ⌐

b. ☑ Driver's license No. and state: *none D3673306*    ☐ Unknown    *CA B4475839*
c. ☐ Social Security No.:                                 ☐ Unknown
d. ☑ Date of Birth: *9/27/84*                              ☐ Unknown    *10/10/76*

_____    ▶    _____
        (TYPE OR PRINT NAME)                    (SIGNATURE OF APPLICANT OR ATTORNEY)
                                            ☐ ON INFORMATION AND BELIEF

## ABSTRACT OF JUDGMENT

6.    I certify that the following is a true and correct judgment entered in this action.

7.    Judgment creditor *(name)*:
                                                            [SEAL]
        ☐ whose address or whose attorney's address appears on this form
            above the court's name.

8.    Judgment debtor *(full name as it appears in judgment)*:

9.    Judgment entered on *(date)*:

10.    Total amount of judgment as entered or last renewed: $

This abstract of judgment issued on *(date)*:

                                        Clerk, by _____, Deputy

## NOTICE TO COUNTY RECORDER

THIS ORDER IS ENFORCEABLE AS IF IT WERE A CIVIL JUDGMENT, PURSUANT TO PENAL CODE SECTION 1202.4(l) AND (m), PENAL CODE SECTION 1214, AND WELFARE AND INSTITUTIONS CODE SECTION 730.6(l) AND (r), AND FUNCTIONS AS AN ABSTRACT OF JUDGMENT.

Form Approved for Optional Use
Judicial Council of California
CR-110/JV-790 (Rev. July 1, 2002)
(Rev. SDCDA/VRE July 1, 2002)    **ORDER FOR RESTITUTION
AND ABSTRACT OF JUDGMENT**    Penal Code, §§ 1202.4(f), 1214;
Welfare and Institutions Code, §730.6(h), (l)

                                                                    Page Two

CR-110/JV-790 ADDENDUM

**FOR COURT USE ONLY**

0204

CASE NAME:

| **ADDENDUM TO ORDER FOR RESTITUTION AND ABSTRACT OF JUDGMENT** | CASE NUMBER: |
|---|---|

*[Continued from Page One and Page Two]*

1a. ☐

b. ☐

c. ☐

d. ☐

2. ☐

3. ☐

4. ☐

5. ☐

6. ☐

7. ☐

8. ☐

9. ☐

10. ☐

Date: _____    _____
                                                          JUDICIAL OFFICER

Form Approved for Optional Use
Judicial Council of California
CR-110/JV-790 [Rev. July 1, 2002]
[Rev. SDCDA/VRE July 1, 2002]

**ORDER FOR RESTITUTION
AND ABSTRACT OF JUDGMENT**

Penal Code, §§ 1202.4(f), 1214;
Welfare and Institutions Code, §730.6(h), (l)

Page Three

REPORTER TRANSCRIPTS ARGUMENTED

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA ) | FROM SAN DIEGO COUNTY |
| ) | |
| PLAINTIFF AND RESPONDENT,) | HON. ESTEBAN HERNANDEZ, |
| ) | JUDGE |
| VS. ) | |
| ) | APPEAL NO. D043198 |
| JAVIER RODRIGUEZ, ) | NO. SCS176087 |
| ) | |
| DEFENDANT AND APPELLANT. ) | **JURY VOIR DIRE** |
| ) | |

REPORTER'S TRANSCRIPT ON APPEAL -- AUGMENT

AUGUST 5, 2003

AUGUST 7, 2003

SAN DIEGO, CALIFORNIA

VOL. 1

PAGES 1 -- 174



APPEARANCES:

FOR THE PLAINTIFF AND RESPONDENT:    BILL LOCKYER
                                      ATTORNEY GENERAL
                                      STATE OF CALIFORNIA
                                      110 WEST A STREET
                                      SAN DIEGO, CA. 92101

FOR THE DEFENDANT AND APPELLANT:    ROBERT L. SWAIN
                                     ATTORNEY AT LAW
                                     964 FIFTH AVENUE, STE. 214
                                     SAN DIEGO, CA. 92101


REPORTED BY:  IRENE PERKINS, CSR 12727

1    CHULA VISTA, CALIFORNIA; TUESDAY, AUGUST 5, 2003; 10:36 A.M.

2              THE COURT: BEFORE WE GET STARTED, I WANTED TO JUST

3    PUT ON THE RECORD THAT I DID A LITTLE BIT OF RESEARCH, AND I

4    FOUND A CASE.  IT'S AN UNPUBLISHED CASE, BUT IT'S

5    NEVERTHELESS HELPFUL FOR IT'S ANALYSIS.  IT'S PEOPLE V.

6    RAMIREZ & SANDOVAL.  IT'S FOUND AT 2002 CAL.APP.UNPUB LEXIS

7    10665.  AND THE COURT NUMBER IS G029236.

8         THIS WAS A CASE DEALING WITH A VERY SIMILAR SITUATION

9    WHERE THE COURT -- THE TRIAL COURT WAS DECIDING WHETHER TO

10   ADMIT THE DEFENDANT'S JUVENILE ADJUDICATION.  AND THERE THE

11   TRIAL COURT DID ADMIT THE DEFENDANT'S JUVENILE COURT

12   ADJUDICATIONS AS EVIDENCE OF THE GANG ENHANCEMENT OF 186.22.

13   AND IT WAS OVER DEFENSE OBJECTION.

14        AND THE COURT OF APPEALS ON REVIEW FOUND THAT THAT WAS

15   PROPER.  AND, SPECIFICALLY, THE COURT OF APPEAL SAID, "THE

16   JURY WAS SUBSEQUENTLY INSTRUCTED THAT EVIDENCE OF THE

17   DEFENDANT'S PAST CRIMES WOULD BE CONSIDERED ONLY FOR THE

18   LIMITED PURPOSE OF DETERMINING IF IT TENDS TO SHOW, ONE, THE

19   PATTERN OF CRIMINAL GANG ACTIVITY, TWO, KNOWLEDGE OF ONE OF

20   THE PRIMARY ACTIVITIES OF THE LA JOLLA CRIMINAL STREET GANG."

21        AND THEN FURTHER ON, THE COURT OF APPEAL SAID, "BECAUSE

22   THE EVIDENCE WAS HIGHLY RELEVANT TO SHOW THAT MARK, AS A

23   MEMBER OF THE LA JOLLA CRIMINAL STREET GANG, ENGAGED IN A

24   PATTERN OF CRIMINAL GANG ACTIVITY, THE COURT'S DECISION TO

25   ADMIT HIS JUVENILE ADJUDICATION WAS NOT AN ABUSIVE

26   DISCRETION.  AND IT CITED TO PEOPLE V. FUNES, F-U-N-E-S,

27   WHICH IS '94 -- IT'S A 1994 CASE AT 23 CAL.APP.4TH 1506 CITE

28   1518.  SO THERE IT WAS A JUVENILE ADJUDICATION, AND IT WAS

1    THE DEFENDANT'S OWN PRIOR OFFENSES THAT WERE USED FOR THE

2    PREDICATE ACTS.  AND EVEN THOUGH IT'S NOT BINDING AUTHORITY,

3    SINCE IT'S AN UNPUBLISHED OPINION, NEVERTHELESS, THE ANALYSIS

4    SEEMS VERY PALPABLE.

5         AND AT THIS POINT, I'LL JUST OPEN IT UP AND ASK, SINCE I

6    LEFT IT OPEN AT THE END OF DAY, DID COUNSEL COME UP WITH ANY

7    ADDITIONAL AUTHORITY THAT YOU WANTED ME TO CONSIDER AT THIS

8    TIME?

9         MR. LEAHY:  NO, YOUR HONOR.  I DID NOT.

10        THE COURT:  MR. SANCHEZ?

11        MR. SANCHEZ:  NO, YOUR HONOR.

12        THE COURT:  OKAY.  ALL RIGHT.  OKAY.  IS THERE

13    ANYTHING ELSE THAT WE NEED TO TAKE UP BEFORE WE BRING IN THE

14    JURY?

15        MR. LEAHY:  YOUR HONOR, I JUST WANTED TO PUT ON THE

16    RECORD THAT I HAVE RETRIEVED JOSE LEON'S JUVENILE FILE

17    RELATING TO THIS 211, AND I HAVEN'T HAD A CHANCE TO

18    THOROUGHLY REVIEW IT.  BUT I WOULD ASK AT SOME POINT TO HAVE

19    A 402 HEARING AS TO WHETHER OR NOT THE CO-PARTICIPANTS IN

20    THAT CASE WERE OR WERE NOT SIDRO GANG MEMBERS.  THERE'S A

21    QUESTION IN MY MIND IN THE BRIEF REVIEW OF THE FILE THAT I

22    MADE AS TO WHETHER OR NOT THE OTHER KIDS THAT WERE INVOLVED

23    IN THAT -- AND I'M NOT SURE AT THIS POINT WHO WAS CHARGED --

24    WHETHER OR NOT THEY WERE OR WERE NOT SIDRO GANG MEMBERS.  SO

25    I JUST ASK THE COURT AT SOME POINT TO GIVE ME AN OPPORTUNITY

26    TO REQUEST THAT BEFORE WE GET INTO THAT QUESTION.

27        THE COURT:  OKAY.  AND THEN MAYBE TO SAVE SOME

28    TIME, WHEN THE GANG EXPERT WHO'S GOING TO TESTIFY COMES IN,

1    DO YOU WANT TO HAVE A DISCUSSION TO SEE IF THAT WOULD SAVE

2    TIME?

3              MR. LEAHY:  VERY GOOD, YOUR HONOR.

4              THE COURT:  OKAY.

5              MS. ROACH:  AND, YOUR HONOR, ADDITIONALLY, I THINK

6    THE POLICE REPORTS INDICATE THAT ALL FOUR OF THE INDIVIDUALS

7    CLAIMED SIDRO GANG MEMBERSHIP AT THE TIME THE CRIME WAS

8    COMMITTED.

9              THE COURT:  OKAY.  ANYTHING ELSE BEFORE WE CALL IN

10   THE JURY?

11             MR. LEAHY:  NO, YOUR HONOR.

12             THE COURT:  OKAY.

13             (AT 10:41 A.M. THE PROSPECTIVE JURORS ENTERED THE

14             COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD:)

15        GOOD MORNING, LADIES AND GENTLEMEN.  MY NAME IS JUDGE

16   ESTEBAN HERNANDEZ.  AND AT THIS TIME, I'M GOING TO HAVE THE

17   ATTORNEYS INTRODUCE THEMSELVES TO YOU.

18             MS. ROACH:  GOOD MORNING.  MY NAME IS SOPHIA ROACH.

19   I WORK FOR THE DISTRICT ATTORNEY'S OFFICE FOR THE COUNTY OF

20   SAN DIEGO.

21             MR. SANCHEZ:  GOOD MORNING, LADIES AND GENTLEMEN.

22   MY NAME IS BENJAMIN SANCHEZ.  I REPRESENT MR. JAVIER

23   RODRIGUEZ, WHO IS SEATED TO MY RIGHT.

24             MR. LEAHY:  I'M JERRY LEAHY.  I REPRESENT JOSE LUIS

25   LEON WHO IS IMMEDIATELY TO MY LEFT.

26             THE COURT:  OKAY.  THANK YOU.  NOW, LADIES AND

27   GENTLEMEN, LET ME EXPLAIN A LITTLE BIT ABOUT HOW WE'RE GOING

28   TO BE PROCEEDING THIS MORNING.  WE'RE GOING TO BE STARTING

1    AT HOME.  OCCUPATION, RETIRED CLERGY.  BUT I ALSO OWN MY OWN

2    BUSINESS, AND I'M STILL WORKING AT THAT.

3            THE COURT:  AND WHAT KIND OF BUSINESS IS IT?

4            PROSPECTIVE JUROR JANICE KISHPAUGH:  I SELL BOOKS

5    AND GAMES THAT PROMOTE POSITIVE VALUES.  MY EX-SPOUSE IS ALSO

6    RETIRED CLERGY.  I HAVE HAD A COUPLE OF PRIOR JURY

7    EXPERIENCES.  NO ASSOCIATION WITH LAW ENFORCEMENT.  NO

8    INVOLVEMENT IN ANY OF THE JUSTICE SYSTEMS.  I'VE HAD SEVERAL

9    BREAK-INS IN OUR HOME.  AND I SEE NO REASON WHY I CAN'T BE

10   IMPARTIAL.

11           THE COURT:  THANK YOU.

12       NUMBER 15, [JUROR NO. 8].

13           JUROR NO. 8:  MY NAME IS [JUROR NO. 8].  I'M A

14   RESIDENT OF BONITA.  I'M MARRIED WITH TWO TEENAGE CHILDREN.

15   I'M EMPLOYED AS AN EDUCATIONAL PSYCHOLOGIST WITH THE CHULA

16   VISTA SCHOOL DISTRICT.  MY SPOUSE IS AN ELEMENTARY SCHOOL

17   PRINCIPAL.  I'VE HAD ONE PRIOR JURY EXPERIENCE OVER 10 YEARS

18   AGO IN SAN DIEGO.  AND MY RESPONSES FROM 8 TO 11 ARE NO.

19           THE COURT:  OKAY.  THANK YOU.

20       NUMBER 16, MR. TOTH.

21           PROSPECTIVE JUROR MICHAEL TOTH:  MICHAEL TOTH.  I

22   LIVE IN CHULA VISTA.  MARRIED.  NO CHILDREN.  I MANAGE THE

23   LENDING FUNCTION FOR A COMMERCIAL BANK.  MY SPOUSE DOES

24   VOLUNTEER WORK.  NO PRIOR JURY EXPERIENCE.  NO ASSOCIATION

25   WITH LAW ENFORCEMENT.  NO INVOLVEMENT IN CRIMINAL, MILITARY,

26   CUSTOMS, OR IMMIGRATION.  I'VE BEEN A VICTIM OF -- I WAS

27   REAR-ENDED ON THE 805 BY AN UNINSURED MOTORIST, TOTALED MY

28   CAR, PUSHED ME INTO ANOTHER UNINSURED MOTORIST IN FRONT OF

GIOVANNI PALLAVICINI

1

2    BY MR. LEAHY:

3        Q.    MR. PALLAVICINI?

4        A.    YES.

5        Q.    AM I CLOSE?

6        A.    NO, BUT THAT'S ALL RIGHT.

7        Q.    PLEASE PRONOUNCE YOUR NAME FOR ME.

8        A.    PALLAVICINI.

9        Q.    MY WIFE SPEAKS SOME ITALIAN, AND SHE WOULD DO A

10    MUCH BETTER JOB THAN I DO.  IS THAT AN ITALIAN NAME?

11        A.    YES, IT IS.

12        Q.    OKAY.  SO YOU'VE INDICATED THAT YOU HAVE SOME

13    PROBLEM -- THAT'S NOT THE RIGHT WAY TO PUT IT.  YOU HAVE AN

14    AVERSION TO GANG MEMBERS.  WOULD THAT BE A WAY TO

15    CHARACTERIZE IT?

16        A.    YEAH, YOU CAN SAY THAT.

17        Q.    WHEN YOU SEE PEOPLE ON THE STREET THAT YOU THINK

18    MIGHT BE ASSOCIATED WITH A GANG, YOU AVOID THOSE PEOPLE'S

19    CONTACT; IS THAT CORRECT?

20        A.    YEAH.

21        Q.    SIR, WHAT WE'RE LOOKING FOR IN THIS CASE IS, THERE

22    WILL BE EVIDENCE, WE BELIEVE, THAT WILL -- THE PROSECUTION

23    WILL TRY TO SHOW THAT THESE TWO YOUNG MEN ARE GANG MEMBERS.

24    YOU'LL HEAR THAT TESTIMONY, AND IT WILL BE UP TO YOU TO

25    DECIDE WHETHER THEY ARE OR ARE NOT GANG MEMBERS.  DO YOU

26    UNDERSTAND THAT?

27        A.    YEAH, I UNDERSTAND.

28        Q.    NOW, SHE WILL PROBABLY HAVE A LAW ENFORCEMENT

1         CHULA VISTA, CALIFORNIA; AUGUST 7, 2003; 8:59 A.M.

2         THE COURT:  LET'S GO AHEAD AND GO ON THE RECORD.

3 JUST A QUICK SCHEDULING ISSUE ON THE RECORD.  ALL RIGHT.

4 CALLING THE CASE OF THE PEOPLE VERSUS JOSE LEON, AND JAVIER

5 RODRIGUEZ.  COUNSEL IS PRESENT.  DEFENDANTS ARE NOT PRESENT.

6 JURY IS NOT PRESENT.  I WANT TO RECONFIRM ON OUR SCHEDULING.

7 CAN YOU REFRESH MY RECOLLECTION OF WHY WE'RE DARK ON MONDAY?

8         MR. SANCHEZ:  MONDAY I HAVE SOME MEDICAL

9 APPOINTMENTS.

10         THE COURT: OH, IT WAS THE MEDICAL APPOINTMENT.

11         MR. SANCHEZ:  ON MONDAY, YES.

12         THE COURT:  AND THOSE ARE STILL FIRM?  THOSE CAN

13 NOT BE CHANGED?

14         MR. SANCHEZ:  YEAH, I CAN'T CHANGE THOSE.  NO, I

15 CAN'T CHANGE THEM.

16         THE COURT:  OKAY.  NOW, WITH REGARD TO TUESDAY THE

17 -- YOU HAVE --

18         MR. SANCHEZ:  I HAVE --

19         THE COURT:  -- INDICATED THAT YOU HAVE A LAWSUIT IN

20 LOS ANGELES WHERE YOU NEEDED TO BE THERE?

21         MR. SANCHEZ:  WELL, I'VE ELECTED NOT TO GO.

22         THE COURT:  OKAY.

23         MR. SANCHEZ:  SO I'LL BE HERE.

24         THE COURT:  AND YOU ARE NOT UNDER SUBPOENA IN THAT

25 CASE?

26         MR. SANCHEZ:  I'M NOT UNDER SUBPOENA.  I HAVE NO

27 ORDER.  SO I'M GOING TO CONTACT MY LAWYER AND TELL HIM TO

28 JUST PROCEED WITHOUT ME.

1            THE COURT:  OKAY.  I JUST WANT TO MAKE SURE THAT --

2            MR. SANCHEZ:  I WILL GIVE THEM THE NUMBER OF THIS

3    COURT IN CASE THEY WANT TO CALL DOWN AND CONFIRM WHERE I'M

4    AT.  BUT SINCE I'M NOT UNDER SUBPOENA, I DON'T SEE WHY I NEED

5    TO BE THERE.

6            THE COURT:  OKAY.  DO YOU WANT ME TO CALL THE JUDGE

7    AS A COURTESY JUST TO LET HIM KNOW THAT YOU'RE HERE, OR HOW

8    DO YOU -- DO YOU WANT ME TO DO ANYTHING IN THAT REGARD?

9            MR. SANCHEZ:  JUST TO LET THEM KNOW THAT I'M HERE

10   IF THEY NEED ME.

11           THE COURT:  OKAY.  SO YOU --

12           MR. SANCHEZ:  BUT I WILL BE REPRESENTED BY AN

13   ATTORNEY.

14           THE COURT:  SO YOU DO WANT ME TO CALL?

15           MR. SANCHEZ:  I GUESS, YOU KNOW, THE COURT CALLING

16   WOULD ADD MORE CREDIBILITY AS OPPOSED TO HAVING MY LAWYER

17   TELL THEM.  THEY NEVER BELIEVE LAWYERS ANYWAY.

18           THE COURT:  ALL RIGHT.  I'LL MAKE THAT CALL AND LET

19   HIM KNOW THAT YOU'RE IN TRIAL HERE.

20           MR. SANCHEZ:  THANK YOU.  I'D APPRECIATE IT.  SO

21   I'LL BE READY TO GO ON -- I'LL BE AVAILABLE TUESDAY AND

22   WEDNESDAY.

23           THE COURT:  AND THEN WITH REGARD TO THURSDAY?

24           MR. SANCHEZ:  THURSDAY I HAVE TO BE IN EL CENTRO.

25   I CAN'T IMAGINE THIS GOING THAT FAR.

26           THE COURT:  WELL, IN THE EVENT WE'RE STILL IN

27   TRIAL, THOUGH, I WOULD LIKE YOU TO BE HERE AVAILABLE TO GO.

28           MR. SANCHEZ:  WELL, I THINK WE'D BE IN TRIAL

1    PLEASE STEP OUTSIDE.

2              MS. ROACH:  YOUR HONOR, IF I COULD ASK THAT SHE BE

3    PLACED ON STANDBY SO THAT SHE DOESN'T HAVE TO WAIT IN THE

4    COURT.

5              THE COURT:  YES.  CALL HER BACK IN.

6         ALL RIGHT.  MS. LIMON, I JUST WANTED TO LET YOU KNOW,

7    I'M PLACING YOU ON STANDBY BECAUSE WE'RE NOT SURE EXACTLY

8    WHEN, IF WE MAY NEED YOU, WHEN THAT MIGHT BE, OKAY?  THANK

9    YOU.

10                    *Nothing from Sanchez!*

11                   MARTIN HERRERA,

12   HAVING BEEN FIRST DULY ADMINISTERED AN OATH IN ACCORDANCE

13   WITH CODE OF CIVIL PROCEDURE SECTION 2094, WAS EXAMINED AND

14   TESTIFIED AS FOLLOWS:

15

16             THE CLERK:  CAN YOU PLEASE STATE YOUR FULL NAME AND

17   SPELL YOUR LAST NAME FOR THE RECORD.

18             THE WITNESS:  MARTIN HERRERA.  IT'S H-E-R-R-E-R-A.

19             THE COURT:  YOU MAY PROCEED.

20                   **DIRECT EXAMINATION**

21   BY MS. ROACH:

22        Q.   MR. HERRERA, ARE YOU RELATED TO LAURA LIMON?

23        A.   YES, SHE'S MY WIFE.

24        Q.   DO YOU HAVE ANY CHILDREN TOGETHER?

25        A.   YES, MA'AM.

26        Q.   BACK ON MAY 11TH OF 2003, WERE YOU WITH YOUR WIFE

27   AND YOUR SON AND YOUR BROTHER DRIVING BACK FROM MEXICO?

28        A.   YES, WE WERE.

1       Q.    AND WHERE WERE YOU DRIVING TO?

2       A.    THE ADDRESS?

3       Q.    WELL, WHOSE HOUSE WAS IT THAT YOU WERE DRIVING TO?

4       A.    MY BROTHER.

5       Q.    AND IS THAT NEAR THE 200 BLOCK OF QUINTARD STREET

6   IN CHULA VISTA?

7       A.    YES, IT IS.

8       Q.    DO YOU REMEMBER APPROXIMATELY WHAT TIME IN THE

9   MORNING YOU ARRIVED AT THE 200 BLOCK OF QUINTARD STREET?

10      A.    LIKE 2:20 -- BETWEEN 2:30 AND 3 IN THE MORNING.

11      Q.    SO, EARLY IN THE MORNING?

12      A.    YEAH.

13      Q.    AND ONCE YOU GOT TO THE ADDRESS, DID YOU TRY TO

14   PARK THE VEHICLE THAT YOU WERE DRIVING?

15      A.    YES.

16      Q.    AND DID YOU PARK IN A PARKING STALL, OR DID YOU

17   PARK IT ON THE STREET OR IN THE LOT?

18      A.    IT WAS IN A PARKING STALL.

19      Q.    AND DID YOU NOTICE ANYTHING UNUSUAL AFTER PARKING

20   THE VEHICLE?

21      A.    WELL, WHEN WE FIRST WENT IN THE PARKING LOT, THERE

22   WAS AN EXPLORER, AND IT HAD THE DOOR OPEN.

23      Q.    DO YOU REMEMBER WHAT COLOR THE EXPLORER WAS?

24      A.    I THINK IT WAS GREEN.  IT WAS A DARK COLOR.

25      Q.    AND WHEN YOU SAID THAT THE DOOR WAS OPEN, WHICH

26   DOOR WAS OPEN?

27      A.    THE DRIVER'S DOOR.

28      Q.    AND WAS THERE ANY LIGHT COMING FROM IN THE CAR?

1          A.    YEAH, THE LIGHT WAS -- THAT'S HOW I NOTICED THAT

2     THE DOOR WAS OPEN.

3          Q.    WHAT HAPPENED NEXT?

4          A.    SO WHEN WE PARKED MY TRUCK, I TURNED AROUND AND SAW

5     THESE -- THESE GUYS LIKE IN MY BROTHER'S TRUCK, AND THEY

6     WERE, LIKE, MESSING WITH IT, SO I TURNED AROUND AND TOLD MY

7     BROTHER, "HEY, SOMEBODY'S MESSING WITH YOUR TRUCK."

8          Q.    NOW, WHEN YOU FIRST NOTICED THIS, DID YOU NOTICE

9     BECAUSE YOU SAW SOMETHING OR BECAUSE YOU HEARD SOMETHING?

10         A.    I HEARD SOMETHING.

11         Q.    WHAT EXACTLY DID YOU HEAR, IF YOU KNOW?

12         A.    LIKE, THEY WERE TRYING TO PULL THE GRILL.

13         Q.    WHAT PART OF THE TRUCK?  WERE THEY ON THE FRONT OR

14    THE BACK?

15         A.    IN THE FRONT.

16         Q.    IS THERE SOME KIND OF SPECIAL GRILL ON THE FRONT OF

17    YOUR BROTHER'S TRUCK?

18         A.    NO, IT'S AN OLD BEAT UP TRUCK.

19         Q.    WHEN YOU LOOKED OVER, COULD YOU SEE WHAT THE

20    INDIVIDUALS LOOKED LIKE?

21         A.    I SAW ONE, HE WAS LIKE -- HE WAS KIND OF DUCKING.

22         Q.    AND THE PERSON THAT WAS DUCKING, DID YOU SEE

23    ANYTHING ABOUT THEIR APPEARANCE?

24         A.    YEAH, IT WAS A SHORT ONE.

25         Q.    AND DID THAT PERSON HAVE HAIR?

26         A.    NO.

27         Q.    WHAT WERE THEY WEARING, IF YOU KNOW?

28         A.    NO, I DON'T KNOW WHAT THEY WERE WEARING.  THEY WERE



1    LIKE DARK CLOTHES.

2         Q.    DID THEY HAVE ON DIFFERENT CLOTHES BETWEEN THE TWO

3    OF THEM, OR DID THEY LOOK LIKE THEY WERE DRESSED THE SAME?

4              MR. LEAHY:    YOUR HONOR, THIS MISSTATES THE

5    EVIDENCE.    I THINK HE STATED HE ONLY SAW ONE PERSON.

6              THE COURT:    OVERRULED.    YOU MAY ANSWER.

7              THE WITNESS:    WHAT WAS THE QUESTION?    CAN YOU

8    REPEAT IT, PLEASE?

9    BY MS. ROACH:

10         Q.    DO YOU RECALL WHETHER THEY WERE DRESSED SIMILARLY

11    OR DIFFERENTLY?

12         A.    WELL, THEY WERE DRESSED, LIKE, YOU KNOW, NORMAL.

13    HOW CAN I SAY IT?    YOU KNOW, NOT -- THEY WERE NOT REAL

14    DRESSED.

15         Q.    WHAT I'M ASKING YOU IS, DID IT LOOK LIKE THEY WERE

16    WEARING THE SAME COLOR CLOTHING, OR DID ONE OF THEM HAVE ON A

17    DIFFERENT COLOR CLOTHING THAN THE OTHER?

18         A.    WELL, YEAH, ONE HAD DIFFERENT CLOTHES.    IT WAS

19    LIKE, I THINK, ONE WAS LIGHTER, AND THE OTHER ONE WAS DARK.

20         Q.    NOW, THE ONE WITH THE LIGHTER CLOTHES, WAS HE THE

21    TALL ONE OR THE SHORT ONE?

22         A.    THE TALL ONE.

23         Q.    AND DID YOU NOTICE ANYTHING ABOUT THE TALL ONE,

24    WHETHER OR NOT HE HAD ANY HAIR?

25         A.    NO.

26         Q.    YOU DIDN'T NOTICE, OR HE DIDN'T HAVE ANY HAIR?    I'M

27    SORRY.

28         A.    HE DIDN'T HAVE ANY HAIR.

1    Q.    NOW, AFTER YOU SAW THEM NEAR THE FRONT GRILL OF

2    YOUR BROTHER'S TRUCK, WHAT DID YOU DO?

3        A.    WELL, I TOLD MY WIFE TO TAKE MY KID INSIDE BECAUSE

4    I SAW HIM THERE.  AND ONE HAD LIKE A CROWBAR OR SOMETHING.

5        Q.    DID YOU SEE THAT IN HIS HANDS?

6        A.    WELL, HE DROPPED IT, AND I HEARD IT WHEN HE DROPPED

7    IT.

8        Q.    WAS THAT THE TALL ONE OR THE SHORT ONE THAT HAD THE

9    CROWBAR?

10        A.    THE TALL ONE.

11        Q.    AND WERE THEY ABLE TO SEE YOU?  IN OTHER WORDS, DID

12    YOU MAKE EYE CONTACT WITH THEM?

13        A.    YEAH, WE DID.

14        Q.    AFTER YOU ASKED YOUR WIFE TO GO INSIDE, DO YOU KNOW

15    WHETHER OR NOT SHE STAYED IN THE PARKING LOT, OR DID YOU SEE

16    HER GO INSIDE?

17        A.    NO, SHE JUST WALKED ALL THE WAY IN BECAUSE I TOLD

18    HER TO CALL 911.

19        Q.    AND AS FAR AS YOU KNOW, SHE LEFT THE PARKING LOT?

20        A.    EXACTLY.

21        Q.    NOW, AFTER YOUR WIFE LEFT THE PARKING LOT AND YOU

22    HEARD THE CROWBAR DROP, WHAT DID YOU SEE HAPPEN NEXT?

23        A.    WELL, I WALKED BEHIND MY WIFE ALL THE WAY IN, AND

24    WHEN I HEARD THE CROWBAR, I TURNED AROUND, AND THEY WERE

25    RIGHT THERE BREAKING INTO THE CAR.

26        Q.    WHEN YOU SAID, "BREAKING IN THE CAR," JUST NOW, YOU

27    MADE KIND OF A MOTION WITH YOUR ARM BENT AT THE ELBOW AND

28    MOVING BACK.  CAN YOU TELL US EXACTLY WHAT YOU SAW THEM DO TO

1    BREAK INTO THE CAR?

2        A.    WELL, I SAW THE TALL ONE WHEN HE BROKE THE WINDOW

3    OF THE JETTA OF THE CAR, AND THAT'S HE BROKE IT, LIKE, WITH

4    HIS ELBOW OR SOMETHING, AND THAT'S THE ONLY THING I SAW WHEN

5    I TURNED AWAY, BECAUSE I CONTINUED WALKING.  I JUST TURNED

6    AROUND AND SAW HIM WHEN HE BROKE IT.

7        Q.    COULD YOU HEAR THE WINDOW BREAKING?

8        A.    YEAH.

9        Q.    WHAT DID YOU SEE HAPPENED AFTER THE WINDOW WAS

10   BROKEN?

11       A.    HE WAS INSIDE THE CAR.  HE WAS TRYING TO READ

12   SOMETHING.  I DON'T KNOW WHAT HE WAS DOING.

13       Q.    NOW, DID YOU RECOGNIZE THE VEHICLE THAT HE WAS

14   BREAKING INTO AT ALL?

15       A.    YEAH.

16       Q.    AND HOW DID YOU RECOGNIZE IT?

17       A.    WELL, THE OWNER OF THE CAR, SHE LIVES LIKE ON TOP

18   OF US, LIKE ACROSS IN THE OTHER APARTMENTS, SO WE KNEW IT WAS

19   HER CAR.

20       Q.    ALL RIGHT.  NOW, DO YOU RECALL WHETHER OR NOT THERE

21   WAS ANY LIGHTS ON THE PARKING LOT?

22       A.    WHAT DO YOU MEAN?  WHAT KIND OF LIGHTS?

23       Q.    LIKE STREETLIGHTS OR OVERHEAD LIGHTS?

24       A.    YEAH.  WELL, THERE'S LIGHTS.

25       Q.    OKAY.  DID YOU HAVE ANY PROBLEMS SEEING EITHER OF

26   THE TWO PEOPLE THAT YOU SAW AROUND YOUR BROTHER'S CAR AND

27   AROUND THE JETTA?

28       A.    NO, I WAS RIGHT THERE, LIKE FROM WHERE YOU'RE --

1   WHERE YOU'RE AT.  THAT'S WHERE THEY'RE AT.

2       Q.   LIKE FROM YOU TO ME RIGHT NOW?

3       A.   YEAH.

4           MS. ROACH:  YOUR HONOR, CAN YOU GIVE US AN ESTIMATE

5   ON THE DISTANCE?

6           THE COURT:  RECORD WILL REFLECT APPROXIMATELY --

7   LET'S SEE -- 22 FEET FROM THE WITNESS STAND TO THE BAR, AND

8   SO YOU'RE ABOUT 2 FEET.  SO ABOUT 20 FEET.

9           MS. ROACH:  ABOUT 20 FEET.  OKAY.

10  BY MS. ROACH:

11      Q.   NOW, AT THIS POINT, WHAT WAS YOUR BROTHER DOING?

12      A.   WELL, I WALKED INSIDE BECAUSE 911, THEY DIDN'T WANT

13  TO RESPOND, AND THEY WERE LIKE, "WELL, WHAT'S YOUR NAME," AND

14  THIS AND THAT, AND I WAS LIKE, "YOU KNOW WHAT?  WE NEED HELP.

15  WE HAVE THESE CRIMINALS OVER HERE, BECAUSE THEY'RE ALL

16  STUMBLING AROUND, AND THEY'RE ON SOMETHING."  SO THAT'S WHEN

17  I GOT SCARED.  SO I WENT WITH MY KID, TOOK HIM IN.  I DON'T

18  KNOW WHAT MY BROTHER WAS DOING.  I DON'T KNOW.  HE STAYED

19  OUTSIDE LOOKING AT THEM.

20      Q.   SO DID YOU LEAVE THE APARTMENT DOOR OPEN OR SHUT

21  WHEN YOU WENT INSIDE?

22      A.   WELL, AT THE TIME WE LEFT IT OPEN, BUT, THEN, WHEN

23  I THINK, LIKE, WHEN MY BROTHER CAME BACK, BECAUSE I YELLED AT

24  THEM, BECAUSE WHEN THEY BROKE THE WINDOW I YELLED AT THEM,

25  "I'M GOING TO CALL THE POLICE.  YOU GUYS BETTER LEAVE."  SO

26  AT THAT TIME, WE WERE ALREADY IN FRONT OF THE DOOR OF THE

27  APARTMENT.

28      Q.   WHEN YOU SAY, "WE," YOU MEAN YOU, YOUR WIFE, AND

1    YOUR SON?

2         A.    EXACTLY.  AND MY BROTHER.

3         Q.    AND YOUR BROTHER.  NOW, ONCE THAT HAPPENED, WHAT

4    DID YOU DO ONCE YOU SAID THAT YOU WERE GOING TO CALL THE

5    COPS?

6         A.    WE WENT INSIDE, BECAUSE HE PULLED OUT A GUN.

7         Q.    I'M SORRY.  YOU WERE, OR YOU WERE NOT?  DID YOU SAY

8    YOU WERE INSIDE OR YOU WERE NOT?

9         A.    WE WERE GOING INSIDE RIGHT THERE.

10        Q.    OKAY.  AND WHEN YOU SAID THAT THEY PULLED OUT A

11   GUN, DID YOU SEE THEM PULL OUT A GUN?

12        A.    NO, I DIDN'T.  I ONLY HEARD THE SHOT.

13        Q.    WHEN YOU SAY YOU HEARD THE SHOT, WERE YOU CERTAIN

14   AT THAT TIME THAT THAT WAS A GUNSHOT?

15        A.    YEAH.

16        Q.    DO YOU HAVE EXPERIENCE IN FIRING GUNS?

17        A.    NO, BUT WHEN I TURNED AROUND, I DIDN'T SEE THE

18   GUNSHOT.  I SAW THE FIRE COME UP, SO I THOUGHT IT WAS A GUN.

19        Q.    WHEN YOU SAY YOU SAW THE FIRE COME OUT, TELL ME

20   EXACTLY -- WELL, FIRST OF ALL, IN THE LOCATION OF WHERE THE

21   FIRE WAS COMING FROM, WAS THAT IN THE LOCATION OF THE SHORT

22   ONE OR THE TALL ONE?

23        A.    IT WAS IN THE TALL ONES -- IT WAS IN THE LOCATION

24   OF THE SHORT ONE.

25        Q.    OKAY.  AND --

26        A.    AND THE TALL ONE WAS IN FRONT OF HIM.  SO THEY WERE

27   NOT LIKE -- HE WAS IN THE BACK, AND HE WAS, LIKE, WALKING

28   TOGETHER IN FRONT OF THE TALL ONE WAS, LIKE, WALKING TO THE

1    CAR, AND THE SHORT ONE WAS IN THE BACK.

2        Q.   AND WHEN YOU SAW THIS, I MEAN, WHAT WAS IT -- WAS

3    IT A FIRE, OR WAS IT A FLASH, WAS IT JUST A LIGHT?  WHAT

4    EXACTLY DID YOU SEE?

5        A.   IT WAS LIKE A LIGHT.

6        Q.   DID YOU SEE WHAT PART OF THE SHORT ONE'S BODY THAT

7    LIGHT WAS COMING FROM?

8        A.   NO, IT WAS UP IN THE AIR.

9        Q.   UP IN THE AIR?

10       A.   YEAH.

11       Q.   AND DID IT LOOK LIKE THE SHORT ONE WAS REACHING

12   OVER HIS HEAD?  YOU'VE MADE KIND OF A MOTION THAT THERE WAS

13   REACHING OVER THE HEAD?

14       A.   NO, I ONLY SAW, LIKE, THE FIRE COME OUT A LITTLE

15   BIT.  I DON'T KNOW WHAT IT WAS LIKE A LIGHT OR SOMETHING, BUT

16   I DON'T REMEMBER EXACTLY HOW HE HAD HIS HANDS.  ALL THE WAY

17   UP OR NO.

18       Q.   BUT DID IT APPEAR THAT HIS HAND WAS RAISED?

19       A.   WELL, YEAH.

20       Q.   AND FOR THE RECORD, WHEN YOU WERE DESCRIBING THAT,

21   YOU HAD YOUR ARM BENT AT THE ELBOW AND THEN YOU WERE RAISING

22   IT IN VARIOUS HEIGHTS UP ABOVE YOUR HEAD, CORRECT?

23       A.   WELL, IT'S KIND OF HARD TO SEE IT, SO I COULDN'T

24   SEE EXACTLY HOW HE HAD HIS HAND.  AND THEN IT HAPPENED SO

25   QUICK.  I WAS ALL EXCITED.  SO I DON'T KNOW EXACTLY HOW HE

26   HAD IT.

27       Q.   SO ONCE YOU HEARD THE GUNSHOT, AND YOU SAW THE

28   LIGHT, DID YOU GO INSIDE THE APARTMENT?

1    **CHULA VISTA, CALIFORNIA; THURSDAY, AUGUST 7, 2003; 1:32 P.M.**

2                    (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

3    OUT OF THE PRESENCE OF THE JURORS:)

4                    THE COURT:  THE RECORD WILL REFLECT COUNSEL IS

5    PRESENT, DEFENDANTS ARE PRESENT, THE JURY IS NOT PRESENT.  WE

6    HAVE A NOTE HERE FROM JUROR NUMBER 7.  IT READS:  "I HAVE

7    SOME CONCERNS REGARDING THE DEFENDANTS.  THEY LOOK FAMILIAR.

8    AT FIRST SIGHT, I THOUGHT I MIGHT HAVE SEEN THEM ON

9    TELEVISION, PARENTHESIS, NEWS.  THE MORE I LOOK AT THEM, I

10   THINK IT MIGHT BE SOMEWHERE ELSE, AND THIS CONCERNS ME.

11   COULD IT BE POSSIBLE FOR ME TO BE EXCUSED?  [JUROR NO. 7]."

12        I THINK WE SHOULD PROBABLY INQUIRE.

13                    MR. LEAHY:  WE SHOULD PROBABLY TALK TO HER.

14                    THE COURT:  LET'S BRING HER IN BY HERSELF.

15                    (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

16   IN THE PRESENCE OF JUROR NO. 7:)

17                    THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

18   JUROR NUMBER 7 IS PRESENT.  AND WE HAVE RECEIVED YOUR NOTE

19   CONCERNING THE FACT THAT YOU THINK THAT THE DEFENDANTS LOOK

20   FAMILIAR.  AND I NEED TO INQUIRE A LITTLE BIT MORE ABOUT

21   THIS.  AND THE RECORD WILL REFLECT THE JURY IS NOT PRESENT,

22   COUNSEL AND THE DEFENDANTS ARE PRESENT.

23        YOU MAY PROCEED.

24                    JUROR NO. 7:  I WAS JUST GOING TO SAY, AT FIRST

25   WHEN -- UPON FIRST SIGHT, LIKE I SAID, I THOUGHT THERE WAS

26   SOME KIND OF FAMILIARITY, AND I THOUGHT MAYBE IT COULD HAVE

27   BEEN FROM THE NEWS.  I DON'T KNOW.  I'M THINKING IT MIGHT NOT

28   BE.  I DON'T KNOW IF IT COULD BE.  I DON'T KNOW THEM, FIRST

1   OF ALL.  BUT THERE'S JUST, YOU KNOW, THEY LOOK FAMILIAR.  I

2   DON'T KNOW WHERE FROM.  I COULDN'T TELL YOU.  I COULDN'T TELL

3   YOU IF IT WAS, YOU KNOW, FROM THE RESTAURANT DOWN THE STREET.

4   I COULDN'T TELL YOU WHERE.  BUT IT MAKES ME UNCOMFORTABLE

5   KNOWING THIS.  I CAN'T GIVE YOU ANY SPECIFICS.  ALL I CAN SAY

6   IS I'M JUST NOT COMFORTABLE WITH IT.  I DON'T KNOW WHY, YOU

7   KNOW.

8           THE COURT:  WELL, LET ME ASK YOU THIS, THE FACT

9   THAT THEY LOOK FAMILIAR AND YOU'RE NOT SURE WHERE, THAT DOES

10  NOT CAUSE YOU TO PREJUDGE THE CASE, DOES IT?

11          JUROR NO. 7:  NO.  NO, I'M JUST -- I'M JUST NOT

12  COMFORTABLE WITH THAT, YOU KNOW.  MY INSTINCTS SAY SOMETHING

13  JUST DOESN'T FEEL RIGHT.

14          THE COURT:  OKAY.  NOW, THE FACT THAT YOU MAY OR

15  MAY NOT HAVE SEEN THEM IN THE PAST, DOES THAT AFFECT YOUR

16  ABILITY TO LOOK AT THE EVIDENCE AND MAKE A DETERMINATION

17  BASED SIMPLY ON EVIDENCE THAT COMES IN?

18          JUROR NO. 7:  JUST LOOKING, NO, OF COURSE.  I MEAN,

19  I KNOW WHAT YOU'RE --

20          THE COURT:  AND THEN WOULD YOU BE ABLE TO APPLY THE

21  LAW THAT I GIVE YOU, FACTS, AND FIND THEM BASED STRICTLY ON

22  THE EVIDENCE?

23          JUROR NO. 7:  YOUR WORDS, OF COURSE, MAKE PERFECT

24  SENSE, AND OF COURSE I CAN DO THAT.  LIKE I SAID, INTERNALLY,

25  I'M JUST NOT -- I DON'T KNOW.  I JUST DON'T FEEL COMFORTABLE.

26          THE COURT:  OKAY.  BUT SINCE YOU'RE NOT SURE FROM

27  WHAT CONTEXT, SENSING THAT THERE'S SOMETHING MORE, IS THERE A

28  FEAR, OR IS THERE SOME OTHER CONCERN?

1              JUROR NO. 7:  SURE, I GUESS IT COULD BE.  LIKE I

2     SAID, I DON'T KNOW THEM OR ANYTHING LIKE THAT.  BUT, YOU

3     KNOW, I GUESS MY FEAR WOULD BE, EASILY PUT, WOULD BE FEAR OF

4     RETALIATION ONE WAY OR ANOTHER.

5              THE COURT:  OKAY.  NOW, ONE THING I DID NOT MENTION

6     AT THE BEGINNING, AND WHICH I COULD -- WELL, LET ME DISCUSS

7     WITH THE ATTORNEYS.  BUT IT -- WELL, LET ME JUST SPEAK WITH

8     THE ATTORNEYS FOR A MOMENT WITHOUT THE REPORTER.

9              (SIDEBAR CONFERENCE HELD; NOT REPORTED.)

10             (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

11    IN THE PRESENCE OF JUROR NO. 7:)

12             THE COURT:  THE RECORD WILL REFLECT WE'RE BACK IN

13    THE COURTROOM.  COUNSEL ARE PRESENT, DEFENDANTS ARE PRESENT,

14    AND JUROR NUMBER 7 IS PRESENT.  AT THIS TIME, LET ME JUST

15    HAVE THE ATTORNEYS ASK SOME MORE QUESTIONS OF YOU.

16        MR. LEAHY.

17    BY MR. LEAHY:

18        Q.   HI.

19        A.   HI.

20        Q.   YOU USED THE WORD "RETALIATION" A MOMENT AGO.  DO

21    YOU REMEMBER THAT?  DO YOU REMEMBER USING THE WORD

22    "RETALIATION"?

23        A.   YES.

24        Q.   THAT SUGGESTS TO ME THAT BECAUSE THERE'S SOME GANG

25    OVERTONES IN THIS CASE, THAT YOU FEEL PERHAPS SOME FEAR ABOUT

26    YOUR INVOLVEMENT IN THE TRIAL; IS THAT CORRECT?

27        A.   YES.

28        Q.   I GUESS THE REAL QUESTION THAT WE NEED TO KNOW IS,

1    DO YOU THINK THAT YOU CAN SET THAT FEAR ASIDE AS YOU CONSIDER

2    THE EVIDENCE IN THIS CASE?

3         A.    I MEAN, ACADEMICALLY, OF COURSE, YES, I CAN.  BUT

4    LIKE I SAID, IT JUST -- SOMETHING JUST WASN'T SITTING WELL WE

5    ME.  AND I THOUGHT, YOU KNOW, I SHOULD SAY SOMETHING.

6         Q.    TO THE BEST OF MY KNOWLEDGE, THESE MEN HAVE NEVER

7    BEEN ON TELEVISION.  SO I DON'T THINK YOU WOULD HAVE SEEN

8    THEM BECAUSE OF THAT.  CERTAINLY THIS CASE DID NOT GET ANY

9    PUBLICITY.

10    DO YOU THINK THAT YOUR FEELINGS WOULD INFLUENCE HOW YOU

11    DECIDED THE ISSUES IN THIS CASE?  DO YOU THINK IT WOULD MAKE

12    YOU MORE PRONE TO FIND THESE YOUNG MEN GUILTY, OR MORE PRONE

13    TO FIND THEM NOT GUILTY?

14         A.    NO, I CAN FOLLOW THOSE INSTRUCTIONS.  I CAN DO

15    THAT, YOU KNOW, PUTTING LIKE -- I CAN SEPARATE MY EMOTIONS

16    FROM THAT.  BUT LIKE I SAID, SOMETHING JUST WASN'T SITTING

17    WELL WE ME.  AND I THOUGHT SINCE IT WAS MY CONCERN THAT I

18    SHOULD SPEAK UP BEFORE, YOU KNOW, I WENT ANY FURTHER.  THAT'S

19    ALL.

20         Q.    WE CERTAINLY APPRECIATE THAT.  BUT I THINK YOU CAN

21    UNDERSTAND OUR CONCERN, IS THAT WE NEED TO KNOW THAT YOU CAN

22    LISTEN FAIRLY AND OBJECTIVELY TO THE EVIDENCE, AND WHEN YOU

23    GO BACK INTO THE JURY ROOM, YOU CAN LEAVE ASIDE THOSE

24    FEELINGS, PRESUME THAT THESE GENTLEMEN ARE NOT GUILTY, AND

25    JUST LOOK AT THE EVIDENCE, AND SEE IF THE EVIDENCE CONVINCES

26    YOU OF THEIR GUILT.  DO YOU THINK YOU CAN DO THAT?

27         A.    YES, I CAN.  YOU KNOW, I WAS SITTING HERE, AND I'M

28    THINKING, "OKAY.  OF COURSE," LIKE I SAID, "I DON'T KNOW

1    THESE GENTLEMEN."  I'M THINKING, "YEAH, THEY COULD BE

2    INNOCENT, I DON'T KNOW.  THEY COULD BE GUILTY, I DON'T KNOW."

3    I DON'T KNOW WHAT THE OUTCOME IS GOING TO BE.  I JUST HAVE

4    THAT FEELING.  AND LIKE I SAID, I THOUGHT SINCE I WASN'T

5    FEELING COMFORTABLE WITH IT, LIKE I SAID, I SHOULD SPEAK UP.

6              MR. LEAHY:  I APPRECIATE THAT.  THANK YOU VERY

7    MUCH.

8              THE COURT:  THANK YOU.

9         MR. SANCHEZ, ANY QUESTIONS?

10             MR. SANCHEZ:  NO, YOUR HONOR.  NO, THANK YOU.

11             THE COURT:  MS. ROACH, ANY QUESTIONS?

12             MS. ROACH:  NO, YOUR HONOR.

13             THE COURT:  OKAY.  AND LET ME JUST INDICATE THAT

14   WHEN THE JURORS RETURN BACK INTO THE COURTROOM, I'M GOING TO

15   BE GIVING ALL THE JURORS AN ADMONISHMENT THAT YOUR NAME AND

16   ALL YOUR PERSONAL INFORMATION WILL BE SEALED PENDING FURTHER

17   COURT ORDER.  AND THAT IF THERE IS A REQUEST BY ANY ATTORNEY

18   FOR ANY PERSONAL INFORMATION, THAT WOULD COME TO THE COURT,

19   AND WITH NOTIFICATION TO YOU IN ADVANCE PRIOR TO ANYTHING

20   BEING GIVEN OUT.  DOES THAT MAKE YOU FEEL MORE AT EASE?

21             JUROR NO. 7:  IT DOES.

22             THE COURT:  OKAY.  ALL RIGHT.  OKAY.  WELL, THANK

23   YOU VERY MUCH.  AND AT THIS TIME, IF YOU'LL JUST STEP OUTSIDE

24   FOR A MOMENT.

25             JUROR NO. 7:  OKAY.  SORRY FOR THE INCONVENIENCE.

26             MR. SANCHEZ:  NO PROBLEM.

27             (WHEREUPON JUROR NO. 7 EXITED THE COURTROOM AND THE

28   FOLLOWING PROCEEDINGS WERE HELD:)

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 36 of 132
Case 2:08-cv-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 47 of 50
162

1          THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

2    THAT JUROR NO. 7 HAS LEFT THE ROOM.  COUNSEL ARE PRESENT,

3    DEFENDANTS ARE PRESENT.  AND MR. LEAHY.

4          MR. LEAHY:  YOUR HONOR, I JUST WOULD LIKE TO ASK

5    THE COURT TO EXCUSE HER BASED ON THE INFORMATION THAT WE

6    HAVE.

7          MR. SANCHEZ:  JOIN IN THE MOTION, YOUR HONOR.   *Trilateral Agreement!*

8          THE COURT:  MS. ROACH?

9          MS. ROACH:  I'LL STIPULATE TO THE COURT.

10          THE COURT:  BASED ON JUROR NUMBER 7'S COMMENTS, I

11   THINK SHE WAS JUST BEING CAREFUL, AND IN AN ABUNDANCE OF

12   CAUTION BECAUSE OF THE POSSIBILITY THAT SHE MAY HAVE SEEN

13   THEM IN THE PAST, SHE DOES EXPRESS CONCERN, AND SHE DID USE

14   THE WORD "RETALIATION" AT SOME POINT.  AND I THINK THE FACT

15   THAT THAT CAME AFTER LISTENING TO THE WITNESS, HERRERA'S

16   TESTIMONY, WHEREIN HE EXPRESSES SOME FEAR OF RETALIATION, MAY

17   HAVE PUT THAT THOUGHT IN HER MIND, BECAUSE CERTAINLY SHE DID

18   NOT COME FORWARD EARLIER ABOUT RECOGNIZING ANYBODY OR

19   ANYTHING OF THAT NATURE.  AND I THINK THAT THAT'S PROBABLY

20   SOMETHING, OR IN TERMS OF WHAT HAS CAUSED HER TO COME FORWARD

21   AND MAKE THE STATEMENTS.  BUT IT IS CLEAR FROM THE QUESTIONS,

22   THAT SHE WILL BE ABLE TO LISTEN TO THE EVIDENCE AND MAKE HER

23   DECISION SIMPLY ON THE EVIDENCE AND THE LAWS AS I INSTRUCT

24   HER.  AND, THEREFORE, THE REQUEST TO HAVE HER REMOVED AT THIS

25   TIME WILL BE DENIED.

26          AND WHAT I WILL DO IS, I WILL JUST MAKE A GENERAL

27   ADMONITION TO THE JURY WHEN THEY RETURN INTO THE COURTROOM

28   THAT ALL OF THEIR INFORMATION, INCLUDING THEIR NAMES, WILL BE

1    SEALED PENDING FURTHER COURT ORDER, AND WE WILL SIMPLY REFER

2    TO THEM BY THEIR SEAT NUMBER FROM NOW ON.  AND IF THERE -- IF

3    ANYBODY HAS ANY KIND OF CONCERN, I THINK THAT WILL HELP THEM.

4          OKAY.  SO AT THIS TIME, WE'LL CALL IN THE JURY.  AND

5    THIS NOTE WILL BE COURT'S EXHIBIT 3.

6                (WHEREUPON THE JURY ENTERED THE COURTROOM AND THE

7    FOLLOWING PROCEEDINGS WERE HAD:)

8          THE COURT:  OKAY.  LET ME HAVE JUST A MOMENT WITH

9    COUNSEL AND THE REPORTER.

10               (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

11   CHAMBERS OUT OF THE PRESENCE OF THE JURY:)

12         THE COURT:  THE RECORD WILL REFLECT COUNSEL AND I

13   ARE PRESENT OUTSIDE THE PRESENCE OF THE JURY.

14         I HAVE RECEIVED YET ANOTHER LETTER, AND THIS ONE IS

15   TYPED: "DEAR JUDGE HERNANDEZ, AFTER HEARING OPENING

16   STATEMENTS THIS MORNING, I FEEL THERE IS INFORMATION I NEED

17   TO PROVIDE YOU.  AS I STATED ON TUESDAY, AUGUST 5TH, DURING

18   JURY SELECTION, I PRESENTLY WORK AS A SCHOOL COUNSELOR IN

19   NATIONAL CITY.  BUT WITHIN THE NEXT TWO WEEKS, I PLAN TO BE

20   TAKING A COUNSELING POSITION AT SAN YSIDRO ADULT SCHOOL.  I

21   TELL YOU THIS BECAUSE IT WAS BROUGHT UP IN COURT THAT THE

22   SUSPECTS IN THE CASE COULD BE AFFILIATED WITH THE, QUOTE,

23   SIDRO, END QUOTE, GANG.

24         THE COUNSELING POSITION AT SAN YSIDRO ADULT SCHOOL

25   INVOLVES COMMUNITY OUTREACH, ALONG WITH BEING THE POINT OF

26   CONTACT WITH EDUCATIONAL AND VOCATIONAL OPPORTUNITIES AT THE

27   SCHOOL SITE FOR STUDENTS 17 YEARS OF AGE AND OLDER.  WORK

28   HOURS ARE MORNINGS, AFTERNOONS, AND EVENINGS, ALONG WITH AN

1    ADDITIONAL SATURDAY.

2        SUFFICE IT TO SAY, THERE IS CONTINUAL PUBLIC CONTACT.

3    FOR THE MOST PART, INDIVIDUALS ARE NOT TURNED AWAY FROM

4    ENROLLING IN CLASSES AT THE SCHOOL. BASICALLY, WE TRY TO

5    HELP ANYONE WHO WALKS IN THE DOOR ASKING FOR INFORMATION OR

6    ASSISTANCE. GIVEN THIS POSITION, IT IS LIKELY I WILL HAVE

7    CONTACT WITH PEOPLE WHO KNOW OF OR ARE INVOLVED WITH THE,

8    QUOTE, SIDRO, END QUOTE, GANG, OR MAY BE FAMILIAR WITH THIS

9    CASE. IT IS ALSO POSSIBLE I COULD HAVE CONTACT WITH THE

10   SUSPECTS THEMSELVES AT SOME POINT, AND/OR THEIRSELVES OR

11   FRIENDS. THERE MAY HAVE BEEN PEOPLE IN THE COURTROOM THIS

12   MORNING WHO PRESENTLY ARE STUDENTS AT THE SCHOOL WHO I AM NOT

13   AWARE OF.

14       THESE POSSIBILITIES, QUITE FRANKLY, ARE BOTHERSOME FOR

15   ME. I CANNOT GUARANTEE THAT MY DECISION IN THIS CASE WILL

16   NOT BE INFLUENCED BY THE POTENTIAL OF CONTACT WITH

17   INDIVIDUALS INVOLVED WITH THIS CASE AT SOME TIME IN THE

18   FUTURE. THEREFORE, I ASK YOU CONSIDER TO ALLOW ME BE REMOVED

19   FROM THIS CASE.

20       SINCERELY [JUROR NO. 10], JUROR NUMBER 10."

21       SO YET AGAIN WE HAVE ANOTHER JUROR COMING FORWARD WITH

22   SOME FEAR OF RETALIATION.

23           MS. ROACH: I'M NOT SURE IF IT'S FEAR OF

24   RETALIATION OR SIMPLY THAT HE'D BE AFFECTED IN SOME WAY OF

25   KNOWING THE PEOPLE.

26           THE COURT: HE SAYS "INFLUENCED AT SOME POINT IN

27   THE FUTURE."

28           MR. SANCHEZ: I'M ALSO CONCERNED THAT THESE JURORS

1   ARE TALKING TO ONE ANOTHER REGARDING THIS ISSUE OF

2   RETALIATION.

3          THE COURT:  WELL, I WILL AGAIN ADMONISH THEM THAT

4   THEY CANNOT BE TALKING WITH ANYONE, INCLUDING FELLOW JURORS,

5   ABOUT ANYTHING REGARDING THE CASE.

6          WHAT I SUGGEST WE DO IS WE ASK THIS INDIVIDUAL

7   SEPARATELY ABOUT THE EXTENT OF THAT CONCERN.

8          MS. ROACH:  THE OTHER THING IS THAT HE'S NOT GOING

9   TO BE STARTING THIS JOB FOR THE NEXT TWO WEEKS.  WE MAYBE WE

10  CAN EVEN DO AN ORDER WHERE HE IS NOT TO GO TO THE JOB UNTIL

11  HE'S COMPLETED HIS DELIBERATIONS.

12         MR. LEAHY:  WELL, I'M THINKING THAT WAS NOT WHAT

13  HE'S CONCERNED ABOUT.  HE'S CONCERNED ABOUT THE FUTURE.

14         THE COURT:  RIGHT.

15         MR. SANCHEZ:  WHEN HE DOES GO TO WORK.

16         THE COURT:  HIS CONCERN IS ABOUT ONCE HE'S AT THE

17  WORK SITE.

18         MS. ROACH:  SO I GUESS THAT IS A FEAR OF

19  RETALIATION.  I DON'T KNOW WHAT ELSE IT COULD BE.

20         THE COURT:  WELL, AT THIS POINT, LET'S DO THIS.

21  WE'LL ASK JUROR NUMBER 10 TO REMAIN, ASK THE OTHERS TO STEP

22  OUT WHILE WE JUST GO OVER IT.

23         MR. SANCHEZ:  YOU WANT TO BRING HIM BACK HERE, OR

24  YOU WANT TO TELL EVERYBODY TO LEAVE?

25         THE COURT:  WELL, LET'S BRING JUROR NUMBER 10 BACK.

26  THAT WILL PROBABLY BE BEST.

27         (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS IN

28  THE PRESENCE OF JUROR NO. 10:)

1    CHULA VISTA, CALIFORNIA; THURSDAY, AUGUST 7, 2003; 1:32 P.M.

2                    (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

3    OUT OF THE PRESENCE OF THE JURORS:)

4                    THE COURT:  THE RECORD WILL REFLECT COUNSEL IS

5    PRESENT, DEFENDANTS ARE PRESENT, THE JURY IS NOT PRESENT.  WE

6    HAVE A NOTE HERE FROM JUROR NUMBER 7.  IT READS:  "I HAVE

7    SOME CONCERNS REGARDING THE DEFENDANTS.  THEY LOOK FAMILIAR.

8    AT FIRST SIGHT, I THOUGHT I MIGHT HAVE SEEN THEM ON

9    TELEVISION, PARENTHESIS, NEWS.  THE MORE I LOOK AT THEM, I

10   THINK IT MIGHT BE SOMEWHERE ELSE, AND THIS CONCERNS ME.

11   COULD IT BE POSSIBLE FOR ME TO BE EXCUSED?  [JUROR NO. 7]."

12          I THINK WE SHOULD PROBABLY INQUIRE.

13                    MR. LEAHY:  WE SHOULD PROBABLY TALK TO HER.

14                    THE COURT:  LET'S BRING HER IN BY HERSELF.

15                    (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

16   IN THE PRESENCE OF JUROR NO. 7:)

17                    THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

18   JUROR NUMBER 7 IS PRESENT.  AND WE HAVE RECEIVED YOUR NOTE

19   CONCERNING THE FACT THAT YOU THINK THAT THE DEFENDANTS LOOK

20   FAMILIAR.  AND I NEED TO INQUIRE A LITTLE BIT MORE ABOUT

21   THIS.  AND THE RECORD WILL REFLECT THE JURY IS NOT PRESENT,

22   COUNSEL AND THE DEFENDANTS ARE PRESENT.

23          YOU MAY PROCEED.

24                    JUROR NO. 7:  I WAS JUST GOING TO SAY, AT FIRST

25   WHEN -- UPON FIRST SIGHT, LIKE I SAID, I THOUGHT THERE WAS

26   SOME KIND OF FAMILIARITY, AND I THOUGHT MAYBE IT COULD HAVE

27   BEEN FROM THE NEWS.  I DON'T KNOW.  I'M THINKING IT MIGHT NOT

28   BE.  I DON'T KNOW IF IT COULD BE.  I DON'T KNOW THEM, FIRST

1    OF ALL.  BUT THERE'S JUST, YOU KNOW, THEY LOOK FAMILIAR.  I

2    DON'T KNOW WHERE FROM.  I COULDN'T TELL YOU.  I COULDN'T TELL

3    YOU IF IT WAS, YOU KNOW, FROM THE RESTAURANT DOWN THE STREET.

4    I COULDN'T TELL YOU WHERE.  BUT IT MAKES ME UNCOMFORTABLE

5    KNOWING THIS.  I CAN'T GIVE YOU ANY SPECIFICS.  ALL I CAN SAY

6    IS I'M JUST NOT COMFORTABLE WITH IT.  I DON'T KNOW WHY, YOU

7    KNOW.

8             THE COURT:  WELL, LET ME ASK YOU THIS, THE FACT

9    THAT THEY LOOK FAMILIAR AND YOU'RE NOT SURE WHERE, THAT DOES

10   NOT CAUSE YOU TO PREJUDGE THE CASE, DOES IT?

11            JUROR NO. 7:  NO.  NO, I'M JUST -- I'M JUST NOT

12   COMFORTABLE WITH THAT, YOU KNOW.  MY INSTINCTS SAY SOMETHING

13   JUST DOESN'T FEEL RIGHT.

14            THE COURT:  OKAY.  NOW, THE FACT THAT YOU MAY OR

15   MAY NOT HAVE SEEN THEM IN THE PAST, DOES THAT AFFECT YOUR

16   ABILITY TO LOOK AT THE EVIDENCE AND MAKE A DETERMINATION

17   BASED SIMPLY ON EVIDENCE THAT COMES IN?

18            JUROR NO. 7:  JUST LOOKING, NO, OF COURSE.  I MEAN,

19   I KNOW WHAT YOU'RE --

20            THE COURT:  AND THEN WOULD YOU BE ABLE TO APPLY THE

21   LAW THAT I GIVE YOU, FACTS, AND FIND THEM BASED STRICTLY ON

22   THE EVIDENCE?

23            JUROR NO. 7:  YOUR WORDS, OF COURSE, MAKE PERFECT

24   SENSE, AND OF COURSE I CAN DO THAT.  LIKE I SAID, INTERNALLY,

25   I'M JUST NOT -- I DON'T KNOW.  I JUST DON'T FEEL COMFORTABLE.

26            THE COURT:  OKAY.  BUT SINCE YOU'RE NOT SURE FROM

27   WHAT CONTEXT, SENSING THAT THERE'S SOMETHING MORE, IS THERE A

28   FEAR, OR IS THERE SOME OTHER CONCERN?

1          JUROR NO. 7: SURE, I GUESS IT COULD BE. LIKE I

2    SAID, I DON'T KNOW THEM OR ANYTHING LIKE THAT. BUT, YOU

3    KNOW, I GUESS MY FEAR WOULD BE, EASILY PUT, WOULD BE FEAR OF

4    RETALIATION ONE WAY OR ANOTHER.

5          THE COURT: OKAY. NOW, ONE THING I DID NOT MENTION

6    AT THE BEGINNING, AND WHICH I COULD -- WELL, LET ME DISCUSS

7    WITH THE ATTORNEYS. BUT IT -- WELL, LET ME JUST SPEAK WITH

8    THE ATTORNEYS FOR A MOMENT WITHOUT THE REPORTER.

9          (SIDEBAR CONFERENCE HELD; NOT REPORTED.)

10          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

11    IN THE PRESENCE OF JUROR NO. 7:)

12          THE COURT: THE RECORD WILL REFLECT WE'RE BACK IN

13    THE COURTROOM. COUNSEL ARE PRESENT, DEFENDANTS ARE PRESENT,

14    AND JUROR NUMBER 7 IS PRESENT. AT THIS TIME, LET ME JUST

15    HAVE THE ATTORNEYS ASK SOME MORE QUESTIONS OF YOU.

16          MR. LEAHY.

17    BY MR. LEAHY:

18          Q.    HI.

19          A.    HI.

20          Q.    YOU USED THE WORD "RETALIATION" A MOMENT AGO. DO

21    YOU REMEMBER THAT? DO YOU REMEMBER USING THE WORD

22    "RETALIATION"?

23          A.    YES.

24          Q.    THAT SUGGESTS TO ME THAT BECAUSE THERE'S SOME GANG

25    OVERTONES IN THIS CASE, THAT YOU FEEL PERHAPS SOME FEAR ABOUT

26    YOUR INVOLVEMENT IN THE TRIAL; IS THAT CORRECT?

27          A.    YES.

28          Q.    I GUESS THE REAL QUESTION THAT WE NEED TO KNOW IS,

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 43 of 132
Case 2:08-cv-02310-JVS-SS    Document 1-6    Filed 04/08/2008    Page 45 of 50
160

1    DO YOU THINK THAT YOU CAN SET THAT FEAR ASIDE AS YOU CONSIDER

2    THE EVIDENCE IN THIS CASE?

3          A.    I MEAN, ACADEMICALLY, OF COURSE, YES, I CAN.   BUT

4    LIKE I SAID, IT JUST -- SOMETHING JUST WASN'T SITTING WELL WE

5    ME.   AND I THOUGHT, YOU KNOW, I SHOULD SAY SOMETHING.

6          Q.    TO THE BEST OF MY KNOWLEDGE, THESE MEN HAVE NEVER

7    BEEN ON TELEVISION.   SO I DON'T THINK YOU WOULD HAVE SEEN

8    THEM BECAUSE OF THAT.   CERTAINLY THIS CASE DID NOT GET ANY

9    PUBLICITY.

10    DO YOU THINK THAT YOUR FEELINGS WOULD INFLUENCE HOW YOU

11   DECIDED THE ISSUES IN THIS CASE?   DO YOU THINK IT WOULD MAKE

12   YOU MORE PRONE TO FIND THESE YOUNG MEN GUILTY, OR MORE PRONE

13   TO FIND THEM NOT GUILTY?

14          A.    NO, I CAN FOLLOW THOSE INSTRUCTIONS.   I CAN DO

15   THAT, YOU KNOW, PUTTING LIKE -- I CAN SEPARATE MY EMOTIONS

16   FROM THAT.   BUT LIKE I SAID, SOMETHING JUST WASN'T SITTING

17   WELL WE ME.   AND I THOUGHT SINCE IT WAS MY CONCERN THAT I

18   SHOULD SPEAK UP BEFORE, YOU KNOW, I WENT ANY FURTHER.   THAT'S

19   ALL.

20          Q.    WE CERTAINLY APPRECIATE THAT.   BUT I THINK YOU CAN

21   UNDERSTAND OUR CONCERN, IS THAT WE NEED TO KNOW THAT YOU CAN

22   LISTEN FAIRLY AND OBJECTIVELY TO THE EVIDENCE, AND WHEN YOU

23   GO BACK INTO THE JURY ROOM, YOU CAN LEAVE ASIDE THOSE

24   FEELINGS, PRESUME THAT THESE GENTLEMEN ARE NOT GUILTY, AND

25   JUST LOOK AT THE EVIDENCE, AND SEE IF THE EVIDENCE CONVINCES

26   YOU OF THEIR GUILT.   DO YOU THINK YOU CAN DO THAT?

27          A.    YES, I CAN.   YOU KNOW, I WAS SITTING HERE, AND I'M

28   THINKING, "OKAY.   OF COURSE," LIKE I SAID, "I DON'T KNOW

1    THESE GENTLEMEN."  I'M THINKING, "YEAH, THEY COULD BE

2    INNOCENT, I DON'T KNOW.  THEY COULD BE GUILTY, I DON'T KNOW."

3    I DON'T KNOW WHAT THE OUTCOME IS GOING TO BE.  I JUST HAVE

4    THAT FEELING.  AND LIKE I SAID, I THOUGHT SINCE I WASN'T

5    FEELING COMFORTABLE WITH IT, LIKE I SAID, I SHOULD SPEAK UP.

6              MR. LEAHY:  I APPRECIATE THAT.  THANK YOU VERY

7    MUCH.

8              THE COURT:  THANK YOU.

9         MR. SANCHEZ, ANY QUESTIONS?

10              MR. SANCHEZ:  NO, YOUR HONOR.  NO, THANK YOU.

11              THE COURT:  MS. ROACH, ANY QUESTIONS?

12              MS. ROACH:  NO, YOUR HONOR.

13              THE COURT:  OKAY.  AND LET ME JUST INDICATE THAT

14    WHEN THE JURORS RETURN BACK INTO THE COURTROOM, I'M GOING TO

15    BE GIVING ALL THE JURORS AN ADMONISHMENT THAT YOUR NAME AND

16    ALL YOUR PERSONAL INFORMATION WILL BE SEALED PENDING FURTHER

17    COURT ORDER.  AND THAT IF THERE IS A REQUEST BY ANY ATTORNEY

18    FOR ANY PERSONAL INFORMATION, THAT WOULD COME TO THE COURT,

19    AND WITH NOTIFICATION TO YOU IN ADVANCE PRIOR TO ANYTHING

20    BEING GIVEN OUT.  DOES THAT MAKE YOU FEEL MORE AT EASE?

21              JUROR NO. 7:  IT DOES.

22              THE COURT:  OKAY.  ALL RIGHT.  OKAY.  WELL, THANK

23    YOU VERY MUCH.  AND AT THIS TIME, IF YOU'LL JUST STEP OUTSIDE

24    FOR A MOMENT.

25              JUROR NO. 7:  OKAY.  SORRY FOR THE INCONVENIENCE.

26              MR. SANCHEZ:  NO PROBLEM.

27              (WHEREUPON JUROR NO. 7 EXITED THE COURTROOM AND THE

28    FOLLOWING PROCEEDINGS WERE HELD:)

*misleading; proper references of ICC*

1          THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

2     THAT JUROR NO. 7 HAS LEFT THE ROOM.  COUNSEL ARE PRESENT,

3     DEFENDANTS ARE PRESENT.  AND MR. LEAHY.

4          MR. LEAHY:  YOUR HONOR, I JUST WOULD LIKE TO ASK

5     THE COURT TO EXCUSE HER BASED ON THE INFORMATION THAT WE

6     HAVE.

7          MR. SANCHEZ:  JOIN IN THE MOTION, YOUR HONOR.

8          THE COURT:  MS. ROACH?

9          MS. ROACH:  I'LL STIPULATE TO THE COURT.

10         THE COURT:  BASED ON JUROR NUMBER 7'S COMMENTS, I

11    THINK SHE WAS JUST BEING CAREFUL, AND IN AN ABUNDANCE OF

12    CAUTION BECAUSE OF THE POSSIBILITY THAT SHE MAY HAVE SEEN

13    THEM IN THE PAST, SHE DOES EXPRESS CONCERN, AND SHE DID USE

14    THE WORD "RETALIATION" AT SOME POINT.  AND I THINK THE FACT

15    THAT THAT CAME AFTER LISTENING TO THE WITNESS, HERRERA'S

16    TESTIMONY, WHEREIN HE EXPRESSES SOME FEAR OF RETALIATION, MAY

17    HAVE PUT THAT THOUGHT IN HER MIND, BECAUSE CERTAINLY SHE DID

18    NOT COME FORWARD EARLIER ABOUT RECOGNIZING ANYBODY OR

19    ANYTHING OF THAT NATURE.  AND I THINK THAT THAT'S PROBABLY

20    SOMETHING, OR IN TERMS OF WHAT HAS CAUSED HER TO COME FORWARD

21    AND MAKE THE STATEMENTS.  BUT IT IS CLEAR FROM THE QUESTIONS,

22    THAT SHE WILL BE ABLE TO LISTEN TO THE EVIDENCE AND MAKE HER

23    DECISION SIMPLY ON THE EVIDENCE AND THE LAWS AS I INSTRUCT

24    HER.  AND, THEREFORE, THE REQUEST TO HAVE HER REMOVED AT THIS

25    TIME WILL BE DENIED.

26         AND WHAT I WILL DO IS, I WILL JUST MAKE A GENERAL

27    ADMONITION TO THE JURY WHEN THEY RETURN INTO THE COURTROOM

28    THAT ALL OF THEIR INFORMATION, INCLUDING THEIR NAMES, WILL BE

1   SEALED PENDING FURTHER COURT ORDER, AND WE WILL SIMPLY REFER

2   TO THEM BY THEIR SEAT NUMBER FROM NOW ON.  AND IF THERE -- IF

3   ANYBODY HAS ANY KIND OF CONCERN, I THINK THAT WILL HELP THEM.

4        OKAY.  SO AT THIS TIME, WE'LL CALL IN THE JURY.  AND

5   THIS NOTE WILL BE COURT'S EXHIBIT 3.

6             (WHEREUPON THE JURY ENTERED THE COURTROOM AND THE

7   FOLLOWING PROCEEDINGS WERE HAD:)

8             THE COURT:  OKAY.  LET ME HAVE JUST A MOMENT WITH

9   COUNSEL AND THE REPORTER.

10             (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

11   CHAMBERS OUT OF THE PRESENCE OF THE JURY:)

12             THE COURT:  THE RECORD WILL REFLECT COUNSEL AND I

13   ARE PRESENT OUTSIDE THE PRESENCE OF THE JURY.

14        I HAVE RECEIVED YET ANOTHER LETTER, AND THIS ONE IS

15   TYPED:  "DEAR JUDGE HERNANDEZ, AFTER HEARING OPENING

16   STATEMENTS THIS MORNING, I FEEL THERE IS INFORMATION I NEED

17   TO PROVIDE YOU.  AS I STATED ON TUESDAY, AUGUST 5TH, DURING

18   JURY SELECTION, I PRESENTLY WORK AS A SCHOOL COUNSELOR IN

19   NATIONAL CITY.  BUT WITHIN THE NEXT TWO WEEKS, I PLAN TO BE

20   TAKING A COUNSELING POSITION AT SAN YSIDRO ADULT SCHOOL.  I

21   TELL YOU THIS BECAUSE IT WAS BROUGHT UP IN COURT THAT THE

22   SUSPECTS IN THE CASE COULD BE AFFILIATED WITH THE, QUOTE,

23   SIDRO, END QUOTE, GANG.

24        THE COUNSELING POSITION AT SAN YSIDRO ADULT SCHOOL

25   INVOLVES COMMUNITY OUTREACH, ALONG WITH BEING THE POINT OF

26   CONTACT WITH EDUCATIONAL AND VOCATIONAL OPPORTUNITIES AT THE

27   SCHOOL SITE FOR STUDENTS 17 YEARS OF AGE AND OLDER.  WORK

28   HOURS ARE MORNINGS, AFTERNOONS, AND EVENINGS, ALONG WITH AN

1    ADDITIONAL SATURDAY.

2        SUFFICE IT TO SAY, THERE IS CONTINUAL PUBLIC CONTACT.

3    FOR THE MOST PART, INDIVIDUALS ARE NOT TURNED AWAY FROM

4    ENROLLING IN CLASSES AT THE SCHOOL.  BASICALLY, WE TRY TO

5    HELP ANYONE WHO WALKS IN THE DOOR ASKING FOR INFORMATION OR

6    ASSISTANCE.  GIVEN THIS POSITION, IT IS LIKELY I WILL HAVE

7    CONTACT WITH PEOPLE WHO KNOW OF OR ARE INVOLVED WITH THE,

8    QUOTE, SIDRO, END QUOTE, GANG, OR MAY BE FAMILIAR WITH THIS

9    CASE.  IT IS ALSO POSSIBLE I COULD HAVE CONTACT WITH THE

10   SUSPECTS THEMSELVES AT SOME POINT, AND/OR THEIRSELVES OR

11   FRIENDS.  THERE MAY HAVE BEEN PEOPLE IN THE COURTROOM THIS

12   MORNING WHO PRESENTLY ARE STUDENTS AT THE SCHOOL WHO I AM NOT

13   AWARE OF.

14       THESE POSSIBILITIES, QUITE FRANKLY, ARE BOTHERSOME FOR

15   ME.  I CANNOT GUARANTEE THAT MY DECISION IN THIS CASE WILL

16   NOT BE INFLUENCED BY THE POTENTIAL OF CONTACT WITH

17   INDIVIDUALS INVOLVED WITH THIS CASE AT SOME TIME IN THE

18   FUTURE.  THEREFORE, I ASK YOU CONSIDER TO ALLOW ME BE REMOVED

19   FROM THIS CASE.

20       SINCERELY [JUROR NO. 10], JUROR NUMBER 10."

21       SO YET AGAIN WE HAVE ANOTHER JUROR COMING FORWARD WITH

22   SOME FEAR OF RETALIATION.

23       MS. ROACH:  I'M NOT SURE IF IT'S FEAR OF

24   RETALIATION OR SIMPLY THAT HE'D BE AFFECTED IN SOME WAY OF

25   KNOWING THE PEOPLE.

26       THE COURT:  HE SAYS "INFLUENCED AT SOME POINT IN

27   THE FUTURE."

28       MR. SANCHEZ:  I'M ALSO CONCERNED THAT THESE JURORS

1    ARE TALKING TO ONE ANOTHER REGARDING THIS ISSUE OF

2    RETALIATION.

3             THE COURT:  WELL, I WILL AGAIN ADMONISH THEM THAT

4    THEY CANNOT BE TALKING WITH ANYONE, INCLUDING FELLOW JURORS,

5    ABOUT ANYTHING REGARDING THE CASE.

6        WHAT I SUGGEST WE DO IS WE ASK THIS INDIVIDUAL

7    SEPARATELY ABOUT THE EXTENT OF THAT CONCERN.

8             MS. ROACH:  THE OTHER THING IS THAT HE'S NOT GOING

9    TO BE STARTING THIS JOB FOR THE NEXT TWO WEEKS.  WE MAYBE WE

10   CAN EVEN DO AN ORDER WHERE HE IS NOT TO GO TO THE JOB UNTIL

11   HE'S COMPLETED HIS DELIBERATIONS.

12            MR. LEAHY:  WELL, I'M THINKING THAT WAS NOT WHAT

13   HE'S CONCERNED ABOUT.  HE'S CONCERNED ABOUT THE FUTURE.

14            THE COURT:  RIGHT.

15            MR. SANCHEZ:  WHEN HE DOES GO TO WORK.

16            THE COURT:  HIS CONCERN IS ABOUT ONCE HE'S AT THE

17   WORK SITE.

18            MS. ROACH:  SO I GUESS THAT IS A FEAR OF

19   RETALIATION.  I DON'T KNOW WHAT ELSE IT COULD BE.

20            THE COURT:  WELL, AT THIS POINT, LET'S DO THIS.

21   WE'LL ASK JUROR NUMBER 10 TO REMAIN, ASK THE OTHERS TO STEP

22   OUT WHILE WE JUST GO OVER IT.

23            MR. SANCHEZ:  YOU WANT TO BRING HIM BACK HERE, OR

24   YOU WANT TO TELL EVERYBODY TO LEAVE?

25            THE COURT:  WELL, LET'S BRING JUROR NUMBER 10 BACK.

26   THAT WILL PROBABLY BE BEST.

27            (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS IN

28   THE PRESENCE OF JUROR NO. 10:)

1    CHULA VISTA, CALIFORNIA; THURSDAY, AUGUST 7, 2003; 1:32 P.M.

2            (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

3    OUT OF THE PRESENCE OF THE JURORS:)

4            THE COURT:  THE RECORD WILL REFLECT COUNSEL IS

5    PRESENT, DEFENDANTS ARE PRESENT, THE JURY IS NOT PRESENT.  WE

6    HAVE A NOTE HERE FROM JUROR NUMBER 7.  IT READS:  "I HAVE

7    SOME CONCERNS REGARDING THE DEFENDANTS.  THEY LOOK FAMILIAR.

8    AT FIRST SIGHT, I THOUGHT I MIGHT HAVE SEEN THEM ON

9    TELEVISION, PARENTHESIS, NEWS.  THE MORE I LOOK AT THEM, I

10    THINK IT MIGHT BE SOMEWHERE ELSE, AND THIS CONCERNS ME.

11    COULD IT BE POSSIBLE FOR ME TO BE EXCUSED?  [JUROR NO. 7]."

12        I THINK WE SHOULD PROBABLY INQUIRE.

13            MR. LEAHY:  WE SHOULD PROBABLY TALK TO HER.

14            THE COURT:  LET'S BRING HER IN BY HERSELF.

15            (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

16    IN THE PRESENCE OF JUROR NO. 7:)

17            THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

18    JUROR NUMBER 7 IS PRESENT.  AND WE HAVE RECEIVED YOUR NOTE

19    CONCERNING THE FACT THAT YOU THINK THAT THE DEFENDANTS LOOK

20    FAMILIAR.  AND I NEED TO INQUIRE A LITTLE BIT MORE ABOUT

21    THIS.  AND THE RECORD WILL REFLECT THE JURY IS NOT PRESENT,

22    COUNSEL AND THE DEFENDANTS ARE PRESENT.

23        YOU MAY PROCEED.

24            JUROR NO. 7:  I WAS JUST GOING TO SAY, AT FIRST

25    WHEN -- UPON FIRST SIGHT, LIKE I SAID, I THOUGHT THERE WAS

26    SOME KIND OF FAMILIARITY, AND I THOUGHT MAYBE IT COULD HAVE

27    BEEN FROM THE NEWS.  I DON'T KNOW.  I'M THINKING IT MIGHT NOT

28    BE.  I DON'T KNOW IF IT COULD BE.  I DON'T KNOW THEM, FIRST

1    OF ALL.  BUT THERE'S JUST, YOU KNOW, THEY LOOK FAMILIAR.  I

2    DON'T KNOW WHERE FROM.  I COULDN'T TELL YOU.  I COULDN'T TELL

3    YOU IF IT WAS, YOU KNOW, FROM THE RESTAURANT DOWN THE STREET.

4    I COULDN'T TELL YOU WHERE.  BUT IT MAKES ME UNCOMFORTABLE

5    KNOWING THIS.  I CAN'T GIVE YOU ANY SPECIFICS.  ALL I CAN SAY

6    IS I'M JUST NOT COMFORTABLE WITH IT.  I DON'T KNOW WHY, YOU

7    KNOW.

8            THE COURT:  WELL, LET ME ASK YOU THIS, THE FACT

9    THAT THEY LOOK FAMILIAR AND YOU'RE NOT SURE WHERE, THAT DOES

10   NOT CAUSE YOU TO PREJUDGE THE CASE, DOES IT?

11           JUROR NO. 7:  NO.  NO, I'M JUST -- I'M JUST NOT

12   COMFORTABLE WITH THAT, YOU KNOW.  MY INSTINCTS SAY SOMETHING

13   JUST DOESN'T FEEL RIGHT.

14           THE COURT:  OKAY.  NOW, THE FACT THAT YOU MAY OR

15   MAY NOT HAVE SEEN THEM IN THE PAST, DOES THAT AFFECT YOUR

16   ABILITY TO LOOK AT THE EVIDENCE AND MAKE A DETERMINATION

17   BASED SIMPLY ON EVIDENCE THAT COMES IN?

18           JUROR NO. 7:  JUST LOOKING, NO, OF COURSE.  I MEAN,

19   I KNOW WHAT YOU'RE --

20           THE COURT:  AND THEN WOULD YOU BE ABLE TO APPLY THE

21   LAW THAT I GIVE YOU, FACTS, AND FIND THEM BASED STRICTLY ON

22   THE EVIDENCE?

23           JUROR NO. 7:  YOUR WORDS, OF COURSE, MAKE PERFECT

24   SENSE, AND OF COURSE I CAN DO THAT.  LIKE I SAID, INTERNALLY,

25   I'M JUST NOT -- I DON'T KNOW.  I JUST DON'T FEEL COMFORTABLE.

26           THE COURT:  OKAY.  BUT SINCE YOU'RE NOT SURE FROM

27   WHAT CONTEXT, SENSING THAT THERE'S SOMETHING MORE, IS THERE A

28   FEAR, OR IS THERE SOME OTHER CONCERN?

1     JUROR NO. 7: SURE, I GUESS IT COULD BE. LIKE I

2 SAID, I DON'T KNOW THEM OR ANYTHING LIKE THAT. BUT, YOU

3 KNOW, I GUESS MY FEAR WOULD BE, EASILY PUT, WOULD BE FEAR OF

4 RETALIATION ONE WAY OR ANOTHER.

5     THE COURT: OKAY. NOW, ONE THING I DID NOT MENTION

6 AT THE BEGINNING, AND WHICH I COULD -- WELL, LET ME DISCUSS

7 WITH THE ATTORNEYS. BUT IT -- WELL, LET ME JUST SPEAK WITH

8 THE ATTORNEYS FOR A MOMENT WITHOUT THE REPORTER.

9     (SIDEBAR CONFERENCE HELD; NOT REPORTED.)

10     (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

11 IN THE PRESENCE OF JUROR NO. 7:)

12     THE COURT: THE RECORD WILL REFLECT WE'RE BACK IN

13 THE COURTROOM. COUNSEL ARE PRESENT, DEFENDANTS ARE PRESENT,

14 AND JUROR NUMBER 7 IS PRESENT. AT THIS TIME, LET ME JUST

15 HAVE THE ATTORNEYS ASK SOME MORE QUESTIONS OF YOU.

16   MR. LEAHY.

17 BY MR. LEAHY:

18   Q. HI.

19   A. HI.

20   Q. YOU USED THE WORD "RETALIATION" A MOMENT AGO. DO

21 YOU REMEMBER THAT? DO YOU REMEMBER USING THE WORD

22 "RETALIATION"?

23   A. YES.

24   Q. THAT SUGGESTS TO ME THAT BECAUSE THERE'S SOME GANG

25 OVERTONES IN THIS CASE, THAT YOU FEEL PERHAPS SOME FEAR ABOUT

26 YOUR INVOLVEMENT IN THE TRIAL; IS THAT CORRECT?

27   A. YES.

28   Q. I GUESS THE REAL QUESTION THAT WE NEED TO KNOW IS,

1    DO YOU THINK THAT YOU CAN SET THAT FEAR ASIDE AS YOU CONSIDER

2    THE EVIDENCE IN THIS CASE?

3         A.    I MEAN, ACADEMICALLY, OF COURSE, YES, I CAN.  BUT

4    LIKE I SAID, IT JUST -- SOMETHING JUST WASN'T SITTING WELL WE

5    ME.  AND I THOUGHT, YOU KNOW, I SHOULD SAY SOMETHING.

6         Q.    TO THE BEST OF MY KNOWLEDGE, THESE MEN HAVE NEVER

7    BEEN ON TELEVISION.  SO I DON'T THINK YOU WOULD HAVE SEEN

8    THEM BECAUSE OF THAT.  CERTAINLY THIS CASE DID NOT GET ANY

9    PUBLICITY.

10   DO YOU THINK THAT YOUR FEELINGS WOULD INFLUENCE HOW YOU

11   DECIDED THE ISSUES IN THIS CASE?  DO YOU THINK IT WOULD MAKE

12   YOU MORE PRONE TO FIND THESE YOUNG MEN GUILTY, OR MORE PRONE

13   TO FIND THEM NOT GUILTY?

14        A.    NO, I CAN FOLLOW THOSE INSTRUCTIONS.  I CAN DO

15   THAT, YOU KNOW, PUTTING LIKE -- I CAN SEPARATE MY EMOTIONS

16   FROM THAT.  BUT LIKE I SAID, SOMETHING JUST WASN'T SITTING

17   WELL WE ME.  AND I THOUGHT SINCE IT WAS MY CONCERN THAT I

18   SHOULD SPEAK UP BEFORE, YOU KNOW, I WENT ANY FURTHER.  THAT'S

19   ALL.

20        Q.    WE CERTAINLY APPRECIATE THAT.  BUT I THINK YOU CAN

21   UNDERSTAND OUR CONCERN, IS THAT WE NEED TO KNOW THAT YOU CAN

22   LISTEN FAIRLY AND OBJECTIVELY TO THE EVIDENCE, AND WHEN YOU

23   GO BACK INTO THE JURY ROOM, YOU CAN LEAVE ASIDE THOSE

24   FEELINGS, PRESUME THAT THESE GENTLEMEN ARE NOT GUILTY, AND

25   JUST LOOK AT THE EVIDENCE, AND SEE IF THE EVIDENCE CONVINCES

26   YOU OF THEIR GUILT.  DO YOU THINK YOU CAN DO THAT?

27        A.    YES, I CAN.  YOU KNOW, I WAS SITTING HERE, AND I'M

28   THINKING, "OKAY.  OF COURSE," LIKE I SAID, "I DON'T KNOW

1    THESE GENTLEMEN."  I'M THINKING, "YEAH, THEY COULD BE

2    INNOCENT, I DON'T KNOW.  THEY COULD BE GUILTY, I DON'T KNOW."

3    I DON'T KNOW WHAT THE OUTCOME IS GOING TO BE.  I JUST HAVE

4    THAT FEELING.  AND LIKE I SAID, I THOUGHT SINCE I WASN'T

5    FEELING COMFORTABLE WITH IT, LIKE I SAID, I SHOULD SPEAK UP.

6            MR. LEAHY:  I APPRECIATE THAT.  THANK YOU VERY

7    MUCH.

8            THE COURT:  THANK YOU.

9        MR. SANCHEZ, ANY QUESTIONS?

10            MR. SANCHEZ:  NO, YOUR HONOR.  NO, THANK YOU.

11            THE COURT:  MS. ROACH, ANY QUESTIONS?

12            MS. ROACH:  NO, YOUR HONOR.

13            THE COURT:  OKAY.  AND LET ME JUST INDICATE THAT

14    WHEN THE JURORS RETURN BACK INTO THE COURTROOM, I'M GOING TO

15    BE GIVING ALL THE JURORS AN ADMONISHMENT THAT YOUR NAME AND

16    ALL YOUR PERSONAL INFORMATION WILL BE SEALED PENDING FURTHER

17    COURT ORDER.  AND THAT IF THERE IS A REQUEST BY ANY ATTORNEY

18    FOR ANY PERSONAL INFORMATION, THAT WOULD COME TO THE COURT,

19    AND WITH NOTIFICATION TO YOU IN ADVANCE PRIOR TO ANYTHING

20    BEING GIVEN OUT.  DOES THAT MAKE YOU FEEL MORE AT EASE?

21            JUROR NO. 7:  IT DOES.

22            THE COURT:  OKAY.  ALL RIGHT.  OKAY.  WELL, THANK

23    YOU VERY MUCH.  AND AT THIS TIME, IF YOU'LL JUST STEP OUTSIDE

24    FOR A MOMENT.

25            JUROR NO. 7:  OKAY.  SORRY FOR THE INCONVENIENCE.

26            MR. SANCHEZ:  NO PROBLEM.

27            (WHEREUPON JUROR NO. 7 EXITED THE COURTROOM AND THE

28    FOLLOWING PROCEEDINGS WERE HELD:)

*Misleading? Proper reiteration of law.*

1          THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

2     THAT JUROR NO. 7 HAS LEFT THE ROOM.  COUNSEL ARE PRESENT,

3     DEFENDANTS ARE PRESENT.  AND MR. LEAHY.

4          MR. LEAHY:  YOUR HONOR, I JUST WOULD LIKE TO ASK

5     THE COURT TO EXCUSE HER BASED ON THE INFORMATION THAT WE

6     HAVE.

7          MR. SANCHEZ:  JOIN IN THE MOTION, YOUR HONOR.

8          THE COURT:  MS. ROACH?

9          MS. ROACH:  I'LL STIPULATE TO THE COURT.

10         THE COURT:  BASED ON JUROR NUMBER 7'S COMMENTS, I

11    THINK SHE WAS JUST BEING CAREFUL, AND IN AN ABUNDANCE OF

12    CAUTION BECAUSE OF THE POSSIBILITY THAT SHE MAY HAVE SEEN

13    THEM IN THE PAST, SHE DOES EXPRESS CONCERN, AND SHE DID USE

14    THE WORD "RETALIATION" AT SOME POINT.  AND I THINK THE FACT

15    THAT THAT CAME AFTER LISTENING TO THE WITNESS, HERRERA'S

16    TESTIMONY, WHEREIN HE EXPRESSES SOME FEAR OF RETALIATION, MAY

17    HAVE PUT THAT THOUGHT IN HER MIND, BECAUSE CERTAINLY SHE DID

18    NOT COME FORWARD EARLIER ABOUT RECOGNIZING ANYBODY OR

19    ANYTHING OF THAT NATURE.  AND I THINK THAT THAT'S PROBABLY

20    SOMETHING, OR IN TERMS OF WHAT HAS CAUSED HER TO COME FORWARD

21    AND MAKE THE STATEMENTS.  BUT IT IS CLEAR FROM THE QUESTIONS,

22    THAT SHE WILL BE ABLE TO LISTEN TO THE EVIDENCE AND MAKE HER

23    DECISION SIMPLY ON THE EVIDENCE AND THE LAWS AS I INSTRUCT

24    HER.  AND, THEREFORE, THE REQUEST TO HAVE HER REMOVED AT THIS

25    TIME WILL BE DENIED.

26         AND WHAT I WILL DO IS, I WILL JUST MAKE A GENERAL

27    ADMONITION TO THE JURY WHEN THEY RETURN INTO THE COURTROOM

28    THAT ALL OF THEIR INFORMATION, INCLUDING THEIR NAMES, WILL BE

1    SEALED PENDING FURTHER COURT ORDER, AND WE WILL SIMPLY REFER

2    TO THEM BY THEIR SEAT NUMBER FROM NOW ON.  AND IF THERE -- IF

3    ANYBODY HAS ANY KIND OF CONCERN, I THINK THAT WILL HELP THEM.

4         OKAY.  SO AT THIS TIME, WE'LL CALL IN THE JURY.  AND

5    THIS NOTE WILL BE COURT'S EXHIBIT 3.

6              (WHEREUPON THE JURY ENTERED THE COURTROOM AND THE

7    FOLLOWING PROCEEDINGS WERE HAD:)

8              THE COURT:  OKAY.  LET ME HAVE JUST A MOMENT WITH

9    COUNSEL AND THE REPORTER.

10             (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

11   CHAMBERS OUT OF THE PRESENCE OF THE JURY:)

12             THE COURT:  THE RECORD WILL REFLECT COUNSEL AND I

13   ARE PRESENT OUTSIDE THE PRESENCE OF THE JURY.

14        I HAVE RECEIVED YET ANOTHER LETTER, AND THIS ONE IS

15   TYPED:  "DEAR JUDGE HERNANDEZ, AFTER HEARING OPENING

16   STATEMENTS THIS MORNING, I FEEL THERE IS INFORMATION I NEED

17   TO PROVIDE YOU.  AS I STATED ON TUESDAY, AUGUST 5TH, DURING

18   JURY SELECTION, I PRESENTLY WORK AS A SCHOOL COUNSELOR IN

19   NATIONAL CITY.  BUT WITHIN THE NEXT TWO WEEKS, I PLAN TO BE

20   TAKING A COUNSELING POSITION AT SAN YSIDRO ADULT SCHOOL.  I

21   TELL YOU THIS BECAUSE IT WAS BROUGHT UP IN COURT THAT THE

22   SUSPECTS IN THE CASE COULD BE AFFILIATED WITH THE, QUOTE,

23   SIDRO, END QUOTE, GANG.

24        THE COUNSELING POSITION AT SAN YSIDRO ADULT SCHOOL

25   INVOLVES COMMUNITY OUTREACH, ALONG WITH BEING THE POINT OF

26   CONTACT WITH EDUCATIONAL AND VOCATIONAL OPPORTUNITIES AT THE

27   SCHOOL SITE FOR STUDENTS 17 YEARS OF AGE AND OLDER.  WORK

28   HOURS ARE MORNINGS, AFTERNOONS, AND EVENINGS, ALONG WITH AN

1    ADDITIONAL SATURDAY.

2         SUFFICE IT TO SAY, THERE IS CONTINUAL PUBLIC CONTACT.

3    FOR THE MOST PART, INDIVIDUALS ARE NOT TURNED AWAY FROM

4    ENROLLING IN CLASSES AT THE SCHOOL.  BASICALLY, WE TRY TO

5    HELP ANYONE WHO WALKS IN THE DOOR ASKING FOR INFORMATION OR

6    ASSISTANCE.  GIVEN THIS POSITION, IT IS LIKELY I WILL HAVE

7    CONTACT WITH PEOPLE WHO KNOW OF OR ARE INVOLVED WITH THE,

8    QUOTE, SIDRO, END QUOTE, GANG, OR MAY BE FAMILIAR WITH THIS

9    CASE.  IT IS ALSO POSSIBLE I COULD HAVE CONTACT WITH THE

10   SUSPECTS THEMSELVES AT SOME POINT, AND/OR THEIRSELVES OR

11   FRIENDS.  THERE MAY HAVE BEEN PEOPLE IN THE COURTROOM THIS

12   MORNING WHO PRESENTLY ARE STUDENTS AT THE SCHOOL WHO I AM NOT

13   AWARE OF.

14        THESE POSSIBILITIES, QUITE FRANKLY, ARE BOTHERSOME FOR

15   ME.  I CANNOT GUARANTEE THAT MY DECISION IN THIS CASE WILL

16   NOT BE INFLUENCED BY THE POTENTIAL OF CONTACT WITH

17   INDIVIDUALS INVOLVED WITH THIS CASE AT SOME TIME IN THE

18   FUTURE.  THEREFORE, I ASK YOU CONSIDER TO ALLOW ME BE REMOVED

19   FROM THIS CASE.

20        SINCERELY [JUROR NO. 10], JUROR NUMBER 10."

21        SO YET AGAIN WE HAVE ANOTHER JUROR COMING FORWARD WITH

22   SOME FEAR OF RETALIATION.

23             MS. ROACH:  I'M NOT SURE IF IT'S FEAR OF

24   RETALIATION OR SIMPLY THAT HE'D BE AFFECTED IN SOME WAY OF

25   KNOWING THE PEOPLE.

26             THE COURT:  HE SAYS "INFLUENCED AT SOME POINT IN

27   THE FUTURE."

28             MR. SANCHEZ:  I'M ALSO CONCERNED THAT THESE JURORS

1    ARE TALKING TO ONE ANOTHER REGARDING THIS ISSUE OF

2    RETALIATION.

3                THE COURT:  WELL, I WILL AGAIN ADMONISH THEM THAT

4    THEY CANNOT BE TALKING WITH ANYONE, INCLUDING FELLOW JURORS,

5    ABOUT ANYTHING REGARDING THE CASE.

6        WHAT I SUGGEST WE DO IS WE ASK THIS INDIVIDUAL

7    SEPARATELY ABOUT THE EXTENT OF THAT CONCERN.

8                MS. ROACH:  THE OTHER THING IS THAT HE'S NOT GOING

9    TO BE STARTING THIS JOB FOR THE NEXT TWO WEEKS.  WE MAYBE WE

10   CAN EVEN DO AN ORDER WHERE HE IS NOT TO GO TO THE JOB UNTIL

11   HE'S COMPLETED HIS DELIBERATIONS.

12                MR. LEAHY:  WELL, I'M THINKING THAT WAS NOT WHAT

13   HE'S CONCERNED ABOUT.  HE'S CONCERNED ABOUT THE FUTURE.

14                THE COURT:  RIGHT.

15                MR. SANCHEZ:  WHEN HE DOES GO TO WORK.

16                THE COURT:  HIS CONCERN IS ABOUT ONCE HE'S AT THE

17   WORK SITE.

18                MS. ROACH:  SO I GUESS THAT IS A FEAR OF

19   RETALIATION.  I DON'T KNOW WHAT ELSE IT COULD BE.

20                THE COURT:  WELL, AT THIS POINT, LET'S DO THIS.

21   WE'LL ASK JUROR NUMBER 10 TO REMAIN, ASK THE OTHERS TO STEP

22   OUT WHILE WE JUST GO OVER IT.

23                MR. SANCHEZ:  YOU WANT TO BRING HIM BACK HERE, OR

24   YOU WANT TO TELL EVERYBODY TO LEAVE?

25                THE COURT:  WELL, LET'S BRING JUROR NUMBER 10 BACK.

26   THAT WILL PROBABLY BE BEST.

27                (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS IN

28   THE PRESENCE OF JUROR NO. 10:)

1            THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

2    JUROR NUMBER 10 IS PRESENT.  WE'RE OUTSIDE THE PRESENCE OF

3    THE JURY WITH COUNSEL.  AND WE HAVE RECEIVED AND READ YOUR

4    LETTER TO THE COURT.  AND I SIMPLY NEED TO INQUIRE OF YOU

5    ABOUT YOUR CONCERN.  CAN YOU EXPLAIN A LITTLE BIT MORE ABOUT

6    YOUR CONCERN OTHER THAN WHAT YOU'VE ALREADY WRITTEN?

7            JUROR NO. 10:  SURE.  IRREGARDLESS OF, FOR EXAMPLE,

8    THE OUTCOME OF THE CASE, IF ONE OF THOSE TWO INDIVIDUALS, TWO

9    SUSPECTS, OR FAMILY MEMBERS WHO MAY HAVE SEEN ME, NOT KNOWING

10   MYSELF WHAT THE OUTCOME IS, EVEN IF THEY WALK INTO AN AREA,

11   I'M BASICALLY THE NUMBER 2 PERSON THERE ON THE SITE, ALTHOUGH

12   REALLY NUMBER 1 IN TERMS OF THE PUBLIC, BECAUSE IT'S KIND OF

13   CLOSED DOORS.  {SOMEBODY WALKS INTO THAT OFFICE, RECOGNIZES ME

14   FROM THE CASE, GOES BACK -- OR IF I KNOW, FOR EXAMPLE, THOSE

15   TWO GENTLEMEN, I WOULD FEEL UNCOMFORTABLE DOING MY DUTIES TO

16   ASSIST THEM, NOT KNOWING, LIKE I SAID, WHAT RAMIFICATION, OR

17   WHAT THEY MAY BE FEELING AS A RESULT OF THE COURT CASE.}

18           THE COURT:  OKAY.  NOW, LET ME ASK YOU THIS, AT

19   THIS POINT, NOT HAVING -- WELL, JUST HAVING HEARD THE

20   EVIDENCE THAT YOU'VE HEARD SO FAR, WOULD YOU STILL BE ABLE TO

21   DO THE TWO THINGS THAT I MENTIONED AT THE BEGINNING, THAT IS,

22   BASED SIMPLY ON THE EVIDENCE THAT COMES IN, AND NOT FROM ANY

23   OTHER OUTSIDE CONSIDERATION, DETERMINE WHAT THE FACTS ARE

24   BASED SIMPLY ON THE EVIDENCE.  CAN YOU DO THAT?

25           JUROR NO. 10:  YES, I CAN, YOUR HONOR.

26           THE COURT:  WOULD YOU BE ABLE TO APPLY THE LAW THAT

27   I GIVE YOU TO THOSE FACTS AS I DETERMINE THEM?

28           JUROR NO. 10:  I BELIEVE I COULD APPLY THE LAW.

*[handwritten annotation at right: Incongruent with PS. 164, lns. 15-18]*

1    AGAIN MY -- I WOULD BE WRESTLING.  I'M GOING TO BE HONEST

2    WITH YOU.  I'M GOING TO BE WRESTLING WITH MY CONSCIENCE IN

3    TERMS OF, IRREGARDLESS OF HOW I SEE THE FACTS, I WOULD BE

4    WRESTLING BEING THAT IN THE BACK OF MY MIND, I'M IN A

5    SITUATION IN A LOCAL WHERE THERE IS PROBABLY THE POTENTIAL

6    FOR CONTACT WITH THOSE TWO GENTLEMEN, OR SOMEONE ELSE.  LIKE

7    I SAID, THERE COULD VERY WELL BE SOMEBODY OUT THERE RIGHT NOW

8    IN THE COURTROOM WHO ATTENDS CLASSES THERE WHO I'M NOT EVEN

9    AWARE OF.  AND I'M THERE IN A COUPLE OF WEEKS, AND THEY MAY

10   SEE THAT, IRREGARDLESS OF WHAT THE OUTCOME OF THE CASE IS.

11            THE COURT:  OKAY.  SO DO YOU THINK THAT THAT

12   CONCERN IN THE BACK OF YOUR MIND WOULD BE ALLEVIATED BY THE

13   COURT SEALING ALL YOUR PERSONAL INFORMATION?

14            JUROR NO. 10:  I DON'T KNOW.  I DON'T KNOW IF

15   THAT'S AN ISSUE NECESSARILY, BECAUSE RIGHT NOW, THERE'S

16   POTENTIAL VISUAL INFORMATION, PEOPLE, AND I DON'T KNOW.  BUT

17   HAVING WORKED AT THE ADULT SCHOOL BEFORE, I KNOW, LIKE I

18   SAID, I'M BASICALLY THE POINT OF CONTACT, AND PEOPLE COME IN

19   WHETHER THEY'RE GOING TO TAKE CLASSES OR NOT.  THEY ASK FOR

20   INFORMATION, AND WE ATTEMPT TO ASSIST JUST ANYBODY WHO'S

21   THERE.  SO AGAIN, THAT'S BASICALLY THE POINT CONTACT AT THAT

22   SCHOOL.

23        AND AGAIN, IF I WAS STAYING IN NATIONAL CITY, IT REALLY

24   WOULD NOT BE A PROBLEM FOR ME.  SO GIVEN THE FACT THAT I'M

25   GOING TO SAN YSIDRO, IT IS GOING TO BE A PROBLEM FOR ME.

26            THE COURT:  OKAY.  AND DURING THE JURY SELECTION

27   PROCESS, YOU DID NOT RAISE THAT AT THE TIME.  IS THERE

28   SOMETHING THAT HAS OCCURRED IN-BETWEEN THAT HAS CAUSED YOU TO

1    COME FORWARD WITH THIS?

2                    JUROR NO. 10:  WELL, YES, BECAUSE NO INFORMATION

3    THAT WE WERE GIVEN WAS -- THERE WAS NO INFORMATION THAT

4    CONCERNED THAT THESE GENTLEMEN MAY RESIDE OR WERE PART OF THE

5    SIDRO GANG THAT CAME UP THIS MORNING.  I WAS NOT AWARE OF

6    THAT PRIOR TO THIS MORNING.  AS I RECALL, THERE WAS GANG

7    AFFILIATION POTENTIALLY, BUT IT DID NOT INDICATE WHICH

8    PARTICULAR AREA OF TOWN.

9                    THE COURT:  OKAY.  MR. LEAHY, YOU CARE TO INQUIRE?

10                    MR. LEAHY:  JUST A LITTLE BIT, YOUR HONOR.

11   BY MR. LEAHY:

12        Q.   SIR, DID YOU -- HAVE YOU TALKED WITH ANY OF THE

13   OTHER JURORS ABOUT THESE CONCERNS THAT YOU'RE HAVING?

14        A.   NO, NOT AT ALL.

15        Q.   I TAKE IT THAT YOU HAVE A CONCERN THAT THIS WHOLE

16   ISSUE WILL SOMEHOW CREEP INTO HOW YOU DECIDE THE CASE; IS

17   THAT WHAT YOU'RE SAYING TO US?

18        A.   I BELIEVE IT COULD HAPPEN, YES.  I DON'T KNOW THAT

19   FOR SURE AT THIS POINT.  BUT I BELIEVE THAT'S A POSSIBILITY.

20        Q.   AND THAT'S BECAUSE THIS IS A SAN YSIDRO GANG, AND

21   YOU'RE HEAD OF THE SAN YSIDRO -- I UNDERSTAND FROM YOUR

22   LETTER THAT YOU'LL HAVE CONTACT WITH YOUNG ADULTS, I GUESS?

23        A.   PRIMARILY YOUNG ADULTS.  IT'S MY PARTICULAR AREA.

24                    MR. LEAHY:  OKAY.  THANK YOU, SIR.

25                    THE COURT:  OKAY.  MR. SANCHEZ, ANY QUESTIONS?

26                    MR. SANCHEZ:  NO, YOUR HONOR.  I DON'T HAVE ANY

27   QUESTIONS.  THANK YOU.

28                    THE COURT:  MS. ROACH, ANY QUESTIONS?

1    BY MS. ROACH:

2       Q.   IN WHAT AREA DO YOU THINK A POSSIBLE -- I GUESS

3    WHAT I WANT TO TRY AND FIGURE OUT, IF YOU'RE CONCERNED ABOUT

4    YOUR ABILITY TO DO YOUR JOB LATER IN THE COMMUNITY, OR IF

5    YOU'RE CONGERNED ABOUT YOUR ABILITY TO DELIBERATE FAIRLY AND

6    IMPARTIALLY?

7       A.   BOTH.

8       Q.   AND WITH REGARD TO THE DELIBERATION SITUATION, YOU

9    DON'T KNOW THE INDIVIDUALS, DON'T KNOW WHETHER OR NOT YOU

10   WILL HAVE ANY CONTACT, WHAT IS IT -- WHAT IS IT YOU'RE

11   CONCERNED ABOUT IMPACTING YOUR DELIBERATIONS?  I'M ASSUMING

12   YOU WON'T BE DOWN THERE DURING THE DELIBERATION; IS THAT

13   CORRECT?  YOU WON'T BE IN SAN YSIDRO?

14      A.   WELL, I'M SUPPOSED TO START THE 18TH OF AUGUST.

15           THE COURT:  AND TODAY BEING THE 7TH.

16   BY MS. ROACH:

17      Q.   SO ASSUMING THAT YOU DON'T START THAT JOB UNTIL

18   AFTER DELIBERATIONS ARE CONCLUDED IN THIS CASE, WHAT

19   SPECIFICALLY ARE YOU CONCERNED ABOUT IMPACTING THE

20   DELIBERATIONS?

21      A.   WELL, IT WOULD IMPACT MY DELIBERATIONS.  IN THE

22   BACK OF MY MIND, THE POTENTIAL IN THE FUTURE FOR, AGAIN,

23   THESE TWO GENTLEMEN, OR PEOPLE WHO HAVE SEEN ME INVOLVED IN

24   THIS CASE, COMING INTO WHERE MY OFFICE IS AT THE SCHOOL, ME

25   NOT KNOWING NECESSARILY IF IT'S, YOU KNOW, WHO KNOWS WHAT

26   ABOUT -- IF THEY SAW ME IN THIS PARTICULAR CASE.

27           FOR AN EXAMPLE, IF I WERE TO REACH A VERDICT OF GUILTY,

28   AS AN EXAMPLE, AGAIN, NOT KNOWING WHAT THE SENTENCING WAS, IF

1    THAT IS WHAT HAPPENS TO THOSE GENTLEMEN, OR ANYONE ELSE WHO

2    KNOWS OF THAT, SOMEONE COMES IN, THEY RECOGNIZE ME AS A JUROR

3    WHO VOTED GUILTY, AND I WOULD FEEL -- AND NOT ME NECESSARILY

4    RECOGNIZING THEM OR NOT -- IF THEY KNEW THAT I WAS INVOLVED

5    IN THIS CASE, I WOULD -- IT WOULD BE DIFFICULT FOR ME, I

6    THINK, TO REALLY WANT TO DO MY JOB -- MY REGULAR JOB, NOT MY

7    JOB AS JUROR.  SO IT'S SOME RESERVATIONS ABOUT HOW I WOULD

8    VOTE.

9         Q.    AND IF YOU -- LET'S TAKE THE OPPOSITE APPROACH.  IF

10   YOU WERE NOT CONVINCED BY THE EVIDENCE, IS THERE ANYTHING

11   ABOUT YOUR CONCERN THAT WOULD MAKE YOU VOTE GUILTY EVEN

12   THOUGH BY LAW YOU FELT THEY WERE NOT GUILTY?

13        A.    I'M NOT SURE ABOUT THAT.  I DON'T REALLY KNOW.

14        Q.    SO YOU DON'T THINK YOU'D BE ABLE TO FOLLOW THE LAW?

15        A.    IT'S JUST LIKE I SAID, I'M GOING TO A NEW POSITION

16   WHERE THERE'S A GREAT AMOUNT OF PUBLIC CONTACT IN AN AREA

17   WHICH, QUITE FRANKLY, IS FAIRLY CLOSE IN TERMS OF WHO KNOWS

18   WHAT, AND WHAT GOES ON.  AND MY CONCERN IS, WHATEVER I DO IN

19   THIS CASE, HOWEVER IT'S JUDGED IN THIS CASE, THAT AS SOME

20   POINT, IT COULD FALL BACK ON ME BECAUSE OF WHERE I'M WORKING.

21        Q.    AND SO IF YOU WERE TO FIND THAT THE EVIDENCE

22   CONVINCES YOU BEYOND A REASONABLE DOUBT, WOULD YOU THINK THAT

23   THERE'S A CHANCE THAT YOU MIGHT VOTE NOT GUILTY JUST TO AVOID

24   THAT IN THE FUTURE?

25        A.    THAT COULD BE.

26             MS. ROACH:  OKAY.

27             THE COURT:  LET ME ASK YOU THIS QUESTION.  IF RIGHT

28   NOW YOU'RE SAYING -- YOU'RE SAYING YOU'RE NOT SURE WHETHER

1      YOU CAN DO YOUR OBLIGATION AS A JUROR BECAUSE OF THAT

2      CONCERN, IF YOU WERE TO REMAIN ON THE JURY AND THEN REACH A

3      POINT WHERE YOU CAME TO THAT CONCLUSION THAT YOU CAN NO

4      LONGER DO YOUR JOB AS A JUROR BECAUSE YOUR CONCERNS HAVE NOW

5      BEEN SO GREAT IN YOUR MIND, HEIGHTENED, WOULD YOU HAVE ANY

6      TROUBLE INFORMING ME?

7              JUROR NO. 10:  I WROTE THE LETTER TO INFORM YOU

8      INITIALLY BECAUSE THAT WAS AGAIN MY CONCERN.  AND SO I DIDN'T

9      WANT TO LET IT LINGER AFTER THIS MORNING.

10             THE COURT:  ALL RIGHT.  BUT -- BUT --

11             JUROR NO. 10:  SO IN MY MIND, THAT'S SHOWING MY

12     CONCERN.

13             THE COURT:  RIGHT.  BUT MY QUESTION IS, TO THE

14     POINT -- BECAUSE AT THIS POINT, FROM WHAT I SEE HERE, YOU'RE

15     SAYING -- I HEAR YOU SAYING THAT YOU CAN STILL DO YOUR JOB AS

16     A JUROR.

17             JUROR NO. 10:  I HOPE I CAN.

18             THE COURT:  AND BASE YOUR DELIBERATION SIMPLY ON

19     THE EVIDENCE AND SIMPLY ON THE LAW AS I INSTRUCT YOU,

20     CORRECT?

21             JUROR NO. 10:  I HOPE I CAN DO IT, YES.

22             THE COURT:  BUT IF AT SOME POINT IN THE FUTURE YOU

23     DON'T THINK YOU CAN DO THAT ANY LONGER, WOULD YOU THEN HAVE

24     ANY HESITATION ABOUT NOT LETTING ME KNOW THAT YOU CAN NO

25     LONGER DISCHARGE YOUR DUTY AS A JUROR?

26             JUROR NO. 10:  I DON'T REALISTICALLY BELIEVE RIGHT

27     NOW THAT I CAN PERFORM THE JOB AS A JUROR AS IT WAS

28     ORIGINALLY STIPULATED.  I THINK THAT'S ALWAYS -- YOU KNOW,

1    FROM NOW ON, I'M GOING TO BE HONEST WITH YOU, FROM NOW ON,

2    THERE'S GOING TO BE A LINGERING DOUBT IN MY MIND THAT AT SOME

3    POINT, THIS WILL, GIVEN MY POSITION WITH MY EMPLOYER, THAT

4    IT'S GOING TO COME BACK TO ME AT SOME POINT IN TIME IN SOME

5    WAY.

6            THE COURT:  AND THERE'S -- IS THERE ANYTHING THAT

7    WE CAN DO TO ALLEVIATE THAT CONCERN IN TERMS OF SEALING

8    PERSONAL INFORMATION, OR ADMONISHMENTS, OR ANYTHING THAT

9    WOULD MAKE YOU FEEL COMFORTABLE TO DO YOUR JOB?

10           JUROR NO. 10:  I DON'T BELIEVE SO.  AGAIN, PEOPLE

11   HAVE SEEN ME HERE.  WHETHER YOU SEAL THE RECORD OR NOT,

12   PEOPLE HAVE SEEN ME HERE.  AND AGAIN, I HAVE -- I HAVE NO

13   KNOWLEDGE IF ANYONE ATTENDS THAT SCHOOL OR PLANS TO ATTEND

14   THAT SCHOOL, BUT AGAIN IT'S STILL IN THE BACK OF MY MIND.

15           THE COURT:  OKAY.  ANY FURTHER QUESTIONS?

16           MR. LEAHY:  NO, YOUR HONOR.  THANK YOU.

17           MR. SANCHEZ:  NO, YOUR HONOR.

18           MS. ROACH:  NO.

19           THE COURT:  OKAY.  THANK YOU.  IF YOU'LL PLEASE

20   RETURN TO YOUR SEAT.

21           (WHEREUPON JUROR NO. 10 EXITED AND THE FOLLOWING

22   PROCEEDINGS WERE HELD:)

23           THE COURT:  THE RECORD WILL REFLECT THAT COUNSEL

24   ARE PRESENT, JUROR NUMBER 10 HAS LEFT THE ROOM.  BASED ON HIS

25   ANSWER, ESPECIALLY THE LATTER PART, IT SOUNDS LIKE HE'S NOT

26   GOING TO BE ABLE TO DO HIS JOB.  DO YOU ALL AGREE?

27           MS. ROACH:  YES.

28           MR. LEAHY:  RELUCTANTLY, YOUR HONOR, I THINK THAT'S

1      TRUE.

2                  MR. SANCHEZ:  I THINK WE MIGHT KEEP HIM ON.

3                  THE COURT:  SO AT THIS POINT, WE'LL EXCUSE HIM, AND

4      WILL, AS I STATED BEFORE, INDICATE THAT EVERYBODY'S

5      INFORMATION WILL BE SEALED PENDING FURTHER COURT ORDER.

6                  MS. ROACH:  AND DO WE GO TO THE FIRST ALTERNATE?

7                  MR. SANCHEZ:  THE FIRST.  THEY JUST GO IN ORDER.

8                  THE COURT:  OKAY.  WE'LL GO BACK.

9                  (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT

10     IN THE PRESENCE OF THE JURY:)

11                 THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

12     WE'RE BACK IN THE PRESENCE OF THE JURY.  COUNSEL ARE PRESENT,

13     DEFENDANTS ARE PRESENT.

14          JUROR NUMBER 10, YOU ARE EXCUSED.  IF YOU'LL PLEASE

15     RETURN TO THE JURY ROOM.  THANK YOU VERY MUCH.

16          AND ALTERNATE NUMBER 1, IF YOU'LL PLEASE HAVE A SEAT IN

17     NUMBER 10.

18                 THE COURT:  ALL RIGHT.  BEFORE WE PROCEED ANY

19     FURTHER, LADIES AND GENTLEMEN, LET ME STATE TO YOU THAT ALL

20     OF YOUR NAMES AND PERSONAL INFORMATION ARE SEALED PENDING

21     FURTHER COURT ORDER, AND, THEREFORE, I WILL NOT BE REFERRING

22     TO YOU THROUGHOUT THE COURSE OF THIS TRIAL BY NAME FOR

23     PURPOSES OF THE COURT'S RECORD.  YOU WILL NOW BE REFERRED TO

24     SIMPLY BY YOUR JUROR SEAT NUMBER.  AND ALL COMMUNICATIONS

25     WITH THE COURT WILL BE SIGNED BY YOU BY YOUR ASSIGNED NUMBER,

26     AND NOT BY NAME.  AND THEN, IN THIS REGARD, ALL PERSONAL

27     INFORMATION, ADDRESS AND SO FORTH, IS ALSO SEALED PENDING

28     FURTHER COURT ORDER.  WERE THERE ANY REQUESTS AT A LATER TIME

1    BY THE ATTORNEYS TO FIND OUT ANY PERSONAL INFORMATION, THAT

2    WOULD COME TO THE COURT, AND YOU WOULD BE NOTIFIED PRIOR TO

3    AND GIVEN A CHANCE TO RESPOND PRIOR TO ANY INFORMATION BEING

4    DISCLOSED.  SO YOUR INFORMATION IS NOW SEALED.

5              (FURTHER PROCEEDINGS HELD.  REPORTED BUT NOT

6    TRANSCRIBED HEREIN.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORTER TRANSCRIPTS

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) PLAINTIFF AND RESPONDENT, ) | FROM SAN DIEGO COUNTY HON. ESTEBAN HERNANDEZ |
| VS. ) | JUDGE |
| JAVIER RODRIGUEZ, ) DEFENDANT AND APPELLANT. ) | APPEAL NO. D043198 NO. SCS176087 |

**REPORTER'S TRANSCRIPT ON APPEAL**

AUGUST 4, 2003

SAN DIEGO, CALIFORNIA

VOL. I

PAGES 1 -- 36-100

COPY

APPEARANCES:

FOR THE PLAINTIFF AND RESPONDENT:    BILL LOCKYER
                                     ATTORNEY GENERAL
                                     STATE OF CALIFORNIA
                                     110 WEST A STREET
                                     SAN DIEGO, CA. 92101


FOR THE DEFENDANT AND APPELLANT:     JAVIER RODRIGUEZ
                                     IN PRO PER




REPORTED BY:  IRENE PERKINS, CSR 12727

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO, SOUTH COUNTY DIVISION

DEPARTMENT 14                BEFORE HON. ESTEBAN HERNANDEZ, JUDGE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, )<br>)<br>PLAINTIFF, )<br>)<br>VS. )<br>)<br>JOSE LUIS LEON, )<br>& )<br>JAVIER RODRIGUEZ, )<br>)<br>DEFENDANTS. )<br>) | CASE NO. SCS176087 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

AUGUST 4, 2003

APPEARANCES:

FOR THE PLAINTIFF:        SOPHIA ROACH
                          DEPUTY DISTRICT ATTORNEY

FOR DEFENDANT LEON:       JERRY LEAHY
                          ATTORNEY AT LAW

FOR DEFENDANT RODRIGUEZ:  BENJAMIN SANCHEZ
                          ATTORNEY AT LAW

REPORTED BY: IRENE PERKINS, CSR NO. 12727
SAN DIEGO SUPERIOR COURT

1    <u>CHULA VISTA, CALIFORNIA; AUGUST 4, 2003; 1:35 P.M.</u>

2              (A CONFERENCE WAS HELD IN CHAMBERS, NOT REPORTED.)

3              THE COURT:  CALLING THE CASE OF THE PEOPLE VERSUS

4    JOSE LEON AND JAVIER RODRIGUEZ CASE, CS176087.  APPEARANCES.

5              MS. ROACH:  SOPHIA ROACH ON BEHALF OF THE PEOPLE.

6              MR. SANCHEZ:  BEN SANCHEZ ON BEHALF OF JAVIER

7    RODRIGUEZ, WHO'S PRESENT OUT OF CUSTODY.

8              MR. LEAHY:  JERRY LEAHY ON BEHALF OF JOSE LEON.

9    JOSE'S PRESENT, YOUR HONOR.

10              THE COURT:  OKAY.  FIRST ORDER OF BUSINESS.  WE

11    HAVE AMENDED INFORMATION.  IF YOU GO AHEAD AND ARRAIGN YOUR

12    CLIENT.

13              MR. SANCHEZ:  ON BEHALF OF MR. RODRIGUEZ, HIS TRUE

14    NAME APPEARS THEREON.  HE'S BEEN PREVIOUSLY ADVISED OF HIS

15    CONSTITUTIONAL RIGHTS.  WE'LL WAIVE FURTHER READING.  ENTER A

16    PLEA OF NOT GUILTY.  DENY ALL ALLEGATIONS.

17              THE COURT:  THANK YOU.  NOT GUILTY PLEA WILL BE

18    ENTERED.  DENIAL OF ALLEGATIONS.  THE COURT HAS PREVIOUSLY

19    RECEIVED A CONSTITUITIONAL RIGHTS ADVISAL FORM SIGNED BY THE

20    DEFENDANT.  BAIL WILL REMAIN AS SET.

21         AND YOUR CLIENT AS WELL.

22              MR. LEAHY:  JERRY LEAHY ON BEHALF OF JOSE LEON.

23    YOUR HONOR, WE RECEIVED A COPY OF THE AMENDED INFORMATION.

24    MY CLIENT'S PREVIOUSLY BEEN ADVISED OF HIS CONSTITUTIONAL

25    RIGHTS.  WE'RE ASKING THAT A NOT GUILTY PLEA BE ENTERED, AND

26    DENIAL OF ALL THE ALLEGATIONS.

27              THE COURT:  THANK YOU.  NOT GUILTY PLEA WILL BE

28    ENTERED.  DENIAL OF ALLEGATIONS.  THE COURT HAS RECEIVED A

1    CONSTITUTIONAL RIGHTS ADVISAL FORM SIGNED BY THE DEFENDANT,

2    AND BAIL WILL REMAIN AS SET.

3        ALL RIGHT.  NOW, INITIALLY WE WENT OVER A NUMBER OF

4    MATTERS IN CHAMBERS IN PREPARATION FOR STARTING THE TRIAL.

5    NOW, THE FIRST ORDER OF BUSINESS LOOKS LIKE IT'S AN ISSUE OF

6    TIMING.  AND WE HAVE JUST BEEN INFORMED THAT WE WILL BE DARK

7    ON FRIDAY, AND COUNSEL HAD PREVIOUSLY INDICATED THAT

8    MR. LEAHY WILL BE DOING A PRELIM ON WEDNESDAY, SO WILL BE

9    UNAVAILABLE ON WEDNESDAY.  AND MR. SANCHEZ WILL BE

10   UNAVAILABLE MONDAY FOR A DOCTOR'S APPOINTMENT AND ANOTHER

11   PROCEEDING IN THE AFTERNOON.  SO THAT MEANS AT THIS POINT,

12   WE'RE GOING TO BE DARK THIS WEDNESDAY, THIS FRIDAY, AND NEXT

13   MONDAY.  MR. SANCHEZ WERE YOU ALSO SAYING THAT YOU'RE GOING

14   TO BE UNAVAILABLE TUESDAY, OR IS THAT SOMETHING THAT CAN BE

15   PUT OFF.

16        MR. SANCHEZ:  I'M GOING TO TRY, BUT I DON'T THINK

17   SO.  IT'S A TRIAL THAT'S OCCURRING IN LOS ANGELES, SO I HAVE

18   A DEFENDANT IN, SO I THINK I HAVE TO BE THERE.  IT'S A CIVIL

19   MATTER, BUT IT'S NOT A CRIMINAL.  BUT I WILL CALL --

20   HONESTLY, I DON'T KNOW IF IT'S A JURY CASE OR NOT.  IF IT'S

21   NOT I MAY BE ABLE TO DO IT IN ONE DAY.

22        THE COURT:  WELL, LET'S -- WELL, FOR TIMING

23   PURPOSES, WHEN WE WERE BACK IN CHAMBERS, WE WERE TALKING

24   ABOUT TELLING THE JURY THAT THIS CASE WOULD GO THROUGH

25   THURSDAY OF NEXT WEEK.  I THINK WITH THE EXTRA DAY, I THINK

26   WE SHOULD TELL THEM AT LEAST FRIDAY OF NEXT WEEK, OR DO YOU

27   THINK WE SHOULD GO BEYOND THAT IN TERMS OF ESTIMATING FOR THE

28   TRIAL.  ANYBODY THINK THAT WE SHOULD TELL THEM BEYOND FRIDAY

1    OF NEXT WEEK?

2              MR. SANCHEZ:  I DON'T THINK SO.

3              THE COURT:  MR. LEAHY?

4              MR. LEAHY:  NO, YOUR HONOR, I DON'T.

5              THE COURT:  MS. ROACH?

6              MS. ROACH:  NO.

7              THE COURT:  OKAY.  SO I'LL TELL THEM THAT THIS CASE

8    WILL HAVE -- WE'LL BE DARK AT LEAST THREE DAYS, AND PLAN ON

9    THIS CASE LASTING THROUGH NEXT FRIDAY.  OKAY.  AND WE DO --

10   MR. SANCHEZ, YOU GAVE ME THE NAME OF THE ADDITIONAL POSSIBLE

11   WITNESS, GLORIA RODRIGUEZ.

12             MR. SANCHEZ:  THAT'S CORRECT.

13             THE COURT:  OKAY.  SO NOW, LET'S START GOING

14   THROUGH THE IN LIMINE MATTERS AND THE PEOPLE'S TRIAL BRIEF.

15   AND FOR THE RECORD, MR. RODRIGUEZ HAS NOT BEEN DRESSED OUT.

16   MR. SANCHEZ, WILL YOU PREPARE A DRESS OUT ORDER?

17             MR. SANCHEZ:  YOUR HONOR, I HAD A DRESS OUT ORDER.

18   I DELIVERED CLOTHES TO THE JAIL ON SATURDAY, SO I'M NOT SURE

19   WHAT HAPPENED THERE.  AND I HAVE A RECEIPT SOMEWHERE FOR THE

20   CLOTHES.

21             THE COURT:  OKAY. WELL --

22             MR. SANCHEZ:  BUT I DID DELIVER THEM ON SATURDAY TO

23   THE JAIL.

24             THE COURT:  WELL, IN AN ABUNDANCE OF CAUTION, JUST

25   PREPARE ANOTHER ONE SO I CAN SIGN, AND THEN MAKE SURE THAT

26   HE'S DRESSED OUT FOR TOMORROW BECAUSE IT'S ALREADY 3:10, AND

27   AFTER WE GET THROUGH THESE MOTIONS, IT LOOKS LIKE WE'RE NOT

28   GOING TO BE CALLING UP THE JURY TODAY, AND ESPECIALLY IN

1      LIGHT OF THE FACT THAT HE'S NOT DRESSED OUT.

2                  MR. SANCHEZ:  OKAY.

3                  THE COURT:  OKAY.  SO GOING THROUGH THE TRIAL

4      BRIEF.  FIRST ISSUE -- WE'LL JUST TAKE THEM ONE BY ONE.  ON

5      PAGE 2, IF THE DEFENDANTS TESTIFY THEY MAY BE IMPEACHED WITH

6      PRIOR FELONY CONVICTIONS AND TRUE FINDINGS, SPECIFICALLY

7      PEOPLE WOULD SEEK TO INTRODUCE MR. LEON'S TRUE FINDING AS A

8      JUVENILE FOR PENAL CODE SECTION 211 DATING FROM 1999, AND

9      ALSO RODRIGUEZ'S PRIOR CONVICTION OF PENAL CODE SECTION 459

10     ALSO FROM 1999.  DO YOU SUBMIT ON THE DISCUSSION IN CHAMBERS,

11     OR IS THERE ANYTHING IN ADDITION THAT YOU WISH TO ADD?

12                 MR. SANCHEZ:  I'LL SUBMIT IT, YOUR HONOR.

13                 MR. LEAHY:  I'M SORRY, YOUR HONOR.  WAS THIS THE

14     GANG EVIDENCE ISSUE?

15                 THE COURT:  NO, NO.  THIS IS ONLY FOR PURPOSES OF

16     IMPEACHMENT.

17                 MR. LEAHY:  SUBMIT IT.

18                 THE COURT:  OKAY.  ALL RIGHT.  BASED ON PEOPLE VS.

19     CASTRO AND IT'S PROGENY, THE COURT FINDS THAT THEY WILL BE

20     PERMITTED TO BE IMPEACHED IF THEY TESTIFY.  FIRST OF ALL,

21     MR. LEON WOULD BE PERMITTED TO BE IMPEACHED WITH HIS 211 TRUE

22     FINDING FROM 1999.  AND MR. RODRIGUEZ WILL BE PERMITTED TO BE

23     IMPEACHED WITH HIS PRIOR CONVICTION OF PENAL CODE SECTION

24     459, AS THEY ARE BOTH CRIMES OF MORAL TURPITUDE.  AND CASE

25     LAW INSTRUCTS THAT PEOPLE WHO TESTIFY ARE NOT ENTITLED TO A

26     FALSE AURA OF VERACITY IN THOSE INSTANCES.  THEY DO -- THEY

27     ARE CRIMES OF MORAL TURPITUDE, SO UNDER CASTRO AND BEAGLE AND

28     THE PROGENY OF THOSE CASES, THOSE WILL BE PERMITTED FOR

1    IMPEACHMENT PURPOSES.

2          NEXT ISSUE IS CHARACTER EVIDENCE FOR IMPEACHMENT.  AND

3    IT'S MY UNDERSTANDING THAT NEITHER MR. LEON NOR MR. RODRIGUEZ

4    WILL BE PRESENTING CHARACTER EVIDENCE; IS THAT CORRECT?

5          MR. LEAHY:  ON BEHALF OF MR. LEON, THAT'S CORRECT.

6          MR. SANCHEZ:  AND THAT'S CORRECT ON BEHALF OF

7    MR. RODRIGUEZ.

8          THE COURT:  OKAY.  SO THAT MAKES THAT ISSUE MOOT,

9    BECAUSE THERE'S NO NEED TO ADDRESS WHETHER THE PEOPLE CAN

10   PRESENT IMPEACHMENT CHARACTER EVIDENCE.  SO THAT ISSUE

11   BECOMES MOOT.  AND WE DO HAVE -- JUST OFF THE RECORD FOR A

12   MINUTE.

13          (DISCUSSION CONCERNING AN UNRELATED MATTER, NOT

14          REPORTED.)

15          THE COURT:  BACK ON THE RECORD.  BEFORE WE GET TO

16   THE NEXT ISSUE, WHICH IS THE 1101(B), LET ME JUMP AHEAD TO

17   WHAT'S NOTED AS THE 4TH ISSUE ON PAGE 7 OF THE PEOPLE'S

18   MOTION, WHICH HAS TO DO WITH GANG EVIDENCE UNDER PENAL CODE

19   SECTION 186.22.  NOW, HERE IN THE AMENDED INFORMATION, WE

20   HAVE THE GANG ENHANCEMENT ALLEGATION, THE 186.22 ALLEGATION.

21   AND IN OUR DISCUSSION IN LIMINE, BASICALLY WE WERE TALKING

22   ABOUT WHAT CAN COME IN UNDER PROPERLY ADMITTED EVIDENCE TO

23   ESTABLISH THE GANG ENHANCEMENT.  AND THE DISCUSSION, FIRST OF

24   ALL, CENTERED ON WHETHER IT COULD INCLUDE PREDICATE ACTS THAT

25   INCLUDE PRIOR CONVICTIONS OR TRUE FINDINGS OF THE DEFENDANTS.

26   AND MR. LEAHY HAD POINTED OUT HE HAD NOT ENCOUNTERED A

27   SITUATION IN THE PAST WHERE THE PREDICATE CRIME WAS A PRIOR

28   CONVICTION OF ONE OF THE DEFENDANTS.

1       AND LOOKING AT THE CASE LAW, THE PEOPLE CITE AMPLE CASE

2   LAW, A LOT OF CASES -- PEOPLE VS. OLGEIN(SIC), PEOPLE VS.

3   GOMEZ(SIC), PEOPLE VS. LOEUN, L-O-E-U-N, WHICH IS 17 CAL.4TH

4   1, AS WELL AS PEOPLE VS. ZERMENO, Z-E-R-M-E-N-O, WHICH IS 21

5   CAL.4TH 927. AND BASED ON THOSE CASES AND OTHER ADDITIONAL

6   CASES, THE PEOPLE'S POSITION IS THAT PREDICATE OFFENSES CAN

7   INCLUDE OFFENSES FOR WHICH THE DEFENDANTS HAVE EITHER HAD A

8   CONVICTION FOR A TRUE FINDING. AND THE SPECIFIC ONES THAT WE

9   WERE DISCUSSING WAS MR. LEON'S TRUE FINDING AS A JUVENILE FOR

10  THE 211. AND SO WE TOOK A BREAK, AND WE WERE LOOKING AT THE

11  CASE LAW. AND COUNSEL WAS LOOKING AT THE CASE LAW. IS THERE

12  ANYTHING, MR. LEAHY, YOU WANT TO ADD TO THAT DISCUSSION?

13      MR. LEAHY: YOUR HONOR, I DON'T -- YES, THERE IS.

14  I DON'T INDICATE -- I CANNOT INDICATE TO THE COURT THAT I

15  READ ALL OF THE CASES. HOWEVER, I WAS ABLE TO READ SOME OF

16  THEM. AND NONE OF THE CASES THAT I READ ARE CASES IN WHICH

17  THE PROSECUTION SOUGHT TO INTRODUCE A PRIOR GANG RELATED

18  CRIME OF A DEFENDANT AS ONE OF THE PREDICATE CRIMES TO

19  ESTABLISH THE GANG ENHANCEMENT.

20      INTERESTINGLY ENOUGH, THE MOST RECENT CASES WHICH ARE

21  THE ZERMENO, Z-E-R-M-E-N-O, AND THE LOEUN CASE, L-O-E-U-N. I

22  DIDN'T READ LOEUN, BUT I DID READ ZERMENO. THOSE ARE KIND OF

23  INTERESTING CASES, AT LEAST THE ONE THAT I READ, THE ZERMENO

24  CASE IS INTERESTING, AND I THINK IT'S TOTALLY MISQUOTED IN

25  THE DISTRICT ATTORNEY'S PAPERS.

26      THAT CASE WAS A CASE IN WHICH THE CRIME THAT WAS AT

27  ISSUE, THE CRIME THAT WAS BEING TRIED IN THAT CASE, THE

28  PEOPLE WERE TRYING TO ESTABLISH JUST BY USING THAT CRIME,

```
 1    THEY WERE TRYING TO ESTABLISH TWO PREDICATE CRIMES, THAT WAS

 2    WHAT THEY WERE TRYING TO DO.  AND APPARENTLY, THE UNDER --

 3    THE COURT BELOW WAS APPARENTLY WAS ABLE TO DO THAT.  THEY

 4    SAID THAT WE HAD THE INITIAL CRIME, WHICH WAS SOME TYPE OF AN

 5    ASSAULT, I BELIEVE, SOME TYPE OF A FIGHT, COULD BE USED, AND

 6    THEN AN AIDER AND ABETTOR WHO IS ALSO A GANG MEMBER, WHOSE

 7    JOB IT WAS TO KEEP AWAY PEOPLE FROM INTERFERING IN THE FIGHT,

 8    KIND OF ACTING AS THE GATEKEEPER, THAT HIS AIDING AND --

 9    EXCUSE ME YOUR HONOR.

10              THE COURT:  OFF THE RECORD FOR A SECOND.

11              (DISCUSSION CONCERNING AN UNRELATED MATTER.  NOT

12              REPORTED.)

13              THE COURT:  BACK ON THE RECORD.  YOU MAY CONTINUE.

14              MR. LEAHY:  THANK YOU.

15              THE COURT:  SO YOU WERE DISTINGUISHING THAT CASE

16    ZERMENO.

17              MR. LEAHY:  WHAT THE PROSECUTION WAS SEEKING TO DO

18    IN THAT CASE WAS TO USE THE INSTANT CRIME, WHICH I THINK THE

19    LAW SAYS CLEARLY THEY CAN USE AS TWO PREDICATE OFFENSES.  THE

20    SUPREME COURT SAID, "NO, YOU CAN'T DO THAT" AND THE REASON

21    IS THAT IF ONE PERSON'S LIABILITY IS PREDICATED ON AN AIDER

22    AND ABETTOR LIABILITY, YOU DON'T HAVE TWO CRIMES.  YOU ONLY

23    HAVE ONE CRIME.  AND SO THEY TOLD THE COURT'S BELOW YOU CAN'T

24    DO IT.

25              NOW, THAT'S CLEARLY, IN ONCE SENSE, NOT RELEVANT AT ALL

26    TO THE ISSUE THAT IS INVOLVED IN THIS CASE, AND THAT THE

27    DISTRICT ATTORNEY IS SEEKING TO PUT BEFORE YOUR HONOR.  AND

28    IT SEEMS TO ME THAT WHAT THAT COURT -- WHAT THAT CASE DOES
```

1    STAND FOR APPARENTLY IS THAT THE CRIME AT TRIAL, THE CRIME AT

2    ISSUE, CAN BE USED AS ONE OF THE PREDICATE CRIMES FOR THE

3    GANG ENHANCEMENT.  BUT THERE'S NOTHING IN THAT CASE THAT

4    TALKS ABOUT A SITUATION LIKE WE HAVE HERE, WHICH IS, CAN WE

5    USE A FORMER CRIME OF ONE OF THE DEFENDANTS AS A PREDICATE

6    CRIME.

7         NOW, IT SEEMS TO ME THAT WE OUGHT TO BE CAREFUL IN DOING

8    THAT.  IF WE'RE USING THE CRIME THAT'S AT ISSUE, FOR EXAMPLE,

9    THE CASE INVOLVING THIS AUTO BURGLARY THAT WE HAVE BEFORE

10   YOUR HONOR, ONE CAN UNDERSTAND WHY THE COURT OF APPEALS AND

11   THE SUPREME COURT MIGHT SAY, "WELL, YOU CAN USE THAT BECAUSE

12   YOU'RE GOING TO HAVE TO -- AS A PREDICATE CRIME -- BECAUSE

13   YOU'RE GOING TO HAVE TO PROVE IT UP ANYWAY.  YOU'RE GOING TO

14   HAVE TO PROVE UP THE FACTS.  IT'S NOT GOING TO BE PREJUDICIAL

15   TO THE DEFENDANT OTHER THAN THE NORMAL PREJUDICE THAT OCCURS

16   BECAUSE THERE ARE FACTS COMING IN THAT INDICATE THAT HE

17   COMMITTED A CRIME."  AND SO I CAN UNDERSTAND WHY THAT CRIME

18   CAN SERVE THE DUAL PURPOSE OF, YOU KNOW, OBVIOUSLY THE

19   EVIDENCE SHOULD GO TOWARDS HIS GUILT, AND THE EVIDENCE CAN

20   ALSO GO TOWARDS HIS GANG INVOLVEMENT.  BUT THAT'S WHAT WE

21   HAVE HERE.

22        WHAT WE HAVE HERE IS A PRIOR CRIME OF MY CLIENT, THE

23   DEFENDANT.  AND ALTHOUGH THEIR ARGUMENT IS THAT WE JUST WANT

24   TO BRING THAT CRIME IN AS ON THE GANG ENHANCEMENT, IT'S ALSO

25   EXTREMELY PREJUDICIAL, AND SEEMS TO ME THAT SINCE I'VE FOUND

26   NO CASE THAT ALLOWED THAT TO BE USED AS A PREDICATE CRIME, A

27   PRIOR CRIME OF THE DEFENDANT TO BE USED AS A PREDICATE CRIME.

28   I THINK THE COURT'S GOT TO BE VERY CAUTIOUS AND VERY CAREFUL.

1    AND I THINK THAT RATHER THAN BLUR THE ANALYSIS OF THE GANG

2    ENHANCEMENT AND 1101(B), I THINK THE COURT NEEDS TO SIMPLY

3    LOOK AT 1101(B) AND SAY COULD THIS COME IN UNDER 1101(B), AND

4    THAT'S THE ANALYSIS.  I WOULD ASK THE COURT TO BE VERY

5    CIRCUMSPECT AS TO WHETHER OR NOT THAT KIND OF EVIDENCE CAN

6    COME IN UNDER THE GUIDES OF THE GANG ENHANCEMENT WITHOUT SOME

7    EXPLICIT AUTHORITY THAT SAYS IT CAN COME IN.

8        NOW, THERE'S ANOTHER ARGUMENT THAT THE DISTRICT ATTORNEY

9    MADE IN CHAMBERS WHICH WAS THAT, "WELL, WHAT BETTER WAY TO

10   SHOW THAT A PERSON IS GANG INVOLVED OTHER THAN HE WAS

11   INVOLVED IN PRIOR GANG CRIMES." I DON'T THINK I CAN

12   CHALLENGE THE FACT THAT THAT MAY BE THE VERY BEST EVIDENCE

13   THAT THERE IS THAT JOSE LEON IS A GANG MEMBER, BUT THEY'RE

14   NOT GOING TO NEED IT.  THEY'VE GOT, AS THE PRELIMINARY

15   EXAMINATION CLEARLY SHOWS, THEY'VE GOT INCREDIBLE AMOUNTS OF

16   EVIDENCE THAT TIES HIM WITH SAN YSIDRO.  THEY'VE GOT FI'S,

17   THEY'VE GOT ADMISSIONS, THEY'VE GOT ALL KIND OF THE USUAL

18   STUFF THAT THEY NORMALLY USE.  THEY'VE GOT A LOT OF EVIDENCE.

19   THEY GOT A GANG EXPERT, THEY GOT ALL OF THIS STUFF THAT'S

20   GOING TO COME IN.  SO I WOULD SIMPLY SAY THE PREJUDICIAL

21   EFFECT FAR OUTWEIGHS ANY PROBATIVE VALUE THAT IT MIGHT HAVE

22   ON THE ISSUE OF WHETHER THESE WERE GANG MEMBERS AND WHETHER

23   THE GANG ENHANCEMENT SHOULD APPLY.  THEY HAD NO PROBLEM AT

24   THE PRELIM ESTABLISHING IT.  I DON'T ANTICIPATE THEY'RE GOING

25   TO HAVE SOME DIFFICULTY AT THE TRIAL ESTABLISHING IT.  AND

26   WHY SHOULD THEY BE ALLOWED TO CIRCUMVENT THE 1101(B) RULES

27   WHICH ARE SPECIFIC STATUTES SPECIFICALLY DESIGNED TO CONTROL

28   THE ADMISSION OF PRIOR BAD ACTS.  AND IT'S A VERY SERIOUS

1   ISSUE.  THE STATUTE IS VERY CLEAR ON WHAT'S GOT TO BE MET

2   BEFORE IT CAN COME IN.  IT'S DANGEROUS KIND OF TESTIMONY.

3   AND WHY SHOULD THE DISTRICT ATTORNEY BE ALLOWED TO CIRCUMVENT

4   ALL OF THE 1101(B) RULES AND SNEAK IT IN THROUGH THE BACK

5   DOOR, AND I WOULD ARGUE TO THE COURT THAT THAT'S IMPROPER AND

6   COURT SHOULD NOT ALLOW IT.  I HAVEN'T HAD A CHANCE TO READ

7   ALL OF THE CASES PERHAPS IF THERE IS A CASE THAT TALKS ABOUT

8   THE USE OF A PARTICULAR DEFENDANT'S PRIOR CRIMES THAT COME IN

9   UNDER SOME THEORY OTHER THAN 1101(B), I WOULD LIKE TO READ

10  IT.

11          THE COURT:  WELL, BEFORE YOU SIT DOWN LET ME JUST

12  ASK YOU ALSO IN REGARDS TO ANOTHER ASPECT OF OUR DISCUSSION

13  IN CHAMBERS WAS THAT YOU WERE NOT GOING TO BE REQUESTING A

14  402 HEARING BEFORE THE JURY COMES IN REGARDING THE GANG

15  ENHANCEMENT; IS THAT CORRECT.

16          MR. LEAHY:  THAT'S CORRECT.

17          THE COURT:  AND MR. SANCHEZ, IS THAT ALSO CORRECT?

18          MR. SANCHEZ:  YES, IT IS, YOUR HONOR.

19          THE COURT:  OKAY.  SO IN OTHER WORDS, YOUR BASIC

20  CHALLENGE TO THAT EVIDENCE WILL COME IN THE COURSE OF TRIAL

21  THROUGH CROSS-EXAMINATION AND SO FORTH?

22          MR. LEAHY:  THAT'S CORRECT.

23          THE COURT:  MR. SANCHEZ?

24          MR. SANCHEZ:  THAT'S CORRECT.

25          THE COURT:  AND MR. SANCHEZ IS THERE ANYTHING IN

26  ADDITION YOU WISH TO ADD IN REGARDS TO THAT LAST ISSUE

27  MR. LEAHY WAS ADDRESSING?

28          MR. SANCHEZ:  NO, YOUR HONOR.  I SUBMIT.

1          THE COURT:  OKAY.  MS. ROACH.

2          MS. ROACH:  THANK YOU, YOUR HONOR.  FIRST OF ALL

3    I'D LIKE TO ADDRESS MR. LEAHY'S ALLEGATION THE PROSECUTION

4    WAS MISQUOTING ZERMENO.  IN FACT, THE PROSECUTION GOES AT

5    GREAT LENGTHS IN PAGE 16 AND 17 TO DESCRIBE EXACTLY WHAT

6    HAPPENS IN ZERMENO.  THERE ARE NO MISQUOTES.  IT'S SIMPLY PUT

7    IN THERE FOR THE CROSS-ADMISSION THAT ZERMENO NARROWED THE

8    SCOPE OF THE LOEUN DECISION.

9          IN ADDITION, IN DISCUSSING CASES THAT SPECIFICALLY ALLOW

10   A DEFENDANT'S PRIOR ACT TO BE A PREDICATE OFFENSE, WE HAVE

11   BOTH IN RE ELODIO O., THAT'S E-L-O-D-I-O, AND THEN INITIAL O,

12   AT 56 CAL.APP4TH 1174.  THERE'S ALSO PEOPLE VERSUS LOEUN,

13   L-O-E-U-N, AND THAT'S AT 17 CAL.4TH 1, BOTH OF THOSE CASES

14   ALLOWED A PROSECUTOR TO CHARGE TWO ACTS, TWO SEPARATE ACTS BY

15   A DEFENDANT, AND USE ONE OF THOSE ACTS AS A PREDICATE OFFENSE

16   IN ORDER TO PROVE THE PATTERN OF CRIMINAL GANG ACTIVITY.  SO

17   I THINK BOTH OF THOSE CASES ARE DIRECTLY ON POINT AS TO THAT

18   ISSUE.

19         AS TO MR. LEAHY'S FOURTH ARGUMENT, HE ARGUED THAT IT IS

20   TOO PREJUDICIAL TO ADMIT THE PRIOR CRIME BECAUSE IT IS SO

21   PROBATIVE.  WELL, THAT IS NOT THE DEFINITION OF PREJUDICIAL.

22   THE PROBATIVE VALUE SIGNIFICANTLY OUTWEIGHS ANY PREJUDICE

23   WHICH WOULD BE SOMETHING COMING TO THE DEFENDANT THAT'S

24   UNTOWARD OR UNWARRANTED.  AND IN THIS CASE, THE REALITY IS

25   THAT THESE DEFENDANTS ARE CHARGED ON COUNTS 3 AND 4 WITH

26   CRIMES THAT HAVE AS ELEMENTS THE REQUIREMENT THAT I PROVE

27   THEY ARE GANG MEMBERS.  SO ISSUES OF BIFURCATION AND

28   PREJUDICE AS TO THEIR GANG STATUS ARE REALLY MOOT.  I MEAN,

1    THOSE ARE ISSUES THAT I HAVE TO PROVE UP NOT ONLY AS

2    ALLEGATIONS, BUT AS PART AND PARCEL OF THE UNDERLYING

3    CHARGES.  I REALLY DON'T THINK THAT THE 352 ARGUMENT HAS ANY

4    WEIGHT WHATSOEVER WHEN YOU'RE TALKING ABOUT THE PROSECUTOR'S

5    DUTY TO PROVE AN ELEMENT TO THE OFFENSE.

6         AND THEN, FINALLY, WITH REGARD TO THE 1101(B) EVIDENCE,

7    IT IS TRUE THAT 1101(B) DOES DEFINE THE LIMITED AREAS WHERE A

8    PERSON CAN BRING IN PRIOR BAD ACTS, BUT TWO OF THOSE AREAS

9    THAT ARE WELL RECOGNIZED ARE MOTIVE AND INTENT.  AND THAT'S

10   EXACTLY WHAT THE PROSECUTION IS TRYING TO DO HERE.  AND WHEN

11   YOU'VE GOT A SITUATION WHERE BOTH THE ALLEGATIONS AS WELL AS

12   ELEMENTS OF THE OFFENSE REQUIRE THE PROSECUTION THEN TO

13   INTRODUCE EVIDENCE OF GANG AFFILIATION, THEN I DON'T SEE ANY

14   PREJUDICE THAT CAN ATTACH TO INTRODUCING THAT SAME TYPE OF

15   EVIDENCE UNDER 1101(b) AND MOTIVE AND INTENT.  AND IN FACT, I

16   THINK BECAUSE OF THE CROSS-ADMISSIBILITY, THE BURDEN IS, IN

17   FACT, SOMEWHAT LESSENED BECAUSE THE PREJUDICE ASPECT IS VOID.

18   YOU SIMPLY GET THAT EVIDENCE IN BECAUSE IT COMES IN AS AN

19   ELEMENT AS WELL AS AN ALLEGATION.

20            THE COURT:  MR. LEAHY?

21            MR. LEAHY:  YOUR HONOR, PEOPLE V. LOEUN -- AND I'M

22   QUOTING HER EXACT LANGUAGE FROM HER MOVING PAPERS.

23            THE COURT:  AT WHAT PAGE?

24            MR. LEAHY:  I'M LOOKING AT PAGE 15 OF HER MOTION,

25   YOUR HONOR.

26            THE COURT:  OKAY.

27            MR. LEAHY:  SHE SAYS, "MORE SIGNIFICANTLY, THE

28   CALIFORNIA SUPREME COURT OF PEOPLE v. LOEUN HAS GIVEN ITS

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 82 of 132
Case 2:08-cv-02310-JVS-SS    Document 1-7    Filed 04/08/2008    Page 25 of 50

13

1   EXPRESSED BLESSING TO THIS CONCEPT.  LOEUN FOUND THE

2   PROSECUTION COULD ESTABLISH THE PREDICATE OFFENSES TO THE

3   EVIDENCE OF THE DEFENDANT'S ACTIVITY IN THE CHARGED CRIME."

4   NOW, SHE TOOK THE -- SHE JUST ARGUED THAT THIS WAS A PRIOR

5   CRIME, AND THAT SOMEHOW LOEUN WAS CONCERNED WITH A PRIOR

6   CRIME, AS SHE'S TRYING TO SAY WE CAN GET MR. LEON'S PRIOR

7   CRIME.  BUT SHE QUOTES IT HERSELF.  I MEAN, THAT CASE ALSO

8   CONCERNS THE CHARGED CRIME, AND I DON'T DISPUTE THAT.  BUT I

9   DON'T THINK SHE'S FOUND ANY CASE LAW AT ALL THAT SAYS YOU CAN

10  USE A PRIOR CRIME OF A DEFENDANT AS ONE OF THE PREDICATE

11  CRIMES.  IF SHE FINDS IT, I'D LIKE TO READ IT.  BUT SHE'S NOW

12  MISQUOTING LOEUN.  HER OWN MOVING PAPERS SAID IT WAS THE

13  CHARGED CRIME THAT WAS AT ISSUE THERE.

14       AND, YOUR HONOR, I HAVEN'T ADDRESSED THE 1101(B) AT ALL.

15  AND I ASSUME WE'RE GOING TO LEAVE THAT.  WE'RE GOING TO DEAL

16  WITH THAT SEPARATELY.  AND I'M NOT ASKING THE COURT TO MERGE

17  THE TWO ANALYSIS, AS THE DISTRICT ATTORNEY IS CLAIMING.  I

18  THINK THEY ARE SEPARATE ANALYSIS.  THEY HAVE TO BE DONE

19  SEPARATELY.  AND I ASK THE COURT NOT TO JUMP ON SOME

20  BANDWAGON OF CROSS-ADMISSABILITY.

21       THE COURT:  OKAY.  MS. ROACH.

22       MS. ROACH:  YOUR HONOR, JUST WITH REGARD TO LOEUN,

23  I THINK I WAS FAIRLY CLEAR THAT THOSE WERE BOTH CHARGED

24  OFFENSES.  AND THE ONLY DISTINCTION THAT I CAN FIND IS THAT

25  THE COURT ACTUALLY HAS THE BENEFIT OF HAVING PRIOR

26  CONVICTIONS FOR OFFENSES THAT OCCURRED IN THE PAST.  WITH

27  CHARGED OFFENSES, YOU DON'T HAVE THAT BENEFIT.  SO, IN FACT,

28  I THINK THE PREJUDICE IS EVEN REDUCED BEYOND WHAT IT WOULD

1    NORMALLY BE.  SO I DO THINK THAT LOEUN AND ELODIO O., BECAUSE

2    THEY DEAL WITH A DEFENDANT'S OWN ACT BEING THE PREDICATE, ARE

3    DISPOSITIVE.  I DON'T THINK THEY THERE'S ANY RATIONALE WHICH

4    SUPPORTS THAT THEY'RE NOT PART OF THE CHARGED OFFENSE, THAT

5    MEANS THAT THEY CAN'T COME IN UNDER THE PREDICATE.

6            THE COURT:  MR. SANCHEZ, ANYTHING?

7            MR. SANCHEZ:  NO, YOUR HONOR.

8            THE COURT:  LET ME JUST ASK THIS QUESTION OF THE

9    DEFENSE.  DO YOU HAVE ANY CASE THAT SAYS THE OPPOSITE OF WHAT

10   THE DA IS SAYING THAT YOU CANNOT USE A PREDICATE AS A

11   PREDICATE OFFENSE, ONE FOR WHICH THE DEFENDANT HAS EITHER A

12   TRUE FINDING OR CONVICTION?

13           MR. LEAHY:  NO.

14           THE COURT:  MR. SANCHEZ?

15           MR. SANCHEZ:  NO, I DO NOT.

16           MR. LEAHY:  YOUR HONOR, BUT THE BURDEN I DON'T

17   THINK IS ON US.  BUT I CERTAINLY, IF I HAVE AN OPPORTUNITY,

18   WHICH IT LOOKS LIKE I'M GOING TO HAVE SOME TIME, THEN I'LL

19   CERTAINLY DO SOME RESEARCH AND SEE IF I CAN FIND ANY.  BUT

20   THE CASES THAT THE DISTRICT ATTORNEY CITES CANNOT GO TO

21   SUPPORT THE THEORY THAT MR. LEON'S PRIOR CRIME CAN BE USED AS

22   A PREDICATE CRIME.  AND I THINK THE BURDEN IS ON THEM IF THEY

23   WANT TO ADVANCE THAT.  BUT I DON'T HAVE ANY CASE LAW TO THE

24   CONTRARY.

25           THE COURT:  OKAY.  SO LET ME JUST INDICATE THIS.

26   AS WE GO THROUGH TODAY ON THESE IN LIMINE MATTERS, I'LL MAKE

27   MY INITIAL DETERMINATION, BUT I WILL LEAVE OPEN THE

28   POSSIBILITY THAT IF YOU FIND SOME ADDITIONAL AUTHORITY, YOU

1    CAN CERTAINLY RAISE THAT TOMORROW MORNING.

2        MR. LEAHY:  THANK YOU, YOUR HONOR.

3        THE COURT:  OKAY.  SO STICKING STRICTLY WITH THE

4    FOURTH MOTION MADE BY THE PEOPLE ON PAGE -- STARTING ON PAGE

5    7, WITH REGARD TO GANG EVIDENCE BEING ADMISSIBLE PURSUANT TO

6    186.22, HERE THE COURT WILL RULE THAT THE PEOPLE WILL BE

7    PERMITTED TO USE AS PREDICATE ACTS PRIOR CONVICTIONS OR TRUE

8    FINDINGS AGAINST THE DEFENDANTS AS SOME OF THOSE PREDICATE

9    ACTS TO SHOW THE GANG ENHANCEMENT.  AND THAT WILL BE IN

10   CONJUNCTION WITH AN ADMONITION AT THE TIME WITH WHICH THAT

11   EVIDENCE COMES UP THAT THAT EVIDENCE GOES SOLELY TO THE

12   ENHANCEMENT, THE GANG ENHANCEMENT.

13       MS. ROACH:  YOUR HONOR, WOULD THAT ALSO BE INCLUDED

14   AS TO THE ELEMENTS OF COUNTS 3 AND 4?

15       THE COURT:  AND TO THE ELEMENTS OF 3 AND 4.  ONLY

16   ADMISSIBLE FOR COUNTS 3 AND 4, AND THE ENHANCEMENT.

17       OKAY.  NOW, AND AS PART OF COMING TO THIS RULING, THE

18   COURT HAS ALSO WEIGHED AND CONSIDERED EVIDENCE CODE SECTION

19   352, AND FINDS THAT THE PROBATIVE VALUE OUTWEIGHS THE

20   POTENTIAL PREJUDICE, AND ESPECIALLY WITH REGARDS TO COUNTS 3

21   AND 4, ARE ELEMENTS OF THE CRIME THAT THE PEOPLE HAVE TO

22   ESTABLISH.

23       NOW, GOING BACKWARDS, SO TO SPEAK, TO THE THIRD ISSUE

24   RAISED BY THE PEOPLE IN THEIR TRIAL BRIEF, WHICH IS THE

25   1101(B) THAT BEGINS ON PAGE 4 OF THE PEOPLE'S TRIAL BRIEF.

26   NOW, HERE, THE ANALYSIS IS DIFFERENT.  HERE THE CASES ARE

27   PEOPLE VS. EWOLDT 7 CAL.4TH 380, AND PEOPLE VS. BALCOLM 7

28   CAL.4TH 414.  AND FIRST OF ALL, THE COURT IS LOOKING TO SEE

1    WHETHER THE EVIDENCE IS MATERIAL AND RELEVANT, THAT IT'S NOT

2    SIMPLY PROPENSITY EVIDENCE, AND ALSO LOOKING AT THE DEGREE OF

3    SIMILARITY BETWEEN THE PRIOR ACT CHARGED AND THE CURRENT

4    CRIME ALLEGED.

5        AND INITIALLY IN THE PEOPLE'S PAPERS, THE PEOPLE

6    INDICATED PAGE 4, LINES 17 THROUGH 18, THAT IT IS ADMISSIBLE

7    FOR MOTIVE, OPPORTUNITY, INTENT, PREPARATION, PLAN,

8    KNOWLEDGE, IDENTITY, ABSENCE OF MISTAKE OR ACCIDENT,

9    BASICALLY EVERYTHING UNDER 1101(B).  BUT, NOW, AFTER FURTHER

10   DISCUSSION, THE PEOPLE ARE NARROWING THAT TO MOTIVE AND

11   INTENT.  CLEARLY WITH REGARD TO IDENTITY, THIS IS NOT A

12   SIGNATURE CRIME.  FOR EXAMPLE, FOCUSING SPECIFICALLY ON --

13   AND LET ME JUST CLARIFY HIS.  ARE THE PEOPLE INDICATING BY

14   THIS DISCUSSION -- BECAUSE I THINK THE FOCUS IS PRIMARILY ON

15   DEFENDANT LEON NOT ON DEFENDANT RODRIGUEZ WITH REGARD TO HIS

16   PRIOR BURGLARY; IS THAT CORRECT?

17        MS. ROACH:  THAT'S CORRECT, YOUR HONOR.

18        THE COURT:  AND THE PEOPLE ARE NOT ASSERTING THAT

19   THE PRIOR BURGLARIES ON RODRIGUEZ IS IN FURTHERANCE OF ANY

20   CRIMINAL STREET ACTIVITY?

21        MS. ROACH:  NOT IN THE SAME SENSE THAT THERE'S A

22   GROUP OF GANG MEMBERS WHO ARE GOING IN TO COMMIT A CRIME.

23   MR. RODRIGUEZ'S BURGLARY, BECAUSE IT IS ONE OF THE PREDICATED

24   OFFENSES, AND HE WAS A DOCUMENTED GANG MEMBER AT THE TIME,

25   CAN BE USED AS A PREDICATE UNDER THE CURRENT CASE LAW.  BUT

26   IN MY MIND, THERE'S A DISTINCTION BETWEEN THAT AND THE TYPE

27   OF INTENT AND MOTIVE THAT ARE SHOWN IN MR. LEON'S PRIOR WHERE

28   HE WAS CLEARLY AIDING AND ABETTING OTHER GANG MEMBERS.  I

1    DON'T THINK THAT MR. LEON'S -- I'M SORRY -- MR. RODRIGUEZ'S

2    PRIOR IS ADMISSIBLE UNDER 1101(B), BUT I DO THINK THAT

     *why didn't my attorney argue this? 1101(B)*

3    MR. LEON'S IS.

4              THE COURT:  OKAY.  SO FOR OUR DISCUSSION, WE'RE

5    FOCUSING ON MR. LEON'S PRIOR 211, AND THAT'S THE FOCUS OF

6    THIS DISCUSSION.  SO, AGAIN, IDENTITY, THIS NOT THE SIGNATURE

7    CRIME.  THE PRIOR 211, AS I UNDERSTAND THE OFFER OF PROOF, IS

8    THAT IT WAS MR. LEON AND TWO OTHER INDIVIDUALS WHO WERE ALSO

9    MEMBERS OF THE SAME GANG WHO CONFRONTED SOMEONE THAT TOOK

10   PROPERTY FROM THEM, CORRECT?

11             MS. ROACH:  THAT IS CORRECT, YOUR HONOR.  I THINK

12   THERE WERE THREE INDIVIDUALS ASIDE FROM MR. LEON.

13             THE COURT:  OKAY.  SO A TOTAL OF FOUR?

14             MS. ROACH:  YES.

15             THE COURT:  ALL RIGHT.  AND THEN THE INSTANT

16   OFFENSE, AS THE OFFER OF PROOF BY THE PEOPLE, IS THAT IT WAS

17   A SITUATION OF A CAR BURGLARY BEING INTERRUPTED BY SOME

18   CIVILIANS WHO CAME UP ON IT, AND AT THAT POINT, THE CIVILIANS

19   WERE THREATENING TO CALL THE POLICE, AND THEN THERE WAS A

20   GUNSHOT TO SCARE THEM OFF, AND THEN MR. LEON AND

21   MR. RODRIGUEZ LEFT IN A CAR.  AND THEN AFTERWARDS, THEY WERE

22   PULLED OVER AND THERE WAS A SHORT FOOT PURSUIT.

23        AND WITH REGARD TO THE RELEVANT ASPECTS HERE, WITH

24   REGARD TO INTENT, NOW, INTENT, IN TERMS OF THE DIFFERENT

25   ANALYSIS, REQUIRES THE LEAST DEGREE OF SIMILARITY, BECAUSE

26   SIMILAR INTENT CAN BE INFERRED FROM SIMILAR ACTS IF A PRIOR

27   THEFT-RELATED OFFENSES, BUT IT'S A VERY DIFFERENT THEFT-TYPE

28   OF OFFENSE.  THE FIRST ONE, THE 211(B) FROM AN INDIVIDUAL,

1    AND THE INSTANT ONE BEING OF A CAR.

2        WITH REGARD TO MOTIVE, I TAKE IT THE PEOPLE'S POSITION

3    IS THAT THIS CRIME IS FOR THE BENEFIT OF THE STREET GANG.

4    GOING INTO MOTIVE, THAT WOULD REQUIRE A HIGHER DEGREE OF

5    SIMILARITY THAN FOR INTENT.  IT GOES TO MORE LIKE A COMMON

6    PLAN.  AND HERE, THERE NEEDS TO BE COMMON FEATURES SUCH THAT

7    AN INFERENCE CAN BE DRAWN THAT THE DEFENDANT WHO COMMITTED

8    THE PRIOR WOULD ALSO COMMIT THE CURRENT ACT.  SO THE DEGREE

9    OF SIMILARITY HAS TO BE HIGHER THAN FOR INTENT, NOT AS HIGH

10   AS FOR IDENTIFICATION.  BUT HERE I THINK IT'S VERY CLEAR IT'S

11   NOT A SIGNATURE CRIME, AND I DON'T THINK THE PEOPLE ARE

12   ARGUING THAT.  SO WITH REGARD TO MOTIVE AND INTENT, LET ME

13   FIRST GET THE PEOPLE'S SPECIFIC POSITION AS TO MOTIVE AND

14   INTENT UNDER 1101(B).

15       MS. ROACH:  THANK YOU, YOUR HONOR.  YOUR HONOR, I

16   THINK THAT THE MOTIVE IN BOTH CASES IS TO STEAL.  IT'S FOR

17   PROFIT.  IN ADDITION, THE OTHER MOTIVE IS TO ASSIST, TO AID

18   AND ABET A FELLOW GANG MEMBER.  SO THERE'S ACTUALLY TWO

19   SEPARATE MOTIVES WHICH I THINK FORM THE BASIS FOR THIS CRIME.

20   AND MOTIVE IS REALLY SIMPLY PART IN PARCEL OF INTENT.  WHAT

21   YOU'RE DRIVEN BY IN SOME WAY MAKES YOUR INTENT WHAT IT IS.

22   IS YOUR INTENT TO AID AND ABET?  IS YOUR INTENT TO STEAL?

23   THAT TYPE OF THING.

24       I WOULD NOTE THAT IN THE FIRST OFFENSE, THERE WAS A

25   THEFT.  IT INVOLVED SIDRO GANG MEMBERS WHICH I THINK IS

26   IMPORTANT BECAUSE IT IS A STRONG SIMILARITY BETWEEN BOTH OF

27   THE OFFENSES.  IT INVOLVED ACCOSTING AN INDIVIDUAL, WHICH IS

28   DIFFERENT OBVIOUSLY THAN THE INSTANT CASE IN SOME REGARDS,

1   BUT THE ITEMS THAT WERE STOLEN WERE SIMILAR -- CREDIT CARDS,

2   PHONE CARDS, THINGS OUT OF THIS INDIVIDUAL'S WALLET.  IN THE

3   CURRENT OFFENSE, SIMILAR THINGS WERE TAKEN -- IDENTIFICATION

4   CARD, SHELL GAS STATION CARD, CLEARLY THE TYPES IF ITEMS THAT

5   WERE TAKEN WERE ITEMS THAT WERE DESIGNED TO MAKE A FINANCIAL

6   GAIN FOR THE INDIVIDUALS INVOLVED IN THE CRIME.

7         ALSO, IN BOTH OF THE CRIMES, A WEAPON WAS USED.  IN THE

8   FIRST CRIME, A SCREWDRIVER WAS USED.  IN THE SECOND CRIME, A

9   FIREARM WAS USED.  I THINK THE FACT THAT THERE WAS ARMING BY

10  ONE OF THESE GANG MEMBERS DURING EACH OF THE CRIMES IS

11  IMPORTANT.  WE CAN LOOK AT SPECIFICS AS FAR AS IT BEING A

12  STRONG ARM ROBBERY -- OR AN ARMED ROBBERY VERSUS A VEHICLE

13  BURGLARY ON THE FACE I THINK THAT THEY SEEM QUITE DIFFERENT.

14  BUT THE FACT IS THAT AS SOON AS WITNESSES WERE WILLING TO

15  STEP IN TO TRY AND DEFEND THE PROPERTY, THE TWO DEFENDANTS

16  WERE WILLING TO USE FORCE IN ORDER TO RETAIN THE PROPERTY.  I

17  THINK THAT THAT IS ALSO A SIMILARITY.

18         I THINK THAT THE USE OF FORCE TO TAKE PROPERTY IS

19  UNUSUAL ENOUGH IN ITSELF THAT THE COURT SHOULD LOOK AT THE

20  FACT THAT IT WAS REALLY USED IN BOTH CASES AS BEING A

21  STRIKING SIMILARITY, AND NOT JUST A DIFFERENCE BETWEEN THEM

22  BECAUSE THE FORCE WAS USED DIRECTLY ON A PERSON IN THE OTHER

23  AND ONLY AFTER THE TAKING IN THE SECOND CRIME.

24         THE COURT:  OKAY.  MR. LEAHY.

25         MR. LEAHY:  THANK YOU, YOUR HONOR.  WELL, I GUESS

26  ANY TWO CRIMES HAVE SOME SIMILARITIES.  USUALLY THE CRIMINALS

27  IN BOTH CASES WEAR SHOES.  SO THAT MAKES THEM SIMILAR, AND

28  THAT'S ESSENTIALLY WHAT THE DISTRICT ATTORNEY IS TRYING TO

1    ARGUE HERE.

2        YOUR HONOR, I THINK IT'S IMPORTANT TO TAKE A LOOK AT THE

3    FACTS OF THE CURRENT CRIME.  THERE IS NO ALLEGATION, AND

4    THERE WILL BE NO EVIDENCE THAT JOSE LEON SHOT A WEAPON.

5    THERE WILL BE NO EVIDENCE THAT HE USED A WEAPON IN THE

6    COMMISSION OF THIS AUTO BURGLARY, NOR WAS HE THE ONE -- THERE

7    WILL BE NO EVIDENCE THAT HE WAS THE ONE THAT ALLEGEDLY SHOT

8    THE WEAPON TO INTIMIDATE A WITNESS.

9        THERE WILL BE EVIDENCE THAT AFTER MR. LEON AND HIS

10   ASSOCIATE LEFT THE SCENE, HAD DRIVEN SOME DISTANCE AWAY, THAT

11   THE VEHICLE THAT THEY WERE IN WAS STOPPED BY THE POLICE.  AND

12   THAT WHEN IT WAS STOPPED, MR. LEON, WHO WAS THE PASSENGER,

13   EXITED THE VEHICLE.  HE WAS LOCATED -- HE WAS ARRESTED --

14   CONTACTED A SHORT DISTANCE AWAY, AND A .22-CALIBER WEAPON WAS

15   FOUND IN HIS PANTS.  HE NEVER DREW IT.  HE NEVER THREATENED

16   ANYBODY WITH IT.  AS A MATTER OF FACT, WHEN HE WAS ARRESTED,

17   HE INDICATED TO THE OFFICERS -- HIS HANDS WERE IMMOBILE.  HE

18   COULDN'T MOVE HIS HANDS -- BUT HE INDICATED WITH HIS HEAD

19   WHERE THIS WEAPON WAS.  THEY SAID, "DO YOU HAVE ANY WEAPONS?"

20   AND HE BASICALLY INDICATED BY NODDING WHERE IT WAS.  SO HE

21   GAVE IT UP.

22        NOW, THE PRIOR CRIME, ALLEGEDLY -- AND I HAVEN'T PULLED

23   MY FILE.  I REPRESENTED MR. LEON IN THAT CRIME, SO I'VE GOT

24   THE POLICE REPORTS, BUT I HAVEN'T HAD A CHANCE TO LOOK AT

25   THEM.  BUT I'LL JUST ASSUME THAT FACTS ARE AS THE COURTS

26   UNDERSTANDS THEM, AND AS THE DISTRICT ATTORNEY UNDERSTANDS

27   THEM.  MR. LEON IS NOT GOING TO BE FOUND RESPONSIBLE FOR

28   INTIMIDATING A WITNESS BECAUSE OF ANYTHING HE AFFIRMATIVELY

*ergo Sanchez's reliance upon Leah in. of def. was misplaced, a Lechy's loye ty to refer Leo nec. constitute a conflict of in terest.*

1    DID.  HE MAY HAVE BEEN INVOLVED IN A ROBBERY WITH A COUPLE OF

2    OTHER PEOPLE.  HE MAY -- I DON'T KNOW -- I DON'T RECALL NOW

3    EXACTLY WHAT HIS INVOLVEMENT WAS IN THAT.  BUT IT WAS

4    CLEARLY, HE WASN'T -- I DON'T THINK THAT WAS AN AIDING AND

5    ABETTING CASE.  I WOULD BE INTERESTED TO KNOW IF IT WAS.  BUT

6    I DON'T REMEMBER NOW WHAT THE BASIS OF HIS LIABILITY WAS IN

7    THAT CASE.

8         BUT IN THIS CASE, IF HE'S RESPONSIBLE FOR INTIMIDATING A

9    WITNESS, IT'S NOT BECAUSE OF ANYTHING HE DID, IT'S GOING TO

10   BE BECAUSE OF A COUPLE OF LEGAL THEORIES.  IT'S GOING TO BE     *prejudicial To*

11   BECAUSE OF THE REASONABLE AND PROBABLE CONSEQUENCES THEORY     *codef. Rodriguez*

12   AND THE APPLICATION OF THAT THEORY.  AND IT'S GOING TO BE AS

13   A -- WHICH IS A SUBDIVISION OF THE OVERALL AIDING AND

14   ABETTING THEORY.  THAT'S WHAT THEY'RE GOING TO SAY.  SO THE

15   CRIMES ARE SUBSTANTIALLY DIFFERENT.  WHETHER CREDIT CARDS ARE

16   TAKEN IN THE ONE CRIME OR CREDIT CARDS WERE TAKEN IN BOTH THE

17   CRIMES IS TOTALLY IRRELEVANT.  YOU DON'T GET TO USE

18   SIMILARITY OF PROPERTY TAKEN OR IT MIGHT HAVE BEEN A DOLLAR

19   BILL IN THE ONE CASE AND A DOLLAR BILL IN THE SECOND CASE AND

20   THAT NOT SUFFICIENT TO SAY THAT THEY ARE SO SIMILAR THAT YOU

21   GET TO BRING THEM IN UNDER 1101(B), AND THAT'S REALLY WHAT

22   SHE'S ARGUING.

23        MR. LEON DIDN'T THREATEN ANYONE.  MR. LEON DIDN'T FIRE A

24   WEAPON.  MR. LEON DIDN'T DISPLAY A WEAPON.  MR. LEON HAD NO

25   DIRECT INVOLVEMENT IN THAT CRIME.  AND I DON'T BELIEVE THAT

26   UNDER 1101(B) IT'S SUFFICIENT TO SIMPLY SAY THAT, "WELL, THEY

27   WERE BOTH GANG CRIMES."  I DON'T THINK THAT SATISFIES, BY

28   ITSELF, THE RULES UNDER 1101(B).  THERE'S REALLY NO

1    SIMILARITY BETWEEN WHAT MR. LEON DID IN THIS CASE, AND WHAT

2    HE ALLEGEDLY DID IN THE OTHER CASE.

3         SO THAT'S, WITHOUT HAVING REALLY DONE ANY SUFFICIENT

4    RESEARCH ON IT, THAT'S OFF THE TOP OF MY HEAD, YOUR HONOR.  I

5    DON'T SEE THAT THIS COMES WITHIN 1101(B).

6              THE COURT:  OKAY.  MR. SANCHEZ?

7    *incompetent* MR. SANCHEZ:  I DON'T HAVE ANYTHING TO ADD TO THAT,

8    YOUR HONOR.

9              THE COURT:  OKAY.  ANYTHING FURTHER, MS. ROACH?

10             MS. ROACH:  NO, YOUR HONOR.

11             THE COURT:  OKAY.  IN GOING THROUGH CASE LAW ON

12   1101(B), INVOLVED IN BALCOLM, ALSO CONSIDERING THE ISSUES FOR

13   WHICH THE PEOPLE ARE SEEKING TO INTRODUCE AS MOTIVE AND

14   INTENT, AND ALSO FACTORING IN EVIDENCE CODE SECTION 352, THE

15   COURT SEES THE EVIDENCE IN THIS AREA AS LENDING MORE TOWARDS

16   PROPENSITY EVIDENCE, AND WILL RULE THAT IT WILL BE EXCLUDED

17   UNDER 1101(B).

18   AND SO TO RECAP, THE EVIDENCE OF THE PRIORS WILL BE

19   ADMITTED WITH REGARD TO THE GANG ENHANCEMENT, INCLUDING THE

20   PREDICATE ACTS, AND WITH REGARDS TO COUNTS 3 AND 4.  AND THE

21   JURY WILL BE SPECIFICALLY ADMONISHED THAT IT IS ONLY

22   ADMISSIBLE FOR COUNTS 3 AND 4, AND THE 186.22 ENHANCEMENT.

23   BUT IT WILL NOT BE PERMITTED TO BE USED AS SUBSTITUTIVE

24   EVIDENCE TO THE UNDERLINED OFFENSES OTHER THAN COUNTS 3 AND

25   FOUR BECAUSE 3 AND 4 INVOLVE THE GANG ASPECT OF IT.

26        OKAY.  NOW, NEXT WE HAVE THE ISSUE OF BIFURCATION OF THE

27   STRIKE PRIOR.  THAT WAS DISCUSSED IN CHAMBERS.  AND IN THAT

28   REGARD, THE PEOPLE WERE ASKING WHETHER THE JURY IS GOING TO

1    BE WAIVED ON THAT.  OTHERWISE, THEY ARE REQUESTING TO BE ABLE

2    TO VOIR DIRE THE JURY WITH REGARD TO THAT.  MR. SANCHEZ.

3            MR. SANCHEZ:  YOUR HONOR, THEY JUST BROUGHT

4    MR. RODRIGUEZ OUT, AND I HAVEN'T HAD THE OPPORTUNITY TO

5    DISCUSS WITH HIM OR EXPLAIN TO HIM THE OPTIONS HE HAS WITH

6    RESPECT TO HOW THE PRIOR IS DECIDED.

7            THE COURT:  OKAY.  WHY DON'T YOU JUST TAKE A MOMENT

8    AND TALK WITH HIM.

9            MR. SANCHEZ:  ALL RIGHT.  I WILL DO THAT.  BUT

10   SINCE WE'RE NOT GOING TO HAVE A JURY HERE TODAY ANYWAY, I'LL

11   CERTAINLY MAKE SURE THAT HE UNDERSTANDS IT BY TOMORROW

12   MORNING.  BUT I CAN TALK WITH HIM NOW.

13           (COUNSEL AND THE DEFENDANT CONFER.)

14           MR. SANCHEZ:  YOUR HONOR, MR. RODRIGUEZ IS WILLING

15   TO WAIVE HIS RIGHT TO HAVE THE JURY DECIDE ON THE PRIOR AND

16   HAVE THE COURT MAKE THAT DETERMINATION.

17           THE COURT:  OKAY.  ALL RIGHT.  AND FOR THE RECORD,

18   MR. RODRIGUEZ, DO YOU WAIVE YOUR RIGHT TO A JURY TRIAL ON THE

19   ISSUE OF YOUR STRIKE PRIOR?

20           DEFENDANT RODRIGUEZ:  YES, YOUR HONOR.

21           THE COURT:  OKAY.  AND THAT DECISION WAS MADE AFTER

22   HAVING CONSULTED WITH YOUR ATTORNEY ABOUT YOUR RIGHTS IN THAT

23   REGARD AND POTENTIAL DEFENSES THAT YOU COULD RAISE IN FRONT

24   OF A JURY IN REGARDS TO THAT; IS THAT CORRECT?

25           DEFENDANT RODRIGUEZ:  YES, YOUR HONOR.

26           THE COURT:  OKAY.  AND SO I TAKE IT THEN THAT AT

27   THE END OF THE CASE, ASSUMING -- WELL, WOULD HE BE ADMITTING

28   IT UP FRONT OR JUST AT THE END IN THE EVENT OF A --

1          MR. SANCHEZ:   IN THE EVENT OF A CONVICTION, YOUR

2     HONOR, HE WOULD ALLOW THE COURT TO MAKE A DETERMINATION.

3          THE COURT:   IT WOULD BE A COURT TRIAL THEN AT THE

4     END?

5          MR.  SANCHEZ: YES.

6          THE COURT:   OKAY.  ALL RIGHT.  AND SO WE WILL MAKE

7     A NOTE OF THAT, THAT WITH REGARD TO THE STRIKE PRIOR, THE

8     JURY TRIAL WAS WAIVED, AND IT WOULD BE A COURT TRIAL AT THAT

9     POINT IN THE EVENT OF A CONVICTION.

10         NOW, THE NEXT ISSUE IS ADMISSABILITY OF THE 911 TAPE.

11    AND, I BELIEVE, IN OUR DISCUSSIONS BOTH COUNSEL WERE WILLING

12    TO STIPULATE TO THAT; IS THAT CORRECT?

13         MS. ROACH:   YES, YOUR HONOR.

14         MR. SANCHEZ:   YES, I BELIEVE WE WERE WILLING TO

15    STIPULATE TO THEIR AUTHENTICITY, YES.

16         THE COURT:   OKAY.  ALL RIGHT.  STIPULATION IS

17    ACCEPTED.

18         MS. ROACH:   SO YOUR HONOR, WITH REGARD TO

19    AUTHENTICITY, THAT'S OBVIOUSLY ONE ISSUE.  WITH REGARD TO

20    ADMISSIBILITY --

21         THE COURT:   DO COUNSEL STIPULATE TO ADMISSABILITY

22    OF THE 911 TAPE?

23         MR. SANCHEZ:   WELL, I --

24         MR. LEAHY:   YOUR HONOR, I THINK THAT --

25         MR. SANCHEZ:   -- I DON'T KNOW WHY THE WHOLE TAPE

26    NEEDS TO BE INTRODUCED.  I'M NOT SURE -- WE'RE GOING TO  HAVE

27    THE PEOPLE THAT SPOKE ON THE TAPE TESTIFY.

28         THE COURT:   WELL, THE PEOPLE'S MOTION AT PAGES 23

1    AND FOLLOWING INDICATE THE THEORY THAT IT'S A SPONTANEOUS

2    STATEMENT AT THE TIME OF THE EVENT THAT ADDRESSES THE EVENT

3    ITSELF.

4           MR. SANCHEZ:  WELL, THE WITNESSES WILL BE ON THE

5    STAND TO TESTIFY TO THOSE THINGS.  I MEAN, IF THEY'RE

6    SPONTANEOUS STATEMENTS, THEN OF COURSE THEY'RE ADMISSIBLE.

7    IF THE COURT FIND THEY'RE SPONTANEOUS, THEY'RE ADMISSIBLE.

8    BUT WILL THE COURT NEED TO KNOW -- WOULD THE COURT NEED A

9    FOUNDATION TO MAKE THAT DETERMINATION PRIOR TO HEARING THE

10   TAPE?

11          THE COURT:  THE FOUNDATION WITH REGARD TO --

12          MR. SANCHEZ:  WHETHER IT'S A SPONTANEOUS STATEMENT

13   OR NOT.

14          THE COURT:  MR. LEAHY.

15          MR. LEAHY:  YOUR HONOR, I THINK THAT WHAT

16   MR. SANCHEZ IS SUGGESTING IS THAT WE WILL STIPULATE TO THE

17   AUTHENTICITY OF IT AND THE CHAIN OF CUSTODY AND ALL OF THAT.

18   BUT WHETHER IT'S A SPONTANEOUS DECLARATION, I THINK THE COURT

19   IS GOING TO TO HAVE TO MAKE THAT DETERMINATION.

20          THE COURT:  OKAY.  AND MS. ROACH.

21          MR. SANCHEZ:  RATHER THAN JUST PLAY THE TAPE.

22          MS. ROACH:  YOUR HONOR, I DON'T KNOW.  IT COULD

23   PROBABLY BE RESOLVED WITHOUT PLAYING THE TAPE IF COUNSEL

24   AGREES THAT MY REPRESENTATIONS REGARDING THE TAPE ARE

25   ACCURATE AS DESCRIBED IN THE BRIEF WHICH IS THAT THERE IS A

26   WITNESS ON THE PHONE TALKING AS THIS INCIDENT IS OCCURRING.

27   IF YOU PREFER TO HAVE ME BRING IN THE TAPE TO ESTABLISH THAT,

28   I COULD CERTAINLY DO THAT.  WE HAVE A TRANSCRIPT AS WELL AS

*Rescued by Leahy*

1       THE TAPE.  BUT I THINK IT'S FAIRLY OBVIOUS FROM THE TAPE THAT

2   SHE'S SPEAKING WHILE IT'S HAPPENING.

3           MR. SANCHEZ:  WE CAN MAKE A STIPULATION AS TO WHAT

4   THE DA WANTS TO OFFER.  I DON'T KNOW WHAT YOU WANT TO OFFER

5   YET.  I HAVEN'T READ THAT PORTION OF YOUR BRIEF.  BUT IT'S

6   POSSIBLE ONCE WE DISCUSS THAT, THAT WE CAN STIPULATE TO THAT.

7           MS. ROACH:  THE PEOPLE ARE OFFERING THE ENTIRE

8   TAPE.  IT'S FAIRLY BRIEF.

9           THE COURT:  OKAY.  BUT DO COUNSEL STIPULATE TO THE

10  FACTUAL BASIS OF THE FACT THAT THE PERSON ON THE TAPE MADE

11  THE TAPE CONTEMPORANEOUS WITH THE EVENTS THAT ARE BEING

12  DISCUSSED ON THE TAPE?

13          MR. SANCHEZ:  YES, I BELIEVE THAT'S CORRECT.  I

14  HAVE NO PROBLEM WITH THAT.

15          THE COURT:  AND MR. LEAHY?

16          MR. LEAHY:  YOUR HONOR, COULD WE DEFER THAT UNTIL

17  TOMORROW?

18          THE COURT:  LET ME SEE.  DO YOU HAVE A COPY OF THE

19  TRANSCRIPT WITH YOU?

20          MS. ROACH:  I CAN GO GET ONE FROM MY OFFICE IF I

21  CAN JUST ABOUT 5 MINUTES.

22          THE COURT:  DO YOU HAVE EXTRA COPIES OF IT?

23          MS. ROACH:  I CAN MAKE A COPY OF IT.  IT'S IN THE

24  PROCESS OF BEING CORRECTED, SO IT'S GOT SOME HANDWRITTEN

25  NOTES ON IT.

26          THE COURT:  OKAY.  IT WILL TAKE JUST A COUPLE OF

27  MINUTES?

28          MS. ROACH:  IT WON'T TAKE LONG AT ALL.  AND IF THE

1      COURT WOULD LIKE, I'LL ALSO BRING IN THE TAPE.

2              THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

3      COUNSEL IS PRESENT, DEFENDANT IS PRESENT.  THE PEOPLE HAVE

4      BROUGHT IN THE 911 TAPE AND THE TRANSCRIPT OF IT.  AND AT

5      THIS TIME SHE WILL PLAY IT.  COUNSEL STIPULATE THAT REPORTER

6      NEED NOT HAVE TO TAKE DOWN THE TAPE, AND WE CAN SIMPLY READ

7      ALONG WITH THE TRANSCRIPT?

8              MR. SANCHEZ:  I STIPULATE, YOUR HONOR, ON BEHALF OF

9      MR. RODRIGUEZ.

10             MR. LEAHY:  SO STIPULATED, YOUR HONOR.

11             THE COURT:  OKAY.

12             MS. ROACH:  SO STIPULATED.

13             THE COURT:  ALL RIGHT.  YOU MAY PLAY THE TAPE.

14             (911 AUDIOTAPE WAS PLAYED, NOT REPORTED.

15             THE COURT:  FOR THE RECORD, WE HAVE LISTENED TO THE

16     TAPE AND FOLLOWED ALONG WITH THE TRANSCRIPT.  AND SO THE

17     PEOPLE'S POSITION IN THE TRIAL BRIEF IS THAT IT'S ADMISSIBLE

18     AS A SPONTANEOUS STATEMENT THAT WAS MADE UNDER THE STRESS AND

19     THE EXCITEMENT WITH NO OPPORTUNITY TO REFLECT.  AND

20     MR. LEAHY.

21             MR. LEAHY:  YOUR HONOR, I THINK TAKING BOTH OF

22     THESE TAPES TOGETHER, WE'VE GOT THREE SPEAKERS.  WE'VE GOT

23     THE BROTHER AND THE SISTER ON THE FIRST ONE, AND WE'VE GOT

24     THE VICTIM OF A CAR BURGLARY IN THE LAST ONE.  THE LAST ONE,

25     I THINK, IS THE EASIEST ONE TO DEAL WITH BECAUSE APPARENTLY

26     SHE DIDN'T SEE ANYTHING.  SHE SIMPLY SAYS, "SOMEBODY CAME TO

27     MY DOOR AND SAYS THEY'RE BREAKING INTO MY CAR."  SO I DON'T

28     THINK THAT COMES WITHIN ANY SPONTANEOUS DECLARATION EXCEPTION

1    TO THE HEARSAY RULE BECAUSE SHE'S NOT REPORTING ANYTHING THAT

2    SHE HERSELF ALLEGEDLY SAW.

3        AND I THINK THE SAME CAN BE -- STATEMENT CAN BE MADE

4    WITH REGARD TO THE FEMALE NARRATOR ON THE LENGTHIER -- THE

5    FIRST 911 CALL BECAUSE SHE APPARENTLY AGAIN DIDN'T SEE

6    ANYTHING.  SHE'S RELATING INFORMATION THAT APPARENTLY HER

7    BROTHER IS TELLING HER.  AND I WOULD ASK THE COURT TO LOOK AT

8    EACH AND EVERY ONE OF THE STATEMENTS THAT SHE ALLEGEDLY MADE.

9    AND IT APPEARS THAT SHE IS NEVER REPORTING ANYTHING THAT SHE

10   SAW.  SHE'S NOT GIVING A NARRATION OF ANYTHING THAT SHE IS

11   CURRENTLY SEEING OR THAT SHE'S -- OR RECOUNTING SOMETHING

12   THAT SHE HAS PREVIOUSLY SEEN.  SHE'S SIMPLY RELATING WHAT HER

13   BROTHER IS SAYING.

14        SO I THINK IF WE GO -- THE ONLY PERSON APPARENTLY WHO

15   SAW ANYTHING WHO WOULD QUALIFY AS A SPONTANEOUS DECLARATION

16   WOULD BE THE BROTHER.  AND I THINK THERE'S A SERIOUS QUESTION

17   IN HERE AS TO EXACTLY WHAT HE SAW.  HE GIVES CONTRADICTORY

18   STATEMENTS ABOUT THE WHITE JACKET, THE BLACK JACKET.  HE

19   SAYS, "THEY SHOT AT THE APARTMENT BUILDING."  "NO, THEY SHOT

20   UP IN THE AIR."  "DID HE SHOOT AT YOU?"  "NO, THEY DIDN'T

21   SHOOT AT ME."  "YES, THEY SHOT AT ME."  I MEAN, HE'S ALL OVER

22   THE PLACE IN HIS STATEMENTS.

23        SO I THINK THAT BEFORE HIS STATEMENTS CAN COME IN --

24   FIRST OF ALL, I THINK WE GOT A FOUNDATIONAL QUESTION.  IT

25   APPEARS, I SHOULD SAY, THAT HE'S THE ONE WHO IS MAKING THE

26   STATEMENTS IN THE BACKGROUND THAT HIS SISTER, I TAKE IT, IS

27   RELATING OVER THE PHONE.  BUT MAYBE THAT ISN'T EVEN TRUE.

28   MAYBE WE'VE GOT SOME OTHER SPEAKER THAT WE'RE NOT AWARE OF,

1     SOME OTHER PERSON WHO'S THIS UNIDENTIFIED VOICE.  SO I THINK

2     BEFORE WE GO MUCH FURTHER, WE'RE GOING TO NEED TO HAVE THAT

3     PERSON COME IN AND TELL US WHAT HE, IN FACT, SAW BEFORE ANY

4     OF THE STATEMENTS OF THE SISTER, OR ANY OF THE STATEMENTS

5     FROM THE BACKGROUND CAN BE ALLOWED TO COME IN.

6          I DON'T THINK SHE HAS ANY -- I DON'T THINK THERE'S ANY

7     EXCEPTION TO THE HEARSAY RULE, SPONTANEOUS DECLARATION OR

8     OTHERWISE, WHERE SHE WOULD BE ABLE TO TESTIFY AS TO WHAT HER

9     BROTHER WAS WATCHING.  THE BROTHER MIGHT BE ABLE TO HAVE A

10    HEARSAY EXCEPTION UNDER THE SPONTANEOUS DECLARATION RULE, BUT

11    APPARENTLY SHE DOES NOT.  SO I THINK WE HAVE SERIOUS

12    FOUNDATIONAL ISSUES, AND WE'RE GOING TO NEED THE BROTHER AND

13    SISTER TO COME IN AND TRY TO SORT THIS OUT FOR US.

14               THE COURT:  MR. SANCHEZ.

15               MR. SANCHEZ:  WELL, I CONCUR, YOUR HONOR.  CLEARLY

16    THE PURPOSE OF SPONTANEOUS DECLARATION IS ITS AUTHENTICITY

17    BECAUSE IT'S SOMETHING THAT SOMEBODY HAS SAW BECAUSE OF THE

18    SUDDEN NATURE OF WHAT HAS OCCURRED, AND THEY SAW IT, AND

19    THERE'S AN ACCURACY THERE.  BUT CLEARLY, THERE'S NO ACCURACY

20    HERE.  THE FEMALE WITNESS HAS WALKED BACK AND FORTH AS TO

21    WHAT HAPPENED, AND THEN IT COMES OUT THAT SHE DIDN'T ACTUALLY

22    SEE WHAT HAPPENED.  SHE'S GETTING HER INFORMATION FROM

23    ANOTHER SOURCE WHO IS NOT -- WE'RE NOT TOO SURE OF WHAT THAT

24    PERSON SAW EITHER.  BUT AT THE VERY MINIMUM, THE FEMALE

25    WITNESS DOES NOT QUALIFY, IN MY VIEW, UNDER THE SPONTANEOUS

26    DECLARATION SIMPLY BECAUSE SHE DIDN'T SEE IT, AND SHE ADMITS

27    IT.

28               THE COURT:  OKAY.  MS. ROACH.

1          MS. ROACH:  YOUR HONOR, IT'S CLEAR THAT LAURA LIMON

2    WAS PRESENT IN THE PARKING LOT WHEN THESE INDIVIDUALS WERE

3    BREAKING INTO CARS INITIALLY.  SHE HAD RAN UPSTAIRS TO CALL

4    POLICE.  I THINK THAT THAT IS A RATIONAL CONCLUSION, AND THE

5    ONLY RATIONAL CONCLUSION THAT CAN BE DRAWN FROM THE FACT THAT

6    SHE MADE THE 911 CALL.  THEN SHE IS PRESENT WHILE SHE LISTENS

7    TO WHAT IS GOING ON AND WHILE WE LISTEN TO WHAT IS GOING ON

8    ON THE TAPE, INCLUDING HEARING A GUNSHOT.  SPONTANEOUS

9    DECLARATIONS ARE NOT RESERVED FOR THINGS THAT PEOPLE SEE.

10   ANYTHING THAT SOMEBODY EXPERIENCES AND CAN TESTIFY TO IN

11   COURT, THEY CAN TESTIFY TO IN THE FORM OF A SPONTANEOUS

12   STATEMENT.

13        IN ADDITION, THERE'S A CATCHALL PROVISION UNDER THE

14   HEARSAY RULE FOR TRUSTWORTHY HEARSAY.  AND HERE WHERE

15   MS. LIMON IS RELAYING SOME INFORMATION CLEARLY THAT HER

16   BROTHER-IN-LAW IS GIVEN HER, WE HEAR THE BROTHER-IN-LAW

17   GIVING IT TO HER.  WE HEAR THE INCIDENT GOING DOWN BLOW BY

18   BLOW.  AND I THINK THIS IS EXACTLY THE TYPE OF EVIDENCE THAT

19   THAT CATCH ALL PROVISION WOULD ENCOMPASS.

20        IN ADDITION TO THAT, THERE REALLY IS A DOUBLE EXCEPTION

21   HERE, BECAUSE YOU'VE GOT MR. HERRERA WHO IS SEEING THIS

22   INCIDENT, WHO IS EXCITED BY THE INCIDENT, AND YOU'VE GOT

23   MS. LIMON WHO IS SEEING THIS INCIDENT, AND EXCITED BY THE

24   INCIDENT, AND THE COMMUNICATION BETWEEN HERRERA AND LIMON

25   REALLY QUALIFIES AS A DOUBLE EXCEPTION UNDER THE HEARSAY

26   RULE.

27        I THINK THIS IS AN ABSOLUTELY CLASSIC 911 TAPE OF AN

28   INCIDENT GOING DOWN IN PROGRESS.  THERE'S NOTHING TO INDICATE

1    THAT THERE'S ANYTHING FRAUDULENT.  IT'S CERTAINLY CHAOTIC.

2    CERTAINLY THERE'S SOME AREAS THAT ARE GOING TO NEED

3    CLARIFICATION.  I THINK THE 911 OPERATOR SEES THAT HERSELF.

4    BUT THAT'S INHERENT TO ANY TYPE OF SITUATION WHERE YOU'VE GOT

5    A VIOLENT ACT THAT OCCURS.

6         MR. SANCHEZ:  YOUR HONOR, JUST BRIEFLY IN RESPONSE.

7    THERE'S NO DISPUTE THAT THIS FEMALE WITNESS HEARD A GUNSHOT.

8    THAT'S NOT IN DISPUTE.  CERTAINLY SHE COULD HAVE HEARD IT

9    DOWNSTAIRS OR UPSTAIRS OR WHEREEVER, AND THAT'S NOT THE

10   DISPUTE.  NOBODY IS ARGUING TO THAT.

11        THE ISSUE HERE, THOUGH, IS, WAS THE GUNSHOT FIRED AT THE

12   INDIVIDUALS, OR WAS IT FIRED UP IN THE AIR.  THAT -- THAT --

13   THAT SHE DIDN'T SEE.  THAT SHE CAN'T TELL BY HEARING, AND

14   THAT SHE CAN -- THE ONLY WAY SHE COULD TELL IS BY LISTENING

15   TO SOMEBODY ELSE.  AND EVEN THEN, ADMITTEDLY, SHE GOT IT

16   WRONG BECAUSE WE GOT A TOTALLY DIFFERENT STORY FROM A PERSON

17   WHO DID SEE IT.

18        SO IT'S NOT AN ISSUE AS TO WHETHER THE GUNSHOT -- IF SHE

19   HEARD THAT OR NOT.  NOBODY'S DISPUTING THAT.  CERTAINLY SHE

20   DID.  IF THAT WAS THE ONLY THING WE WERE GOING TO HEAR FROM

21   HER, THERE WOULD BE NO OBJECTION.  "I HEARD A GUNSHOT."  BUT

22   SHE'S ATTEMPTING TO INFORM -- AT THE TIME SHE -- YES, SHE IS

23   SHOOKED UP, AND SHE'S BEING SORT OF GRILLED BY THE POLICE

24   DISPATCHER AT THE SAME TIME.  BUT THIS KIND OF TAPE COMING

25   OUT TO A JURY GIVES THE IMPRESSION -- A FALSE ONE -- THAT THE

26   GUNSHOT WAS BEING FIRED AT THESE INDIVIDUALS.

27        THE COURT:  MR. LEAHY.

28        MR. LEAHY:  YOUR HONOR, I WOULD JUST SUGGEST TO

1    THE COURT THAT I ASSUME THAT BOTH OF THESE PEOPLE ARE GOING

2    TO TESTIFY IN THE TRIAL, AND SO I WONDER WHY THIS IS EVEN

3    RELEVANT.  BUT I THINK AS LONG AS THEY'RE GOING TO BE

4    WITNESSES WE SHOULD TAKE THEM ON VOIR DIRE OUTSIDE OF THE

5    PRESENCE OF THE JURY AND GET INTO THESE FACTS.

6        I'M NOT SO SURE THAT A SPONTANEOUS DECLARATION IS -- IF

7    YOU LOOK AT THE DEFINITION OF A SPONTANEOUS DECLARATION IT

8    DOESN'T SAY ANYTHING ABOUT RELATING WHAT SOMEBODY ELSE TELLS

9    THEM, AND THE OTHER PERSON -- IF THE OTHER PERSON HAS THE

10   RIGHT TO CLAIM SPONTANEOUS DECLARATION THAT SOMEHOW THE

11   SECOND PERSON, THE REPORTING INDIVIDUAL, SOMEHOW GETS TO

12   CLAIM IT.

13       AND I DON'T KNOW WHERE -- HOW THIS GENERAL RULE THAT,

14   "WELL, THERE'S A SUCH THING AS TRUSTWORTHY HEARSAY AND THIS

15   FALLS WITHIN THAT," I DON'T THINK THAT THAT APPLIES HERE.  SO

16   I THINK THAT WE NEED SOME FURTHER FOUNDATION BEFORE WE DECIDE

17   WHAT TO DO WITH THIS TAPE.

18           THE COURT:  OKAY.  ANYTHING FURTHER?

19           MS. ROACH:  JUST FINALLY, YOUR HONOR.  I THINK THE

20   TAPE IS VERY CLEAR THAT THE SHOT WAS NOT FIRED DIRECTLY AT

21   THE WITNESS.  HOWEVER, EVEN THE WITNESS HIMSELF WHEN HE IS

22   ASKED SAYS, "YES, THEY'RE FIRING IT AT ME," BECAUSE WHAT HE

23   ASSUMES IS THAT IT'S IN RESPONSE TO HIS WORDS, "WE'RE CALLING

24   THE COPS."  SO THERE IS REALLY NOT A DISPUTE OF FACTS WITHIN

25   THE TAPE.  IT'S SIMPLY A FLUSHING OUT OF WHAT HAPPENED.  I

26   THINK THE TAPE, IF I WERE TO COME IN AND ONLY PLAY

27   MS. LIMON'S PART OF THE CONVERSATION WOULD PROBABLY BE

28   INADMISSIBLE.  BUT THE FACT IS WE'RE PLAYING THE ENTIRE

1    CONVERSATION.  THE CONTENTS OF THAT CONVERSATION IS

2    IMPORTANT.  THERE ARE CLEARLY SPONTANEOUS STATEMENTS MADE BY

3    MR. HERRERA.  AND MS. LIMON'S STATEMENTS PROVIDE THE CONTEXT

4    FOR HIS STATEMENTS COMING IN.  AND I WOULD URGE THE COURT TO

5    ADMIT IT.

6                THE COURT:  OKAY.  ANYTHING FURTHER?

7                MR. LEAHY:  NO, YOUR HONOR.

8                MR. SANCHEZ:  NOTHING FURTHER.

9                THE COURT:  OKAY.  THE COURT AGREES WITH THE FIRST

10   PART OF MR. LEAHY'S STATEMENT THAT THE SECOND CALL DOES NOT

11   APPEAR TO BE A SPONTANEOUS STATEMENT MADE UNDER THE STRESS OF

12   AN EXCITING EVENT.  IT'S A WOMAN WHO CALLS IN BASICALLY

13   SAYING THAT SHE HAS GOTTEN WORD, SOMEONE KNOCKED ON HER DOOR

14   AND TOLD HER SOMEONE WAS BREAKING INTO CARS.  SO SHE RELAYED

15   THAT TO THE POLICE.  SO THAT DOES NOT APPEAR TO BE A

16   SPONTANEOUS STATEMENT UNDER THE STRESS OF THE EXCITEMENT OF

17   THE EVENT.  SO THE SECOND CALL WILL BE EXCLUDED.

18        WITH REGARD TO THE FIRST CALL, THE PRIMARY PERSON WHO IS

19   EXPERIENCING THE EXCITED EVENTS IS MR. HERRERA, AND HE IS

20   RELAYING THAT THROUGH THE FEMALE.  AND IT'S VERY CLEAR FROM

21   THE CONTENT OF THE TAPE THAT HE SAYS SOMETHING, THEN SHE

22   REPEATS IT TO THE OPERATOR.  AND THAT'S THROUGHOUT THE ENTIRE

23   TAPE.  THE OPERATOR ASKS, "HOW MANY SUBJECTS?"  SHE THEN

24   CALLS OUT, "HOW MANY ARE THERE?  HOW MANY GUYS ARE THERE?"

25   AND THEN HE RESPONDS BACK, "TWO."  AND THEN THE FEMALE

26   REPLIES BACK, "TWO.  THERE ARE TWO OF THEM."  SO IT'S CLEARLY

27   THAT QUESTION, RESPONSE, AND IT'S GOING THROUGH HER.  THE

28   FEMALE IS SIMPLY A CONDUIT FOR THE EXCITED STATEMENTS OF

1    MR. HERRERA WHO IS THE ONE OUT THERE PERCEIVING IT.  AND SO

2    IT'S HIS SPONTANEOUS STATEMENTS, AND THE FEMALE IS THE

3    CONDUIT FOR HIS EXCITED STATEMENTS.

4         AND IN ADDITION TO THAT, OR TO SUPPLEMENT THAT, IT IS

5    CLEAR FROM THE CONTENT THAT SHE WAS ONE OF THE INDIVIDUALS

6    WHO INITIALLY SAW THEM DOING THE BREAKING INTO THE CARS, THEN

7    RAN OFF TO CALL THE POLICE.  SO IN THAT SENSE, SHE IS ALSO

8    UNDER THE EXCITEMENT OF THE EVENTS AT THE TIME IN TERMS OF

9    HER REPORTING THAT, HERE'S SOMETHING THAT SHE PERCEIVED,

10   I.E., THE BREAKING INTO OF THE VEHICLES.

11        SO HER PART WITH REGARD TO WHAT SHE PERCEIVED ARE HER

12   SPONTANEOUS STATEMENTS, AND THE OTHER STATEMENTS THAT ARE

13   RELAYED THROUGH HER FROM MR. HERRERA ARE MR. HERRERA'S

14   SPONTANEOUS STATEMENTS.  AND ANYTHING BEYOND THAT CERTAINLY

15   ONCE THE WITNESSES ARE ON THE STAND, THEY CAN BE

16   CROSS-EXAMINED TO WHAT EXACTLY THEY SAW.  BUT THERE WAS A

17   BACK AND FORTH AS TO WHETHER THE SHOTS WERE SHOT AT THE

18   INDIVIDUALS OR UP IN THE AIR, AND I THINK THAT WOULD JUST

19   UNDER THE EXCITEMENT OF THE TIME THAT THEY SAID, "YES, THEY

20   WERE SHOT AT ME."  BUT THEN WHEN THEY TRIED TO PIN THEM DOWN,

21   THEY SAY, "NO, THESE WERE SHOT IN THE AIR."  AND SO THAT, IF

22   ANYTHING, JUST LENDS FURTHER CREDIBILITY TO THE FACT THAT

23   THEY ARE UNDER THE EXCITEMENT OF THE EVENT, AND EXPLAINING IT

24   MORE CLEARLY THE MORE INQUIRIES THERE ARE MADE BY THE

25   OPERATOR.

26        SO THE COURT WILL RULE THAT THE SECOND CALL WILL BE

27   EXCLUDED, AND FIRST CALL WILL BE ADMITTED.

28        AND IF YOU'LL CLEAN UP THE TRANSCRIPTS TO DELETE THAT

35

1    SECOND ONE.  AND ALSO, YOU'VE MADE SOME HAND NOTATIONS.  IF
2    YOU'LL HAVE THOSE TYPED IN, OKAY?  ALL RIGHT.  AND ARE THERE
3    ANY OTHER IN LIMINE'S BEFORE WE ADJOURN FOR TODAY?
4             MR. LEAHY:  NO, YOUR HONOR.
5             MR. SANCHEZ:  NO, YOUR HONOR.
6             MS. ROACH:  NO.
7             THE BAILIFF:  YOUR HONOR, I JUST GOT A CALL.  THERE
8    IS NO DRESS-OUT ORDER FOR MR. RODRIGUEZ AT THIS TIME.
9             THE COURT:  OKAY.  SO MR. SANCHEZ WOULD YOU PREPARE
10   ANOTHER ONE?
11            MR. SANCHEZ:  YES, I WILL.
12            THE COURT:  AND SO I CAN SIGN THAT AND MAKE SURE
13   THAT HE'S DRESSED OUT FOR TOMORROW.  TOMORROW WE WILL BEGIN
14   AT 9 A.M. SHARP, AND WE'LL SEE YOU TOMORROW MORNING.
15            MR. LEAHY:  YOUR HONOR, I WAS GOING TO ASK THE
16   COURT TO INDULGE ME A LITTLE IN THE MORNING, IF POSSIBLE.  I
17   KNOW THIS IS --
18            THE COURT:  WE'RE ALREADY GOING TO BE DARK THREE
19   DAYS.
20            MR. LEAHY:  I KNOW.  I KNOW.  I HAVE A SENTENCING
21   DOWNTOWN AT 9.  OBVIOUSLY, I'M JUST GOING TO CONTINUE IT.
22   BUT I WOULD LIKE TO HAVE AN OPPORTUNITY -- I WILL TRY AND GET
23   THERE QUITE A WAYS BEFORE 9 O'CLOCK AND SEE IF I CAN GET IN
24   AND JUST CONTINUE IT.  BUT --
25            THE COURT:  BUT CAN'T YOU GET SOMEONE ELSE TO MAKE
26   THAT APPEARANCE?
27            MR. LEAHY:  I CAN TRY, BUT ALL OF THE PEOPLE IN MY
28   OFFICE ARE ON VACATION, EVERYBODY EXCEPT ME.  SO --

1

36-100

2          THE COURT:  WELL, WHATEVER PUBLIC DEFENDER IS

3     ASSIGNED TO THAT DEPARTMENT --

4          MR. LEAHY:  WE'LL, IT'S A SENTENCING IN A SPECIAL

5     DEPARTMENT, SO, I MEAN, IT'S NOT A REGULAR PUBLIC DEFENDER

6     APPEARANCE.

7          THE COURT:  OKAY.  BECAUSE I WANT TO START AT 9, IF

8     AT ALL POSSIBLE.

9          MR. LEAHY:  YES, YOUR HONOR.

10          THE COURT:  OKAY.  THANK YOU.

11          (AT 4:26 P.M. AN ADJOURNMENT WAS TAKEN UNTIL

12          TUESDAY, AUGUST 5, AT 9:00 A.M.)

13                              - - -

14          (THIS PAGE DESIGNATED 36-100 FOR BLOCK-NUMBERING

15          PURPOSES ONLY.  PROCEEDINGS CONTINUE ON PAGE 101.

16          NOTHING OMITTED.)

17

18

19

20

21

22

23

24

25

26

27

28

1                    CERTIFICATE OF REPORTER

2

3    STATE OF CALIFORNIA )
                        ) ss:
4    COUNTY OF SAN DIEGO )

5

6         THE PEOPLE OF THE STATE OF CALIFORNIA

7                          VS.

8                   JAVIER RODRIGUEZ

9                 CASE NO. SCS176087

10                  AUGUST 4, 2003

11                 PAGES 1 -- 36-100

12

13        I, IRENE PERKINS, CSR NO. 12727, A CERTIFIED SHORTHAND

14   REPORTER IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN

15   AND FOR THE COUNTY OF SAN DIEGO, HEREBY CERTIFY THAT I MADE A

16   SHORTHAND RECORD OF THE PROCEEDINGS HAD IN THE WITHIN CASE

17   AND THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE, AND

18   CORRECT TRANSCRIPTION OF THE PROCEEDINGS IN THIS CASE.

19        DATED THIS 22ND DAY OF DECEMBER, 2003.

20

21

22

23

24

25        IRENE PERKINS, CSR 12727

26

27

28

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | FROM SAN DIEGO COUNTY |
| PLAINTIFF AND RESPONDENT,) | HON. ESTEBAN HERNANDEZ, |
| ) | JUDGE |
| VS. ) | |
| ) | |
| JAVIER RODRIGUEZ, ) | APPEAL NO. D043198 |
| DEFENDANT AND APPELLANT. ) | NO. SCS176087 |
| ) | |

REPORTER'S TRANSCRIPT ON APPEAL

AUGUST 7, 2003

SAN DIEGO, CALIFORNIA

VOL. II

PAGES 101 -- 296-300

COPY

APPEARANCES:

FOR THE PLAINTIFF AND RESPONDENT:    BILL LOCKYER
                                     ATTORNEY GENERAL
                                     STATE OF CALIFORNIA
                                     110 WEST A STREET
                                     SAN DIEGO, CA. 92101


FOR THE DEFENDANT AND APPELLANT:     JAVIER RODRIGUEZ
                                     IN PRO PER




REPORTED BY:  IRENE PERKINS, CSR 12727

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO, SOUTH COUNTY DIVISION

DEPARTMENT 14                BEFORE HON. ESTEBAN HERNANDEZ, JUDGE

---

PEOPLE OF THE STATE OF CALIFORNIA,  )
                                    )
            PLAINTIFF,              )
                                    )
        VS.                         )        CASE NO. SCS176087
                                    )
JOSE LUIS LEON                      )
        &                           )
JAVIER RODRIGUEZ,                   )
                                    )
            DEFENDANTS.             )

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

AUGUST 7, 2003

APPEARANCES:

FOR THE PLAINTIFF:        SOPHIA ROACH
                          DEPUTY DISTRICT ATTORNEY

FOR DEFENDANT LEON:       JERRY LEAHY
                          ATTORNEY AT LAW

FOR DEFENDANT RODRIGUEZ:  BENJAMIN, SANCHEZ
                          ATTORNEY AT LAW

1        A.     EXACTLY.  CLOSE THE DOOR.

2        Q.     WAS LAURA ALREADY ON THE PHONE TO 911 WHEN THAT

3    HAPPENED?

4        A.     OH, YEAH.

5        Q.     NOW, NOW AFTER THE 911 CALL WAS PLACED, DID THE

6    POLICE ARRIVE TO TAKE A STATEMENT FROM YOU?

7        A.     YEAH.

8        Q.     AND DID THEY TAKE YOU TO A LOCATION AWAY FROM THE

9    APARTMENTS?

10       A.     YES.

11       Q.     DID THEY ASK YOU TO LOOK AT SOME SUSPECTS THAT THEY

12   HAD IN CUSTODY?

13       A.     YES.

14       Q.     DID THEY GIVE YOU AN ADMONITION ABOUT THESE COULD

15   BE THE RIGHT PEOPLE, THESE MIGHT NOT BE THE RIGHT PEOPLE, AND

16   IT WAS UP TO YOU?

17    ✳ A.     NO, THEY TOLD US THAT THEY FOUND THE GUN ON HIM AND

18   THEY FOUND THE CAR -- THE VEHICLE, AND THEN THEY FOUND SOME

19   ITEMS OF THE PERSON THAT THEY BROKE IN.

20       Q.     DO YOU KNOW IF THEY TOLD YOU THAT BEFORE YOU MADE

21   AN IDENTIFICATION OR AFTER?

22       A.     NO, AFTER.

23       Q.     OKAY.  AND BEFORE YOU MADE THE IDENTIFICATION, DID

24   THEY SAY ANYTHING TO YOU ABOUT ACTUALLY MAKING THE

25   IDENTIFICATION?  DID THEY READ YOU SOMETHING BEFORE YOU

26   LOOKED AT ANYBODY INVOLVED IN THIS CRIME?

27    ✳ A.     NO.

28       Q.     SO YOU DON'T REMEMBER ANYTHING LIKE THAT?

Case 3:08-cv-01007-H-CAB   Document 1-4   Filed 06/03/2008   Page 110 of 132
169
Case 2:08-cv-02310-JVS-SS   Document 1-8   Filed 04/08/2008   Page 3 of 50

1      A.   NO.

2      Q.   ALL RIGHT.  NOW, DID THEY SHOW YOU THE INDIVIDUALS

3   ONE AT A TIME OR TOGETHER?

4      A.   ONE AT A TIME.

5      Q.   AND HOW MANY PEOPLE DID THEY SHOW YOU ALTOGETHER?

6      A.   TWO.

7      Q.   DID YOU RECOGNIZE THE TWO PEOPLE THAT THEY SHOWED

8   YOU?

9      A.   YES, I DID.

10      Q.   DO YOU SEE THOSE TWO PEOPLE HERE IN COURT TODAY?

11      A.   YES, I DO.

12      Q.   THE INDIVIDUAL THAT YOU'VE DESCRIBED AS THE TALL

13   ONE, CAN YOU PLEASE TELL US WHERE HE IS SEATED AND WHAT HE IS

14   WEARING?

15      A.   WELL, THEY DON'T LOOK ALIKE, YOU KNOW.  THEY'VE

16   CHANGED A LITTLE BIT.

17      Q.   OKAY.  DO YOU SEE THE PERSON THAT YOU IDENTIFIED ON

18   THAT DAY HERE IN COURT?

19      A.   THEY DON'T LOOK THE SAME ANYMORE.

20      Q.   OKAY.  WHEN YOU SAY, "THEY DON'T LOOK THE SAME," DO

21   YOU RECOGNIZE THEM?

22      A.   NO, I DON'T KNOW THEM, SO, NO.

23      Q.   SO DO YOU SEE THE SHORT ONE HERE IN COURT TODAY?

24      A.   NO.

25      Q.   NOW, BACK ON THE DATE THAT THIS HAPPENED WHEN YOU

26   WERE SHOWN TWO PEOPLE THAT HAD BEEN TAKEN INTO CUSTODY, DID

27   YOU RECOGNIZE THE PERSON WHO YOU DESCRIBED AS THE TALL ONE?

28      A.   THEY SHOWED US REAL FAST, SO, YOU KNOW.

1          Q.    DID YOU TELL THE POLICE THAT YOU RECOGNIZED THE

2     TALL ONE?

3          A.    YEAH.

4          Q.    AND, IN FACT, DID YOU TELL THEM YOU WERE 100

5     PERCENT POSITIVE?

6          A.    YES, I DID.

7          Q.    AND DID YOU TELL THE POLICE THAT YOU RECOGNIZED THE

8     SHORT ONE WITH THE BLACK JACKET?

9          A.    YES, I DID.

10         Q.    AND YOU ALSO TOLD THE POLICE MORE DETAILS ABOUT

11    WHAT THE INDIVIDUALS WERE WEARING AT THE TIME YOU SAW THEM

12    BREAK INTO THE CAR; IS THAT CORRECT?

13         A.    WELL, YEAH, I THINK SO, BUT I DON'T REMEMBER RIGHT

14    NOW EXACTLY WHAT THEY HAD.  IT WAS A LONG TIME AGO, SO I

15    CAN'T TELL YOU EXACTLY WHAT THEY HAD ON.  I WAS SO EXCITED.

16    I WAS ABOUT THE SAFETY OF MY KID, SO, YOU KNOW.

17         Q.    WOULD IT HELP REFRESH YOUR RECOLLECTION TO READ

18    THROUGH THAT VERSION OF YOUR POLICE REPORT?

19         A.    WELL, I GUESS SO.

20              MR. LEAHY:  YOUR HONOR, I DON'T THINK A PROPER

21    FOUNDATION HAS BEEN MADE TO REFRESH HIS RECOLLECTION.

22              THE COURT:  OVERRULED.

23              THE WITNESS:  IT WAS 3 O'CLOCK IN THE MORNING, YOU

24    KNOW.

25    BY MS. ROACH:

26         Q.    AND SHOWING YOU THE THIRD PARAGRAPH HERE, PAGE 6.

27    IF YOU COULD READ THAT QUIETLY TO YOURSELF.  LET ME KNOW WHEN

28    YOU'RE DONE.

1          MR. LEAHY:  COULD WE ASK WHAT SHE'S USING TO

2     REFRESH HIS RECOLLECTION, YOUR HONOR?

3          MS. ROACH:  THIRD PARAGRAPH, PAGE 6.  OFFICER

4     PICONE'S REPORT.

5     BY MS. ROACH:

6          Q.   AND IS YOUR RECOLLECTION REFRESHED AS TO WHETHER

7     YOU PROVIDED A MORE SPECIFIC DESCRIPTION AS TO WHAT THE TALL

8     ONE WAS WEARING?

9          A.   WELL, I SAID THAT, WHAT IT SAYS THERE.

10         Q.   OKAY.  DID YOU TELL POLICE THAT HE WAS WEARING A

11    WHITE SHIRT?

12         A.   YES, I DID.

13         Q.   AND WITH REGARD TO THE SHORT ONE, DO YOU RECALL

14    WHETHER THE SHORT ONE WAS WEARING A DARK COLOR OR A LIGHT

15    COLOR?

16         A.   I THINK HE HAD A BLACK JACKET ON.

17         Q.   WHILE YOUR WIFE'S ON THE PHONE TO 911, WERE YOU

18    PROVIDING HER SPECIFICALLY WITH INFORMATION ABOUT --

19         A.   YEAH.

20         Q.   -- WHAT YOU HAD SEEN TO TRY AND GET THE POLICE

21    THERE?

22         A.   YEAH, I WAS KIND OF MAD.  I WAS TELLING HER, "WHY

23    DON'T THEY HURRY UP?  WHY ARE THEY TAKING SO LONG?  WHY ARE

24    THEY ASKING ALL THESE QUESTIONS?"  THAT'S THE ONLY THING I

25    RECALL BECAUSE AT THE TIME I WAS ALL EXCITED BECAUSE I DIDN'T

26    KNOW IF THEY WERE GOING TO COME TO US TO OUR APARTMENT.  SO

27    THAT'S WHY I WAS TELLING THEM, "TELL THEM TO HURRY UP.  WHY

28    IS NOBODY HERE?"

1    Q.    SO YOU DO REMEMBER SPEAKING WITH YOUR WIFE WHILE

2    SHE WAS ON THE PHONE?

3    A.    YEAH, WELL, EVERYBODY WAS SPEAKING TO HER.   THERE

4    WAS BIG DRAMA GOING ON.

5    Q.    AND MR. HERRERA, DO YOU HAVE CONCERNS ABOUT

6    IDENTIFYING ANYBODY HERE IN COURT TODAY?

7    A.    CAN YOU REPEAT THAT?

8    Q.    DO YOU HAVE CONCERNS ABOUT IDENTIFYING ANYBODY HERE

9    IN COURT TODAY?

10    A.    DO I WANT TO IDENTIFY THEM?

11    Q.    YEAH.   DO YOU WANT TO IDENTIFY SOMEBODY HERE IN

12    COURT TODAY?

13    A.    NO.

14    Q.    AND YOU DID NOT WANT TO BE HERE IN COURT TODAY,

15    CORRECT?

16    A.    NO, I DIDN'T WANT TO BE HERE.

17    Q.    AND AS A MATTER OF FACT, YOU WERE ORDERED BACK THIS

18    MORNING AND YOU DIDN'T APPEAR, AND YOU HAD TO BE BROUGHT IN;

19    IS THAT CORRECT?

20    A.    EXACTLY.

21    Q.    AND INITIALLY WHEN I ASKED YOU IF YOU RECOGNIZED

22    THE PEOPLE THAT BROKE INTO THE CAR AND ASKED YOU IF THEY WERE

23    HERE IN COURT TODAY, YOU SAID, "YES"; IS THAT RECOGNIZE?

24    A.    YES.

25    Q.    THEN WHEN I ASKED YOU TO IDENTIFY THOSE PEOPLE

26    INDIVIDUALLY AND ASKED WHERE THEY WERE SEATED, YOU WOULD NOT

27    DO THAT; IS THAT CORRECT?

28    A.    NO, BECAUSE I DON'T WANT ANY PROBLEMS.   I'M KIND OF

1    SCARED.  I DON'T WANT NOBODY GOING TO MY HOUSE AND DOING

2    STUFF.

3        Q.    ARE THEY HERE IN COURT TODAY?

4        A.    YES, THEY ARE.

5        Q.    CAN YOU PLEASE TELL US WHERE THE TALL ONE IS

6    SEATED.

7        A.    OVER THERE.

8            MS. ROACH:  MAY THE RECORD PLEASE REFLECT THAT THE

9    WITNESS HAS POINTED IN DEFENDANT LEON'S DIRECTION.

10            THE COURT:  INDICATE AN ITEM OF CLOTHING.

11    BY MS. ROACH:

12        Q.    CAN YOU TELL ME WHAT HE'S WEARING?

13        A.    YEAH, HE HAS A -- THE DARK GRAY SHIRT.

14    BY MS. ROACH:

15        Q.    AND --

16            THE COURT:  SHORT-SLEEVED?

17            THE WITNESS:  LONG-SLEEVED.

18            THE COURT:  LONG-SLEEVED.  RECORD WILL REFLECT

19    IDENTIFICATION OF DEFENDANT LEON.

20    BY MS. ROACH:

21        Q.    AND IS THE SHORT ONE HERE IN COURT TODAY?

22        A.    YES, HE IS.

23        Q.    CAN YOU PLEASE TELL ME WHERE HE'S SEATED?

24        A.    RIGHT THERE IN FRONT.

25        Q.    CAN YOU TELL ME AN ITEM OF CLOTHING THAT HE'S

26    WEARING?

27        A.    SQUARE SHIRT.

28        Q.    BY SQUARE DO YOU MEAN PLAID?

1          A.    UH-HUH.

2                THE COURT:  RECORD WILL REFLECT IDENTIFICATION OF

3     DEFENDANT RODRIGUEZ.

4                MS. ROACH:  THANK YOU, YOUR HONOR.  THANK YOU,

5     MR. HERRERA.  I HAVE NOTHING FURTHER.

6                THE COURT:  THANK YOU.  CROSS-EXAM, MR. LEAHY.

7                MR. LEAHY:  THANK YOU, YOUR HONOR.

8                          **CROSS-EXAMINATION**

9     BY MR. LEAHY:

10         Q.    GOOD MORNING, MR. HERRERA.

11         A.    GOOD MORNING.

12         Q.    THIS EVENT HAPPENED BACK IN MAY OF THIS YEAR,

13    RIGHT?

14         A.    YES, SIR.

15         Q.    AND YOU AND LAURA AND ANGEL HAD GONE DOWN TO MEXICO

16    THAT DAY, CORRECT?

17         A.    YES.

18         Q.    YOU HAD BEEN IN MEXICO THE WHOLE DAY UNTIL LATE

19    INTO THE EVENING?

20         A.    THE WHOLE WEEKEND.

21         Q.    WHOLE WEEKEND?

22         A.    YEAH.

23         Q.    DO YOU REMEMBER WHAT DAY OF THE WEEK IT WAS WHEN

24    THIS INCIDENT HAPPENED?

25         A.    NO, I DON'T.

26         Q.    YOU WERE COMING BACK FROM ROSARITA BEACH, I THINK;

27    IS THAT RIGHT?

28         A.    YES, SIR.

1        Q.    DID YOU HAVE ANYTHING OF AN ALCOHOLIC NATURE TO

2    DRINK WHILE YOU WERE IN MEXICO?

3        A.    OH, YEAH.  WE WERE PARTYING ON THE WEEKEND.

4        Q.    OKAY.  WAS LAURA PARTYING WITH YOU ALSO?

5        A.    NO, SHE DON'T DRINK.

6        Q.    OKAY.  BUT ANGEL -- YOU AND ANGEL WERE PARTYING?

7        A.    YEAH.

8        Q.    YOU HAD A RENTAL CAR, CORRECT?

9        A.    YES, SIR.

10       Q.    AND YOU CAME BACK ACROSS THE BORDER, AND WHO WAS

11   DRIVING THE RENTAL CAR?

12       A.    MY WIFE.

13       Q.    LAURA?

14       A.    YEAH.

15       Q.    OKAY.  ARE YOU SURE SHE WASN'T SEATED IN THE

16   BACKSEAT OF THE VEHICLE?

17       A.    I DON'T REMEMBER.  IT WAS A LONG TIME AGO.  SO I

18   DON'T REMEMBER EXACTLY IF SHE WAS DRIVING OR HE WAS DRIVING.

19       Q.    OKAY.  "HE," MEANING ANGEL?

20       A.    WELL, YEAH, HE WAS THE ONLY ONE IN THE VEHICLE.  IT

21   COULDN'T HAVE BEEN MY LITTLE KID.

22       Q.    SO THE DRIVER COULD HAVE BEEN LAURA, OR IT COULD

23   HAVE BEEN --

24       A.    YEAH, ONE OF THE BOTH OF THEM BECAUSE I DON'T HAVE

25   A LICENSE, SO I WASN'T DRIVING.

26       Q.    OKAY.  ALL RIGHT.  WHEN YOU FIRST GOT IN THE

27   PARKING LOT, YOU DIDN'T ACTUALLY PARK IN A SPOT, CORRECT?

28       A.    NO, YES, WE DID.

1        Q.    DID YOU HAVE TO -- LET ME ASK YOU THIS QUESTION.

2    ISN'T IT TRUE THAT THE FIRST PLAN YOU HAD WAS TO DRIVE UP

3    NEAR THE BUILDING AND LET LAURA OUT OF THE BACKSEAT?

4        A.    NO, IT WAS TO UNLOAD OUR STUFF AND MY BROTHER'S

5    STUFF THAT WAS IN THE TRUCK.

6        Q.    I'M SORRY?

7        A.    TO UNLOAD OUR STUFF FROM THE TRUCK, BECAUSE NOW

8    THAT I RECALL, WE DIDN'T PARK EXACTLY IN A PARKING THING.  IT

9    WAS NEXT TO A HANDICAP LITTLE THING.  THAT'S WHERE WE WERE

10   PARKED.

11       Q.    OKAY.  BUT LAURA GOT OUT, AND SHE HAD THE --

12       A.    I DON'T REMEMBER WHO GOT OUT.  I WAS THE ONE THAT

13   HAD TO GET OUT FIRST BECAUSE I WAS IN THE PASSENGER SIDE, SO

14   I KNOW THAT.  I'M THE ONE THAT SAW THEM.

15       Q.    OKAY.  AND YOU FIRST SAW -- YOU SAW ONE PERSON OR

16   TWO AT FIRST?

17       A.    I SAW ONE.

18       Q.    OKAY.  AND THE FIRST PERSON YOU SAW, WHERE WAS THAT

19   PERSON STANDING?

20       A.    HE WAS STANDING IN A -- IT WAS THE SHORT ONE, HE

21   WAS STANDING BY THE -- A 4RUNNER.

22       Q.    DO YOU KNOW WHOSE 4RUNNER THAT IS?

23       A.    YEAH, IT'S MY NEIGHBOR'S.

24       Q.    OKAY.  WAS THERE ANY INDICATION THAT THE PERSON,

25   THE SHORT ONE, WAS DOING ANYTHING TO THE 4RUNNER?

26       A.    HE WASN'T DOING NOTHING TO IT.  HE WAS JUST LIKE

27   HIDING THERE.

28       Q.    DID YOU SAY ANYTHING AT THAT TIME TO THAT PERSON?

1          A.    I TELL MY BROTHER, "HEY, LOOK.  SOMEBODY'S THERE."

2          Q.    YOU SAID THAT TO ANGEL?                Sanchez

3          A.    YES, SIR.                      Shd. hv. mvd.
                                                  4. severence!

4          Q.    NOW, WAS IT THEN THAT YOU TOLD LAURA, "HEY, TAKE

5    THE CHILD AND GET INSIDE"?

6          A.    EXACTLY.

7          Q.    DID YOU THINK THERE WAS GOING TO BE SOME TROUBLE --

8    MAY BE SOME TROUBLE?

9          A.    I KNEW IT.

10         Q.    WERE YOU GETTING NERVOUS YOURSELF?

11         A.    YES, I WAS.

12         Q.    OKAY.  HOW MUCH HAD YOU HAD TO DRINK THAT NIGHT, DO

13   YOU REMEMBER?

14       ⚡ A.    NOT THAT MUCH.  PROBABLY A COUPLE OF BEERS.  WE

15   WENT TO EAT DINNER AND THAT WAS IT.  WE DRANK A COUPLE BEERS.

16   WE WERE READY TO GO BACK TO MY HOUSE WHERE I LIVE.  AND

17   BEFORE WE CAME WE HAD TO STAY THERE BECAUSE ALL THAT

18   HAPPENED.

19         Q.    OKAY.  BECAUSE YOU WERE NERVOUS, YOU WERE -- YOU

20   STARTED TO WALK RIGHT BEHIND LAURA AS SHE WAS HEADING UP TO

21   THE APARTMENT, RIGHT?

22         A.    EXACTLY.

23         Q.    AND AS YOU WERE WALKING UP TO THE APARTMENT, DID

24   YOU SAY ANYTHING TO THE PERSON YOU SAW BY THE 4RUNNER?

25       ⚡ A.    NO.

26         Q.    DID YOU SAY ANYTHING TO THE PERSON BY THE 4RUNNER

27   BEFORE YOU ACTUALLY GOT TO YOUR APARTMENT?

28         A.    YEAH, I -- WHEN THEY BROKE THE WINDOW OF THE JETTA,

1    I YELLED AT THEM, "I'M GOING TO CALL THE COPS."

2        Q.    OKAY.  NOW, AT SOME POINT, YOU SAW A SECOND PERSON,

3    RIGHT?

4        A.    AFTERWARDS.

5        Q.    WHAT DO YOU MEAN BY "AFTERWARDS"?

6        A.    WELL, I DIDN'T SEE THEM AT THE MOMENT.  I SAW THEM

7    WHEN MY BROTHER WALKED UP TO THEM AND TOLD HIM, "HEY," THE

8    ONE HE SAW HE WALKED UP BECAUSE HE WAS MESSING WITH HIS

9    TRUCK.  HE SAID, "WHAT ARE YOU DOING WITH MY TRUCK?  I'M JUST

10   TELLING YOU BECAUSE THAT'S MY TRUCK."

11       Q.    MR. HERRERA, YOU'VE TOLD US THAT WHEN YOU SAW THE

12   SHORTER GUY BY THE CAR, YOU IMMEDIATELY TOLD LAURA, "TAKE THE

13   CHILD AND GET IN THE APARTMENT."  AND YOU WERE KIND OF

14   NERVOUS AND YOU START FOLLOWING HER, CORRECT?

15       A.    YEAH, BUT BEFORE THAT, MY BROTHER WALKED TO HIS

16   TRUCK AND HE SAW THE OTHER SUBJECT, THE TALL ONE.

17       Q.    NOW, DID YOU SEE YOUR BROTHER WALK TO HIS TRUCK?

18       A.    EXACTLY.  I WAS RIGHT THERE.

19       Q.    OKAY.  BUT YOU DIDN'T SEE THE OTHER SUBJECT, DID

20   YOU?

21       A.    NOT YET.

22       Q.    OKAY.  DID YOUR BROTHER SAY ANYTHING TO ANY OF THE

23   SUBJECTS AT THAT POINT?

24       A.    WELL, YEAH.  HE WENT IN FRONT OF HIS TRUCK.  HE SAW

25   THEM, AND THEY WERE HIDING.  I DIDN'T KNOW WHAT HE WAS DOING.

26   AND THAT'S WHEN HE TOLD HIM, "WHAT ARE YOU DOING WITH MY

27   TRUCK?  THAT'S MY TRUCK."

28       Q.    OKAY.  THAT'S WHAT ANGEL SAID?

1        A.    YEAH.

2        Q.    AND WHEN YOU HEARD THAT, WERE YOU ALREADY WALKING

3    BACK TO THE APARTMENT?

4        A.    I WAS BARELY GETTING OFF THE CAR.  WE WERE BARELY

5    GOING TO GET OUT THE KID, BECAUSE WHEN IT WAS ONE SUBJECT,

6    THE FIRST ONE THAT I SAW, I TURNED AROUND AND LOOKED AT HIM,

7    I TOLD HIM, "HEY, SOMEBODY'S THERE."  BY THEN MY BROTHER

8    WALKED TO HIS TRUCK TO CHECK OUT HIS TRUCK AND HE SAW THE

9    OTHER ONE.  SO WHEN HE SEES THE OTHER ONE, I TELL HIM -- I

10   OPEN THE DOOR AND SAY, "YEAH, TAKE THE KID INSIDE."

11       Q.    OKAY.  AND THEN YOU START WALKING BEHIND LAURA?

12       A.    EXACTLY.

13       Q.    NOW, DO YOU REMEMBER TELLING THE POLICE THAT YOU

14   BELIEVE YOU SAW THE GUN, DO YOU REMEMBER THAT?

15       A.    I NEVER SAW THE GUN.  I SAW THE FIRE, NOT THE GUN.

16       Q.    DO YOU REMEMBER TELLING THE POLICE THAT YOU NEVER

17   SAW THE SUBJECT FIRING THE GUN?

18       A.    I DON'T REMEMBER EXACTLY BECAUSE IT WAS LIKE IT

19   HAPPENED REAL QUICK.  I PROBABLY DID, OR PROBABLY I DIDN'T.

20   I DON'T REMEMBER.

21       Q.    SO YOU DON'T REALLY REMEMBER IF YOU SAW --

22       A.    ALL I REMEMBER IS THAT I TOLD THE POLICE THAT I SAW

23   THE GUN.  THAT'S WHAT I DON'T REMEMBER.

24       Q.    I'M SORRY?

25       A.    I DON'T REMEMBER IF I TOLD THE POLICE I SAW THE GUN

26   OR I DIDN'T.

27       Q.    YOU DON'T REMEMBER TELLING THE POLICE THAT YOU DID

28   NOT SEE THE GUN?

```
1        A.   I DON'T REMEMBER.

2        Q.   BUT AS YOU SIT HERE TODAY, YOU KNOW YOU DIDN'T SEE

3   THE GUN?

4        A.   I DON'T REMEMBER.

5        Q.   OKAY.  WHAT ABOUT TELLING THE POLICE THAT YOU NEVER

6   SAW THE GUY FIRING THE GUN, REMEMBER TELLING THE POLICE THAT?

7        A.   YEAH, I THINK I TOLD THEM THAT I DIDN'T SEE THEM.

8        Q.   OKAY.  YOUR MEMORY HAS FADED, HAS IT NOT, SINCE

9   EVENTS BACK IN MAY?

10       A.   OH, YEAH, A LOT.

11       Q.   SO YOU THINK YOUR MEMORY WAS BETTER PACK IN MAY

12  THAN THEY ARE TODAY?

13       A.   PROBABLY NO.  PROBABLY IT'S WORSE.

14       Q.   YOU THINK YOUR MEMORY IS WORSE TODAY?

15       A.   YEAH.

16       Q.   OKAY.  YOU WENT INTO THE APARTMENT WITH LAURA,

17  CORRECT?

18       A.   YES, SIR.

19       Q.   DID YOU SEE HER DIAL 911?

20       A.   I WAS NOT EVEN THERE WHEN SHE DIALED 911.  HOW AM I

21  GOING TO SEE HER DIAL 911?  SHE WENT FIRST, REMEMBER?

22       Q.   OKAY.  YOU WERE WALKING BEHIND LAURA TO THE

23  APARTMENT, CORRECT?

24       A.   YES, SIR.

25       Q.   SHE GOT IN THE APARTMENT AHEAD OF YOU, CORRECT?

26       A.   YEAH.

27       Q.   HOW LONG AFTER HER DID YOU GET INTO THE APARTMENT?

28       A.   4 SECONDS.  6 SECONDS.
```

1      Q.    OKAY.  BUT YOU DID NOT SEE HER PICK UP THE PHONE

2    AND DIAL 911?

3      A.    NO, SHE WAS ALREADY ON THE PHONE WHEN I GOT IN

4    THERE.

5      Q.    OKAY.  SO BY THE TIME YOU GET IN THE APARTMENT

6    SHE'S ALREADY ON THE PHONE, RIGHT?

7      A.    YEAH.

8      Q.    NOW, FROM INSIDE THE APARTMENT YOU CAN'T SEE THE

9    JETTA, COULD YOU?

10     A.    YES, YOU CAN.

11     Q.    YOU CAN?

12     A.    FROM THE ENTRANCE OF THE DOOR, YOU CAN'T SEE THE

13   JETTA.  NOT INSIDE THE APARTMENT.  BUT WHEN YOU WERE IN THE

14   ENTRANCE YOU CAN SEE FROM THERE.

15     Q.    ALL RIGHT.  WHAT ABOUT YOUR BROTHER'S TRUCK.  CAN

16   YOU SEE THE OTHER TRUCK FROM INSIDE THE APARTMENT?

17     A.    IT WAS THERE, YEP.  YOU CAN SEE THAT, TOO.

18     Q.    OKAY.  AND WHEN YOU GOT INTO THE APARTMENT, LAURA'S

19   ON THE PHONE.  WHERE'S ANGEL?

20     A.    HE'S OUTSIDE STILL, I THINK, COMING IN.  HE'S

21   WALKING IN, BUT IT'S KIND OF FAR, SO IT TOOK HIM A LITTLE

22   WHILE TO COME.

23     Q.    NOW, AT SOME POINT, YOU HEARD SOMETHING YOU SAW --

24   THOUGHT WAS A GUNSHOT, CORRECT?

25     A.    WELL, I GUESS SO.

26     Q.    YOU GUESS SO?

27     A.    WELL, IT WAS FIRE.  I DIDN'T SEE THE GUN EXACTLY,

28   YOU KNOW.

1       Q.   OKAY.  BUT DO YOU REMEMBER IF YOU HEARD SOMETHING

2    THAT SOUNDED TO YOU LIKE THE GUNSHOT?

3       A.   YES, SIR.

4       Q.   OKAY.  DO YOU KNOW WHERE YOU WERE WHEN YOU HEARD

5    THAT?

6       A.   IN FRONT OF THE DOOR GOING INTO THE APARTMENT.

7       Q.   SO YOU WERE ALMOST AT THE APARTMENT WHEN YOU HEARD

8    IT, RIGHT?

9       A.   IN THE DOOR OF THE APARTMENT.

10      Q.   OKAY.

11      A.   NOT ON THE INSIDE, BUT RIGHT NEAR THE DOOR.

12      Q.   NOW, WAS THAT BECAUSE YOU HAD GONE INSIDE THE

13   APARTMENT AND GONE BACK TO THE DOOR?

14      A.   DROPPED OFF MY KID, YOU KNOW, BECAUSE MY WIFE GOT

15   THE PHONE, AND WHEN SHE WAS ALREADY ON THE PHONE, MY KID

16   STARTED CRYING, SO I HAD TO PICK HIM UP AND LIE HIM DOWN ON

17   THE SOFA.

18      Q.   OKAY.  LAURA'S ALREADY ON THE PHONE TO 911?

19      A.   YEAH.

20           MR. LEAHY:  OKAY.  YOUR HONOR, CAN WE PLAY THE

21   TAPE?

22           THE COURT:  ALL RIGHT.  EXHIBIT 6.

23           MR. LEAHY:  EXHIBIT 6.

24   BY MR. LEAHY:

25      Q.   MR. HERRERA, I'D LIKE TO PLAY FOR YOU NOW THE 911

26   CALL THAT LAURA MADE, OKAY?

27      A.   YEAH.

28      Q.   AND AFTER WE'RE DOWN PLAYING IT, I'D LIKE YOU TO

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 124 of 132
Case 2:08-cv-02310-JVS-SS    Document 1-8    Filed 04/08/2008    Page 17 of 50
183

1    IDENTIFY, IF YOU CAN IDENTIFY FOR US, YOUR VOICE ON THAT

2    TAPE, OKAY?

3        A.    OKAY.

4            THE COURT:    COUNSEL STIPULATE WHENEVER THE TAPE IS

5    PLAYED THAT THE REPORTER NEED NOT TRANSCRIBE?

6            MS. ROACH:    YES, YOUR HONOR.

7            MR. SANCHEZ:    YES, YOUR HONOR.

8            THE COURT:    AND MR. LEAHY?

9            MR. LEAHY:    YES, YOUR HONOR.

10           THE COURT:    OKAY.    THANK YOU.    IS IT REWOUND

11   ALREADY?

12           MR. LEAHY:    YOUR HONOR, MAY I SHOW THE WITNESS A

13   TRANSCRIPT SO THAT HE CAN READ ALONG?

14           THE COURT:    SURE.

15   BY MR. LEAHY:

16       Q.    MR. HERRERA, I'D LIKE TO GIVE YOU -- THIS IS A

17   TRANSCRIPT THAT HAS BEEN MADE OF THE 911 TAPE, AND MAYBE THAT

18   WILL HELP YOU FOLLOW ALONG, IF YOU'D LIKE.

19           THE COURT:    WHICH IS EXHIBIT 7.

20           MR. LEAHY:    YES.

21           (PEOPLE'S EXHIBIT 6, 911 AUDIOTAPE, WAS PLAYED, NOT

22           REPORTED.)

23   BY MR. LEAHY:

24       Q.    MR. HERRERA, WERE YOU ABLE TO IDENTIFY YOUR VOICE

25   AT ALL IN THERE?

26       A.    NO, I DIDN'T.

27       Q.    NO?

28       A.    NO.

1        Q.    DID YOU HEAR A MALE VOICE IN THE BACKGROUND?

2        A.    YEAH, THERE WAS A LOT OF STUFF GOING ON IN THE

3    BACKGROUND, SO PROBABLY ONE OF MY VOICE IN THERE, TOO.

4        Q.    DOES IT REFRESH YOUR RECOLLECTION AT ALL AS TO WHAT

5    YOU WERE DOING OR -- WELL, LET ME --

6        A.    I DON'T REMEMBER WHAT I WAS DOING.

7        Q.    OKAY.  LET ME REPHRASE THAT.

8        WHEN DID YOU FIRST BECOME AWARE THAT ANGEL HAD COME BACK

9    INTO THE APARTMENT?

10       A.    I DON'T REMEMBER WHEN.

11       Q.    WAS IT BEFORE LAURA WAS DONE WITH THE 911 CALL?

12       A.    I DON'T REMEMBER.

13       Q.    AT SOME POINT, YOU HEARD ANGEL -- LET ME REPHRASE

14   THAT.  DID YOU AT ANYTIME YOURSELF PERSONALLY TELL THESE

15   PEOPLE THAT YOU SAW IN THE PARKING LOT THAT YOU WERE GOING TO

16   GO CALL THE POLICE?

17       A.    I DON'T REMEMBER TELLING THEM THAT.

18       Q.    DO YOU REMEMBER SAYING ANYTHING TO THOSE TWO

19   SUSPECTS?

20       A.    NO, I DON'T.

21       Q.    DO YOU REMEMBER ANGEL -- HEARING ANGEL SAY TO THE

22   SUSPECTS, "I'M GOING TO CALL THE POLICE," OR, "GO CALL THE

23   POLICE"?

24       A.    YEAH, HE SAID, "GO CALL THE POLICE," BUT NOT TO THE

25   SUSPECTS.

26       Q.    OKAY.  WHO DID HE SAY THAT TO?

27       A.    PROBABLY TO ME OR TO MY WIFE.  I DON'T KNOW EXACTLY

28   TO WHO.  I REMEMBER HEARING IT.

1       Q.    WHEN HE SAID THAT, WHAT KIND OF VOICE WAS HE USING?

2    WAS HE WHISPERING OR WAS HE YELLING?

3       A.    I DON'T KNOW.  I DON'T REMEMBER THAT.

4       Q.    DID YOU HAVE ANY TROUBLE HEARING HIM?

5       A.    NO, WE WERE ALL TOGETHER WHEN THAT HAPPENED.  WHEN

6    WE GOT -- WHEN WE GOT MY KID AND ALL THAT, WE WERE ALL

7    TOGETHER.  SO HE WOULDN'T BE YELLING.  HE WAS JUST LIKE

8    TALKING NORMAL, PROBABLY WHISPERING KIND OF SLOW SO THEY

9    WON'T HEAR.

10      Q.    AND THAT WAS AS LAURA WAS STILL TRYING TO GET OUT

11   OF THE CAR, RIGHT?

12      A.    I THINK SHE WAS ALREADY OFF THE CAR BECAUSE WE GOT

13   OFF THE CAR FIRST, AND THEN WE GOT THE KID OUT.

14      Q.    OKAY.  SO YOU WERE TRYING TO GET THE KID OUT, YOU

15   WERE HELPING TO GET THE KID OUT, AND THEN THAT'S WHEN ANGEL

16   SAID, "GO CALL THE POLICE."

17      A.    YEAH, I THINK SO.

18      Q.    AND, I THINK, YOU SAID IN KIND OF A LOW VOICE

19   BECAUSE YOU ALL WERE CLOSE TOGETHER, CORRECT?

20            THE COURT:  IS THAT A YES?

21            THE WITNESS:  YES.

22   BY MR. LEAHY:

23      Q.    HE DID NOT SAY IT --

24            THE COURT:  HOLD ON.  BECAUSE WHEN YOU ANSWER YOU

25   NEED TO ANSWER YES OR NO BECAUSE OUR REPORTER NEEDS TO TAKE

26   IT DOWN.

27            THE WITNESS:  OKAY.

28            THE COURT:  YOU MAY CONTINUE.

Case 3:08-cv-01007-H-CAB    Document 1-4    Filed 06/03/2008    Page 127 of 132
Case 2:08-cv-02310-JVS-SS    Document 1-8    Filed 04/08/2008    Page 20 of 50
186

```
 1              MR. LEAHY:  THANK YOU, YOUR HONOR.  I'M SORRY.
 2     BY MR. LEAHY:
 3         Q.   HE DID NOT SAY THAT AT THE SUSPECTS, THE PEOPLE IN
 4     THE PARKING LOT, RIGHT?
 5         A.   NO.
 6         Q.   HE SAID IT TO YOU AND LAURA?
 7         A.   YES.
 8         Q.   OKAY.  HOW LONG DID IT TAKE YOU TO WALK FROM THE
 9     CAR TO THE FRONT OF LAURA -- OF THE APARTMENT?
10         A.   I DON'T KNOW.  I DIDN'T TIME IT.
11         Q.   WELL, HOW FAR IS IT?
12         A.   I DON'T KNOW THE MEASUREMENTS EITHER.  IT'S IN THE
13     POLICE REPORT.  THEY MEASURED IT EXACTLY HOW MUCH IS IT.  I
14     DON'T KNOW HOW MUCH TIME IT TOOK.  ALL I KNOW IS I WAS
15     RUNNING OR WALKING REAL SLOW.  I WAS EXCITED.  I JUST GOT
16     THERE.
17         Q.   OKAY.
18         A.   I CAN'T RECALL IF IT WAS 3 SECONDS, 3 MINUTES, YOU
19     KNOW.
20         Q.   IS THERE ANYWAY THAT YOU CAN ESTIMATE FOR US HOW
21     MUCH TIME PASSED?
22         A.   NO, I CAN'T.
23         Q.   NO?
24         A.   NO.
25         Q.   DID YOU -- YOU DIDN'T RUN, THOUGH, FROM THE PARKING
26     LOT TO THE --
27         A.   I DON'T REMEMBER.
28         Q.   OKAY.  HOW OLD IS THIS CHILD?
```

```
1          A.   HE'S SMALL.  5.

2          Q.   WAS -- DID SOMEONE CARRY HIM TO THE APARTMENT?

3          A.   WELL, YEAH.  HE WAS ASLEEP.

4          Q.   OKAY.  WHO CARRIED HIM, DO YOU KNOW?

5          A.   I DON'T REMEMBER IF IT WAS ME OR HER.

6          Q.   I THINK YOU TOLD US THAT WHEN YOU GOT TO THE

7    APARTMENT YOU HAD TO PUT THE CHILD DOWN, DO YOU REMEMBER

8    THAT?

9          A.   BECAUSE HE WOKE UP AND HE WAS CRYING.  I MOVED HIM

10   BECAUSE SHE WAS ON THE PHONE.

11         Q.   AFTER?

12         A.   YEAH.

13         Q.   OKAY.  BUT YOU'RE NOT SURE WHO CARRIED HIM TO THE

14   APARTMENT?

15         A.   I THINK SHE CARRIED HIM IN.

16         Q.   OKAY.  SO SHE WOULDN'T HAVE BEEN RUNNING, RIGHT?

17         A.   WELL, NO, I DON'T THINK SO.

18         Q.   OKAY.  AND YOU WERE FOLLOWING HER, BEHIND HER,

19   RIGHT?

20         A.   YES, SIR.

21         Q.   SO IT PROBABLY TOOK A LITTLE TIME TO GET TO THE

22   APARTMENT, RIGHT?

23         A.   YEAH, PROBABLY IT DID.

24              MR. LEAHY:  THAT'S ALL I HAVE, YOUR HONOR.  THANK

25   YOU.

26              THE COURT:  THANK YOU.  CROSS-EXAM, MR. SANCHEZ.

27              MR. SANCHEZ:  THANK YOU, YOUR HONOR.

28    //
```

1                          CROSS-EXAMINATION

2    BY MR. SANCHEZ:

3         Q.   GOOD MORNING, MR. HERRERA.

4         A.   GOOD MORNING.

5         Q.   HOW ARE YOU THIS MORNING?

6         A.   OKAY.

7         Q.   I'M GOING TO ASK YOU A COUPLE OF QUESTIONS

8    REGARDING THE PARKING LOT, AND I WANT TO SHOW YOU WHAT'S BEEN

9    MARKED AS DEFENSE EXHIBIT A.  DO YOU RECOGNIZE THIS DIAGRAM?

10        A.   NO.

11        Q.   OKAY.  DO YOU RECOGNIZE THE LAYOUT OF THE

12   APARTMENTS ON QUINTARD?

13        A.   NO, I DON'T LIVE THERE, SO, NO.

14        Q.   LET ME ASK YOU THIS.  ON ONE SIDE OF THIS DIAGRAM,

15   THE RIGHT-HAND SIDE AS WE'RE LOOKING AT IT, THERE IS WHAT

16   APPEARS TO BE STALLS, DO YOU SEE THOSE -- SEE THE LINES

17   THERE?

18        A.   YEAH.

19        Q.   STALLS FOR --

20        A.   SO THIS WILL BE THE STREET?

21        Q.   RIGHT.  THOSE ARE STALLS FOR CARS TO BE PARKED IN,

22   OKAY?  NOW, WHERE YOU PULLED IN, WAS THAT THE DRIVEWAY THAT

23   YOU PULLED IN TO?

24        A.   WHICH ONE?

25        Q.   WHERE THE STALLS ARE?

26        A.   I CAN'T RECOGNIZE THAT.  I DON'T KNOW WHERE IT WAS.

27   IT WAS JUST -- THERE WAS A SWIMMING POOL, SO IT HAS TO BE

28   THIS WAY, RIGHT?  WHAT IS THIS, QUINTARD?

1         Q.    NO, THOSE ARE STALLS.  THAT'S WHERE THE CARS GO.

2         A.    YEAH, BUT THIS IS THE STREET QUINTARD, RIGHT?  THIS

3    IS THE ENTRANCE.  SO MY BROTHER LIVES RIGHT THERE, AND WE

4    WERE PARKED RIGHT HERE.

5         Q.    WHEN YOU SAY, "RIGHT THERE," COULD YOU IDENTIFY

6    WHAT YOU JUST SAID, "RIGHT THERE".

7         A.    WELL, THESE ARE APARTMENTS, NO?

8         Q.    YES.

9         A.    THEN HE LIVES RIGHT THERE.

10        Q.    WHERE IT SAYS 9?

11              THE COURT:  IS THAT A YES?

12   BY MR. SANCHEZ:

13        Q.    IS THAT A YES?

14        A.    NO.  DO I HAVE TO SAY WHERE HE LIVES, OR WHAT?

15        Q.    WELL, YOU POINTED TO AN APARTMENT --

16        A.    BUT I DON'T WANT TO TELL YOU WHERE HE LIVES

17   EXACTLY, RIGHT?  DO I HAVE TO?

18        Q.    YES.  I ASKED YOU THE QUESTION WHAT APARTMENT DOES

19   HE LIVE IN.

20              MS. ROACH:  YOUR HONOR, PERHAPS THE WITNESS CAN

21   PLACE AN "X" ON THE APARTMENT NUMBER WHERE HIS BROTHER LIVES

22   IN.

23              THE WITNESS:  YEAH, I THINK SO.

24              THE COURT:  OKAY.  ALL RIGHT.  IF YOU WILL PLACE AN

25   "X" -- DO WE HAVE A MARKER HERE -- WITH A BLUE PEN.  IF YOU

26   CAN MARK THAT WITH AN "X".

27   BY MR. SANCHEZ:

28        Q.    MARK WITH AN "X" WHERE YOUR BROTHER LIVES.

1      A.    RIGHT THERE.  RIGHT THERE.

2      Q.    NOW, FROM THAT LOCATION WHERE YOU MARKED THE "X",

3    DO YOU NOW RECOGNIZE WHERE THE CARS WOULD HAVE BEEN PARKED IN

4    THE EVENING?

5      A.    YEAH, WE WERE PARKED RIGHT THERE.  YOU WANT ME TO

6    PUT AN "X" TOO?

7      Q.    WHY DON'T YOU PUT -- PUT AN "X" WHERE YOU SEE THE

8    -- WELL PUT A "1" WHERE THE JETTA WAS PARKED.

9      A.    WHERE THE JETTA WAS PARKED?

10     Q.    RIGHT.

11           THE COURT:  THE RECORD WILL REFLECT HE PLACED A "1"

12   ON THE EXHIBIT A.

13   BY MR. SANCHEZ:

14     Q.    NOW, THERE ARE TWO --

15     A.    IT'S NOT EXACTLY WHERE IT WAS, OKAY, SO YOU CAN

16   KNOW.

17     Q.    THERE WERE TWO LINES OF --

18     A.    YES, CORRECT.

19     Q.    NOW, WERE THE CARS PARKED ON THE AISLE CLOSEST TO

20   THE APARTMENTS OR THE ONE FARTHEST?

21     A.    NO, ON THE OUTSIDE.

22     Q.    OKAY.  SO THAT'S NOT ENOUGH ON THE SIDE THEN TO

23   SHOW WITH THIS?

24     A.    YES.

25     Q.    OKAY.  BUT THAT'S APPROXIMATELY IN TERMS OF HOW

26   CLOSE TO THE DUMPSTER THEY WERE?

27           OKAY.  HOW ABOUT THE -- HOW ABOUT THE PICKUP TRUCK?

28     A.    IT WAS NEXT TO IT.  WHAT DO YOU WANT ME TO PUT FOR

1    THAT?

2         Q.   WELL, PUT A "2".

3              THE COURT:   RECORD WILL REFLECT HE'S PLACED A "2"

4    ON THE DIAGRAM.

5    BY MR. SANCHEZ:

6         Q.   OKAY.   NOW, WHEN YOU PULLED IN THAT NIGHT, DO YOU

7    RECALL, WERE THE SLOTS -- THE PARKING SLOTS -- ALL FILLED

8    THAT NIGHT?

9         A.   THERE WAS A COUPLE OF THEM VACANT.

10        Q.   OKAY.

11        A.   I DON'T KNOW, TWO PROBABLY.

12        Q.   WELL, WHEN YOU PULLED IN AND PARKED THE VEHICLE

13   THAT YOU WERE IN, YOU DIDN'T PULL INTO A SLOT TO PARK, RIGHT?

14        A.   NO, WE DIDN'T.

15        Q.   OKAY.   YOU JUST PARKED OUT ON THE --

16        A.   I PARKED IT RIGHT HERE.   THAT'S WHERE I WAS PARKED.

17   SEE THIS LITTLE ENTRANCE RIGHT HERE.   RIGHT THERE.   I WAS

18   PARKED RIGHT THERE BECAUSE WE WERE GOING TO UNLOAD.

19        Q.   BUT THAT WAS NOT A --

20        A.   NO, IT WASN'T.

21        Q.   IT WAS NOT A PARKING PLACE?

22        A.   NO.

23        Q.   OKAY.

24             MS. ROACH:   YOUR HONOR IS THERE ANY MARK ON EXHIBIT

25   A WHERE HE WAS.   I DON'T KNOW IF HE MADE A MARK OR NOT.

26             THE COURT:   PUT A "3" WHERE HE WAS PARKED.

27   BY MR. SANCHEZ:

28        Q.   WELL, I DON'T KNOW.   FIRST SHOW ME WHERE YOU

1    PARKED.

2          A.    AGAIN, RIGHT HERE.

3          Q.    OKAY.  THE REASON I ASKED YOU -- THE REASON I ASK

4    YOU IS BECAUSE WHERE YOU ARE POINTING IS A PARKING PLACE.

5          A.    WELL, NOW IT IS, BUT BEFORE IT WASN'T.  THEY

6    REMARKED EVERYTHING, SO IT'S DIFFERENT, AND RIGHT HERE THERE

7    USED TO BE A HANDICAPPED RIGHT HERE, RIGHT?

8          Q.    OKAY.

9          A.    AND RIGHT NEXT TO IT THERE'S TWO POLES.

10         Q.    OKAY.  LET ME ASK THE QUESTIONS FIRST, OKAY?

11         A.    OKAY.

12         Q.    ARE YOU SAYING THEN THAT THESE SPACES WERE

13    DIFFERENT NOW THEN THEY WERE AT THE TIME?

14         A.    THEY'RE DIFFERENT NOW.

15         Q.    THEY'RE DIFFERENT NOW.  OKAY.  SO THEY'VE BEEN

16    REMARKED?

17         A.    EXACTLY.

18         Q.    OKAY.  AND AT THE TIME THAT YOU PARKED THERE, THERE

19    WAS A HANDICAPPED SPACE THERE?

20         A.    YES, SIR.

21         Q.    AND YOU GUYS PARKED IN THE HANDICAPPED SPACE?

22         A.    NO, NEXT TO IT.

23         Q.    NEXT TO IT, THE HANDICAPPED SPACE?  OKAY.  WHY

24    DON'T YOU MARK -- AND THAT SPACE WAS EMPTY?

25         A.    WELL, WHEN WE PARKED THERE, YES, IT WAS.

26         Q.    ALL RIGHT.  DO YOU WANT TO MARK A "3" WHERE YOU

27    WERE PARKED?

28         A.    RIGHT THERE?

1          Q.    WHERE YOU PARKED THE CAR THAT NIGHT.

2                THE WITNESS:  OH, THE CAR THAT NIGHT.

3                THE COURT:  THE RECORD WILL REFLECT HE'S PLACED A

4     "3" ON THE DIAGRAM.

5                THE WITNESS:  BUT THAT'S NOT A STALL, OKAY?

6     FROM RIGHT THERE IT IS KIND OF DIFFERENT.

7     BY MR. SANCHEZ:

8          Q.    ALL RIGHT.  WERE THE SPACES NEXT TO YOU THEN, DID

9     THEY HAVE CARS IN THEM; DO YOU RECALL?

10         A.    YEAH, THEY DID.

11         Q.    OKAY.  I'M REFERRING TO SPACES THAT GO UP FROM

12    THERE.  THEY HAD ALL HAD CARS IN THEM?

13         A.    ONLY ONES THAT DIDN'T HAVE WAS THE ONES BEHIND

14    THEM.  IT WAS LIKE FOUR OR FIVE MORE THIS WAY.

15         Q.    THOSE WERE THE ONES THAT DIDN'T HAVE ANY CARS IN

16    THEM?

17         A.    YEAH, LIKE A COUPLE OF THEM WERE EMPTY.  I THINK

18    THE FIRST ONES WERE EMPTY.  FIRST ONES TO THE THIRD ONE, I

19    THINK, WERE EMPTY, AND THEN THERE WERE CARS AROUND THEM.

20         Q.    OKAY.  SO WHEN YOU EXITED THE VEHICLE, YOU HEARD A

21    NOISE AND YOU LOOKED UP --

22         A.    NO, I DIDN'T HEAR A NOISE.

23         Q.    OH, YOU DIDN'T HEAR A NOISE?

24         A.    NO, MY BROTHER'S THE ONE THAT HEARD THE NOISE.

25         Q.    SO YOU HEARD, OR YOU SAW --

26         A.    I SAW SOMEBODY LIKE THAT.

27         Q.    YOU SAW SOMETHING IN THE AREA WHERE YOU HAVE MARKED

28    "1" AND "2"; IS THAT CORRECT?

1          A.   NO, HE WAS OVER HERE, THE GUYS ARE.  HE WAS NOT

2     AROUND THE TRUCK.

3          Q.   HE WASN'T AROUND THE JETTA OR THE PICKUP TRUCK?

4          A.   AT THE MOMENT, NO.  HE WAS OVER HERE.  THE ONE I

5     SAW, THE ONE I FIRST SAW, HE WAS LIKE WATCHING OUT.

6          Q.   WELL, WAS HE BY A VEHICLE?

7          A.   YEAH, HE WAS BY THE 4RUNNER.

8          Q.   THE 4RUNNER?  OKAY.  WELL WHY DON'T YOU MARK --

9          A.   I GUESS IT WOULD BE A "4" FOR THAT ONE, RIGHT?

10         Q.   OKAY.  WE'RE AT "4"?  "4" FOR THE 4RUNNER.  OKAY.

11              THE COURT:  RECORD WILL REFLECT HE HAS PLACED A "4"

12    ON THE DIAGRAM.

13    BY MR. SANCHEZ:

14         Q.   SO WHEN YOU LOOK UP AND YOU LOOK TOWARDS THE

15    DIRECTION OF NUMBER 4, YOU SAW AN INDIVIDUAL, CORRECT?

16         A.   YES, SIR.

17         Q.   OKAY.  THEN YOU STARTED TO GO TO THE APARTMENT AND

18    CALL 911?

19         A.   NO, I TOLD MY BROTHER, "SOMEBODY'S THERE."

20         Q.   OKAY.  AFTER YOU TALKED TO ANGEL, DID YOU THEN TELL

21    YOUR WIFE TO GO TOWARDS THE APARTMENT?

22         A.   YES.

23         Q.   AND YOU FOLLOWED HER TO THE APARTMENT, CORRECT?

24         A.   YES, SIR.

25         Q.   OKAY.  SO AT SOME POINT IN TIME -- ALL RIGHT.  ONCE

26    YOU STARTED HEADING TOWARDS THE APARTMENT, DID YOU -- COULD

27    YOU SHOW US WHERE YOU WERE ON THIS DIAGRAM WHEN YOU HEARD THE

28    NOISE THAT YOU BELIEVE WAS A SHOT.  WERE YOU INSIDE THE

1    APARTMENT?

2          A.    NO, I WASN'T.  I WAS AT THE DOOR.  DO YOU WANT ME

3    TO MARK IT?

4          Q.    NO, THAT'S NOT NECESSARY.  YOU WERE AT THE DOOR OF

5    THE APARTMENT WHEN YOU HEARD IT; IS THAT CORRECT?

6          A.    YES.

7          Q.    OKAY.  SO IT TOOK AT LEAST THE TIME THAT IT TOOK

8    FOR YOU TO GO FROM YOUR VEHICLE TO THE FRONT DOOR OF THE

9    APARTMENT BEFORE YOU HEARD THAT NOISE; IS THAT CORRECT?

10          A.    WELL, I GUESS SO.

11          Q.    WELL --

12          A.    HOW WAS I GOING TO GET FROM THERE TO THERE?  YEAH.

13    YES.

14                MR. SANCHEZ:  THANK YOU, MR. HERRERA.  I HAVE NO

15    FURTHER QUESTIONS.

16                THE COURT:  ANY REDIRECT?

17                        **REDIRECT EXAMINATION**

18    BY MS. ROACH:

19          Q.    MR. HERRERA, YOU'VE INDICATED THAT YOU DON'T RECALL

20    EXACTLY WHAT YOU TOLD THE POLICE THE NIGHT THIS INCIDENT

21    HAPPENED; IS THAT CORRECT?

22          A.    UH-HUH.

23          Q.    AS YOU SIT HERE TODAY, DO YOU HAVE A DISTINCT

24    MEMORY OF SEEING A LIGHT AT THE SAME TIME THAT YOU HEARD WHAT

25    YOU BELIEVE WAS A GUNSHOT?

26                THE COURT:  IS THAT A YES?

27    BY MS. ROACH:

28          Q.    IS THAT A YES?

1          A.    YES.   SORRY.

2                MS. ROACH:   THANK YOU.   I HAVE NOTHING FURTHER.

3                THE COURT:   ANYTHING FURTHER?

4                MR. LEAHY:   JUST A FEW, YOUR HONOR.

5                        RECROSS EXAMINATION

6    BY MR. LEAHY:

7          Q.    DO YOU REMEMBER AT SOME POINT, MR. HERRERA, THAT

8    YOUR FRIEND ANGEL --

9          A.    HE'S NOT MY FRIEND, HE'S MY BROTHER.

10         Q.    -- YOUR BROTHER, ANGEL, SAID THAT HE WAS GOING TO

11   GO TELL THE OWNER OF THE JETTA THAT SOMEONE WAS BREAKING INTO

12   IT?

13         A.    I TOLD HIM TO GO TELL HER.

14               MS. ROACH:   BEYOND THE SCOPE OF REDIRECT.

15               THE COURT:   SUSTAINED.

16               MR. LEAHY:   MAY I TAKE HIM BACK ON

17   CROSS-EXAMINATION, YOUR HONOR?

18               THE COURT:   WELL, ARE YOU GOING TO ASK THAT HE BE

19   SUBJECT TO RECALL LATER?

20               MR. LEAHY:   PROBABLY.   YES, I WILL.

21               THE COURT:   OKAY.   ANYTHING FURTHER?

22               MR. LEAHY:   MAY I INQUIRE ON THIS LINE OF -

23               THE COURT:   WELL, IT'S BEYOND THE SCOPE.

24               MS. ROACH:   YOUR HONOR, OUT OF CONCERN FOR THIS

25   WITNESSES SCHEDULING, IF MR. LEAHY IS PLANNING ON RECALLING

26   HIM, I DON'T HAVE ANY PROBLEM WITH HIM GOING INTO HIS PART OF

27   THE CASE AT THIS POINT IN TIME IF HE WANTS TO TAKE THIS

28   WITNESS ON DIRECT AT THIS POINT.

1             THE COURT:  ALL RIGHT.  WITH THAT OFFER, YOU MAY

2      PROCEED.

3             MR. LEAHY:  THE ONLY PROBLEM WITH THAT IS I THINK I

4      NEED HIM ON RECALL ANYWAY, YOUR HONOR.

5             THE COURT:  WELL, OKAY.  ALL RIGHT.  WELL,

6      OBJECTION SUSTAINED.

7             MR. LEAHY:  THANK YOU.  THEN ASK THAT THE WITNESS

8      NOT BE EXCUSED.

9             THE COURT:  ALL RIGHT.  ANYTHING FURTHER,

10     MR. SANCHEZ?

11            MR. SANCHEZ:  NO, YOUR HONOR.

12            THE COURT:  ALL RIGHT.  MR. HERRERA, YOU ARE

13     SUBJECT TO BEING RECALLED.  WE DON'T KNOW EXACTLY WHEN THAT

14     MAY BE, BUT YOU'RE STILL SUBJECT TO RECALL.  THANK YOU VERY

15     MUCH.

16            MS. ROACH:  AND YOUR HONOR, IF I CAN JUST ASK THE

17     COURT'S PERMISSION THAT I CONTACT MR. HERRERA TO COME BACK TO

18     COURT SO HE DOESN'T HAVE TO WAIT FOR THE REMAINDER OF THE

19     PEOPLE'S CASE?

20            THE COURT:  YES.  OKAY.  THANK YOU.  YOU MAY STEP

21     DOWN.

22            THE WITNESS:  OKAY.

23            MS. ROACH:  YOUR HONOR, IF WE COULD APPROACH

24     BRIEFLY?

25            (SIDEBAR CONFERENCE, NOT REPORTED.)

26            THE COURT:  ALL RIGHT.  COUNSEL, DID YOU HAVE A

27     MOTION?

28            MR. SANCHEZ:  YES, YOUR HONOR.  AT THIS POINT,

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ─────────────────────── ) | |
| PEOPLE OF THE STATE OF CALIFORNIA, ) | FROM SAN DIEGO COUNTY |
| PLAINTIFF AND RESPONDENT, ) | HON. ESTEBAN HERNANDEZ, |
| ) | JUDGE |
| VS. ) | |
| ) | |
| JAVIER RODRIGUEZ, ) | APPEAL NO. D043198 |
| DEFENDANT AND APPELLANT. ) | NO. SCS176087 |
| ─────────────────────── ) | |

REPORTER'S TRANSCRIPT ON APPEAL

AUGUST 12, 2003

SAN DIEGO, CALIFORNIA

VOL. III

PAGES 301 -- 440-500

APPEARANCES:

FOR THE PLAINTIFF AND RESPONDENT:    BILL LOCKYER
                                     ATTORNEY GENERAL
                                     STATE OF CALIFORNIA
                                     110 WEST A STREET
                                     SAN DIEGO, CA. 92101


FOR THE DEFENDANT AND APPELLANT:    JAVIER RODRIGUEZ
                                    IN PRO PER




REPORTED BY:  IRENE PERKINS, CSR 12727

1                    CERTIFICATE OF REPORTER

2

3     STATE OF CALIFORNIA )
                          ) ss:
4     COUNTY OF SAN DIEGO )

5

6              THE PEOPLE OF THE STATE OF CALIFORNIA

7                             VS.

8                      JAVIER RODRIGUEZ

9                    CASE NO. SCS176087

10                    AUGUST 12, 2003

11                   PAGES 301 -- 440-500

12

13          I, IRENE PERKINS, CSR NO. 12727, A CERTIFIED SHORTHAND

14    REPORTER IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN

15    AND FOR THE COUNTY OF SAN DIEGO, HEREBY CERTIFY THAT I MADE A

16    SHORTHAND RECORD OF THE PROCEEDINGS HAD IN THE WITHIN CASE

17    AND THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE, AND

18    CORRECT TRANSCRIPTION OF THE PROCEEDINGS IN THIS CASE.

19          DATED THIS 22ND DAY OF DECEMBER, 2003.

20

21

22

23

24

25                              IRENE PERKINS, CSR 12727

26

27

28

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 9 of 100
Case 2:08-cv-02310-VVS-SS    Document 1-8    Filed 04/08/2008    Page 34 of 50
341

1          AGAIN, LADIES AND GENTLEMEN, I'LL ADMONISH YOU, IT IS

2     YOUR DUTY NOT TO CONVERSE AMONGST YOURSELVES OR WITH ANYONE

3     ELSE ON ANY SUBJECT CONNECTED WITH THE TRIAL, OR TO FORM OR

4     EXPRESS ANY OPINION UNTIL THE CASE IS FINALLY SUBMITTED TO

5     YOU.  15 MINUTE BREAK.

6               (RECESS.)

7               THE COURT:   ALL RIGHT.   PEOPLE MAY CALL THEIR NEXT

8     WITNESS.

9               MS. ROACH:   JUDGE, CAN WE APPROACH SIDEBAR FOR JUST

10    BRIEFLY?

11              THE COURT:   DO YOU WANT THE REPORTER?

12              MS. ROACH:   NO.

13              (SIDEBAR CONFERENCE, NOT REPORTED.)

14              MS. ROACH:   THANK YOU.   PEOPLE CALL INVESTIGATOR

15    PETER MARTINEZ.

16

17                         PETER MARTINEZ,

18    HAVING BEEN FIRST DULY ADMINISTERED AN OATH IN ACCORDANCE

19    WITH CODE OF CIVIL PROCEDURE SECTION 2094, WAS EXAMINED AND

20    TESTIFIED AS FOLLOWS:

21

22              THE CLERK:   PLEASE STATE YOUR FULL NAME AND SPELL

23    YOUR LAST NAME FOR THE RECORD.

24              THE WITNESS:   MY NAME IS PETER MARTINEZ,

25    M-A-R-T-I-N-E-Z.

26              THE COURT:   YOU MAY PROCEED.

27    //

28    //

1                         DIRECT EXAMINATION

2       BY MS. ROACH:

3            Q.    INVESTIGATOR MARTINEZ, HOW ARE YOU CURRENTLY

4       EMPLOYED?

5            A.    I'M CURRENTLY EMPLOYED WORKING WITH THE SAN DIEGO

6       COUNTY DA'S OFFICE.

7            Q.    AND WHAT IS THE JOB TITLE THAT YOU HAVE RIGHT NOW?

8            A.    I'M A CRIMINAL INVESTIGATOR ASSIGNED TO THE GANG

9       PROSECUTION UNIT.

10           Q.    HOW LONG HAVE YOU WORKED WITH THE DISTRICT

11      ATTORNEY'S OFFICE?

12           A.    APPROXIMATELY 18 MONTHS.

13           Q.    HOW MUCH OF THAT TIME HAS BEEN SPENT IN THE GANG

14      UNIT?

15           A.    THE ENTIRE 18 MONTHS.

16           Q.    PRIOR TO YOUR EMPLOYMENT WITH THE DISTRICT

17      ATTORNEY'S OFFICE, WERE YOU A LAW ENFORCEMENT OFFICER?

18           A.    YES, I WAS.

19           Q.    COULD YOU PLEASE DESCRIBE FOR US WHAT YOUR PRIOR

20      EXPERIENCE IS.

21           A.    1984 I WAS HIRED BY THE SAN DIEGO COUNTY SHERIFF'S

22      DEPARTMENT.  FROM 1984 THROUGH 1987 I WORKED AT THE SOUTHBAY

23      JAIL HERE IN THE CITY OF CHULA VISTA.  FROM 1987 TO 1997 I

24      WORKED AT ONE OF THE SHERIFF'S PATROL STATIONS DOWN IN THE

25      CITY OF IMPERIAL BEACH.  FROM 1997 I WAS REASSIGNED AS A GANG

26      INVESTIGATOR.  I WORKED UP IN NORTH SAN DIEGO IN THE CITY OF

27      SAN MARCOS.  I WORKED THERE FROM APPROXIMATELY 1997 TO 1999.

28      FROM 1999 I RETURNED TO THE CITY OF IMPERIAL BEACH AND I

1    CONTINUED AS A GANG INVESTIGATOR FROM 1999 UNTIL THE YEAR

2    2002 WHERE THEN I CAME TO THE DISTRICT ATTORNEY'S OFFICE.

3         Q.   NOW, WHEN YOU WERE FIRST EMPLOYED BY THE SHERIFF'S

4    DEPARTMENT WORKING IN THE JAILS, DID YOU COME INTO CONTACT

5    WITH GANG MEMBERS ON A REGULAR BASIS?

6         A.   YES, I DID.

7         Q.   AND, SIMILARLY, WHEN YOU WERE WORKING IN THE

8    IMPERIAL BEACH STATION, DID YOU BECOME FAMILIAR WITH SOUTHBAY

9    GANG MEMBERS?

10        A.   YES, I DID.

11        Q.   AND THIS AREA OF SOUTHBAY, I'M REFERRING TO GANG

12   MEMBERS FROM NATIONAL CITY, CHULA VISTA, SAN YSIDRO, AND

13   IMPERIAL BEACH.  WOULD YOU SEE PEOPLE FROM ALL OF THOSE AREAS

14   IN THE IMPERIAL BEACH AREA?

15        A.   YES, WE DID.

16        Q.   AND HOW CLOSE IS SAN YSIDRO TO THE IMPERIAL BEACH

17   SHERIFF'S STATION?

18        A.   THE BOUNDARIES OF THE CITY OF IMPERIAL BEACH IS SAN

19   YSIDRO.  THERE'S ANOTHER TWO SMALLER COMMUNITIES IN-BETWEEN

20   SAN YSIDRO AND THE CITY OF IMPERIAL BEACH.

21        Q.   IS IT FAIR TO SAY THAT WHILE YOU WORKED AT THE

22   IMPERIAL BEACH ON PATROL THAT YOU CAME INTO CONTACT WITH SAN

23   YSIDRO GANG MEMBERS ON A FAIRLY REGULAR BASIS?

24        A.   YES.

25        Q.   AND IN YOUR 5 YEARS -- IT WAS ABOUT 5 YEARS AS A

26   GANG INVESTIGATOR?

27        A.   CORRECT.

28        Q.   WHAT WAS YOUR PRIMARY DUTY?

1          A.   AS WHEN I WAS ASSIGNED WITH THE SHERIFF'S

2     DEPARTMENT GANG UNIT MY PRIMARY GOAL WAS TO HANDLE ALL

3     GANG-RELATED CRIMES THAT CAME IN FROM EITHER PATROL OR EITHER

4     WE WERE CALLED OUT BECAUSE A CRIME HAD OCCURRED WHICH WE

5     NEEDED GANG INVESTIGATORS TO CONTINUE ON WITH THE

6     INVESTIGATION.  ANOTHER THING THAT WE DID WAS THAT WE

7     MONITORED AND ALSO IDENTIFIED GANG MEMBERS THAT WERE COMING

8     INTO THE SPECIFIC GANGS.  BECAUSE I WORKED OUT OF THE

9     IMPERIAL BEACH STATION, MY PRIMARY DUTY WAS TO MONITOR THE

10    GANG MEMBERS FROM THE IMPERIAL STREET GANG.  BECAUSE I ALSO

11    WORKED IN THE LINCOLN ACRES AREA OVER THERE BY NATIONAL CITY,

12    WE ALSO HAVE LINCOLN ACRES STREET GANG THAT WE ALSO

13    MONITORED.  WE ALSO MONITORED THE SOUTHEAST LOCOS.

14         NOW, WHAT HAPPENED DURING -- DURING THE TIME THAT --

15    WHEN YOU'RE MONITORING, OF COURSE, YOU HAVE GANG RIVALS

16    OCCURRING, OR GANGS EITHER FROM IMPERIALS WOULD GO TO WHAT I

17    CALL THE SISTER COMMUNITIES LIKE NESTOR, DEL SOL, SAN YSIDRO,

18    NATIONAL CITY, CHULA VISTA, AND COMMIT CRIMES AND THEN RETURN

19    TO THEIR OWN TURF AREA.  OR WHAT WOULD HAPPEN IS THAT GANG

20    MEMBERS WOULD COME INTO IMPERIAL BEACH AND HAVE AN EITHER

21    RIVAL GANG FIGHT OR HAVE A GANG CRIME THAT OCCURRED WITHIN

22    THE CITY.  SO WE ALSO WOULD KEEP IN CONTACT WITH THE LOCAL

23    GANG INVESTIGATOR FROM THOSE SPECIFIC AREAS SUCH AS CHULA

24    VISTA AND NATIONAL CITY AND SAN DIEGO POLICE DEPARTMENT SO WE

25    CAN -- EVERYBODY THEN CAN KEEP AWARE OF WHAT'S GOING ON.

26         Q.   NOW, WITH REGARD TO THESE -- I'LL CALL THEM

27    INTELLIGENCE MEETINGS -- ARE THOSE SOMETHING THAT YOU

28    REGULARLY ATTEND TO THIS DAY?

Case 3:08-cv-01007-H-CAB     Document 1-5     Filed 06/03/2008     Page 13 of 100
Case 2:08-cv-02310-JVS-SS     Document 1-8     Filed 04/08/2008     Page 38 of 50

345

1      A.     THE MEETINGS AND THE -- I MEAN, WE'RE ALSO

2   CONTINUOUSLY KEEPING IN TOUCH WITH LOCAL LAW ENFORCEMENT FROM

3   OUR LOCAL SISTER COMMUNITIES TO KEEP OURSELVES UPDATED ON

4   THE -- ON THE GANG SITUATION.

5      Q.     AND MORE THAN JUST IN AN INFORMAL SETTING, DO YOU

6   ALSO ATTEND FORMAL GANG INTELLIGENCE MEETINGS ON A MONTHLY

7   BASIS?

8      A.     YES, I DO.

9      Q.     DO YOU ATTEND BOTH ONES FOR THE COUNTY OF SAN DIEGO

10  AS WELL AS FOR THE SOUTHBAY AREA SPECIFICALLY?

11     A.     YES, I DO.

12     Q.     AND PRIOR TO OR DURING YOUR TRAINING AS A GANG

13  INVESTIGATOR, DID YOU RECEIVE ANY SPECIAL EDUCATION IN THE

14  AREA OF GANG DOCUMENTATION MEMBERSHIP?

15     A.     YES, I DID.

16     Q.     CAN YOU PLEASE DESCRIBE THAT FOR US BRIEFLY.

17     A.     I HAVE APPROXIMATELY OVER 200 HOURS OF SEMINARS AND

18  GANG CONFERENCES THAT I HAVE ATTENDED.  I AM A MEMBER OF THE

19  CALIFORNIA GANG INVESTIGATORS ASSOCIATION.  I'M ALSO A MEMBER

20  OF THE CALIFORNIA NARCOTICS OFFICERS ASSOCIATION, WHICH ALSO

21  THEY HAVE CLASSES WHICH DEALS WITH GANGS AND DRUGS.

22     Q.     DO YOU KEEP UP-TO-DATE ON CURRENT PUBLICATIONS PUT

23  OUT BY THOSE ORGANIZATIONS, BOTH CALIFORNIA GANG

24  INVESTIGATORS AND CALIFORNIA NARCOTICS OFFICERS ASSOCIATION?

25     A.     YES.

26     Q.     AND DO YOU ALSO HAVE AS PART OF YOUR CURRENT DUTIES

27  AS AN INVESTIGATOR FOR THE DISTRICT ATTORNEY'S OFFICE TO BE

28  AWARE OF WHAT THE CURRENT TRENDS ARE IN GANG ACTIVITY IN THE

1    SOUTHBAY AREA?

2        A.    YES, I DO.

3        Q.    AND, SPECIFICALLY, DO YOU WORK WITH A DA WHO

4    HANDLES SOLELY GANG-RELATED VIOLENCE CASES?

5        A.    YES, I DO.

6        Q.    AND IS THAT MYSELF?

7        A.    YES, IT IS.

8        Q.    NOW, WITH REGARD TO DOCUMENTATION OF A GANG MEMBER,

9    IS THERE ANY KIND OF A CENTRALIZED SYSTEM FOR DOING THAT

10   THROUGHOUT THE STATE?

11       A.    WE HAVE WHAT WE CALL A CAL/GANG DATABASE WHICH IS A

12   DATABASE WHERE ALL THE GANG INVESTIGATORS THAT HAVE PASSED

13   THE COURSE CAN PLACE THEIR GANGS AND THEIR -- AND THEIR

14   DOCUMENTED GANG MEMBERS INTO THE SYSTEM.  BASICALLY, WHAT IT

15   IS, IT'S FOR US TO KEEP UPDATED ON INFORMATION, RESIDENCY,

16   TATOOS, VEHICLES, AND ALL OF THAT TYPE OF INFORMATION.

17       Q.    WHO ORCHESTRATES THAT DATABASE, OR WHO MANAGES IT?

18       A.    THE CAL/GANG COORDINATOR, OR THE COORDINATION

19   AGENCY IS SAN DIEGO POLICE DEPARTMENT.

20       Q.    AND ARE THERE ADDITIONAL AGENCIES IN OTHER COUNTIES

21   THAT MANAGE CAL/GANG DATABASES FOR THOSE COUNTIES?

22       A.    YES.

23       Q.    SO FOR INSTANCE, LOS ANGELES COUNTY HAS ITS OWN

24   ORGANIZER?

25       A.    LOS ANGELES DOJ.  AND THERE'S ONE FURTHER UP NORTH

26   THAT ASSIST WITH THE NORTHERN PART OF CALIFORNIA.

27       Q.    AND WHO SETS UP THE GUIDELINES FOR CAL/GANGS?

28       A.    WELL, THE GUIDELINES FOR DOCUMENTING GANG AND

1    DOCUMENTING A GANG MEMBER CAME FROM DOJ.

2         Q.    AND ARE THOSE -- WHEN YOU SAY "DOJ", YOU MEAN THE

3    DEPARTMENT OF JUSTICE?

4         A.    DEPARTMENT OF JUSTICE.

5         Q.    AND THOSE GUIDELINES ARE -- IS COMPLIANCE WITH

6    THOSE GUIDELINES REQUIRED IN ORDER FOR AN AGENCY TO INPUT

7    INFORMATION INTO CAL/GANGS?

8         A.    YES.

9         Q.    AND DOES AN INDIVIDUAL WHO IS ENTERING THAT

10   INFORMATION HAVE TO BE SPECIFICALLY TRAINED BY A DEPARTMENT

11   OF JUSTICE CERTIFIED CLASS BEFORE THEY CAN EVEN PUT ANYTHING

12   INTO CAL/GANGS?

13        A.    CORRECT.

14        Q.    NOW, WITH REGARD TO CAL/GANG DOCUMENTATION, CAN YOU

15   TELL US WHAT CAL/GANGS REQUIRES BEFORE A PERSON CAN BE PUT IN

16   AS A GANG MEMBER?

17        A.    IN ORDER FOR A PERSON TO BE DOCUMENTED AS A GANG,

18   THERE IS APPROXIMATELY FIVE CRITERIAS THAT ARE LISTED.  ONE

19   IS THAT THE PERSON BASICALLY ADMITS HE IS A GANG MEMBER.  HE

20   BASICALLY ADMITS TO LAW ENFORCEMENT AND HE SAYS, "I'M SO AND

21   SO."  WHEN I MEAN SO AND SO, I'M TALKING ABOUT A MONIKER THAT

22   HE GIVES, OR A STREET NAME THAT HE GIVES.  "I CLAIM SIDRO,"

23   OR, "I CLAIM DEL SOL."

24        THE SECOND CRITERIA IS THAT THE PERSON IS CONTACTED

25   WITH -- EITHER HAS TATOOS ON THEM, HAS PARAPHERNALIA THAT IS

26   ASSOCIATING TO THAT SPECIFIC GANG, ALSO, CLOTHING.  WHEN I'M

27   TALKING ABOUT PARAPHERNALIA, SOMETIME THEY HAVE CLOTHING THAT

28   SAYS "DEL SOL" OR "SIDRO" OR "IMPERIALS" ON IT.  SO,

1    BASICALLY, THEY ARE COMMUNICATING TO THE OUTSIDE PUBLIC THAT,

2    "I'M FROM THIS PARTICULAR GANG."

3        THE THIRD THING IS POLICE OBSERVATION.  IT'S WHAT WE

4    CALL FIELD INTERVIEW REPORTS.  THOSE ARE WHEN LAW ENFORCEMENT

5    CONTACTS SOMEBODY IN A SPECIFIC AREA AND THEY JUST GET

6    GENERAL INFORMATION FROM THE PERSON.  AND THOSE FIELD AND

7    INTERVIEW REPORTS HAVE DATES, ADDRESSES WHERE THE CONTACT WAS

8    MADE, THE TIME THE PERSON WAS CONTACTED, AND SOMETIMES THEIR

9    MONIKER IS PLACED IN THERE, AND INFORMATION LIKE DRIVER'S

10   LICENSE, SOCIAL SECURITY NUMBER, THE RESIDENCE OF WHERE THE

11   PERSON LIVES, AND THEN ALSO COMPANIONS WHO WAS WITH THIS

12   PERSON.  BUT THEN, ALSO, THERE IS SOME LINES, ALMOST LIKE A

13   BOX, WHERE THE OFFICER CAN WRITE A LITTLE, YOU KNOW -- YOU

14   KNOW, A LITTLE SYNOPSIS, SMALL SYNOPSIS OF WHAT THE CONTACT

15   WAS ABOUT OR IF, SAY, THIS PERSON CLAIMED TO ME, "I'M SO AND

16   SO FROM THIS SPECIFIC GANG."  AND THEN THE OFFICER HAS WHERE

17   HE PUTS HIS NAME AND HIS I.D. AND THE AGENCY.

18       ALSO, POLICE REPORTS, IF THE POLICE REPORTS ARE THAT

19   EITHER HE IS A VICTIM OF A CRIME.  LET'S SAY THERE'S A RIVAL

20   GANG SITUATION THAT HAPPENS AND HE SAYS, "WELL, SO AND SO

21   FROM THE OTHER GANG DID IT BECAUSE I'M SO AND SO FROM THIS

22   GANG."  ALSO, LIKE I SAID, POLICE OBSERVATIONS, POLICE

23   REPORTS, BEING ARRESTED WITH OTHER DOCUMENTED GANG MEMBERS

24   FROM WITHIN THEIR OWN GANG.

25       AND THE OTHER ONE IS -- WELL, THE FIELD INTERVIEWS

26   OBSERVATIONS IS CRITERIA THREE, THE ARRESTS ARE CRITERIA

27   FOUR, AND THE FIFTH CRITERIA IS A -- IF A SEPARATE PERSON

28   ADVISES US THAT HE IS A GANG MEMBER FROM A CERTAIN AREA GANG.

1    AND IT COULD BE ANYONE.  IT COULD BE A NEIGHBOR, IT COULD BE

2    A RELATIVE, IT COULD BE, YOU KNOW, SOMEBODY FROM A SCHOOL.

3    YOU KNOW, PUBLIC IDENTITY.  *Hearsay*

4        SO OUT OF THOSE FIVE CRITERIA, THEY DON'T HAVE TO MEET

5    ALL FIVE.  THEY CAN MEET, SAY, THREE OF THE FIVE, OKAY?  AND

6    I'M GOING TO TALK ABOUT HOW WE DID IT AT THE SHERIFF'S

7    DEPARTMENT.  WE DID THREE INDIVIDUAL CONTACTS, OKAY?  SO IF

8    ONE CONTACT WAS, OKAY, HE WAS CONTACTED BY HIMSELF BUT HAD

9    PARAPHERNALIA BY CLOTHING OR PHONEBOOK THAT SAID "SIDRO" ON

10   IT OR SOMETHING, OKAY, THAT WOULD BE ONE CONTACT.  AND THE

11   SECOND CONTACT HE WOULD BE WITH SOMEBODY ELSE.  HE'S

12   CONTACTED WITH A FELLOW GANG MEMBER.  THAT'S CONTACT TWO.

13   CONTACT THREE COULD BE SOME TYPE OF ARREST, OKAY, WITH A

14   FELLOW GANG MEMBER, OKAY?  THOSE ARE THREE CONTACTS.  THAT

15   THIRD CONTACT IS WHEN WE WOULD HAVE ENOUGH DOCUMENTATION TO

16   DOCUMENT HIM AS A GANG MEMBER.

17       Q.    WHAT DOES CAL/GANGS REQUIRE?  *= protection*

18    *   A.    CAL/GANGS REQUIRES TWO.  *vio.?*

19       Q.    AND ARE THERE SOME AGENCIES THAT ONLY COMPLY WITH

20   THE TWO WITH THAT STANDARD RATHER THAN THE THREE?

21       A.    CORRECT.  THE SHERIFF'S DEPARTMENT.  WE WANTED TO

22   BE SURE, SO WE ADDED THE THIRD ONE.

23       Q.    AND WHAT ABOUT THE SAN DIEGO POLICE DEPARTMENT, DO

24   THEY ALSO USE THREE CONTACTS PRIOR TO PUTTING PEOPLE INTO

25   CAL/GANGS?

26    *   A.    I BELIEVE THEY USE THE TWO.

27       Q.    THEY USE THE TWO?

28       A.    CORRECT.

1        Q.    AND WITH REGARD TO CAL/GANGS INFORMATION, DOES IT

2    STAY IN THE SYSTEM INDEFINITELY, OR IS IT PURGED OUT AFTER A

3    CERTAIN AMOUNT OF INACTIVITY?

4        A.    ONCE A PERSON IS DOCUMENTED AS A GANG MEMBER, AS

5    THE PERSON IS STILL INVOLVED IN SOME TYPE OF CRIMINAL STREET

6    GANG ACTIVITY, THEN HE IS CONTINUALLY BEING MONITORED.  IF

7    FOR AT ONE TIME -- AND I'M JUST GOING TO LOOK.  I'M JUST

8    GOING TO GIVE YOU JUST AS EXAMPLE, IF THE PERSON IS BEING --

9    FINISHES BEING CONTACTED, OR STOPS BEING CONTACTED AT THE

10   YEAR 2000, OKAY, AND AT 2002 HE HAS NO MORE CONTACTS, OKAY,

11   EITHER IN THE FIELD OR IF HE IS, YOU KNOW, ACTUALLY IN THE

12   PRISON OR IN THE JAIL, THEN WHAT WE DO IS WE PLACE THEM ON AN

13   INACTIVITY STATUS, OKAY.

14       NOW, IN ORDER TO BE PURGED, YOU HAVE TO HAVE THREE

15   ADDITIONAL YEARS.  SO YOU HAVE TO HAVE A TOTAL OF FIVE, OKAY?

16   SO YOUR FIRST TWO YEARS ARE INACTIVE, AND THEN IF HE HAS NO

17   MORE CONTACTS OR ANYTHING THAT SHOWS THAT HE'S CONTINUED TO

18   BE WITH THE GANG, THEN IT'S A TOTAL OF FIVE.  AND AT THE

19   FIFTH YEAR, HIS INFORMATION GETS PURGED FROM THE SYSTEM.

20       Q.    IS IT FAIR TO SAY, THOUGH, THAT AFTER TWO YEARS

21   THERE WILL BE SOME INDICATION FROM CAL/GANGS DATABASE IF THE

22   PERSON IS INACTIVE IF THEY HADN'T BEEN CONTACTED IN THAT TWO

23   YEAR PERIOD?

24       A.    YES.  ACTUALLY, IN CAL/GANG, WE CAN MARK IF EITHER

25   THE PERSON IS ACTIVE OR INACTIVE.

26       Q.    NOW, AGENCIES THAT TAKE ADVANTAGE OF THE CAL/GANG

27   SYSTEM, DO THEY HAVE TO BE AUDITED TO MAKE SURE THAT THEY ARE

28   COMPLYING WITH THE PROPER DOCUMENTATION AND BACKGROUND

1    INFORMATION TO SUPPORT WHAT THEY'RE ENTERING INTO THE SYSTEM?

2         A.    ▆▆.

3         Q.    AND IF THEY ARE NOT IN COMPLIANCE AT THE TIME OF

4    THEIR AUDIT, CAN THEY ESSENTIALLY HAVE THEIR CAL/GANG

5    PRIVILEGES REMOVED?

6         A.    ▆▆.

7         Q.    THEY WILL NOT BE ALLOWED TO ENTER INFORMATION OR

8    RETRIEVE INFORMATION?

9         A.    CORRECT.

10        Q.    NOW, WITH REGARD TO GANGS IN THE SOUTHBAY, ARE YOU

11   FAMILIAR WITH A GANG THAT CALLS ITSELF "SIDRO"?

12        A.    YES, I AM.

13        Q.    CAN YOU PLEASE TELL US, DOES SIDRO -- IS IT A

14   TRADITIONAL GANG IN THE SENSE THAT IT FITS DEFINITIONS

15   PROVIDED BY BOTH PENAL CODE SECTION 18622, AS WELL AS BY THE

16   DOJ DEFINITION OF WHAT A GANG IS?

17        A.    YES.

18        Q.    AND, APPROXIMATELY, WHEN DID SIDRO BEGIN TO BE

19   DOCUMENTED BY LAW ENFORCEMENT?

20        A.    WELL, SIDRO WAS DOCUMENTED BY THE SAN DIEGO POLICE

21   DEPARTMENT IN 1994.

22        Q.    NOW, THAT'S THE FIRST DATE OF DOCUMENTATION.  ARE

23   YOU AWARE OF WHETHER OR NOT THE GANG WAS IN EXISTENCE PRIOR

24   TO THAT?

25        A.    YES, I DO.

26        Q.    AND THE DATE OF DOCUMENTATION SIMPLY REFLECTS WHEN

27   THE POLICE DEPARTMENT STARTED COLLECTING DATA ON THE GANG IN

28   ORDER TO ENTER IT INTO CAL/GANGS; IS THAT CORRECT?

1      A.    CORRECT.

2      Q.    DO YOU KNOW APPROXIMATELY HOW MANY MEMBERS THE

3   SIDRO GANG CURRENTLY HAS?

4      A.    THEY CURRENTLY HAVE 225 GANG MEMBERS.

5      Q.    AND THESE ARE ALL INDIVIDUALS WHO HAVE AT A MINIMUM

6   TWO CONTACTS WHERE THEY SATISFIED ONE OF THE FIVE CRITERIA;

7   IS THAT CORRECT?

8      A.    CORRECT.

9      Q.    DOES THE SIDRO GANG HAVE ANY PARTICULAR BOUNDARIES

10  WITHIN SAN DIEGO COUNTY?

11     A.    SIDRO GANG IS MOSTLY IN THE SAN YSIDRO COMMUNITY.

12  THE BOUNDARIES THAT HAVE BEEN SET ARE, TO THE SOUTH WOULD BE

13  THE BORDER, TO THE NORTH WOULD BE 905, TO THE WEST WOULD BE

14  THE BEACH, AND TO THE EAST WOULD BE WHAT THEY CALL OTAY --

15  THE OTAY BORDER.  SO THOSE ARE YOUR PERIMETERS.

16     Q.    AND DO YOU KNOW WHETHER OR NOT SIDRO GANG MEMBERS

17  MEET EITHER ON A FORMAL OR INFORMAL BASIS?

18     A.    YES, I DO.

19     Q.    ARE YOU FAMILIAR WITH SOME OF THE AREAS THAT SIDRO

20  GANG MEMBERS CONGREGATE AT?

21     A.    YES.

22     Q.    AND WHAT ARE SOME OF THE PRIMARY AREAS WHERE YOU

23  SEE SIDRO GANG MEMBERS CONGREGATE AT?

24     A.    THERE'S A PARK AND A STREET ON SYCAMORE.

25     Q.    IS THAT CESAR CHAVEZ PARK?

26     A.    YES, IT IS.

27     Q.    AND IN ADDITION TO THE PARK, ARE THERE OTHER

28  LOCATIONS?

1        A.    THERE'S OTHER LOCATIONS LIKE ON EAST PARK IN SAN

2    YSIDRO BOULEVARD IN THAT AREA.

3        Q.    ARE THERE A NUMBER OF APARTMENT COMPLEXES WHERE

4    THERE HAVE BEEN REPEATED PROBLEMS OR CONTACTS WITH LAW

5    ENFORCEMENT AND GROUPS OF SIDRO GANG MEMBERS?

6        A.    YES.

7        Q.    AND ADDITIONALLY, IS THERE A RESIDENCE OR A SERIES

8    OF APARTMENTS ON 300 SYCAMORE WHERE YOU SEE ROUTINE

9    CONGREGATION OF GANG MEMBERS?

10       A.    THAT'S WHERE I'VE NOTICED A MAJORITY OF THE

11   CONTACTS ARE, ON SYCAMORE.

12       Q.    NOW, IN ORDER FOR A GANG TO MEET THE CRITERIA UNDER

13   186.22, IT HAS TO BE SHOWN THAT THEY HAVE A PRIMARY CRIMINAL

14   ACTIVITY.  ARE YOU FAMILIAR WITH THE CRIMINAL ACTIVITY THAT

15   SIDRO GANG MEMBERS HAVE PARTICIPATED IN THE RECENT PAST?

16            MR. LEAHY:  YOUR HONOR, IT'S A LEADING QUESTION,

17   AND I OBJECT TO COUNSEL TESTIFYING.

18            THE COURT:  REPHRASE.

19   BY MS. ROACH:

20       Q.    ARE YOU AWARE OF WHAT THE PRIMARY CRIMINAL

21   ACTIVITIES IS OF SIDRO GANG MEMBERS?

22       A.    YES.

23       Q.    AND CAN YOU PLEASE GIVE US WHAT YOU WOULD CONSIDER

24   THEIR PRIMARY CRIME?

25       A.    WELL, I LOOK AT -- I LOOK AT RANGES, OKAY?

26   EVERYTHING FROM VANDALISM UP TO MURDER.  SO THEY'VE --

27   THEY'VE MET AT LEAST ON ONE OCCASION THEY MET SOME TYPE

28   WITHIN THOSE BOUNDARIES.  WE'RE TALKING ABOUT ASSAULTS, WE'RE

1    TALKING ABOUT EXTORTIONS, WE'RE TALKING ABOUT BURGLARIES,

2    NARCOTICS INVOLVEMENT, AND OTHER TYPES.

3         Q.   HOW ABOUT OTHER THEFTS LIKE GRAND THEFT AUTO?

*distinguishable from Auto Burg.*

4         A.   YES.

5         Q.   AND WHAT ABOUT ROBBERIES?

6         A.   YES.

7         Q.   IN YOUR RESEARCH, DO YOU FIND THAT THERE IS ONE

8    CRIME THAT APPEARS TO STICK OUT MORE RECENTLY WITH MANY OF

9    THE SIDRO GANG MEMBERS THAN OTHERS?

10        MR. LEAHY:  RELEVANCE.  OBJECTION.  RELEVANCE, YOUR

11   HONOR.

12        THE COURT:  OVERRULED.

13        THE WITNESS:  WHAT I HAVE NOTICED IN THE DATA THAT

14   I'VE GATHERED IS THAT SIDRO IS INVOLVED IN A LOT OF

15   ROBBERIES.

16        Q.   AND THAT'S THE TAKING OF PROPERTY BY FORCE OR FEAR?

17        A.   YES, IT IS.

18        Q.   NOW, DOES THE SIDRO GANG HAVE A COMMON SIGN OR

19   SYMBOL?

20        A.   S-Y FOR SAN YSIDRO.

21        Q.   ARE THERE ALSO NUMBERS THAT YOU WILL ROUTINELY SEE

22   ASSOCIATED WITH THOSE LETTERS S-Y THAT REPRESENT THOSE

23   LETTERS?

24        A.   1925.

25        Q.   WHAT DO THOSE REPRESENT?

26        A.   THERE'S VARIOUS WAYS THAT GANGS CAN COMMUNICATE.

27   ONE OF THEM IS THROUGH EITHER GRAFFITI OR THROUGH TATOOS.  IF

28   YOU, FOR INSTANCE, YOU TAKE THE ALPHABET A THROUGH Z.  A WILL

1    BE 1, B WILL BE 2, C WILL BE 3, DOWN ALL THE WAY, Y WILL BE

2    25, Z WILL BE 26.  SO IF YOU TAKE THOSE LETTERS AND YOU PUT

3    EACH LETTER TO THOSE NUMBERS, THEN WHEN YOU SEE THESE NUMBERS

4    EITHER ON GRAFFITI OR TATOOS, THEY REPRESENT -- THEY MAKE UP

5    THOSE LETTERS FROM WHAT THEY REPRESENT FOR.  IN OTHER WORDS,

6    S IS 19, Y IS 25.  FOR SAN YSIDRO, YOU SEE A LOT OF 1904,

7    OKAY?  S, 19 AND 4 IS D FOR SAN DIEGO, OKAY?  THAT'S JUST ONE

8    WAY THAT -- THAT MEANS OF TYPE OF COMMUNICATION.

9        Q.    AND BASED ON YOUR TRAINING AND EXPERIENCE, DO YOU

10   FIND THAT THE USE OF EITHER THE LETTERS S-Y, THE WORDS SAN

11   YSIDRO, THE WORD SIDRO, AND 1925, APPEAR COMMONLY IN TATOOS

12   AND CLOTHING WORN AND HAD BY SIDRO GANG MEMBERS?

13       A.    YES.

14       Q.    AND ALSO, THOUGH IT MAY SEEM OBVIOUS, DO THEY ALSO

15   HAVE A COMMON NAME?  A COMMON NAME IN TERMS OF THE GANGS

16   NAME?

17       A.    THE GANG, YES.

18       Q.    AND THAT IS THE NAME SIDRO?

19       A.    SIDRO.

20       Q.    AND TO OTHER RIVAL GANG MEMBERS, IF YOU WERE SIMPLY

21   TO CALL OUT THE WORD "SIDRO" WHAT WOULD THAT COMMUNICATE?

22       A.    IF I'M SAYING "SIDRO" TO A RIVAL GANG, YOU'RE

23   BASICALLY TELLING THAT GROUP OF PEOPLE WHERE YOU'RE FROM,

24   OKAY?  BASICALLY, YOU'RE TELLING THEM, "HEY, I'M FROM SIDRO.

25   SO, YOU KNOW, I'M JUST LETTING YOU KNOW."  SOMETIMES THOSE

26   GANGS WILL TALK BACK OR THEY WILL SAY WHERE THEY'RE FROM, AND

27   THEN THAT'S HOW ACTUALLY THERE'S A CHANCE OF YOUR

28   COMMUNICATION ESCALATING.

1    Q.   WHEN YOU SAY ESCALATING, YOU MEAN IN TERMS OF AN

2    ASSAULT OR SOME OTHER TYPE OF VIOLENT ACTIVITY?

3    *  A.   CORRECT.

4    Q.   NOW, WITH REGARDS TO THE SIDRO GANG, HAVE YOU BEEN

5    ABLE TO ESTABLISH WHETHER OR NOT THEY HAVE A PATTERN OF

6    CRIMINAL ACTIVITY BY DOING RESEARCH AND BEING AWARE OF THE

7    PREVIOUS CRIMINAL PROSECUTIONS AGAINST SIDRO GANG MEMBERS?

8    A.   YES, I HAVE.

9    Q.   SPECIFICALLY IN SEPTEMBER 26TH OF 2002, ARE YOU

10   AWARE THAT A DOCUMENTED SIDRO GANG MEMBER BY THE NAME SABAS

11   ALDANA WAS CONVICTED OF ROBBERY?

12   A.   YES, HE WAS.

13   Q.   AND ARE YOU ALSO AWARE THAT IN SEPTEMBER 20TH OF

14   2001, A DOCUMENTED SIDRO GANG MEMBER BY THE NAME OF OCTAVIO

15   MENDOZA WAS ALSO CONVICTED OF ROBBERY?

16   A.   YES, HE WAS.

17   Q.   AND ARE YOU ALSO AWARE THAT ON DECEMBER 15TH OF

18   1999, DEFENDANT JOSE LEON, A DOCUMENTED SIDRO GANG MEMBER,

19   WAS CONVICTED OF -- I'M SORRY -- WAS FOUND TRUE IN JUVENILE

20   COURT OF COMMITTING A ROBBERY?

21   MR. LEAHY:   OBJECTION AS TO FOUNDATION, YOUR HONOR.

22   MOVE TO STRIKE THE ANSWER.

23   THE COURT:   LAY THE FOUNDATION.

24   BY MS. ROACH:

25   Q.   INVESTIGATOR MARTINEZ, HAVE YOU DONE ANY RESEARCH

26   IN ORDER TO TESTIFY IN THIS CASE HERE TODAY?

27   A.   YES, I HAVE.

28   Q.   AND IN DOING THAT RESEARCH, HAVE YOU GONE THROUGH

1    COPIES OF CERTIFIED PRIOR CONVICTIONS AND TRUE FINDINGS OF

2    EACH OF THE INDIVIDUALS YOU'RE TESTIFYING ABOUT?

3         A.    YES, I HAVE.

4         Q.    SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS

5    PEOPLES EXHIBIT 29, DO YOU RECOGNIZE THIS ITEM?

6              (PEOPLE'S EXHIBIT 29, CONVICTION RECORD, PC211,

7              2002, MARKED FOR IDENTIFICATION.)

8         A.    YES, THIS IS THE CASE ON MR. SABAS ALDANA.

9         Q.    AND DOES THAT SHOW THE CONVICTION THAT YOU JUST

10   TESTIFIED TO THAT OCCURRED IN SEPTEMBER OF 2002 FOR ROBBERY?

11        A.    YES, IT IS.

12        Q.    AND SHOWING YOU WHAT'S BEEN MARKED PEOPLE'S EXHIBIT

13   28, DO YOU RECOGNIZE THIS ITEM?

14             (PEOPLE'S EXHIBIT 28, CONVICTION RECORD, PC211,

15             2001, MARKED FOR IDENTIFICATION.)

16        A.    YES, THIS IS THE ROBBERY CHARGE ON MR. MENDOZA.

17        Q.    IT SHOWS A CONVICTION OF ROBBERY FROM SEPTEMBER

18   20TH, 2001?

19        A.    YES.

20        Q.    SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS

21   PEOPLES EXHIBIT 10, DO YOU RECOGNIZE THIS ITEM?

22             (PEOPLE'S EXHIBIT 10, JUVENILE RECORD, DEFENDANT

23             LEON, MARKED FOR IDENTIFICATION.)

24        A.    THIS IS THE JUVENILE DOCUMENTATION ON MR. JOSE

25   LEON.

26        Q.    AND DOES THAT JUVENILE DOCUMENTATION INDICATE THAT

27   THERE IS A TRUE FINDING FROM DECEMBER 15TH, 1999, FOR

28   ROBBERY?

1        MR. LEAHY:  YOUR HONOR, I'M GOING TO OBJECT AND ASK

2    THE COURT TO GIVE A LIMITING INSTRUCTION AT THIS TIME.

3        THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THERE

4    IS CERTAIN EVIDENCE THAT IS ADMITTED FOR A LIMITED PURPOSE,

5    AND THIS IS ONE OF THOSE.  THE PURPOSE FOR WHICH THIS IS

6    ADMITTED IS SOLELY THE ALLEGATION OF PENAL CODE SECTION

7    186.22, SUBDIVISION B1, ATTACHED TO EACH OF THE COUNTS, AS

8    WELL AS FOR COUNTS 3 AND 4.  SO THIS EVIDENCE IS ADMITTED

9    SOLELY FOR THAT ENHANCEMENT PURPOSE ATTACHED TO EACH COUNT

10   AND ALSO LIMITED FOR CONSIDERATION ON COUNTS 3 AND 4, AND NOT

11   TO BE CONSIDERED FOR ANY OTHER PURPOSE.

12       YOU MAY PROCEED.

13   BY MS. ROACH:

14       Q.   AND ARE YOU ALSO AWARE THAT ON APRIL 22ND OF 1999,

15   THAT A DOCUMENTED GANG MEMBER, DEFENDANT JAVIER RODRIGUEZ,

16   WAS CONVICTED OF RESIDENTIAL BURGLARY?

17       A.   YES.

18       Q.   AND SHOWING YOU WHAT'S BEEN MARKED AS PEOPLE'S

19   EXHIBIT 8, DO YOU RECOGNIZE IT?

20           (PEOPLE'S EXHIBIT 8, CONVICTION RECORD, DEFENDANT

21           RODRIGUEZ, MARKED FOR IDENTIFICATION.)

22       A.   YES, I DO.

23       Q.   AND DOES THAT APPEAR TO BE A CERTIFIED COPY OF HIS

24   CONVICTION IN THAT MATTER?

25       A.   YES.

26       Q.   NOW, WITH REGARD TO THE IDENTIFICATION OF

27   MR. ALDANA AND OCTAVIO MENDOZA AS SIDRO GANG MEMBERS, WHAT

28   RESEARCH DID YOU DO TO DETERMINE WHETHER OR NOT THEY WERE

1    GANG MEMBERS?

2        A.    MY RESEARCH COMPILED FROM INFORMATION GATHERED FROM

3    THE CAL/GANGS DATA SYSTEM.

4        Q.    IN ADDITION, WERE YOU THE GANG INVESTIGATOR WHEN

5    MR. ALDANA WAS PROSECUTED?

6        A.    YES.

7        Q.    AND THAT WAS HERE IN THE SOUTHBAY COURT?

8        A.    YES.

9        Q.    AND WITH REGARD TO OCTAVIO MENDOZA, DID YOU RELY ON

10   PRIOR PROBATION REPORTS, CERTIFIED CONVICTIONS, AS WELL AS

11   CAL/GANGS INFORMATION?

12       A.    YES, I DID.

13       Q.    AND WERE YOU ABLE TO DETERMINE WHETHER OR NOT BOTH

14   MR. ALDANA AND MENDOZA HAVE THE REQUISITE NUMBER OF CONTACTS

15   IN ORDER TO DETERMINE THAT THEY WERE GANG MEMBERS?

16       A.    YES, THEY DID.

17       Q.    IN FACT, DID BOTH OF THEM HAVE MORE THAN WHAT WAS

18   REQUIRED BY THE DEPARTMENT OF JUSTICE?

19       A.    MR. ALDANA DID, YES.

20       Q.    AND SPECIFICALLY, HOW MANY CONTACTS DID MR. ALDANA

21   HAVE?

22       A.    APPROXIMATELY OVER 17.

23       Q.    AND ONE OF THOSE LAST CONTACTS WAS IN APRIL 27TH OF

24   THIS YEAR; IS THAT CORRECT?

25       A.    YES.

26       Q.    AND DURING THAT CONTACT, HE WAS ACTUALLY WITH

27   DEFENDANT JOSE LEON; IS THAT CORRECT?

28       A.    YES, HE WAS.

1          ※ MR. LEAHY:  OBJECTION, YOUR HONOR.  MOVE TO STRIKE

2      ON RELEVANCE GROUNDS.

3               THE COURT:  OVERRULED.

4      BY MS. ROACH:

5          Q.   NOW, WITH REGARD TO DEFENDANT JAVIER RODRIGUEZ, IS

6      HE DOCUMENTED WITHIN THE CAL/GANGS SYSTEMS?

7          A.   YES, HE IS.

8          Q.   AND CAN YOU PLEASE TELL US WHAT FORM OF

9      DOCUMENTATION HAS BEEN USED TO DETERMINE WHETHER OR NOT

10     MR. RODRIGUEZ IS AN ACTIVE PARTICIPANT IN A CRIMINAL STREET

11     GANG?

12         ※ A.   BY THE CAL/GANG SYSTEM, WHICH SAN DIEGO PD DOES THE

13     ENTRY, IT WAS BY FIELD INTERVIEWS.

14         Q.   AND APPROXIMATELY HOW MANY FIELD INTERVIEWS WERE

15     THERE SHOWING CONTACTS WITH MR. RODRIGUEZ?

16         A.   IF I CAN REFRESH MY MEMORY?

17         Q.   IF IT WOULD HELP REFRESH YOUR RECOLLECTION.

18         ※ A.   YES, IT WOULD.  ON MR. RODRIGUEZ, REGARDING FIELD

19     INTERVIEWS, THERE WERE APPROXIMATELY OVER 30.

20         Q.   AND DID MR. RODRIGUEZ CLAIM ANY GANG MONIKER DURING

21     THOSE CONTACTS?

22         A.   YES.

23         Q.   AND WHAT WAS THE MONIKER THAT HE CLAIMED MOST

24     FREQUENTLY?

25         A.   EITHER "CHICO" OR "JAVI".

26         Q.   AND DID THE FIELD INTERVIEWS INDICATE WHETHER OR

27     NOT MR. RODRIGUEZ HAD ANY TATOOS THAT WERE CONNECTED WITH

28     SIDRO GANG MEMBERSHIP?

1       A.   YES, HE DID.

2       Q.   HOW MANY TATOOS DID HE HAVE?

3       A.   HE HAD THREE SPECIFIC TATOOS, BUT IN FOUR

4   LOCATIONS.

5       Q.   WHAT ARE THOSE TATTOOS, IF YOU KNOW?

6       A.   HE HAD THREE DOTS ON HIS LEFT HAND, HE HAS "SIDRO"

7   ON THE BACK OF HIS NECK, HE HAS THE NUMBERS 1925 BOTH ON HIS

8   RIGHT ARM AND ON HIS STOMACH AREA.

9       Q.   AND IN ADDITION TO OBSERVING THE DOCUMENTATION IN

10  CAL/GANGS, DID YOU ALSO HAVE AN OPPORTUNITY TO VIEW THOSE

11  TATOOS DURING THE PRELIMINARY EXAMINATION IN THIS MATTER?

12      A.   YES, I DID.

13      Q.   AND DO THEY STILL APPEAR ON THE LOCATIONS THAT

14  YOU'VE JUST DESCRIBED?

15      A.   YES, THEY DO.

16      Q.   IN ADDITION TO IDENTIFYING HIMSELF BY MONIKER AND

17  HAVING TATOOS, DID MR. RODRIGUEZ EVER ADMIT TO OFFICERS THAT

18  HE WAS A SIDRO GANG MEMBER?

19      A.   YES, HE HAS.

20      Q.   AND APPROXIMATELY HOW MANY OCCASIONS HAS THAT

21  OCCURRED?

22      A.   I WOULD HAVE TO GO BACK TO MY NOTES.

23      Q.   IF THAT WOULD HELP REFRESH YOUR RECOLLECTION.

24      A.   THANK YOU.  APPROXIMATELY 23.

25      Q.   IN ADDITION, WAS HE ROUTINELY CONTACTED IN AREAS

26  KNOWN FOR SIDRO GANG ACTIVITY?

27      A.   YES, HE WAS.

28      Q.   WAS HE EVER CONTACTED IN THE COMPANY OF OTHER

1    DOCUMENTED SIDRO GANG MEMBERS?

2        A.    YES, HE WAS.

3        Q.    HOW SPECIFICALLY DID THAT OCCUR IN FIELD INTERVIEW

4    CONTACTS?

5        A.    AGAIN, I HAVE TO --

6        Q.    IF IT WOULD HELP REFRESH YOUR RECOLLECTION.

7        A.    OKAY.  APPROXIMATELY 5.

8        Q.    NOW, WOULD YOU CONSIDER THIS DOCUMENTATION TO BE

9    SIGNIFICANTLY OVER WHAT IS REQUIRED FOR DOCUMENTED \-- I'M

10   SORRY -- FOR DEPARTMENT OF JUSTICE?

11       A.    YES IT IS.

12            MR. LEAHY:  YOUR HONOR, I'LL OBJECT ON RELEVANCE.

13   I DON'T THINK HE'S QUALIFIED TO GIVE OPINION.

14            THE COURT:  OVERRULED.  YOU CAN CROSS-EXAMINE ON

15   IT.

16   BY MS. ROACH:

17       Q.    NOW, WITH REGARD TO MR. LEON, DOES HE ALSO HAVE

18   PRIOR CONTACTS SIMILAR TO THOSE OF MR. RODRIGUEZ?

19            MR. LEAHY:  OBJECT AS TO VAGUE, YOUR HONOR.

20            THE COURT:  SUSTAINED.  REPHRASE.

21   BY MS. ROACH:

22       Q.    HOW MANY CONTACTS WITH POLICE HAVE BEEN DOCUMENTED

23   IN CAL/GANGS FOR LEON?

24       A.    I HAVE TO REFRESH MY MEMORY.

25       Q.    IF IT WOULD HELP ASSIST YOU.

26       A.    APPROXIMATELY 12.

27       Q.    AND WHAT ARE THE DATE RANGES FOR THOSE 12

28   OCCASIONS?

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 31 of 100
363
Case 2:08-cv-02310-JVS-SS    Document 1-9    Filed 04/08/2008    Page 6 of 50

1          A.    FROM JUNE OF 1999, TO THE RECENT ONE IN 2003.

2          Q.    THAT'S FOR APRIL OF 2003?

3          A.    YES.

4          Q.    AND, I APOLOGIZE, CAN YOU ALSO GIVE US THE DATE

5     RANGE FOR DEFENDANT RODRIGUEZ'S CONTACTS?

6          A.    YES.  REFRESHING MY MEMORY.  THAT GOES BACK FROM

7     OCTOBER OF 1990, TO SEPTEMBER OF 2002.

8          Q.    AND WOULD HIS MOST RECENT CONTACT ACTUALLY BE

9     DEFINED AS HIS ARREST IN THIS CASE WITH DEFENDANT LEON?

10         A.    YES.

11         Q.    NOW, WITH REGARD TO THE 12 OCCASIONS WHEN MR. LEON

12    WAS CONTACTED, DID HE HAVE ANY MONIKER THAT HE PROVIDED TO

13    POLICE TO INDICATE GANG AFFILIATION?

14         A.    YES, HE HAS.

15         Q.    WHAT WAS THAT?

16         A.    HE GAVE ONE AS "SIDRO MALOS".

17         Q.    AND WAS THAT?

18               MR. LEAHY:  YOUR HONOR, COULD I HAVE THAT REPEATED?

19               THE WITNESS:  SIDRO MALOS.

20    BY MS. ROACH:

21         Q.    IN ADDITION, HAS HE ALSO GIVEN THE MONIKER

22    "TREMENDO" ON PRIOR OCCASIONS?

23         A.    YES, HE HAS.

24         Q.    AND DO THE FIELD INTERVIEWS INDICATE WHETHER OR NOT

25    MR. LEON HAS ANY TATTOOS THAT ARE ASSOCIATED WITH GANG

26    AFFILIATION?

27         A.    YES, HE DOES.

28         Q.    WHAT IS THAT?

1        A.    THE THREE DOTS ON HIS WRIST.

2        Q.    WHAT DO THOSE THREE DOTS REPRESENT?

3    ✳ A.    "MY CRAZY LIFE."

4        Q.    AND IS THAT SOMETHING THAT YOU AS A GANG

5    INVESTIGATOR AND AS A PATROL OFFICER SEE FREQUENTLY IN THE

6    WEB OF THE HANDS ON DOCUMENTED GANG MEMBERS?

7        A.    YES.

8        Q.    AND ON THE OCCASIONS THAT MR. LEON WAS FIELD

9    INTERVIEWED BY POLICE, HOW MANY OF THE TIMES DID HE CLAIM

10   SIDRO GANG MEMBERSHIP?

11       A.    REFRESHING MY MEMORY.  AT LEAST 2.

12       Q.    AND ON OTHER OCCASIONS, DID HE TELL POLICE THAT HE

13   BACKED SIDRO, OR THAT HE WOULD GO DOWN WITH SOMEBODY FROM

14   SIDRO IN ORDER TO SHOW HIS AFFILIATION WITH THAT GANG?

15       A.    YES, HE HAS.

16       Q.    IS THAT IN ADDITION TO TIMES THAT YOU'VE

17   DISCOVERED?

18            MR. LEAHY:  YOUR HONOR, I'M GOING TO OBJECT ON

19   FOUNDATIONAL GROUNDS.

20            THE COURT:  OKAY.  LAY THE FOUNDATION.

21   BY MS. ROACH:

22       Q.    INVESTIGATOR MARTINEZ, IN YOUR REVIEW OF

23   INFORMATION IN THIS CASE, DID YOU GO DOWN TO THE SAN DIEGO

24   POLICE DEPARTMENT AND COLLECT ORIGINAL FIELD INTERVIEW SLIPS

25   REGARDING DEFENDANT LEON?

26   ✳ A.    YES, I DID.

27       Q.    AND DID YOU READ THROUGH EACH OF THOSE FIELD

28   INTERVIEW SLIPS INDIVIDUALLY?

1          A.   YES, I DID.

2          Q.   AND DID THE FIELD INTERVIEW SLIPS CONTAIN

3    INFORMATION SUCH AS THE TYPE THAT YOU'VE DESCRIBED WHICH

4    SUPPORTED THE ENTRY OF THESE DEFENDANTS INTO THE CAL/GANG

5    SYSTEM?

6          A.   YES, IT DID.

7          Q.   AND IS ONE OF THE CRITERIA WHICH YOU'RE REQUIRED TO

8    ESTABLISH THAT THAT INDIVIDUAL ADMITTED ASSOCIATION OR

9    MEMBERSHIP?

10         A.   YES, IT IS.

11         Q.   AND WAS THAT RELEVANT TO YOUR INQUIRY AS AN EXPERT

12   WITNESS?

13         A.   YES.

14      ✳ Q.   IS IT SOMETHING THAT YOU RELY ON FOR YOUR OPINION

15   THAT HE IS A DOCUMENTED GANG MEMBER?

16         A.   YES, IT IS.

17         Q.   AND WERE THERE OCCASIONS WHEN HE WOULD, RATHER THAN

18   SAY HE WAS A MEMBER OF SIDRO, SIMPLY INDICATE THAT HE EITHER

19   BACKED SIDRO OR THAT HE WAS STANDING BY HIS HOMEBOY?

20         A.   YES, HE DID.

21         Q.   WERE THERE ALSO TIMES WHEN HE WAS CONTACTED IN THE

22   COMPANY OF OTHER DOCUMENTED SIDRO GANG MEMBERS?

23         A.   YES, HE WAS.

24         Q.   AND APPROXIMATELY, HOW MANY TIMES DID THAT OCCUR?

25      ✳ A.   REFRESHING MY MEMORY.  AT LEAST 4.

26         Q.   AND ONCE AGAIN THE MOST RECENT OF THOSE CONTACTS

27   WAS WITH SABAS ALDANA IN APRIL?

28         A.   YES.

1    Q.    AND THEN AGAIN WITH DEFENDANT RODRIGUEZ IN THE

2    CURRENT INCIDENT?

3        A.    CORRECT.

4        Q.    WITH REGARD TO THE CRIMES OF THEFT, BURGLARY,

5    ROBBERY, VEHICLE THEFT, HOW DO CRIMES LIKE THAT BENEFIT A

6    GANG?

7        A.    EITHER BY THE ITEMS THAT ARE TAKEN -- EITHER THE

8    ITEMS CAN BE USED SUCH AS A CREDIT CARD OR A CHECKBOOK OR

9    SOME TYPE OF ITEM THAT WAS TAKEN FROM THE CAR -- THEY CAN

10   EITHER SELL IT OR GET MONEY FOR IT, OR WITH THE SHORT TIME

11   PERIOD UNTIL THE CREDIT CARDS ARE STOPPED OR CANCELED, THEY

12   CAN USE THOSE TYPE OF ITEMS TO BENEFIT THEIR GANG, OR GETTING

13   ITEMS OF PURCHASE FOR THEMSELVES.

14       Q.    HOW DOES THE USE OF A FIREARM BENEFIT A GANG?

15       A.    WELL, THE USE OF FIREARMS BENEFITS GANGS.  IF A

16   GANG MEMBER HAS A FIREARM ON HIM, ONE, IT'S USED TO EITHER

17   PROTECT HIMSELF OR HE'S USING THE FIREARM TO BE USED IN A

18   CRIME.  ALSO, THE FIREARM IS THERE TO BE SHOWN JUST FOR

19   INTIMIDATION FACTOR.

20       Q.    AND IF THAT FIREARM IS LOADED, WOULD THAT BE

21   SOMETHING THAT WOULD TYPICALLY INCREASE PERHAPS THE BRAVERY

22   OF THE PERSON THAT'S CARRYING IT?

23       A.    YES.

24       Q.    AND WITH REGARDS TO WITNESS INTIMIDATION, HOW DOES

25   THAT CRIME BENEFIT GANG MEMBERS?

26       A.    WELL, IF YOU DON'T HAVE A VICTIM OR A WITNESS WHO'S

27   GOING TO COME TO COURT TO TESTIFY AGAINST THESE -- AGAINST

28   THE GANG MEMBERS, THEN BASICALLY WHAT THEY'RE TRYING TO DO

*Handwritten annotations:*
Key!
potential for
fuel usage?
yes!

Serves purp., hwev, bey
the gvn. scope.

1   IS, THAT CASE IS GOING TO GO AWAY BECAUSE YOU CAN'T GO ON

2   WITH THE CASE ANYMORE TO BRING IT TO THE COURT SYSTEM.   SO,

3   BASICALLY, THEY DON'T WANT THOSE WITNESSES OR VICTIMS TO

4   IDENTIFY THE SUSPECTS BY JUST INTIMIDATION PURPOSES.

5       Q.   AND IN YOUR OPINION, WHEN A GANG MEMBER BENEFITS

6   INDIVIDUALLY FROM A THEFT, IS THAT GENERALLY SOMETHING THAT

7   BENEFITS THE GANG?

8       A.   YES.

9       Q.   AND WHY IS THAT?

10      A.   WELL, LIKE I SAID BEFORE, THEY CAN USE THOSE ITEMS

11  OR ITEM TAKEN FROM EITHER THE VEHICLE OR A RESIDENCE OR SAY A

12  COMMERCIAL BUILDING IN ORDER TO PROVIDE MORE FOR THEIR GANG.

13      Q.   AND WITH REGARD TO WITNESS INTIMIDATION,

14  SPECIFICALLY WITH THE USE OF FIREARMS, HOW DOES THAT BENEFIT

15  MORE THAN JUST THE INDIVIDUAL GANG MEMBER?   HOW DOES THAT

16  BENEFIT THE GANG?

17      A.   WELL, IT BENEFITS THE GANG BECAUSE IT SHOWS THAT

18  THE GANG IS VERY STRONG.   IT SHOWS THAT, BASICALLY, YOU'RE

19  NOT GOING TO MESS WITH US EITHER FROM THE COMMUNITY OR EITHER

20  FROM ANOTHER RIVAL GANG.

21      Q.   IN YOUR EXPERIENCE IN INVESTIGATING VIOLENT CRIMES

22  IN THE SOUTHBAY AREA, IS THIS SOMETHING THAT WORKS?

23      A.   YES, IT DOES.

24      Q.   AND HOW COMMON IS IT FOR YOU TO FIND THAT THERE ARE

25  WITNESSES OR VICTIMS WHO DO NOT WANT TO COME FORWARD IN

26  CRIMES SIMPLY BY VIRTUE OF THE FACT THAT A GANG MEMBER MAY BE

27  INVOLVED?

28      A.   JUST BY IT BEING A GANG MEMBER BEING INVOLVED OR

*handwritten note in right margin:* But the wits. in quest. had no idea wheth. the alleged perps. wr. membs. or not

1    IT'S JUST SIMPLY A GANG CASE, I MEAN, IT'S HARD TO GET

2    WITNESSES TO COME FORWARD.

3        Q.    AND IS IT FAIR TO SAY THAT IN THIS PAST YEAR YOU

4    YOURSELF HAVE DONE A NUMBER OF RELOCATIONS OF WITNESSES

5    PRECISELY BECAUSE OF THOSE REASONS?

6            MR. LEAHY:  I'M GOING TO OBJECT ON RELEVANCE

7    GROUNDS.

8            THE COURT:  OVERRULED.

9            THE WITNESS:  YES, I HAVE.  I'VE DONE NUMEROUS.

10   BY MS. ROACH:

11       Q.    NOW, YOU'RE FAMILIAR WITH THE FACTS OF THIS CASE,

12   CORRECT?

13       A.    YES, I AM.

14       Q.    AND BASED ON YOUR KNOWLEDGE OF THIS CASE, THE FACT

15   THAT THERE IS A VEHICLE THEFT WHERE A CREDIT CARD

16   IDENTIFICATION AND A NUMBER OF OTHER SMALL ITEMS WERE TAKEN,

17   IS IT YOUR OPINION THAT THAT THEFT WAS COMMITTED FOR THE

18   BENEFIT OF DOCUMENTED GANG MEMBERS FOR THE BENEFIT OF THE

19   GANG?

20       A.    YES, IT WAS.

21       Q.    AND WITH REGARD TO THE FIRING OF THE WEAPON AFTER

22   WITNESSES INDICATED THAT THEY CALLED THE POLICE, IS IT YOUR

23   OPINION THAT THAT IS DONE FOR THE BENEFIT OF THE GANG BY

24   INDIVIDUAL GANG MEMBERS?

25       A.    YES, IT IS.

26       Q.    AND WITH REGARD TO POSSESSION OF FIREARMS, IS IT

27   YOUR OPINION THAT THAT, IN FACT, BENEFITS THE CRIMINAL STREET

28   GANG?

1         A.    YES, IT DOES.

2              MS. ROACH:    YOUR HONOR, EXCEPT -- OR WITH REGARD TO

3    THE ONE FINAL ISSUE, WE'RE DONE.

4              THE COURT:    ALL RIGHT.    WE'RE AT OUR LUNCH HOUR,

5    LADIES AND GENTLEMEN.    AGAIN, LADIES AND GENTLEMEN, I'LL

6    ADMONISH YOU IT IS YOUR DUTY NOT TO CONVERSE AMONGST

7    YOURSELVES OR WITH ANYONE ELSE ON ANY SUBJECT CONNECT WITH

8    THE TRIAL OR FORM OR EXPRESS ANY OPINION UNTIL THE CASE IS

9    FINALLY SUBMITTED TO YOU.    SO WE WILL RESUME PROMPTLY AT

10   1:30.    HAVE A GOOD LUNCH.

11              (AT 11:53 A.M. THE JURY EXITED THE COURTROOM

12              AND THE FOLLOWING PROCEEDINGS WERE HAD:)

13              THE COURT:    ALL RIGHT.    THE RECORD WILL REFLECT THE

14   JURY HAS LEFT THE ROOM.    COUNSEL ARE PRESENT, DEFENDANTS ARE

15   PRESENT.    IN OUR SHORT RECESS OUTSIDE THE PRESENCE OF THE

16   JURY, WE DISCUSSED THE ONE ISSUE THAT THE PEOPLE WANTED  TO

17   MAKE PHOTOGRAPHS OF THE TATTOOS RATHER THAN HAVE THEM SHOW

18   THE TATTOOS BY REMOVING THEIR CLOTHING.    AND SO TO FACILITATE

19   THAT, CAN WE TAKE THOSE IN THIS ROOM, OR IN THE BACK.

20              THE BAILIFF:    IN THE BACK.

21              MS. ROACH:    OKAY.    WE'LL BE RIGHT BACK WITH A

22   POLAROID.

23              THE COURT:    BECAUSE THEY NEED TO TAKE THOSE PHOTOS

24   AT THIS TIME SO THAT THOSE CAN BE USED IN THE TRIAL.    AND

25   THEN, COUNSEL, ALSO NEEDS TO SPEAK WITH THEM IN THE BACK.

26              MS. ROACH:    AND, YOUR HONOR, IF I COULD JUST --

27   WELL, MAYBE I CAN TALK TO COUNSEL, THAT'S FINE.    I JUST WANT

28   TO GET A TIME ESTIMATE FOR BOTH SO I KNOW WHEN TO BRING IN

```
 1   CLOSING EXHIBITS.

 2              THE COURT:  OKAY.  THANK YOU.  WE'RE IN RECESS.

 3              MR. LEAHY:  YOUR HONOR, I'M GOING TO MAKE A REQUEST

 4   TO SEE THE FI'S REGARDING MR. LEON.

                MS. ROACH:  THOSE HAVE ALL BEEN PROVIDED IN

 6   DISCOVERY.

 7              MR. LEAHY:  OKAY.  THANK YOU.

 8              MS. ROACH:  THANK YOU.

 9              (AT 11:56 A.M. THE NOON RECESS WAS TAKEN UNTIL

10              1:34 P.M. OF THE SAME DAY.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1       A.    THE SUV, IN THE BOTTOM.

2       Q.    OKAY.  WHERE YOU KEEP THE SPARE TIRE?

3       A.    YES.

4       Q.    AND YOU SHOT IT IN THE AIR?

5       A.    YES.

6       Q.    WELL, WHY DID YOU DO THAT?

7       A.    TO THIS TIME I DON'T RECOLLECT WHAT THE REASON

8   BEHIND THAT, WHY I SHOT IT.  I MEAN, I WOULD SAY OUT OF

9   STUPIDITY, BUT AT THE SAME TIME, I KNOW I WAS TRYING TO SHOW

10  OFF, YOU KNOW, JUST SOMETHING STUPID THAT I HAD DONE, YOU

11  KNOW, JUST TO FEEL THE RUSH OF IT, I GUESS.  I DON'T KNOW.  I

12  CAN'T REALLY --

13      Q.    NOW, DID YOU BECOME AWARE AT SOME POINT IN TIME IF

14  THERE WERE PEOPLE THERE, THERE WAS SOMEBODY IN THE AREA?

15      A.    YES.

16      Q.    OKAY.  DID YOU -- DID YOU TALK TO THAT PERSON?

17      A.    NO.

18      Q.    YOU DIDN'T SAY ANYTHING TO THEM?

19      A.    NO.

20      Q.    OKAY.  DID YOU HEAR THEM TALK?

21      A.    WELL, NOT ACTUALLY TALK.  I HEARD SOMEBODY

22  SCREAMING SOMETHING OR YELLING SOMETHING.  THAT'S WHEN I

23  NOTICED SOMEONE WAS AGAINST THERE OR AROUND THERE BECAUSE I

24  DIDN'T REALLY SEE NOBODY, BUT I HEARD SOMEBODY YELLING

25  THINGS.  AND THAT'S WHEN I TOLD MY PARTNER, YOU KNOW, "LET'S

26  GO."

27      Q.    OKAY.  SO YOU DIDN'T REALLY SEE ANYBODY?

28      A.    NO.

1      Q.   BUT YOU DID HEAR SOMEBODY YELL OUT SOMETHING?

2      A.   YEAH.

3      Q.   OKAY.  DID YOU UNDERSTAND WHAT THEY YELLED OUT?

4      A.   NO.

5      Q.   AND ONCE YOU BECAME AWARE THAT THERE WAS SOMEBODY

6  THERE, YOU TOLD YOUR FRIEND, "LET'S LEAVE," OR, "LET'S GET

7  OUT OF HERE"?

8      A.   YES.

9      Q.   COULD YOU TELL WHERE HE WAS AT THE TIME?

10     A.   NO, NOT REALLY, NO.

11     Q.   OKAY.  NOW, I TAKE IT YOU WERE DRIVING AT THAT

12  TIME, CORRECT?

13     A.   YES.

14     Q.   OKAY.  SO YOU SAID, "LETS GO."  YOU GOT IN THE CAR

15  AND STARTED DRIVING AWAY?

16     A.   YES.

17     Q.   YOU DROVE OUT THE DRIVEWAY OF THE PARKING LOT?  IS

18  THAT A YES?

19     A.   YES.  SORRY.

20     Q.   AND DID YOU BECOME AWARE OF THE POLICE THAT WERE IN

21  YOUR MIRROR?  DID YOU SEE THE POLICE COMING AFTER YOU?

22     A.   NO, NOT UNTIL THE LIGHTS WENT ON.

23     Q.   YOU SAW THE LIGHTS?

24     A.   YEAH.

25     Q.   THE RED LIGHTS?

26     A.   YEAH.

27     Q.   OKAY.  AND WHEN YOU SAW THE RED LIGHTS, WHAT DID

28  YOU DO?

1          A.    I PULLED OVER.

2          Q.    NOW, AT THAT POINT IN TIME, WHAT WAS YOUR STATE OF

3     MIND?  HOW WERE YOU THINKING AT THAT POINT IN TIME?

4              MS. ROACH:  OBJECTION.  RELEVANCE AS TO STATE OF

5     MIND AT THAT POINT IN TIME.

6              THE COURT:  SUSTAINED.

7     BY MR. SANCHEZ:

8          Q.    DID THE POLICE OFFICER COME TO GET YOU OUT OF THE

9     CAR?

10         A.    I DON'T REALLY REMEMBER THAT.

11         Q.    YOU DON'T REMEMBER?

12         A.    NO.

13         Q.    YOU REMEMBER BEING ARRESTED AT THAT POINT IN TIME?

14         A.    I REMEMBER BEING TAKEN, YES.  WELL, WHEN I -- I

15     GUESS SOMEBODY SAID, YOU KNOW, "EXIT THE VEHICLE," AND I

16     EXITED, PUT THE HANDS UP.  I REMEMBER JUST BEING KNOCKED TO

17     THE GROUND.

18         Q.    YOU REMEMBER BEING KNOCKED DOWN TO THE GROUND?

19         A.    YES.  WELL, SOMEBODY TASED ME FROM BEHIND.

20         Q.    THEY DID WHAT?

21         A.    TASED.

22         Q.    TASED YOU?

23         A.    YES.

24         Q.    WITH A TASER GUN?

25         A.    TASER GUN, YES.

26         Q.    IN THE BACK?

27         A.    IN MY LEGS.

28         Q.    IN YOUR LEGS?

1       A.   YES, TWICE.

2       Q.   DO YOU KNOW WHY THEY DID THAT?

3            MS. ROACH:   OBJECTION.   CALLS FOR SPECULATION.

4            THE COURT:   SUSTAINED.

5  MR. SANCHEZ:

6       Q.   AND IT WAS AFTER THAT THAT YOU WERE THEN

7  HANDCUFFED?

8       A.   YES.

9       Q.   AND TAKEN INTO CUSTODY?

10      A.   YES.

11           MR. SANCHEZ:   THAT'S ALL THE QUESTIONS I HAVE, YOUR

12 HONOR.

13           THE COURT:   ALL RIGHT.   BEFORE WE HAVE

14 CROSS-EXAMINATION, LADIES AND GENTLEMEN, WE HAVE ONE OF OUR

15 NEW JUDGES VISITING US, AND THE JUDGES ARE GOING TO BE

16 MEETING WITH THE NEW JUDGE.   AND SO, WE'LL BE CONCLUDING

17 EARLY TODAY.   WE WILL RESUME TOMORROW MORNING AT 9.   WE ARE

18 MAKING SUBSTANTIAL PROGRESS.

19      AGAIN, I'LL ADMONISH YOU, IT IS YOUR DUTY NOT TO

20 CONVERSE AMONGST YOURSELVES OR WITH ANYONE ELSE ON ANY

21 SUBJECT CONNECTED WITH THE TRIAL, OR TO FORM OR EXPRESS ANY

22 OPINION UNTIL THE CASE IS FINALLY SUBMITTED TO YOU.   SEE YOU

23 AT 9 A.M. TOMORROW.

24           (AT 4:00 P.M. THE JURY WAS EXCUSED AND THE

25           FOLLOWING PROCEEDINGS WERE HAD:)

26      THE COURT:   ALL RIGHT.   THE RECORD WILL REFLECT THE JURY

27 HAS LEFT THE ROOM.   COUNSEL IS PRESENT, DEFENDANT IS PRESENT.

28 WHY DON'T WE PLAN ON GOING OVER FINALIZING THE INSTRUCTIONS

1                                                          440-500

2      TOMORROW EITHER RIGHT BEFORE OR AFTER THE NOON HOUR.  AND YOU

3      SAID YOU HAD SOMETHING ELSE, MR. LEAHY?

4                  MR. LEAHY:  YOUR HONOR, I JUST WANT TO ASK THE

5      COURT TO TAKE A LOOK AT CALJIC 4.21.1, 4.21.2, AND 4.22.

6                  THE COURT:  LET ME HAVE THOSE NUMBERS AGAIN.

7                  MR. LEAHY:  4.21.1 -- THESE ARE THE VOLUNTARY

8      INTOXICATION INSTRUCTIONS -- 4.21.2, AND 4.22.

9                  THE COURT:  OKAY.  I'LL TAKE A LOOK AT THOSE.

10                 MS. ROACH:  AND, YOUR HONOR, IF THIS IS THE ONLY

11     WITNESS, I WOULD ANTICIPATE BEING READY FOR CLOSING ARGUMENT

12     PROBABLY BY 10 O'CLOCK TOMORROW.  SO I DON'T KNOW IF THE

13     COURT WANTS TO MEET FOR JURY INSTRUCTIONS EARLIER?

14                 THE COURT:  WHY DON'T WE MEET FOR INSTRUCTIONS AT

15     8:30 TOMORROW MORNING.

16                 MS. ROACH:  8:30.

17                 THE COURT:  OKAY.  I'LL SEE YOU AT 8:30 TOMORROW

18     MORNING.

19                 MR. LEAHY:  THANK YOU.

20                 (AT 4:00 P.M. AN ADJOURNMENT WAS TAKEN UNTIL

21                 WEDNESDAY, AUGUST 13, AT 9:00.)

22                           - - -

23                 (THIS PAGE DESIGNATED 440-500 BLOCK-NUMBERING

24                 PURPOSES ONLY.  PROCEEDINGS CONTINUE ON PAGE 501.

25                 NOTHING OMITTED.)

26

27

28

1    WELL, IN THAT CASE, WE'LL TAKE OUR AFTERNOON RECESS.  AGAIN,

2    I WILL ADMONISH YOU, IT IS YOUR DUTY NOT TO CONVERSE AMONGST

3    YOURSELVES OR WITH ANYONE ELSE ON ANY SUBJECT CONNECTED WITH

4    THIS TRIAL, OR FORM OR EXPRESS ANY OPINION UNTIL THE CASE IS

5    FINALLY SUBMITTED TO YOU.  15 MINUTE RECESS.

6            (RECESS.)

7            THE COURT:  ALL RIGHT.  WELCOME BACK, LADIES AND

8    GENTLEMEN.  AND MR. SANCHEZ, YOU MAY CALL YOUR FIST WITNESS.

9            MR. SANCHEZ:  YOUR HONOR, WE WOULD LIKE -- DEFENSE

10   WOULD CALL GLORIA RODRIGUEZ.

11           THE COURT:  SHE IS BEING ASSISTED BY THE COURT

12   CERTIFIED INTERPRETER.

13

14                    GLORIA A. VAZQUEZ

15   THE DEFENDANT'S WITNESS, HAVING BEEN SWORN, TESTIFIED THROUGH

16   A SPANISH-LANGUAGE INTERPRETER AS FOLLOWS:

17

18           THE CLERK:  PLEASE HAVE A SEAT ON THE WITNESS

19   STAND.  CAN YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR

20   LAST NAME FOR THE RECORD.

21           THE WITNESS:  GLORIA ALICIA VAZQUEZ, CAPITAL

22   V-A-Z-Q-U-E-Z.

23           THE COURT:  YOU MAY PROCEED.

24                    **DIRECT EXAMINATION**

25   BY MR. SANCHEZ:

26       Q.   GOOD AFTERNOON, MS. VAZQUEZ.  DO YOU KNOW THIS

27   GENTLEMAN SEATED IN FRONT OF ME?

28       A.   YES.

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 45 of 100
417
Case 2:08-cv-02310-JVS-SS    Document 1-9    Filed 04/08/2008    Page 20 of 50

1          Q.    ARE YOU MARRIED TO HIM?

2          A.    YES.

3          Q.    DO YOU HAVE CHILDREN WITH HIM?

4          A.    YES.

5          Q.    HOW MANY CHILDREN DO YOU HAVE WITH HIM?

6          A.    TWO CHILDREN.

7          Q.    HOW OLD ARE THEY?

8                MS. ROACH:  OBJECTION.  RELEVANCE.

9                THE COURT:  OVERRULED.

10               THE WITNESS:  MY LITTLE BOY IS 3 YEARS OLD AND MY

11     OTHER LITTLE BOY IS 5 MONTHS.

12     BY MR. SANCHEZ:

13         Q.    NOW, YOU LIVE IN WHAT AREA OF TOWN?

14         A.    CITY HEIGHTS.

15         Q.    CITY HEIGHTS.  AND HOW LONG HAVE YOU LIVED AT CITY

16     HEIGHTS?

17         A.    SINCE 1999.

18         Q.    HAVE YOU AND MR. RODRIGUEZ LIVED AT CITY HEIGHTS

19     TOGETHER SINCE 1999?

20         A.    YES.

21         Q.    AND WHY DID YOU -- IS THERE ANY PARTICULAR REASON

22     YOU MOVED TO CITY HEIGHTS?

23         A.    YES, TO BE FAR AWAY FROM SAN YSIDRO.

24         Q.    OKAY.  NOW, COULD YOU TELL US WHERE MR. RODRIGUEZ

25     IS EMPLOYED?

26         A.    HE USED TO WORK BUILDING THE STADIUM THAT IS BEING

27     BUILT DOWNTOWN.

28         Q.    BUT WHAT DOES HE DO IN THAT JOB?

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 46 of 100
418
Case 2:08-cv-02310-JVS-SS    Document 1-9    Filed 04/08/2008    Page 21 of 50

1          A.    CONCRETE WORK.

2          Q.    AND APPROXIMATELY, DOES HE GET OFF OF WORK THE SAME

3     TIME EVERYDAY?

4          A.    YES.

5          Q.    AND WHAT TIME WOULD THAT BE?

6          A.    HE USED TO GET OUT OF WORK AT 3:30 AND HE'D BE HOME

7     BY 4.

8          Q.    THAT'S FROM MONDAY THROUGH FRIDAY?

9          A.    YES.

10         Q.    AND GENERALLY SPEAKING, IS HE USUALLY HOME IN THE

11    EVENINGS?

12         A.    YES.

13         Q.    AND ON WEEKENDS, DO YOU AND HIM AND THE CHILDREN

14    GENERALLY DO THINGS TOGETHER?

15         A.    YES.

16         Q.    WHAT KIND OF THINGS DO YOU DO?

17         A.    WE'D GO ON OUTINGS AND TO VISIT THE CHILDREN'S

18    GRANDPARENTS.

19         Q.    NOW, ARE YOU AWARE IF MR. RODRIGUEZ STILL HAS A

20    PROBLEM WITH DRUGS?

21         A.    HE WAS GOING TO A CLASS ABOUT DRUGS.

22         Q.    GOING TO A CLASS FOR DRUGS?

23         A.    YES.

24         Q.    DO YOU KNOW HOW OFTEN HE WOULD GO?

25         A.    HE WOULD GO ON THURSDAYS AND FRIDAYS.

26         Q.    DO YOU KNOW WHERE THE CLASS WAS?

27         A.    NO, JUST THAT IT WAS IN NATIONAL CITY.  HE WOULD

28    COME OVER, I DON'T KNOW EXACTLY, BUT IT WAS IN NATIONAL CITY.

1       Q.   NOW, WHERE -- COULD YOU TELL US WHERE YOUR

2   MOTHER-IN-LAW RESIDES?  YOU DON'T HAVE TO GIVE ME ADDRESS,

3   BUT JUST GENERAL?

4       A.   SHE LIVES OVER THERE AROUND SAN YSIDRO.

5       Q.   OKAY.  AND DID YOU AND YOUR HUSBAND GO TO VISIT HER

6   FROM TIME TO TIME?

7       A.   YES.

8       Q.   NOW, DO YOU RECALL MOTHER'S DAY OF THIS YEAR?

9       A.   YES.

10      Q.   DID YOU GO VISIT HER ON MOTHER'S DAY THIS YEAR?

11      A.   YES.

12      Q.   AND WHILE YOU WERE AT HER HOME VISITING HER, DID

13   MR. RODRIGUEZ RECEIVE A TELEPHONE CALL FROM MR. LEON?

14           MS. ROACH:  OBJECTION.  LEADING.  CALLS FOR

15   SPECULATION OF PERSONAL KNOWLEDGE.

16           THE COURT:  SUSTAINED.

17   BY MR. SANCHEZ:

18      Q.   DO YOU KNOW WHETHER HE RECEIVED A CALL FROM

19   MR. LEON?

20           MS. ROACH:  OBJECTION.  CALLS FOR SPECULATION.  NO

21   FOUNDATION.

22           MR. SANCHEZ:  I'M NOT ASKING HER TO SPECULATE.  I'M

23   ASKING HER IF SHE KNOWS.

24           THE COURT:  REPHRASE.

25   BY MR. SANCHEZ:

26      Q.   LET ME PUT IT THIS WAY.  DO YOU KNOW IF

27   MR. RODRIGUEZ RECEIVED A TELEPHONE CALL?

28      A.   NO, HE JUST RECEIVED A PHONE CALL, BUT I DON'T KNOW

1    FROM WHOM.

2         Q.    AND DID HE -- DID HE AFTER THAT PHONE CALL, DID HE

3    LEAVE THE HOUSE?

4         A.    YES.

5         Q.    AND DO YOU KNOW APPROXIMATELY WHAT TIME THAT WAS?

6         A.    AROUND 10:15 IN THE EVENING.

7              MR. SANCHEZ:    THANK YOU.   I HAVE NOTHING -- NO

8    FURTHER QUESTIONS, YOUR HONOR.

9              THE COURT:    THANK YOU.   CROSS-EXAM.

10             MR. LEAHY:    NO, I HAVE NO QUESTIONS, YOUR HONOR.

11   THANK YOU.

12             THE COURT:    OKAY.   MS. ROACH.

13                         **CROSS-EXAMINATION**

14   BY MS. ROACH:

15        Q.    BACK ON MOTHER'S DAY, DID YOU AND YOUR HUSBAND GO

16   TO YOUR MOTHER-IN-LAW'S HOUSE TOGETHER?

17        A.    NO.

18        Q.    DID YOU GO WITH HIM AT ALL?

19             MR. SANCHEZ:    THAT'S AMBIGUOUS.   THEY JUST ASKED IF

20   THEY WENT TOGETHER. I DON'T UNDERSTAND THE QUESTION.

21             THE COURT:    OVERRULED.   YOU MAY ANSWER.

22             THE WITNESS:   I DIDN'T UNDERSTAND THE QUESTION.

23   BY MS. ROACH:

24        Q.    I'M SORRY.   DID YOU GO TO YOUR MOTHER-IN-LAW'S

25   HOUSE?

26        A.    YES.

27        Q.    OKAY.   HOW DID YOU GET THERE?

28        A.    I WAS GOING TO TAKE MY SISTER -- MY SISTER TOOK ME.

1      Q.   AND DID YOU GO WITH YOUR CHILDREN?

2      A.   YES.

3      Q.   YOUR CHILDREN AT THAT TIME WERE A MONTH OLD AND 3;

4    IS THAT CORRECT?

5      A.   NO.

6      Q.   HOW OLD WERE THEY?

7      A.   MY LITTLE BOY WAS ALMOST GOING TO BE 3 YEARS OLD.

8    HE STILL HAD A MONTH TO GO.  AND MY OTHER LITTLE BOY -- AND

9    THE BABY WAS THREE MONTHS OLD.

10     Q.   AND HOW LONG WAS IT THAT YOU STAYED AT YOUR

11   MOTHER-IN-LAW'S HOUSE ON THAT DAY?

12     A.   WHO?

13     Q.   YOU.

14     A.   ME?

15     Q.   YES, YOU.

16     A.   I ARRIVED THERE AT AROUND 7, AND I LEFT AT ABOUT 1

17   IN THE MORNING.

18     Q.   AND DID YOUR CHILDREN LEAVE WITH YOU AS WELL, OR

19   DID THEY STAY AT THEIR GRANDMOTHERS?

20     A.   THEY LEFT WITH ME.

21     Q.   WERE YOU WAITING AT THE HOUSE FOR YOUR HUSBAND TO

22   RETURN?

23     A.   YES.

24     Q.   AND WERE YOU WORRIED ABOUT HIM AT ALL?

25     A.   YES.

26     Q.   WAS IT UNUSUAL FOR HIM TO GO OUT AT NIGHT?

27     A.   YES.

28     Q.   NOW, LET ME ASK YOU THIS.  HOW LONG HAVE YOU BEEN

1    MARRIED?

2         A.    2 MONTHS.

3         Q.    AND HOW LONG HAVE YOU BEEN LIVING TOGETHER?

4         A.    SINCE 1999.

5         Q.    HAVE YOU LIVED TOGETHER THE ENTIRE TIME SINCE 1999?

6         A.    YES.

7         Q.    HAVE YOU EVER LIVED IN SAN YSIDRO WITH YOUR

8    HUSBAND?

9         A.    NO.

10        Q.    DO YOU HAVE ANY IDEA WHY HE WOULD USE AN ADDRESS ON

11   WARDLOW IN SAN YSIDRO DURING POLICE CONTACTS IN 2001?

12             MR. SANCHEZ:  OBJECTION.  SPECULATION.

13             THE COURT:  OVERRULED.  YOU MAY ANSWER.

14             THE WITNESS:  BECAUSE THAT'S THE ADDRESS FOR HIS

15   PARENTS.

16   BY MS. ROACH:

17        Q.    WAS HE STILL LIVING WITH HIS PARENTS OFF AND ON

18   THROUGHOUT THAT TIME?

19        A.    NO.

20        Q.    DO YOU KNOW WHETHER OR NOT YOUR HUSBAND WAS JUMPED

21   INTO THE SIDRO GANG AT A YOUNG AGE?

22        A.    NO, I DON'T KNOW.

23        Q.    DO YOU KNOW WHETHER HE EVER ASSOCIATED WITH SIDRO

24   GANG MEMBERS?

25        A.    NO.

26        Q.    DO YOU KNO WHETHER ANY OF HIS BROTHERS ARE MEMBERS

27   OF THE SIDRO GANG?

28        A.    NO.

1        Q.    DO YOU KNOW MR. LEON?

2        A.    NO.

3        Q.    SO THIS GENTLEMAN SITTING RIGHT OVER HERE ON THE

4    FAR END OF THE TABLE, YOU DON'T KNOW HIM AT ALL?

5        A.    YES, BUT I DIDN'T KNOW HIS LAST NAME WAS LEON.

6        Q.    AND HOW OFTEN HAVE YOU MET HIM PREVIOUSLY?

7        A.    VERY FEW TIMES.

8        Q.    AND IN WHAT SETTING WOULD YOU SEE MR. LEON?

9        A.    WHEN HE WOULD GO TO THE HOUSE.

10       Q.    TO YOUR HOUSE IN NORTH PARK?

11       A.    NO, I DIDN'T LIVE IN NORTH PARK.  CITY HEIGHTS.

12       Q.    TO YOUR HOUSE IN CITY HEIGHTS?

13       A.    YES.

14       Q.    OKAY.  HOW MANY TIMES WOULD YOU SAY?

15       A.    ABOUT FIVE TIMES.

16       Q.    AND WHEN MR. LEON CAME TO YOUR HOUSE, DID HE COME

17   WITH OTHER PEOPLE?

18       A.    NO.

19       Q.    AND DID MR. LEON AND YOUR HUSBAND DO DRUGS IN YOUR

20   HOUSE WHEN THEY WERE TOGETHER?

21            MR. LEAHY:  BEYOND THE SCOPE OF DIRECT EXAMINATION.

22            THE COURT:  OVERRULED.

23            THE WITNESS:  NO.

24   BY MS. ROACH:

25       Q.    AND WOULD THEY DISAPPEAR FOR ANY LENGTH OF TIME

26   WHEN HE WOULD COME AND VISIT ON PRIOR OCCASIONS?

27       A.    NO.

28       Q.    DO YOU KNOW WHETHER OR NOT MR. LEON IS A SIDRO GANG

1    MEMBER?

2         A.    I DON'T KNOW ANYTHING ABOUT HIM.

3         Q.    DID YOU GROW UP IN SAN YSIDRO?

4         A.    NO.

5         Q.    AND HAVE YOU EVER LIVED IN SAN YSIDRO?

6         A.    NO.

7         Q.    NOW, WITH REGARD TO THESE CLASSES THAT YOU SAID

8    YOUR HUSBAND WAS GOING TO, YOU DON'T KNOW WHETHER HE WAS

9    GOING TO CLASSES OR NOT, DO YOU?

10        A.    YES, HE WOULD GO TO THE CLASSES.

11        Q.    HOW DID YOU KNOW THAT?  WOULD YOU SEE HIM?

12        A.    NO, BECAUSE HE WOULD TAKE A PAPER, AND THEY WOULD

13   SIGN IT AND PUT THE DATE ON IT WHENEVER HE ATTENDED THE

14   CLASS.

15        Q.    AND THAT WASN'T RECENTLY, THAT WAS SOME TIME AGO,

16   CORRECT?

17        A.    NO.

18        Q.    HOW RECENTLY WAS THAT?

19        A.    IT WAS IN MARCH -- IN MARCH OR IN APRIL WHEN HE WAS

20   GOING TO CLASSES.

21        Q.    HOW LONG DID THE CLASSES LAST?

22        A.    NO.  I DON'T KNOW.

23        Q.    DID YOUR HUSBAND HAVE GUNS IN THE HOUSE?

24        A.    NO.

25        Q.    WHAT ABOUT AMMUNITION?  DID YOU EVER SEE THAT

26   AROUND THE HOUSE?

27        A.    NO.

28        Q.    WHAT KIND OF CAR DOES YOUR HUSBAND DRIVE?

1    A.   AN EXPLORER WAGON.

2    Q.   AND IS THAT A CAR THAT YOU ALSO DRIVE?

3    A.   NO.

4    Q.   HOW IS IT THAT YOUR CHILDREN ARE TRANSPORTED ON

5    THESE FAMILY OUTINGS?  DO YOU DRIVE IN THE CAR WITH THEM, OR

6    DOES YOUR HUSBAND DRIVE ALL OF YOU TOGETHER?

7    A.   HE'LL DRIVE.

8    Q.   SO YOU'RE IN THE CAR FREQUENTLY?

9    A.   YES.

10    Q.   AND YOU HAVE A LOT OF GEAR FOR THE BABIES?

11    A.   YES.

12    Q.   SO, CAR SEATS, AND DIAPER BAGS, AND EXTRA CLOTHES,

13    AND STROLLERS?

14    A.   YES.

15    Q.   AND IS IT FAIR TO SAY THAT ALL OF THAT EQUIPMENT

16    PRETTY MUCH TAKES THE WHOLE CAR FOR STORAGE?

17         MR. LEAHY:  SPECULATION AND VAGUE, YOUR HONOR.

18         THE COURT:  OVERRULED.

19         THE WITNESS:  I DIDN'T UNDERSTAND.

20    BY MS. ROACH:

21    Q.   WELL, WHEN YOU'RE LOADING UP THE KIDS IN THE CAR,

22    DO YOU OPEN THE BACK HATCH OF THE TRUCK?

23    A.   NO.

24    Q.   HAVE YOU EVER OPENED THE BACK OF YOUR HUSBAND'S

25    TRUCK OR EXPLORER?

26    A.   YES.

27    Q.   HAVE YOU EVER SEEN A GUN BACK THERE?

28    A.   NO.

1     Q.   DO YOU KNOW WHERE YOUR HUSBAND STORED HIS GUN?

2     A.   I DIDN'T KNOW THAT HE HAD A GUN.

3     Q.   DID YOU EVER GO INTO HIS CAR THE NIGHT THAT YOU

4  WENT TO YOUR MOTHER-IN-LAW'S HOUSE?

5     A.   NO.

6     Q.   SO THERE WAS NOTHING INSIDE OF THE CAR THAT YOU

7  NEEDED, NO CHILD SEAT TO GET OUT FOR YOUR SISTER OR ANYTHING

8  LIKE THAT?

9     A.   NO.

10    Q.   WHERE DO YOU NORMALLY KEEP YOUR CHILD SEATS?

11    A.   AT HOME.

12    Q.   YOU DON'T KEEP THEM IN THE CAR?

13    A.   BECAUSE SOMETIMES I GO OUT WITH MY SISTER AND I

14  NEED THE SEATS.

15    Q.   DO YOU RECOGNIZE PEOPLE'S EXHIBIT 19?

16    A.   NO.

17    Q.   DO YOU RECOGNIZE THE PHOTOGRAPHS DEPICTED IN

18  PEOPLE'S EXHIBIT 4?

19    A.   THE TOP ONES, I DO.

20    Q.   AND WHAT ARE THE TOP ONES?

21    A.   WELL, THE WAGON.

22    Q.   IS THAT YOUR HUSBAND'S CAR?

23    A.   IT USED TO BE MY HUSBAND'S CAR.

24    Q.   BACK IN MAY, WAS THIS YOUR HUSBAND'S CAR?

25    A.   YES.

26    Q.   AND YOU NEVER NOTICED ANYTHING UNUSUAL INSIDE OF

27  THE CAR, NO GUNS, NO AMMUNITION, NOTHING LIKE THAT?

28    A.   NO.

1     Q.   DO YOU KNOW YOUR HUSBAND TO CARRY TOOLS WITH HIM

2   WHEN HE'S DRIVING IN HIS CAR?

3     A.   YES.

4     Q.   WHAT TYPES OF TOOLS WOULD HE NORMALLY CARRY?

5     A.   WELL, IN THE EVENT THAT HE GETS A FLAT TIRE, YOU

6   KNOW, WHATEVER TOOLS HE NEEDS TO REPAIR THE FLAT TIRE, AND

7   WHATEVER TOOLS HE USES AT WORK FOR HIS JOB.

8     Q.   AND DO YOU KNOW WHAT TYPE OF TOOLS HE HAS TO TAKE

9   THE TIRES OFF OF THE CAR?

10     A.   NO.

11     Q.   YOU NEVER SAW IT?

12     A.   YES, BUT I DON'T NO.

13     Q.   YOU REMEMBER IF IT WAS BLACK OR SILVER?

14     A.   NO.

15     MS. ROACH:  I HAVE NOTHING FURTHER.

16     THE COURT:  THANK YOU.  ANY REDIRECT?

17     MR. SANCHEZ:  NO, YOUR HONOR.

18     THE COURT:  ANYTHING FURTHER?

19     MR. LEAHY:  NO, YOUR HONOR.  THANK YOU.

20     THE COURT:  OKAY, MA'AM.  YOU'RE EXCUSED.

21   MR. SANCHEZ, YOU MAY CALL YOUR NEXT WITNESS.

22     MR. SANCHEZ:  THANK YOU, YOUR HONOR.  THE DEFENSE

23   WOULD CALL JAVIER RODRIGUEZ.

24

25                JAVIER RODRIGUEZ,

26   HAVING BEEN FIRST DULY ADMINISTERED AN OATH IN ACCORDANCE

27   WITH CODE OF CIVIL PROCEDURE SECTION 2094, WAS EXAMINED AND

28   TESTIFIED AS FOLLOWS:

1    THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

2  YOUR LAST NAME FOR THE RECORD.

3    THE WITNESS:  JAVIER RODRIGUEZ.  RODRIGUEZ IS

4  SPELLED AS R-O-D-R-I-G-U-E-Z.

5    THE COURT:  ALL RIGHT.  YOU MAY PROCEED, COUNSEL.

6    MR. SANCHEZ:  THANK YOU, YOUR HONOR.

7                    **DIRECT EXAMINATION**

8  BY MR. SANCHEZ:

9    Q.   MR. RODRIGUEZ, PRIOR TO YOUR ARREST, WHAT PART OF

10  TOWN WERE YOU RESIDING IN?

11    A.   CITY HEIGHTS.

12    Q.   HOW LONG HAVE YOU RESIDED IN CITY HEIGHTS?

13    A.   SINCE I WAS RELEASED FROM INCARCERATION, '99.

14    Q.   '99?

15    THE COURT:  COULD YOU MOVE THE MICROPHONE UP

16  CLOSER?  THANK YOU.

17  BY MR. SANCHEZ:

18    Q.   AND WITH WHO DO YOU RESIDE THERE?

19    A.   MY WIFE AND TWO KIDS.

20    Q.   WERE YOU EMPLOYED AT THE TIME?

21    A.   YES, SIR.

22    Q.   WHERE WERE YOU EMPLOYED?

23    A.   I WAS EMPLOYED -- WELL, I WAS EMPLOYED BY THE UNION

24  LOCAL 500.  I'M A FINISHER.  THEY EMPLOYED ME WITH A JOB AT

25  SAN DIEGO STADIUM BALLPARK DOWNTOWN.

26    Q.   DOWNTOWN?

27    A.   YES, SIR.

28    Q.   YOU WOULD -- WHAT I BELIEVE WE HEARD THAT YOU

1    GENERALLY WOULD GET OFF WORK ABOUT 3:30 IN THE AFTERNOON?

2        A.   YEAH, WHEN THERE WAS NO OVERTIME.  BASICALLY, 3:30.

3        Q.   OKAY.  IF THERE WAS OVERTIME THEN, YOU WOULD WORK?

4        A.   OH, YEAH.  SOMETIMES YOU HAD TO WAIT TILL THE

5    CONCRETE DRY UP, SO --

6        Q.   HOW LONG DID YOU WORK THERE?

7        A.   I WORKED THERE ABOUT A YEAR -- AROUND A YEAR.

8        Q.   OKAY.  AND WAS THAT JUST AT THAT SITE THAT YOU

9    WORKED THERE A YEAR, OR DID YOU WORK AT OTHER SITES BEFORE

10   THAT?

11       A.   YEAH, I WORKED AT OTHER SITES.  WHAT THE UNION DOES

12   IT PROVIDES YOU WITH JOBS.  WHEN ONE JOB IS DONE, THEY GET

13   YOU -- THEY LOOK, YOU KNOW.  THEY GET YOU ANOTHER JOB SITE.

14       Q.   THEY SEND YOU SOMEWHERE ELSE?

15       A.   YEAH, THEY SEND YOU SOMEWHERE ELSE.  THEY'RE LIKE

16   OUR AGENT, YOU CAN SAY THAT.

17       Q.   WHERE DID YOU WORK BEFORE THAT?

18       A.   BEFORE THAT, I WORKED FOR A COMPANY NAMED HANDYMEN

19   IN SANTEE.  WE DID BUILDINGS, LIKE, BUSINESS BUILDINGS,

20   FOUNDATIONS AND ALL THAT, WALLS.

21       Q.   OKAY.  HOW LONG WERE YOU THERE?

22       A.   I WAS THERE FOR LIKE THREE MONTHS.

23       Q.   IS THAT SORT OF THE WAY IT'S GONE FOR THE LAST FOUR

24   YEARS, YOU'D WORK AT A JOB --

25       A.   I WORKED AT DIFFERENT PLACES.  WHEN I WAS RELEASED

26   FROM INCARCERATION, I WAS WORKING FOR COSTCO AT THE

27   WAREHOUSE.  I STARTED AT THE WAREHOUSE -- I WORKED THERE FOR

28   A PREVIOUS AMOUNT OF TIME.  I CAN'T REALLY RECALL HOW MUCH

1    TIME.  I WAS -- I WAS EITHER LAID OFF OR LOOKED FOR ANOTHER

2    JOB.  I HAD A JOB NO MATTER WHAT.

3        Q.    SO YOU -- YOU'VE BEEN EMPLOYED CONTINUOUSLY?

4        A.    YEAH, THAT'S NO PROBLEM.

5        Q.    NOW, BEFORE YOU MOVED TO CITY HEIGHTS, WHERE WERE

6    YOU RESIDING?

7        A.    AT MY PARENT'S HOUSE.

8        Q.    AND WHERE IS THAT LOCATION?

9        A.    IN SAN YSIDRO.

10       Q.    AND DO YOU RECALL HOW OLD YOU WERE WHEN YOU FIRST

11   MOVED TO SAN YSIDRO?

12       A.    I STARTED -- I STARTED ELEMENTARY THERE.  SO I'D

13   SAY, AROUND 1985.

14       Q.    OKAY.  SO YOU WERE IN ELEMENTARY SCHOOL?

15       A.    YEAH, I WAS GOING -- I STARTED THERE SECOND GRADE.

16       Q.    NOW, COULD YOU TELL US HOW LONG YOU'VE KNOWN

17   MR. LEON?

18       A.    I KNOW MR. LEON BY HIS OLDER BROTHER.  I GREW UP

19   WITH HIS OLDER BROTHER.

20       Q.    IN SAN YSIDRO?

21       A.    YEAH, IN SAN YSIDRO.

22       Q.    SO YOU KNOW OTHER MEMBERS OF HIS FAMILY?

23       A.    YEAH, I KNOW ALL OF HIS FAMILY, HIS COUSINS.

24       Q.    ABOUT HOW MANY YEARS WOULD YOU SAY?

25       A.    8 YEARS.

26       Q.    HOW OLD ARE YOU NOW BY THE WAY?

27       A.    I'M 27.

28       Q.    NOW, AT SOME POINT IN TIME, DID YOU JOIN THE SIDRO

1  GANG?

2       A.   YES, I DID.

3       Q.   CAN YOU TELL US ABOUT HOW HOLD YOU WERE AT THE

4  TIME.

5       A.   I WAS ABOUT 11, 12.

6       Q.   WHY DID YOU JOIN THE GANG?

7       A.   WELL, I -- AT THAT TIME, IT'S KIND OF HARD TO

8  EXPLAIN.  I MEAN, ALL MY SURROUNDINGS -- I GOT MY BROTHERS

9  ARE ALL GANG MEMBERS, THE COMMUNITY WHERE I LIVE.  I MEAN,

10 THAT'S ALL I SEE.  MY FRIENDS, THEY WERE GANG MEMBERS.  I

11 MEAN, IT HAD A BIG INFLUENCE ON ME AT THAT POINT WHEN I WAS

12 YOUNG.  I GUESS I WANTED TO BECOME PART OF SOMETHING, YOU

13 KNOW?  I FELT LIKE I BELONGED TO SOMETHING, YOU KNOW?

14      Q.   YOU HAD SOME BROTHERS IN THE GANG?

15      A.   YEAH.

16      Q.   HOW MANY BROTHERS DO YOU HAVE?

17      A.   I GOT -- I GOT -- I GOT FIVE BROTHERS.

18      Q.   WHEN YOU WERE A MEMBER OF THE GANG, DID YOU GET IN

19 TROUBLE FROM TIME TO TIME?

20      A.   YEAH.  YES.

21      Q.   IN 1998, DID YOU SUFFER A CONVICTION FOR BURGLARY?

22      A.   YES.

23      Q.   AND IN 1997, DID YOU SUFFER A CONVICTION FOR CAR

24 THEFT?

25      A.   YES.

26      Q.   BECAUSE OF THOSE CASES, DID YOU DO SOME TIME IN

27 CUSTODY?

28      A.   YES.

1    Q.   AND WHAT YEAR DID YOU GET OUT?

2    A.   WHICH ONE?

3    Q.   THE LAST ONE?

4    A.   THE LAST ONE, I WAS RELEASED AUGUST OF '99.

5    Q.   AUGUST OF '99?

6    A.   YES.

7    Q.   IS THAT WHEN YOU MOVED TO CITY HEIGHTS?

8    A.   YES.

9    Q.   WAS THAT TO GET AWAY FROM SAN YSIDRO?

10    A.   YES.

11    Q.   WAS THAT YOUR INTENT AT THAT TIME TO GET OUT OF

12   GANG LIFE?

13              MS. ROACH:   OBJECTION.  LEADING.

14              THE COURT:   SUSTAINED.

15   BY MR. SANCHEZ:

16    Q.   WHY WERE YOU TRYING TO GET OUT OF SAN YSIDRO?

17    A.   BECAUSE OF -- I WAS TIRED OF THAT LIFESTYLE.  I WAS

18   JUST -- I WANTED TO HAVE MY OWN FAMILY, JUST DO WHAT'S RIGHT,

19   YOU KNOW, JUST --

20    Q.   DURING THIS PERIOD OF TIME THEN YOU HAD A -- WERE

21   YOU USING DRUGS?

22    A.   YES.

23    Q.   WE HEARD FROM YOUR WIFE THAT YOU WERE GOING TO --

24   YOU WERE ATTENDING A DRUG PROGRAM?

25    A.   YES.

26    Q.   WHAT PROGRAM WAS THAT?

27    A.   IT'S CALLED CRASH.

28    Q.   WERE YOU GOING TO THE CLASSES?

1      A.   YES.

2      Q.   BUT YOU WERE STILL USING DRUGS?

3      A.   YES.

4      Q.   AND MOTHER'S DAY OF THIS YEAR, DID YOU GO TO SAN

5   YSIDRO TO VISIT YOUR MOTHER?

6      A.   YES, I DID.

7      Q.   AND WHILE YOU WERE IN SAN YSIDRO AT YOUR MOTHER'S

8   HOUSE, DID YOU RECEIVE A CALL?

9      A.   YES.

10     Q.   AND WHO WAS THAT CALL FROM?

11     A.   FROM MY FRIEND, JOSE LEON.

12     Q.   JOSE LEON?

13     A.   YEAH.

14     Q.   DID HE INVITE YOU TO GET TOGETHER?

15     A.   WE BOTH AGREED ON JUST SPENDING SOME -- SOME TIME,

16   AND --

17     Q.   DID YOU GUYS DECIDE TO GET TOGETHER?

18     A.   YEAH, WE DECIDED TO GET TOGETHER.

19     Q.   DID YOU HAVE A LITTLE BIT TO DRINK WHEN YOU GOT

20   TOGETHER?

21     A.   OH, YES.

22     Q.   THIS WAS LATE AT NIGHT?

23     A.   YES.

24     Q.   OKAY.  DID YOU -- WERE YOU USING ANY DRUGS THAT

25   NIGHT?

26     A.   AT THE TIME WE WERE DRINKING, I TOOK SOME PILLS

27   CALLED -- THEY'RE CALLED ROCHES, I GUESS, DATE RAPE.  IT'S A

28   PILL WHERE YOU GET YOU KNOW MEMORY LOSS AND WHATEVER.  IT

Research Agent

1    RELAXES YOU, YOU KNOW?

2          Q.    DID YOU FEEL AT SOME POINT IN TIME, DID YOU FEEL

3    THE EFFECT OF THE DRUGS OR THE PILLS?

4          A.    OH, YEAH.

5          Q.    TELL US HOW YOU FELT?  WHAT WERE YOU FEELING AFTER

6    YOU STARTED FEELING THE EFFECT?

7          A.    WELL, WHEN YOU'RE -- I GUESS -- WELL, IT MAKES ME

8    FEEL WHEN I TAKE THEM, LIKE, I SAY, IT RELAXES ME.  AT THE

9    TIME, I'M DOING EVERYTHING IN SLOW MOTION, AND I DON'T

10   ACKNOWLEDGE SOMETIMES WHAT I'M DOING.  IT'S KIND OF HARD TO

11   EXPLAIN.  I MEAN, I WOULD APPRECIATE IF THERE WAS SOME KIND

12   OF EVALUATION ON THAT PILL.  BUT IT'S KIND OF HARD TO EXPLAIN

13   FOR MYSELF WHAT IT DOES TO ME.  THERE'S PARTS WHERE THAT --

14   WHAT THAT PILL DOES IS IT BLANKS YOU OUT FOR A CERTAIN TIME,

15   AND THEN YOU COME BACK TO YOUR SENSES, AGAIN, LIKE, AND YOU

16   SEE THINGS BLURRY, YOU KNOW.  YOU'RE NOT IN -- YOU'RE NOT IN

17   THE RIGHT STATE OF MIND, BASICALLY.  YOU'RE NOT FOCUSED ON

18   WHAT YOU'RE DOING.  YOU'RE NOT NORMAL.

19         Q.    SO YOU DIDN'T FEEL A NORMAL STATE OF MIND?

20         A.    NO, I DID NOT.

21         Q.    OKAY.  BUT YOU REMEMBER YOU WERE DRIVING.  WERE YOU

22   DRIVING AROUND?

23         A.    YES.

24         Q.    OKAY.  AND SO YOU AND YOUR FRIEND MR. LEON WERE

25   DRIVING AROUND THAT NIGHT IN THE CAR, AND YOU'D BEEN TAKING

26   THESE PILLS, AND YOU WERE FEELING HIGH?

27         A.    YES.

28         Q.    DO YOU RECALL MAKING A STOP SOMEPLACE?

*[handwritten margin note: Failed to subpoena Xpert wit.! cause]*

1    A.   DO I HAVE TO KNOW EXACTLY WHERE?

2    Q.   NO, NO.  I'M JUST ASKING YOU IF YOU RECALL MAKING A

3  STOP SOMEPLACE?

4    A.   YES.

5    Q.   DO YOU RECALL WHY YOU HAD TO STOP?

6    A.   TO URINATE.

7    Q.   WAS IT -- DO YOU RECALL IF IT WAS A PARKING LOT OR

8  NOT?

9    A.   I RECALL, LIKE, GOING INTO, I THINK IT'S APARTMENTS

10  OR HOUSES.  I DON'T KNOW, LIKE, APARTMENTS, AND JUST PARKING

11  AND OPEN THE DOOR.  AND I JUST WAS TAKING A -- I WAS

12  URINATING BEHIND A CAR.  PEOPLE --

13    Q.   YOU WERE BEHIND A CAR?

14    A.   YEAH.  I GUESS I FIGURED NOBODY WOULD SEE ME.  I

15  DIDN'T REALIZE IT WAS AT 3 O'CLOCK IN THE MORNING, TOO, SO --

16    Q.   SO YOU REALLY DIDN'T KNOW WHAT TIME IT WAS?

17    A.   NO, BECAUSE MY SENSE TELLS ME, YOU KNOW, URINATE

18  BEHIND A CAR JUST BECAUSE NOBODY WILL SEE YOU.  BUT I DIDN'T

19  EVEN NOTICE WHAT TIME IT WAS REALLY.

20    Q.   NOW, DO YOU RECALL AT SOME POINT IN TIME GOING AND

21  GETTING YOUR GUN?

22    A.   YES.

23    Q.   WHAT DID YOU DO WITH THE GUN?

24    A.   I JUST GOT IT AND SHOT IT IN THE AIR.

25    Q.   WHERE WAS THE GUN?

26    A.   IT WAS IN THE SPARE TIRE UNDERNEATH, YOU KNOW, YOU

27  HAVE THE SPARE TIRE.

28    Q.   IN THE BACK OF THE --

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, )<br>PLAINTIFF AND RESPONDENT, )<br>)<br>VS. )<br>)<br>JAVIER RODRIGUEZ, )<br>DEFENDANT AND APPELLANT. )<br>) | FROM SAN DIEGO COUNTY<br>HON. ESTEBAN HERNANDEZ,<br>JUDGE<br><br>APPEAL NO. D043198<br>NO. SCS176087 |

REPORTER'S TRANSCRIPT ON APPEAL

AUGUST 13, 2003

SAN DIEGO, CALIFORNIA

VOL. IV

PAGES 501 -- 677-800

APPEARANCES:

FOR THE PLAINTIFF AND RESPONDENT:   BILL LOCKYER
                                    ATTORNEY GENERAL
                                    STATE OF CALIFORNIA
                                    110 WEST A STREET
                                    SAN DIEGO, CA. 92101


FOR THE DEFENDANT AND APPELLANT:    JAVIER RODRIGUEZ
                                    IN PRO PER




REPORTED BY:   IRENE PERKINS, CSR 12727

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO, SOUTH COUNTY DIVISION

DEPARTMENT 14                BEFORE HON. ESTEBAN HERNANDEZ, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
              PLAINTIFF,           )
                                   )
         VS.                       )      CASE NO. SCS176087
                                   )
JOSE LUIS LEON,                    )
      &                            )
JAVIER RODRIGUEZ,                  )
                                   )
              DEFENDANTS.          )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

AUGUST 13, 2003

APPEARANCES:

FOR THE PLAINTIFF:        SOPHIA ROACH
                          DEPUTY DISTRICT ATTORNEY

FOR DEFENDANT LEON:       JERRY LEAHY
                          ATTORNEY AT LAW

FOR DEFENDANT RODRIGUEZ:  BENJAMIN SANCHEZ
                          ATTORNEY AT LAW

1       MS. ROACH:  YES, WE WITHDREW THAT LAST TIME.

2       THE COURT:  THAT WAS WITHDRAWN.

3       MR. LEAHY:  AND 2.72 HAS ALSO BEEN WITHDRAWN?

4       MS. ROACH:  THAT'S BEEN WITHDRAWN.

5       THE COURT:  YES.

6       MR. LEAHY:  OKAY.  THANK YOU.

7       THE COURT:  OKAY.  THEN WE HAVE 2.90, 3.00, 3.01.

8  NOW, HERE -- NOW, 3.02, WE HAVE THE NEW ONE.

9       MS. ROACH:  AND, YOUR HONOR, AFTER WE TALKED, I

10  WENT BACK AND LOOKED THROUGH THIS INSTRUCTION CAREFULLY.  THE

11  GENERAL AIDING AND ABETTING INSTRUCTION WILL APPLY TO

12  MR. RODRIGUEZ, BUT WE ARE NOT ALLEGING THAT HE AIDED AND

13  ABETTED UNDER THE NATURAL AND PROBABLE CONSEQUENCES THEORY.

14  SO I TAILORED THIS SOLELY TO FIT MR. LEON AND THE WITNESS

15  INTIMIDATION COUNT.  AND IN MY MIND, THAT'S HOW IT'S PROPERLY

16  ARGUED.

17       THE COURT:  OKAY.  SO THE PEOPLE HAVE ELECTED TO

18  PURSUE IT IN THAT FASHION?

19       MS. ROACH:  CORRECT.

20       THE COURT:  OKAY.  ANY OBJECTION?  *Nothing from Sanchez!*

21       MR. LEAHY:  I WAS JUST READING IT, YOUR HONOR.

22       THE COURT:  WELL, IF YOU HAVE A CONCERN, WHY DON'T

23  WE JUST PUT A POST-IT ON IT FOR NOW AND THEN WE'LL COME BACK.

24       MR. LEAHY:  VERY GOOD, YOUR HONOR.  I THINK THAT I

25  DO HAVE A QUESTION ABOUT IT.

26       THE COURT:  OKAY.  NEXT, WE HAVE 3.03, TERMINATION

27  OF LIABILITY.  AND ON 3.30, NOW, HERE THERE WAS A POST-IT

28  BECAUSE OF COUNT 5, BUT NOW COUNT 5 HAS BEEN DISCUSSED, SO

1    THAT SHOULD BE 5 -- HOLD ON JUST A SECOND.  I WAS SKIPPING

2    OVER 3.03.  THERE WAS A NEW ONE.  YOU'VE MADE A MODIFICATION.

3    OH, I SEE.  YOU CHANGED IT, "BEFORE THE COMMISSION OF THE

4    CRIMES CHARGED," RATHER THAN COUNTS 1 AND 2.  YOU MADE IT

5    GENERAL.

6            MS. ROACH:  CORRECT, BECAUSE WE WILL BE PURSUING AN

7    AIDING AND ABETTING THEORY ON MR. RODRIGUEZ ON COUNT 1, JUST

8    NOT BY VIRTUE OF NATURAL AND PROBABLE CONSEQUENCES.

9            THE COURT:  OKAY.  SO WE'LL INSERT THE NEW ONE.  DO

10   YOU HAVE A QUESTION ON THAT?

11           MR. LEAHY:  I'M SORRY, YOUR HONOR.  WHICH ONE ARE

12   WE SPEAKING OF NOW?

13           THE COURT:  3.03.  THERE'S A NEW VERSION, AND

14   BASICALLY IT'S MODIFIED -- TAKEN OUT COUNTS 1 AND 2 AND LEFT

15   IT OPEN.

16           MR. LEAHY:  THAT'S FINE, YOUR HONOR.

17           THE COURT:  OKAY.  NEXT WE HAVE 3.30, THEN 3.31,

18   14.58 --

19           MR. LEAHY:  YOUR HONOR, I HAVE A -- COULD -- I

20   WOULD NEED A COUPLE OF MINUTES TO TAKE A CLOSE LOOK AT 3.31.

21   IF WE CAN PUT A POST-IT NOTE ON THAT ONE.

22           THE COURT:  OKAY.  WE'LL PUT A POST-IT ON 3.31.

23   THEN WE HAVE 14.58.  THEN WE HAVE 14.54.  AND WE DO HAVE THE

24   NEW ONE THAT SUBSTITUTES A VEHICLE FOR STRUCTURE.  JUST

25   CORRECT THAT.  14.56 --

26           MS. ROACH:  AND, YOUR HONOR, ON THE VERDICT FORMS,

27   I'VE JUST ELIMINATED THE FIRST DEGREE LANGUAGE.  SO I'M NOT

28   SURE THAT WE NEED 14.56.  WE ARE NOT GOING TO BE ASKING THEM

1    A.   WELL, YEAH.  I MEAN, SOMEBODY TASES YOU, YOU'RE

2    GOING TO FEEL IT.  AFTER THAT, THEY TOOK ME TO THE VEHICLE

3    AND I FELL ASLEEP.   I KNOCKED UNCONSCIOUS IN THE CAR.

4    Q.   YOU WERE KNOCKED UNCONSCIOUS, OR YOU FELL ASLEEP?

5    A.   WELL, LET ME REPHRASE THAT.  YEAH, I PASSED OUT.

6    Q.   WHEN DID YOU DO THE DRUGS?

7    A.   WHEN?

8    Q.   YES.

9    A.   WHEN WE WERE OUTSIDE THE HOUSE.

10    Q.   OUTSIDE OF MR. LEON'S HOUSE?

11    A.   YES.

12    Q.   DID YOU BUY THEM?

13    A.   NOPE.

14    Q.   DID MR. LEON BUY THEM?

15    A.   NOPE.

16    Q.   WHO ELSE WAS WITH YOU?

17    A.   WHO ELSE WAS WITH US?

18    Q.   YES.  WHO ELSE WAS WITH YOU?

19    A.   NOBODY.

20    Q.   DID SOMEBODY COME BY IN A CAR AND THROW THE DRUGS

21    OUT THE WINDOW AT YOU?  I MEAN, HOW DID THEY COME INTO YOUR

22    POSSESSION?

23    A.   WELL, ALL I CAN SAY IS THAT I TOOK THEM.  I TOOK

24    THE DRUGS.

25    Q.   WHAT KIND OF DRUGS AGAIN ARE THESE?

26    A.   ROCHES.

27    Q.   AND YOU DON'T KNOW WHAT SPECIFICALLY THEY ARE, DO

28    YOU?

1    YOURSELVES OR WITH ANYONE ELSE ON ANY SUBJECT CONNECTED WITH

2    THE TRIAL, OR TO FORM OR EXPRESS ANY OPINION UNTIL THE CASE

3    IS FINALLY SUBMITTED TO YOU.  OUR 15 MINUTE BREAK.

4              (AT 10:03 A.M. THE JURY WAS EXCUSED AND THE

5              FOLLOWING PROCEEDINGS WERE HAD:)

6              THE COURT:  ALL RIGHT.  RECORD WILL REFLECT THE

7    JURY HAS LEFT THE ROOM.  COUNSEL ARE PRESENT, DEFENDANT IS

8    PRESENT.  MR. LEAHY.

9              MR. LEAHY:  YOUR HONOR, I NEED TO KNOW BASED ON THE

10   STATE OF THE EVIDENCE IF THE COURT WILL INSTRUCT THE JURY

11   WITH REGARD TO VOLUNTARY INTOXICATION REGARDING MR. LEON.

12             THE COURT:  OKAY.  HAVE A SEAT.  WE NEED TO TALK

13   ABOUT THAT.  WELL, THERE HAS BEEN TESTIMONY FROM

14   MR. RODRIGUEZ THAT MR. LEON DID INGEST THE DATE RAPE DRUG,

15   FIVE DATE RAPE DRUGS, HALF OF A RACK, AS WELL AS TWO 40 OUNCE

16   BEERS AND SOME CORONAS, WHICH WOULD SEEM TO WARRANT GIVING

17   THAT AS TO BOTH DEFENDANTS.  AND SO MS. ROACH, DO YOU WISH TO

18   BE HEARD ON THAT?

19             MS. ROACH:  YES, YOUR HONOR.  PEOPLE DISAGREE.

20   WHAT MR. LEON HAS TESTIFIED TO IS THAT HE, HIMSELF --

21             MR. LEAHY:  MR. LEON DID NOT TESTIFY.

22             MS. ROACH:  I'M SORRY.  MR. RODRIGUEZ HAS TESTIFIED

23   TO WAS THAT HE HIMSELF WAS IMPAIRED.  HE WAS NOT SEEING

24   THINGS OR HEARING THINGS CLEARLY.  HIS PERCEPTION WAS

25   DISTORTED.  THERE'S BEEN ABSOLUTELY NO EVIDENCE AS TO WHAT

26   THE EFFECT WAS ON MR. LEON WHETHER OR NOT HE WAS INTOXICATED.

27   IT DOESN'T TALK ABOUT VOLUNTARY INGESTION.  IT TALKS ABOUT

28   INTOXICATION. *THERE'S BEEN NO EXPERT TESTIMONY REGARDING

1   WHAT THESE PILLS WOULD DO TO YOU, NO FOUNDATION THAT THEY

2   WERE IN FACT EVEN WHAT MR. RODRIGUEZ SAYS THEY WERE.  THERE'S

3   NO CHEMICAL ANALYSIS.  I THINK THAT THERE IS NO COMPETENT

4   EVIDENCE WHICH CAN BE USED TO SUPPORT MR. LEON'S TRYING TO

5   USE THAT PARTICULAR DEFENSE WITH THE STATE OF THE EVIDENCE AS

6   IT CURRENTLY SITS.

7           THE COURT:  OKAY.  MR. LEAHY.

8           MR. LEAHY:  YOUR HONOR, WE HAD -- WE'VE GOT

9   TESTIMONY FROM MR. RODRIGUEZ THAT HE PERSONALLY OBSERVED, AS

10  THE COURT INDICATED, PERSONALLY OBSERVED MR. LEON TAKING

11  FIVE OF THESE PILLS.  HE'S ALSO TESTIFIED THAT HE WAS HIGH.

12  HE TESTIFIED THAT HE'S TAKEN THEM MANY TIMES.  YOU TAKE TWO

13  OF THEM, THEN YOU'RE ALREADY LOOPED.  I THINK THE JURY CAN

14  REASONABLY CONCLUDE THAT IF SOMEBODY TAKES FIVE, THEY'RE IN

15  PRETTY BAD SHAPE.  HE TESTIFIED THAT HE TOOK HALF THE RACK,

16  FIVE, MR. LEON TOOK HALF THE RACK, FIVE.  HE TESTIFIED HOW

17  HIGH HE WAS AND HOW DIFFICULT HIS MEMORY IS REGARDING THE

18  EVENTS OF THAT EVENING BECAUSE OF THE DRUGS THAT HE TOOK.  HE

19  TESTIFIED THAT HE SAW HIM DRINK TWO 40 OUNCE BOTTLES OF BEER

20  AND SOME CORONAS.  I THINK THE JURY CAN TAKE THAT

21  INFORMATION.  I THINK WE HAVE THE RIGHT TO TELL THEM THAT IF

22  THEY FIND IT THAT -- I THINK THAT THE JURY SHOULD BE

23  INSTRUCTED JUST AS MR. RODRIGUEZ WILL BE INSTRUCTED REGARDING

24  HIS SITUATION THAT THEY CAN TAKE INTO CONSIDERATION VOLUNTARY

25  INTOXICATION.

26          THE COURT:  OKAY.  MR. SANCHEZ, DO YOU WISH TO BE

27  HEARD OR NOT?

28          MR. SANCHEZ:  NO, YOUR HONOR.

1        THE COURT:  OKAY.  BASED ON THE EVIDENCE PRESENTED

2    INCLUDING THE ADMISSION DURING THE TRIAL, THE COURT WILL FIND

3    TRUE THE STRIKE PRIOR ALLEGATION THAT MR. RODRIGUEZ WAS

4    CONVICTED ON APRIL 22ND, 1999, OF PENAL CODE SECTION 459 IN

5    SAN DIEGO SUPERIOR COURT, COURT NUMBER SCD142327.

6        ANYTHING FURTHER?

7        MS. ROACH:  NO, YOUR HONOR.

8        MR. SANCHEZ:  NO, YOUR HONOR.  I JUST WOULD LIKE TO

9    INQUIRE AS TO THE SENTENCING DATE?

10        THE COURT:  YES.  HIS SENTENCING DATE IS CURRENTLY

11   SET FOR SEPTEMBER 15TH.  AND MR. LEAHY -- SINCE YOU WERE GONE

12   AND YOU HAD WAIVED YOUR PRESENCE, INDICATED THAT ON THAT DATE

13   SEPTEMBER 15TH, THERE MAY BE A MOTION FOR NEW TRIAL OR

14   SIMILAR MOTIONS.  AND IF THERE WAS SUCH A MOTION FILED, THEN

15   THAT DATE WOULD BY VACATED, AND THEN A NEW DATE OF OCTOBER

16   14TH WOULD BE SET.  SO IT'S BASICALLY A CONTINGENT DATE.

17   IT'S ONE OF THOSE TWO DATES DEPENDING ON WHETHER A --

18        MR. SANCHEZ:  SEPTEMBER 15TH?

19        THE COURT:  SEPTEMBER 15TH.

20        MR. SANCHEZ:  AT WHAT TIME?

21        THE COURT:  AT 9 O'CLOCK IN THIS DEPARTMENT.

22        MR. SANCHEZ:  OKAY.  I'M IN FEDERAL COURT THAT

23   MORNING.  BUT I SORT OF ANTICIPATE THERE MIGHT BE A MOTIONS,

24   SO I'M NOT SURE.

25        THE COURT:  HOW ABOUT OCTOBER 14TH?

26        MR. SANCHEZ:  OCTOBER 14TH.  I WANTED TO MEET WITH

27   HIM.

28        THE COURT:  RIGHT.  I WOULD SPECULATE THAT YOU AND

1                                                                1005-1100

2    MR. LEAHY WOULD CONFER ABOUT ANY MOTIONS TO FILE AND SO

3    FORTH.

4             MR. SANCHEZ:  SURE.  WOULD THAT BE IN THE MORNING,

5    YOUR HONOR, OCTOBER 14TH?

6             THE COURT:  YES, OCTOBER 14TH WOULD ALSO BE 9 A.M.

7    IN THIS DEPARTMENT.

8             MR. SANCHEZ:  OKAY.  THAT'S FINE, YOUR HONOR.

9    THANK YOU.

10            THE COURT:  OKAY.  THANK YOU VERY MUCH.

11            MS. ROACH:  SO ARE WE SETTING THE SEPTEMBER DATE OR

12   THE OCTOBER DATE?

13            THE COURT:  WELL, WE SET BOTH DATES BECAUSE

14   SEPTEMBER 15 WOULD BE THE REGULAR SENTENCING DATE.  BUT IF

15   THERE'S A DEFENSE MOTION, THEN IT WOULD BE KICKED OVER TO

16   OCTOBER 14TH.

17            MS. ROACH:  ALL RIGHT.  THANK YOU.

18            THE COURT:  OKAY.

19            MS. ROACH:  THANK YOU, YOUR HONOR.

20            THE COURT:  THANK YOU.

21            (AT 10:12 A.M. AN ADJOURNMENT WAS TAKEN UNTIL

22            OCTOBER 14TH, 2003.)

23                          - - -

24            (THIS PAGE DESIGNATED 1005-1100 FOR BLOCK-NUMBERING

25            PURPOSES ONLY.  PROCEEDINGS CONTINUE ON PAGE 1101.

26            NOTHING OMITTED.)

27

28

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 73 of 100
1101
Case 2:08-cv-02310-JVS-SS    Document 1-9    Filed 04/08/2008    Page 48 of 50

1          CHULA VISTA, CALIFORNIA, TUESDAY, OCTOBER 14, 2003

2

3          THE COURT:  GOOD MORNING, EVERYONE.

4          MS. ROACH:   GOOD MORNING, YOUR HONOR.

5          MR. SANCHEZ:   GOOD MORNING, YOUR HONOR.

6          THE COURT:  ALL RIGHT.  CALLING THE CASE OF PEOPLE

7    VERSUS JAVIER RODRIGUEZ, CASE SCS176087.

8          MS. ROACH:   SOPHIA ROACH APPEARING ON BEHALF OF THE

9    PEOPLE.

10         MR. SANCHEZ:   BEN SANCHEZ ON BEHALF OF JAVIER

11   RODRIGUEZ WHO IS PRESENT BEFORE THE COURT IN CUSTODY.

12         THE COURT:   THE COURT HAS READ AND CONSIDERED THE

13   PROBATION REPORT AND THE SUPPLEMENTAL PROBATION REPORT AS WELL

14   AS THE DEFENSE STATEMENT IN MITIGATION AND THE ATTACHMENTS, ALL

15   OF THE LETTERS AND DOCUMENTS INCLUDING THE LETTER FROM DELANCY

16   STREET AND THE CERTIFICATES AND AT THIS TIME I WILL HEAR ANY

17   ADDITIONAL ARGUMENTS THAT YOU WISH TO MAKE.

18         MR. SANCHEZ:   YOUR HONOR, MR. RODRIGUEZ HAS HANDED

19   TO ME THIS MORNING THREE ADDITIONAL LETTERS THAT HE WOULD LIKE

20   THE COURT TO SEE.

21         THE COURT:  ALL RIGHT.

22         MR. SANCHEZ:   I DON'T HAVE COPIES, BUT THEY'RE

23   LETTERS FROM HIS MOTHER, ONE FROM HIS SISTER.

24         THE COURT:  THANK YOU.  ALL RIGHT.  THE COURT HAS

25   READ AND CONSIDERED THE THREE ADDITIONAL LETTERS.  THAT WILL BE

26   MADE PART OF THE FILE.

27         MR. SANCHEZ:   YOUR HONOR, THIS IS SOME WHAT OF A

28   TROUBLING CASE FOR ME IN TERMS OF ATTEMPTING TO ADDRESS THE

1    SENTENCING BECAUSE OF THE CONSEQUENCES OF THIS CASE.  AS IT

2    TURNS OUT, THE GANG ALLEGATIONS AS THEY ARE WRITTEN ARE TO ME

3    VERY TROUBLING IN THAT THE SITUATION THAT WE HAD IN THIS

4    PARTICULAR CASE MR. RODRIGUEZ IS ADMITTINGLY A FORMER GANG

5    MEMBER.  HE IS NO LONGER A GANG MEMBER.

6                   I THINK THE EVIDENCE WAS PRETTY SUFFICIENT IN

7    THAT REGARD UNDERSTANDING, OF COURSE, THAT FOR THIS ALLEGATION

8    HE DOESN'T EVEN HAVE TO BE A GANG MEMBER AND THAT HAS BEEN

9    SOMETHING THAT HAS BEEN VERY DIFFICULT FOR MR. RODRIGUEZ TO

10   UNDERSTAND.  I FIND THAT SOMEWHAT TROUBLING MYSELF.

11                   MR. RODRIGUEZ, ALTHOUGH HE DID MAKE THAT

12   MISTAKE, HE DID COMMIT A CRIME AND HE ADMITS IT AND HE IS

13   PREPARED TO FACE THE CONSEQUENCES OF IT.  HE -- HE AT SOME

14   POINT IN HIS LIFE, SOME FOUR OR FIVE YEARS AGO, DECIDED HE NO

15   LONGER WANTED ANY PART OF THE GANG LIFE AND HE -- HE ATTEMPTED

16   TO DO SOMETHING ABOUT IT.

17                   HE MOVED OUT OF THE NEIGHBORHOOD.  HE -- HE HAD

18   A WIFE AND TWO CHILDREN.  HE WORKED, SUPPORTED THE FAMILY,

19   LIVED WHAT MOST PEOPLE CONSIDERED A NORMAL LIFE, BUT HE STILL

20   MAINTAINED A DRUG PROBLEM AND THAT IS HOW I WOULD DESCRIBE  --

21   IF I HAD TO DESCRIBE THIS CASE IT WOULD BE MORE OF A DRUG CASE

22   AS OPPOSED TO A GANG CASE, AND MR. RODRIGUEZ HAS DONE -- SINCE

23   HE'S IN CUSTODY A LOT OF THINGS HAVE HAPPENED TO HIM MENTALLY.

24                   HE'S VERY FEARFUL OF LOOSING HIS FAMILY, HIS

25   WIFE AND HIS TWO CHILDREN.  HE HAS ATTEMPTED TO DO EVERYTHING

26   HE COULD TO SOMEHOW TURN HIS LIFE AROUND AND HE EVEN STARTED

27   THAT BEFORE HE CAME INTO CUSTODY, BUT BECAUSE OF THE WAY THE

28   LAW IS WRITTEN NOW AND BECAUSE OF -- I UNDERSTAND WE HAVE

1   SEVERAL PROBLEMS WITH THE LEGISLATURE TO WORK WITH AND THEY

2   DRAFT AS MANY NEW LAWS AS POSSIBLE, BUT IT IS SORT OF -- IT

3   SORT OF ENCOMPASSES EVERYBODY AND THERE IS NO OUTS.

4            THERE IS NO -- THERE IS NO WAY FOR SOMEBODY

5   LIKE MR. RODRIGUEZ WHO FELL BACK, MADE A MISTAKE.  NOW, IT IS

6   TRUE THAT HE PROBABLY SHOULD NOT BE WITH HIS CO-DEFENDANT THAT

7   NIGHT AND AS IT TURNS OUT MAY HAVE EVEN BEEN A WORSE SITUATION

8   THAN FIRST THOUGHT.

9            HOWEVER, I THINK IT IS VERY UNDERSTANDABLE WHEN

10  MR. RODRIGUEZ' MOTHER AND FATHER REMAIN LIVING WHERE THEY HAVE

11  ALWAYS LIVED IN SAN YSIDRO THAT HE WILL BE BACK IN THE

12  NEIGHBORHOOD AT THE VERY MINIMUM TO VISIT HIS MOTHER ON

13  MOTHER'S DAY.  THERE IS NOTHING UNREASONABLE ABOUT THAT.

14           I THINK IN THIS CASE WHAT I'M ASKING THE COURT

15  TO DO IS TO LOOK AT THE CONDUCT OF MR. RODRIGUEZ IN THIS CASE

16  AND SENTENCE HIM BASED ON THAT AS OPPOSED TO WHAT TONS OF

17  ALLEGATIONS AND ENHANCEMENTS CAN DO FOR HIM OR WOULD DO FOR

18  HIM.

19           I WOULD LIKE TO THINK THAT MR. RODRIGUEZ IS NOT

20  ENDING HIS LIFE AT THIS POINT BECAUSE OF THIS CASE.  I WOULD

21  LIKE TO SEE HIM AT SOME POINT IN THE FUTURE HAVE ANOTHER CHANCE

22  AND SOMETIME HAVE A FAMILY BECAUSE I THINK THAT HE IS  -- AT

23  THIS POINT IN HIS LIFE HAS HEARD ENOUGH AND KNOWS ENOUGH AND IS

24  STRONG ENOUGH NOW TO NEVER HAVE TO GO BACK TO THAT LIFE STYLE

25  AGAIN.

26           MR. RODRIGUEZ WOULD ALSO LIKE TO ADDRESS THE

27  COURT ON HIS OWN BEHALF AND POINT OUT SOME CERTAIN FACTORS HE

28  THINKS THE COURT SHOULD CONSIDER.

1    THE COURT:  ALL RIGHT.  I'LL HEAR FROM MR. RODRIGUEZ.

2    THE DEFENDANT:  STAND UP?

3    THE COURT:  GO AHEAD.

4    THE BAILIFF:  YOU CAN SIT DOWN.

5    THE DEFENDANT:  YOUR HONOR, AS MR. SANCHEZ WAS

6  EXPLAINING, YOU KNOW, THESE LAST FIVE MONTHS HAVE BEEN THE

7  LONGEST FIVE MONTHS IN MY ENTIRE LIFE.  FOR THE FIRST TIME IN

8  MY LIFE I'M AWAY FROM MY WIFE AND MY TWO KIDS, ESPECIALLY MY

9  OLDER SON THAT I SO MUCH GREW ATTACHED TO AND I'M FRUSTRATED

10  AND I'M DISAPPOINTED FOR THE OUTCOME OF THIS TRIAL AND

11  ALLEGATIONS, YOU KNOW, AND FOR MANY REASONS AS FAR AS THE GANG

12  ALLEGATIONS, YOUR HONOR, I TOTALLY DISAGREE.

13    YOU KNOW, WHEN I WAS INCARCERATED IN '98 I WAS

14  TIRED OF LIVING THAT LIFESTYLE.  I WAS TIRED OF JUST -- I WAS

15  PHYSICALLY JUST TIRED LIVING LIKE THAT.  WHEN I WAS RELEASED IN

16  '99 I GOT TOGETHER WITH MY GIRLFRIEND.  THAT WAS MY WIFE AND,

17  YOU KNOW, DECIDED I NEEDED TO DO SO SOMETHING ABOUT IT.

18    SO I MOVED AWAY FROM THE NEIGHBORHOOD AS FAR AS

19  I COULD AND CONTINUED WORKING MAINTAINING MY FAMILY, YOU KNOW,

20  FINANCIALLY AND BEING JUST A PART OF THEIR LIFE AS FAR AS ME

21  BEING WITH MY CHILDREN ALL THE TIME, YOU KNOW, AND I MAINTAINED

22  THOSE THINGS, YOUR HONOR, FOR THREE AND A HALF YEARS AND

23  DEVOTED BASICALLY MY TIME AND MY EFFORT TO MY FAMILY AND MY

24  WORK.

25    I DON'T SEE MYSELF BEING A GANG MEMBER.  I

26  CAN'T LIVE A LIFE LIKE THAT.  I UNDERSTAND THAT I USED TO BE A

27  GANG MEMBER, YOUR HONOR.  I DO ACCEPT THAT, BUT I LET THAT GO.

28  I WANTED TO LIVE A BETTER LIFE WITH MY FAMILY AND MYSELF AND

Case 3:08-cv-01007-H-CAB   Document 1-5   Filed 06/03/2008   Page 77 of 100
Case 2:08-cv-02310-JVS-SS   Document 1-10   Filed 04/08/2008   Page 2 of 19
1105

1   LIKE MR. SANCHEZ IS TRYING TO EXPLAIN IT IS TRUE.

2                    IT WAS JUST ONE NIGHT THAT I CONSUMED SO MUCH

3   DRUGS AND ABUSED ON IT.  I REALIZED IT COST ME SO MUCH GRIEF,

4   MY FAMILY, AND, YOU KNOW, IT HAS NOTHING TO DO WITH GANGS, YOUR

5   HONOR.  I HAD NO INTENTIONS OF DOING NOTHING TO HURT ANYBODY

6   OR, YOU KNOW, I JUST MESSED UP, YOU KNOW, AND I JUST NEED

7   ANOTHER CHANCE.

8                    THAT'S ALL.  THAT'S IT, YOUR HONOR.

9               THE COURT:  OKAY.  ANYTHING FURTHER, MR. SANCHEZ?

10              MR. SANCHEZ:  NO, YOUR HONOR.

11              THE COURT:  MS. ROACH?

12              MS. ROACH:  THANK YOU, YOUR HONOR.  YOUR HONOR, A

13  JURY SAT AND LISTENED TO THE EVIDENCE IN THIS CASE AND MADE

14  FINDINGS ON EACH OF THE COUNTS AND DETERMINED THAT THESE WERE

15  CRIMES THAT WERE COMMITTED FOR THE BENEFIT OF A CRIMINAL STREET

16  GANG.

17                    I DON'T BELIEVE THAT THIS IS THE APPROPRIATE

18  VENUE TO QUESTION THE PROPRIETARY OF THOSE LAWS.  THEY ARE

19  CLEARLY PUT INTO PLACE AND REACTION TO THE FACT THAT THERE IS

20  RANDOM VIOLENCE PERPETRATED BY GANG MEMBERS AGAINST MEMBERS OF

21  THE COMMUNITY WHICH IS BEYOND THAT OF OTHER CITIZENS AND THIS

22  CASE REALLY IS AN EXCELLENT EXAMPLE OF THAT.

23                    WE HAVE WHAT WOULD NORMALLY BE JUST A TYPICAL

24  VEHICLE THEFT OR PERHAPS A CAR BURGLARY PERHAPS SIMILAR TO ONE

25  THAT MR. RODRIGUEZ WAS INVOLVED IN PREVIOUSLY AND WHEN

26  WITNESSES COME FORWARD TO TRY AND PROTECT THE PROPERTY OF

27  ANOTHER A GUN IS PULLED OUT AND A SHOT IS FIRED.

28                    THAT CONDUCT I THINK IS EXACTLY WHAT WAS

1   CONTEMPLATED WHEN THE LEGISLATURE ENACTED PENAL CODE SECTION

2   186.22 AND PENAL CODE SECTION 12022.5.  WE DON'T WANT PEOPLE

3   OUT COMMITTING CRIMES FOR THE BENEFIT OF GANGS WHICH ARE

4   CLEARLY MORE VIOLENT THAN OTHER GROUPS WITHIN SOCIETY AND USING

5   FIRE ARMS TO DO SO.

6           ~~THE ONLY EVIDENCE THAT WE HAVE IN THIS CASE~~

7   ~~THAT THIS IS SOME TYPE OF DRUG INDUCED ABERRANT BEHAVIOR ON THE~~

8   ~~PART OF MR. RODRIGUEZ IS HIS OWN TESTIMONY~~, AND I THINK THE

9   COURT PROBABLY REMEMBERS WHAT THE QUALITY AND CHARACTER OF THAT

10  TESTIMONY WAS.  IT WAS POOR.  IT WAS POOR.

11          ~~HE CLEARLY WAS NOT TELLING THE TRUTH ABOUT WHAT~~

12  ~~HAD HAPPENED~~.  HE WAS WILLING TO INCULPATE HIMSELF TO A CERTAIN

13  DEGREE, BUT AT THE SAME TIME NOT WILLING TO INCULPATE HIS

14  CO-DEFENDANT.  HE BASICALLY MADE A VARIETY OF SELF-SERVING

15  STATEMENTS SO HE COULD ATTEMPT TO GET HIMSELF OUT OF THIS.

16          THE ARGUMENT THAT HE NO LONGER IS ACTIVE WITH

17  THE GANG I THINK ALSO SHOULD FALL ON DEAF EARS BECAUSE THE

18  REALITY IS THAT A NORMAL WORKING PERSON WHO HAS GOT CHILDREN

19  AND A WIFE AND A JOB DOES NOT ~~ALL OF A SUDDEN DECIDE TO DRINK~~

20  ~~BEER~~ ON THE STREET WITH HIS BUDDY, ~~OR A BUNCH OF DRUGS~~ THAT ARE

21  RANDOMLY HANDED TO HIM AND THEN GO OUT WITH A FIRE ARM IN HIS

22  VEHICLE AND AMMUNITION ALL OVER HIS CAR TO COMMIT THEFTS.

23          IT IS JUST ~~NOT NORMAL BEHAVIOR~~.  ~~MR. RODRIGUEZ~~

24  ~~MAY HAVE THE BENEFIT OF SOMETIME WITHOUT HAVING A VIOLATION~~, BUT

25  THE REALITY IS THAT ~~HIS PRIOR CRIMINAL HISTORY INCLUDES VERY~~

26  ~~VERY SIMILAR BEHAVIOR~~.  HE IS STEALING AUTO PARTS.  HE GETS

27  CAUGHT.  HE INTIMIDATES WITNESSES.

28          THIS IS BEHAVIOR THAT NEEDS TO BE STOPPED AND

*[handwritten in right margin: Not, huev- = in freq- ency]*

1    IT IS A LESSON OR MESSAGE THAT HE NEEDS TO SEND TO THIS

2    PARTICULAR GANG COMMUNITY WHICH THE COURT IS PROBABLY AWARE

3    AFTER THE RESULT OF THIS TESTIMONY IS VERY ACTIVE AND, IN FACT,

4    JUST TODAY WE'RE FILING A MURDER CASE THAT INVOLVES TWO OTHER

5    SAN YSIDRO GANG MEMBERS.

6              THIS IS AN ACTIVE VIOLENT GANG.  YOUR HONOR, I

7    WOULD REQUEST THAT YOU FOLLOW THE PROBATION OFFICER'S

8    RECOMMENDATION.  THERE IS NO JUSTIFICATION TO DEVIATE FROM THE

9    MIDDLE TERM.  THERE IS NO MITIGATION WITH THE DEFENDANT WITH A

10   CRIMINAL HISTORY.  HE HAS A STRIKE.

11             HE USED A WEAPON.  HE FIRED THE WEAPON.  BASED

12   ON ALL OF THOSE FACTORS I THINK THAT WHAT PROBATOIN HAS

13   RECOMMENDED IS WELL DESERVED.

14             THE COURT:  MR. SANCHEZ?

15             THE DEFENDANT:  YOUR HONOR, CAN I SAY SOMETHING, YOUR

16   HONOR?

17             THE COURT:  ALL RIGHT.

18             THE DEFENDANT:  YOU KNOW, I UNDERSTAND WHAT SHE IS

19   SAYING ABOUT MY PAST AND AS FAR AS BEING A PARENT AND DOING

20   THIS CRIME, YOUR HONOR.  I UNDERSTAND THAT.  I UNDERSTAND.  I

21   MADE A MISTAKE.  YOUR HONOR, I WOULD LIKE TO POINT OUT CERTAIN

22   THINGS.

23             AS FAR AS BENEFITTING FROM A GANG, WHY WOULD I

24   BENEFIT FROM A GANG THAT I'M NO PART OF NO MORE?  I'M PART OF

25   THE UNION.  I HAVE A PENSION PLAN.  I HAD BENEFITS FOR MYSELF,

26   MEDICAL, AND MY WIFE.  I HAVE ALL THIS GOING THAT I HAD, BUT

27   FOR THREE YEARS AND A HALF, YOUR HONOR, WHY WOULD I CONSIDER

28   LOOSING ALL THIS VALUE, YOUR HONOR, TO CONSIDER BENEFITTING

1    FROM SOMETHING THAT IS THE VALUE OF STEALING SOME PROPERTY OF A

2    CAR FOR A GANG THAT I'M NOT EVEN PART OF, YOUR HONOR.

3                    THAT MAKES NO SENSE, YOUR HONOR, AND AS FAR AS

4    EVERYTHING, JUST AMMUNITION BEING ALL OVER THE VEHICLE, I

5    WASN'T IN THE RIGHT STATE OF MIND.  I DIDN'T KNOW WHAT WAS

6    HAPPENING AND AS FAR AS THE ALLEGATION AS FAR AS LEAVING AND

7    SAYING THIS IS WHAT HAPPENED, I HAVE REALLY NO REMEMBRANCE OF

8    WHAT REALLY HAPPENED THAT NIGHT, YOUR HONOR, AND NOW IT COMES

9    OUT TO DRUG USE.

10                    I'M NOT HERE MAKING EXCUSES, YOUR HONOR.  I

11    KNOW I DID  -- I BROKE THE LAW, YOUR HONOR, BUT IT WASN'T

12    INTENTIONALLY DONE AND THIS IS JUST DONE BY A THEORY OR

13    ASSUMPTION BY THE D.A. SAYING THAT WHILE I WAS OUT THERE DOING

14    GANG ACTIVITY HE WAS OUT THERE DOING THIS, AND SHE IS TRYING TO

15    LINK ME WITH OTHER THINGS THAT I HAD NO PART OF, YOUR HONOR.

16                    AS FAR AS ME BEING -- YOU KNOW, ONE THING I

17    WOULD LIKE TO EXPLAIN AS FAR AS ME BEING CONTACTED BY THE

18    POLICE THAT IS TAKEN OUT OF CONTENT BECAUSE HERE I AM.  I'M

19    GOING TO VISIT MY MOTHER, YOUR HONOR, AND MY BROTHER IS STILL A

20    GANG MEMBER AND THEY HAVE FRIENDS OUT THERE AND DECIDED TO

21    CONSERVATE WITH HIM AND HERE IS A POLICE OFFICER AND HE ROLLS

22    BY.  HE DECIDES HE SEES A CRIME.

23                    HE WANTS TO KNOW WHAT IS GOING ON FOR NO REASON

24    AND ACCUSES ME.  SHE WANTS TO USE THAT.  WELL, THERE HAS BEEN

25    SOME GANG ACTIVITY HERE.  SO HE WANTS TO KNOW WHAT IS GOING ON.

26    SO HE TAKES DOWN INFORMATION.  I COOPERATE.  I HAVE NOTHING TO

27    HIDE, YOUR HONOR.  I'M DOING GOOD.

28                    SO I GAVE MY NAME AND THAT IS BEING USED

1                      CERTIFICATE OF REPORTER

2

3     STATE OF CALIFORNIA )
                          ) ss:
4     COUNTY OF SAN DIEGO )

5

6            THE PEOPLE OF THE STATE OF CALIFORNIA

7                            VS.

8                     JAVIER RODRIGUEZ

9                   CASE NO. SCS176087

10                    AUGUST 18, 2003

11                    1001 -- 1005-1100

12

13         I, IRENE PERKINS, CSR NO. 12727, A CERTIFIED SHORTHAND

14    REPORTER IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN

15    AND FOR THE COUNTY OF SAN DIEGO, HEREBY CERTIFY THAT I MADE A

16    SHORTHAND RECORD OF THE PROCEEDINGS HAD IN THE WITHIN CASE

17    AND THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE, AND

18    CORRECT TRANSCRIPTION OF THE PROCEEDINGS IN THIS CASE.

19         DATED THIS 22ND DAY OF DECEMBER, 2003.

20

21

22

23

24                        _____
                          IRENE PERKINS, CSR 12727
25

26

27

28

1          COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                    FOURTH APPELLATE DISTRICT

3                          DIVISION ONE

4        - - - - - - - - - - - - - - - - - - )
                                             )
5    PEOPLE OF THE STATE OF CALIFORNIA,       )
                                             )
6                    PLAINTIFF AND            )
                     RESPONDENT,              )
                                             )
7                                            )
             VS.                             )   NO. SCS176087
8                                            )
     JAVIER RODRIGUEZ,                        )   DO 43198
                                             )
9                                            )
                     DEFENDANT AND            )
10                   APPELLANT.               )
         - - - - - - - - - - - - - - - - - - )

11

12

13        APPEAL FROM THE SUPERIOR COURT OF SAN DIEGO COUNTY

                        SOUTH COUNTY DIVISION

14   BEFORE THE HONORABLE ESTEBAN HERNANDEZ, JUDGE PRESIDING

15                REPORTER'S TRANSCRIPT ON APPEAL

16                     VOLUME 8   1101-1115

17                     OCTOBER 14, 2003

18

19   APPEARANCES:

20   FOR THE PLAINTIFF          BILL LOCKYER
     AND RESPONDENT:            STATE ATTORNEY GENERAL
21                             1515 K STREET
                               SACRAMENTO, CA  95814
22
     FOR THE DEFENDANT          IN PROPRIA PERSONA
23   AND APPELLANT:

24

25

26                             MELANIE LEITER-HIRSCHORN
                               CSR NO. 4740
27                             OFFICIAL REPORTER
                               SAN DIEGO, CALIFORNIA

28

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF SAN DIEGO

3

4     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

      PEOPLE OF THE STATE OF CALIFORNIA,        )

5                                               )

                       PLAINTIFF,               )      NO. SCS176087

6                                               )

             VS.                                )

7                                               )

      JAVIER RODRIGUEZ,                          )

8                                               )

                       DEFENDANT.               )

9                                               )

      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

10                        REPORTER'S TRANSCRIPT

11                      CHULA VISTA, CALIFORNIA

12                        OCTOBER 14, 2003

13

14    APPEARANCES:

15    FOR THE PEOPLE:          SYLVIA ROACH
      SOCIAL SERVICES:         DEPUTY DISTRICT ATTORNEY

16

      FOR THE DEFENDANT:       BEN SANCEHZ
17                             ATTORNEY AT LAW

18

19

20

21

22

23

24

25                                  MELANIE HIRSCHORN
                                    CSR 4740
26                                  OFFICIAL REPORTER
                                    SAN DIEGO, CALIFORNIA
27

28

1   AGAINST ME NOW AND IS TAKEN OUT OF CONTEXT.  I'M NOT SAYING

2   THAT I'M DOING GANG ACTIVITY THERE.  I'M NOT INVOLVED IN

3   NOTHING.  THEY'RE JUST SAYING THAT I'M JUST  -- I'M JUST --

4   I'M JUST SEEN WITH ANOTHER GANG MEMBER AND THE SAME THING AS ME

5   JUST WALKING DOWN THE STREET AND ME BUMPING INTO AN OLD FRIEND,

6   YOUR HONOR, AND IT IS JUST TAKEN OUT OF CONTEXT.

7          SO WE HAVE ALL THESE SITUATIONS AND SHE IS

8   MAKING SOMETHING UP AND SHE PUTS OUT THIS IS INVOLVING A GANG

9   AND IT IS JUST A THEORY, YOUR HONOR.  IT IS JUST A THEORY, AN

10  ASSUMPTION.  THE REAL FACT IS, YOUR HONOR, THAT I KNOW WHAT I

11  DID THAT NIGHT.  I APOLOGIZE FOR THAT.

12          IF I DIDN'T HAVE REAL RECOGNITION TO REMEMBER

13  SPECIFICALLY WHAT HAPPENED, OF COURSE, NOT.  ~~INCLUDED~~

14  ~~INTOXICATED~~ YOUR HONOR.  ~~THIS IS WHAT THIS DRUG DOES TO YOU~~.

15  AS FAR AS WHAT IT REALLY DOES TO YOU MENTALLY YOU'RE NOT OF THE

16  SAME MIND.  I UNDERSTAND THAT, YOUR HONOR.

17          I UNDERSTAND THAT, YOUR HONOR.  I WOULD LIKE TO

18  ONCE AGAIN ADDRESS THE COURT.  I'M NOT MAKING AN EXCUSE, YOUR

19  HONOR.  I'M JUST SAYING THAT ~~I HAVE A PROBLEM WITH DRUGS~~.  I

20  REALIZE THAT.  I UNDERSTAND I WAS GOING OUT THERE.  I NEED TO

21  SEEK HELP.

22          THE REASON WHY I DROPPED THE DRUG CLASS OUT

23  THERE I DIDN'T WANT TO LOOSE A JOB.  TO ME THAT WAS A CONCRETE

24  THING.  I SHOULD GO.  I DO HAVE A PROBLEM.  I ACCEPT THAT TO

25  THIS DAY.  I DO ACCEPT THAT I DO HAVE A PROBLEM AND I JUST NEED

26  HELP, YOUR HONOR.  THAT IS ALL.

27          I'M ASKING FOR HELP.  I'M ASKING FOR

28  OPPORTUNITY TO CHANGE.  I UNDERSTAND THE D.A.  SHE HAS

1   PAPERWORK IN FRONT OF HER OF MY HISTORY AND SHE GOES BY THAT,

2   BUT THERE IS MORE TO IT, YOUR HONOR.  THERE IS MORE TO REALLY

3   LOOK INTO.

4          IT'S WHAT REALLY HAPPENED.  I LET THAT GO, YOUR

5   HONOR.  I LET THAT GANG LIFE GO. I REGRET IT.  I REGRET FOR

6   DOING THIS CRIME.  I WANT TO CHANGE AND IT HAS NOTHING TO DO

7   WITH GANGS, JUST THE WAY I'M THINKING, THE CHOICES THAT I'M

8   MAKING, MY THINKING PROCESS.

9          I NEED TO VALUE MY FAMILY AND GOING THROUGH THE

10  PROGRAMS HELP ME REALIZE SO MANY THINGS, YOUR HONOR.  I WANT TO

11  CONTINUE TO GO TO THESE PROGRAMS.  I JUST ASK THE COURT NOT TO

12  GIVE UP ON ME, YOUR HONOR.

13         THANK YOU.

14      THE COURT:  THANK YOU.  ANYTHING FURTHER,

15  MR. SANCHEZ?

16      MR. SANCHEZ:   YOUR HONOR, JUST BRIEFLY.  HE TALKS

17  ABOUT NORMAL, WHAT THE NORMAL PERSON DOES.  I ONLY SUBMIT TO

18  THE COURT THAT ~~WHEN SOMEONE IS UNDER THE INFLUENCE OF NARCOTICS~~

19  ~~OR DRUGS, SELDOM IS THEIR CONDUCT NORMAL.~~  THE DA THINKS THAT

20  ~~EVERYTHING THAT HAPPENED IN THIS CASE WAS CONSISTENT WITH~~

21  ~~PEOPLE WHO ARE UNDER THE INFLUENCE OF DRUGS.~~

22         I DON'T THINK -- I DON'T KNOW HOW THAT CAN EVEN

23  BE DISPUTED REALLY.  ~~THE ONLY THING WE HAVE TO GO BY WAS HIS~~

24  ~~TESTIMONY,~~ ~~THE PSYCHIATRIST ON CALL, THE BEHAVIOR~~ WAS

25  CONSISTENT WITH PEOPLE UNDER THE INFLUENCE OF DRUGS AND THINGS

26  THAT PEOPLE DO WHILE UNDER THE INFLUENCE OF DRUGS IS NORMAL.

27         EVERYTHING IS RATIONALIZED WHEN PEOPLE ARE

28  UNDER THE INFLUENCE OF DRUGS.  SO I FIND THAT THE MOST POWERFUL

*[handwritten margin notes:]* failed to subpoena Xpert. W...

*[handwritten margin note:]* gave cause to invk. the test. of an Xpert

Case 3:08-cv-01007-H-CAB   Document 1-5   Filed 06/03/2008   Page 86 of 100
Case 2:08-cv-02310-JVS-SS   Document 1-10   Filed 04/08/2008   Page 11 of 19
1111

1   FACTOR IN THIS CASE IS ~~THAT THEY WERE UNDER DRUGS~~.

2   UNFORTUNATELY -- UNFORTUNATELY HE DIDN'T SEE IT THAT WAY.  IT

3   TURNED OUT TO BE AN OFFENSE.

4          IT CERTAINLY WAS A HIGHLY MITIGATING FACTOR IN

5   THIS CASE IN MY OPINION.  I ASK THE COURT TO TAKE THAT INTO

6   CONSIDERATION IN THE SENTENCE.

7          THE COURT:  OKAY.  THANK YOU.  PROBATION WILL BE

8   DENIED.  THE DEFENDANT IS STATUTORILY INELIGIBLE FOR PROBATION

9   UNDER PENAL CODE SECTION 1203.06 SUBDIVISION (A) (1) AND ALSO

10  PENAL CODE SECTION 667 (B) THROUGH (I).  THE COURT WILL FOLLOW

11  THE RECOMMENDATION OF PROBATION AND SENTENCE AS FOLLOWS.

12  ~~ON COUNT 2~~, WHICH IS ~~PENAL CODE SECTION 136.1~~

13  (B)(1)THE MIDDLE TERM OF ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ BUT BECAUSE

14  OF THE STRIKE PRIOR UNDER PENAL CODE SECTION 667(B) THROUGH (I)

15  THAT WILL BE ~~DOUBLED TO FOUR YEARS FOR THE GANG ALLEGATION~~ OF

16  PENAL CODE SECTION ~~186.22 SUBDIVISION (B)(1)~~ WHICH IS ~~ATTACHED~~

17  ~~TO COUNT TWO~~.

18          THE COURT WILL IMPOSE A CONSECUTIVE TERM OF

19  FIVE YEARS.  FOR THE PERSONAL USE OF A FIRE ARM ALLEGATION

20  UNDER PENAL CODE SECTION 12022.5 SUBDIVISION (A)(1) THE COURT

21  WILL IMPOSE A CONSECUTIVE TERM OF FOUR YEARS WHICH IS THE

22  MIDDLE TERM.

23          FOR COUNT 1 WHICH IS PENAL CODE SECTION 459

24  ONE-THIRD OF THE MID TERM WILL BE IMPOSED.  SO IT IS EIGHT

25  MONTHS DOUBLED TO 16 MONTHS BECAUSE OF THE STRIKE PRIOR

26  ALLEGATION FOR A TOTAL OF 16 MONTHS WHICH WILL BE IMPOSED

27  CONSECUTIVELY.

28          THE GANG ALLEGATION OF PENAL CODE SECTION

Case 3:08-cv-01007-H-CAB    Document 1-50    Filed 06/03/2008    Page 87 of 190
Case 2:08-cv-02310-JVS-SS    Document 1-50    Filed 04/08/2008    Page 92 of 190
1112

1    186.22 SUBDIVISION (B)(1) WHICH IS ATTACHED TO COUNT 1 IS THREE

2    YEARS WHICH IS STAYED PURSUANT TO PENAL CODE SECTION 654.  WITH

3    REGARD TO COUNT 3 WHICH IS THE PENAL CODE SECTION 12025

4    SUBDIVISION (B)(3) COUNT THE MIDDLE TERM OF FOUR YEARS WILL BE

5    IMPOSED AND STAYED PURSUANT TO PENAL CODE SECTION 654.

6              THE GANG ALLEGATION ON PENAL CODE SECTION

7    186.22 SUBDIVISION (B)(1) WHICH IS ATTACHED TO COUNT 3 IS THE

8    MIDDLE TERM TWO YEARS WHICH IS STAYED PURSUANT TO PENAL CODE

9    SECTION 654.  WITH REGARD TO COUNT 4 THE MIDDLE TERM OF FOUR

10   YEARS IS IMPOSED AND STAYED PURSUANT TO PENAL CODE SECTION 654.

11             THE GANG ALLEGATION IN PENAL CODE SECTION

12   186.22 SUBDIVISION (B)(1) WHICH IS ATTACHED TO COUNT 4 IS THREE

13   YEARS.  THAT WILL BE STAYED PURSUANT TO PENAL CODE SECTION 654.

14   ACCORDINGLY, DEFENDANT'S TOTAL TERM IS 14 YEARS AND FOUR

15   MONTHS.

16             HIS CREDITS ARE AS FOLLOWS.  156 ACTUAL WITH 23

17   DAYS OF CREDIT UNDER PENAL CODE SECTION 2933.1 FOR A TOTAL OF

18   179 DAYS CREDIT.  DEFENDANT IS ORDERED TO PAY RESTITUTION FINE

19   PURSUANT TO PENAL CODE SECTION 1202.4 SUBDIVISION (B) IN THE

20   AMOUNT OF $10,000 FORTHWITH OR AS PROVIDED IN PENAL CODE

21   SECTION 2085.5.

22             DEFENDANT IS ORDERED TO PAY AN ADDITIONAL FINE

23   OF $10,000 PURSUANT TO PENAL CODE SECTION 1202.45 SUSPENDED

24   UNLESS PROBATION IS REVOKED.  DEFENDANT IS ORDERED TO PAY

25   DIRECT RESTITUTION TO THE VICTIM DEBRA TUCKER IN THE AMOUNT OF

26   $250.

27             THIS RESTITUTIO TO DEBRA TUCKER IS ORDERED TO

28   BE PAID PRIOR TO PAYING ANY OTHER FINE OR RESTITUTION AND IS

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 90 of 100
Case 2:08-cv-02310-JVS-SS    Document 1-10    Filed 04/08/2008    Page 13 of 19
1113

1    ORDERED TO BE PAID JOINTLY AND SEVERELY WITH CO-DEFENDANT JOSE

2    LEON.

3            MR. RODRIGUEZ, IT IS MY DUTY AT THIS TIME TO

4    ADVISE YOU OF YOUR APPEAL RIGHTS.  YOU HAVE THE ABSOLUTE RIGHT

5    TO APPEAL FROM THE JUDGMENT OF THIS COURT IN IMPOSING SENTENCE

6    ON YOU TODAY.  THAT MEANS IF YOU WISH TO APPEAL, YOU MUST FILE

7    A WRITTEN NOTICE OF YOUR INTENTION TO APPEAL WITHIN 60 DAYS

8    FROM TODAY.

9            AN APPEAL NOT FILED WITHIN 60 DAYS SHALL BE

10    VOID AND OF NO AFFECT.  THE NOTICE MUST BE IN WRITING AND

11    SIGNED BY YOU OR YOUR ATTORNEY OR BY BOTH OF YOU.  IT MUST

12    SPECIFY WHAT YOU ARE APPEALING FROM AND WHETHER IT IS THE WHOLE

13    JUDGMENT OR JUST PART OF THE JUDGMENT.

14            IF YOU APPEAL AND DO NOT HAVE THE FINANCIAL

15    ABILITY TO RETAIN THE SERVICES OF AN ATTORNEY TO REPRESENT YOU

16    ON APPEAL, THE APPELLATE AUTHORITIES WILL APPOINT COUNSEL TO

17    REPRESENT YOU IN THAT REGARD.  IT IS YOUR OBLIGATION TO KEEP

18    THE APPELLATE AUTHORITIES ADVISED AT ALL TIMES OF YOUR CURRENT

19    RESIDENTIAL ADDRESS SO THEY CAN BE IN CONTACT WITH YOU AND

20    ADVISE YOU OF YOUR APPOINTED COUNSEL.

21            PEOPLE MOVE TO DISMISS THE TROLLEY TICKET?

22    MS. ROACH:    YES, YOUR HONOR.

23    THE COURT:  THAT MOTION IS GRANTED.

24            ANYTHING FURTHER?

25    MR. SANCHEZ:    NOTHING FURTHER, YOUR HONOR.

26    MS. ROACH:    YOUR HONOR, I BELIEVE ON THE VICTIM

27    RESTITUTION IT SHOULD BE DONNA TUCKER AND I DO HAVE A CR 110

.8    FOR THAT.

1          THE COURT:  OKAY.  THAT WILL BE MODIFIED TO DONNA

2     TUCKER. OKAY.   THAT WILL BE THE ORDER.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 3:08-cv-01007-H-CAB    Document 1-5    Filed 06/03/2008    Page 93 of 100
Case 2:08-cv-02310-JVS-SS    Document 1-10    Filed 04/08/2008    Page 15 of 19
1115

1    STATE OF CALIFORNIA)

2                      )

3    COUNTY OF SAN DIEGO)

4

5              I, MELANIE HIRSCHORN, CERTIFICATE NO. 4740, A COURT

6    REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN

7    AND FOR THE COUNTY OF SAN DIEGO, HEREBY CERTIFY THAT I REPORTED

8    IN MACHINE SHORTHAND THE PROCEEDINGS IN THE WITHIN CASE, AND

9    THAT THE FOREGOING TRANSCRIPT, CONSISTING OF PAGES 1101 THROUGH

10   1114, IS A FULL, TRUE AND CORRECT TRANSCRIPTION OF THE

11   PROCEEDINGS IN THIS CASE.

12             DATED AT SAN DIEGO, CALIFORNIA, THIS _____ DAY

13   OF _____, _____ .

14

15

16

17

18

19

20                              _____

21                              MELANIE HIRSCHORN

22                              CSR NO. 4740

23                              SUPERIOR COURT REPORTER

24

25

26

27

28

**SHERRI R. CARTER**
District Court Executive
and Clerk of Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los Angeles, CA 90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

Tuesday, April 08, 2008

**JAVIER ESPINOZA RODRIGUEZ (V15361)**
**CALIFORNIA MENS COLONY**
**P.O. BOX 8101**
**SAN LUIS OBISPO CA 93409-8101**

Dear Sir/Madam:

A [X] Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number CV08- 2310 JVS (SS)

A [ ] Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case number and also assigned the civil case number

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:

[ ] District Court Judge ______________________

[X] Magistrate Judge **Suzanne H. Segal**

at the following address:

[X] U.S. District Court
312 N. Spring Street
Civil Section, Room G-8
Los Angeles, CA 90012

[ ] Ronald Reagan Federal
Building and U.S. Courthouse
411 West Fourth St., Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4750

[ ] U.S. District Court
3470 Twelfth Street
Room 134
Riverside, CA 92501

The Court must be notified within fifteen (15) days of any address change. If mail directed to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the case with or without prejudice for want of prosecution.

Very truly yours,

Clerk, U.S. District Court

By: MHERNAND
Deputy Clerk



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los
Angeles, CA 90012
Tel: (213) 894-3535

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**SHERRI R. CARTER**
District Court Executive
and Clerk of Court

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

Tuesday, April 08, 2008

JAVIER ESPINOZA RODRIGUEZ (V15361)
CALIFORNIA MENS COLONY
P.O. BOX 8101
SAN LUIS OBISPO   CA 93409-8101

Dear Sir/Madam:

Your petition has been filed and assigned civil case number      CV08- 2310 JVS (SS)

Upon the submission of your petition, it was noted that the following discrepencies exist:

☒ 1. You did not pay the appropriate filing fee of $5.00. Submit a cashier's check, certified bank check, business or corporate check, government issued check, or money order drawn on a major American bank or the United States Postal Service payable to 'Clerk U.S. District Court'. If you are unable to pay the entire filing fee at this time, you must sign and complete this court's Prisoner's Declaration In Support of Request to Proceed In Forma Pauperis in its entirety. The Clerk's Office will also accept credit cards (Mastercard, Visa, Discover, American Express) for filing fees and miscellaneous fees. Credit card payments may be made at all payment windows where receipts are issued.

☒ 2. The Declaration in Support of Request to Proceed in Forma Pauperis is insufficient because:

☐ (a) You did not sign your Declaration in Support of Request to Proceed in Forma Pauperis.

☒ (b) Your Declaration in Support of Request to Proceed in Forma Pauperis was not completed in its entirety.

☒ (c) You did not submit a Certificate of Prisoner's Funds completed and signed by an authorized officer at the prison.

☐ (d) You did not use the correct form. You must submit this court's current Declaration in Support of Request to Proceed in Forma Pauperis.

☐ (e) Other: _____

Enclosed you will find this court's current Prisoner's Declaration in Support of Request to Proceed in Forma Pauperis, which includes a Certificate of Funds in Prisoner's Account Form.

Sincerely,

Clerk, U.S. District Court

MHERNAND

By: _____

Deputy Clerk

FILED

2008 APR -8 PM 2:20

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| | CASE NUMBER |
| **JAVIER ESPINOZA RODRIGUEZ** | **CV08- 2310 JVS (SS)** |
| PLAINTIFF(S) | |
| V. | |
| **JOHN C MARSHALL, WARDEN** | **NOTICE OF REFERENCE TO A UNITED STATES MAGISTRATE JUDGE** (Petition for Writ of Habeas Corpus) |
| DEFENDANT(S) | |

Pursuant to General Order 07-02, the within action has been assigned to the calendar of the Honorable James V. Selna, U.S. District Judge. Pursuant to General Order 05-07, the within action is referred to U.S. Magistrate Judge Suzanne H. Segal, who is authorized to consider preliminary matters and conduct all further hearings as may be appropriate or necessary. Thereafter, unless the Magistrate Judge determines that an evidentiary hearing is required, the Magistrate Judge shall prepare a report and recommendation and file it with the Clerk of the Court which may include proposed findings of fact and conclusions of law where necessary or appropriate, and may include a proposed written order or judgment, which shall be mailed to the parties for objections.

Pleadings and all other matters to be called to the Magistrate Judge's attention shall be formally submitted through the Clerk of the Court.

The Court must be notified within fifteen (15) days of any address change. If mail directed by the clerk to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the petition with or without prejudice for want of prosecution.

Clerk, U.S. District Court

| | |
|---|---|
| April 8, 2008 | By    MHERNAND |
| Date | Deputy Clerk |



TIER ESPINOZA ROSRIGIGUEZ V-15361
CALIFORNIA MEN'S COLONY-EAST 5360
CMC-PRISON
P.O. BOX 8101
LUIS OBISPO, CA 93409-8101
"LEGAL MAIL"

APR - 3 2008

CLERK OF THE U.S. DISTRICT COURT FOR THE CENTRAL
DISTRICT OF CALIFORNIA
UNITED STATES COURTHOUSE
ATTN: INTAKE/DOCKET SECTION
312 NORTH SPRING STREET
LOS ANGELES, CA 90012

"LEGAL MAIL"

**FILED**

2008 APR -8 PM 2:20

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
AT LOS ANGELES

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER ESPINOZA RODRIGUEZ | CASE NUMBER |
| **PLAINTIFF(S)** | **CV08- 2310 JVS (SS)** |
| V. | |
| JOHN C MARSHALL, WARDEN | **NOTICE OF REFERENCE TO A UNITED STATES MAGISTRATE JUDGE** |
| **DEFENDANT(S)** | **(Petition for Writ of Habeas Corpus)** |

Pursuant to General Order 07-02, the within action has been assigned to the calendar of the Honorable James V. Selna, U.S. District Judge. Pursuant to General Order 05-07, the within action is referred to U.S. Magistrate Judge Suzanne H. Segal, who is authorized to consider preliminary matters and conduct all further hearings as may be appropriate or necessary. Thereafter, unless the Magistrate Judge determines that an evidentiary hearing is required, the Magistrate Judge shall prepare a report and recommendation and file it with the Clerk of the Court which may include proposed findings of fact and conclusions of law where necessary or appropriate, and may include a proposed written order or judgment, which shall be mailed to the parties for objections.

Pleadings and all other matters to be called to the Magistrate Judge's attention shall be formally submitted through the Clerk of the Court.

The Court must be notified within fifteen (15) days of any address change. If mail directed by the clerk to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the petition with or without prejudice for want of prosecution.

Clerk, U.S. District Court

| April 8, 2008 | By | MHERNAND |
|---|---|---|
| Date | | Deputy Clerk |

XTER ESPINOZA ROSRIGIGUEZ V-15361
LIFORNIA MEN'S COLONY-EAST 5360
TE PRISON
. BOX 8101
LUIS OBISPO, CA 93409-8101
"LEGAL MAIL"

APR - 3 2008

CALIFORNIA MEN'S COLONY
STATE PRISON
SAN LUIS OBISPO CA 93409

CLERK OF THE U.S. DISTRICT COURT FOR THE CENTRAL
DISTRICT OF CALIFORNIA
UNITED STATES COURTHOUSE
ATTN: INTAKE/DOCKET SECTION
312 NORTH SPRING STREET
LOS ANGELES, CA 90012

"LEGAL MAIL"

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Javier Espinoza Rodriguez

FILING FEE PAID  Yes  No
BY MOTION FILED
COPIES SENT TO
Court    Pro se

2254  1983

John C. Marshall

**FILED**
JUN - 3 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** San Luis Obispo
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Javier Espinoza Rodriguez
PO Box 8101
San Luis Obispo, CA 93409
V-15361

**ATTORNEYS (IF KNOWN)**

'08 CV 1007 H CAB

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)     FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

(nature of suit checkboxes; 530 Habeas Corpus General marked ☒)

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE _____ Docket Number _____

DATE   6/3/2008    SIGNATURE OF ATTORNEY OF RECORD